**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

ARTEC EUROPE S.À.R.L.,

                Plaintiff,

      v.

SHENZHEN CREALITY 3D
TECHNOLOGY CO., LTD., AND
KICKSTARTER, PBC,

              Defendants.

**Civil Action No.: 1:22-1676 (WFK)(VMS)**

**PLAINTIFF'S POST-HEARING BRIEF**

**PLAINTIFF'S POST HEARING BRIEF**

Pursuant to the Court's April 8, 2022 order, Plaintiff Artec Europe S.à.r.l. ("Artec") respectfully submits this Post-Hearing Brief and Sur-Reply to its Application for Temporary Restraining Order and Preliminary Injunction.

## A.        Preliminary Statement

Artec seeks a temporary restraining order and preliminary injunction that enjoins Kickstarter, PBC ("Kickstarter") from disbursing or transferring to Shenzhen Creality 3D Technology Co., LTD ("Creality") (or its affiliates and representatives) any funds raised through Kickstarter to purchase the Creality Lizard Scanner. Artec has persuasively demonstrated at this early stage of the litigation through its papers, witness and expert testimony, and documentary evidence that it has a likelihood of success on its copyright claims and well as its patent claims, or at a minimum, that it has raised serious questions going to the merits on its copyright claims.[1] Artec has also persuasively demonstrated that that it will be irreparably harmed without the requested injunction.

Notably, Kickstarter—the only party against whom Artec seeks the injunction—filed a five-page response brief and no supporting evidence. Creality asserts that its declarations controvert Artec's requested relief. However, Creality's declarations (primarily by a single individual) are riddled with misrepresentations, misstatements, factual inaccuracies, and unsupportable propositions, and as such, they fail to rebut Artec's overwhelming evidence.

---

[1] *See* Dkt. 4, 5, 26, 26-1 through 26-6, 28-1, 28-2, 29.  Creality has tried to assert that Artec limited its right to obtain preliminary relief to its copyright claims based on a statement in Artec's reply brief.  Artec made no such waiver.  The very same reply papers contained a detailed claim chart detailing and establishing Artec's patent infringement analysis.

Artec has demonstrated this Court has jurisdiction over both Creality and Kickstarter. Creality's contacts with New York are both substantial and purposeful. The defendants do not (and cannot) refute their connections to and contacts with New York, including the Terms of Service that govern their relationship, in which they agreed to litigate any disputes in New York.[2] Their relationship and concerted activity gives rise to and is implicated in Artec's claims against both Defendants. Creality responded in detail to Artec's substantive allegations, but did not otherwise dispute jurisdiction. Creality's only statement on jurisdiction is a footnote stating that Creality makes a "limited appearance" without waiving objections to service, process, jurisdiction, or venue.

Artec has demonstrated a strong case on its copyright based on the testimony of George Edwards PhD, Gleb Gusev, and multiple other witnesses. Artec has made a sufficient showing of its copyright infringement claim.[3] Gleb Gusev also described detailed examples of how Creality's CR-Scan 01 scanner and CR Studio software meet each and every requirement of claim 1 of U.S. Patent No. 7,768,656 (the '656 patent).[4] Creality has now submitted a supplemental declaration of Mr. Luowei proposing an alternative reason for the visual anomaly shared by Artec and Creality software. Even if this this alleged "anomaly" related to open source code, Artec has submitted sufficient evidence in support of its copying and infringement claim that show a sufficiently serious question as to copying Artec code.[5] And, Creality does not otherwise dispute Artec's remaining evidence submitted in support of infringement.

---

[2] *See* Corrected Reply at p. 2 [Dkt. 29]; *see* Ex. A-2, Terms of Use at ¶ 17 [enclosed herein as Ex. A-2].

[3] *See* Gusev Dec. at ¶¶ 4-40 [Dkt.4].

[4] *See* Gusev Dec. at Ex. A [Dkt. 26-2].

[5] *See* Gusev Dec. at ¶¶ 4-40 [Dkt. 4]; *See* Edwards Dec. at pp. 7-20 [Dkt. 26-4].

Despite Creality's and Kickstarter's arguments to the contrary, price erosion has been repeatedly recognized as a kind of irreparable harm which justifies the issuance of a preliminary injunction.[6] Artec has submitted ample evidence that it will be irreparably harmed absent the requested injunction, including evidence of price erosion and resetting consumer price expectations.[7] Artec has also presented compelling evidence that because Creality has no agents for service of process in the U.S. and would be impossible to enforce a judgment against, Artec also faces irreparable harm from an inability to meaningfully enforce its legal rights absent the requested injunction.[8]

During the April 8, 2022 hearing, Kickstarter conceded that regardless of *where* the funds went, it wished to "release" the funds:

```
                        Proceedings                    27

1   this to go on for another two weeks.  We want this, if at all
2   possible, we would like to see this resolved today.
3   Kickstarter would like to be out of this as quickly as
4   possible and we would like to be able to release the funds and
5   let the parties resolve their dispute.  But Kickstarter --
```

---

[6] *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001) ("Given the testimony of the likelihood of price erosion . . . we see no deficiency in the district court's finding of irreparable harm."); *Veeco Instruments Inc. v. SGL Carbon, LLC*, No. 17-CV-2217 (PKC), 2017 WL 5054711, at *27 (E.D.N.Y. Nov. 2, 2017) ("irreversible price erosion may constitute irreparable harm").

