# Exhibit 4 – Invalidity Expert Report Excerpts

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

ARTEC EUROPE S.A.R.L.,

                              PLAINTIFF,

V.

SHENZHEN CREALITY 3D
TECHNOLOGY CO., LTD., &
SHENZHEN JIMUYIDA CO., LTD.

                              DEFENDANTS,

C.A. No. 20-621-GBW

**JURY TRIAL DEMANDED**

# OPENING EXPERT REPORT OF STEVEN J. GORTLER
## ON INVALIDITY OF U.S. PATENT NOS. 7,768,656, 8,488,129, AND 10,962,357

and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." I have also been informed there are three exceptions to patent eligible subject matter under 35 U.S.C. § 101: laws of nature, physical phenomena and abstract ideas. These exceptions are not patent eligible subject matter.

44.    I also understand a two-step approach detailed by the Supreme Court case in *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014) can be used to resolve questions relating to patent eligible subject matter. The first step is to determine whether the claim at issue is directed to a "patent ineligible concept" like an abstract idea. If it is, the second step is to identify "what else" is claimed so as to determine whether the claim amounts to "significantly more" than the abstract idea. If a claim does not recite "significantly more" than an abstract idea, it is invalid under Section 101.

## IV. Background of Technology

45.    In this section I provide some background information about widely known, routine and conventional aspects of 3D scanning technology common to all three Asserted Patents.  I also provide a foundation for my later opinions about anticipation and obviousness of the Asserted Claims in Sections V–VII.  Unless otherwise specified, the opinions expressed in this background section apply to the entire time frame in which the Asserted Patents claim priority, ranging from August 28, 2007 (for the '656 Patent) to September 19, 2018 (for the '357 Patent).  Further, all technologies described in this background section were in existence at the earliest priority date claimed by the Asserted Patents, i.e., August 28, 2007.  As such, these considerations equally apply to all three Asserted Patents.

A. **Structured Light Scanning**

46.     All three Asserted Patents relate to 3D scanning technology, which uses optical techniques to measure the geometry of a solid object.  There are several techniques that can be used for 3D scanning, including stereo imaging and LIDAR.  The Asserted Patents employ a specific type of 3D scanning called "structured light scanning," and this discussion will focus on this specific variant of 3D scanning.  However, similar considerations apply to other techniques, such as stereo imaging.

47.     The '656 Patent describes prior art structured light scanning as follows:

> There are known devices and methods for performing non-contact measurement of a 3D surface shape of a material object, such as through the use of a structured-light triangulation method. The triangulation method of measuring the surface shape of material objects utilizes the projection of light onto the surface of the object that is, generally, an amplitude-modulated, time-modulated and/or wavelength-modulated ("structured light"). An image of structured light projected onto the surface of an object (hereinafter referred to as "the image") is captured by a camera in a direction different from the direction that the structured light is projected. The image is then analyzed to calculate the shape of the object's surface.

'656 Patent at 1:12–24.

48.     The projected light pattern is called "structured" because, unlike a conventional light source which is "unstructured," the light has been deliberately organized into a specific structure or pattern that makes it useful for 3D measurements.  As described below, structured light patterns can be configured in many ways, including arrays of symbols, lines of varying thickness, colored stripes, grids and checkerboards, etc.  Light can also be structured temporally, e.g., by varying its intensity or color over time, so that different parts of the pattern can be visible at different times.

49.     The reason for using structured light instead of uniform light is that the pattern projected on the object being scanned helps correlate the directions of the incident and reflected

light beams.  For example, if a unique color or a unique symbol is associated with specific locations on the projected pattern, finding the same color or symbol in the captured image will uniquely determine the direction in which that specific color or symbol was reflected.  By using a triangulation algorithm, one can determine the distance of the object in the direction in which that specific color of symbol was projected.

## B.  Structured Light Projectors

50.     All structured light scanners require a projector to project the structured light pattern onto the three-dimensional object being scanned.  While there are different kinds of projectors for different applications and requirements, they are all devices that project structured light, and they all share the same common features.

51.     All structured light projectors require a light source.  Widely known and commonly used light sources include light bulbs, LED sources, and laser sources.  The specific choice of light source will depend on requirements such as cost, power consumption, and switching speed.  Note that the light generated by the light source is unstructured, i.e., it is a cone of substantially uniform light with no pattern other than that associated with the physics of light generation (directionality, etc.).  The light may have a wavelength (e.g., infrared, visible, or ultraviolet) suitable for a specific application.  *See* Section V.H.6.a.

52.     All structured light projectors require a device for creating structured light from the unstructured light provided by the light source.  Broadly speaking, structured light may be created by passive or active means.  The choice of active or passive light structuring depends on requirements such as cost, complexity, and programmability.

53.     The most common type of passive light structuring is a slide, such as is used in a traditional slide projector.  A slide is a plate or film of transparent material (e.g., glass or clear

13

plastic) that carries a fixed pattern permanently formed by physical means on its surface (e.g., by etching, printing, or lithography). A slide offers low cost and simplicity but does not offer programmability.

54.    Active light structuring may be accomplished with a digital device that receives input from a digital processor and generates a light pattern based on that input. Examples of active light structuring devices include liquid crystal displays (LCDs) and digital micromirror devices (DMDs). Active light structuring devices offer programmability but are more expensive and complex. They may also have inferior resolution as compared to fixed slides.

55.    All structured light projectors require a projector lens. Without a lens, it would be practically impossible to focus the structured light onto the three-dimensional object being scanned. Conventionally, the term "lens" may refer to a compound lens comprising multiple lenses arranged at specific distances to achieve desired optical properties.

56.    All lenses have properties such as aperture, focal length, surface curvature, refractive index, etc. Three specific properties common to all lenses are of interest to my opinions in this report. The "optical axis" of a lens is the central axis running perpendicular to the lens surface around which the lens is symmetrical. The "optical center" of a lens is the point within the lens where light rays pass through without being deviated. The "vertex" of a lens is the point where the optical axis intersects the lens surface. *See, e.g.*, US2004/0012861 to Yamaguchi at [0040] ("[T]he vertex of the image side surface denotes the intersection of the surface and the optical axis."); US2005/0248724 to Jones at [0003] ("Each aspherical surface that is a surface of revolution includes a vertex that is defined as the point on the surface where the surface intersects the axis of revolution."). Since lenses have two surfaces, they always have two vertices (front and back).

57.    The '656 and '129 Patent use the term "vertex" in a sense that appears to refer to the "optical center" instead.  Even though lenses have complex optical properties, for some scanning purposes, a camera and projector can be understood using a simplified pinhole model.  In this model of a camera, rays of light from the scene pass through the pinhole, which is a single point, called "optical center" and are recorded at the position where they hit a sensor plane.  In the terminology of this model, the term "optical axis" refers to the line that passes through the optical center and hits the sensor plane perpendicularly. The same simplified geometry can be used to model a projector.  The '656 Patent uses the term "vertex" to refer to the points denoted by 124 and 130 in Figures 1 and 2, which appear to be the optical centers of the camera 108 and the projector 106:



**Fig. 1**

*See also* Figs. 2, 6, 7, 9, 11.

58.    In practice, the difference between the optical center of a lens or a vertex of a lens, and the optical center of a simplified pinhole camera is a matter of perhaps a few millimeters, or even less for the very small lenses typically used in structured light systems.

15

Therefore, the opinions I express in this report are not materially affected whether one understands the word "vertex" literally as (front or back) vertex, or as "optical center."

59.     Examples of projectors comprising a light source, a slide with a slide pattern located on the slide's surface, and a projector lens characterized by a projector lens vertex can be found in many of the prior art references discussed in this report.  *See, e.g.*. Sections V.G.1.b (Tomasi reference), V.H.1.b (LeMoigne reference), VI.G.1.c (Rusinkiewicz reference), and VI.H.1.c (Hassebrook reference).  A POSA would have been able to use the projectors disclosed in those references in any other structured light scanning system, with the routine modifications and adaptations that were well within the level of skill in the art.

60.     An example of a commercial structured light projector is the Compaq MP1800 DLP projector, used in the Rusinkiewicz system.  *See* Section VI.G.1.c; Rusinkiewicz at 443 ("[t]he system uses a Compaq MP1800 DLP projector, with a maximum resolution of 1024x768.").  This projector includes a light source ("User replaceable 120 watt high-efficiency, long-life lamp"), a slide with a slide pattern located on the slide's surface ("Digital Light Processing (DLP) technology"), and a projector lens characterized by a projector lens vertex ("Manual 1.3:1 zoom lens").  User's Guide – Compaq MP1800 Microportable Projector (May 2000), at 1-1.

61.     In sum, the use of a projector comprising a light source, a slide with a slide pattern located on the slide's surface, and a projector lens characterized by a projector lens vertex would have been inherent in any structured light scanning system in the relevant time frame (2007–2018).  At the absolute minimum, using such a projector would have been well-known, routine and conventional to a POSA.  Moreover, the use of such a projector in a structured-light scanning system would have been obvious to a POSA as the application of a familiar technique

16

to a known problem with predictable results, or the simple substitution of one known element for another according to the knowledge of a POSA. Such application would be motivated by the nature of the problem being solved, by the teachings of the prior art itself, by the knowledge of a POSA, and also by design incentives or market forces.

### C. Cameras

62.    All structured light scanners require a camera to capture an image of the structured light pattern as reflected by the three-dimensional object being scanned. While there are different kinds of cameras for different applications and requirements, they are all image capture devices and they all share the same common features.

63.    All cameras for structured light scanning require a photographic lens. Without a lens, it would be practically impossible to capture a focused image of the structured light from the three-dimensional object being scanned. As described above, all photographic lenses have an optical center, which for our purposes can be considered the same as the optical center of a simplified pinhole model, and referred to as "vertex" in the '656 Patent. *See* Section IV.B.

64.    All cameras for structured light scanning require a matrix radiation receiver. Without a matrix radiation receiver, or image sensor array, it would be impossible to capture an image composed of picture elements, or "pixels" as they are known in the art. In order to capture such an image, a radiation receiver has a matrix of sensors, each detecting a single pixel. Examples of matrix radiation receivers include photocathodes, charge coupled devices (CCDs), and CMOS image sensors. The following diagram shows the matrix radiation receivers in CCDs and CMOS image sensors, respectively:



El Gamal et al., "CMOS Image Sensors," *IEEE Circuits and Devices Magazine*, vol. 21, issue 3 (May-June 2005), pp. 6–20, at p. 8.

65.     All cameras for structured light scanning require a camera driver, which is a circuit that amplifies the sensor signals from the matrix radiation receiver and converts them to a format suitable for use by a digital processor, including steps such as analog amplification, analog-to-digital conversion (ADC), and digital signal processing (DSP).  Without a camera driver, the raw sensor output would not be suitable for subsequent processing performed in 3D scanning, such as image processing and triangulation.  For example, a CCD image sensor includes an array of MOS capacitors, one for each pixel, each storing a very small charge that represents the light intensity at that pixel.  That charge needs to be amplified by a special circuit (called a charge amplifier) to make it suitable for further processing.  Similarly, a CMOS image sensor includes an array of active pixels or photodiodes that generate a weak signal, and readout amplifiers to convert that signal to usable levels. *See* El Gamal at p. 8 (discussing readout architectures of CCD and CMOS arrays).

18

66.    An early example of camera for structured-light scanning is the image orthicon. *See* Section V.G.1.d (LeMoigne reference).  The image orthicon is an image capture device used in television since the 1940's.  An image orthicon is described in U.S. Patent No. 3,866,078 to Norman et al., entitled "Image orthicon" and filed on October 26, 1973 ("Norman").  Figure 1 of Norman depicts "a typical prior art image orthicon" with lens system 10, photocathode 12 (matrix radiation receiver), and secondary emission amplifier 22 (camera driver):



*See* Norman at 1:30–2:26.

