# Exhibit 7 - Rebuttal Expert Report of Dr. Iman Sadeghi Regarding Validity Excerpts

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ARTEC EUROPE S.À.R.L., <br><br>             Plaintiff, <br><br>      v. <br><br> SHENZHEN CREALITY 3D TECHNOLOGY CO., LTD. and SHENZHEN JIMUYIDA TECHNOLOGY CO., LTD., <br><br>             Defendants. | Case No. 1:22-1676 (OEM)(VMS) |

**REBUTTAL EXPERT REPORT OF IMAN SADEGHI, PH.D.**



205 S Broadway, #300
Los Angeles, CA 90012
www.quandarypeak.com

Gortler's Opening Report. As detailed below, similar deficiencies identified by the Examiner during the IPR are also present throughout Gortler's Opening Report.

### 7.1.2. *The Asserted Claims Satisfy the Written Description Requirements*

#### 7.1.2.1. [1.F], [12.F] "at least a first slide virtual line … and a second slide virtual line … defined on said slide surface"

79.    Dr. Gortler claims that the specification does not meet the written description requirements for "virtual lines." (See Gortler Rpt. ¶¶ 119-122)

80.    The specification of the '656 Patent repeatedly describes the meridians as being on the surfaces of the slide:

> "[T]he projector meridians 187 and camera meridians 188 are representative lines that can be represented on the surfaces of the slide 122 […]" (The '656 Patent, 5:35-38 referencing Fig 5.)

81.    The Asserted Claims define these virtual lines by the intersection between said slide surface and a first [or second] plane passing through said projector lens vertex and through said device lens vertex. This is a clear geometric definition. A plane intersecting a surface (the slide surface) defines a line on that surface.

82.    The specification clearly describes these planes passing through the vertices of the projector and camera, and their relationship to the projector meridians on the slide:

> "[T]he position of the meridians 187 is determined by projecting the structured light 113 from the projector lens 181 onto the surface 110 of the object 111, where each of the projector meridians 187 will lie in a plane 125 that extends from the vertex 124 of the structured

---

**QUANDARY PEAK RESEARCH**

205 S Broadway, #300
Los Angeles, CA 90012
www.quandarypeak.com

87.     Since the virtual lines are the intersection of these planes with the slide surface, this provides direct written description for groups of coded elements being located along these virtual lines.

88.     The specification describes forming a slide pattern where coded elements are intentionally arranged into groups, and these groups are specifically located along the geometrically defined projector meridians. Based on my review, in my opinion, this conveys description sufficient for a POSITA to recognize the inventor's possession of the claimed invention at the time of filing.

*7.1.3.   The Asserted Claims Satisfy the Enablement Requirement*

7.1.3.1.   [1.F], [12.F] "at least a first slide virtual line … and a second slide virtual line … defined on said slide surface"

89.     The specification *does* teach a POSITA how to make and use the invention. A POSITA understands that given a projector lens vertex, a camera lens vertex, and a slide surface, the intersection of a plane through these vertices with the slide surface defines a line on that slide. The specification teaches arranging "coded elements"—which are part of the slide pattern—along these defined lines.

90.     Contrary to Dr. Gortler's contention, the '656 Patent does not instruct a POSITA *not* to define epipolar lines on the slide surface in the sense claimed (See Gortler Rpt. ¶ 125). The '656 Patent teaches that the lines themselves aren't the projected image feature, but the coded elements are, and these are arranged along those defined lines on the slide:

Rebuttal Expert Report of Dr. Iman Sadeghi Regarding Validity

*Restricted – Attorneys' Eyes Only*



205 S Broadway, #300
Los Angeles, CA 90012
www.quandarypeak.com

assessed based on the intrinsic evidence—the claims, specification, and prosecution history—not based on Dr. Gortler's independent interpretation of how Artec supposedly interprets the claims for infringement. Dr. Gortler appears to inaccurately conflate Artec's purported method of demonstrating infringement (e.g., by superimposing calculated lines on an image of an accused product's output for illustrative purposes in litigation) with his claims about the definiteness of the claim language itself.

