# Exhibit 8 - Gortler 6/2/25 Transcript Excerpts

Transcript of Steven Gortler, Ph.D.
Conducted on June 2, 2025

**Page 1**

```
 1          UNITED STATES DISTRICT COURT
 2          EASTERN DISTRICT OF NEW YORK
 3   ------------------------------X
 4   ARTEC EUROPE S.A.R.L.,        :
 5            Plaintiff,           :
 6        v.                       : CASE NO.:
 7   SHENZHEN CREALITY 3D          : 1:22-1676 (OEM)(VMS)
 8   TECHNOLOGY CO., LTD. and      :
 9   SHENZHEN JIMUYIDA TECHNOLOGY  :
10   CO., LTD.,                    :
11            Defendants.          :
12   ------------------------------X
13
14      Videotaped Deposition of STEVEN GORTLER Ph.D.
15                 Virtually Conducted
16              Monday, June 2, 2025
17                   7:14 a.m.
18
19
20
21
22
23   Job No.:  585829
24   Pages 1 - 301
25   Reported by:  Cynthia Lichtman, CSR No. 14601, CVR
```

**Page 2**

```
 1        Videotaped deposition of STEVEN GORTLER
 2   Ph.D., held virtually via Zoom videoconference:
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23          Pursuant to agreement, before Cynthia
24   Lichtman, Notary Public in and for the State of
25   California.
```

**Page 3**

```
 1              A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFF:
 3        MICHAEL CUMMINGS, ESQUIRE
 4        RIMON LAW, P.C.
 5        1990 K Street, NW
 6        Suite 420
 7        Washington, DC 20006
 8        (202) 400-3846
 9
10   ON BEHALF OF THE DEFENDANTS:
11        ANDREA PACELLI, ESQUIRE
12        KING & WOOD MALLESONS
13        500 Fifth Avenue
14        50th Floor
15        New York, New York 10110
16        (212) 319-4755
17
18   ALSO PRESENT
19   Iman Sadeghi, Ph.D. - Expert
20   David Aikens, Expert
21   Isiah Sheridan - Videographer, Planet Depos
22   Dominic Adams - Technician, Planet Depos
23
24
25
```

**Page 4**

```
 1              C O N T E N T S
 2   EXAMINATION OF STEVEN GORTLER PH.D.        PAGE
 3        By Mr. Cummings                     7, 297
 4        By Mr. Pacelli                         290
 5
 6              E X H I B I T S
 7              (Attached.)
 8   STEVEN GORTLER Ph.D. DEPOSITION EXHIBITS   PAGE
 9   Exhibit 1       Gortler Initial Report      11
10                   4/7/25
11   Exhibit 2       Gortler Exhibit A, CV       13
12   Exhibit 3       Gortler Exhibit B,          18
13                   Materials Considered
14   Exhibit 4       US Patent 7768656           24
15   Exhibit 5       US Patent 8488129           25
16   Exhibit 6       US Patent 10962357          28
17   Exhibit 7       Le Moigne, Structured       57
18                   Light Patterns
19   Exhibit 8       Aikens Second Expert        64
20                   Report, 5/7/25
21   Exhibit 9       Tomasi Patent Application   77
22   Exhibit 10      Dr. Iman Sadeghi Expert    109
23                   Report, 4/7/25
24
25   (Exhibits continued on next page)
```

45

1 it's not behaving like a pinhole model, I better go
2 to the store and buy a new camera because it's not
3 going to work. But if it is behaving like a pinhole
4 model, try to figure out what is the exact geometry
5 of the model. So you fit that to the data. It's an
6 optimization process. There is 30 or maybe 50 years
7 of literature on variations of how to perform this
8 calibration process.
9         But in summary, it's an experiment that
10 is done with the camera observing known patterns to
11 deduce what is the model? Is there a model that --
12 that well approximates my physical camera? And is
13 that -- and what, actually, is the -- is the
14 detailed geometry of that model?
15         Okay. So I think that is a good place --
16 I'll stop there. That's a good place to get an --
17 that's enough terminology to get us started.
18     Q   Okay. Good. So let's go back up to
19 where we were in your report, and we may -- we
20 may -- we'll probably return to the subject of
21 pinhole cameras at some point. Okay. And I
22 think --
23     A   I have a window open, and there is some
24 truck noise. Do you mind if I --
25         THE WITNESS: Actually, Andrea, can you

46

1 close the window? It's a turn, and you just turn it
2 a lot until it gets quiet. And it's a lot of
3 turning.
4     A   Stand by.
5     Q   We'll wait a second.
6     A   There's a truck reverse beeping, which is
7 kind of getting on my nerves. I like the fresh air,
8 though. It's a beautiful 70 degrees on the East
9 Coast today.
10         Okay. I'm back.
11     Q   Okay. We'll keep going. We were -- we
12 were on, I think, paragraph 52.
13     A   62, I believe.
14     Q   Okay. I may -- I -- I don't have the --
15 we had talked about -- okay. 62. Thank you.
16         So in the next -- I think we had gone on
17 to capture -- I think you had -- we had talked about
18 all cameras for structured light require a
19 photographic lens. I believe that's where we were,
20 and you -- and I'd asked you about the example of a
21 pinhole camera.
22         And, though -- is it -- it's true, I
23 mean, in theory at least, is it not, that some
24 pinhole cameras do not actually have a lens?
25     A   A physical pinhole camera never has a

47

1 lens.
2     Q   Okay.
3     A   That's why it's called a pinhole camera.
4     Q   I see.
5     A   And they're only used in high school
6 projects or art exhibits perhaps. They're not --
7 I've never seen one used in real life for any
8 technological purpose whatsoever.
9     Q   Understood. Okay. Okay. The next thing
10 you have in this statement is all cameras for
11 structured light -- this is paragraph 64 -- all
12 cameras for structured-light scanning require a
13 matrix radiation receiver.
14         Now, I mentioned earlier -- you -- you
15 had mentioned earlier that you thought that was an
16 unusual -- or I don't want to put words in your
17 mouth, but that it was not as commonly used as other
18 terms; is that fair to say?
19     A   I think it's almost never been used
20 except in Russian.
21     Q   I see. And just briefly, then --
22     A   But I think I -- I think we can talk
23 about what it means. I mean, it -- there are
24 English words, and English words have meanings. So
25 it's not uninterpretable.

48

1     Q   Okay.
2     A   Within range.
3     Q   Okay. Then, what is your interpretation
4 of what a matrix -- matrix radiation receiver is?
5     A   Okay. So --
6         MR. PACELLI: Objection. Form.
7     A   There was an objection to form?
8     Q   Yes.
9     A   And I could use --
10     Q   And my question --
11         MR. PACELLI: Sure.
12     Q   Yes.
13     A   Sorry.
14     Q   Okay. I'll restate it.
15     A   So --
16     Q   Do you -- what is your under -- for the
17 purposes that you've used that term in this report,
18 what is your understanding of a matrix radiation
19 receiver?
20     A   Okay. So honestly, the first -- in
21 modern times, I would say -- what is modern times --
22 late '80s, early '90s to now, anytime you have an
23 electric camera of -- conventional electric camera,
24 a video, or still, it's going to use either a CCD or
25 a CMOS-type sensor. And so that's 99.9999 percent

**49**

1  of cameras that -- that you buy, what you do. So
2  one reading is simply when they say a matrix
3  radiation receiver, it's shorthand for CCD or CMOS.
4      Another reading -- which that's a very
5  specific reading, but that's actually what people
6  do, so that's one way to read it. Another way, if
7  you want to just take it very broad as a sort of --
8  just think of it as something -- as more of a broad
9  category, the broadest category would simply be
10  matrix simply means it has some two-dimensional
11  sensing surface, using the word matrix here in a
12  very broad sense just to mean -- just to mean, you
13  know, some surface where you catch elect -- photons
14  and turn them into electrons.
15      If you want to get more narrow, possibly
16  it might require that the matrix have actual
17  discrete physical elements physically on the
18  receiver as opposed to pixels being deduced from
19  this two-dimensional sensor.
20      So you might -- I don't know anymore, but
21  you might want to add that. You might want to add
22  that it's a rectangular grid, although that's
23  probably maybe too narrow because I'm not even -- I
24  suspect that many actual cameras that people use in
25  life, their grids may not be rectangular. They may

**50**

1  be -- or square. And I'm not even sure, you know,
2  in the physical -- ultimately, you take a picture,
3  and you get a grid of pixels. That comes out of the
4  process. I have not taken apart enough cameras or
5  studied enough to know -- especially even color
6  cameras, where they have weird offsets to use for
7  the various different colors. I'm not sure that
8  they all even -- what everybody would call a camera
9  really would use a rectangular array, grid array.
10      But again, one could read that as well
11  into the word matrix. So I would say that there is
12  really -- the short answer is, when you say camera,
13  electrical camera these days, you meet CCD or CMOS.
14  Full stop.
15      If you want to start a discussion on the
16  philosophy of cameras and what, you know, may or may
17  not count, and you want to start reading into the
18  word matrix, there is sort of a series of broad to
19  more narrow terms you may want to use, definitions
20  you may want to use.
21      Q   Okay. Going down to the next paragraph,
22  65, in your report. So all cameras for
23  structured-light scanning require a camera driver.
24  And then you go on to say, which is a circuit that
25  amplifies the sensor signals from a -- a matrix

**51**

1  radiation receiver and converts them to a format
2  suitable for use by a digital processor, and it goes
3  on.
4      Do you see that paragraph?
5      A   Yes.
6      Q   Okay. And why would -- why, in your
7  opinion, do all cameras for structured light require
8  a camera driver, as you describe it?
9      A   Let me just reread that paragraph to
10  see --
11      Q   Okay. Yeah.
12      A   -- exactly what I did or didn't say.
13      Okay. So if you're using a CCD or CMOS
14  camera, there is some minimal circuitry that is
15  required to produce a usable image. In particular,
16  the way these things work in a very, very layman's
17  broad sense, is photons come through the lens. They
18  hit sensor elements. Those sensor elements, using
19  rocket science, end up storing an electrical -- some
20  kind of electrical charge due to the pixel. But
21  this is happening at the incredibly, you know,
22  small-scale level.
23      You want to pull out from this a -- a
24  usable image. So my understanding, at the very
25  least, is you need to have amplification going on.

