# Exhibit - 15 Steven Gortler Deposition Excerpts

**Page 1**

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK
------------------------------X
ARTEC EUROPE S.A.R.L.,        :
          Plaintiff,          :
     v.                       : CASE NO.:
SHENZHEN CREALITY 3D          : 1:22-1676 (OEM)(VMS)
TECHNOLOGY CO., LTD. and      :
SHENZHEN JIMUYIDA TECHNOLOGY  :
CO., LTD.,                    :
          Defendants.         :
------------------------------X

     Videotaped Deposition of STEVEN GORTLER Ph.D.
              Virtually Conducted
              Monday, June 2, 2025
                   7:14 a.m.




Job No.: 585829
Pages 1 - 301
Reported by: Cynthia Lichtman, CSR No. 14601, CVR
```

**Page 2**

```
     Videotaped deposition of STEVEN GORTLER
Ph.D., held virtually via Zoom videoconference:












          Pursuant to agreement, before Cynthia
Lichtman, Notary Public in and for the State of
California.
```

**Page 3**

```
                   A P P E A R A N C E S
ON BEHALF OF THE PLAINTIFF:
     MICHAEL CUMMINGS, ESQUIRE
     RIMON LAW, P.C.
     1990 K Street, NW
     Suite 420
     Washington, DC 20006
     (202) 400-3846

ON BEHALF OF THE DEFENDANTS:
     ANDREA PACELLI, ESQUIRE
     KING & WOOD MALLESONS
     500 Fifth Avenue
     50th Floor
     New York, New York 10110
     (212) 319-4755

ALSO PRESENT
Iman Sadeghi, Ph.D. - Expert
David Aikens, Expert
Isiah Sheridan - Videographer, Planet Depos
Dominic Adams - Technician, Planet Depos
```

**Page 4**

```
                   C O N T E N T S
EXAMINATION OF STEVEN GORTLER PH.D.         PAGE
     By Mr. Cummings                        7, 297
     By Mr. Pacelli                         290


