# EXHIBIT G

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

ARTEC EUROPE S.A.R.L.,

PLAINTIFF,

V.

SHENZHEN CREALITY 3D TECHNOLOGY CO., LTD., & SHENZHEN JIMUYIDA CO., LTD.

DEFENDANTS,

C.A. No. 20-621-GBW

**JURY TRIAL DEMANDED**

# OPENING EXPERT REPORT OF STEVEN J. GORTLER ON INVALIDITY OF U.S. PATENT NOS. 7,768,656, 8,488,129, AND 10,962,357

73. The Toshiba IK-TU40A camera used a variety of photographic lenses (e.g., 4mm and 15mm lenses), and included three 1/3" CCDs with 410,000 pixels (matrix radiation receivers) and a camera driver with a variety of DSP functions. B&H CCD SourceBook at 15.

74. A POSA would have been able to use the cameras disclosed in those references in any other structured light scanning system, with the routine modifications and adaptations that were well within the level of skill in the art.

75. In sum, the use of a camera including a photographic lens having a vertex, a matrix radiation receiver, and a camera driver would have been inherent in any structured light scanning system in the relevant time frame (2007–2018). At the absolute minimum, using such a camera would have been well-known, routine and conventional to a POSA. Moreover, the use of such a camera in a structured-light scanning system would have been obvious to a POSA as the application of a familiar technique to a known problem with predictable results, or the simple substitution of one known element for another according to the knowledge of a POSA. Such application would be motivated by the nature of the problem being solved, by the teachings of the prior art itself, by the knowledge of a POSA, and also by design incentives or market forces.

**D. Epipolar Geometry**

76. Epipolar geometry has long been used in the field of computer vision and is described in introductory materials and textbooks. For example, the '656 Patent acknowledges that epipolar geometry is known in the art. *See* '656 Patent at 5:11 ("Based on affine epipolar geometry …"). The following summary is adapted from a tutorial by Hartley and Zisserman, "Multiple View Geometry," CVPR June 1999 ("Hartley 1999").[1] While that tutorial discusses

[1] Available at https://users.cecs.anu.edu.au/~hartley/Papers/CVPR99-tutorial/tutorial.pdf. I incorporate by reference the Hartley 1999 tutorial in this report.

epipolar geometry in the context of multiple camera views (i.e., stereoscopic vision), the same geometry applies if one replaces one of the cameras with a structured-light projector.

77. The basic geometry is defined by two planes corresponding to the projector slide (left) and the camera sensor (right). In a pinhole camera model, the projector and slide each have an optical center. In a physical camera, the camera and projector planes are behind the optical centers (the film is behind the lens) but simply for convenience, in the mathematical description, the planes are often drawn in front of the centers as shown in the following figure. In this model, a ray of light starts from the projector optical center, crosses the projector plane at a point x, is reflected at a point X on the surface of the object being scanned, and travels to the camera optical center, intersecting the camera plane along the way.



78. The epipolar line for point x on the projector plane is the set of all possible points on the camera plane corresponding to all possible distances (ranges) where point X is located from the projector optical center.

79. Epipolar lines on both the projector plane and the camera plane are formed by the intersection with an "epipolar plane" which passes through the projector and camera optical center. As a consequence, points on an epipolar line on the projector plane always fall on the corresponding epipolar line on the camera plane, regardless of the geometry of the object being scanned (i.e., regardless of the depth of point x in 3D space).

## Epipolar Geometry




- The epipolar line $l'$ is the image of the ray through $x$.
- The epipole $e'$ is the point of intersection of the line joining the camera centres—the baseline—with the image plane.
- The epipole is also the image in one camera of the centre of the other camera.
- All epipolar lines intersect in the epipole.

80. The same geometry is used to solve the triangulation problem to determine the range of the object's surface from knowledge of the corresponding points on the projector and camera planes.