[7] *See e.g.,* Osipov Dec. at ¶¶ 37-42 [Dkt. 28-1]; Gusev Dec. at ¶¶ 36-38 [Dkt. 4].

[8] *Motorola, Inc. v. Abeckaser*, No. 07-CV-3963(CPS)(SMG), 2009 WL 1362833, at *4 (E.D.N.Y. May 14, 2009); *Pamlab, L.L.C. v. Macoven Pharms., L.L.C.*, 881 F. Supp. 2d 470, 476 (S.D.N.Y. 2012) (citing *See CRP/Extell Parcel I. L.P. v. Cuomo*,394 Fed.Appx. 779, 781 (2d Cir.2010) (some internal citations omitted).

Artec's relief requested at this stage is merely for the funds to remain in the United States (something that will not occur if the funds are released by Kickstarter), pending resolution of the case. This is not an onerous request and Creality has not demonstrated the balance of hardships weighs in its favor.[9]

For these reasons, Artec requests the court grant its request to enjoin Kickstarter from disbursing the funds to Creality and from allowing Creality to create a duplicative campaign marketing the same product.

**B.    The Court should enjoin Kickstarter from releasing the funds to Creality.**

**1.    Creality and Kickstarter are subject to jurisdiction in this Court.**

Kickstarter—the only party against whom Artec seeks the injunction—does not dispute it is subject to personal jurisdiction in this Court.

Creality is subject to jurisdiction in this Court. First, Creality submitted to the jurisdiction of the court by responding to Artec's motion, substantively participating in the proceedings, and appearing at the April 8 hearing.[10] Next, the Second Circuit has confirmed that the district court need only establish jurisdiction over the party to be enjoined.[11] Because the injunction seeks only to restrain *Kickstarter*, against whom the Court undoubtedly has jurisdiction, the question of jurisdiction against Creality is not determinative.

---

[9] In the alternative to its relief requested, Artec requests the Court order Kickstarter to deposit the disputed funds into the registry of the court.

[10] *TLC Vision (USA) Corp. v. Freeman*, No. 4:12CV01855 ERW, 2013 WL 2181267 (E.D. Mo. 2013) (finding waiver of personal jurisdiction through participation in a preliminary injunction proceeding).

[11] *See, NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230, 243 (2d Cir. 2013) ("Since the amended injunctions do not directly enjoin payment system participants, it is irrelevant whether the district court has personal jurisdiction over them."); *see also Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 134 (2d Cir. 2014) ("a district court can enforce an injunction against a nonparty such as BOC only if it has personal jurisdiction over that nonparty.").

Third, Creality has not (and cannot) dispute that it entered into a contract with Kickstarter, which is centered around and requires it to litigate in New York.[12] Regardless of whether it has shipped accused products to the United States, Creality fails to refute that sought and accepted a direct investment in its product from 4,000 individuals who reside in the United States (including New York), that it affirmatively sought out a campaign to raise funds through its relationship with Kickstarter in New York, and that it has availed itself of the privileges of doing business in New York (and the United States). Accordingly, Creality is subject to jurisdiction in this Court.

**2.    Artec has demonstrated a likelihood of success on the merits.**

**a.    The Court can grant Artec's relief on its copyright claims.**

Copyright infringement generally is established by showing "(a) that the defendant had access to the copyrighted work and (b) the substantial similarity of protectible material in the two works."[13] Artec has demonstrated—and Creality does not dispute—that Creality had access to Artec's software. Indeed, Luowei admits that Creality purchased and rented "numerous" scanners from Artec, which containted the software. Mr. Gusev explains at length the substantial similarity of the protectible material in Creality's software. Further, Artec's retained expert, Dr. Edwards opines that:

- Magic Wand and CR Studio exhibit an idiosyncratic, difficult-to-detect, and undesirable behavior (i.e., misbehavior) found in Artec Studio. This misbehavior is almost certainly caused by the same bug in the source code of all three applications. For the reasons explained in this report, the most plausible and apparent explanation for the existence of

---

[12] *See,* Ex. A-2, Terms of Use at ¶ 17 [enclosed herein as Exhibit A-2]; *See, e.g.*, *Envirocare Techs., LLC v. Simanovsky*, No. 11-CV-3458 (JS) (ETB), 2012 WL 2001443, at *3 (E.D.N.Y. June 4, 2012). ("As one court has stated: 'Sellers cannot expect to avail themselves of the benefits of the internet-created world market that they purposefully exploit and profit from without accepting the concomitant legal responsibilities that such an expanded market may bring with it.'")).