67.    Another example of camera for structured-light scanning is the FLIR (Forward Looking Infrared) camera.  *See* Section V.G.1.d (LeMoigne reference).  A FLIR camera is described in U.S. Patent No. 4,672,439 to Florence et al., entitled "FLIR imager with hybrid optical/electronic processor" and filed Sept. 4, 1985 ("Florence").  Figure 2 of Florence depicts a FLIR camera with optics 26 including lenses, charge coupled devices (CCDs) 46 and 48 (matrix radiation receivers), and processing electronics 50 (camera driver):



*See* Florence at 3:3–39.

68.     Another example of camera for structured-light scanning is the Sony DXC-LS1 digital camera.  The Sony DXC-LS1 digital camera was commercially available at least as early as May 2002, when it was expressly referenced in the Rusinkiewicz reference in the context of a structured-light scanning application.  *See* Section VI.G.1.d.  Further, commercial publications describing the Sony DXC-LS1 digital camera were publicly available at least as early as February 2007.  *See* B&H Professional Video SourceBook, Section 1 – CCD Cameras, at https://web.archive.org/web/20070225123122/https://www.bhphotovideo.com/FrameWork/Product_Resources/SourceBookProVideo/01CCDCameras.pdf ("B&H CCD SourceBook").

69.     The Sony DXC-LS1 camera was composed of "a compact camera head, and a separate Camera Control Unit (CCU)":





B&H CCD SourceBook at 10–11.

70. The Sony DXC-LS1 camera used a variety of photographic lenses (e.g., 4mm and 12mm lenses), and included a CCD sensor with 380,000 pixels (matrix radiation receiver) and a camera driver with DSP (Digital Signal Processor) and AGC (Automatic Gain Control). B&H CCD SourceBook at 10–11.

71. Another example of camera for structured-light scanning is the Toshiba IK-TU40A digital camera. The Toshiba IK-TU40A digital camera was commercially available at least as early as May 2002, when it was expressly referenced in the Rusinkiewicz reference in the context of a structured-light scanning application. *See* Section VI.G.1.d. Further, commercial publications describing the Toshiba IK-TU40A digital camera were publicly available at least as early as February 2007. *See* B&H CCD SourceBook at 15.

72. Like the Sony DXC-LS1, the Toshiba IK-TU40A digital camera was CCD-based and included a camera head and a CCU:



B&H CCD SourceBook at 15.

73.     The Toshiba IK-TU40A camera used a variety of photographic lenses (e.g., 4mm and 15mm lenses), and included three 1/3" CCDs with 410,000 pixels (matrix radiation receivers) and a camera driver with a variety of DSP functions.  B&H CCD SourceBook at 15.

74.     A POSA would have been able to use the cameras disclosed in those references in any other structured light scanning system, with the routine modifications and adaptations that were well within the level of skill in the art.

75.     In sum, the use of a camera including a photographic lens having a vertex, a matrix radiation receiver, and a camera driver would have been inherent in any structured light scanning system in the relevant time frame (2007–2018).  At the absolute minimum, using such a camera would have been well-known, routine and conventional to a POSA.  Moreover, the use of such a camera in a structured-light scanning system would have been obvious to a POSA as the application of a familiar technique to a known problem with predictable results, or the simple substitution of one known element for another according to the knowledge of a POSA.  Such application would be motivated by the nature of the problem being solved, by the teachings of the prior art itself, by the knowledge of a POSA, and also by design incentives or market forces.

**D.  Epipolar Geometry**

76.     Epipolar geometry has long been used in the field of computer vision and is described in introductory materials and textbooks.  For example, the '656 Patent acknowledges that epipolar geometry is known in the art.  *See* '656 Patent at 5:11 ("Based on affine epipolar geometry …").  The following summary is adapted from a tutorial by Hartley and Zisserman, "Multiple View Geometry," CVPR June 1999 ("Hartley 1999").[1]  While that tutorial discusses

---

[1] Available at https://users.cecs.anu.edu.au/~hartley/Papers/CVPR99-tutorial/tutorial.pdf.  I incorporate by reference the Hartley 1999 tutorial in this report.

epipolar geometry in the context of multiple camera views (i.e., stereoscopic vision), the same geometry applies if one replaces one of the cameras with a structured-light projector.

77.    The basic geometry is defined by two planes corresponding to the projector slide (left) and the camera sensor (right).  In a pinhole camera model, the projector and slide each have an optical center. In a physical camera, the camera and projector planes are behind the optical centers (the film is behind the lens) but simply for convenience, in the mathematical description, the planes are often drawn in front of the centers as shown in the following figure.  In this model, a ray of light starts from the projector optical center, crosses the projector plane at a point x, is reflected at a point X on the surface of the object being scanned, and travels to the camera optical center, intersecting the camera plane along the way.

## Correspondence Geometry

Given the image of a point in one view, what can we say about its position in another?



- A point in one image "generates" a line in the other image.
- This line is known as an epipolar line, and the geometry which gives rise to it is known as epipolar geometry.

23

78. The epipolar line for point x on the projector plane is the set of all possible points on the camera plane corresponding to all possible distances (ranges) where point X is located from the projector optical center.

79. Epipolar lines on both the projector plane and the camera plane are formed by the intersection with an "epipolar plane" which passes through the projector and camera optical center. As a consequence, points on an epipolar line on the projector plane always fall on the corresponding epipolar line on the camera plane, regardless of the geometry of the object being scanned (i.e., regardless of the depth of point x in 3D space).

### Epipolar Geometry



- The epipolar line $l'$ is the image of the ray through $x$.
- The epipole $e'$ is the point of intersection of the line joining the camera centres—the baseline—with the image plane.
- The epipole is also the image in one camera of the centre of the other camera.
- All epipolar lines intersect in the epipole.

80.     The same geometry is used to solve the triangulation problem to determine the range of the object's surface from knowledge of the corresponding points on the projector and camera planes.



81.     If the projector and camera planes are parallel to the line connecting the projector and camera optical centers, then the epipolar lines are also parallel to that line.  This is an important property that comes into play in many practical applications.  For example, if the projector and camera are parallel and placed side by side in the horizontal direction, the projector and camera epipolar lines are parallel and horizontal.  *See* Section V.F.1 (Tomasi reference).  Likewise, if the projector and camera are parallel and stacked in the vertical direction, the

projector and camera epipolar lines are parallel and vertical. *See* Section V.F.2 (Le Moigne reference).

82.      Epipolar geometry has long been used to simplify the problem of finding the correspondence between points on the projected pattern and points on the captured image. It is not always necessary to physically form epipolar lines on the projector plane. However, forming such lines as part of the structured light pattern may have certain benefits. For example, the Le Moigne reference (Section V.F.2) discloses the use of a structured-light pattern that includes vertical lines, which in this case are epipolar lines, as shown in Figure 2:



(a)                    (b)

(c)                    (d)

83.    Le Moigne discloses that forming such vertical (epipolar) lines as part of the structured-light pattern may be useful for purposes of image extraction and albedo normalization. *See* Le Moigne at 542–543 ("The vertical lines serve two purposes; they aid in the extraction of the horizontal lines, and they are utilized to normalize the albedo variations.").

84.    Another example is provided by WO 2007/059780 to Vinther et al. ("Vinther"). Vinther discloses a structured-light scanning system in which the projector and camera are horizontally offset, so that epipolar lines are horizontal. At the same time, Vinther's structured-light pattern includes parallel, vertical lines, as shown in Fig. 5.



Fig. 5

85.    Because of this geometry, when projected on a solid object, the pattern results in distorted vertical lines, while the horizontal (epipolar) lines remain straight, as depicted in Fig. 7.



Fig. 7

86.    Even though the light coding is embodied in vertical lines, Vinther discloses that forming such horizontal (epipolar) lines as part of the structured-light pattern may be useful for calibration purposes.  *See* Vinther at 8:23–25 ("To support the calibration process a number of horizontal lines [5.3] [7.1] can be inserted in the source image.").

87.    Based on these disclosures, it is my opinion that a POSA would find it obvious to modify the teachings of the prior art to design a structured-light pattern that includes epipolar lines physically formed on the slide.  A motivation to do so is provided by the prior art itself, e.g., to improve image extraction, albedo normalization, and/or calibration.  Moreover, adding epipolar lines to an existing structured-light pattern would be the use of a known technique to improve similar devices, methods, or products in the same way, with predictable results.

28

### E. Applications of Structured Light Scanning

88.     Structured-light scanning has wide applicability to a range of fields including mechanical engineering, archaeology, robotics, security, and the arts.  Each field may have somewhat different requirements, for example high resolution and accuracy for security applications and high speed for robotic navigation.  However, the principles of operation of structured light scanning are the same for all fields of applications, and improvements in one field readily carry over to a different field.

89.     Facial scanning is a common field of application of 3D scanning in general and structured light scanning technology in particular.  Scanning the face of a person has a number of applications of obvious utility.  A first example is physical and computer security, where an individual's identity is verified via measurement of their facial features.  *See, e.g.*, US2008/0285056 to Blayvas at [0001] ("structured light 3D scanners … are used in multiple applications, such as: Security applications, where a 3D scan of the face is performed for the sake of further face recognition"); *see also* Section VI.H.4 (Hassebrook reference).  Another example is the manufacturing of custom masks and other products that need to precisely fit a person's face.  *See, e.g.*, JP 2005139593A at [0022] (discussing a "mask creation system" including "a three-dimensional scanner device").  A third application is the preparation of busts and other artifacts that precisely reproduce a person's facial features.  *See, e.g.*, Section VI.G.4 (Rusinkiewicz reference); *see also* Section V.F.1 (Tomasi reference disclosing the scanning of a human face as an obvious example of structured light scanning).

90.     Notably, scanning a person's face does not pose any special challenges to 3D scanning technology, because the resolution and accuracy requirements are less demanding than other applications, such as precision mechanics or fingerprint scanning.  The only requirement of

facial scanning is a relatively high speed, because a person's face may move slightly during scanning. However, that requirement is common to many other fields of application, and a POSA would have been familiar with that issue and would have known how to solve it (e.g., by using strobe lighting that captures an instantaneous shapshot).

91.    In sum, the application of any known structured light scanning technique to scan a person's face would have been well-known, routine and conventional to a POSA in the relevant time frame (2007–2018). Moreover, the use of structured-light scanning for facial scanning would have been obvious to a POSA as the application of a familiar technique to a known problem with predictable results. Such application would be motivated by the nature of the problem being solved, by the teachings of the prior art itself, by the knowledge of a POSA, and also by design incentives or market forces.

### F. The "Flashlight" Limitations

92.    Claims 8 and 19 of the '656 Patent, discussed in Section V below, recite the limitation of "a flashlight source." I have been informed that the Court has construed this term as "a small portable light operated from self-contained cells." *See* Section V.B. I am not aware of any use in today's structured-light scanning systems of such "small portable light operated from self-contained cells." In a real system, the light source is integrated within the projector, and therefore not independently "portable" or "operated from self-contained cells." However, it appears that in Artec's view, this limitation is met as long as the light projector's light source is "commonly used as a flashlight source." *See* Section V.G.7.a. Under Artec's interpretation of the claims, prior art light sources such as LEDs and light bulbs will meet that limitation. *See id.*

93.    Moreover, to the extent this limitation requires battery operation, a POSA would find it obvious to use such a light source in a structured-light scanning system. For example,

'656 Patent at 3:59–65.  Further, each of the projector and camera has a central optical axis, described as follows: "The projector 106 includes a central projector optical axis 112 and the camera 108 includes a central camera optical axis 116, such that the triangulation angle 120 is the angle extending between where the projector optical axis 112 and the camera optical axis 116 intersect."  '656 Patent at 3:44–48.  The concepts of lens, lens vertex, and central optical axis were well known in the prior art and inherent in virtually all optical systems used in this kind of structured-light scanning, and the '656 Patent does not claim those were novel features of the projector 106 or camera 108.