93.     As discussed in § 6.4 the Court has already construed the claim terms. It is my understanding that once the Court has construed claim terms, those terms are generally considered to have met the definiteness requirement for the purpose of subsequent validity analysis by experts.

7.1.4.1.     [1.F], [12.F] "at least a first slide virtual line … and a second slide virtual line … defined on said slide surface"

94.     The term "virtual line" is definite because it is explicitly defined within the Asserted Claims themselves: "defined by an intersection between said slide surface and a first plane passing through said projector lens vertex and through said device lens vertex." ('656 Patent at 8:43-46 (Claim 1); 10:1-4 (Claim 12)) Given a system with a projector, camera, and slide, a POSITA can determine these lines on the slide surface.

95.     Contrary to Dr. Gortler's contentions, in my opinion, the fact that lines can be mathematically calculated and overlaid does not necessarily make the original claim term indefinite. These geometrically defined lines are defined on the surface of the slide as disclosed by the invention.

96.    A POSITA designing or analyzing a system would know how to determine these lines based on the system's physical geometry and the teachings of the invention with reasonable certainty.

7.1.4.2.    [1.E], [12.E] & [1.G], [12.G] "coded elements … assigned to … first/second group … located along said first/second virtual line[s]"

97.    The Asserted Claims require that the "coded elements of said first group are located along said first virtual line" ('656 Patent at 8:50-51 (Claim 1); 10:8-9 (Claim 12)) which is a specific limitation on the design of the slide pattern. A "coded element" is defined by the patent as being "characterized by at least one parameter... [defining] a spatial or temporal distribution of an amplitude or a wavelength" ('656 Patent at 8:32-35 (Claim 1); 9:52-54, (Claim 12)). Examples include "regions of varying shape, form and/or length" or "regions of different thickness" (*See* '656 Patent, 6:45-50). Accordingly, a POSITA understands what a coded element is within this context with reasonable certainty.

98.    The claim requires these elements to be located along the specifically defined virtual lines. Therefore, a POSITA would understand that the coded elements must be intentionally placed on the slide so as to align with these pre-defined geometric lines with reasonable certainty.

*7.1.5.    The Asserted Claims Are Directed to Patent Eligible Subject Matter*

99.    As outlined below, in my opinion the asserted claims are not directed to an abstract idea and nonetheless contain inventive concepts.

---



205 S Broadway, #300
Los Angeles, CA 90012
www.quandarypeak.com

7.1.5.1.   <u>Alice Step 1: Asserted Claims Are Not Directed to an Abstract Idea</u>

100.    Contrary to Dr. Gortler's contention (See Gortler's Rpt. ¶¶ 143-145) the Asserted Claims are not merely directed to "epipolar geometry" or a "mathematical concept." Claim 1 is directed to a tangible "system for the 3D measurement," and Claim 12 to a "method for the 3D measurement." These are specific, practical applications that result in a physical measurement of a real-world object. The inventive feature is the specific configuration of the slide pattern within the system/method, wherein "coded elements" are arranged in "groups" that are "located along" these "virtual lines," which are themselves defined by the physical geometry of the system's projector and camera lens vertices and the slide surface. This is a specific application and physical instantiation, not an abstract idea. Based on my review and in my opinion, Dr. Gortler's over-simplification of the scope of the claims is unsupported by their plain language and the specification.

101.    In fact, during the prosecution history of the '656 Patent, the inventors described what they believed to be the inventive features that the cited prior art failed to teach:

> "In the pages that follow below, Applicants will set forth in detail that:
> 1) the cited prior art fails to teach or suggest a system or method for 3D measurement of a material object where coded elements in the structured light pattern are located along virtual lines that are defined by the intersections of the slide surface with a plurality of planes passing through the vertices of the light projector and the camera; and
> 2) the cited prior art fails to teach or suggest a system or method for 3D measurement of a material object where coded elements are always found in the image along virtual lines that are defined by the same virtual planes that define the virtual lines along

QUANDARY PEAK
RESEARCH

205 S Broadway, #300
Los Angeles, CA 90012
www.quandarypeak.com

which the coded elements are located in the structured light pattern, i.e., on the surface of the slide." ('656 Patent Prosecution History, IPR Ex. 1002, at p. 137)

102.    The invention involves projecting specifically structured light from a physical slide, reflecting it off a physical object, capturing it with a physical camera, and processing it with a computing device—not a mere abstract concept.