**52**

1  You also need clock -- clocking. That is, a camera,
2  a video camera takes a picture at various rates.
3  And so there needs to be some notion of the -- the
4  clock speed of when the readout is taking place.
5  And that's going to require circuitry.
6      You're also, as -- as part of the
7  clocking, you're going to require clearing
8  circuitry, or something's going to need to say,
9  okay, this picture was taken, stored, transmitted.
10  And now I need to reset my sensors back to zero so I
11  can start again and take the picture of the next
12  time. Again, that needs to -- that needs circuitry.
13  You can't do that just with the raw sensor elements.
14  I'll stop there.
15      Q   Okay. Now, I --
16      A   Oh, actually may I add something?
17      Q   Sure.
18      A   Of course, you could add more -- and
19  that's at the minimal, you would -- a CCD or a CMOS,
20  at minimal, would need amplification, readout,
21  clearing, and clocking. There's more and more
22  stuff. And over time, more and more functionality
23  has been placed into cameras as -- you know, as
24  cameras have gotten -- as circuits have gotten
25  smaller and cheaper. More and more cool stuff can

53

1  be done on your camera that -- you know, every --
2  every five years or whatever, every generation of
3  your iPhone, the camera is doing more and more and
4  more. And an iPhone is all integrated, but even a
5  standalone camera is doing more and more and more.
6      And so in some sense, the sky is the
7  limit as to what kind of additional on-camera
8  processing might want to do beyond the essential
9  things that I just mentioned for which the camera
10  would be usable -- a CCD or a CMOS would be usable
11  without.
12     Q   Okay. So then -- then it -- is it --
13  does it follow -- and please, don't let me put words
14  in your mouth if it's not an accurate description.
15  If you have a camera that is using what we would
16  call -- we'll refer to it as a radiation receive --
17  matrix radiation receiver -- that's a mouthful for
18  me this morning -- matrix radiation receiver --
19  would be correct, then, that the camera couldn't
20  function unless it had something you could
21  characterize as a camera driver?
22     MR. PACELLI: Objection. Form.
23     Go ahead.
24     A   So you are putting words in my mouth
25  because, as we just talked about, it's not really

54

1  clear what a matrix radiation receiver does or
2  doesn't encompass. If -- I will say, yes, if you
3  gave me a camera, and you told me it was a CCD or
4  CMOS, I would agree with your statement.
5      Q   So can you --
6      A   It is true -- I would say that a CCD or a
7  CMOS camera definitely doesn't do anything without a
8  driver circuit.
9      Q   Okay.
10     A   A matrix radiation receiver is a little
11  bit of, you know, tea leaves.
12     Q   I see. And -- and you had -- you said,
13  in your experience, a large majority -- I believe
14  you said it was 99 percent or more of things that
15  you -- that you characterize as functioning as a
16  matrix radiation receiver have either the CCD or the
17  CMOS?
18     MR. PACELLI: Objection. Form.
19     A   Correct.
20     Q   All right. I've moved down -- now,
21  again, Dr. Gortler, we've been going over an hour
22  here. And I generally go between an hour, an hour
23  and 15, typically, between breaks. If there's any
24  time you want a break, please feel free to -- to
25  ask.

55

1      A   I understand -- understand.
2      Q   Okay. And the only exception would be if
3  a question is pending. If I've asked you a question
4  and you haven't answered it yet, that's usually not
5  a good time to take a break.
6      Do you understand that?
7      A   I understand.
8      Q   Yeah, and any other time for any other
9  reason. But maybe I'll ask, if it's okay with you,
10  maybe one or two more questions before we move on?
11     A   No problem.
12     Q   Okay. Going back to your report, I want
13  to refer to the next paragraph, 66. And it says --
14  where it says, An early example of camera for
15  structured-light scanning is the image orthicon.
16  And you make a reference to the Le Moigne reference.
17  Do you see that?
18     A   Yes, I do.
19     Q   And I just want -- going -- I'm going to
20  go to what was Exhibit -- I believe, Exhibit 3, your
21  Exhibit B to your report, and look at that for a
22  second. Could you -- could you return to that
23  Exhibit B, if you can find it? I guess it would --
24  or your Exhibit B. I believe, it was the third
25  thing we entered as exhibit?

56

1      A   Yes, I see it.
2      Q   Okay. And on the first page, I can count
3  down -- one, two, three, four, five, six, seven,
4  eight, nine, ten, 11, 12 -- about 12, there's a Le
5  Moigne, et al. structured-light patent for robot
6  mobility.
7      Do you see that line there?
8      A   Yes, I do.
9      Q   Is that the Le Moigne reference that you
10  are referring to in your report in paragraph --
11     A   So to be 100 percent sure, to see it -- I
12  think, yes. To be 100 percent sure, I would need to
13  see the physical --
14     Q   And we'll do that right now.
15     A   -- along with the title --
16     Q   Okay.
17     A   -- to see it. But I do believe, at this
18  point, that this is the paper that I looked at that
19  I referred to as Le Moigne.
20     Q   Okay.
21     A   It looks like the right title, but I
22  don't see the paper in front of me.
23     Q   Right.
24     A   So maybe it was a different paper with a
25  slightly different title.

65

1    A   Yes, sure.

2        Okay.  FLIR is a general term used over a

3   long period of time.  And so what he is saying here,

4   which I don't disagree with, is the term itself just

5   means forward-looking infrared.  It could mean many

6   different things.

7    Q   But -- and he uses that to conclude that

8   a -- well, in paragraph 25, that a -- a POSA,

9   P-O-S-A, would understand that each of the cameras

10  -- he's disagreeing with that, with your

11  conclusion, and he is justifying that with 26.

12   A   So -- okay.  So there, again, I show

13  examples of orthicons, which, under some definition,

14  has a matrix radiation receiver.  Again, hard to

15  know; the term is vague.  I showed a specific

16  example of an orthicon that uses the word matrix in

17  its own description.  So there certainly were

18  orthicons that would have used a matrix.  I showed

19  you a picture of a FLIR which did clearly use a CCD,

20  which is a matrix.

21       That is -- that is -- that is my

22  explanation of that conclusion.

23   Q   Okay.  And what would -- do you have an

24  understanding of, in the Le Moigne reference, and I

25  believe -- let me double-check the date.  I believe

66

1   it was 19 --

2    A   '88.

3    Q   -- 88.

4        Back in 1988, were the FLIRs using a

5   matrix radiation receiver common at that time?

6    A   So I think my answer is going to be

7   they -- again, depending on how you define matrix

8   radiation receiver, they definitely had to have some

9   kind of receiver.  They would have been

10  two-dimensional.  Did you want -- did they have a

11  grid of pixels?  The answer -- let me see, what year

12  was the Florence, for comparison.  Florence was '85.

13  But, no, it is -- it is possible that they were

14  using cameras that did not have CCDs.  Actually,

15  certainly, if they -- orthicon did not have CCD; the

16  FLIR, I don't know what they used.

17   Q   Okay.  So -- and then, I guess the

18  question, then, is, does Le Moigne, then, by making

19  these references, necessarily teach a person

20  ordinarily skilled in the art, at the time of the

21  patents, beginning with the '656 patent, would it

22  necessarily -- would these references necessarily

23  teach the use of a radiation --

24   A   So I would say --

25   Q   -- the use of a radiation matrix

67

1   radiation receiver?

2    A   I would say two things.  Again, the first

3   one is you have to decide whether orthicon has a

4   matrix radiation receiver or not.  I'm going to

5   leave that one open.  Moreover, it is true that in

6   the late '80s, camera technology was -- was very

7   -- was advancing.  And what we would now call

8   digital camera -- CCDs become much more -- only

9   common in the late '80s and, like, camcorders, and

10  digital cameras really exploded both in, you know --

11  actually, so take it back.

12       So CCDs, if you bought any kind of

13  electrical video camera, already by the mid-'90s

14  almost certainly would've had a CCD; by 2000, it

15  would've been a CCD with a digital power output.

16       So the short answer is, you know, every

17  year there are different cameras.  You buy the

18  camera that is best for your purposes.  In the late

19  '80s, people were probably scrambling to do the

20  best they could to do image processing.  They

21  obviously needed pixels at the end.  They needed a

22  matrix of pixels at the end.  Whether or not that

23  happened on the camera or downstream -- you know,

24  this -- the Le Moigne paper, I would say, is not

25  incredibly detailed in their hardware choices.

68

1    Q   Okay.  And now we're turning back to your

2   report, back to the paragraph -- get back to the

3   paragraph.  We were looking at the other one.  And

4   I'm going to -- we are going to back up to -- I

5   think you make -- you make a reference -- you're

6   going back up to paragraph 56 in your report.

7    A   56?  Hold on.

8    Q   Your page 14.

9    A   Yes.

10   Q   Okay.  And it says -- you give the -- the

11  definition of a vertex of a lens, a point.  And this

12  is in the middle of the paragraph.  Okay.  You

13  mention the optical center of a lens is the point

14  within the lens where light -- light rays pass

15  through without being deviated.

16       Do you see that?

17   A   Hold on.

18       Yes.

19   Q   Okay.  And later on when you are speaking

20  of Tomasi, you mention -- and I'll get you down to

21  that.  I think we are at paragraph -- we'll go down

22  to 177.