                   E X H I B I T S
                     (Attached.)
STEVEN GORTLER Ph.D. DEPOSITION EXHIBITS    PAGE
Exhibit 1       Gortler Initial Report      11
                4/7/25
Exhibit 2       Gortler Exhibit A, CV       13
Exhibit 3       Gortler Exhibit B,          18
                Materials Considered
Exhibit 4       US Patent 7768656           24
Exhibit 5       US Patent 8488129           25
Exhibit 6       US Patent 10962357          28
Exhibit 7       Le Moigne, Structured       57
                Light Patterns
Exhibit 8       Aikens Second Expert        64
                Report, 5/7/25
Exhibit 9       Tomasi Patent Application   77
Exhibit 10      Dr. Iman Sadeghi Expert     109
                Report, 4/7/25
(Exhibits continued on next page)
```

### 289

1  minute.
2      MR. PACELLI: So if we can keep it to
3  this question, that would be great. I have a couple
4  of minutes of a direct.
5      A  Okay. So this would be in the Sadeghi
6  infringement. Okay. So this would be Exhibit 10, I
7  believe. Okay. I will now -- I did a search for
8  the word markers, and I found it.
9      THE VIDEOGRAPHER: This is the
10 videographer. Mr. Gortler -- Dr. Gortler, if you
11 could make sure you keep your head in the frame.
12     THE WITNESS: Oh, I'm sorry. Yeah, I am
13 sorry.
14     A  I'm looking right now at the Sadeghi
15 report.
16     So in Sadeghi, paragraph -- paragraph 70,
17 I believe, is the reference here. And he says,
18 quote, this patent eliminates the overhead and
19 simplifies the learning curve associated with using
20 markers. That is the -- I believe what I'm
21 referencing to when I say that the Sadeghi claims --
22 that it obviates the need for markers.
23     Q  Okay.
24     MR. CUMMINGS: Okay. So just to be
25 clear, Counsel, you're -- you're -- so you're

### 290

1  telling me, since we are past the seven hours, you
2  are ending the deposition, the main part?
3      Oh, you're -- you're on mute.
4      MR. PACELLI: I'm going to --
5      THE WITNESS: Turn the -- turn the
6  camera?
7      MR. CUMMINGS: No, no, he -- no, no, he
8  was fine. He's fine. I just didn't hear him.
9      MR. PACELLI: I'm just going to speak
10 closer to the -- to the mic.
11     Yeah, I mean the rules, we have a
12 seven-hour limit, and it's been a long day. I only
13 have a couple minutes of direct. So yes, I would
14 like to move on with my redirect [sic] and be done
15 for the day.
16     MR. CUMMINGS: Okay.
17     EXAMINATION BY COUNSEL FOR THE DEFENDANTS
18 BY MR. PACELLI:
19     Q  Okay. So I'm going to start with just --
20 just a couple of questions, Dr. Gortler, to clarify
21 a couple of things that you said.
22     First of all, you recall counsel asked
23 you --
24     MR. PACELLI: For the videographer, can
25 you hear me?

### 291

1      THE VIDEOGRAPHER: Yes, sir.
2      MR. PACELLI: Okay.
3      Q  So you recall counsel asked you whether
4  you knew how the accused products, the defendant
5  products use the epipolar geometry, correct?
6      A  That is correct.
7      Q  Okay. Now, I understand you said you
8  didn't review this analysis, correct?
9      A  That is correct.
10     Q  Okay. Can you explain why you didn't do
11 that analysis?
12     A  Sure. The way -- I think I explained.
13 The way that I -- what I did was I looked at all --
14 in the infringement report, I looked at every single
15 specific code, either variables or -- or -- so there
16 were two separate things.
17     There was just a generic listing of
18 dozens and dozens and dozens of file names. I did
19 not -- in the beginning, I started looking at them,
20 and I realized this was going to go nowhere. But
21 the report has a number of specific discussion of
22 specific variables and specific functions and
23 specific interpretations of those. So what I did
24 was look at each of those, and then spend time with
25 the code, understanding what was going on in that

### 292

1  code, what the variables were doing, what the
2  purpose of that was.
3      And I didn't do -- it would have been
4  really -- well, it would have taken -- it would have
5  been impossible -- or not impossible, but it would
6  have taken months to simply do a top-to-bottom scan
7  of what is going on in every single place of the
8  code. I did not look. I suspect what I was looking
9  at was maybe 10 percent of the code. I don't know
10 exactly, but it was certainly a small fraction.
11     Q  Did you need to do that analysis in order
12 to form your opinions on infringement?
13     A  No, I did not need -- so the -- most
14 of -- all of the codes that were most relevant had
15 to do with infringement on the '357. There was no
16 claims ever about the code on the '656, for example,
17 using the epipolar geometry within any piece of
18 code. The only thing cited there was a calibration
19 file and a procedure that read the calibration file.
20 And that I looked at, yes. We could read the file
21 and open it up. And, of course, you need
22 calibration to do triangulation. That's very
23 standard. And, of course, you could use calibration
24 information for the inherent epipolar geometry of
25 the physical object that you own, but there was

293

1 nothing else pointed to beyond that, and, of course,
2 the patents themselves, which we have talked about
3 at -- at length. So there was never any suggestion
4 of any other code that was relevant towards
5 infringement of '656.
6   Q   Okay. Do you recall that there were
7 several questions regarding certain types of cameras
8 of, let's say, historical significance, such as the
9 image orthicon and the FLIR. Do you recall that?
10   A   Yes, I do.
11   Q   Do you know what would be the time frame,
12 you know, the heyday of the image orthicon? Do you
13 know?
14   A   So again, I'm not, certainly, an expert
15 in the history of cameras. It certainly sounds like
16 it was used primarily in the TV industry, probably
17 going way back. As a practitioner -- so I started
18 working in this area in the mid-'90s. And by then,
19 we were using -- we were -- by the mid-'90s, we
20 would not have been using an orthicon. In the
21 mid-'90s, we would have been using a CCD camera that
22 probably, in and of itself, produced an analog
23 output, and then we would have hooked up to that
24 what we call a digitizer scan, which would take an
25 analog output of the CCD camera and turn that into a

294

1 digital -- a digital -- a digital representation.
2        Probably by, I would say, the late '90s,
3 maybe '98, '99, I remember we were using FireWire
4 cameras. That was another -- that, at that point,
5 was actually a digital output-type camera. And then
6 by a couple -- and again -- in those days, in 1998,
7 1999, like, a consumer, like, wouldn't know -- these
8 were still specialized items. A FireWire camera was
9 something that a man on the street would not have
10 had or known what to do with. But then, of course,
11 fast-forward another two or three years, and all of
12 a sudden, you know, you're buying these little
13 point-and-shoot cameras that have video. And at
14 this point, you know, there's an entire revolution
15 of consumer products where, now, digital, still, and
16 video cameras is a standard consumer-level item,
17 not, like, a special high-tech science lab item.
18        And so there was this real evolution
19 where, in the olden times, people doing scanning
20 were not using on-the-street technology. And they
21 were using whatever technology they could find.
22 And, you know, every year as time went on, the
23 market changed, what you bought changed. And
24 obviously, as we know, by -- I don't know what year
25 the iPhone came out, but whatever -- I certainly,

295

1 well before 2002, had a point-and-shoot digital
2 camera that did video.
3        And so, you know, it would have been, at
4 that point in time, certainly by 2007, I would not
5 have gone out and gotten an orthicon. I've never
6 actually seen an orthicon. I would have, you know,
7 gotten a -- I would have gone and gotten any sort of
8 conventional, fully digital-output video camera.
9   Q   Okay. So by 2007, when both the '656 and
10 the '129 patents were filed, if a -- a person of
11 ordinary skill in the art heard of the camera, a
12 digital camera, what kind of camera would they be
13 thinking about?
14   A   They would be thinking of a fully --
15 possibly -- actually, possibly, a fully
16 digital-output camera with a CCD or a CMOS with a
17 conventional lens. This would have been, you know,
18 what everybody would have known to be a camera.
19 Again, presumably, you could maybe think really hard
20 about funny things and ask -- you know, you could
21 play an academic game, is this a camera? Is that a
22 camera? But that's a game. Right? A camera --
23 everyone would know a camera when they see it.
24   Q   Okay. One last thing. I know, right at
25 the beginning of this deposition, you mentioned

296

1 potential confusion between the '129 and the '357.
2 I just wanted you to explain what this confusion
3 consists in?
4   A   Oh, okay. So the reason why I'm
5 confused -- I don't know if this is relevant to
6 anything -- was because, although the patents are
7 significantly different, at the end of the day,
8 especially with relation to the infringement
9 contentions, they both started focusing on the
10 element of preview. So the '129 which is the
11 providing position and orientation, as we discussed
12 whatever that means, that ended up getting a
13 discussion of, well, is a preview fitting that kind
14 of description.
15        Meanwhile, in the '357, there was a
16 claim -- I'm going to call it 12. I don't remember
17 which claim it was -- which involved -- so '357 is
18 about thresholds for quantity of data. And there
19 was also a discussion of previews and how those
20 previews might describe different levels --
21 different achievement of these thresholds. And that
22 is -- because of the overlap due to the preview
23 topic is the element where I sometimes lose track of
24 if we're talking about a preview, are we talking
25 about '357 for the purposes or are we talking about