### Triangulation

Triangulation :

- Knowing $\mathrm{P}$ and $\mathrm{P}'$
- Knowing $\mathrm{x}$ and $\mathrm{x}'$
- Compute $\mathrm{x}'$ such that

$$\mathbf{x} = \mathrm{P}\mathrm{x} \quad ; \quad \mathbf{x}' = \mathrm{P}'\mathrm{x}$$




81. If the projector and camera planes are parallel to the line connecting the projector and camera optical centers, then the epipolar lines are also parallel to that line. This is an important property that comes into play in many practical applications. For example, if the projector and camera are parallel and placed side by side in the horizontal direction, the projector and camera epipolar lines are parallel and horizontal. *See* Section V.F.1 (Tomasi reference). Likewise, if the projector and camera are parallel and stacked in the vertical direction, the

projector and camera epipolar lines are parallel and vertical. *See* Section V.F.2 (Le Moigne reference).

82. Epipolar geometry has long been used to simplify the problem of finding the correspondence between points on the projected pattern and points on the captured image. It is not always necessary to physically form epipolar lines on the projector plane. However, forming such lines as part of the structured light pattern may have certain benefits. For example, the Le Moigne reference (Section V.F.2) discloses the use of a structured-light pattern that includes vertical lines, which in this case are epipolar lines, as shown in Figure 2:



1. **[1.F], [12.F] "at least a first slide virtual line and a second slide virtual line are defined on said slide surface, where said first slide virtual line is defined by an intersection between said slide surface and a first plane passing through said projector lens vertex and through said device lens vertex, and said second slide virtual line is defined by an intersection between said slide surface and a second plane passing through said projector lens vertex and through said device lens vertex" (claims 1, 12)**

***a. Written Description***

119. I am informed that the Court has construed the claim term "a first slide virtual line and a second slide virtual line are defined on said slide surface" to require the "virtual line[s]" to "exist[] on the surface of the slide," i.e., to be "contained on the surface of the slide medium":

> As the Court explains above, the specification teaches that the virtual lines comprising the "slide pattern" must be contained on the surface of the slide medium and not projected onto the slide from another third source.
>
> The Court concludes and adopts Creality's position and construes the term to mean "[t]he slide pattern exists on the surface of the slide."

Claim Construction Order at 31. The Court further explained in reference to a related term that "defined on said slide surface" means "fixed or demarcated on the outer surface of the slide":

> According to the dictionary, the word "define" means to "to fix or mark the limits of; demarcate." Define, Merriam-Webster.com (last accessed August 4, 2024). The word "on," used a preposition here, may mean "used as a function word to indicate position in or in contact with an outer surface" or "used as a function word to indicate the location of something." On, Merriam-Webster.com (last accessed August 4, 2024). Together, this leads to the plain understanding based on the language of the specification that the "slide pattern" is fixed or demarcated on the outer surface of the slide.

*Id.* at 13.

120. The "virtual line" limitations, as construed by the Court, have no support in the written description of the '656 Patent. The phrase "virtual line" does not appear anywhere in the specification of the '656 Patent. Nor does the specification mention "intersection[s]" between the slide surface and the various planes recited in the claims. Rather, the specification discusses

epipolar geometry in terms of "projector meridians" and "camera meridians." *See, e.g.*, '656 Patent at 5:20–7:25. As such, in the following I will equate the claimed "slide virtual line[s]" with the "projector meridians" of the specification.[2]

121. The specification discusses the "projector meridians" only in terms of their geometric properties, and not as physical objects. Indeed, the specification clearly indicates that the "projector meridians" are not physically constructed on the slide:

> In one or more embodiments, the system 100 and associated method for the 3D measurement of the shape of material objects uses the principle that, regardless of the position of the projector 106 and the camera 108 in relation to each other, it is possible to draw a straight line 187 through any point of the slide 122, such that, when the projected pattern in the structured light 113 is projected on the surface 110 of the object 111, a corresponding straight line 188 exists in the image 140 captured by the camera 108, regardless of the shape of the surface 110 being captured. Any pair of such lines 187 and 188 forms a one-to-one correspondence, where such lines will be referred to as "meridians" hereafter and, in particular, as "camera meridians 188" for the captured image by the camera 108 and as "projector meridians 187" for the projected structured light 113 from the projector 106, as illustrated by way of example in FIG. 5. In one embodiment, ***the projector meridians 187 and camera meridians 188 are representative lines that can be represented on the surfaces of the slide 122 and the matrix radiation receiver 128, but they are not actually part of the pattern that is projected onto the object 111 and captured by the camera 108***.