[13] *Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 412 (S.D.N.Y. 1999); *see also*, *Fisher–Price, Inc. v. Well–Made Toy Mfg. Corp.*, 25 F.3d 119, 122–23 (2d Cir.1994) ("In the context of deciding whether the defendant copied at all (as distinguished from whether it *illegally* copied), 'similarity' relates to the entire work, not just the protectible elements.") (alteration in original).

the bug in Magic Wand and CR Studio is that source code including the bug was copied from Artec Studio into Magic Wand and CR Studio.

- It is likely that the Magic Wand and CR Studio software contain decoding algorithm code that is a copy of, was derived from, or was written with reference to the Artec Studio decoding algorithm code for the Artec Eva scanner. The decoding algorithm is fundamental to the Artec Studio software's function and purpose.

- I confirmed that there are similarities in portions of the user interface as described in the Gusev Declaration. In my opinion, the similarity in the Workspace/Data Panel windows of Artec Studio, Magic Wand, and CR Studio would be unlikely to occur purely by chance.[14]

While Luowei attempts to muddy the water with his supplemental declaration by raising a question about the anomalous artifact, *this is only one example of the ample evidence Artec submitted in support of its copyright claim.*[15] And, Creality has failed to refute the remaining claims. Creality's attempt to refute the copyright claim fails.

### b. The Court can grant Artec's relief on its patent claims.

Creality argued in its opposition that Artec did not provide sufficient specificity on how its patent was infringed to establish a reasonable likelihood of success on the merits of its patent claim.[16] And, in its April 8, 2022 letter motion, Creality claims Artec renounced patent infringement in its reply as a potential basis for its TRO.[17] On the contrary, there, Artec provided a claim chart setting out in detail how Creality's scanners infringe Claim 1 of Artec's U.S. Patent 7,768,656 ('656 Patent).[18] Creality points to *Millipore Corp. v. WL. Gore & Associates, Inc.*, arguing that Artec cannot show a likelihood of success on the merits because it did not construe

---

[14] Edwards Dec. at p. 20 [Dkt. 26-4].

[15] Gusev Dec. at ¶¶ 9-37 [Dkt. 4]; Osipov Dec. at ¶¶ 7-13 [enclosed herein as Ex. C]; Edwards Dec. [Dkt. 26-4].

[16] Creality Opposition at p. 6 [Dkt. 20].

[17] Letter Motion [Dkt. 30] ("In reply, Artec conceded that its request for injuctive relief is based solely on its copyright claim.").

[18] *See* Gusev Dec. at Ex. A [Dkt. 26-2].

the scope of its terms.[19] But Creality fails to identify any terms within Claim 1 for which claim construction is necessary, or explain why these terms cannot be assigned their plain and ordinary meaning. Indeed, assigning all terms in Claim 1 their ordinary and customary meaning, as this Court can and should do,[20] the chart explains and establishes that Creality's scanner falls within the claim language by using Artec's patented system measuring the dimensionality of a physical object by projecting structured light onto the object being measured.[21] Creality fails to refute the natural breadth of Artec's short and readable patent claim.

> ### c. Kickstarter's argument on contributory liability rests on a misunderstanding of when infringement occurs.

Kickstarter claims that it cannot be contributorily liable for infringement because the Kickstarter campaign ended on March 12, 2022—the day after it received Artec's cease-and-desist letter, on March 11, 2022. Kickstarter reasons that it cannot have knowingly aided the infringement because—by the time it was aware of the allegations—no additional customers could purchase Creality scanners on Kickstarter. Thus, it concludes, any knowing conduct by Kickstarter cannot have caused any new infringement.

Kickstarter's argument misunderstands when infringement occurs in this case. Whereas in *Youtube*, infringement occurs solely when copyrighted material is broadcast on Youtube's website, here, infringement occurs—not *only* when a backer purchases the scanner through Kickstarter's

---

[19] 2011 WL 5513193 (D.N.J. 2011); *see* Creality Opposition at p. 6 [Dkt. 20].

[20] "In construing the claim language, the court must begin with the principle that 'the words of a claim are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (*quoting Vitronics*, 90 F.3d at 1582)). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id*. at 1314.

[21] *See* Gusev Dec. at Ex. A [Dkt. 26-2].

website—but when a backer receives the scanner in the mail and downloads a copy of the infringing software necessary to operate it (violating Artec's copyright).

Indeed, Kickstarter took numerous steps after receiving constructive notice of the infringement to materially aid Creality's infringement:

- On March 11, 2022, Kickstarter received constructive notice of the claims prior to the end of the campaign.[22] Kickstarter allowed the campaign to continue.