    101.    Figure 6 of the '656 Patent depicts the set of planes 125 passing through projector vertex 124 and camera vertex 130:



Fig. 6

    102.    The intersection of each plane 125 with the slide 122 and the matrix radiation receiver 128 defines what the '656 Patent calls "projector meridians" and "camera meridians," respectively.  '656 Patent at 5:20–63.  While the '656 Patent uses non-standard terminology, it is

clear that such "meridians" correspond to well-known epipolar lines.  For example, the specification states:

> Based on ***affine epipolar geometry***, if two cameras are looking at the same object or scene, it is possible to draw ***a straight line*** through any point in the image of the one camera, with all points of the object or scene corresponding to that line lying along ***a straight line*** in the image of the other camera, regardless of the shape of the object or scene. This principle can be applied to surface shape scanning using structured-light triangulation to determine the 3D shape of a material object.

'656 Patent at 5:11–19.  As was well-known in the prior art, each of the planes 125 that pass through the projector and camera optical centers are epipolar planes, and the intersection of an epipolar plane with the projector/camera plane is a projector/camera epipolar line (which the patent calls projector/camera meridian).  *See* Section IV.D (showing same geometric construction for epipolar lines).

103.    The purported improvement of the '656 Patent lies in the use of "groups" of coded elements, each group being located along a "meridian" or epipolar line of the slide:

> In one or more embodiments, the slide 122 is selected such that structured light 113 is formed possessing at least two coded elements that lie within a plane 125 passing through the vertices 124, 130 of the projector 106 and the camera 108. In one or more embodiments, ***the structured light 113 can be formed as a pattern including a plurality of different groups of coded elements, wherein all of the coded elements in each group of coded elements lie within the same respective plane 125 passing through the vertices 124, 130 of the projector 106 and the camera 108***. Different groups of coded elements will lie in different planes 125.

'656 Patent at 6:35–45.  Because each group of coded elements can be identified from purely geometric considerations, the 3D measurement only requires analyzing the position of a coded element within its own group, i.e., along a meridian in the camera's image:

> [G]roups of coded elements 164 and 165 each lie on a respective projector meridian 187 in the slide 122 and will also lie with a respective camera meridian 188 in the image 140 (where the projector meridians 187 and the camera meridians 188 are illustrated as vertical lines in these figures). ***The particular shape of the surface 110 of the object 111 being analyzed will cause the coded***

36

[1.C] a computing device for determining a measurement relating to the shape of said object using a triangulation algorithm based on a correspondence between points in said slide pattern and said image, and

[1.D] wherein said slide pattern comprises a plurality of coded elements, where each of said coded elements is characterized by at least one parameter and, where said at least one parameter defines a spatial or temporal distribution of an amplitude or a wavelength of said structured light, and

[1.E] wherein said coded elements are assigned to one of at least first group or second group, each of which first group and second group comprising at least two of said coded elements, and

[1.F] wherein at least a first slide virtual line and a second slide virtual line are defined on said slide surface, where said first slide virtual line is defined by an intersection between said slide surface and a first plane passing through said projector lens vertex and through said device lens vertex, and said second slide virtual line is defined by an intersection between said slide surface and a second plane passing through said projector lens vertex and through said device lens vertex, and

[1.G] wherein said coded elements of said first group are located along said first virtual line and said coded elements of said second group are located along said second virtual line.

107.    As explained above, limitations [1.Preamble], [1.A], [1.B], [1.C], and [1.D] describe conventional structured light scanning which the '656 Patent admits as prior art. *See* '656 Patent at 1:10–35. I note that the recitation of "coded elements" in limitation [1.D] is substantially equivalent to the recitation of "a structured light pattern" in limitation [1.A]. As explained above, light is "structured" when it includes non-uniformities in intensity or color, i.e., "a spatial … distribution of an amplitude or a wavelength," or some time variance of the light, i.e., "a … temporal distribution of an amplitude or a wavelength." *See* Section IV.A. As such, limitation [1.D] adds nothing to limitation [1.A], and serves only to define terms for later use in limitations [1.E] and [1.G] (referring back to "groups" of "coded elements").

40

108.    Limitation [1.F] recites "slide virtual line[s]," i.e., projector meridians or epipolar lines, which as discussed below were well-known in the prior art.  The claim language "a [first/second] plane passing through said projector lens vertex and through said device lens vertex" matches the definition of epipolar planes (indicated as planes 125 in the '656 Patent specification), and the intersection of an epipolar plane (plane 125) with the projector plane defines a projector meridian  or projector epipolar line.  *See* Section V.A.  The identity of the claims' "projector virtual lines," the specification's "projector meridians," and the prior art "epipolar lines" is shown by a comparison of the geometry in the '656 Patent and the prior art (Hartley 1999 tutorial), which is identical except for a 90-degree rotation.



'656 Patent Fig. 6                              Hartley 1999 at 28

109.    Limitations [1.E] and [1.G] recite "assign[ment]" of "coded elements" to "group[s]" and the "locat[ion]" of such "group[s]" "along … virtual line[s]," which as discussed below was also well-known in the prior art.  Further, as explained above, the specification and drawings of the '656 Patent do not teach any specific alignment between the "coded elements" and the "virtual line[s]," as the drawings show projector meridians and camera meridians crossing coded elements at random with no particular correlation.   *See* Section V.A.

139.    As an additional issue, it is unclear what exactly constitutes a "coded element" in Artec's view.  From this and other diagrams in Artec's infringement contentions, it appears that Artec considers the thick portions of as "coded elements" the thick portions of the bright lines in the structured-light pattern.  *See* Ex. A at 15–18, 30.  However, this is inconsistent with the testimony of Artec's CTO, Mr. Gusev, who indicated that both thick **and** thin portions of the bright lines are individual "coded elements."  *See* 02/27/2025 Gusev Tr. at 85–86.

140.    Under Artec's application of the claims for infringement purposes, the claims are indefinite because for any structured-light pattern, one could draw literally **any** epipolar lines and follow those lines until they touch **any two** features of the pattern, where a feature may be any portion of the structured-light pattern.  For that reason, a person of ordinary skill in the art would not be informed of the claim scope with reasonable certainty.  In other words, even after having designed and manufactured a structured light scanner, a person of ordinary skill in the art would not know whether or not that scanner infringes the claims of the '656 Patent, because that would depend on which epipolar lines the plaintiff can mentally superimpose on top of the structured light pattern, and which arbitrarily-defined "coded elements" happen to cross those arbitrary lines.  Indeed, under Artec's interpretation a wide range of structured light patterns known in the prior art would automatically fall within the scope of the claims, including each of the prior-art structured-light patterns discussed in Section V.F.

## E.  Patent Eligibility

141.    In my opinion, each of the Asserted Claims of the '656 Patent is directed to patent ineligible subject matter. As explained below, the Asserted Claims are directed to an unpatentable abstract idea. In addition, none of the Asserted Claims recites an inventive concept that is significantly more than the abstract idea.

142.    As an initial matter, independent claim 1 of the '656 Patent is representative of the Asserted Claims for purposes of a patent eligibility analysis.  I will discuss other claims below.

143.    With respect to Step 1 of the *Alice* analysis, the '656 Patent describes a system for scanning a three-dimensional object to create a visual representation of its shape using non-contact structured light triangulation.  While verbose, claim 1 effectively involves a setup of standard components for structured light 3D scanning, comprising a projector, camera, and triangulation computer (limitations [1.Preamble], [1.A], [1.B], [1.C], and [1.D]).  Thus, limitations [1.Preamble], [1.A], [1.B], [1.C], and [1.D] provide simply a field of application to structured light scanning.

144.    The only purportedly inventive feature of the Asserted Claims is the use of "virtual" lines based on epipolar geometry (limitations [1.E], [1.F], and [1.G]).  That, however, is merely the recitation of an abstract idea or mathematical concept.  Indeed, Artec's own Chief Technology Officer, Gleb Gusev, testified that virtual lines are "a mathematical abstract notion that does not exist in reality."  02/27/2025 Gusev Tr. at 97:3–11. This is further confirmed by the specification of the '656 Patent, which does not disclose any particular physical meaning of the "virtual lines" in terms of a specific structured-light pattern.  *See* Section V.A.  In sum, claim 1 of the '656 Patent is directed to the abstract concept of using epipolar geometry in the field of structured light scanning.  I am informed that limitations restricting an abstract idea or mathematical concept to a specific field of application (here, structured light scanning) do not turn it into a patentable invention.

145.    In addition, as discussed above, for infringement purposes Artec takes the position that the limitations of "a first slide virtual line" and "a second slide virtual line" are met by any possible epipolar line that can be drawn through any coded elements on the slide surface.  *See*

Section V.D.1.c. This further shows that determining such "virtual" lines using known principles of epipolar geometry involves a purely mental concept that can be worked out simply using a pen and paper. In Artec's case, this mental process is accomplished by drawing mathematically defined, but not not physically defined, epipolar lines on top of an image of the structured light pattern in the accused products.

146. With respect to Step 2 of the *Alice* analysis, the Asserted Claims of the '656 Patent do not contain any elements that comprise an inventive concept either considered individually or as an ordered combination. Representative claim 1 recites a number of hardware components—a light projector, image capture device, and computing device—which the '656 Patent recognizes as conventional. As discussed above, the '656 Patent acknowledges that the basic elements of structured light scanning were known in the art. '656 Patent at 1:12–24. Moreover, the '656 Patent describes each of the structural elements recited in the claim as well-known, routine, and conventional, without suggesting that any of them is unconventional or inventive. For example, the '656 Patent describes the light projector as simply "a slide projector including a light source 126 and a light modulating device 122 for modulating the light emitted from the light source 126." '656 Patent at 3:10–12. Likewise, the image capturing device is also described in purely conventional terms as a known camera: "The optical unit 102 includes a camera 108 or other image detecting device for capturing an image of the structured light 113 acting on the surface 110 of the object 111." '656 Patent at 3:30–32; *see also id.* at 3:32–48. The computing device is also described in conventional terms as any general-purpose computer: "The computing device 104 analyzes the captured image received from the camera output 134 to perform the desired calculations…" '656 Patent at 3:49–51; *see also id.* at 7:26–32 ("The computing system 104 may comprise a general-purpose computer system which is suitable for

60

implementing the method for the 3D measurement of the shape of material objects in accordance with the present disclosure. The computing system 104 is only one example of a suitable computing environment and is not intended to suggest any limitation as to the scope of use or functionality of the invention."). Based on my experience, these are off-the-shelf components universally used in structured-light scanning systems, and well-known at the time of the filing of the application which issued as the '656 Patent. I understand that merely using conventional hardware to implement an abstract idea does not confer patent eligibility.

147.    Nor does the '656 Patent indicate that it improves any mathematical analysis. Indeed, rather than purporting to improve the underlying triangulation method recited in the claims, the specification of the '656 Patent acknowledges that the claimed inventions use "triangulation techniques known to those skilled in the art." '656 Patent at 4:11–12. I understand that applying a known algorithm in a standard fashion does not constitute an inventive concept.

148.    Nor does the recitation of "coded elements" alter my assessment. In particular, limitations [1.E] and [1.G] recite "assign[ment]" of "coded elements" to "group[s]" and the "locat[ion]" of such "group[s]" "along … virtual line[s]." As detailed below, these elements were well-known in the prior art. *See* Section V.F. Moreover, the construction of "groups" from a set of "coded elements" is itself a mental process, as the claims do not place any constraints on how a "group" is formed. This was confirmed by Mr. Gusev. *See* 02/27/2025 Gusev Tr. at 90:22–23 ("[A] group consists of any two coded elements.").

149.    Further, as explained above, the specification and drawings of the '656 Patent do not teach any specific alignment between the "groups" of "coded elements" and the "virtual line[s]," as the drawings show projector meridians and camera meridians crossing coded

elements at random with no particular correlation.   See Section V.C.  Accordingly, these generically described "groups" of "coded elements" also cannot constitute an inventive concept.