7.1.5.2.    Alice Step 2: Asserted Claims Recite and Inventive Concept

103.    Even if, for argument's sake, the claims were deemed directed to an abstract idea—which they are not—they recite an inventive concept that transforms them into a patent-eligible application.

104.    The inventive concept is the specific arrangement of the structured light pattern: the use of coded elements assigned to groups located along at least two specific virtual lines, where these lines are defined by the intersection of planes passing through the projector and device lens vertices with the slide surface.

105.    The '656 Patent discloses an improvement by "simplifying the task of identifying structured light elements... achieving complete linearization of the surface shape calculation algorithm" in certain cases (The '656 Patent, 6:30-33). While it uses "triangulation techniques known," (The '656 Patent, 4:12). the specific input to those techniques—the uniquely structured and simplified data from the disclosed slide pattern—is improved.

106.    In my opinion, the Asserted Claims are directed to a specific, tangible system and method for 3D measurement incorporating a structured light pattern design. This design provides

 

QUANDARY PEAK
RESEARCH

205 S Broadway, #300
Los Angeles, CA 90012
www.quandarypeak.com

The claims contemplate variation in wavelength, not merely perceptual color distinctions. Dr. Gortler does not sufficiently explain how Tomasi would suggest modulation beyond the visible spectrum.

113.    Similarly, Dr. Gortler does not provide sufficient explanation on how a POSITA would learn from Tomasi's discussion of varying size grid points to implement a variation in amplitude of structured light. Spatial changes in grid size may aid in visual identification but do not imply any variation in the intensity or energy of the light projected. Gortler's report provides insufficient analysis connecting grid geometry with amplitude modulation.

114.    In my opinion, Dr. Gortler's analysis fails to sufficiently identify disclosures in Tomasi—express or inherent—that teaches or suggests the claimed spatial or temporal distribution of amplitude or wavelength of the projected structured light.

7.1.6.4.    Claim 1.F-1.G & 12.F-12G – Gortler's Report does not sufficiently show that Tomasi renders obvious a "virtual line" or "coded elements" along the virtual line

115.    Dr. Gortler does not explain sufficiently how Tomasi purportedly teaches or suggests "virtual lines" as that term is used in the '656 Patent—i.e., lines defined on the slide surface formed by the intersection of planes passing through the optical vertices of both the projector and the camera. While Tomasi references epipolar geometry and epipolar lines generally, he does not adequately tie these concepts to a slide-based encoding geometry as required by the '656 patent claims. As noted in § 6.3, Artec's alleged interpretation of "virtual lines" has no bearing on the analysis of anticipation or obviousness.



205 S Broadway, #300
Los Angeles, CA 90012
www.quandarypeak.com

capturing system 102 may analyze the surface 110 of the object 111. In one or more embodiments, **the object capturing system 102 may base its calculations on the assumption that the object 111 is disposed at a reference position and/or in the reference orientation."** (Emphasis added. '129 Patent at 3:46-62)

"In one or more embodiments, where the object 111 is associated with a user of the display device 101, **the reference position and/or the reference orientation provided by the display device 101 may correspond to a position and/or an orientation associated with the use of the display device 101**. For example, where the object 111 is a face of a user of the display device 101, **the reference position and/or the reference orientation provided by the display device 101 may be the position and/or the orientation at which the user would maintain its face during operation of the display device 101**." (Emphasis added. '129 Patent at 4:57-67)

140.    The specification also discloses that:

"According to embodiments of the present disclosure, the display device may provide a position and orientation for the object to assume with respect to the projection and detection devices." ('129 Patent at 1:62-65).