23   A   I'm getting there.

24   Q   Okay.

25   A   I'm not there yet, just scrolling.

77

1 report that -- and that's what I think -- I do say
2 in my report -- I could find -- that's what I think
3 he really meant. But -- but if you want, you can
4 interpret it to mean something else, which means
5 that patent doesn't quite hold -- make a lot of
6 technical sense. But we can go down that discussion
7 as well, if you want.
8    Q   Okay. Since we mentioned Tomasi, I think
9 we'll -- we'll put it in, in case you -- in case we
10 need to reference it. And we probably will soon.
11 So I will place into the chat what is now going to
12 be Exhibit 9, which I believe is the Tomasi
13 reference that you're referring to. We just -- just
14 for -- since you mentioned it, will be complete at
15 this point.
16       Let me know when you can see it.
17       (Whereupon, Exhibit 9 was marked for
18 identification and is attached to the transcript.)
19    A   I don't see it -- oh, I think maybe --
20 hold on. I have to press it, like, twice for it to
21 appear, but I do have it now, yes.
22    Q   Okay. And we'll just enter it in to be
23 sure here. I put a patent publication, actually,
24 with the publication number of US 2004/0005092A1,
25 with the publication date of January 8, 2004, and

78

1 the inventor is a Carlo Tomasi.
2       So you can see this document now?
3    A   Yes, I can.
4    Q   Okay. And this is what you're
5 referring -- you're referring to in your report as
6 the Tomasi reference, correct?
7    A   That is correct.
8    Q   Okay. And what does Tomasi describe
9 about the lenses used in -- the lenses used -- or
10 what does he describe about the lenses in the Tomasi
11 reference?
12       MR. PACELLI: Objection. Form.
13    A   Okay. So he doesn't talk a whole lot,
14 again, about the physical decisions he made of which
15 cameras he used or, you know, what lens he bought or
16 the projector he bought. He uses fairly generic
17 terms.
18       Notably though, we can look at figure 3,
19 which is his description of the geometric model of
20 what he is seeing, and there should be a -- so tell
21 me if -- tell me when you've found figure 3.
22    Q   Yeah, I'm over here on figure 3. Yes.
23    A   And lo and behold, this figure is
24 identical to the figures we have already looked at,
25 specifically the figure in my report on epipolar

79

1 geometry, as well as the figure 2 in the '656. And
2 this is a classical picture of the geometry --
3 geometric model of the camera and projector setting.
4 And behold, he's labeled 302 and 304 as projector
5 optical center and camera optical center.
6       So again, it is completely clear from the
7 context that whatever particular camera or projector
8 he bought, he is assuming that the geometry is
9 well-approximated by the pinhole model shown in
10 figure 3.
11    Q   Now, you said -- so when you say -- you
12 say he refers to, in figure 3, projector optical
13 center, I guess for both the projector and the
14 camera. And is it your interpretation -- you've
15 gone -- you had said quite a bit about what your
16 interpretation is of a vertex. Is a -- is a vertex,
17 then, in your reading of the '656 patent, that the
18 vertex refers -- necessarily refers to this
19 projector optical center?
20       MR. PACELLI: Objection. Form.
21    A   If '656 is read to make sense and was
22 written by people who knew what they were doing,
23 then, yes; if it was written by multiple people who
24 meant different things with the word vertex, then,
25 no.

80

1    Q   Well, I'm going to -- to refer you to --
2 back to Mr. Aikens' report. And I -- I may -- I
3 think we have that as Exhibit 8.
4       Do you need a break for some -- some
5 reason?
6    A   No, no, no, I'm good. Thank you for
7 asking.
8    Q   I just wanted to check.
9       And I want to refer you back down to his
10 report on page 12. And he has a -- and paragraphs
11 41 and 42.
12    A   I am there.
13    Q   Okay. Okay. And it says, There are many
14 types of lenses -- I'm reading from paragraph 41,
15 page 12 -- some of them do not have a vertex. Not
16 all lenses are photographic lenses, as he mentioned.
17 And then he listed a number of lenses -- of
18 examples, such as videographer -- videographic
19 lenses, panoramic lenses, Fesnel lenses, binary,
20 holographic, diffractive, gradient, and then many
21 others. And he's claiming that it's not
22 necessarily -- that any lens does, in fact, have
23 something that can be called a vertex. And he gives
24 example of a gradient index lens in his last --
25 okay.

81

1    So if there are -- and Tomasi, he doesn't
2  describe his lens any more than to say it's a lens.
3  And it says -- so is it true, then, it's not --
4  Tomasi is not necessarily describing a lens with a
5  vertex?
6      MR. PACELLI: Objection. Form.
7      A  Okay. So like I said, I don't believe
8  '656 is describing a lens with a vertex as well.
9  When they say the word vertex, I don't believe they
10 mean the surface vertex. Or I've said they either
11 don't mean it or they don't mean it completely,
12 because half the time they say vertex of the field
13 of view without qualifying as the word lens.
14     So again, I don't agree at all with the
15 characterization that the '656 is referring to a
16 surface vertex. I believe it is probably poor
17 terminology possibly translated by non-English
18 speakers where the word vertex is what they ended up
19 with.
20     That said, I do know what a vertex --
21 surface vertex of a lens is. I have no doubt that
22 Dr. Aikens could find exotic lenses, things that are
23 pieces of glass that, for whatever reason, they
24 might argue doesn't have a surface. Who knows?
25 Maybe it doesn't have -- it's not centrally

82

1  symmetric so there's no axis. In which case, maybe
2  it wouldn't have a vertex.
3      That said, in -- in multi-view or
4  structured light, you are -- as we talked about at
5  length, you are trying to get a camera that behaves,
6  essentially, as simply as possible. You literally
7  don't even want blur. You literally just want
8  something that behaves like a pinhole camera in
9  which case you would get a conventional lens.
10     A conventional lens would have a surface
11 vertex as described. I have actually never come
12 across a lens in this context that is not,
13 essentially, a symmetric lens, which, then, should
14 have a surface vertex by this definition.
15     Moreover, you know, you're not trying
16 to -- the point of this -- of this is when you -- if
17 you are trying to create a scanning system, you
18 would figure out -- you'd go to your supplier and
19 find what cameras and lenses are for sale at what
20 price. And again, for this context, you would have
21 to pay a lot of money or hire somebody to create
22 something very exotic. So you could go through
23 extraordinary means, certainly, and possibly produce
24 some cameras that behaved well enough but didn't
25 have lenses with an excess of symmetry, and,

83

1  therefore, not a -- an obvious notion of a surface
2  vertex.
3      But again, that's like -- again, that
4  would be like trying to use a pinhole camera, you
5  know, to film a movie. It -- with enough work,
6  maybe somebody could do it. I don't want to say
7  it's impossible, but it's not the way things are
8  done.
9      Q  But -- but this is one example in which
10 you mentioned, not necessarily all lenses without a
11 classic vertex or what you said is a surface vertex,
12 would be expensive. For example, isn't it true that
13 plastic lenses are often relatively inexpensive?
14     A  I think they would have a surface vertex
15 as well. I'm not an expert in optics and that word.
16 But if, you know, you draw a picture of a lens and
17 how it behaves, it typically has a -- an axis of
18 symmetry. It has a surface. Axis plus surface
19 seems to be a surface vertex. So I don't think
20 it's -- glass versus plastic is the least bit
21 relevant.
22     Q  So to be -- so -- so to finish this off,
23 when you -- is it correct that, in your report, you
24 are -- you are coming to the conclusion that the Le
25 Moigne reference and the Tomasi reference -- so are

84

1  you -- let me rephrase that.
2      For your -- your opinion, as to how the
3  Tomasi and Le Moigne references may disclose the
4  claims of the '656 patent, are you -- have you --
5  are you using a particular meaning to what you
6  ascribe to a lens with a vertex?
7      MR. PACELLI: Objection. Form.
8      A  So I -- we're going over the same ground
9  again, but that's -- that's okay.
10     Q  Sorry. I just wanted you to -- go ahead.
11     A  But I -- I will answer your question. I
12 try to -- I'd like to answer -- I'll try to answer
13 it.
14     My -- the best interpretation of the '656
15 to me is if you want to -- the best interpretation
16 of when you say the word for vertex is going to be
17 what I call pinhole vertex. And in that sense, that
18 is completely described by both Le Moigne and,
19 most -- more importantly, by Tomasi.
20     To the degree that you think you can make
21 sense of -- of a claim where it's a lens surface
22 vertex, which we've, again, argued I don't think
23 that's a very reasonable way to read it, but to that
24 degree Le Moigne says the word lens. And so to that
25 degree, I believe that a person working in this area

85

1  who bought a camera -- I wouldn't even -- he
2  wouldn't need to tell me it has a lens.  It would
3  have a lense.  But he told me it has a lens.  And he
4  wouldn't have to tell me that it's not a weird, you
5  know, toric lens that's used for astigmatism, but
6  it's a lens that's used for a camera.  And that
7  camera has a -- an axis of symmetry, as
8  conventionally would be found.
9       And so, yes, I would say, in both senses,
10 it is clear that that's what would be going on to a
11 person working in the area.
12      And then the third thing, again, is --
13 which you didn't ask, but I'll just say, of
14 course -- again, you go to your supplier, and you'd
15 say, please buy me a camera.  And, you know, they
16 would get you a camera, and the camera would have a
17 lens.  And that lens would -- you know, unless
18 you -- unless you, you know, asked for some -- you
19 know, for some wacky optics, you're going to get a
20 camera that has a surface vertex, as defined.
21     Q  Okay.  Let's move on for a minute to the
22 next section of your report.  On the -- and I'll
23 give you the paragraph.  Under section D, beginning
24 of paragraph 76, you referred to epipolar geometry
25     A  Let me get there.  Let me search this

86

1  time, get there faster.  No. 376.  Come on.  Oh, I
2  think I got there.
3       I'm there.
4      Q  Okay.  And just going down, we -- we
5  talked about -- under paragraph 77, you mentioned
6  the -- the figure that you have -- that you
7  describe that -- well, again, you mentioned it, but
8  how would you describe the figure under paragraph 77
9  that you referenced earlier on page 23?
10     A  The figure -- the figure in paragraph 77
11 is a -- is a -- let's see.  Okay.  So this figure
12 goes together with the figure in paragraph 79.  So
13 these two figures -- and, in fact, the figure in
14 paragraph 80.  So I would take these three figures
15 as -- as a sequence describing really one or a set
16 of related ideas.
17      So now, when you want to talk about them
18 more specifically, the first one -- I'm just -- let
19 me read exactly what my reference is here.  Okay.
20 So the first one is -- is a -- is a start -- is
21 trying to motivate the idea of epipolar geometry.
22      So epipolar geometry is something that --
23 and we'll go through exactly, if you want, what this
24 means geometrically.  It's a geometry that occurs as
25 soon as you have the model of two pinhole

87

1  or, equivalently, a pinhole camera and a pinhole
2  projector.
3       It was discovered, I believe, in the late
4  1800s and was described in photogrammetry in the
5  photogrammetry literature there.  Then it kind of
6  went to sleep because people weren't doing this
7  until, you know, image processing took off.  And it
8  comes back, I believe, with the launch of Higgins in
9  the '80s.  And then was one of the central
10 concepts used in stereo, which is two-camera vision.
11      All right.  So what are we looking at
12 here?  We're looking at two cameras or a camera and
13 a projector.  It's just geometry.  And there's a
14 point in the scene labeled as X.  And in the left
15 camera, you see a point on the square labeled as X.
16 And that -- that connects the line from the point X
17 that is out in the scene, connecting it to the
18 pinhole, which is on the lower left.  Again, here,
19 the pinhole is shown behind the film plane, which is
20 the nonphysical description.  And then you have that
21 point X.  So that's the point X, as observed in the
22 left picture.
23      Now, the question is, where is that point
24 out in the scene?  So you look at -- because it's a
25 pinhole model, the point that created the point X --