'656 Patent at 5:20–40. There is no other disclosure of the "projector meridians" being formed as part of the structured light pattern.

122. Because the specification of the '656 Patent does not describe the "projector meridians" as physical lines that exist on the surface of the slide, but rather as mathematical abstractions, it fails to provide written description for the claims of the '656 Patent as construed by the Court. Otherwise put, the specification of the '656 Patent does not convey to a person of

[2] While the discussion below focuses on the "projector meridians," the same would apply to the "camera meridians" which are exact geometrical counterparts of the "projector meridians" on the camera side.

ordinary skill in the art that the applicant was in possession of the claimed invention, including "virtual line[s]" being formed as part of the structured light pattern.

123. Notably, the prior art references I discuss below teach how to choose structured light patterns such that the epipolar lines are physically formed on the slide surface. *See* Section V.H.1.g (LeMoigne reference); *see also* Section IV.D (Vinther reference).

***b. Enablement***

124. For the same reasons why the claims fail the written description requirement, they fail the enablement requirement. The specification of the '656 Patent provides ***no*** description of "projector meridians" being "contained on the surface of the slide medium" or being "fixed or demarcated on the outer surface of the slide." As such, the specification would not teach a person of ordinary skill in the art how to make and use the invention as claimed, without undue experimentation. Specifically, a person of ordinary skill in the art would be left to guess which specific "virtual lines," out of an infinite number of possible epipolar lines, would be defined on the slide; what purpose such "virtual lines" would accomplish; and how such "virtual lines" would coexist with the "coded elements" also claimed without impeding the recognition of the "coded elements" by the triangulation algorithm.

125. By contrast, the prior art would enable a person of ordinary skill in the art to design a structured light pattern that demarcates the epipolar lines directly using the pattern of the coded elements. *See* Section IV.D (Le Moigne and Vinther references). The '656 Patent provides no such enabling disclosure. Indeed, the '656 Patent expressly instructs a reader to ***not*** define epipolar lines on the slide surface.

### c. *Indefiniteness*

126. I have reviewed Artec's infringement contentions for the '656 Patent. From my review, it appears that in Artec's view, the limitations of "a first slide virtual line" and "a second slide virtual line" are met by any possible epipolar line that can be drawn through any coded elements on the slide surface. For example, Artec's infringement contentions include the following two images (02/28/2025 Infringement Contentions, Ex. A at 24):



127. The image on the left is labeled "Image from CR studio showing the pattern projected onto an object." *Id.* Thus, the image on the left shows the structured light pattern as projected by Defendants' accused product. As shown in the image, this structured light pattern does not include "virtual lines." In contrast, the image on the right is labeled "Image from CR studio with virtual lines imposed," meaning that virtual lines have been added to the image by post-processing. As explained by Artec's CTO, Mr. Gusev, he wrote a Python program to mathematically calculate the positions of the virtual lines so that they could be drawn on top of the original image. *See* 02/27/2025 Gusev Tr. at 92–95.

128. Another example of "virtual lines" is depicted in the following image (Ex. A at 25):




129. In this case as well, the structured light pattern as projected by Defendants' accused product does not include "virtual lines," which have been added to the image by post-processing. The blue and red lines were obviously drawn using PowerPoint or similar software by whoever prepared the infringement contentions, because the actual structured light pattern does not include them:




Ex. A at 4.