- On March 12, 2022, the campaign ended. Kickstarter did not begin collecting the funds from the project's backers until the campaign successfully closed, on March 12. Kickstarter did not cancel the campaign, refrain from collecting payments from its users, or return the payments it had collected, or even request any additional information from Artec to better assess its claims. *For the following 14 days, Kickstarter proceeded to collect the funds from all backers.[23]*

- On March 25, 2022, Artec filed its complaint and request for TRO and properly served Kickstarter. Kickstarter, however, did not respond to Artec's emails or take down the website.

- On March 28, 2022, this Court issued its Order to Show Cause for a Temporary Restraining Order and a Preliminary Injunction. At this time, Kickstarter first removed the campaign page from the website—notifying users that the campaign was subject to an IP dispute. At the same time, however, Kickstarter sent a private message to the campaign's backers reassuring them that they would receive their scanners: "the project already ended successfully," their "pledge hasn't been affected," and thus, Creality "should be able to . . .

---

[22] *See* Ex. A-1, Cease and Desist Letter [enclosed herein].

[23] *See* Greenspon Dec. at Exs. C-1, C-2 [Dkt. 28-2].

send any unfulfilled rewards."[24] *In other words, Kickstarter reassured the campaign's backers that they would receive their scanners so that they would not seek to cancel their orders.*

To the extent that Kickstarter wishes to argue that reassuring its backers did not materially aid the infringement, the allegation is contradicted by Declaration of Creality's Xun Luo, who explains that "*[g]iven the possibility of refunds*, the amount [collected through the Kickstarter campaign] may fluctuate."[25] Ultimately, unlike *Youtube*, who took all steps to end any infringement upon becoming aware of the allegations, Kickstarter has knowingly taken steps to materially aid infringement by: (1) allowing the campaign to close; (2) collecting funds from campaign backers over the following 14 days; (3) failing to respond to Artec to seek additional information (after this Court issued its Rule to Show Cause); and (4) emailing campaign backers encouraging them not to seek a refund.

Similarly, Kickstarter argues that enjoining Kickstarter from delivering the funds to Creality will not stop any infringement because the "sales" have already occurred. But this argument fails for the same reason. Infringement is not limited to the moment of sale. A new infringement occurs each time someone receives their scanner in the United States and downloads a copy of the infringing software.

### 3. Artec will suffer irreparable harm if the injunction is not granted.

Despite Creality's and Kickstarter's arguments to the contrary, price erosion has been repeatedly recognized as a kind of irreparable harm which justifies the issuance of a preliminary

---

[24] *See id.*

[25] Creality Luo Dec. at ¶ 9 [Dkt. 21].

injunction.[26] A plaintiff's "loss of pricing power resulting from the sale of inexpensive 'knock-offs' is, by its very nature, irreparable."[27] Where a plaintiff must reduce its prices to compete with an infringer, it suffers irreparable harm because "[r]equiring purchasers to pay higher prices after years of paying lower prices to infringers is not a reliable business option."[28] For example, in *Veeco*, the Eastern District of New York recognized that while a plaintiff "may be able to prove with requisite certainty its losses due to . . . price erosion in the past or near-term future," "the long-term and second-order effects of SGL Carbon's infringement . . . are not likely to be quantifiable with a requisite degree of certainty" and thus a preliminary injunction was warranted.[29]

Artec has submitted ample evidence that it will be irreparably harmed absent the requested injunction.[30] Specifically, the release of funds would irreparably harm Artec by: (1) resulting in irreconcilable price erosion; (2) allowing low-cost infringing products to enter the market; (3) resetting consumer price expectations; (4) causing a loss of market share; (5) forcing Artec to drastically change its pricing structure; (6) allowing Creality to sell or license the products to

---

[26] *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001) ("Given the testimony of the likelihood of price erosion . . . we see no deficiency in the district court's finding of irreparable harm."); *Veeco Instruments Inc. v. SGL Carbon, LLC*, No. 17-CV-2217 (PKC), 2017 WL 5054711, at *27 (E.D.N.Y. Nov. 2, 2017) ("irreversible price erosion may constitute irreparable harm").

[27] *Mint, Inc. v. Amad*, No. 10 CIV. 9395 SAS, 2011 WL 1792570, at *3 (S.D.N.Y. May 9, 2011).

[28] *See Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 976 (Fed. Cir. 1996); *Bushnell, Inc. v. Brunton Co.*, 673 F. Supp. 2d 1241, 1262–63 (D. Kan. 2009) (granting injunction based on price erosion because plaintiff showed "that raising prices if the infringing products are withdrawn is probably not possible.").

[29] *Veeco Instruments Inc.*, 2017 WL 5054711, at *27.