150.    The same analysis applies to claims 2–4, 6–15, and 17–22 of the '656 Patent.  In particular, as detailed above, independent claim 1 is a system claim that is analogous to asserted independent claim 12, which is simply a method claim version of the same subject matter. *See* Section V.B.  Further, as also detailed above, at a high level, claims 2 and 13 recite well-known two-dimensional coded elements, which can be, e.g., geometric figures or bit patterns; claims 3 and 14 recite the existence of epipolar lines on the object being scanned, which is inherent in any structured-light scanning system; claims 4, 6, 7, 15, 17, and 18 recite some common geometric arrangements of the projector and camera in scanning systems; and claims 7–11 and 18–22 recite routine features of 3D scanning systems (wavelengths, light sources, coded elements, etc.).  *See id.*  None of these claims add anything non-abstract or inventive beyond the limitations of claim 12.

151.    In conclusion, in my opinion, the Asserted Claims of the '656 Patent are directed to an abstract concept at Step 1 of the *Alice* analysis—namely, using epipolar geometry in the field of structured light scanning.  At Step 2 of the *Alice* analysis, it is my opinion that the Asserted Claims do not comprise a sufficiently inventive concept to transform this abstract idea into a patent-eligible invention, as they rely on conventional components and techniques without meaningful improvement. Accordingly, it is my opinion that the Asserted Claims of the '656 Patent are invalid as directed to patent-ineligible subject matter under 35 U.S.C. § 101.

152.    I understand that Artec has not yet provided any response to Defendants' contentions that the Asserted Claims of the '656 Patent are directed to patent-ineligible subject matter.  Accordingly, I reserve the right to revise the foregoing opinions should Artec or its

expert provide an explanation asserting that the claims are directed to patent eligible subject matter.

### F. Overview of the Prior Art

#### 1. U.S. Patent Appl. Publ. No. 2004/0005092 to Tomasi ("Tomasi")

153.    The Tomasi Patent application was filed on June 19, 2003, claiming priority to Provisional Application No. 60/390,232, filed on June 19, 2002.  Tomasi was published on January 8, 2004.  Since the '656 Patent has an earliest priority date of August 28, 2007, Tomasi qualified as prior art to the '656 Patent under at least pre-AIA 35 U.S.C. § 102(a), (b), and (e).

154.    Tomasi relates to a three-dimensional structured-light scanning system that measures "depth and other position information of an observed object."  Tomasi at [0002]. Tomasi addresses the "correspondence problem," i.e., "determining which elements in the projection array correspond to elements in the image array."  Tomasi at [0025].  Tomasi presents a solution based on the use of a combination of epipolar geometry and coded elements.

155.    Figure 1 of Tomasi depicts an "image correspondence system" including a projector 110, a camera 120, and a processor 130.  Tomasi at [0033].



FIG. 1

156.    Projector 110 projects an array 112 of "coded light" onto the scene 102, and camera 120 captures an image of the scene 102.  Tomasi at [0034], [0038].  Figure 12 shows an example of such a pattern projected onto a human figure.  Tomasi at [0116].



157.    The structured-light pattern takes advantage of epipolar geometry to simplify the solution of the correspondence problem.  Specifically, the row (vertical) address is known from geometry alone if the rows of "image elements" are disposed along epipolar lines.  "[G]iven the image position of a local pattern, there is only one row of the array that the pattern can belong to. Epipolar geometry determines which row this is."  Tomasi at [0054].  The column (horizontal) address is determined from the coding of the image elements.  "For the column addresses, each image element is identified by a subsequence of the sequence provided with the projection array."  Tomasi at [0055].

158.    In one embodiment of Tomasi's system, "the camera 120 and the projector 110 may be placed in a side-by-side orientation with respect to the scene 102," and further "an optical center of the projector 110 and an optical center of the camera 120 may have parallel optical axes." Tomasi at [0033].  In this configuration, the rows of image elements are disposed along parallel epipolar lines, as depicted in Figure 4.  Tomasi at [0060].



## FIG. 4A

159.    However, Tomasi also states that "any camera and projector arrangement is possible, as long as the array rows on the projected pattern are oriented along the epipolar lines." Tomasi at [0060].  For example, Figure 4B shows rows of image elements disposed along non-parallel epipolar lines for the case in which "the camera 120 is on the side of the projector 110, but slightly ahead of it, so that the epipoles are finite points on both the projector and the sensor plane." *Id.*



## FIG. 4B

## 2. Le Moigne et al., Structured Light Patterns for Robot Mobility, *IEEE J. Robotics and Automation*, vol. 4, no. 5, pp. 541–548, Oct. 1988 ("Le Moigne")

160.    The Le Moigne article was published in the October 1988 issue of the IEEE Journal of Robotics and Automation.  Because this is a major technical journal which is typically carried by large academic libraries, it was readily accessible to the interested public by late 1988 or early 1989 at the latest.  Therefore Le Moigne qualifies as prior art to the '656 Patent under at least pre-AIA 35 U.S.C. § 102(a) and (b), because the '656 Patent has an earliest priority date of August 28, 2007.

161.    Le Moigne provides a detailed discussion of a structured-light 3D scanning technique for robotics applications.  Specifically, Le Moigne addresses "the development of an inexpensive ranging sensor … to enable the robot to construct a topographic map of its immediate environment to be used for planning a path over the terrain while avoiding obstacles." Le Moigne at 541.

162.    Le Moigne's structured-light scanning system is depicted in Figure 1:



163.    The system includes a projector (bottom) and scanner (top) which are co-planar and vertically offset: "The focal planes of the camera and projector are chosen to lie in a common plane, with their respective (horizontal) x-axes parallel and (vertical) y-axes coincident. The camera and projector are separated by a vertical baseline $b_y$." Le Moigne at 544.  Because of this configuration, the epipolar lines are also vertical.  "The configuration we have chosen utilizes a vertical baseline between projector and camera. This results in horizontal disparities which are nearly independent of the vertical coordinate (in fact, the horizontal disparity is zero if the two focal lengths are identical); the implication being that vertical lines in the projected grid appear as vertical lines in the image."  Le Moigne at 545.

164.    Le Moigne uses a structured light pattern with vertical and horizontal lines, with "dots" placed at unique positions along the rows and columns, as exemplified by Figure 2 for different line thicknesses and dot positions:

68



(a)          (b)

(c)          (d)

165.    The scanning process in Le Moigne relies on the fact that vertical (epipolar) lines in the projected grid are straight lines, and uses dot positions to locate the horizontal lines which may be distorted following the object's surface. *See* Le Moigne at 545–547. "The fact that [vertical lines] appear approximately straight and parallel makes them easily detectable in the image, and ultimately, this will help us follow the deformed horizontal lines in order to find the grid intersections." Le Moigne at 545.

166.    Dots are "illuminated squares" bounded by grid lines. Le Moigne at 546. Enough dots are included in the structured light pattern to allow identification of all horizontal lines. "The number of dots included depends on the number of lines in the grid, and is chosen to

'cover' the entire picture. … [T]his 'covering' is realized by distributing the dots over the image in such a way that every intersection is within reach of two or three grid points of at least one dot; two grid points for the lower half of the image … and three grid points for the upper half of the picture." Le Moigne at 543.

## G. Invalidity Over Tomasi

167.    It is my opinion that Tomasi anticipates and/or renders obvious every limitation of the Asserted Claims of the '656 Patent, as explained in detail below.

### 1. Claim 1

168.    It is my opinion that Tomasi discloses each of the limitations of Claim 1.

#### a. *[1.Preamble] "A system for the 3D measurement of the shape of a material object"*

169.    Tomasi discloses a system for the 3D measurement of the shape of a material object. For example, Tomasi describes constructing a topographical map of three-dimensional scenes, that "[t]hree-dimensional sensor systems are increasingly being used in a wide-array of applications" and that in a general application, "a three-dimensional sensor system is used to determine the shape and/or features of an object positioned in a scene of the sensor system's view." Tomasi at [0003]; *see also* [0002], [0022], [0042] and Fig. 12. *See also* limitation [1.C].

#### b. *[1.A] "a light projector for projecting a structured light pattern onto a surface of said object, wherein said light projector comprises a light source, a slide with a slide pattern located on a slide surface, and a projector lens characterized by a projector lens vertex"*

170.    Tomasi discloses a light projector for projecting a structured light pattern onto a surface of said object, wherein said light projector comprises a light source, a slide with a slide pattern located on a slide surface, and a projector lens characterized by a projector lens vertex.

70

For example, Tomasi's structured-light methods contain a projector and a camera system as shown in Figure 1.



*Figure 1*

171.    I am informed that the Court has construed the term "a light projector for …" to have its plain and ordinary meaning, i.e., "a device that projects light." Tomasi's projector meets that construction because it is a device that "projects an array 112 of coded light." Tomasi at [0034]; *see also* Tomasi at [0003]–[0006], [0028], [0061] and Figs. 1, 3.

172.    Tomasi further discloses that the light projector projects a structured light pattern onto the surface of an object. For example, Tomasi describes the light projector "projects an array 112 of coded light onto the scene 102", in which the coded light refers to "light that is

structures or patterned" and scene 102 includes the surface of an object, such as object 105. Tomasi at [0034]; *also see* Tomasi at [0035]–[0037], [0075]–[0076] and Fig. 1.

173.    Tomasi further discloses that the light projector comprises a light source.  For example, Tomasi states that the "projector 110 includes a light-emitting source."  Tomasi at [0034].  Tomasi also teaches the use of light source by "include[ing] a bulb and a slide having a pattern." *Id*.  Tomasi further discloses the use of "a light emitting diode (LED) or laser."  Tomasi at [0036].

174.    Tomasi further discloses that the light projector comprises a slide with a slide pattern located on a slide surface.  For example, Tomasi discloses that structured-light scanning uses "a light emitting source and some mechanism" that codes light, and the mechanism may be "a slide having a pattern," suggesting that the light pattern is fixed onto a conventional slide. *See* Tomasi at [0034]; *see also id.* ("the projection array 112 may correspond to a tangible medium, such as a slide, that includes a grid pattern for producing the coded light structure"); *id.* at [0036] ("The coding may be provided by a slide containing a pattern, which in turn causes the projected light to have a pattern."); *id.* at [0059] ("a standard slide projector"); *id.* at [0076] ("a light may be emitted through a slide that contains the sequence sets encoded into a grid provided on the slide.").  Tomasi further states that the projector has a "plane of light," which indicates that the pattern is formed on a plane which coincides with the slide surface.  *See* Tomasi at [0034].

175.    I am informed that the Court has construed the term "slide" to include a traditional "slide-type," a LCD-type slide, or "other device for creating structured light" as that phrase may be understood by a POSITA.  A POSA would understand that the "slide" taught by Tomasi meets that construction because it is, at a minimum, a "device for creating structured

light." *See* Tomasi at [0034] (coded light refers to structured light and "[w]hen the light passes through the slide, the contents of the slide code the light.").

176.    I am informed that the Court has construed the term "a slide pattern located on a slide surface" to mean that the information comprising the "slide pattern" must physically be located on or contained within the slide surface," whatever medium the "slide" may be.  A POSA would understand that Tomasi teaches that "projector 110 may include a bulb and a slide having a pattern[, and w]hen the light passes through the slide, the contents of the slide code the light" meets that construction.  *See, e.g.*, Tomasi at [0034]; *see also id.* (discussing "a slide, that includes a grid pattern for producing the coded light structure.").

177.    Tomasi further discloses that the light projector may comprise a projector lens characterized by a projector lens vertex.  A POSA would understand that the projector disclosed by Tomasi includes a conventional projector lens, which is inherently characterized by a lens vertex.  For example, Tomasi discloses the use of "a standard slide projector," which a POSA would understand to include a lens.  Tomasi at [0059].  *See* Section IV.B.  Tomasi also states that "[t]he projector optical center 302 of the projector 110 (FIG. 1) and the camera optical center 304 determine a line in space that is called the baseline 310."  Tomasi at [0059].

178.    In the alternative, it would have been obvious to a POSA to use a conventional projector including with a slide pattern located on a slide surface and a projector lens characterized by a projector lens vertex.  *See* Section IV.B.