"The display device 101 may provide a reference position and/or a reference orientation for the position and orientation of object 111." ('129 Patent at 3:50-52)

141.    Based on my analysis, a POSITA would understand that "providing a position and orientation" in the context of a display device and an object capture system inherently involves visual cues or information on the display that provides the initial spatial positioning of the object. The specification clearly links the "providing" of position and orientation to the natural use of the



205 S Broadway, #300
Los Angeles, CA 90012
www.quandarypeak.com

display device itself. This is an embodiment. When a user is interacting with a display, their face or another object is naturally positioned relative to that display.

142.    Based on my review, in my opinion, these disclosures convey sufficient description for a POSITA to recognize that the inventor possessed the claimed invention at time of filing.

### 7.2.2. *The Asserted Claims Satisfy the Enablement Requirement*

143.    Dr. Gortler claims that the '129 Patent does not meet the enablement requirement because he contends that a POSITA "would have to implement the concept of displaying a position and orientation without guidance of any kind," and that "the prior art references discussed below provide far more detailed instructions regarding how to provide such 'position and orientation.' " (*See* Gortler Rpt. ¶¶ 357-358)

144.    First, whether prior art provides more detailed instructions is not relevant to the question of whether the '129 Patent has met the enablement requirement. The question for enablement is whether the '129 Patent *itself* enables a POSITA—and as we show below, it does.

145.    A POSITA in the field of 3D scanning and display technology would readily understand how a display device can be used to guide an object's position and orientation. Implementing visual cues on a display—such as a template, an outline, or a live augmented reality overlay corresponding to a desired position and orientation (e.g., a face outline for facial scanning as might be used with the system of Figure 4 of the '129 Patent )—is well within the skill set of a POSITA and does not require undue experimentation. Such techniques involve standard 2D/3D graphics rendering capabilities common in computing devices equipped with displays, as

**QUANDARY PEAK
RESEARCH**

205 S Broadway, #300
Los Angeles, CA 90012
www.quandarypeak.com

contemplated by the '129 Patent's disclosure of computing device 104 and display device 101 ('129 Patent at 3:25-36, 4:4-11).

146.    The specification provides the "what" (i.e. display provides position/orientation) and the "why" (i.e. for effective capture relative to the detection device, often in the context of normal display use). And the "how" involves standard computer graphics display programming techniques.

147.    The experimentation required, if any, would be routine adjustments of parameters for the visual cues, not an inventive step in itself. The core components involved—namely the display, projector, detector, and a computer—are described, and their interaction for this guidance purpose is conceptually straightforward.

148.    Therefore, in my opinion, the specification teaches a POSITA how to make and use the invention.

### 7.2.3.    *The Asserted Claims Satisfy the Definiteness Requirement*

149.    As discussed in § 6.3, according to my understanding, Artec's application of the claims for infringement purposes is irrelevant to the validity analysis. The validity must be assessed based on the intrinsic evidence—the claims, specification, and prosecution history—not based on subsequent interpretations in litigation. Dr. Gortler conflates Artec's alleged method of demonstrating infringement (e.g., by superimposing calculated lines on an image of an accused product's output for illustrative purposes in litigation) with the definiteness of the claim language itself.

---



205 S Broadway, #300
Los Angeles, CA 90012
www.quandarypeak.com

150.    As discussed in § 6.4 the Court has already construed the claim terms. It is my understanding that once the Court has construed claim terms, those terms are generally considered to have met the definiteness requirement for the purpose of subsequent validity analysis by experts

151.    The phrase "display device provides a position and orientation for said object to take with respect to" the detection device ('129 Patent at 7:6-7 (Claim 1); 8:3-4 (Claim10)) is reasonably certain to a POSITA because it means the display device actively assists in or provides the placement of the object. "Providing" in this context means communicating information, typically visually, that directs the object to a specific spatial relationship with the detection device. This allows the user to move the object until the current position aligns with the reference position. This is a common and well-understood feedback mechanism in interactive user interfaces.

152.    A POSITA designing or analyzing a system would understand the teachings of the invention with reasonable certainty.

### 7.2.4.    *The Asserted Claims Are Directed to Patent Eligible Subject Matter*

153.    As outlined below, in my opinion the asserted claims are not directed to an abstract idea and nonetheless contain inventive concepts.