88

1  capital X, I think is the way they're drawing it
2  here -- that created the imaged point, little X, has
3  to have been somewhere along that line in space that
4  is shown in the figure from the leftmost camera
5  point.  So now we have a line in space.
6       The next question is, well, so we know X
7  has to be somewhere along that line; otherwise, it
8  would not have appeared at this point in the left
9  picture.  But we still don't know where along that
10 line it is.  But what we can do is we can take that
11 line and see what would that line look like in the
12 rightmost image.
13      So think of the line as being comprised
14 of, you know, an infinite number of little points.
15 And for each of those points, draw the line
16 connecting it to the pinhole on the right and see
17 where that line intersects the rightmost film plane.
18 And you would see where is that point imaged on the
19 right.
20      And if you do that for all these points X
21 along the line on the left, that will sweep out, if
22 you have in a pinhole model, a line on the right
23 which is labeled as L-prime.  Okay?  So this is the
24 beginning description of the epipolar geometry
25 whenever you have two pinhole cameras, which is no

149

1   Q   All right.  Turning your attention to the
2  bottom of column 6.
3      A   Column 6 in '656?
4      Q   Yeah, the '656 patent.
5      A   Give me one second.
6         Column 6, I am there.
7      Q   Okay.  And column 6 is a very -- very --
8  it says -- it says, Using such a light structure --
9  160 of figure 13 -- portions represented of captured
10 images recorded by the camera, based on the
11 relational positioning of the projector and camera
12 of figure 7, are illustrated in figures 14 and 15
13 representing planar objects and nonplanar objects,
14 15.  And it goes on to give further description.
15        Does that -- does that description --
16 well, the description there and continuing onto the
17 top of column 7 -- provide you any information about
18 lines on figures 14 and 15?
19     A   Yeah, so this gets to the heart of one
20 of, I think, the -- again, one of the very puzzling
21 parts of this patent, which is, I think, a good
22 topic to dive into.  Yes, so let me read this.
23        From these figures, it can be seen that
24 groups of coded elements each lie on a respective
25 projector meridian in the slide and will also lie

150

1  with the retrospective camera meridian in the
2  image -- okay.  And I'll just continue actually.
3         The next sentence is, The particular
4  shape will cause the elements to move only in a
5  direction along the length of the camera, which is
6  just -- that's just another statement of the
7  abstract concept of epipolar geometry.  Things will
8  move along epipolar lines no matter where they are
9  placed.  Okay.
10        So again, he's saying that these figures
11 can show you groups of elements lying on respective
12 meridians.  That is, essentially -- and then, this
13 matches the claim language.  That claim language,
14 there's a lot -- claim 1 is all background,
15 literally, until the mysterious paragraph about
16 virtual lines being defined that we just talked
17 about.  And then the following paragraph where it
18 said coded elements -- let me read it slowly because
19 it seems to be the whole patent where it said coded
20 elements of said first group are located along said
21 first virtual line, and said coded elements of the
22 said second group are located along said second
23 virtual lines.
24        So the main action words here are located
25 along.  I would highlight that as being something to

151

1  try to understand.  And those same words, I believe,
2  appeared -- each lie on a -- okay?  So that is the
3  verbal description of what we are supposed to see
4  here in those words.
5         So let's look.  So then I look at figure
6  13, and I ask myself, what are the elements, and in
7  what way are they demarcating or organized into
8  horizontal lines?  Similarly, vertical lines are
9  drawn in figure 140, but I do not see -- and there's
10 nothing apparent to my eye where the blob pattern
11 has actually been, in any careful way at all,
12 aligned with these lines.  What I see is,
13 essentially -- I'll use the term haphazard
14 intersection.  I have a bunch of blobs.  They are
15 big.  I've got a bunch of lines.  And there's a law
16 of nature that says if I have a lot of lines and a
17 lot of blobs, the lines would hit the blobs.
18        So that is what figure 15 is showing me.
19 Figure 15 is demonstrating a law of nature that if
20 you have lines, and you have a bunch of big blobs,
21 lines will hit blobs.  And it's unclear to me
22 whether the claim that you want these things to lie
23 on, whether it is just referring to that general
24 fact or whether it is describing something more
25 specific with an actual limitation as was done by Le

152

1  Moigne very carefully or Tomasi.  So Tomasi and Le
2  Moigne have specific descriptions of how things are
3  arranged on these lines.  No description is given
4  anywhere other than these magic words, lie on.  And
5  the figures really just show what appears to be just
6  haphazard happenstance that just happens whenever
7  you have any number of -- any number of blobs and
8  any lines.
9         In this particular figure, had you drawn
10 diagonal lines, they would have also hit lots of
11 blobs.  There is nothing inherently vertical in the
12 pattern shown here.  And so, in that sense, nothing
13 --
14     Q   By the pattern shown here, meaning the
15 pattern -- you said the pattern shown here.  What
16 are you referring to?
17     A   Figure 15.
18     Q   15.
19     A   Of '656.
20     Q   Of '656.  It looks -- there looks like
21 lines that are, at least a majority -- mostly
22 vertical but not perfectly vertical.
23     A   No.  Those are superimposed.  Those are
24 superimposed.
25     Q   Superimposed.

153

1    A    That is not in the figure.
2    Q    Okay.
3    A    The blobs are the actual pattern, those
4  little -- they kind of look like little corpuscles.
5  They look like Abacus beads. There's nothing
6  vertical -- there's no obvious vertical alignment in
7  the Abacus beads. The vertical lines are not in the
8  pattern. They were drawn as part of informative
9  sketches in the patent. And I would ask you if you
10  had made those diagonal, would that, in any less
11  way, align with the Abacus beads. And I would say
12  no differently.
13        The intersections that I am seeing are
14  just sort of law of nature. Lines hitting blobs.
15  I'm not seeing any limit -- any -- any description
16  of what they're trying to do here.
17    Q    Well --
18    A    They -- they are trying to do something,
19  but I don't know what it is.
20    Q    Right.
21    A    Or if they're trying to do something, I
22  don't know what it is.
23    Q    Okay. So going back to the -- where it's
24  described, it does, in fact -- it doesn't say they
25  are random lines. Doesn't say that -- it defines

154

1  them as the -- as -- it says figure 7 illustrated
2  planar objects -- okay -- and non-planar objects,
3  15. And it can be seen that groups of coded
4  elements -- and each on a line -- each on a line on
5  a respective projector median in the slide 12 will
6  also lie on a respective camera median in the image
7  140.
8        So the projector median and the camera
9  median --
10    A    Where are you reading?
11    Q    I'm reading -- I'm reading for you what
12  it says at the bottom of column 6 through the top of
13  column 7 through, approximately, line 6.
14    A    So all you have just stated right now is
15  the abstract concept of epipolar geometry.
16    Q    Right.
17    A    So epipolar geometry, like I said, yes,
18  this is a true statement. Things will move along
19  epipolar lines, will only move based on depth along
20  epipolar lines, as we already established is
21  200-year-old technology -- or maybe 150-year-old.
22        THE REPORTER: You're going a little
23  faster, and there is little bit of cross talk going
24  on.
25        THE WITNESS: Sorry.

155

1    A    There are two separate things to talk
2  about. There is the mere fact of epipolar geometry
3  that things will only appear on corresponding lines.
4  And then there is the question about have you
5  created a slide in which, in some careful way, you
6  have aligned -- there is, inherent in the pattern
7  that you've built, some alignment. Now, we did say
8  that alignment. And what does that mean? Well, if
9  you look at Le Moigne or you look at Tomasi, you see
10  that. You see the alignment. They have done
11  something. They invented something.
12        If you look here, in terms of that -- in
13  terms of epipolar geometry, yes, of course, that
14  works. Epipolar geometry is great. In terms of
15  have they described any limitation of their pattern
16  so that it meets that claim of -- you know, to give
17  any meaning to the sentence of what does it mean for
18  said coded elements to be located along? The answer
19  is I don't see that.
20        By the way, we have switched. See, there
21  were two different paragraphs in the claim. And we
22  were talking about both. So let me just clarify.
23  The first paragraph was the -- you know, virtual
24  lines defined. And then the second paragraph is the
25  wherein said elements are located along. I think

156

1  we've kind of bounced between them, or maybe that's
2  my fault.
3    Q    That's okay.
4    A    And so if you want to -- if you want to
5  sort of -- we're talking about both at the same
6  time, which is maybe a bad idea. So I'm going to
7  pause and let you direct me.
8    Q    Well, then, I'm going to ask you to -- I
9  think when you were talking about being bounced
10  between sentences, you were talking about paragraphs
11  in the claims, correct?
12    A    That is correct.
13    Q    Okay. So just from what I'm talking
14  about, paragraphs in the specification?
15    A    But are we referring back to the concept
16  of defining virtual lines or -- you, yourself, have
17  said -- you know, that's what we were talking about
18  before you pointed to that. Or are we referring now
19  to the coded elements along lines? So the
20  discussion, I think, needs to be organized by the
21  claim. And you were the one who pulled that --
22  pulled -- pulled it in that direction. So I'll let
23  you --
24    Q    So independent of the claim, for the
25  moment, what the specification shows, if -- can --

161

1  that further demonstrates, when you look at it, that
2  there's no obvious relationship between them.  And
3  so this is the same point again that, even after you
4  draw the lines, that doesn't show you any
5  correlation of how the coded movements, which are
6  not lines, were organized to be aligned with the
7  camera meridians.
8      So, for example, in the Tomasi patent or
9  the Le Moigne patent, you could literally see with
10 your eyes.  And if I overlaid the lines, you would
11 see it even more clearly.  But here, when you look
12 at 13, you don't see any lines.  And if I throw the
13 vertical lines on after the fact, that only makes it
14 clearer that there was no organizational principle.
15     Q   Well, so you're saying that -- the
16 description that we talked about earlier, figures 14
17 and 15, starting at the bottom of column 6 and going
18 to the top of column 7, you're saying those do not
19 provide any organizing or organizational -- I forget
20 the word you used -- or any --
21     A   There is no description of any limitation
22 on the pattern in which to -- to tell me in which
23 way they intend to -- what kind of alignment they
24 intend to occur.  They are simply a generic
25 statement about epipolar geometry being good, unlike

162

1  what is done by Tomasi and/or Le Moigne.
2      Q   Okay.  So then, on the very top of the --
3  on these figures, referring to 14 and 15 above, it
4  says they can be seen that groups of coded elements,
5  164 and -- each lie on respective projector median
6  [sic], 187, in the slide 122, will also be -- with
7  respect to camera meridian in the image 140 where
8  the projector meridians and the camera meridians are
9  illustrated as vertical lines in these figures.
10     A   Right, but what is shown, then -- and,
11 again this is figure 14, I believe.  What is shown
12 is vertical lines superimposed upon blobs in a way
13 where there's no apparent correlation.  In
14 particular, had you drawn diagonal lines, you
15 would've seen the exact same nonalignment.  It's
16 just haphazard intersection.  So this doesn't
17 demonstrate anything.  This demonstrates nothing
18 other than that, if I have a lot of blobs and they
19 fill a picture, and I draw a line, it's going to hit
20 some blobs.  That is all this demonstrates.  That is
21 the law of nature.
22     Q   How -- if you drew some diagonal blobs
23 [sic], however, would those diagonal lines be
24 epipolar lines?
25     MR. PACELLI:  Objection.  Form.