130. Under Artec's application of the claims for infringement purposes, the claims are indefinite because one could pick literally ***any*** epipolar lines among an infinite set of possible epipolar lines; call those epipolar lines "virtual lines"; and hope that a few of the "coded

elements" in the structured light pattern happen to be located along those lines. For that reason, a person of ordinary skill in the art would not be informed of the claim scope with reasonable certainty. In other words, even after having designed and manufactured a structured light scanner, a person of ordinary skill in the art would not know whether or not that scanner infringes the claims of the '656 Patent, because that would depend on which ones of the infinite number of epipolar lines the plaintiff can mentally superimpose on top of the structured light pattern.[3]

**2. [1.E], [12.E] "said coded elements are assigned to one of at least first group or second group, each of which first group and second group comprising at least two of said coded elements"; [1.G], [12.G] "wherein said coded elements of said first group are located along said first virtual line and said coded elements of said second group are located along said second virtual line" (claims 1, 12)**

***a. Written Description***

131. The specification of the '656 Patent does not provide written description support for the limitations requiring "[first/second] group[s]" of "coded elements" being "located along" the "[first/second] virtual line[s]." As explained in Section V.A above, the specification discusses the concept of "groups" of coded elements at the most abstract level without any connection to a concrete implementation. The initial discussion of such "groups" is as follows:

> In one or more embodiments, the slide 122 is selected such that structured light 113 is formed possessing at least two coded elements that lie within a plane 125 passing through the vertices 124, 130 of the projector 106 and the camera 108. In one or more embodiments, the structured light 113 can be formed as a pattern including ***a plurality of different groups of coded elements, wherein all of the coded elements in each group of coded elements lie within the same respective plane 125 passing through the vertices 124, 130 of the projector 106 and the camera 108***. Different groups of coded elements will lie in different planes 125. In one or more embodiments such coded elements could be represented by

[3] It is apparent that Artec's position on infringement is inconsistent with the Court's construction, which requires "virtual line[s]" to be physically formed on the slide. My opinion on indefiniteness specifically applies under Artec's application of the claims for infringement purposes.

> regions of varying shape, form and/or length. For example, referring to the illustrative embodiment shown in FIG. 13, the structured light 113 is formed as a structure 160 possessing two coded elements 164 and 165 represented by regions of different thickness. The coded elements are located one by one along the plurality of parallel lines 162 so that their sequence within each line 162 forms a solid line with varying thicknesses of varying lengths. At the same time, all the coded elements lie on a plurality of parallel meridians 187 that jointly with lines 162 form a grid. In this manner, ***a group including a sequence of coded regions 164 and 165 of different thicknesses along each meridian 187 will form a unique sequence relative to the sequences of coded regions 164 and 165 in the other adjacent meridian 187.*** It is understood that other types of patterns can be generated to generate the coded elements or coded regions 164 and 165 in the structured light 113.

'656 Patent at 6:35–62. However, Figure 13 of the '656 Patent, to which this description relates, shows no particular rationale by which the "group including a sequence of coded regions 164 and 165" is defined. Rather, the figure shows a very large number of coded elements (thick/thin portions of horizontal white lines), some of which may or may not be aligned along a projector meridian (which the figure does not show):




Fig. 13

132. The discussion in the '656 Patent continues with reference to Figures 14 and 15:

> Using such a light structure 160 of FIG. 13, portions of representative captured images 140 recorded by the camera 108 based on the relational positioning of the projector 106 and camera 108 of FIG. 7 are illustrated in FIGS. 14 and 15 for representative planar objects (FIG. 14) and non-planar objects (FIG. 15). From these figures, it can be seen that ***groups of coded elements 164 and 165 each lie on a respective projector meridian 187 in the slide 122 and will also lie with a respective camera meridian 188 in the image 140*** (where the projector meridians 187 and the camera meridians 188 are illustrated as vertical lines in these figures).

'656 Patent at 6:63–7:6. Figure 14, to which this description relates, shows no particular rationale by which "groups of coded elements 164 and 165 … lie with a respective camera meridian 188 in the image 140." Rather, the figure shows a very large number of camera

meridians 188 (white near-vertical lines), randomly cutting across a field of very large number of coded elements (gray horizontal blobs):




Fig. 14

133. The same arrangement of camera meridians 188 (white near-vertical lines) randomly cutting across a field of coded elements (gray horizontal blobs) can be observed in Figure 15:




Fig. 15

134. In sum, the specification and drawings of the ’656 Patent fail to provide written description for the claims of the ’656 Patent, including “[first/second] group[s]” of “coded elements” being “located along” the “[first/second] virtual line[s].” Rather, the specification discusses abstract “groups” of coded elements without providing any specifics, and the drawings show camera meridians and coded elements at random locations. Otherwise put, the specification of the ’656 Patent does not convey to a person of ordinary skill in the art that the applicant was in possession of the claimed invention, including “[first/second] group[s]” of “coded elements” being “located along” the “[first/second] virtual line[s].”