[30] *See e.g.,* Osipov Dec. at ¶¶ 37-42 [Dkt. 28-1]; Gusev Dec. at ¶¶ 36-38 [Dkt. 4].

unknown third-parties; and (7) allowing Creality to deliver Artec's software to over 9,000 customers.[31]

Neither Creality nor Kickstarter submit authority or evidence to the contrary. Creality cites *Vertigo*, where the Court recognized that "[p]rice erosion *can* justify a finding of irreparable harm." The court found that the plaintiff had failed to prove price erosion, because the plaintiff: (1) did not show that its price had been reduced at all, and (2) it provided no evidence it was planning to offer its product as a paid service.[32] As previously demonstrated, Artec does in fact sell its product at premium pricing, and has provided sworn testimony that it will be forced to reduce its prices if Creality is permitted to enter the market.[33]

Creality also attempts to categorize Artec's cases regarding freezing assets as involving "criminal fraud or counterfeiting," but this overstates the cases.[34] Instead, each of the cases involved a defendant who obtained money in violation of the law, whether that be fraud or counterfeiting.[35] Here, Creality raised funds intending to manufacture and sell infringing products in violation of patent and copyright laws. As such, the Court has the authority to enjoin the release of funds while this case is pending.

Moreover, the Federal Circuit has recognized that, "[w]hile competitive harms theoretically can be offset by monetary payments in certain circumstances, the likely availability of those monetary payments helps define the circumstances in which this is so."[36] Where the

---

[31] *See* Osipov Dec. at ¶¶ 37-42 [Dkt. 28-1]; Gusev Dec. at ¶¶ 36-38 [Dkt. 4].

[32] *See Vertigo Media, Inc. v. Earbuds Inc.*, No. CV 21-120 (MN), 2021 WL 4806410, at *4 (D. Del. Oct. 14, 2021).

[33] *See* Osipov Dec. at ¶¶ 37-42 [Dkt. 28-1]; Gusev Dec. at ¶¶ 36-38 [Dkt. 4].

[34] Creality Opposition at p. 13 [Dkt. 20].

[35] *See id.* (citing cases).

[36] *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1155–56 (Fed. Cir. 2011).

infringer is a foreign defendant with no U.S. assets that can be attached to satisfy a judgment, this weighs in favor of concluding "that money damages would not be an adequate remedy."[37] Here, Creality is a Chinese entity with no known assets in the United States (other than the funds currently in Kickstarter's hands). Artec requests the Court enjoin Kickstarter from releasing these funds to ensure Artec is able to collect upon any judgment it obtains in this action; otherwise, Artec may be left with an unenforceable judgment.

Creality does not—and cannot—dispute that a money judgment awarded by this Court against it would be impossible to enforce.

> While it is true that irreparable harm is an injury for which a monetary award cannot be adequate compensation, ***the harm alleged in this case is the likelihood that defendants' actions will frustrate this Court's ability to render a meaningful judgment***. Other courts in this Circuit have found, in cases involving similar circumstances, that a plaintiff's showing that a defendant's actions are likely to render a judgment uncollectible qualifies as a showing of irreparable harm.[38]

---

[37] *Canon Inc. v. GCC Intern. Ltd.*, 450 F. Supp. 2d 243, 256 (S.D.N.Y. 2006), *aff'd*, 263 F. App'x 57 (Fed. Cir. 2008); *see also Salita Promotions Corp. v. Ergashev*, 500 F. Supp. 3d 648, 654–55 (E.D. Mich. 2020) ("even if Salita's damages could be calculated, the evidence before the Court suggests such damages might not be recoverable. Ergashev currently lives in Russia and it is unclear if he has any assets in the United States."); *M-I LLC v. FPUSA, LLC*, No. SA:15-CV-406-DAE, 2015 WL 6738823, at *12 (W.D. Tex. Nov. 4, 2015) ("district courts have often found that money damages are insufficient in cases involving foreign infringers."); *Saint-Gobain Tech. Fabrics Am., Inc. v. Checkmate Geosynthetics, Inc.*, No. 6:09-CV-557-ORL, 2010 WL 11507575, at *8 (M.D. Fla. Oct. 26, 2010) ("Even if money damages could be properly assessed, the prospect of collecting money damages from this Canadian defendant with no known assets in the United States favors a finding of inadequate remedies at law."); *Aevoe Corp. v. Shenzhen Membrane Precise Electron Ltd.*, No. 2:12-CV-00054-GMN, 2012 WL 1532308, at *5 (D. Nev. May 1, 2012) ("Aevoe argues that a forward-looking money damages award would be insufficient because Shenzhen Membrane is a foreign company with no assets within the United States. Other courts have indeed found that money damages were insufficient in similar patent infringement cases involving foreign infringers.").

[38] *Motorola, Inc. v. Abeckaser*, No. 07-CV-3963(CPS)(SMG), 2009 WL 1362833, at *4 (E.D.N.Y. May 14, 2009).