### c.    *[1.B] "a device for capturing an image of said structured light pattern reflected on said object, wherein said device for capturing an image comprises a device lens characterized by a device lens vertex"*

179.    Tomasi discloses a device for capturing an image of said structured light pattern reflected on said object, wherein said device for capturing an image comprises a device lens

characterized by a device lens vertex.  For example, Tomasi's structured-light scanning system comprises a camera that "captures an image of the scene." Tomasi at [0038]; *see also id.* at [0007] ("a camera or other optical sensor"), [0024] ("A camera or similar sensing apparatus"), [0033] ("camera 120"), [0059] ("camera optical center 304"), Fig. 1.

180.    I am informed that the Court has construed the term "a device for …" as a means-plus-function term under 35 U.S.C. § 112(f), where the function is "capturing an image of said structured light pattern reflected on said object," and the corresponding structure is "a camera including a lens having a vertex, a matrix radiation receiver, and a camera driver, and equivalents thereto."  A POSA would understand that the camera taught by the Tomasi reference meets that construction.  For example, Tomasi discloses that "[t]he camera 120 may include a lens (not shown) and a frame grabber which obtains data corresponding to an image array 122" and "the camera 120 is of a charged couple device (CCD) or complimentary metal-oxide semiconductor (CMOS) design."  Tomasi at [0038]. As explained above, a CCD is an image sensor that includes a matrix radiation receiver (array of MOS capacitors) and a camera driver (charge amplifiers).  Similarly, a CMOS image sensor includes a matrix radiation receiver (array of active pixels) and a camera driver (readout amplifiers).  *See* Section IV.C

181.    Tomasi further discloses that the camera includes a lens, which is inherently characterized by a lens vertex.  Tomasi at [0038] ("The camera 120 may include a lens"); *id.* ("Enough depth of field in turn requires a sufficient amount of light for a camera lens with a relatively small aperture.").

182.    In the alternative, it would have been obvious to a POSA to use a conventional camera including a lens having a vertex, a matrix radiation receiver, and a camera driver.  *See* Section IV.C.

### d.   [1.C] *"a computing device for determining a measurement relating to the shape of said object using a triangulation algorithm based on a correspondence between points in said slide pattern and said image"*

183.    Tomasi discloses a computing device for determining a measurement relating to the shape of said object using a triangulation algorithm based on a correspondence between points in said slide pattern and said image.  For example, Tomasi discloses the use of a computing device such as a processor to measure a 3-D surface using a triangulation algorithm. Tomasi at [0039]; *see also id.* at [0007]–[0008], [0033] and Figure 1.

184.    Tomasi further discloses that the computing device determines a measurement relating to the shape of said object.  For example, Tomasi states that "the processor 130 determines a correspondence between an element of the image array 122 and an element of the projection array 112."  Tomasi at [0039]; *see also id.* at [0002]–[0003], [0022], [0042], [0125].

185.    Tomasi further discloses that the computing device uses a triangulation algorithm based on a correspondence between points in the slide pattern and the captured image.  Tomasi states that "triangulation techniques such as described in FIG. 5 may be employed to determine how far a region on the surface represented by an element of the image array 122 is from the camera 120."  Tomasi at [0081]; *see also id.* ("This distance may be determined by determining how the column coordinate of the image element differs from its corresponding projector element, as well as knowing a spatial relationship between the camera 120 and the projector 110."); *id.* at [0014], [0025], [0068]–[0072], [0081]–[0082], [0092].



FIG. 5

*Figure 5*

e. **[1.D] "said slide pattern comprises a plurality of coded elements, where each of said coded elements is characterized by at least one parameter and, where said at least one parameter defines a spatial or temporal distribution of an amplitude or a wavelength of said structured light"**

186.    Tomasi discloses that said slide pattern comprises a plurality of coded elements, where each of said coded elements is characterized by at least one parameter and, where said at least one parameter defines a spatial or temporal distribution of an amplitude or a wavelength of said structured light. For example, Tomasi discloses that "a coded light pattern can be created on a scene, by creating a sequence of values that include a plurality of subsequences. Each subsequence may identify one or more elements of a projection array. A value may be assigned to a characteristic in a set of optically distinguishable characteristics." Tomasi at [0006]. As discussed below, such "optically distinguishable characteristics" include amplitude and wavelength of the projected light. Tomasi further discloses a spatially distributed binary coded pattern. "In one embodiment, light is coded to provide discrete identifiable elements. The coded light is then projected onto an object or scene." Tomasi at [0024]. "In step 210, an encoding scheme is developed for the project array" and "[i]n step 220, the code developed in 210 is

76

encoded into the projection array." Tomasi at [0043], [0051]; *see also id.* at [0005]–[0006], [0034]–[0035], [0043]–[0045], [0055], [0074], [0078], [0080], [0090]–[0091], [0107]–[0116], Figures 10 and 11.

187.    Tomasi further discloses that each of the coded elements is characterized by a parameter that defines a spatial distribution of an amplitude of the structured light. For example, Tomasi discloses that "[c]oding the light from the projector 110 requires assigning an optically distinguishable attribute to each element of the projection array 112," and that "each element of the projection array 112 is said to be assigned a symbol representing a binary value." Tomasi at [0089]. Tomasi also discloses that "the manner in which the light may be coded may vary" but in the end, "the coding scheme selected assigns values to specific characteristics of light propagated form the projector 110" and "or three values (0,1 and parity) are utilized" in the binary scheme. Tomasi at [0035]. "There are no fundamental restrictions as to the shapes of the symbols used as identifiers. The main design criterion is that different symbols should be distinguishable. However, the brightness and contrast requirements above suggest projecting binary images (that is, images with only two levels of brightness, black or white)." Tomasi at [0112]. "[G]rid points may be assigned a size from a set of two or more sizes. Other variations and identifiers are possible." Tomasi at [0035]. Therefore, the spatially distributed binary value of the light corresponds to structured light amplitude (e.g., brightness and/or size of the coded elements).

188.    Tomasi further discloses that each of the coded elements is characterized by a parameter that defines a spatial distribution of a wavelength of the structured light. For example, Tomasi discloses that "grid points are colored to have one color from a set of two or more colors." Tomasi at [0035]; *see also id.* at [0051] ("Another embodiment assigns colors to the set

77

representing binary values (e.g. red and blue).").  Therefore, the spatially distributed binary value of the light corresponds to structured light wavelength.

> ### f.    [1.E] *"said coded elements are assigned to one of at least first group or second group, each of which first group and second group comprising at least two of said coded elements"*

189.    Tomasi discloses that said coded elements are assigned to one of at least first group or second group, each of which first group and second group comprising at least two of said coded elements.  For example, Tomasi discloses groups of coded elements, containing at least two coded elements.  "If these two properties are satisfied, a group of contiguous symbols in the image contains, so to speak, its own address: the arrangement of symbols in the group is unique to that particular group in that row of the projected array, and it cannot be confused with any other group."  Tomasi at [0092].

190.    Tomasi further discloses that coded elements are assigned to groups corresponding to rows, where each group of coded elements assigned to a row comprises multiple coded elements.  For example, Tomasi discloses that "geometric or spatial relationships may be used to correlate each row of the image array 122 to a corresponding row of the projection array 112."  Tomasi at [0052].  "[A]ny camera and projector arrangement is possible, as long as the array rows on the projected pattern are oriented along the epipolar lines."  Tomasi at [0060]; *see also id.* at [0054] ("According to epipolar geometry, given the image position of a local pattern, there is only one row of the array that the pattern can belong to. Epipolar geometry determines which row this is."), [0024], [0033], [0057]–[0062], [0079], [0083]–[0087], [0103].  *See also* limitation [1.G].

**b.  [1.A] "a light projector for projecting a structured light pattern onto a surface of said object, wherein said light projector comprises a light source, a slide with a slide pattern located on a slide surface, and a projector lens characterized by a projector lens vertex"**

262.    Le Moigne discloses a light projector for projecting a structured light pattern onto a surface of said object, wherein said light projector comprises a light source, a slide with a slide pattern located on a slide surface, and a projector lens characterized by a projector lens vertex. For example, Le Moigne's structured-light scanning system comprises "a camera separated from the projector by a vertical baseline" as shown in Figure 1:



263.    I am informed that the Court has construed the term "a light projector for …" to have its plain and ordinary meaning, i.e., "a device that projects light." Le Moigne's projector meets that construction because it is "a light source which projects a known pattern of light on the scene." Le Moigne at 541.

104

264.    Le Moigne further discloses that the light projector projects a structured light pattern onto a surface of said object.  For example, Figure 2 of Le Moigne depicts "structured light patterns projected onto two different scenes" comprising multiple material objects.  Le Moigne at 543; *see also id.* at 541 ("structured light" concept involves use of "a light source which projects a known pattern of light on the scene"); Figures 3–5 and 7–12 (depicting structured light patterns projected onto the surfaces of various objects).

265.    Le Moigne further discloses that the light projector comprises a light source.  For example, Le Moigne states that "[a] conventional mercury arc lamp could then be used as a source."  Le Moigne at 542.  Le Moigne also teaches the use of infrared light sources, such as a "carbon dioxide laser."  *Id.*; *see also id.* ("One could … try to overcome the effects of the ambient lighting by utilizing a very powerful light source in the projector").

266.    Le Moigne further discloses that the light projector comprises a slide with a slide pattern located on a slide surface.  A POSA would understand that the grid lighting disclosed by Le Moigne includes a conventional slide for projecting a structured light pattern.  For example, Le Moigne discloses that structured-light scanning uses "a light source which projects a known pattern of light on the scene," suggesting that the light pattern is fixed onto a conventional slide.  Le Moigne at 541.  Le Moigne further states that the projector has a "focal plane," which indicates that the pattern is formed on a plane which coincides with the slide surface.  Le Moigne at 544.

267.    I am informed that the Court has construed the term "slide" to include a traditional "slide-type," a LCD-type slide, or "other device for creating structured light" as that phrase may be understood by a POSITA.  A POSA would understand that the "grid lighting" taught by Le Moigne meets that construction because it is, at a minimum, a "device for creating

105

structured light." *See* Le Moigne at 521 ("a light source which projects a known pattern of light on the scene"); *id.* at 543 ("structured light patterns projected onto two different scenes").

268.    I am informed that the Court has construed the term "a slide pattern located on a slide surface" to mean that the information comprising the "slide pattern" must physically be located on or contained within the "slide surface," whatever medium the "slide" may be.  A POSA would understand that the "grid lighting" taught by Le Moigne meets that construction because it includes a conventional slide for projecting a structured light pattern.  For example, a conventional slide has a slide pattern that is physically located on its surface.

269.    Le Moigne further discloses that the light projector comprises a projector lens characterized by a projector lens vertex.  A POSA would understand that the projector disclosed by Le Moigne includes a conventional projector lens, which is inherently characterized by a lens vertex.  *See* Section IV.B.  For example, Le Moigne states that "[t]he camera and projector are modeled as pinhole imaging devices with focal lengths $f_1$ and $f_2$, respectively."  Le Moigne at 544.

270.    In the alternative, it would have been obvious to a POSA to use a conventional projector including with a slide with a slide pattern located on a slide surface and a projector lens characterized by a projector lens vertex.  *See* Section IV.B.

### c. [1.B] "a device for capturing an image of said structured light pattern reflected on said object, wherein said device for capturing an image comprises a device lens characterized by a device lens vertex"

271.    Le Moigne discloses a device for capturing an image of said structured light pattern reflected on said object, wherein said device for capturing an image comprises a device lens characterized by a device lens vertex. For example, Le Moigne's structured-light scanning system comprises "a camera separated from the projector by a vertical baseline" as shown in

Figure 1.  Le Moigne further discloses various types of cameras for capturing a reflected image of the projected structured light pattern, e.g., "an FLIR-type imaging camera," "an image orthicon or isocon camera," "vidicon tubes or solid-state devices," and "optical processing devices."  Le Moigne at 542.

272.    I am informed that the Court has construed the term "a device for …" as a means-plus-function term under 35 U.S.C. § 112(f), where the function is "capturing an image of said structured light pattern reflected on said object," and the corresponding structure is "a camera including a lens having a vertex, a matrix radiation receiver, and a camera driver, and equivalents thereto."  A POSA would understand that each of the cameras taught by the Le Moigne reference, including a FLIR camera and an image orthicon, meets that construction.  *See* Section IV.C.