### 7.2.4.1.    Alice Step 1: Claims Are Not Directed to an Abstract Idea

154.    Dr. Gortler contends that the Asserted Claims are directed to the abstract idea of "providing instructions for positioning an object during structured light scanning" (Gortler Rpt. ¶ 364) or, under Artec's alleged interpretation, "providing a preview image for positioning an object during structured light scanning" (Gortler Rpt. ¶ 365), likening these to verbal instructions from photographers or instructions in a photo booth. (*See* Gortler Rpt. ¶¶ 363-365).

---



155. However, the '129 Patent and the Asserted Claims recites a tangible system comprising specific physical components: a display device, a projection device, a detection device, and a computing device. These are not just a field of application but essential, interacting parts of a concrete apparatus designed for 3D measurement. The Asserted Claims also recites a specific method involving the physical act of projecting light, capturing images of that light on an object, and determining measurements, all while the display device actively guides the object's position.

156. The Asserted Claims disclose a specific improvement in how 3D structured light scanning is performed—not a mere abstract concept. By using the display device itself to provide position and orientation for the object relative to the detection device, the invention offers a more integrated, potentially more accurate, and user-friendly way to set up the scanning process. The display isn't just showing a picture; it's providing specific spatial information critical for the subsequent capture step by the detection device, which is then processed by the computing device.

157. The invention is directed to a specific improvement in how 3D structured light scanning is performed—not a mere abstract concept.

7.2.4.2.   Alice Step 2: Asserted Claims Recite and Inventive Concept

158. Even if, for argument's sake, the claims were deemed directed to an abstract idea—which they are not—they recite an inventive concept that transforms them into a patent-eligible application.

159. Dr. Gortler claims that the '129 Patent does not contain inventive concepts because he contends that the Asserted Claims use conventional components, and the generic description of the display's role fails to supply an inventive concept. (*See* Gortler Rpt. ¶¶ 366-369).

QUANDARY PEAK
RESEARCH

205 S Broadway, #300
Los Angeles, CA 90012
www.quandarypeak.com

160.    Even if individual components are known, their combination and interaction in a new and useful way can constitute an inventive concept. The inventive concept here lies in the ordered combination of a structured light 3D scanning apparatus (projector, detector, computer) and a display device that is functionally integrated into this system to actively provide a position and orientation for the object to take with respect to the detection device prior to capture.

161.    The invention addresses the technical problem of ensuring proper object placement for effective 3D structured light scanning. Using the display device in this specific guiding role is a technical solution that improves the process. It's not just a generic display, but a display used in a specific, functional way within the scanning system.

162.    While structured light scanning and displays were known, the claimed specific method of using the display to guide the object's position and orientation relative to the detector prior to capture as part of the 3D measurement system does not constitute a merely a routine or conventional application.

163.    The display device is used for more than just displaying unrelated information; it takes on a new role as a positioning guide *specifically for and integrated with* the structured light capture process. This is not its generic function in isolation but a specific function within the claimed system/method. The claims are not directed to an abstract idea, and even if they were, they include an inventive concept that amounts to significantly more than any alleged abstract idea.

---

**QUANDARY PEAK
RESEARCH**

205 S Broadway, #300
Los Angeles, CA 90012
www.quandarypeak.com

*7.2.5.    The Asserted Claims Are Neither Anticipated by Rusinkiewicz nor Rendered Obvious by*

*Rusinkiewicz Alone or In Combination with Other Prior Art*

164.    Dr. Gortler's analysis fails to sufficiently demonstrate that Rusinkiewicz teaches or suggests the dispositive limitation present in Claims 1 and 10 of the '129 Patent: a display device that provides a position and orientation for the object *prior* to image capture. Rusinkiewicz's system operates fundamentally differently, using its display for real-time feedback during active object manipulation, not for setting a pre-capture pose relative to the display itself.