163

1      A   The diagonal lines would not be epipolar
2  lines, but they would align with the blobs just as
3  much as the -- the true epipolar lines did.  And
4  insofar as that happens, then, there is no apparent
5  organization of the blobs along the epipolar lines.
6  Had you drawn non-epipolar lines, they would have
7  the same relationship to the blobs that the epipolar
8  lines did.
9      Q   But they have a relationship.  Don't they
10 have --
11     A   That tells me that they don't do
12 anything.
13     Q   Doesn't each blob or each part of -- of
14 that define -- you know, define the coordinates?  I
15 know coordinate now.  I have a coordinate along a
16 line, along a virtual line that I can use for
17 processing three-dimensional images?
18     MR. PACELLI:  Objection.  Form.
19     A   Given any pattern of blobs with no
20 limitation whatsoever, it doesn't -- you could talk
21 about what epipolar lines intersect it, and that's a
22 law of nature.  And you can use that.  If you see a
23 blob in a picture, you can identify its epipolar
24 line, and you could know to search only along that
25 line in the projector.  That is a classical epipolar

164

1  geometry.  What one could imagine adding on top of
2  that, which was done in La Moigne or Tomasi, is
3  actually designing a pattern where there's actually
4  some clear extra use of the epipolar geometry.  And
5  that might be usable, might be useful.
6      What you see in the '656 is nothing of
7  the sort.  You see a bunch of blobs.  They're
8  organized horizontally in a clear way.  There's no
9  vertical organization of any sort.  And then they
10 say, oh, look, I draw some vertical lines which
11 happen to be epipolar, and they happen to hit them.
12 And that's true.  And epipolar geometry is
13 wonderful.  But it doesn't demonstrate that they
14 have done any -- they're not describing anything
15 specific in terms of what it means to -- you know,
16 is there any meaning -- is there any limitation of
17 their pattern to align it atop of the epipolar
18 geometry?  And that is simply not visible, not
19 described.  It doesn't even seem to exist.
20     Q   Well, but on the sentence that begins on
21 line 6, it says, The particular shape of service 110
22 of the object 111 being analyzed will cause the
23 coded elements 164 and 165 in the image 140 to move
24 only in a direction along the length of camera
25 meridians 188.  The desired 3D measurements of the

---

**165**

1  surface can then be made by analyzing the movement
2  and/or position of the coded elements along the
3  camera meridians with respect to -- with respect to the
4  positions of the respective coded elements 164
5  and -- in the slide 122. And also with respect to
6  the movement and/or position of the other coded
7  elements 165 in the same group of coded elements 165
8  along the same or different camera meridians.
9      So doesn't that show a use of the coded
10  -- of --
11      A  That is a verbatim description of
12  epipolar geometry that we talked about this morning.
13  There's nothing in that sentence that is beyond what
14  was known in the 19th century.
15      Q  In that particular sentence?
16      A  In that paragraph that you read.
17      Q  In the paragraph there?
18      A  You have just stated that, because of
19  epipolar geometry, things where you don't know where
20  they are have to live in epipolar lines. That is
21  epipolar geometry. That is not an invention.
22      Q  But we're not -- here, we're not talking
23  about whether or not we have -- this describes an
24  invention, per se. But we are getting back to --
25  you -- you were claiming that they were -- you said

---

**166**

1  at various points -- let's go back to your opinion
2  on this. You said that at a merely abstract
3  level -- I'm going back to the paragraph 131. So
4  you -- first it says it does not provide -- the
5  specification of the '656 patent does not provide
6  the written description support for the limitations
7  requiring first/second groups of coded elements
8  being located along first and second virtual lines.
9      So given what is described in that
10  paragraph, going from the bottom of column 9 --
11  column 6 to the top of column 7, how does that not
12  provide a written description of support for coded
13  elements being along first and second virtual lines?
14      MR. PACELLI: Objection. Form.
15      Go ahead.
16      A  Let me just read this carefully.
17      Okay. The specification does provide a
18  written description about epipolar geometry, how it
19  works, what it does. The patent also suggests that
20  it is saying something more than that involving
21  words like groups of elements located along, as if
22  this is more than simply stating the 19th century
23  mathematics. I believe there are things that could
24  be stated about coded elements and located along
25  virtual lines that would be inventive and, for

---

**167**

1  example, have been done by Le Moigne or Tomasi in
2  the previous work.
3      On the other hand, I don't see anything
4  in this patent that does anything above and beyond
5  the mathematics along with some vague words about
6  located along that is unsupported by any figures or
7  any words other than the words located along. If
8  all they mean is that there are elements that are
9  big enough that, somehow, they hit lines, then that
10  again is just a statement of a law of nature.
11  That's not even a claim.
12      So when I read the patent -- I should be
13  honest with you, when I read the patent, I assumed
14  that they had some clear intention. I kind of gave
15  them the benefit of the doubt that they were
16  describing an interesting way of setting up your
17  pattern so that it lined up. And that actually was
18  done. I knew that was done in scan, like, it's
19  somewhat common practice. So maybe these guys
20  invented it. Although, clearly, it was already
21  known in Tomasi and Le Moigne. And I didn't even
22  look at the pictures that closely because I just
23  kind of gave them the benefit of the doubt that they
24  were really describing some kind of organizational
25  principle.

---

**168**

1      I was actually kind of shocked when we
2  started, like, looking more at the detail that, in
3  fact, the patent has nothing like that at all. It
4  literally just shows blobs. It shows nothing. And
5  then, we haven't gotten to the infringement claims,
6  but if you look at the infringement claims, they are
7  even more silly where they show lines that barely
8  hit -- clearly, things are not at all aligned, but
9  they barely wing a block. And then they jump up and
10  down and say, oh, look, you -- a coded element was
11  located along a virtual line.
12      I didn't even expect that that was what
13  the patent was attempting to say. I was shocked --
14  although, I have done patents, so I wasn't shocked
15  that it was granted. The patent was granted because
16  the patent examiner probably didn't even know what
17  was going on. But without anything specific about
18  coded elements located along any sort of limitation
19  of that description, there's no statement at all.
20      Q  So I mean, it does say something. So
21  you're reading -- it looks as though you are reading
22  the bottom of -- of the description, from the bottom
23  of column 6 to the top of column 7 as saying -- as
24  describing nothing at all. But there's clearly
25  meridians lines being shown. And if you're going to

---

---

177

1 geometry. But -- but what I'm saying here is
2 nothing more is said than I have elements that are
3 somehow, you know, on lines.
4     THE REPORTER: That are somehow what
5 lines, sir.
6     THE WITNESS: On lines.
7     THE REPORTER: It keeps bleeping out on
8 the word.
9     THE WITNESS: O-N, on.
10     THE REPORTER: Thank you, sir.
11   Q  Going down to your paragraph 137, you
12 talk about indefiniteness of this particular
13 element that we're talking about. Again, just going
14 back up briefly just to be complete, above your
15 paragraph 131, you have a heading 2, and next to
16 that heading, in brackets, are 1.E and in 12 E.
17     Is it correct that -- those 1.E and 12.E
18 refer to the fact that this element is found in both
19 claims 1 and 12?
20   A  Correct.
21   Q  And that your analysis of the written
22 description there applies to both claims -- those
23 elements in both claims 1 and 12.
24   A  (Inaudible.)
25   Q  Is that -- does my question make sense?

---

178

1   A  I said correct. Yes.
2   Q  Oh, okay. Going down -- going to
3 enablement in your paragraph 135. And your -- in
4 your second paragraph, it's explained about the
5 specification of '656 discusses abstract, quote,
6 unquote, groups of coded elements while providing
7 any specifics, and the drawings show projector
8 meridians with the coded elements placed at
9 locations seemingly unrelated to projector
10 medians?
11   A  I lost you. Which paragraph are you on,
12 please?
13   Q  Paragraph 135, page 56.
14   A  Got it. I found it, yes.
15   Q  Okay. And you say, The coded -- the
16 drawings show projector meridians -- then the last
17 part -- with the coded elements placed at locations
18 seemingly unrelated to the projector medians [sic].
19 But it does not say figures 14 and 15 show the
20 relationship that the -- it shows, I think, the
21 meridians being -- crossing the coded elements at
22 regular intervals.
23     (Cross talk.)
24   A  No, it doesn't show crossing at
25 regular intervals. It doesn't show crossing

---

179

1 through their centers. It shows them randomly
2 sometimes intersecting the way a random process
3 might occur. It doesn't show that.
4   Q  Okay. Now, going on to indefiniteness.
5 It says, for example, Artec -- just going down.
6 Indefiniteness is paragraph 137.
7   A  Okay.
8   Q  Okay. And you're referring -- you refer
9 to two images that Artec is using and its
10 infringement contentions supplied in this case; is
11 that correct? And then you show pictures from those
12 infringement -- okay.
13   A  That is correct.
14   Q  So let's say -- the -- you're going down
15 to 136 [sic] where you talk about coded elements.
16 What Artec has done is draw two arbitrary epipolar
17 lines and find any two features, coded elements, of
18 the structured light that intersect those two lines.
19 These coded elements are not mathematical points but
20 instead are shapes that are several pixels wide.
21     Again, so how is it -- you said these
22 coded elements are not mathematical points but
23 instead are shapes and several pixels wide. What do
24 you mean by not being mathematical points in that
25 sentence -- and this is in paragraph 138?