***b. Enablement***

135. For the same reasons why the claims fail the written description requirement, they fail the enablement requirement. As explained above, the specification of the ’656 Patent discusses abstract “groups” of coded elements without providing any specifics, and the drawings

show projector meridians with the coded elements placed at locations seemingly unrelated to the projector meridians. Clearly, this deficient and contradictory description would not enable a person of ordinary skill in the art to implement structured-light scanning with a pattern including "[first/second] group[s]" of "coded elements" being "located along" the "[first/second] virtual line[s]."

136. By contrast, the prior art references I discuss below would enable a person of ordinary skill in the art to create a structured-light pattern with coded elements in well-defined groups aligned precisely with epipolar lines. *See* Section V.F (Tomasi and Le Moigne references). The '656 Patent provides no such enabling disclosure.

***c. Indefiniteness***

137. In its infringement contentions, it appears that Artec assumed that the "[first/second] group[s]" of "coded elements" may be met by any two or more (broadly defined) features in a structured-light pattern, which display any degree of overlap with any one epipolar line. For example, Artec's infringement contentions include the following two images (02/28/2025 Infringement Contentions, Ex. A at 28):




138. What Artec has done is (i) draw any two arbitrary epipolar lines, and (ii) find any two features (coded elements) of the structured-light pattern that intersect those lines. These coded elements are not mathematical points but instead are shapes that are several pixels wide. Artec is then drawing epipolar lines that intersect these coded elements at any unspecified pixel within the coded element. The choice of epipolar lines was not based on the structured-light pattern itself (which does not include epipolar lines; *see* Section V.D.1.a), but on the subjective judgment of the person who prepared this document. Likewise, the choice of features intersecting the epipolar lines was not based on any specific property of those features. Rather, the person who prepared this document worked their back from the arbitrary lines they drew to the features of the structured-light pattern that happened to touch those lines at some point within the feature.

139. As an additional issue, it is unclear what exactly constitutes a "coded element" in Artec's view. From this and other diagrams in Artec's infringement contentions, it appears that Artec considers the thick portions of as "coded elements" the thick portions of the bright lines in the structured-light pattern. *See* Ex. A at 15–18, 30. However, this is inconsistent with the testimony of Artec's CTO, Mr. Gusev, who indicated that both thick ***and*** thin portions of the bright lines are individual "coded elements." *See* 02/27/2025 Gusev Tr. at 85–86.

140. Under Artec's application of the claims for infringement purposes, the claims are indefinite because for any structured-light pattern, one could draw literally ***any*** epipolar lines and follow those lines until they touch ***any two*** features of the pattern, where a feature may be any portion of the structured-light pattern. For that reason, a person of ordinary skill in the art would not be informed of the claim scope with reasonable certainty. In other words, even after having designed and manufactured a structured light scanner, a person of ordinary skill in the art would not know whether or not that scanner infringes the claims of the '656 Patent, because that would depend on which epipolar lines the plaintiff can mentally superimpose on top of the structured light pattern, and which arbitrarily-defined "coded elements" happen to cross those arbitrary lines. Indeed, under Artec's interpretation a wide range of structured light patterns known in the prior art would automatically fall within the scope of the claims, including each of the prior-art structured-light patterns discussed in Section V.F.

**E. Patent Eligibility**

141. In my opinion, each of the Asserted Claims of the '656 Patent is directed to patent ineligible subject matter. As explained below, the Asserted Claims are directed to an unpatentable abstract idea. In addition, none of the Asserted Claims recites an inventive concept that is significantly more than the abstract idea.