Indeed, Creality does not dispute that it is based in China, that it has no meaningful assets in the United States, or that China refuses to enforce U.S. judgments. It does not dispute that the funds at issue are earmarked for its development and manufacturing of the Lizard scanner in China. As such, unless a TRO and preliminary injunction is granted to keep funds in the United States, Artec will likely have no way to collect on any money judgment against Creality. As the court explained in *Pamlab L.L.C. v. Macoven Phams., L.L.C.*, this, alone, establishes irreparable harm:

> Finally, for an injunction to issue, the threatened injury must be shown to be irreparable. Normally, in order to be classified as 'irreparable ,' the threatened harm must be a kind of injury for which a money judgment cannot compensate. ***Nevertheless, even if a money judgment would normally suffice, an injury may be considered irreparable if it is shown that such a judgment would likely be uncollectible,*** by virtue, for example, of the defendant's insolvency.[39]

Likewise, by the same principal, "[n]otwithstanding the general rule that there is no irreparable harm where an aggrieved party seeks solely a monetary award, 'a preliminary injunction is appropriate to prevent a defendant from taking actions to frustrate a judgment.'"[40] No one disputes that—unless these funds are kept in the United States—a monetary judgment against Creality will be unenforceable here.

---

[39] *Pamlab, L.L.C. v. Macoven Pharms., L.L.C.*, 881 F. Supp. 2d 470, 476 (S.D.N.Y. 2012) (citing *See CRP/Extell Parcel I. L.P. v. Cuomo*,394 Fed.Appx. 779, 781 (2d Cir.2010) (some internal citations omitted); *see also Brenntag International Chemicals, Inc. v. Bank of India*,175 F.3d 245, 249–50 (2d Cir. 1999).

[40] *Sea Metro. S.A. v. DGM Commodities Corp.*, 13-CV-1521 (DRH)(AKT), at *5 (E.D.N.Y. Aug. 2, 2013).

####     4.     The balance of hardships and public interest favors Artec.

"[T]he balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided."[41] While claiming it is not a "fly by night" company, Creality incredibly emphasizes that it produces and sells a staggering *one million units* a year.[42] Yet, Creality claims that enjoining Kickstarter from delivering funds to it for roughly 9,000 scanners would injure the startup. But, Creality's entitlement to the funds was necessarily speculative from the get-go. ***Creality's entitlement to the funds, <u>at all</u>, was contingent upon a successful campaign***, as evidenced by its project page on Kickstarter:[43]

<u>All or nothing.</u> This project will only be funded if it reaches its goal by Sat, March 12 2022 3:00 PM CET.

 Kickstarter connects creators with backers to fund projects.

 Rewards aren't guaranteed, but creators must regularly update backers.

---

[41] *Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 411 (S.D.N.Y. 1999) (holding that balance of hardships tipped decidedly in plaintiff's favor and that TRO and preliminary injunction should issue where plaintiff, like Artec here, would be harmed by the release of a new software product that allegedly infringed its copyrights and trade secrets, whereas the harm to defendant was the delay in releasing the potentially infringing software product)).

[42] Creality Luo Dec. at ¶ 3 [Dkt. 21] ("With manufacturing bases covering areas of 50,000 square meters, Creality has achieved annual sales and productions of over 1,000,000 units.").

[43] *See* Osipov Dec. at Ex. A-2 [Dkt. 28-1].

The only potential loss to Creality—assuming eventual success, which Artec disputes—is a short delay in receiving funds. Ultimately, "[a]s to the balance of hardships, "[i]t is axiomatic that an infringer ... cannot complain about the loss of ability to offer its infringing product ." [44]

Neither Creality nor Kickstarter have shown that the public interest would be disserved by the requested relief. In contrast, if there is one categorical imperative to the American system of justice and public interest, it is: (i) the right to have one's claims heard on the merits by a neutral forum (ii) with the power to award meaningful relief. Artec should not be denied that opportunity.

**C.**    **Creality's rendition of the facts and its supporting declarations are not credible.**

Artec made specific allegations in its opening brief, supported by the declaration of a key Artec employee with first-hand knowledge of the events, Gleb Gusev. [45] Artec demonstrated that Creality CR Studio software was copied from Artec's Studio software. [46] It explained that Creality had obtained access to Artec's software through a company called Jimuyida—a company that had improperly copied Artec's hardware and software to create its own "Magic Wand" scanner and software with the help of certain former Artec employees. [47]

In its opposition, Creality does not deny that it obtains its scanners and CR Studio software from Jimuyida. [48] Rather, Creality repeatedly decries that Artec's assertions lacked specificity and

---

[44] *Rovio Entm't, Ltd. v. Allstar Vending, Inc.*, 97 F. Supp. 3d 536, 547 (S.D.N.Y. 2015).

[45] *See* Artec Brief [Dkt. 5]; Gusev Dec. at ¶¶ 1-40 [Dkt. 4].

[46] *See* Artec Brief [Dkt. 5]; Gusev Dec. at ¶¶ 1-40 [Dkt. 4].

[47] *E.g.*, *See* Artec Brief at p. 6 [Dkt. 5] ("On information and belief, . . . Creality copied Artec's copyrighted material without Artec's permission or knowledge, which is obtained from a company called Jimuyida.").