273.    In the alternative, it would have been obvious to a POSA to use a conventional camera including a lens having a vertex, a matrix radiation receiver, and a camera driver.  *See* Section IV.C.

### d.   *[1.C] "a computing device for determining a measurement relating to the shape of said object using a triangulation algorithm based on a correspondence between points in said slide pattern and said image"*

274.    Le Moigne discloses a computing device for determining a measurement relating to the shape of said object using a triangulation algorithm based on a correspondence between points in said slide pattern and said image. For example, Le Moigne discloses the use of a computing device such as a VAX 11/785 or a special-purpose hardware image processor (VICOM).  Le Moigne at 547.

275.    Le Moigne further discloses that the computing device determines a measurement relating to the shape of said object.  For example, Le Moigne measures a continuous 3-D surface

107

that describes the shape of the material objects in the immediate environment of a mobile robot. *See* Le Moigne at 547; *see also* Figures 2–5 and 7–12.

276.    Le Moigne further discloses that the computing device uses a triangulation algorithm based on a correspondence between points in the slide pattern and the captured image. "By utilizing a projected grid of lines, we aim to localize the intersection points in the image, label these intersections with their coordinates in the projected grid, compute the corresponding disparities, and convert this to range information."  Le Moigne at 543; *see also id.* at 541 (disclosing "an active, bi-static triangulation system based on the concept of 'structured light.'").  Specifically, Le Moigne discloses the use of a triangulation formula that is a modification of that of Hall et al., "Measuring Curved Surfaces for Robot Vision," *IEEE Computer*, vol. 15, issue 12, Dec. 1982.  Le Moigne at 543–545 and Ref. [7].

### e.    *[1.D] "said slide pattern comprises a plurality of coded elements, where each of said coded elements is characterized by at least one parameter and, where said at least one parameter defines a spatial or temporal distribution of an amplitude or a wavelength of said structured light"*

277.    Le Moigne discloses that said slide pattern comprises a plurality of coded elements, where each of said coded elements is characterized by at least one parameter and, where said at least one parameter defines a spatial or temporal distribution of an amplitude or a wavelength of said structured light. For example, Le Moigne discloses the use of a rectangular grid of coded elements, each coded element being defined by the crossing of horizontal and vertical lines, augmented by "dots" at each square in the grid to identify specific positions in the structured-light pattern.  "[A] coarse registration of the image against the projected pattern … is done by using the illuminated squares (called 'dots' and bounded by the grid lines themselves) included towards the center of the projected pattern."  Le Moigne at 546.  Fig. 2 depicts different arrangements of illuminated and non-illuminated squares on the grid:

108



(a)          (b)

(c)          (d)

278.    Le Moigne further discloses that each of the coded elements is characterized by a parameter that defines a spatial distribution of an amplitude of the structured light. For example, the horizontal and vertical lines (and thus their crossings) are defined by modulating the light intensity (i.e., amplitude) in space across the light pattern. Further, the presence or absence of a "dot" in a square is obtained by modulating the light intensity (i.e., amplitude) in the squares defined by the rectangular grid. This is substantially the same as the coding pattern shown in Figure 4b of the '656 Patent:



# Fig. 4b

      **f.**   **[1.E] "said coded elements are assigned to one of at least first group or second group, each of which first group and second group comprising at least two of said coded elements"**

279.    Le Moigne discloses that said coded elements are assigned to one of at least first group or second group, each of which first group and second group comprising at least two of said coded elements. For example, each column in the structured-light pattern of Fig. 2(d) comprises ten coded elements (highlighted as red crosses).

280.    Individual coded element may be identified by reference to the closest "dot." "The number of dots included depends on the number of lines in the grid, and is chosen to 'cover' the entire picture. … [T]his 'covering' is realized by distributing the dots over the image in such a way that every intersection is within reach of two or three grid points of at least one dot; two grid points for the lower half of the image … and three grid points for the upper half of the picture." Le Moigne at 543.



342.    Because the display device is supposed to provide "a reference position and/or a reference orientation" during scanning, the display device is positioned at least adjacent the scanning system, and possibly integrated with it:

> While the object capturing system 102 will be referred to herein as being **combined or integrated with** the display device 101, it is understood that the terms combined and integrated shall also refer to the object capturing system 102 being connected to or otherwise attached to the display device in a fixed or removable relationship or otherwise **positioned alongside or adjacent to** the display device 101. In one or more embodiments, the object capturing system 102 positioned alongside or adjacent to the display device 101 is an integrated device.

'129 Patent at 2:56–65.

343.    Notably, the specification of the '129 Patent does not provide any disclosure of how the display device provides "a reference position and/or a reference orientation."  For example, there is no drawing visually depicting a position or orientation as it would be shown by the display device.  Instead, the display device is shown from the back (Fig. 1) or as a blank box (Figs. 2–4).

132

| | • Means: using a photographic lens, having a vertex, a matrix radiation receiver, and a driver as those terms are understood by a POSITA. |
|---|---|
| "a computing device for" | Plain and ordinary meaning. |
| "said display device provides a position and orientation for said object to **take** with respect to said at least one detection device prior to capturing the at least one image" | Plain and ordinary meaning, i.e., "the display device provides a position and orientation for the object to **have** prior to the at least one detection device capturing the at least one image." |
| "positioned near" | Not indefinite; no further construction is necessary. |

### C. Prosecution History

350. The '129 Patent issued from a patent application filed on October 5, 2007 (No. 11/868,352). The originally filed independent claims only recited "a display device" without further limitations. However, dependent claims 2 and 12 recited "the display device provides a position and orientation for the object to assume with respect to [the] detection device."

351. On April 1, 2011, the examiner issued a non-final office action rejecting claims 2 and 12 as indefinite, stating: "[T]he claim language 'to assume' with respect to claim 2 is confusing. What is meant by 'to assume'?" Office Action at 2. The examiner also rejected the claims as anticipated by or obvious over US2008/0106746 to Shpunt et al., alone or in combination with other references.

352. On October 3, 2011, the applicants amended claims 2 and 12 to replace the word "assume" with the word "take." The applicants did not provide any rationale for the amendments or arguments in response to the prior art rejections.

353. On December 23, 2011, the examiner issued a final office action withdrawing the indefiniteness rejection of claims 2 and 12, but maintaining the same prior art rejections.

354.    On June 26, 2012, the applicants amended the independent claims to include the limitations of claims 2 and 12.  In the accompanying amendments, the applicants stated:

> Neither the referenced paragraphs, no [sic] the balance of the Shpunt reference teaches a system, "wherein the display device provides a position and orientation for the object to take with respect to the at least one detection device." In fact, Shpunt teaches away from the applicants' invention when it requires that the distance between the object and the imaging device be calculated. [0054]

Response at 6.

355.    On March 15, 2013, the examiner issued a notice of allowance including an examiner's amendment to include the limitation of "said display device provides a position and orientation for said object to take with respect to said at least one detection device prior to capturing the at least one image."

### D.  Written Description, Enablement, and Indefiniteness

#### 1.  "said display device provides a position and orientation for said object to take with respect to said at least one detection device prior to capturing the at least one image"

##### a.  Written Description

356.    The specification of the '129 Patent does not show that the applicants were in possession of the claimed invention, including that the "display device provides a position and orientation for said object to take with respect to said at least one detection device."  As explained above, the entirety of the discussion of this feature can be found in the specification at 3:46–62 and 4:57–67.  However, that discussion simply repeats or paraphrases the language of the claim without providing a written description of the invention as claimed.  There is no disclosure of a single embodiment of such "provid[ing] a position and orientation."

136

### b. Enablement

357.     For the same reason why the '129 Patent does not provide written description support for the limitation that the "display device provides a position and orientation for said object to take with respect to said at least one detection device," it also would not enable a POSA to practice the claimed invention without undue experimentation.  Simply put, a POSA would have to implement the concept of displaying a position and orientation without guidance of any kind.

358.     Notably, the prior art references discussed below provide far more detailed instructions regarding how to provide such "position and orientation."  *See* Section VI.F.

### c. Indefiniteness

359.     Because the '129 Patent does not explain what it means to "provide[] a position and orientation for said object to take with respect to said at least one detection device," it fails to inform a POSA as to the claim scope with reasonable certainty, rendering the claims indefinite.

360.     In addition to failing to disclose any specific way of "provid[ing] a position and orientation," the '129 Patent does not explain what that "provid[ing]" means.  For example, the '129 Patent does not explain whether and how the "display device" provides instructions for placing the object before the scanning apparatus in the *correct* position and orientation.  As explained above, Artec appears to believe that simply showing the *current* position and orientation meets the claims, whatever that position and orientation happens to be at a particular moment.  *See* Section VI.B.  However, that reading is inconsistent with the specification of the '129 Patent which only refers to a "*reference* position [and] *reference* orientation."  *See, e.g.*, '129 Patent at 3:46–62.  In short, Artec's infringement positions only highlight the ambiguities in the scope of the claims of the '129 Patent.

### E.  Patent Eligibility

361.    In my opinion, each of the Asserted Claims of the '129 Patent is directed to patent ineligible subject matter. As explained below, the Asserted Claims are directed to an unpatentable abstract idea. In addition, none of the Asserted Claims recite an inventive concept that is significantly more than the abstract idea.

362.    As an initial matter, independent claim 1 of the '129 Patent is representative of the Asserted Claims for purposes of a patent eligibility analysis.  I will discuss other claims below.

363.    With respect to Step 1 of the *Alice* analysis, like the '656 Patent, the '129 Patent describes a system and method for scanning a three-dimensional object to create a visual representation of its shape using non-contact structured light triangulation.  Claim 1 involves a setup of standard components for structured light 3D scanning, comprising a projection device, detection device for capturing images (i.e., camera), and a computing device for determining measurements (limitations [1.Preamble], [1.B], [1.C], and [1.D]). The claims provide no details regarding the measurements to be determined.  Thus, limitations [1.Preamble], [1.B], [1.C], and [1.D] provide simply a field of application to structured light scanning.

364.    The only purportedly inventive feature of the Asserted Claims is the use of a display device for providing a "position and orientation" of the object whose image is being captured (limitations [1.A.] and [1.E]).  However, the '129 Patent describes providing such position and orientation guidance in only the most generic terms.  As explained above, the '129 Patent does not disclose how that requirement is accomplished, and the provision of such instructions by a display device in order to ensure a correct scanning, in any event, was well known in the prior art.  *See* Section VI.E.  In sum, claim 1 of the '129 Patent is directed to the abstract concept of providing instructions for positioning an object during structured light

138

scanning.  This is akin to the verbal instructions given by film photographers to their subjects, or the written or visual instructions provided in a photo booth to ensure a subject is in-frame.  I am informed that limitations restricting an abstract idea to a specific field of application (here, structured light scanning) do not turn it into a patentable invention.

365.    In addition, as explained above, Artec appears to believe that simply showing the **current** position and orientation of an object being scanned meets the claims, whatever that position and orientation happens to be at a particular moment.  *See* Section VI.B.  Under that interpretation, claim 1 of the '129 Patent is directed to the abstract concept of providing a preview image for positioning an object during structured light scanning.  This is also a concept found in SLR film cameras since the first half of the twentieth century, in the form of an optical viewfinder.  *See* https://en.wikipedia.org/wiki/Single-lens_reflex_camera.  Also here, limitations restricting an abstract idea to the specific field of application of structured light scanning do not turn the idea into a patentable invention.