165.    The '129 Patent explicitly claims a system and method where the display device dictates a target position and orientation for the object before the measurement occurs. Claim 1 requires "...wherein said display device provides a position and orientation for said object to take with respect to said at least one detection device prior to capturing the at least one image." ('129 Patent at 7:6-9) Claim 10 mirrors this, requiring the step where "...said display device provides a position and orientation for said object to take with respect to the at least one detection device prior to capturing the at least one image..." ('129 Patent at 8:3-6). The specification further clarifies this concept, suggesting the display provides a reference pose, potentially related to the normal operational use of the display, which the object assumes before the system performs its measurement function.

166.    Rusinkiewicz, on the other hand, teaches a system designed for building a complete 3D model through continuous scanning while the user actively manipulates the object *during* the scanning. Its display serves as a feedback mechanism, showing the accumulating model in real-time to help the user identify and fill gaps "holes" in the scan coverage by guiding subsequent



205 S Broadway, #300
Los Angeles, CA 90012
www.quandarypeak.com

movements. Rusinkiewicz discloses using the display to show the *result* of scanning a moving object, aiding the dynamic process of model acquisition. It does not appear to provide any clear teaching or suggestion of using the display to provide a specific, predetermined position or orientation for the object to assume *before* initiating a capture for measurement, as claimed in the '129 Patent.

167.    Dr. Gortler's reliance on Rusinkiewicz's "anchor scans" (Gortler Rpt. ¶374, ¶393-395) as teaching the claimed pre-capture guidance appears misplaced. In Rusinkiewicz, anchor scans are displayed to "ask the user to move the object to line up [a current range image] R with one of the anchors" specifically when "ICP automatic alignment fails" during an ongoing multi-scan model acquisition process (Rusinkiewicz Fig. 9). This is a *re-alignment* procedure to a *previously captured part of the object itself* after tracking is lost. It fundamentally differs from the '129 Patent's teaching where the "display device provides a reference position and/or a reference orientation" ('129 Patent at 3:49-52) for the object serving as the reference for an *initial* pose *prior to initiating an image capture* for 3D measurement.

168.    As discussed earlier in § 6.2, the Court construed the terms "detection device" and "at least one detection device for" which appear in Claim 1, 3, 10, 12  as means-plus-function pursuant to 35 U.S.C. 112(f). Thus, for Rusinkiewicz to anticipate these claim element, it must disclose both the function ("capturing at least one image of an object and at least one image of the structured light pattern acting on the surface of said object") and the specific structure ("using a photographic lens, having a vertex, a matrix radiation receiver, and a driver as those terms are

**QUANDARY PEAK
RESEARCH**

205 S Broadway, #300
Los Angeles, CA 90012
www.quandarypeak.com

understood by a POSITA") or an equivalent as construed by the Court during the claim construction.

169.    Instead of mapping the elements of Rusinkiewicz's camera (e.g., NTSC video camera ) to the claimed structure, Dr. Gortler appears to rely on the conclusory assertion that a POSITA would simply understand Rusinkiewicz's camera meets the construction, thereby ignoring the strict requirements outlined by the Court for identity of structure or equivalence. (*See* § 6.2 and also Aikens's Rebuttal Report §§VII, VIII.B.1)

170.    As explained in § 6.3, according to my understanding, Artec's alleged interpretation of the claim as a "preview mode" is irrelevant to any anticipation-or-obviousness analysis. Moreover, Dr. Gortler provides no rationale for construing the alleged "preview mode" interpretation to mean "as it is being scanned," rather than "prior to capturing the at least one image," which is the construction required by the claim language.

### 7.2.6.    *The Asserted Claims Are Neither Anticipated by Hassebrook nor Rendered Obvious by Hassebrook Alone or In Combination with Other Prior Art*

171.    Dr. Gortler's analysis fails to sufficiently demonstrate that Hassebrook teaches or suggests the key limitation found in Claims 1 and 10 of the '129 Patent: a display device that provides a position and orientation for the object *prior* to image capture. While Hassebrook utilizes a display in its positioning process, its role and function are distinct from that claimed in the '129 Patent.