---

180

1   A  Yep. Got it. This goes back to your
2 words. We're talking about things happening
3 necessarily. So let me explain.
4     Supposed I give you a -- I describe a
5 pattern of lines. Let's just say for the sake of
6 argument, they are all perfectly vertical. Okay?
7 So I say -- I say my work, my epipolar lines, are
8 perfectly vertical parallel lines. And now I put
9 down pure points, random points in a plane. This is
10 a mathematical statement now. I would not --
11 because these points are literally one point,
12 literally 1 nanometer large, I would not expect that
13 any two would lie exactly vertically aligned. Okay?
14 Because I've already told -- epipolar lines, I've
15 have chosen them in advance.
16     And if you talk about specific points, if
17 you show the points that were infinitesimally small
18 and actually aligned, I would know that that
19 shouldn't happen necessarily. It was done because
20 there was some design in the pattern.
21   Q  Okay.
22   A  Conversely, if -- again, let's suppose
23 our horizontal -- our lines are all vertical. And
24 now I'm going to draw, I don't know, 50 blobs, each
25 10 pixels wide. So pixels -- now they're no longer

181

1  mathematical points, but they have size. Then, as a
2  statement of mathematics with a high probability,
3  you are going to find some vertical lines that go
4  through more than one -- don't hit -- maybe not
5  right down the centers but wing a couple of
6  elements. And that is what is described in
7  paragraph 138.
8      Q   So this is just more a general question.
9  Going back to the figure 13 of the patent, are --
10  and you're -- what I -- just -- so to be clear, so
11  what are you referring to -- you just mentioned
12  something as blobs. Are you referring to things in
13  figure 13 as blobs?
14      A   The figure 13 is not -- it's not a
15  blob-based pattern. Rather, it is horizontal
16  patterns -- horizontal -- that the pattern is based
17  in horizontal lines with modulated thickness. So
18  this is not -- you know, there's a number of
19  different ways you could set up your patterns.
20  Figure 13 is not a blob-based. It is, I'll call it,
21  block-based, if you will. So if you look at these
22  horizontal lines, and have these black lines, and
23  then, at some places, they get thick. And so you
24  have these thick blocks that are maybe 20 pixels
25  wide. Now there's some -- some discussion, I know,

182

1  going in the depositions whether or not we should be
2  focusing on the black lines or the white lines.
3  Honestly, I don't care.
4      But either way -- so in this case what
5  are the elements are -- let's just, for the sake of
6  argument, look only at the black lines, would be
7  thick portions. And so thick portions here are a
8  little, in this case, rectangles that are probably
9  20 pixels wide and 7 pixels, roughly, high. And
10  those -- I -- that's what I would associate to the
11  word coded element in this context.
12      Q   Okay. And are you saying that the
13  arrangement of the coded elements in figure 13 are
14  random?
15      A   I don't know what's going on. I would --
16  I'm not sure they're random. I doubt they're
17  completely random. But I don't see -- I don't
18  under -- I don't have any understanding of any
19  particular organizational principle here. I do
20  believe, looking at it, that they did sort of repeat
21  some lines directly. I would say I see that, maybe.
22  So I would say seemingly random. I wouldn't say
23  random.
24      What I certainly don't see is something
25  like we saw in Tomasi or Le Moigne where what we

183

1  think of as the elements are clearly organized along
2  in -- in agreement with epipolar geometry.
3      Q   So going down to your paragraph under
4  patent eligibility, section E -- I guess it's 5E,
5  starting with paragraph 141.
6      Do you see that?
7      A   Yes, I do.
8      Q   And then, you're doing analysis -- it
9  says, With respect to step 1 of the -- the Alice
10  analysis. That's a particular case that you're
11  referring to --
12      A   Correct.
13      Q   -- and I think you referred to it at some
14  point in your legal background?
15      A   Correct.
16      Q   Okay. So -- so I think for -- on
17  paragraph 144 -- we'll read it -- I'll read it
18  unless you'd like to, paragraph 140. The only
19  purportedly inventive features of the asserted
20  claims in use is the use of virtual lines based on
21  epipolar geometry limitations 1E, F, and G.
22      Where do you get the assertion that
23  these -- that this is the -- the only purportedly
24  inventive features are in these particular
25  limitations?

184

1      A   You mean E, F, and G?
2      Q   Yes.
3      A   Sure. Well, let's just -- we can -- if
4  we want, we can read A, B, C, and D. And as far as
5  I understand, those are all just recitations of the
6  prior state of the art. So we can look at those.
7  Let's see.
8      Q   So I guess I'm focusing on the word
9  purportedly. You could say -- one might say,
10  abstractly, the only possible inventive features
11  would be your analysis, but you're saying the --
12      A   Oh, well, I guess --
13      THE REPORTER: Sir, I didn't get the end
14  of your question. There's cross talk.
15      Doctor, your -- the end of your
16  question -- Dr. Gortler, if you could just give a
17  beat. I'm losing the ends of Mr. Cummings'
18  sentences -- questions.
19      A   So let me just read over what I wrote
20  here.
21      Okay. I think this is described in my
22  paragraph 146 where what I describe is how parts A,
23  B, C, and D correspond to elements in the body where
24  they are acknowledged as prior art and as a standard
25  practice. If you want we can go to those in detail,

185

1 but that is what's going on.
2    Q   Okay. I just --
3    A   Should we read that paragraph?
4    Q   No, we don't need to go through that.
5        So what your just -- I'm just trying to
6 understand what your analysis or what your reasoning
7 is, that if -- if -- as you assert that these
8 limitations 1.E, 1.F, and 1.G -- and I'm assuming
9 that's applying to 12.F -- 12.E, F, and G -- that --
10 because -- and going back down to the bottom, 154,
11 it's your conclusion that these, quote, unquote, are
12 off-the-shelf components universally used and
13 structured-light scanning systems, and well-known at
14 the time of filing the application.
15       MR. PACELLI: Objection. Form.
16    A   That is correct.
17    Q   Okay. If some court or some other
18 decisional body were to rule that there -- that
19 something in those three elements in the claims did,
20 in fact, distinguish over the prior art, would that
21 affect your analysis for eligibility?
22       MR. PACELLI: Objection. Form.
23    Q   Do you understand my question? I meant
24 --
25    A   Yeah, I'm looking at the claims now to --

186

1 I'm looking at the claims now to see if there's
2 any -- if there's a shot in hell of that ever
3 happening. That's why I'm just looking at them
4 right now.
5        I will agree with that statement, yes.
6 If somehow someone is -- someone rules that there is
7 something inventive and not just a preamble at --
8 going on in A, B, C, or D, that is not what I -- my
9 description is -- is based on the reading that that
10 is just given -- given as a standard background.
11    Q   Okay.
12    A   I agree with your question.
13    Q   Okay. Now -- we are now looking at the
14 prior art in your -- we'll continue on. We're going
15 down. Now we are in section F and -- where you are
16 comparing Tomasi to the claims in the '656 patent,
17 it begins with the paragraph 153.
18    A   I'm there.
19    Q   Okay. Will you give me a second. Okay.
20 And we'll try to get, quickly, to the right parts of
21 your -- and so -- and going now to -- I'm skipping
22 ahead to paragraph 186 where you say Tomasi
23 discloses that said slide patterns comprises a
24 plurality of coded elements.
25       Do you see that?

187

1        And you cite, too, Tomasi. And I think
2 you cite to paragraphs 6 and 24 and a whole number
3 of them. We're going to take a look at these and
4 Tomasi in a second. Let me get there. If you'll
5 excuse me.
6    A   I'm at paragraph 186. I see what you're
7 talking about, yes.
8    Q   And I'm going to go through these.
9        And -- and so, in Tomasi, he describes
10 coded element in a couple different places; is that
11 correct?
12    A   Yes.
13    Q   Okay. And I'll let you run through them;
14 otherwise, I'll have to ask you too many questions.
15       Where are -- where are the coded elements
16 described in Tomasi, and what are those
17 descriptions?
18    A   Right. So let's -- we will look at that,
19 and I will go one by one through all the coded
20 paragraphs which will take us the next 45 minutes,
21 but let me first give a background.
22    Q   If you can do this as quickly as
23 possible. You don't need to go through --
24    A   I understand.
25    Q   -- entire paragraphs or anything.

188

1    A   I understand.
2        Okay. So the idea of structured light --
3 if you have a flashlight, it gives an unorganized
4 beam of light. The whole scene gets lighter. You
5 can find where you dropped your coins, et cetera.
6 The idea of structured light is that you are
7 projecting some kind of pattern where the pattern is
8 made up of spatial patterns that are somewhat
9 recognizable and somewhat identifiable. Okay?
10 That's what structured light is about.
11       Now, there is -- so how you -- so what
12 does that mean? That could mean anything. So how
13 do you have anything that is identifiable? So when
14 you say structured light, that just means you have
15 some way of creating patterns in the scene that are
16 identifiable.
17       Now, it could be they're identifiable
18 because of the spatial pattern, that is it's a
19 certain shape that is -- you know, a little local --
20 you know, a little icon, a little blobby shape
21 that's identifiable that is being projected. It
22 could be that you're using different colors. So
23 you've got red beams and green beams and purple
24 beams, and because they have different colors, they
25 are somewhat identifiable from each other.

189

1    People also use temporal distinctions
2 where they have a -- a flashing pattern. So one
3 pixel might flash bright, bright, bright, dark,
4 dark, and another pixel might flash bright, dark,
5 bright, dark, dark, dark, dark. And so using time
6 as something you can identify what is being -- you
7 can identify that -- essentially, what -- a specific
8 ray is identified somehow by -- distinguished from
9 the other rays passing through the pinhole by
10 something that is -- that is -- again, something
11 distinguishable somehow.
12    And that's the general -- that's
13 generally how you do -- people do all kinds of
14 distinctions in structured light. Again, whether
15 they use time or color or shape. Sometimes they
16 have each shape -- you might look at the neighboring
17 shapes, and there's some relative coding that also
18 goes on. There's just endless variations. Okay?
19    And generally speaking -- all of those, I
20 will just call, generally speaking, coded elements.
21 It's anything that you can distinguish in a
22 structured-light pattern would go by the word coded
23 element. Now, again, these have to be
24 distinguishable. And we're using cameras, so they
25 have to be optically distinguishable. Okay?