[48] Creality Luo Dec. at ¶ 5 [Dkt. 21] ("Creality has engaged Shenzhen jimuyida Technology Co. Ltd. ('Jimuyida') to design and develop software and hardware for a range of proposed products, including its CR-Scan 01 and CR-Scan Lizard 3D Scanners.").

were not credible without corroboration by third-party affiants and experts.[49] But Artec has provided specific facts, along with several declarations of third parties, including private investigator, Hailong Tang (regarding his investigation into Jimuyida),[50] and computer forensic expert, George Edwards, PhD.[51] Artec has supplemented its sources of factual support and provided additional detail. In doing so, Artec's story has remained consistent.

In contrast, Creality's version of the events is increasingly riddled with contradictions and implausible statements. First, in his original declaration, Jimuyida's Chief Technology Officer, Luowei, denied that Jimuyida ever reviewed any kind of software code from Artec:

> At no time before or during the development of Jimuyida's software, including the 'Magic Wand' software, has it reviewed, analyzed, or copied any software code from Artec.[52]

But that assertion was disproved by Hailong Tang, Artec's investigator, who recorded a meeting with Jimuyida's then Chief Technology Officer (and shareholder), Mr. Yao, on June 27, 2018. Therein, Mr. Yao admitted that Jimuyida studied Artec's hardware and software in developing its products:

> There, I met with Mr. Jian Yao, who was then Chairman of Board of Directors of Wuhan Ruler, and the Chief Technology Officer (CTO) and a shareholder of Jimuyida. . . . At the meeting, Mr. Yao told me that Jimuyida had bought scanners and software from Artec, and that Jimuyida had analyzed and studied the company's 3D products *in great detail*, so that Jimuyida could learn . . . how to make its own 3D products.[53]

---

[49] Creality Opposition at p. 2, 9 [Dkt. 20]. ("There is no forensic analysis. There is no testimony from an expert.").

[50] Tang Dec. [Dkt. 26-1].

[51] Edwards Dec. [Dkt. 26-4].

[52] Creality Luowei Dec. ¶ 10 [Dkt. 22].

[53] Tang Dec. at ¶ 4 [Dkt. 26-1].

This assertion is further contradicted by Artec's evidenced that Jimuyida "employed, worked with, communicated and/or created internal Jimuyida email addresses for a number of former Artec employees who had access to Artec source code prior to leaving Artec in 2014 or 2015 through entity 91ruler.com. "[54]

Likewise, in his original declaration, Luowei flatly asserted that Artec had never contacted Jimuyida regarding its alleged infringement:

> At no time has Artec contacted or otherwise communicated with Jimuyida regarding any of the copyright or patent allegations that are set out in Artec's recent filings against Creality.[55]

But Artec provided a copy of the cease-and-desist letter Artec sent to Jimuyida in 2018.[56] In that letter, Artec expressly alleged that Jimuyida had infringed Artec's copyright and was improperly using Artec's IP to develop infringing products.[57]

When faced with the corroboration of Aretec's facts, Creality filed its Letter Motion on April 3, 2022, to introduce a Supplemental Declaration of Luowei. In his supplemental declaration, Luowei admits, as he must, that Jimuyida "purchased several Artec scanners *for its 3D furniture modeling business.*" In other words, he claims that Jimuyida purchased Artec's scanners—not to analyze for developing their own 3D scanners and software—but to use solely for *scanning furniture.* [58] This, according to Luowei, explains why Jimuyida continued to purchase and rent hundreds of Artec scanners in 2018.

---

[54] Osipov Dec. [enclosed herein].

[55] Creality Luowei Dec. ¶ 14 [Dkt. 22].

[56] Osipov Dec. at Ex. A-1 [Dkt. 28-1].

[57] *Id.*

[58] Supp. Dec. of Luowei at ¶ 4 [Dkt. 31-1].

Luowei does not deny, and thereby concedes, that Jimuyida *did* purchase 14 of Artec's scanners and rented over 200.[59] Mr. Luowei does not explain or assert a proper purpose for which Jimuyida—a competitor—was purchasing Artec's products. Moreover, he does not deny that Jimuyida coordinated with one or more of its affiliate companies—including, Shenzen Jimuyida (MagicWand), Ruler3D (using web domain 91ruler.com, which performed research and development for Jimuyida), and Shenzhen Aisibe (Jiaeda)—to review, analyze, or copy Artec's software code.[60]

Finally, Luowei's supplemental declaration addresses only *one* of several anomalies discussed in the declaration of Artec's computer science and source code expert, George Edwards. Luowei fails to address any of the other core issues and opinions raised by the Declaration of George Edwards, including the use of structured light patterns and decoding algorithms,[61] or by his analysis and conclusion that the similarities in the workspace/data panel windows would be unlikely to occur by chance.[62]

Artec has alleged that Jimuyida copied Artec's software in creating Creality CR Studio software. Creality (and Jimuyida) improperly accessed Artec's source code, copied it without permission, and used it in the code offered with the Creality's product.[63] As explained by Dr. Edwards, the code that creates certain light structures is part of Artec's "decoding algorithm code."[64] Luowei argues that the presence of certain structured light patterns necessarily evidences

---

[59] *See* Osipov Dec. at ¶ 3 [Dkt. 28-1]; s*ee* Tang Dec. ¶ 5 [enclosed herein].