366.    With respect to Step 2 of the *Alice* analysis, the Asserted Claims of the '129 Patent do not contain any elements that comprise an inventive concept either considered individually or as an ordered combination. Representative claim 1 recites a number of hardware components—a projection device, detection device for capturing images (i.e., camera), a computing device for determining measurements, and a display device—which the '129 Patent recognizes as conventional. As discussed above, the '129 Patent acknowledges that the basic elements of structured light scanning were known in the art.  '129 Patent at 1:14–39.  Moreover, the '129 Patent describes each of the structural elements recited in the claim as well-known, routine, and conventional, without suggesting that any of them is unconventional or inventive. For example, the '129 Patent describes the projection device as simply "a slide projector

including a light source 126 and a light modulating device 122 for modulating the light emitted from the light source 126." '129 Patent at 6:1–4. Likewise, the detection device for capturing images is also described in purely conventional terms as a known camera: "The object capturing system 102 further includes at least one detection device 108, wherein the at least one of the detection devices 108 captures at least one image of the structured light 112 acting on a surface 110 of the object 111." '129 Patent at 3:4–7; *see also id.* at 3:8–14.  The computing device is also described in conventional terms as any general-purpose computer: "[A] computing device 104 is connected to the projection device 106 and the detection device 108 such that the computing device 104 may analyze the images captured by the detection device 108 to perform desired calculations such as, but not limited to, the 3D shape of the surface 110 of the object 111, the distance to the object 111, the orientation of the surface 110 being captured, 2D images of the surface 110 of the object 111, and recognition of the object 111." '129 Patent at 3:15–22; *see also id.* at 4:4–11 ("The computing device 104 of the object capturing system 100 may include a general-purpose computer system which is suitable for implementing the methods for the 3D and 2D measurements of the shape of material objects in accordance with the present disclosure.  The computing system 104 is only one example of a suitable computing environment and is not intended to suggest any limitation as to the scope of use or functionality of the invention.").  The patent describes the display device in the most generic of terms, stating that it "may be any device that displays information to a user or toward the object 11," and that "it may include, but is not limited to, a computer monitor, an LCD, a desktop computer, a laptop computer, a television, a portable or mobile telephone, a personal digital assistant, a handheld computing device, a remote terminal, or any other type of display or device that may include a display." '129 Patent at 3:30–36.  Based on my experience, these are off-the-shelf components universally

140

used in structured-light scanning systems, and well-known at the time of the filing of the application which issued as the '129 Patent. I understand that merely using conventional hardware to implement an abstract idea does not confer patent eligibility.

367.    Nor does the recitation of a display device to provide "a reference position and/or a reference orientation" during scanning alter my assessment. As explained above, the specification of the '129 Patent does not provide any disclosure of how the display device provides "a reference position and/or a reference orientation."  For example, there is no drawing visually depicting a position or orientation as it would be shown by the display device.  Instead, the display device is shown from the back (Fig. 1) or as a blank box (Figs. 2–4).  This purely generic description fails to supply any inventive concept.

368.    The same analysis applies to claims 3–5, 10, and 12–13 of the '129 Patent.  In particular, as detailed above, independent claim 10 is a method claim that is analogous to asserted independent claim 1, which is simply a system claim version of the same subject matter. *See* Section VI.B.  Further, as also detailed above, at a high level, claims 3 and 12 recite the same limitations but specify that the projection device and detection device are separated from the display device; claims 4 and 13 merely specify that the display device is a computer display; and claim 5 merely specifies that the type of object being scanned is a face of a user.  None of these claims add anything non-abstract or inventive beyond the limitations of claim 1.

369.    In conclusion, in my opinion, the Asserted Claims of the '129 Patent are directed to an abstract concept at Step 1 of the *Alice* analysis—namely, providing instructions for positioning an object during structured light 3D scanning; or, adopting Artec's interpretation of the claims, providing a preview image for positioning an object during structured light scanning. At Step 2 of the *Alice* analysis, it is my opinion that the Asserted Claims do not comprise a

sufficiently inventive concept to transform this abstract idea into a patent-eligible invention, as they rely on conventional components and techniques without meaningful improvement. Accordingly, it is my opinion that the Asserted Claims of the '129 Patent are invalid as directed to patent-ineligible subject matter under 35 U.S.C. § 101.

370.    I understand that Artec has not yet provided any response to Defendants' contentions that the Asserted Claims of the '129 Patent are directed to patent-ineligible subject matter. Accordingly, I reserve the right to revise the foregoing opinions should Artec or its expert provide an explanation asserting that the claims are directed to patent eligible subject matter.

## F. Overview of the Prior Art

### 1. Rusinkiewicz et al., "Real-Time 3D Model Acquisition," *ACM Transactions on Graphics*, vol. 21, no. 3, pp. 438–446 (July 2002) ("Rusinkiewicz")

371.    The Rusinkiewicz article was published in the July 2002 issue of the ACM Transactions on Graphics. Because this is a major technical journal which is typically carried by large academic libraries, it was readily accessible to the interested public by late 2002 at the latest. Therefore Rusinkiewicz qualifies as prior art to the '129 Patent under at least pre-AIA 35 U.S.C. § 102(a) and (b), because the '129 Patent has an earliest priority date of October 10, 2007.

372.    Rusinkiewicz discloses a structured-light 3D model acquisition system including a projector, a camera, and a display in close proximity to the object being scanned, as shown in Figure 1(a):

142



373.    Rusinkiewicz discloses a real-time preview mode that guides the user to position the object in a position and orientation that ensure proper coverage of the object's surface. Specifically, Rusinkiewicz's system provides "a live preview of the scanned model" that "give[s] the user feedback about which areas of the model have been scanned, and whether any holes are left." Rusinkiewicz at 441. The system "returns range images in real time (60 Hz.) and lets the user perform hole detection and view planning interactively. … By displaying a rough merged model in real-time on a computer screen, the user can find holes (unscanned areas) visually, and move the object to fill them." *Id.* at 439. "[T]he quality of the real-time reconstruction only needs to be good enough to guide the user in positioning the object." *Id.* at 442.

374.    In addition to the live preview mode, Rusinkiewicz discloses providing the user with a desired position and orientation for the object to have during scanning to facilitate alignment of the captured images. Specifically, Rusinkiewicz discloses the use of "anchor scans" to provide a reference position and orientation for an object during scanning. Rusinkiewicz at 442–443. In normal operation, the system uses a real-time variant of ICP

(iterative closest points) to align each new range scan to previously acquired 3D data. *Id.* at 440–441. When ICP automatic alignment fails, the system "take[s] advantage of the human operator's strengths in performing pattern matching by simply displaying one or more range images, asking the user to position the object so it roughly lines up with one of them." *Id.* at 443. The system "ask the user to move the object to line up [range image] R with one of the anchors." *Id.* This is visually illustrated in the last case of Figure 9 of Rusinkiewicz:



375.    The real-time visual feedback and user-guided alignment of Rusinkiewicz provides benefits in terms of both accuracy and robustness. "The ability to provide real-time feedback to the user has yielded benefits throughout the model acquisition pipeline. In addition to simplifying the view planning problem, it has proven useful in restarting after a failed alignment and prompted an aggressive strategy for outlier rejection." Rusinkiewicz at 445.

144

### 2.   U.S. Patent No. 8,224,064 to Hassebrook et al. ("Hassebrook")

376.    The Hassebrook Patent issued from a U.S. patent application filed on October 25, 2006, claiming priority to a parent application filed on May 21, 2003 and a U.S. provisional patent application filed on October 25, 2005.  Therefore Hassebrook qualifies as prior art to the '129 Patent under at least pre-AIA 35 U.S.C. § 102(e) because the '129 Patent has an earliest priority date of October 10, 2007.

377.    Hassebrook discloses "a biometrics system for capturing and processing a handprint image using a structured light illumination to create a 2D representation equivalent of a rolled inked handprint."  Hassebrook at 2:41–44.  The system is depicted in Fig. 2a–2b:



378.    Hassebrook's system includes standard structured-light scanning hardware, including projector 112, cameras 110, and processor 116.  Hassebrook at 5:35–49.  In addition, Hassebrook discloses the use of a "display unit 114 [that] displays the scan volume 104 and in this example, a right hand is positioned within the scan volume 104."  *Id.* at 5:50–52.

145

379.    In operation, Hassebrook's display provides two functionalities: a preview mode and positioning instructions.  "During preview mode, the biometrics system 100 assists in and verifies correct hand positioning."  Hassebrook at 7:56–58.  After preview mode, "the biometrics system 100 will prompt the subject with instructions if the hand is not correctly positioned with possible occlusion of part of the hand from the cameras 110 or projection unit 112. … [T]he instructions may be displayed on the display 114."  *Id.* at 8:3–9.  The overall flow is depicted in Fig. 6 of Hassebrook, and in particular at steps 208 (preview mode) and 212 (instructions):



FIG. 6

*See also id.* at 76:49–8:45.

380.    The preview/instruction functionality in Hassebrook is provided prior to performing the imaging process.  "When the hand is correctly positioned, the biometrics system 104 then provides instructions to maintain hand position, as shown in step 214. The biometrics system 100 captures the hand print images needed for processing as shown in step 216." Hassebrook at 8:18–22.

### G. Invalidity Over Rusinkiewicz

#### 1. Claim 1

381.    It is my opinion that Rusinkiewicz discloses each of the limitations of claim 1.

##### a. *[1.Preamble] "A system for the 3D measurement of the shape of a material object"*

382.    Rusinkiewicz discloses a system for the 3D measurement of the shape of a material object. For example, Rusinkiewicz describes "a new 3D model acquisition system that permits the user to rotate an object by hand and see a continuously-updated model as the object is scanned." Rusinkiewicz at 438. Rusinkiewicz further discloses "a range scanner capable of returning the 3D shape of a moving object" (*id.* at 440), such as the figurines depicted in Figures 10–12.

##### b. *[1.A] "a display device"*

383.    Rusinkiewicz discloses a display device. For example, Rusinkiewicz's system includes a computer monitor, as depicted in Figure 1(a):



148

*See also* limitation [1.E] and claim 4.

###### c.   *[1.B] "at least one projection device for projecting a structured light pattern onto a surface of an object"*

384.    Rusinkiewicz discloses at least one projection device for projecting a structured light pattern onto a surface of an object. For example, Rusinkiewicz's system includes "a DLP projector that displays structured light patterns," as depicted in Figure 1(a):



Rusinkiewicz at 438.  Rusinkiewicz further discloses that "[t]he system uses a Compaq MP1800 DLP projector, with a maximum resolution of 1024x768. Because of the need to synchronize it with the video camera, we currently send an S-Video signal to the projector, limiting us to a resolution of 640x240 interlaced."  Rusinkiewicz at 443.

385.    Rusinkiewicz further discloses that the projection device projects a structured light pattern onto a surface of an object.  For example, Figure 3 shows "the sequence of illumination patterns … There are four different patterns, which can uniquely code 110 stripe boundaries."  Rusinkiewicz at 440.

149



386.    Rusinkiewicz further discloses that the structured light pattern is projected onto a surface of an object, as depicted in Figure 4:



*See also* Rusinkiewicz at 438 ("Our system is based on a 60 Hz. structured-light rangefinder"); *id.* at 439 ("Our system is based on a consumer video projector, used to generate sequences of structured light patterns"); *id.* ("We chose to use a system based on projected structured-light triangulation, since it uses off-the-shelf hardware, permits (slowly) moving objects, and returns a full range image, as opposed to a single point or line of 3D data, every 60th of a second."); Figures 2, 5, 11.

> **d. [1.C] "at least one detection device for capturing at least one image of the surface of said object, wherein at least one of the detection devices captures at least one image of the structured light pattern acting on the surface of said object"**

387.    Rusinkiewicz discloses at least one detection device for capturing at least one image of the surface of said object, wherein at least one of the detection devices captures at least one image of the structured light pattern acting on the surface of said object. For example, Rusinkiewicz's system includes "an NTSC video camera," as depicted in Figure 1(a):



Rusinkiewicz at 438.

388.    Rusinkiewicz further discloses that the system uses "a Sony DXC-LS1 NTSC camera, with a 1/500 sec. shutter speed. The video is digitized by a Pinnacle Studio DC10+ capture card, yielding interlaced 640x240 video fields at 60 Hz." Rusinkiewicz at 443. Rusinkiewicz further discloses using "a higher-quality camera and digitizer (Toshiba IK-TU40A 3-CCD camera and DPS-465 digitizer)" to "obtain lower per-sample noise – under 0.03 mm." *Id.* at 445; *see also id.* at 439 ("a consumer video camera"); *id.* at 440 ("the illuminated object is

151

photographed by an NTSC camera synchronized to the projector"); *id.* ("The system cycles among these frames at 60 Hz., captures video with a synchronized NTSC camera"); *id.* at 445 ("higher-resolution cameras and projectors (for higher-quality data or larger working volumes), high-speed cameras and projectors (for faster allowable motion)"); Figure 2.