172.    The '129 Patent explicitly claims a system and method where the display device provides a position and orientation for the object before the measurement occurs. Claim 1 requires

---

"...wherein said display device provides a position and orientation for said object to take with respect to said at least one detection device prior to capturing the at least one image" (`129 Patent at 7:6-9). Claim 10 mirrors this, requiring the step where "...said display device provides a position and orientation for said object to take with respect to the at least one detection device prior to capturing the at least one image..." (`129 Patent at 8:3-6). The '129 specification suggests the display provides a reference pose, potentially related to normal operational use, which the object assumes before the measurement is taken.

173.    Hassebrook, in contrast, describes a biometric system specifically for capturing handprints. It uses a display primarily as a visual aid during a preview mode. In this mode, the display shows low-resolution images of the hand within the scan volume to help the user correctly position their hand relative to physical guides and the backdrop. The system may also provide instructions on the display to correct positioning. Thus, in Hassebrook, the display assists the user in achieving a *correct* position relative to physical elements within the scan volume. It does not teach a display providing the *actual* position and orientation for the object to take prior to capture, as required by the '129 claims.

174.    Hassebrook discloses a system where the subject (a hand) is carefully "positioned within the scan volume 104" (*See* e.g. Hassebrook at 5:31, 36, 50-52; 7:54-63 , often with the aid of physical "hand positioning pegs 118" (Hassebrook at 7:58-59), to achieve a specific, correct position for biometric capture. The display shows this positioning process or provides corrective instructions (Hassebrook at 7:56-63, 8:3-9). This contrasts with the '129 Patent, where the object (e.g., a user's face) is positioned relative to the display device itself, which "provides a reference

position and/or a reference orientation" ('129 Patent at 3:49-52), such as the natural orientation of a user's face when operating a laptop incorporating the scanner ('129 Patent at 4:57-67, Fig. 4), *prior to* image capture.

175.    As discussed earlier in § 6.2, the Court construed the terms "detection device" and "at least one detection device for" which appear in Claim 1, 3, 10, 12 as means-plus-function pursuant to 35 U.S.C. 112(f). Thus, for Hassebrook to anticipate these claim element, it must disclose both the function ("capturing at least one image of an object and at least one image of the structured light pattern acting on the surface of said object") and the specific structure ("using a photographic lens, having a vertex, a matrix radiation receiver, and a driver as those terms are understood by a POSITA") or an equivalent as construed by the Court during the claim construction.

176.    Instead of mapping the elements of Hassebrook's disclosed cameras[6] to the claimed structure, Dr. Gortler appears to rely on the conclusory assertion that a POSITA would simply understand Hassebrook's camera meets the construction, thereby ignoring the strict requirements outlined by the Court for identity of structure or equivalence. (*See* § 6.2 and also Aikens's Rebuttal Report §§VII, VIII.B.2)

---

[6] Hassebrook, '064 at 5:31-34 "The cameras are preferably commercial high resolution digital cameras or may be specialty cameras designed and manufactured for the biometric system" , 9:8-16 "To meet certain industry or application standards, the cameras must meet certain resolution, depth of field and MTF requirements. In this embodiment, each field of view is approximately a 5" by 4" region with the cameras having 2592 by 1944 pixels per inch (PPI) in order to obtain handprint images of at least 500 ppi. A person of skill in the art would appreciate that the resolution of the camera, MTF and size of the field of view affect the resolution of the resulting handprint images."

Rebuttal Expert Report of Dr. Iman Sadeghi Regarding Validity

*Restricted – Attorneys' Eyes Only*

**QUANDARY PEAK
RESEARCH**

205 S Broadway, #300
Los Angeles, CA 90012
www.quandarypeak.com

208.     Page's concept of "3D data coverage" meeting a "minimum threshold" (Page at 21:22-23, Fig. 13 block 1310) appears to be a general assessment of whether the initial low-resolution scan has broadly captured the object before proceeding to a higher-resolution scan. This is distinct from the '357 Patent's requirement of determining, for *each of a plurality of respective portions* of the surface, whether the *quantity of the first data* for *that specific portion* is sufficient for a *predefined reconstruction accuracy of that portion.*