190

1    So anything of that sort. And that's
2 just standard. That's how you do structured light.
3 And structured light is based on coded elements.
4 Coded elements is based on something which is
5 optically distinguishable. Typically, there's lots
6 and lots of choices of what you might use. So, for
7 example, if you have a bright and dark pattern, if
8 you have a blob, well, that means it's dark, and the
9 blob got light, and then it got dark.
10    How do you get something bright or dark?
11 That is a spatial description of amplitude,
12 brightness. Okay? If you had a red dot next to a
13 blue dot, that would be a spatial distinguishing of
14 color or wavelength. I know we can get into a
15 discussion, and I'm a color theorist, so we could
16 talk about colors as long as you would like to. But
17 people will use the word wavelength here just to
18 mean that we're doing some kind of color.
19    Tomasi -- so now that's the general.
20 Generally coded elements always have patterns.
21 Patterns are always based on something optically
22 distinguishable with very -- you know, there's tons
23 of ways of doing it. The simplest one would be
24 amplitude which literally means brightness. Okay?
25 You don't just have a flashlight; you've got a slide

191

1 with light and dark things. That means you have
2 modulated amplitude.
3    okay. Now, if you want, we can walk
4 through Tomasi and look at the various examples he
5 talks about. Do you want to do that?
6    Q  Yes, please.
7    A  Okay. So now, it's going to take me a
8 little while and look up -- let me look at these
9 references here. I'm just going to read from 187
10 through 188.
11    Q  What -- oh, your --
12    A  Paragraphs --
13    Q  Your paragraph?
14    A  My document, yeah, yeah.
15    So Tomasi further discloses that each of
16 the coded elements is characterized by a parameter
17 that defines a spatial distribution of a wavelength
18 of a structured light. For example, Tomasi
19 discloses that, quote, grid points are colored to
20 have one color from a set of two or more colors.
21 That's what we just talked about. You could use red
22 and green dots, and those are different and are
23 distinguishable. That's -- Tomasi at 35 and 051,
24 quote, another embodiment assigns colors to the set
25 representing binary values. Therefore, he's using

192

1 just two colors. Therefore, the spatially
2 distributed binary values correspond to the
3 structured-light; in this case, wavelength because
4 we're talking about color. 189, Tomasi -- is that
5 it? No, that's -- that's it.
6    So here, he's describing this case
7 using -- oh, did I skip something? I skipped 187.
8 Okay. Let's see.
9    Okay. 187, each of the coded elements
10 is characterized by a parameter that defines a
11 spatial distribution of an amplitude of structured
12 light. For example -- I'll read slower -- coding
13 the light requires assigning an optically
14 distinguishable attribute to each element of the
15 projection array, and that each element of the
16 projection array is said to be assigned a symbol
17 representing a binary value. Tomasi -- okay.
18 Tomasi also discloses that the manner in which the
19 light may be coded may vary, but in the end, the
20 coding scheme selects -- assigns values to specific
21 characteristics of light propagated from the
22 projector and, quote, or three values can be
23 utilized in the binary scheme.
24    There is no fundamental description as to
25 the shapes of the symbols used as identifiers.

193

1  We'll look at a figure in a second.  The main design
2  criteria is that different symbols should be
3  distinguishable; however, the brightness and
4  contrast requirements above suggest projecting
5  binary.  He prefers binary because he doesn't have
6  to worry about grade levels.  That's what he saying
7  there.  He says grid points may be assigned to a
8  set of two or more sizes.  Other variations are
9  possible.  Therefore, the spatially distributed
10  binary value corresponds to structured-light
11  amplitude.  Let's look at Tomasi -- let's look at
12  some figures in his examples.
13       So he gives examples in Tomasi figure 10.
14  There's an example of different shapes that he says
15  you could use.  And so you have a pattern of these
16  different shapes, and since you can tell by looking
17  at a region of an image the difference between a
18  circle and a triangle, you could -- that identifies
19  which coded element you are looking at, at least
20  from the other five possible ones.
21       Again, you see something similar in the
22  figure 12 that we've looked at ad nauseam.  I don't
23  know what the elements look like there.  If you blow
24  them up, they look like weird Pac-Man figures of
25  different shapes and sizes.  And again, those are

194

1  what he's using in this figure as his coded
2  elements, as his identifiable blobs that he's going
3  to use.
4       So a coded element is a very general
5  term.  And Tomasi appears to describe a variety of
6  ways to do this.  This is fairly standard.  People
7  always come up with different patterns.  It's been
8  well-known.  You could use time, that you can use
9  color, you can use shape.  That's -- that's --
10  that's old hat.
11       Q   Okay.  And what is there -- going up to
12  figure 7, per se, figure 7 is -- figures 7, 8, and
13  9, what do each of the S0, S1s and S2s stand for, et
14  cetera, S with the subscript?
15       A   Yeah, so Tomasi was describing something
16  kind of sophisticated here.  So those Ss, S0, S1,
17  and S2, and S3, you can think of that as being in
18  the figure 10, let's say a triangle -- S1 being
19  triangles, S2 being squares, S3 being Xs, et cetera.
20  So they are symbols representing distinct symbols.
21       And what he was talking about in the
22  patent -- he spends a lot of time, and this is part
23  of his invention -- was actually exactly how to go
24  about laying these out within an epipolar line,
25  within a row.  These rows here correspond to what

195

1  are going to be symbols in his well-designed pattern
2  of symbols.  And his idea is, you know, what is --
3  he wants to understand how are you going to organize
4  these patterns?  Are you going to same pattern
5  each -- in each row over and over again?  Or are you
6  going to shift them?
7       And we can go into it, but a lot of the
8  patent here is in sophisticated ways of arranging
9  your collection of symbols in a way so that --
10  obviously, if you only had six blobs, you have to
11  repeat them.  And so you need to use -- you might
12  not want to use just the blob itself, but which blob
13  do you see, and what blobs is it next to?  And so
14  there's a lot of room for invention here.  Or how
15  did you actually lay these out in a way that is most
16  identifiable.
17       In particular, I think a nice one to look
18  at -- yeah, so if you look at figure 9, for example,
19  he was suggesting that you do some shifting pattern.
20  You don't just repeat them.  So that, locally, you
21  know, you could look at a little window of -- of
22  symbols, and you can tell exactly where you are up
23  to at least a huge region.
24       Q   And do -- what do you -- do you have an
25  idea of how -- so the term coded elements, I think

196

1  we described.  So it's fair to characterize it as,
2  you would say, an example at least, in the figure we
3  looked at, figure -- both figure 12 and figure 10,
4  show different, you know, coded elements.  You know,
5  figure 10 showing six different coded elements, and,
6  it's hard to say, but a number of different coded
7  elements in figure 12.  Is that a fair
8  characterization?
9       A   Figure 11 is also showing coded elements
10  based on size.
11       Q   On size, okay.
12       A   That's figure 11.  So you can distinguish
13  the tall rectangle from the short one.  And those
14  are also a way of coding.  He's just telling you
15  there's -- there's just endless ways that you can do
16  coding.
17       Q   Okay.
18       A   And -- and well-known.  He's not
19  claiming -- I don't think -- there's no novelty that
20  he is claiming, I believe, in this at all.
21       Q   Okay.  And how would -- in comparison to
22  that coded elements described and shown in Tomasi,
23  how do those compare to the coded elements shown in
24  the '656 patent to the extent that they are the same
25  or different?

197

1          MR. PACELLI: Objection. Form.
2      A   So clearly, the -- okay. So we can
3  look -- there's a bunch of different patterns in the
4  figures of the '656 patent. We can look and see how
5  close they are. Clearly, in intention, there's no
6  difference at all. They are -- they are somehow
7  patterns that are meant to be identifiable. So we
8  already looked at figure 4A, 4B, and 4C. And those
9  were examples.
10         4C is quite -- these were just described
11 -- I believe these were just described as standard
12 prior art concepts of coded elements. C is quite
13 similar, I would say, in spirit, to Tomasi 10
14 perhaps. They are not the exact same shapes, but
15 they're different Tetris patterns.
16         Figures 4B is more like, actually, Le
17 Moigne in that it's a grid, and that there is some
18 weird spatial variation of the light and darks that
19 are used to distinguish parts of the grid. So I
20 don't think this kind of -- 4B is more like Le
21 Moigne.
22         4A, I don't think we see any more in the
23 rest of either '656 or the prior art that we are
24 discussing.
25         Let's go down to figure -- figure 13 of

198

1  the '656 is a different pattern. That's a pattern
2  based on horizontal lines of regularly modulated
3  thickness to the degree that size of rectangles is
4  what we saw in Tomasi figure 11. That's similar,
5  but it's a slightly different pattern. This pattern
6  is much more similar to -- if you want to pull up
7  Vinther. I think Vinther used this pattern or
8  something like it as his coded elements. If you
9  want, we can pull that up somewhere.
10     Q   Yeah, I don't know if I have that.
11     A   This looks a lot like Vinther. I have
12 Vinther in -- at the very least, in my other report,
13 but maybe it's in this report, too. Let me just
14 search Vinther. I have Vinther in figure -- it's on
15 paragraph 84 of my document. We don't need to go
16 further, if you don't want to.
17     Q   Oh, okay. Of your current document. I
18 will go there.
19     A   Yeah, within the current document. We
20 can look here --
21     Q   Paragraph 84, so quite back -- further
22 back up. I see -- okay. So paragraph 84?
23     A   Yes, so there's a figure. It's called
24 figure 5, and that's from Vinther. And that's a
25 substantially similar pattern to what '656 does in