[60] Supp. Dec. of Luowei at ¶ 4 [Dkt. 31-1].

[61] Edwards Dec. at ¶¶ 47-49 [Dkt. 26-4].

[62] *See id.* at ¶ 52 [Dkt. 26-4].

[63] *See id.* at ¶¶ 24-54 [Dkt. 26-4].

[64] *See id.* at ¶¶ 45-49.

open-source code, but only identifies open-source code that relates to the "click-and-drag" bug. However, these are independent concepts. The presence of structured light patterns is evidence of source code copying and patent infringement regardless of the "click-and-drag" bug in the code. Dr. Edwards' analysis and opinions regarding the structured light patterns and decoding algorithms are not addressed by Luowei's assertion that Creality uses the VTK Open Source Software. Dr. Edwards characterized the decoding algorithm as "fundamental to the Artec Studio software's purpose."[65]

Luowei similarly does not provide any evidence to contradict Dr. Edwards' analysis and conclusion that the similarities in the workspace/data panel windows would be unlikely to occur by chance.[66]

Therefore, while the evidence provided by Creality is insufficient to prove that the click-and-drag bug is caused by the VTK Open Source Software, *even assuming the facts most favorable to Creality*, Creality has provided no explanation for the similarities described by Dr. Edwards in the structured light pattern and user interfaces.

## D. Relief Requested

Artec has demonstrated a sufficiently serious question going to the merits of its copyright infringement claim and that it is likely to succeed on its patent infringement claims. And that it will suffer irreparable harm without the relief requested. Artec respectfully requests that this Court enter a temporary restraining order and preliminary injunction that enjoins:

1.  Kickstarter from disbursing to Creality (or to any subsidiary, affiliate, successor in interest, or any director, officer, employee, attorney, representative, or agent thereof) any funds raised through Kickstarter to purchase the Creality Lizard Scanner; and

---

[65] *See id.* at ¶ 49.

[66] *See id.* at ¶ 52.

2. Kickstarter from allowing Creality to create a duplicative campaign marketing the same Creality product to evade the spirit of this Order, pending adjudication of this dispute.

"[D]istrict courts therefore have authority to freeze a defendant's assets insofar as they could be used to satisfy an award of profits under" intellectual property laws.[67]

In the alternative, Artec is agreeable to the Court granting a temporary restraining order and preliminary injunction and ordering an expedited discovery schedule to resolve the most pressing concern underlying the request for injunctive relief—copying of Artec's source code, after which Creality and Kickstarter would have the opportunity to reurge its opposition to the injunction. In that instance, Artec would propose a four-month discovery schedule, in which the parties would exchange source code, exchange limited written and electronic discovery, and take a limited number of depositions, all with deadlines set by the Court.[68] This proposal balances the equities of the parties, while recognizing all parties' respective interests in the relief sought.

---

[67] *See, e.g., Cengage Learning, Inc. v. Doe 1*, No. 18-CV-403 (RJS), 2018 WL 2244461, at *3 (S.D.N.Y. Jan. 17, 2018) ("Both the Copyright Act and the Lanham Act entitle a plaintiff who establishes a violation of his rights in connection with a registered copyright or trademark to recover a defendant's profits . . . District courts therefore have authority to freeze a defendant's assets insofar as they could be used to satisfy an award of profits under either statute."); *Lions Gate Films Inc. v. Does*, No. 2:14-CV-06033-MMM, 2014 WL 3895240, at *7 (C.D. Cal. Aug. 8, 2014) ("Where profits are available as a final remedy—as they are under 17 U.S.C. § 504—a preliminary asset freeze is an appropriate provisional remedy").

[68] *See Cengage Learning*, 2018 WL 2244461 at *6 (ordering expedited discovery).

April 13, 2022                                     Respectfully submitted,

*/s/ Richard de Bodo*
Barry S. Alexander
**SCHNADER HARRISON SEGAL & LEWIS LLP**
140 Broadway, Suite 3100
New York, New York 10005-1101
Telephone:  (212) 973-8099
balexander@schnader.com

Richard de Bodo (*pro hac vice*)
CA State Bar No. 128199
Charles T. Zerner *(pro hac vice)*
LA State Bar No. 34832
**MUNCK WILSON MANDALA, LLP**
1925 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone:  (310) 855-3311
rdebodo@munckwilson.com
czerner@munckwilson.com

Amanda Greenspon, SBN 426639
**MUNCK WILSON MANDALA, LLP**
12770 Coit Road, Suite 600
Dallas, TX 75251
Telephone: (972) 628-3600
agreenspon@munckwilson.com

Attorneys for Plaintiff
ARTEC EUROPE S.À.R.L.