389.    I am informed that the Court has construed the term "detection device [for]" as a means-plus-function term under 35 U.S.C. § 112(f), where the function is "capturing at least one image of an object and at least one image of the structured light pattern acting on the surface of said object" and the corresponding structure is "using a photographic lens, having a vertex, a matrix radiation receiver, and a driver as those terms are understood by a POSITA."  A POSA would understand that several of the types of cameras taught by Rusinkiewicz meet that construction, including, e.g., the Sony DXC-LS1 NTSC video camera and Pinnacle Studio DC10+ capture card, and the Toshiba IK-TU40A 3-CCD camera and DPS-465 digitizer.  *See* Section IV.C.

390.    In the alternative, it would have been obvious to a POSA to use a conventional camera including a photographic lens, having a vertex, a matrix radiation receiver, and a driver. *See* Section IV.C.

> **e.  [1.D] "a computing device for determining a measurement relating to the captured image"**

391.    Rusinkiewicz discloses a computing device for determining a measurement relating to the captured image. For example, Rusinkiewicz discloses "a range scanner capable of returning the 3D shape of a moving object."  Rusinkiewicz at 440.  Rusinkiewicz's system includes an Intel Pentium-based computing device that "performs triangulation to find 3D points" to determine a range measurement relating to the images captured by the camera:

**CPU Usage:** Our prototype uses a dual-CPU system, with Intel Pentium III Xeon processors running at 1 GHz. One CPU is used for the first few stages of the range scanning pipeline, namely grabbing video frames, finding stripe boundaries, matching the boundaries across time, and identifying the boundaries from the accumulated illumination history. The second CPU *performs triangulation to find 3D points*, aligns the scans using the fast ICP algorithm, integrates range images into the 3D grid, and renders the updated grid. The first piece of this pipeline operates at full speed (60 Hz.), while the second operates slower, approximately 10 Hz.

Rusinkiewicz at 443; *see also id.* at 439 ("We chose to use a system based on projected structured-light triangulation"); *id.* at 445 ("The system uses off-the-shelf components and runs on today's CPUs."); *id.* at 446 ("one major benefit of using a triangulation-based system is that it potentially scales to many different working volumes."); Figures 1, 2.

### f. [1.E] *"said display device provides a position and orientation for said object to take with respect to said at least one detection device prior to capturing the at least one image"*

392.    Rusinkiewicz discloses that said display device provides a position and orientation for said object to take with respect to said at least one detection device prior to capturing the at least one image. For example, Rusinkiewicz discloses that the computer monitor displays "a continuously-updated model as the object is scanned," as depicted in Figure 1(a):



### 3. Claim 4

401.     It is my opinion that Rusinkiewicz discloses each of the limitations of claim 4. As discussed above, Rusinkiewicz discloses each of the limitations of claim 1 from which claim 4 depends. In addition, Rusinkiewicz discloses each of the additional limitations of claim 4.

### a. *"said display device is a computer display"*

402.     Rusinkiewicz discloses that said display device is a computer display. For example, Rusinkiewicz's system includes a computer monitor, as depicted in Figure 1(a):



403.    Rusinkiewicz further discloses that the computer monitor displays an image rendered by an Intel Pentium-based computer system, i.e., it is a computer display:

> **CPU Usage:** Our prototype uses a dual-CPU system, with Intel Pentium III Xeon processors running at 1 GHz. One CPU is used for the first few stages of the range scanning pipeline, namely grabbing video frames, finding stripe boundaries, matching the boundaries across time, and identifying the boundaries from the accumulated illumination history. The second CPU performs triangulation to find 3D points, aligns the scans using the fast ICP algorithm, integrates range images into the 3D grid, and renders the updated grid. The first piece of this pipeline operates at full speed (60 Hz.), while the second operates slower, approximately 10 Hz.

Rusinkiewicz at 443.

### 4.    Claim 5

404.    It is my opinion that Rusinkiewicz discloses each of the limitations of claim 5. As discussed above, Rusinkiewicz discloses each of the limitations of claim 1 from which claim 5 depends. In addition, Rusinkiewicz discloses each of the additional limitations of claim 5.

160

### a. *"said display device is a computer display"*

420.    Rusinkiewicz discloses that said display device is a computer display. *See* claim 4.

## H. Invalidity Over Hassebrook

### 1. Claim 1

421.    It is my opinion that Hassebrook discloses each of the limitations of claim 1.

### a. *[1.Preamble] "A system for the 3D measurement of the shape of a material object"*

422.    Hassebrook discloses a system for the 3D measurement of the shape of a material object. For example, Hassebrook describes a system for the 3D measurement of human features, such as a human hand or face, for biometric purposes. *See* Hassebrook at 1:33–35 ("This invention relates to biometrics, and in particular to three dimensional (3D) imaging using structured light illumination for biometrics."); *see also id.* at 2:41–44 ("The present invention in one embodiment includes a biometrics system for capturing and processing a handprint image using a structured light illumination to create a 2D representation equivalent of a rolled inked handprint."); *id.* at 5:11–14 ("The biometrics system 100 uses SLI techniques to obtain images of a hand print as described herein, wherein a hand print includes either an entire hand print or a finger print or a thumb print or a palm print or a combination thereof."). *See also id.* at 4:24–41, limitation [1.D] and claim 5.

### b. *[1.A] "a display device"*

423.    Hassebrook discloses a display device. For example, Hassebrook discloses a display unit 114, as depicted in Figures 2a and 2b:

166



*See also* Hassebrook at 5:39–43 ("A display 114, such as an LCD screen or other display type, provides a display of the scan volume 104. The display 114 is preferably positioned so that a subject can comfortably insert their hand and view the display 114 at the same time."); *id.* at 5:50–52 ("As seen in FIG. 2 b, the display unit 114 displays the scan volume 104 and in this example, a right hand is positioned within the scan volume 104."). *See also* limitation [1.E] and claim 4.

### c. [1.B] "at least one projection device for projecting a structured light pattern onto a surface of an object"

424.    Hassebrook discloses at least one projection device for projecting a structured light pattern onto a surface of an object. For example, Hassebrook discloses flash projector (also called projection unit) 112, as depicted in Figure 2a:



FIG. 2a

*See* Hassebrook at 5:35–39.  Hassebrook discloses that projector 112 can be a "laser projector, CRT projector or digital projector," or "a consumer or industrial flash with a specialized projection lens."  Hassebrook at 9:50–56; *see also id.* at 3:66–4:23 and Figure 1 (projector 20).

425.    Hassebrook further discloses that projection unit 112 projects a structured light pattern onto a surface of an object, such as a human hand.  "[A] projection unit 112 is positioned to illuminate all or a portion of a hand positioned within the scan volume 104 with one or more structured light patterns." Hassebrook at 5:35–37; *see also id.* at Abstract, 1:33–35, 2:53–59, 4:8–11, 9:45–10:8, 11:45–58, Figs. 7a, 10a, 10b, 11a–11d and associated text.

    **d.  [1.C] "at least one detection device for capturing at least one image of the surface of said object, wherein at least one of the detection devices captures at least one image of the structured light pattern acting on the surface of said object"**

426.    Hassebrook discloses at least one detection device for capturing at least one image of the surface of said object, wherein at least one of the detection devices captures at least one

image of the structured light pattern acting on the surface of said object. For example,

Hassebrook discloses cameras 110, as depicted in Figure 2a:



FIG. 2a

*See* Hassebrook at 5:29–34; *see also id.* at Abstract, 2:53–59, 8:46–9:44, 10:9–15, 11:45–58,

Figs. 7a–7b, 10–10b.  "The cameras are preferably commercial high resolution digital cameras or

may be specialty cameras designed and manufactured for the biometric system 100." *Id.* at 5:31–

34; *see also id.* at 3:66–4:23, Figure 1 (camera 18).

427.    I am informed that the Court has construed the term "detection device [for]" as a

means-plus-function term under 35 U.S.C. § 112(f), where the function is "capturing at least one

image of an object and at least one image of the structured light pattern acting on the surface of

said object" and the corresponding structure is "using a photographic lens, having a vertex, a

matrix radiation receiver, and a driver as those terms are understood by a POSITA."  A POSA

would understand that the commercial high resolution digital cameras or specialty cameras

disclosed by Hassebrook meet that construction.  *See* Section IV.C.

428.    In the alternative, it would have been obvious to a POSA to use a conventional camera including a photographic lens, having a vertex, a matrix radiation receiver, and a driver. *See* Section IV.C.

 **e.    [1.D] "a computing device for determining a measurement relating to the captured image"**

429.    Hassebrook discloses a computing device for determining a measurement relating to the captured image. For example, Hassebrook discloses a processing unit or processor 116 for controlling the system, as depicted in Figure 2a:



*FIG. 2a*

*See* Hassebrook at 5:43–49 ("The biometric system 100 is controlled by processor 116. Processor 116 may be a small personal computer or specialty processor unit that is connected to the cameras 110 and projection unit 112 through connections to USB ports on the cameras and projector, Ethernet LAN connections or other type of connection."); *see also* Figure 11a.

430.    Hassebrook further discloses that processor 116 determines a measurement relating to the captured image, including calculating 3D coordinates from the images captured by

170

cameras 110. "A processing unit calculates 3D coordinates of the hand from the plurality of images using the predetermined coordinates of the backdrop pattern to align the plurality of images and mapping the 3D coordinates to a 2D flat surface to create a 2D representation equivalent of a rolled inked handprint. The processing unit can also adjust calibration parameters for each hand scan from calculating coordinates of the portion of backdrop pattern in the at least one image and comparing with the predetermined coordinates of the backdrop pattern." Hassebrook at Abstract; *see also id.* at 2:59–3:3, 4:24–67, 15:51–20:12, Figures 12, 13, 14a–14d and associated text.

### f. [1.E] *"said display device provides a position and orientation for said object to take with respect to said at least one detection device prior to capturing the at least one image"*

431.    Hassebrook discloses said display device provides a position and orientation for said object to take with respect to said at least one detection device prior to capturing the at least one image.  For example, Hassebrook's display unit provides instructions for correct positioning of the hand, as shown in the flow chart of Figure 6:

171

### 3.  Claim 4

441.    It is my opinion that Hassebrook discloses each of the limitations of claim 4. As discussed above, Hassebrook discloses each of the limitations of claim 1 from which claim 4 depends. In addition, Hassebrook discloses each of the additional limitations of claim 4.

#### a.  *"said display device is a computer display"*

442.    Hassebrook discloses said display device is a computer display. Hassebrook teaches that each of the system's components may be provided as a separate unit.  *See* claim 3. In this embodiment, the processor 116 is "a separate PC … not incorporated within the enclosure 120, for example such that an operator may control the biometric system 100 with an external processor."  Hassebrook at 6:15–25; *see also id.* at 7:42–48 (discussing "operator controlled entry mode").  Similarly, in this embodiment the display unit 114 is "a separate LCD display connected by a cable to … processor 116," i.e., connected by a cable to the separate operator PC. *Id.* at 6:18–19.  As such, in this embodiment the display unit is a computer display.

### 4.  Claim 5

443.    It is my opinion that Hassebrook discloses each of the limitations of claim 5. As discussed above, Hassebrook discloses each of the limitations of claim 1 from which claim 5 depends. In addition, Hassebrook discloses each of the additional limitations of claim 5.

#### a.  *"said object is a face of a user of said display device"*

444.    Hassebrook discloses said object is a face of a user of said display device. For example, Hassebrook teaches that "the system may be modified for obtaining images for other biometrics, such as scars, tattoos, facial features, etc."  Hassebrook at 20:29–32; *see also id.* at 20:28–38.