209.     Similarly, Page's "data density," defined as "the number of data points per unit area" (Page at 16:10-11), is discussed in the context of achieving a "desired global accuracy of capture" or a "required minimum absolute error when data points are connected to form a triangular mesh" (Page at 16:11-13, 16:51-55). While related to data sufficiency, Page's "data density" is a general metric often applied globally. Dr. Gortler fails to sufficiently show that Page discloses this "data density" definition as being the specific "minimum threshold" referred to in block 1310 of its Figure 13, nor how this general metric equates to the '357 Patent's granular threshold for the *quantity of first data* for *each specific portion* being directly tied to the *reconstruction accuracy of that individual portion*. The '357 Patent allows for a more nuanced assessment where different portions of an object might have different data quantity requirements to achieve their respective predefined accuracy, a concept not addressed by Page's global "data density" or "coverage" thresholds.

210.     Furthermore, Page describes other types of thresholds for entirely different purposes. For instance, Figure 3B of Page discusses a threshold related to whether a "new stationary orientation [is] different than previous by more than threshold" (Page Fig 3B, Block



needed" (*See* Gortler Rpt. ¶ 574, Page at 21:29–30) appears to misunderstand the '357 claim. The '357 claim is not merely about avoiding redundant scanning; it's about a specific step of *discarding acquired second data* under specific conditions related to the adequacy of the *first data*. Page's description of using streaming video and then not using subsequent images once reconstruction is "complete" (Page at 6:49-51, as interpreted by Dr. Gortler) refers to stopping the overall process, not the granular discarding of portions of *second data* during an ongoing "further scanning" operation as specified in claim 11.

7.3.2.4.    [12.D, 13, 15] "indication of the quantity of the first data" indicating whether it "meets the predefined threshold," and displaying "distinct indicia"

217.    Page discloses real-time "visual feedback 710" with "differentiated areas 712 representing different levels of quality of scan data" or "density of data points" using "different colors or textures" (Page at 15:51-62; 16:3-5). This feedback is to "avoid re-scanning areas where data quality or quantity are already acceptable" (Page at 15:61-62) or show "when a desired data density...has been reached" (Page at 17:38-39).

218.    While Page provides visual feedback, it's tied to a general "desired data density" or whether overall quantity is "acceptable." This is different from the '357 Patent's specific requirement of an indication showing whether the *quantity of the first data* for *respective portions* meets a *predefined threshold* that is itself defined by the *quantity of data needed to reconstruct that specific portion to a predefined accuracy*. Page's feedback guides overall data acquisition; the '357 Patent's feedback specifically informs about the sufficiency of *initial data* for a *per-portion reconstruction accuracy target*, which then links to the specific data discarding logic of claim 11.



205 S Broadway, #300
Los Angeles, CA 90012
www.quandarypeak.com

Dr. Gortler has not shown that Page's "first data" (e.g., the low-resolution scan of block 1304 in Fig. 13) is assessed in this granular way for this specific purpose, and thus Page cannot provide the claimed indication.

### 7.3.2.5.    [14.C] concerning "updating the indication of the quantity of the first and second data"

219.    Page describes that its "differentiated areas 712...may update dynamically to indicate changes in the status of the net data that has been acquired or is currently being acquired" (Page at 15:53-58).

220.    Page updates its feedback based on "net data density" or the general "status of the net data." This is an update of Page's chosen metric. It is not an update of the specific indication claimed in the '357 Patent, which is an indication of whether the *combined first and second data quantity for a portion* now meets the *predefined threshold for reconstructing that portion to a predefined accuracy*. The underlying metric being updated and the purpose of that indication differ

### 7.3.3.    *No Teaching, Suggestion, or Motivation to Combine Popescu and Page, and an Inadequate Combination Even if Attempted*

221.    Dr. Gortler's obviousness argument for combining Popescu with Page is unpersuasive, in my opinion, because the combination would not result in the invention claimed in the '357 Patent, nor is there a clear motivation for a POSITA to make such a combination to achieve the specific results of the Asserted Claims.

222.    The feedback recited in claims 12 ([12.D]), 13, 14 ([14.C]), and 15 of the '357 Patent is critically dependent on the unique data processing and management method of underlying claim 11.