199

1  figure 13. And then, if you go to figure 15, there
2  we see those little -- I would describe them as
3  lozenges. It seems to be a different -- a different
4  set of elements based on these lozenges. Those are
5  kind of like Tomasi's blobs in figure 12, I would
6  say, but not identical.
7          But we do see -- we see a variety of
8  patterns described in all of the prior art. People
9  just have different patterns. And, you know, I
10 think some of them are mix and match. Some of them
11 might be more specific to the -- an algorithm in
12 question. It would just depend.
13     Q   Okay. Understood.
14         So not looking at what the coded
15 elements are, but in -- in the sense of the
16 difference of the -- difference between patterns
17 described in Tomasi and the pattern shown,
18 particularly figure 13 of this '656 pattern [sic] --
19 '656 patent, do you have a way that you describe the
20 differences of those patterns?
21     A   I would say that figure 13, again, looks
22 more like Vinther where it's -- the patterns are
23 based on variations of thickness of parallel lines.
24 And so we see that in 13. We see that in Vinther as
25 vertical lines being his organizing principles. I

200

1  don't think we see this in Tomasi or Le Moigne. I
2  think they don't use this particular pattern. You
3  know, they use lots of different coded elements.
4  This one is more like Vinther, much less like Tomasi
5  or Le Moigne.
6          But again, in principle, it's just yet
7  another variation of coded elements. There's
8  nothing that stands out specifically about 13 shown
9  here.
10     Q   Okay. And -- and I -- really not so much
11 as the -- what the coded elements are, but any
12 details that you thought of that are different in
13 the patterns -- I guess, either, then, Tomasi or the
14 details of the pattern as described in Vinther?
15         MR. PACELLI: Objection. Form.
16     A   They look -- it would be hard to -- I
17 mean, the difference between Vinther and this, it
18 looks like Vinther has wider spacing in between. So
19 here, the dark and the lights are kind of the same
20 spacing. And in Vinther, it looks like he's got
21 these lights, and then, they are separated a little
22 bit more from each other. That's the main
23 difference I would see there.
24     Q   Okay. And since we're -- we're bouncing
25 around a little bit, I understand, but I want to

241

1 can --
2     Q  No, I think we're -- I'd rather -- I'm
3 afraid we might be running a little late on time.
4 So I'd like to keep on moving a little bit. Maybe
5 if we have time towards the end, we can consider it.
6     A  Sure thing.
7     Q  Okay. And so I think we are going to go
8 next to -- give me a second. I will put it in the
9 chat, as usual. Let me make sure I get -- rearrange
10 my -- I'm putting Exhibit 17, which I think is the
11 right order, the Hassebrook patent, US patent
12 number 8,224,046, dated patent July 17th, 2012.
13 First inventor is a Lawrence G. Hassebrook or
14 Hassebrook.
15     (Whereupon, Exhibit 17 was marked for
16 identification and is attached to the transcript.)
17     A  I see it.
18     Q  Okay. And this is that -- this is --
19 we're not -- we're clear this is the Hassebrook that
20 you relied on in your report?
21     A  I believe so, yes.
22     Q  Okay. And let me get to the right --
23 relevant sections, very quickly, of your report.
24 And again, I'm going to -- I guess it would be on
25 page -- your paragraph 426.

242

1     A  I am there.
2     Q  Okay. And I'm looking to see where
3 Hassebrook -- again, the structure, this is the
4 means plus function identified by the Court. I'm
5 looking to see where Hassebrook -- where Hassebrook
6 describes the structure that the Court identified,
7 again, the lens having a vertex -- photographic lens
8 having vertex, a matrix radiation receiver, and a
9 driver.
10     A  Sure. So the quote I have in my
11 document, which is in 426, quote, The cameras are
12 preferably -- this is from Hassebrook. The cameras
13 are preferably commercial high-resolution digital
14 cameras or maybe specialty cameras designed and
15 manufactured for biometric systems. And then there
16 is some figures that show pictures of cameras.
17     So high commercial -- high-resolution
18 digital camera, that's probably much more than a
19 matrix receiver. That is, there were plenty of CCD
20 cameras before there were digital cameras that
21 produced digital output. Certainly, once you were
22 producing digital output from your camera, you were
23 not using -- you were using a CCD or a CMOS. So a
24 digital camera, you know, is -- is going to matrix
25 radiation receiver plus, plus. It's going to be a

243

1 CCD or a CMOS. So it's going to have a driver, no
2 doubt.
3     The word vertex, by the way, this is
4 literally just cut and paste in this patent from the
5 '656 patent. So all of my discussion of that,
6 wherein, I don't believe that vertex should be read
7 as surface vertex but should be read as pinhole
8 vertex so that triangulation is appropriate is my
9 reading of that. But either way, if you want -- in
10 terms of -- in terms of this notion of a surface
11 vertex, they say -- again, they say high commercial
12 camera [sic]. This, no doubt, would be a camera
13 with a lens. The lens would have an axis of
14 symmetry. And it would have a vertex.
15     Certainly, one could hire somebody to do
16 some, you know, Frankenstein experiment where
17 perhaps Dr. Aikens would claim there's no surface
18 vertex. Be my guest.
19     Q  Okay. I think we need to move on. I'm
20 not sure how long it's been since the last break.
21     MR. CUMMINGS: A little over an hour; is
22 that correct?
23     THE VIDEOGRAPHER: It's been about 45
24 minutes.
25     MR. CUMMINGS: Oh, okay. I think we can

244

1 continue on before we get to the -- actually, I
2 would -- I would -- there is something that I need
3 to go do. I wouldn't mind if -- taking a very short
4 break now, going on, and -- a five-minute break, and
5 we'll be back.
6     THE WITNESS: Okay. Fine with me.
7     THE VIDEOGRAPHER: We're going off the
8 record. The time is 2:17 p.m.
9     (Whereupon, there was a recess in the
10 proceedings.)
11     THE VIDEOGRAPHER: We're back on the
12 record. The time is 2:27 p.m.
13 BY MR. CUMMINGS:
14     Q  Okay. We are switching gears here. I'd
15 like to refer you to -- Dr. Gortler, to your -- your
16 May 7th report concerning invalidity. Okay?
17     A  I've got it in front of me.
18     Q  Okay. Okay. And I want to turn your
19 attention -- we'll try to go to your section 6D
20 beginning paragraph 51. Okay. And going down from
21 there.
22     A  I'm there.
23     Q  Okay. Very good. And again -- again,
24 your analysis under D applies both independent
25 claims 1 and 12; is that correct?

293

1  nothing else pointed to beyond that, and, of course,
2  the patents themselves, which we have talked about
3  at -- at length. So there was never any suggestion
4  of any other code that was relevant towards
5  infringement of '656.
6      Q  Okay. Do you recall that there were
7  several questions regarding certain types of cameras
8  of, let's say, historical significance, such as the
9  image orthicon and the FLIR. Do you recall that?
10     A  Yes, I do.
11     Q  Do you know what would be the time frame,
12  you know, the heyday of the image orthicon? Do you
13  know?
14     A  So again, I'm not, certainly, an expert
15  in the history of cameras. It certainly sounds like
16  it was used primarily in the TV industry, probably
17  going way back. As a practitioner -- so I started
18  working in this area in the mid-'90s. And by then,
19  we were using -- we were -- by the mid-'90s, we
20  would not have been using an orthicon. In the
21  mid-'90s, we would have been using a CCD camera that
22  probably, in and of itself, produced an analog
23  output, and then we hooked up to that
24  what we call a digitizer scan, which would take an
25  analog output of the CCD camera and turn that into a

294

1  digital -- a digital -- a digital representation.
2      Probably by, I would say, the late '90s,
3  maybe '98, '99, I remember we were using FireWire
4  cameras. That was another -- that, at that point,
5  was actually a digital output-type camera. And then
6  by a couple -- and again -- in those days, in 1998,
7  1999, like, a consumer, like, wouldn't know -- these
8  were still specialized items. A FireWire camera was
9  something that a man on the street would not have
10  had or known what to do with. But then, of course,
11  fast-forward another two or three years, and all of
12  a sudden, you know, you're buying these little
13  point-and-shoot cameras that have video. And at
14  this point, you know, there's an entire revolution
15  of consumer products where, now, digital, still, and
16  video cameras is a standard consumer-level item,
17  not, like, a special high-tech science lab item.
18     And so there was this real evolution
19  where, in the olden times, people doing scanning
20  were not using on-the-street technology. And they
21  were using whatever technology they could find.
22  And, you know, every year as time went on, the
23  market changed, what you bought changed. And
24  obviously, as we know, by -- I don't know what year
25  the iPhone came out, but whatever -- I certainly,

295

1  well before 2002, had a point-and-shoot digital
2  camera that did video.
3      And so, you know, it would have been, at
4  that point in time, certainly by 2007, I would not
5  have gone out and gotten an orthicon. I've never
6  actually seen an orthicon. I would have, you know,
7  gotten a -- I would have gone and gotten any sort of
8  conventional, fully digital-output video camera.
9      Q  Okay. So by 2007, when both the '656 and
10  the '129 patents were filed, if a -- a person of
11  ordinary skill in the art heard of the camera, a
12  digital camera, what kind of camera would they be
13  thinking about?
14     A  They would be thinking of a fully --
15  possibly -- actually, possibly, a fully
16  digital-output camera with a CCD or a CMOS with a
17  conventional lens. This would have been, you know,
18  what everybody would have known to be a camera.
19  Again, presumably, you could maybe think really hard
20  about funny things and ask -- you know, you could
21  play an academic game, is this a camera? Is that a
22  camera? But that's a game. Right? A camera --
23  everyone would know a camera when they see it.
24     Q  Okay. One last thing. I know, right at
25  the beginning of this deposition, you mentioned

296

1  potential confusion between the '129 and the '357.
2  I just wanted you to explain what this confusion
3  consists in?
4      A  Oh, okay. So the reason why I'm
5  confused -- I don't know if this is relevant to
6  anything -- was because, although the patents are
7  significantly different, at the end of the day,
8  especially with relation to the infringement
9  contentions, they both started focusing on the
10  element of preview. So the '129 which is the
11  providing position and orientation, as we discussed
12  whatever that means, that ended up getting a
13  discussion of, well, is a preview fitting that kind
14  of description.
15     Meanwhile, in the '357, there was a
16  claim -- I'm going to call it 12. I don't remember
17  which claim it was -- which involved -- so '357 is
18  about thresholds for quantity of data. And there
19  was also a discussion of previews and how those
20  previews might describe different levels --
21  different achievement of these thresholds. And that
22  is -- because of the overlap due to the preview
23  topic is the element where I sometimes lose track of
24  if we're talking about a preview, are we talking
25  about '357 for the purposes or are we talking about