# EXHIBIT 3

Planet Depos
We Make It Happen™

**RESTRICTED – ATTORNEYS' EYES ONLY**

# Transcript of Steven Gortler, Ph.D.

**Date:** June 2, 2025
**Case:** Artec Europe S.A.R.L., -v- Shenzhen Creality 3D Technology Co., Ltd., et al.

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X
ARTEC EUROPE S.A.R.L., :
Plaintiff, :
v. : CASE NO.:
SHENZHEN CREALITY 3D : 1:22-1676 (OEM)(VMS)
TECHNOLOGY CO., LTD. and :
SHENZHEN JIMUYIDA TECHNOLOGY :
CO., LTD., :
Defendants. :
------------------------------X
RESTRICTED — ATTORNEYS' EYES ONLY
Videotaped Deposition of STEVEN GORTLER Ph.D.
Virtually Conducted
Monday, June 2, 2025
7:14 a.m.

Job No.: 585829
Pages 1 - 301
Reported by: Cynthia Lichtman, CSR No. 14601, CVR

2

Videotaped deposition of STEVEN GORTLER Ph.D., held virtually via Zoom videoconference:

Pursuant to agreement, before Cynthia Lichtman, Notary Public in and for the State of California.

3

A P P E A R A N C E S
ON BEHALF OF THE PLAINTIFF:
MICHAEL CUMMINGS, ESQUIRE
RIMON LAW, P.C.
1990 K Street, NW
Suite 420
Washington, DC 20006
(202) 400-3846

ON BEHALF OF THE DEFENDANTS:
ANDREA PACELLI, ESQUIRE
KING & WOOD MALLESONS
500 Fifth Avenue
50th Floor
New York, New York 10110
(212) 319-4755

ALSO PRESENT
Iman Sadeghi, Ph.D. - Expert
David Aikens, Expert
Isiah Sheridan - Videographer, Planet Depos
Dominic Adams - Technician, Planet Depos

4

C O N T E N T S


| EXAMINATION OF STEVEN GORTLER PH.D. | PAGE |
|---|---|
| By Mr. Cummings | 7, 297 |
| By Mr. Pacelli | 290 |


E X H I B I T S
(Attached.)


| STEVEN GORTLER Ph.D. DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| Exhibit 1 | Gortler Initial Report 4/7/25 | 11 |
| Exhibit 2 | Gortler Exhibit A, CV | 13 |
| Exhibit 3 | Gortler Exhibit B, Materials Considered | 18 |
| Exhibit 4 | US Patent 7768656 | 24 |
| Exhibit 5 | US Patent 8488129 | 25 |
| Exhibit 6 | US Patent 10962357 | 28 |
| Exhibit 7 | Le Moigne, Structured Light Patterns | 57 |
| Exhibit 8 | Aikens Second Expert Report, 5/7/25 | 64 |
| Exhibit 9 | Tomasi Patent Application | 77 |
| Exhibit 10 | Dr. Iman Sadeghi Expert Report, 4/7/25 | 109 |


(Exhibits continued on next page)

5

(Exhibits continued from previous page)

E X H I B I T S

(Attached.)

| STEVEN GORTLER Ph.D. DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| Exhibit 11 | Dr. Iman Sadeghi Rebuttal Expert Report | 111 |
| Exhibit 12 | Markman Ruling | 114 |
| Exhibit 13 | DEFINE Definition and Meaning, Merriam Webster | 139 |
| Exhibit 14 | VIRTUAL Definition and Meaning, Merriam Webster | 140 |
| Exhibit 15 | Rusinkiewicz, Real time 3D Model Acquisition | 225 |
| Exhibit 16 | Gortler Non-Infringement Expert Report, 5/7/25 | 228 |
| Exhibit 17 | US Patent 8224064, Hassebrook | 241 |
| Exhibit 18 | Aikens Expert Report, 4/7/25 | 248 |

6

THE VIDEOGRAPHER: Here begins media 1 in the videotaped deposition of Steven Gortler, Ph.D., in the matter of Artec Europe S.A.R.L. v. Shenzhen Creality 3D Technology Co., Ltd., et al. in the United States District Court for the Eastern District of New York, Case Number 1:22-1676 (OEM)(VMS).

Today's date is June 2nd, 2025. The time on the video monitor is 7:14 a.m. Pacific Time. The remote videographer today is Isaiah Sheridan representing Planet Depos. All parties of this video deposition are attending remotely.

Would counsel please voice identify themselves and state whom they represent.

MR. CUMMINGS: This is Michael Cummings, from the Rimon Law Firm for Plaintiff Artec Europe S.A.R.L.

MR. PACELLI: Andrea Pacelli, from the firm of King & Wood Mallesons LLP, representing defendants.

THE VIDEOGRAPHER: The court reporter today is Cynthia Lichtman representing Planet Depos. The witness will now be sworn.

P R O C E E D I N G S

Whereupon,

7

STEVEN GORTLER Ph.D.,

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. CUMMINGS:

Q Okay. Good morning, Dr. Gortler.
**A Good morning.**
Q As a preliminary, have you ever had your deposition taken before?
**A I -- I -- no.**
Q Okay. Although I -- I'm sure counsel explained this to you, we'll go over, quick, a few of the basic ground rules for depositions.
**A Sure.**
Q First, do you understand that your testimony here has the same effect as if you were actually giving the -- this testimony in court?
**A Yes.**
Q Okay. And you understand that you've been -- you've been put under oath and you have the obligation to tell the truth today?
**A Yes.**
Q Okay. And as you're doing -- you've been doing very good and -- so far in answering the

8

questions verbally -- I ask you to please continue to do that rather than, say, nod your head or -- or some other nonverbal gestures, so that the court reporter can capture it. Okay?
**A Okay.**
Q Okay. And now, is there anything that is affecting you today in one way or another, either sickness or medication or -- or other factor that might impede you from giving full and complete answers to my questions today?
**A No, except I occasionally get an irregular heartbeat. And if that happens, I'd need to sit -- essentially, lie down and take some deep breaths to get it to reset. It doesn't usually happen. I'm sitting down. I'm not that concerned. But it -- I will -- it -- it's possible that that could happen.**
Q Okay. And then I can -- then I can assume, then, that should anything like that occur, you will -- you will inform us immediately?
**A Yes, I will.**
Q Okay.
**A Immediately.**
Q Okay. And if there's any other reason you can't answer a question, for example, you can't

understand it or you didn't hear me clearly, will you please let me know?
**A Sure.**
Q And also, please, as you're doing, try to wait until I finish my question before you answer, even if sometimes it's obvious where the question is going. But I would ask that you wait until I finish, again, so the court reporter can capture both sides of the conversation.
**A Sounds good.**
Q And also, your attorney may object to -- to the form of the question, typically. And he'll need time to get that objection stated before you give your answer. Do you understand that?
**A Sounds good.**
Q And most of the time -- and because we don't have a judge present here to decide whether the objection that counsel may make is valid, normally, if you are able to answer the question, please go ahead and answer the question. Do you understand that?
**A I do.**
Q Okay. And -- okay. And approximately, when were you retained to work on this case?
**A I think I was contacted by e-mail in the**



**late fall of 2024.**
Q Okay. And -- and what were you asked to do? What have you been asked to do? Not only when you were initially contacted, but what have you been asked to do in this case?
**A So I was asked -- I think the official term is consultant or expert witness, in general terms.**
**Do you want to know more specific questions --**
Q Yes.
**A -- about what I was asked to do?**
Q Yes, please.
**A Okay. Let's see. So I was told that the ultimate goal -- at first, I was retained to deal with the questions of patent invalidity. Only later near the end of that process did we discuss the idea that I would also or could also be hired to deal with the non-infringement side of things.**
**So for the first number of months, it was only -- we were only -- again, I was hired to do -- to work on the invalidity. The very first thing I was asked to do was to read the three patents, which I'm sure we will identify soon enough, carefully to understand what the case was about.**



**And the next step was to dive into various elements of the prior art to understand what they were doing and how they related to the content of the patents.**
Q Okay. And were you asked -- I take it you were -- is it correct that you were asked to prepare reports for this case?
**A That is correct.**
Q And that you have prepared and submitted two reports in the case?
**A That is correct.**
Q And the first -- and the first report, we'll put this -- we've already said we'll do -- we'll just enter it for the moment. As Exhibit 1, I've put in the April 7th report of Dr. Gortler.
Do you see that in the chat?
(Whereupon, Exhibit 1 was marked for identification and is attached to the transcript.)
**A Yes, let me see if -- give me a second here. Go to the chat, push the button, and it opens up in a PDF reader.**
**So it says this is 2025/04/07, Gortler initial, et cetera.**
Q Yes, could you please review that and confirm whether or not it's a true and accurate copy



of the report -- of a report that you submitted in the case?
**A So it's a 260-page document. Just scrolling through it, it appears to be the same document that I prepared and signed. I'm sure when we look at details, if, for some reason, it does not match my -- my -- what I think my document is, I will be sure to let you know.**
Q Okay. Thank you.
Now, about how many hours did you spend preparing this report, Exhibit 1?
**A I am going to approximate that number at 50 hours.**
Q Okay. And now, sitting here today, is there any -- are you aware of any changes or corrections you would like to make -- or additions you would like to make to the report?
**A I went through it recently to make sure I don't -- the answer -- it -- that is -- I don't think so.**
Q Okay. I will also put the next exhibit in here. So I will copy and paste it and put it into the chat. So we'll enter it in as Exhibit 2. So it was what we received as Dr. Gortler's CV along with the invalidity report of Exhibit 1.

13

(Whereupon, Exhibit 2 was marked for identification and is attached to the transcript.)
Q Could -- can you see the document?
A I see the thing in -- let me see -- I haven't -- I'm trying to open it right now. I have not opened it yet.
Q Okay.
A It's going to take me a second -- let's see -- because it goes into a directory, and then I've got to find the file, and then I've got to open. So it didn't go -- where did it go? I'm going to try to get it again. Oh, now it opened. The second time I pressed it, it opened. It says Exhibit A in big letters.
Q Okay.
A I see it.
Q Okay. Is this a -- a both accurate and current version of your CV?
A Let me make sure it's the current one, 2024.
Yes, it is.
Q Okay. In this CV, does it show your experience in the fields of optics or optical engineering?
A I -- I'm not -- I'm not working in the

14

field of optics or optical engineering --
Q Have you --
A -- or --
Q Okay.
A At this -- in time, I've worked in the fields of computer vision and computer graphics. That's the field where they study the topics of deducing shapes from multiple cameras or cameras and projectors. And so the -- I do have listed the papers that were written over that time. It includes over 20 papers in that field.
That field is distinct from the field of optics, which is the study of glass and plastic and fiber optics and possibly eyeglasses and contact lenses, deformations of the eye and sort [sic]. I don't -- I am not -- I am not working in the -- in that area.
Q So it -- it's true, then, you're not claiming any -- any expertise in the field of optics or optical engineering?
A A person working in computer vision needs to know enough optics to do computer vision. So a person needs to understand, you know, what you need to -- what equipment is needed to get the job done. They need to know how to look up, if there's -- if

15

there's terms that they need to understand, in context, they know how to do that.
So there's a level of expertise in optics that a person would have who is a practitioner or a researcher in computer vision, and to a lesser extent, in computer graphics. But that is different from somebody who spends all day studying the shape of a lens and/or grinding glass.
Q And to the extent that you -- you -- of what you just mentioned, where have you learned and -- or in what context have you learned about the -- the knowledge that you have about optics?
A I may have had an optics course in college. Most of what you do as an adult researcher involves learning lots of new things as you go. I have definitely read an optics book, more than one. So I would say possibly from school, more likely from books, or the context that is -- that it -- any context that it comes up within computer vision.
I'll give you an example. There's a researcher in computer vision. His name is Shree Nayar, from Columbia. And he tends to work on the more exotic optics side within computer vision. So he will be interested in things like, how can you figure out depth of the surface that you've seen

16

point by point using focus information?
Now, if you're using focus information, now you need to have a better understanding of the optics as opposed to if you were doing multi-camera or camera and projector, it's a very simple camera assumption.
So if you're doing work like Shree Nayar does, you really, then, are going to start getting into some of the optics. And if you read his papers, like I have, you need to, then, if there's background there that you didn't -- haven't seen before, you need to look it up.
One project I did -- I believe it's listed in my CV -- is called depth from defocus. This was a project trying to model the way that spiders deduce depth. Spiders are able to figure out how far -- jumping spiders, in particular -- they have very funny eyes, and they can figure out how it is to jump the right distance to catch a -- a little critter and eat it. And it's been somewhat of a mystery of how they do that. I co-advised a student on a project where the theory was that this is actually deduced through the way that things change under motion, under specific blur.
And so for that project, we needed to

17

learn specifically about the optics setting of -- of motion under blur. And then, in particular, motion under blur where the brightness that is let through a different part of the lenses is variegated. So that was a project that was fairly very intense downstream on some of the optical levels. I didn't actually -- I hadn't worked in that before. We ended up proving a theorem that the only way to actually do this properly is with a calcium filter, not that it matters what this -- what that means.
And so that's an example of things. You know, things come up, and then you apply things. But again, I'm not designing lenses. I'm not grinding lenses. And -- and so I learn what I need, as I need.
Q Okay. Now, we're going to put another exhibit here -- give me a minute -- into the chat. Okay. So this will be in as Exhibit 3. The document is -- the PDF is titled Gortler Exhibit B; however, it was -- it was -- or this is what material is considered. This is -- appears to you what we -- this is what we received, and we -- also at the same time on April 7th when we see Dr. Gortler's -- Gortler's report.
Do you -- can you see the document,

18

Dr. Gortler?
(Whereupon, Exhibit 3 was marked for identification and is attached to the transcript.)
A Yes, I can.
Q Okay. Could you please review it and tell me whether or not this is a -- an accurate description of the materials that you considered for your invalidity report?
A This -- this looks -- appears correct.
Q Okay. Since this document was shared, have you considered any other materials with respect to the subject of invalidity of the patents in suit today?
A I would say lots of -- you know, thinking -- there are lots of questions that come up along reading -- when you read things, questions to consider, terminology, see its usage. And so as part of that process, both -- I definitely would have used my computer, done various looks, you know, searches of various things, and also possibly if a paper came up, I might have skimmed or read a paper on something.
So the answer is, this is the formal legal documents related to the case, but as part of -- of thinking about topics, I -- that is not done

19

in isolation.
Q Okay. You -- can you think of any specific, either detailed -- further details about what you might have looked at --
A Sure. I'll give you a couple --
Q -- or any --
A I'm sorry, I didn't let you finish. I'll let you finish.
Q Yes, well, or -- or examples.
A Sure. So here are some examples. Again, this is by zero means exhaustive. The patents often use the words matrix radiation receiver.
Q Okay.
A And that was a term that seemed a little unusual to me as a term in the art. Was this a standard term that's used in the field or in American English?
So I went to Google Scholar, and I typed in -- first, I typed in CCD space camera. And I saw that there were about 2,200,000 documents that seemed relevant. That's an example. We'll talk about that, I'm sure. But then I also typed in, quote, matrix radiation receiver, unquote, space camera. And Google Scholar told me that there were 20 documents in the universe that use that -- that

20

combination of terms.
One of them was the patent '656, interestingly enough. That was on the first page. I then looked at the rest of the documents. I skimmed them. And I noted that they were all either in Russian or with authors from Russian or Ukrainian institutions.
So my conclusion from there is that this is a translation, presumably, from some technical term possibly from the Russian literature. But it is not used widely or almost at all by anybody else in American English. That's an example. That's not a -- we didn't put that in the exhibits. I don't know when I did that, but that's one example.
Another example is the '656 document I noticed referred to something as a -- as a -- a camera exit pupil and a camera entrance pupil. And I knew what those terms meant or I -- I was aware of those terms, but I wanted to get a deeper understanding of what those terms were. And so I, you know, did some -- again, some searching, and I found some academic papers talking about the relevance of those terms. And that may or may not come up in what we talk about today. If it does, my -- if you hear the word camera entrance pupil,

21

that was because I did that -- I -- I did that research to understand the terminology there.
So those are some examples of things that I would have done that were not listed as -- as document -- quote, unquote documents considered.
Q Okay. Can you think of any or recall any other examples?
A This might -- let me think. I mean, there were probably tons. Here's another example. There was some discussion of the distinction -- I was looking at some words, and I was reading some documents, and I was told that -- not that this was that important to me, technically, that there was a discussion of the difference between the usage of the words either or versus neither nor. And that took me down a rabbit hole of websites by, you know, high school teachers trying to describe usages of words.
Again, that's not anything to do with my expertise. But tons of things, I would say, like that came up.
Do you want me to think of some more examples like that?
Q Yes. I'm -- we are just trying to get --
A I didn't, you know, note -- take any

22

notes.
Q Yes, I understand.
A It's kind of an organic process. You're typing. Oh, what is this? What's -- what is this word? Et cetera. Let me try to think about if I have other kinds of examples.
I definitely looked -- I know, because I saw the -- that -- that the experts from our texts seemed to be very, very, very focused on some optical minutia, I cracked open an optics book. I think it's -- Kingslake was one of the authors, just to see how he defined things. I think I also looked at a book by Hecht, H-E-C-H-T.
Q Okay.
A Let me think what else.
Oh, there's a book that's, like, a term -- a dictionary of terms in computer vision. I definitely looked at that. I'd have to use the Web to find -- I don't remember what the name of that book is.
Q Okay.
A But I could -- I could -- if you want me to use the Web, I could probably find it again.
Q No, I don't think we need you to.
And can you remind me, if you would just

23

take a minute, about some logistics about the -- the deposition that I didn't address. I was just thinking since you mentioned it.
Currently, where are you located?
A In my office, in the neighborhood of Allston, in the city of Boston, Massachusetts.
Q Okay. Is there --
A Also known as the Harvard University engineering building.
Q Okay. Oh, good.
Is there anybody with you in -- in that room?
A Andrea Pacelli is 3 feet away from me.
Q Okay. Anyone else?
A And -- and nobody else is.
Q Okay. And as far as your -- the computer that you're working on, is this your personal computer that you're looking at?
A It's my work computer, but it's the computer I use for everything.
Q Okay. Are there other windows open other than the -- the Zoom or the PDFs that we've been looking at?
A There's one other window, which is the directory where the PDFs go to, but I have to click

24

through there to open them up. It's --
Q Okay.
A See, I'm not sure -- I'm still getting this process of how to open up the documents. So I do have a -- it's a little -- you know, a little folder, Explorer window open as well.
Q Okay. And --
A I see a Zoom, a folder, and a PDF is what I see on the bottom.
Q Okay.
A So those are my windows.
Q And that's all the windows, then?
A Correct.
Q Okay. Thank you.
Now we're going to put a few more documents in, in the chat. Okay. We'll do them one at a time.
I've uploaded and will enter in as Exhibit 4, a document, and we'll put it up here. This is a US patent with the number 7,768,656 dated August 3rd, 2020 [sic], with inventors listed as Nikolay Lapa and Yury A. Brailov.
Dr. Gortler, do you see this exhibit?
(Whereupon, Exhibit 4 was marked for identification and is attached to the transcript.)

25

**A Yes.**
**You said August 3rd, 2020. It says 2010.**
Q Oh, excuse me. Thank you.
**A So that's what you meant.**
Q Yes, it is. Thank -- it is. Thank you.
**A But I do see it, yes.**
Q Okay. And do you recognize the document?
**A Quite well.**
Q Okay. And what is this document?
**A This is a patent that I was asked to look at that is being used by the plaintiff's side of a case in which I have been hired by the defendant's side.**
Q Okay. And it -- if it's okay, we'll use the convention to refer this to -- refer to this exhibit as the '656 patent?
**A Fine with me.**
Q Okay. And we'll continue on. I -- you'll probably guess where were going next. I'll give you -- okay. I have entered into the chat a document that says US 8488129. And I will represent that it is a US patent with the number 8,488,129 with the date of July 16, 2013, listing the inventor as a Yan Lapa. This will be Exhibit 5.
(Whereupon, Exhibit 5 was marked for identification and is attached to the transcript.)

26

Q Dr. Gortler, do you see this document?
**A Yes, I do.**
Q Do you recognize the document?
**A Yes, I do.**
Q And what is the document?
**A It is also a patent in the same case being used again in the same sides as I just described.**
Q Okay.
**A And I have looked at that.**
Q Okay. And we'll do one more here. Please give me a second.
And again -- and as far as Exhibit 5, while this -- you -- is it -- you'll understand if I refer this -- to this as the '129 or '129 patent?
**A Yes, I do. I sometimes get -- I sometimes get mixed up, just get confused between the '129 and the '357 just because they have some overlapping -- some overapping [sic]-- overlapping elements. So you'll have to excuse me if I have -- if I get confused. And hopefully, it will become clear from the context that I am confused, and we will clear that up.**
Q Right.

27

**A But I do understand, that yes, there's the one -- the '656, '129, and the '357.**
Q Okay. And, please, I would ask you, if you happen to notice that you're getting confused, please let us know right away.
**A Sure.**
Q Okay. And again, now, as Exhibit 6, we've put up into the chat a document -- a patent, US -- with the number US 10,962,357 with a date of March 30th, 2021. And the first inventor -- I won't go through all of them -- is Alexander Alexandrovich Sharapov.
Do you see this document?
**A No, I don't see that document.**
Q Okay. Maybe I didn't load it correct -- correctly in the chat. Give me a second to make sure that it is, in fact -- okay. It should be. It's in the chat --
**A The last --**
Q -- at the very bottom.
**A The last document I see is US 10,962,357.**
Q Okay. Did -- oh, did I misstate that? Let me start over again, please.
**A I thought we already talked about the '357.**

28

Q Well, you did briefly because you mentioned it, but I -- I -- we haven't addressed it.
**A Oh, I'm sorry. Okay. My bad. You're good.**
Q We didn't officially put it in the -- as an exhibit, which we're doing now as Exhibit 6. And it's the very last one I -- I -- can you -- do you see it now?
**A I do see it, yes.**
(Whereupon, Exhibit 6 was marked for identification and is attached to the transcript.)
Q Okay. And you recognize this document?
**A Yes, I do.**
Q Okay. And what is the document?
**A It, again, is the third patent that I was asked to look at in the context of this case. Again, used in the same way. Again, this was a patent from the plaintiff's side.**
Q Okay. And -- and since you've already used the term, I'll assume that you're comfortable if I refer to this -- you'll understand -- if I refer to this as the '357 patent?
**A Yes, I will.**
Q And have you heard the term patent in suit?

29

A I have not.
Q Okay. Sometimes in the case, we've referred to the three patents together, the '656, '129, and '357, collectively as the patents in suit. And just to inform you, that's a term I -- I may use when I refer to something with -- refer to all three of the patents we just entered in as exhibits at once.
Does that make sense to you?
A Yes, it does.
Q Okay. And if you don't know what I mean when I say that term or any similar term, please let me know.
A Okay.
Q Okay. And I'd like us to return to your -- your expert report, which we -- I believe I -- we put in as Exhibit 1. And its title is -- just for the PDF is 2025/04/07 Gortler Invalidity Expert Report.
Could you please have that up? I'd like to take a look at it.
A I have it up.
Q Okay. And there are a number of sections on it. I would like to turn to -- first to -- to section -- well, in the background of technology,

30

section 4 of your patent.
A If you give me paragraph numbers, I'll be able to --
Q Oh, okay.
A -- find it more quickly.
Q Yes. Okay. Very good. I'm starting with paragraph 62?
A I am there.
Q Okay. And you -- you notice that -- the first thing you -- you said -- this would be 62. You said all structured-light scanners require a camera to capture an image. And you mention -- do you have any kind of general definition of a camera that you use or -- or you're using here, in particular?
A All right. So there's two different questions that one can ask, and I will answer both of them.
When you're doing structured light, this is basically a geometrical or stereovision or multi-camera vision. This is -- you have, let's just say -- let's just do structured light with one projector and one camera. So there is a -- we'll call this -- there's a slide on the projector. There is an image on the camera. And the idea in

31

structured-light scanning is that you see some -- you have something, some element of your projector that you have decided to correspond to an element in your picture. And then you use some geometric reasoning to deduce where in space was a -- a little piece of geometry, a piece of surface, that saw the -- that -- that reflected this projected element and produced this captured pattern in the image.
So in order to do that, you have to have a -- there needs to be a model, a mental model, of the geometry of the scanning. So if, from -- and we'll talk about this, I suspect, a lot and -- but in -- when you're doing multi -- multi-view or structured light, the model, that is a pinhole camera and/or a pinhole projector.
So if in the mathematical model, when you say camera, what you mean is a specific mathematical model of image formation that describes what points on this scene produced what rays, produced what pixels in a camera. And the same goes for the geometric behavior of the projector.
So that's the model that's used. That's what the algorithms downstream will run on. Of course, that's a mathematical model. That is not the physical camera or the physical projector. And

32

so, obviously, you're going to use a physical camera and a physical projector, if you're doing structured light. If you're doing stereo, you would just have multiple physical cameras.
Now, cameras, you know, there's many, many different things that people would count as cameras. But in this context, what you want is a camera that is -- is acting as close as possible to this pinhole model. And so in this particular -- in this context, what you would want is a camera that behaves not exotically.
For example, you wouldn't be using some sort of omnidirectional-type camera or a push broom camera. If you wanted your projector to act like a pinhole camera, you wouldn't be using, you know, lasers and sonar and whatever, and somehow calling that a projector.
So again, the word camera is an English word; projector is an English word. In the context of -- of structured light, it refer -- it would refer -- have two purposes. It refers to the mathematical model of the image creation and formation process, and then, also refers to a -- a physical incarnation, which -- which would -- which is also called the camera or the projector.

33

Q Okay. Now, you said all -- in the next paragraph, paragraph 63 -- just for the record, we're on page 17 of your report -- you said, all -- all cameras for structured-light scans require a photographic lens. And you -- and you go on to say it would be practically impossible to capture a focused image for the structured light from three-dimensional objects being scanned. And you say -- you go on to say -- and you also mention later, the very last line, is simplified pinhole model.

What can you -- what do you mean by simplified pinhole model?

**A Sure. Okay. So can I refer to the '656 -- can we look at the '656 patent and refer to some of the pictures there?**

Q Yeah, sure. We can certainly pull that up.

**A Okay. So I'm going to pull up the '656 -- let me see. I'm trying to think how to best explain this. I guess this will -- and again, let's -- I guess we'll take our time with this.**

Q Okay.

**A So let me start -- actually, I'll start with some figures in my report.**

34

Q Okay.

**A And then we will look at some figures in the '656 as well. Okay?**

Q Okay. Yes.

**A So let me first find, in my report, the figures in question.**

**Okay. So I'm now looking at paragraph 77 of what we're calling my first report, I believe.**

Q Yes, I see that.

**A Page 23.**

Q Okay.

**A Okay. So this is a little sketch. And we'll look at a number of different sketches of what I will call a pinhole model.**

**So the key points -- there's a couple of key points here. On the most left, there's a little black circle. I don't know how to describe this for the purposes of court reporting. But there's the leftmost black circle. It's not labeled in the figure. And there's a rightmost black circle. And they're joined by a substantial horizontal line. Okay? And so those two points represent -- I'm going to call them the pinholes of a pinhole model.**

**Again, I will continue -- I will explain in more detail how this -- how this behaves. This**

35

**we'll take a little bit of exposition. Then you see in the picture two quadrilaterals. And these are meant to represent rectangular shapes in three dimensions. And these are going to -- we are going to call these either the film planes or the slide planes. If these were two cameras, I would call these two film planes.**

**If this was a camera and a projector, I would call one of them a film plane and one of them a slide plane. The geometry doesn't care whether the light is going in or out. So it's the same geometry.**

**Now, in an actual pinhole model, a pinhole camera also refers to a physical object where you take a shoe box -- I have my students do this in class, and they cut out a little square. And then they put some tinfoil in front and a little wax paper in back, and they punch a hole with an actual pin.**

**And so the film plane is the piece -- is actually on the back of the camera. It is behind the pinhole. So in the picture here, you would take these two planes, and you would imagine I'm not in front of those two dots, towards the scene, but rather behind those two dots, away from the scene.**

36

**That is -- that would be a drawing of a physical pinhole model.**

**Now, what happens in a pinhole model is that every point on the plane, on the film plane -- imagine it's a film plane, and it's trying to, like, get some -- get some photons to decide what color or how bright it should be. It looks around, but it's actually in a dark box. And the only way it can see light is any light that comes through a pinhole. And a pinhole is so small that we really think that it's essentially one single ray of light -- that's sort of as an idealization -- coming in from the scene and producing, therefore, whatever the brightness that would be recorded in that one point on the film only is due to a single ray.**

**Now, that is a pinhole camera. It is a -- a physical pinhole camera. That can be modeled mathematically because it's a very simple geometry. That is, you think, you imagine, mathematically, that I have a point in a plane. And every -- every pixel on the plane is -- its color is determined by drawing a straight line from that point through the pinhole, into the scene, and seeing what is at the other end of that point. Is it -- you know, is it my shoe? Is it the wall? Is it the floor?**

37

Whatever -- and whatever brightness there is what produces the recording on the film plane.

Now, mathematically, there's really -- except for a flipping, there is no difference between imagining the plane is behind the pinhole or whether it is in front of the pinhole. That just gives you a reflection. And so it is often more convenient, if you don't want to -- if you don't want to imagine that reflection, is to draw, in visualization, or even in your mathematics to draw the film plane in front of the pinhole.

A real camera couldn't do that because the plane would obviously block the pinhole, and there would be nothing that is recorded. So this is a mathematical convenience. And that's what we see here in this drawing, the two planes have been drawn. And we'll see other examples in the '626 where they are drawn behind that pinhole.

Okay. So let's see. Let's back it up here.

Q Okay.

A So this is one picture -- you -- you asked what is a pinhole camera. So I should answer the question two ways.

There's a physical notion of a pinhole

38

camera, which is used to motivate concepts, when you teach about cameras. And they are often used -- they're used in practice for entertainment purposes possibly. But -- entertainment meaning, like, school -- you know, like, an elementary school project-type thing. But they are very heavily used in -- in computer vision because they give a basic ideal description of the geometry of projection and image formation.

Now, before going on -- actually, let me show you another figure, and let me just write down a note for myself. Let's go to '656. And we can look at figure 2.

Q Okay. I'm there.

A That is a picture of a pinhole model of imaging. So on the left, there's two little -- there's a 124 [sic] -- there's a 122 and a 128. And this is a two-dimensional drawing. So what would've been a film square is now a film line. So 122, to me, represents a -- the -- a film, not a plane but a line, because this is a two-dimensional visualization slice. And the other camera and/or projector, its film plane is labeled 128.

And then there are some points on those film planes not labeled specifically. And let's

39

look at the -- there's a -- let's look at -- look at 122. There's a solid line that starts off on the 122 plane. It goes through a point, 124. It continues on into the scene until it -- they show it -- and they show it crossing a curvy surface that is labeled 110.

And then they show another solid line hitting that same curvy surface point. And let's follow that back down towards -- towards the bottom, towards the pinhole -- towards the point labeled 130, until that line hits another plane labeled 128. And this is in a -- another picture of -- this is an exact same picture of pinhole imaging with two cameras or with a camera and a projector. But in this picture, the planes are shown behind the pinhole. Plane 122 is further away from the scene than the point 124.

I should say, by the way, in this drawing, the point 124 is clearly playing the role of the pinhole. And the point 130, likewise, is playing the role of the pinhole that is this exact same picture that we just saw from my document. And 122 and 128, likewise, are playing the role of the film planes in this idealized cartoon.

Okay. So the difference, then, is --

40

between this picture and the one we saw is that in this picture, the film or projector slide planes are being drawn behind the pinhole as opposed to in front. But that is really a choice of how you want to draw your picture. This is really identical geometry. And I would say this geometry that we see here is the geometry of a pinhole camera.

Q Okay.

A Okay. Now, why -- let me -- I'm not -- let me -- let me continue.

Q Okay.

A So because -- now, why don't we use pin -- why don't we walk around with, you know, pinhole cameras? And the reason is because the pinhole is, by definition, very small, and it lets in very little light. And so if you wanted to use a pinhole camera as a physical device, you would need very, very sensitive film, and this would be difficult and expensive, et cetera. And so, therefore, the very smart people 300 years ago or 200 years ago, realized, well, we need to let in more light.

So the next thing you could do is, instead of using a pin, use your pinky and create a giant hole through the -- through -- through the tinfoil that -- where -- where the pinhole used to

41

be. Now it's a giant hole, and a lot of light can get through. Imagine taking the point in this figure 124 and turning that into a circle, you know, that is half as large as the film plane, if you imagine that.

Now, you'll get a lot of light, but now, every point on the plane is going to be impact -- on the film plane, is going to be impacted by an infinite number of rays going out through that hole in a wide variety of directions. And all of those rays are now going to hit the film plane and have an impact on what is recorded.

So, therefore, if you have a -- well, we'll call it a finite aperture, as opposed to a as-small-as-possible pinhole, you are not able to actually produce what we would consider an image of any sharpness whatsoever. So the way you fix that is you put in a lens. The purpose of the lens is to allow to -- allow -- allow -- allow yourself to have a hole large -- well, one of the purposes -- the main purpose of a lens is to allow yourself to have a hole that is large enough to let a measurable amount of light get through, on the one hand, but still, magically, somehow behave almost as if it were a pinhole camera.

42

Now, how is that possible? Well, it is not quite possible because it's not the same as a pinhole camera. And in particular, if you have a very wide lens, and depending on your optical setting, you -- pictures have things that look blurry. And that's why you have to focus your camera, as we all know. The purpose of the focusing of the cameras is to change some of the relative geometry of the various elements, which could be quite complicated.

So that, for the purpose of range that is in focus, the range which is, let's say -- or the range that is in focus, it is sharp. What -- why is it sharp? It is sharp because each point in the film is capturing information, essentially, from one point off in the scene.

That's -- what that means is the lens is allowing, at least for things that are in focus, for the camera to be well-approximated as if it were a pinhole camera, but it's letting in a finite amount of light. That is the purpose of a lens, the main purpose of a lens.

Now, in other areas, for example, in macro photography, you literally want -- or even in filmmaking, you want the blur because that's part of

43

the artistic effect or it's part of the effect of showing you what you want to see and not showing you what you don't want to see. So in that case, the lens is actually playing an important additive role to what you want to get out of a picture.

But when you're doing multi-view cameras, multi-view stereo, stereo -- structured light, what you want is your camera to behave as possible -- as closely as possible to a pinhole camera. If it is not -- actually, let me get that paper. The picture that we saw in here, by the way, this is a process. This is called triangulation. The idea being that you took the point on these 122 and the point on 128, and you drew these two rays to the pinholes giving you these other two lengths that look like a triangle. I think that's why it's called triangulation. And that's how you figure out the depth.

So in any -- in triangulation-based scanners, you typically want the scanner not to behave -- you want the lens to be as inobtrusive in effect as possible. You don't want it producing non-effects.

Now, the way this is actually, therefore, done in practice -- so you might say, okay, well, I

44

have a camera. What do I do? And the answer to that is calibration. What you do is you have a camera or a camera and a projector or multiple cameras, and then you have various fiducial objects. Often they are pieces of paper with various bull's-eye patterns on them. You can imagine something like a QR code. It's a known pattern. And because it's a known pattern, you can take multiple pictures of -- of this pattern.

And since you know what the pattern is, you can start deducing what is the effective geometry of the camera system. And you can ask yourself, does this camera -- is it behaving like a pinhole model? And if it is a pinhole model, what is the actual careful shape of that pinhole model?

So if you look at the picture again, there's a shape here. 130 is a point. There's this plane 128. And there is actual relative sizes. How large is that plane? Where is that pinhole relative to that plane?

And so when you calibrate a camera, in the setting of stereovision or structured light, what you are doing is you are trying to see, does my camera -- how is my camera behaving? Is it behaving like a pinhole model? And if it is behaving -- if

45

**it's not behaving like a pinhole model, I better go to the store and buy a new camera because it's not going to work. But if it is behaving like a pinhole model, try to figure out what is the exact geometry of the model. So you fit that to the data. It's an optimization process. There is 30 or maybe 50 years of literature on variations of how to perform this calibration process.**

**But in summary, it's an experiment that is done with the camera observing known patterns to deduce what is the model? Is there a model that -- that well approximates my physical camera? And is that -- and what, actually, is the -- is the detailed geometry of that model?**

**Okay. So I think that is a good place -- I'll stop there. That's a good place to get an -- that's enough terminology to get us started.**

Q Okay. Good. So let's go back up to where we were in your report, and we may -- we may -- we'll probably return to the subject of pinhole cameras at some point. Okay. And I think --

**A I have a window open, and there is some truck noise. Do you mind if I --**

THE WITNESS: Actually, Andrea, can you

46

close the window? It's a turn, and you just turn it a lot until it gets quiet. And it's a lot of turning.

**A Stand by.**

Q We'll wait a second.

**A There's a truck reverse beeping, which is kind of getting on my nerves. I like the fresh air, though. It's a beautiful 70 degrees on the East Coast today.**

**Okay. I'm back.**

Q Okay. We'll keep going. We were -- we were on, I think, paragraph 52.

**A 62, I believe.**

Q Okay. I may -- I -- I don't have the -- we had talked about -- okay. 62. Thank you.

So in the next -- I think we had gone on to capture -- I think you had -- we had talked about all cameras for structured light require a photographic lens. I believe that's where we were, and you -- and I'd asked you about the example of a pinhole camera.

And, though -- is it -- it's true, I mean, in theory at least, is it not, that some pinhole cameras do not actually have a lens?

**A A physical pinhole camera never has a**

47

**lens.**

Q Okay.

**A That's why it's called a pinhole camera.**

Q I see.

**A And they're only used in high school projects or art exhibits perhaps. They're not -- I've never seen one used in real life for any technological purpose whatsoever.**

Q Understood. Okay. Okay. The next thing you have in this statement is all cameras for structured light -- this is paragraph 64 -- all cameras for structured-light scanning require a matrix radiation receiver.

Now, I mentioned earlier -- you -- you had mentioned earlier that you thought that was an unusual -- or I don't want to put words in your mouth, but that it was not as commonly used as other terms; is that fair to say?

**A I think it's almost never been used except in Russian.**

Q I see. And just briefly, then --

**A But I think I -- I think we can talk about what it means. I mean, it -- there are English words, and English words have meanings. So it's not uninterpretable.**

48

Q Okay.

**A Within range.**

Q Okay. Then, what is your interpretation of what a matrix -- matrix radiation receiver is?

**A Okay. So --**

MR. PACELLI: Objection. Form.

**A There was an objection to form?**

Q Yes.

**A And I could use --**

Q And my question --

MR. PACELLI: Sure.

Q Yes.

**A Sorry.**

Q Okay. I'll restate it.

**A So --**

Q Do you -- what is your under -- for the purposes that you've used that term in this report, what is your understanding of a matrix radiation receiver?

**A Okay. So honestly, the first -- in modern times, I would say -- what is modern times -- late '80s, early '90s to now, anytime you have an electric camera of -- conventional electric camera, a video, or still, it's going to use either a CCD or a CMOS-type sensor. And so that's 99.9999 percent**

49

of cameras that -- that you buy, what you do. So one reading is simply when they say a matrix radiation receiver, it's shorthand for CCD or CMOS.

Another reading -- which that's a very specific reading, but that's actually what people do, so that's one way to read it. Another way, if you want to just take it very broad as a sort of -- just think of it as something -- as more of a broad category, the broadest category would simply be matrix simply means it has some two-dimensional sensing surface, using the word matrix here in a very broad sense just to mean -- just to mean, you know, some surface where you catch elect -- photons and turn them into electrons.

If you want to get more narrow, possibly it might require that the matrix have actual discrete physical elements physically on the receiver as opposed to pixels being deduced from this two-dimensional sensor.

So you might -- I don't know anymore, but you might want to add that. You might want to add that it's a rectangular grid, although that's probably maybe too narrow because I'm not even -- I suspect that many actual cameras that people use in life, their grids may not be rectangular. They may

50

be -- or square. And I'm not even sure, you know, in the physical -- ultimately, you take a picture, and you get a grid of pixels. That comes out of the process. I have not taken apart enough cameras or studied enough to know -- especially even color cameras, where they have weird offsets to use for the various different colors. I'm not sure that they all even -- what everybody would call a camera really would use a rectangular array, grid array.

But again, one could read that as well into the word matrix. So I would say that there is really -- the short answer is, when you say camera, electrical camera these days, you meet CCD or CMOS. Full stop.

If you want to start a discussion on the philosophy of cameras and what, you know, may or may not count, and you want to start reading into the word matrix, there is sort of a series of broad to more narrow terms you may want to use, definitions you may want to use.

Q Okay. Going down to the next paragraph, 65, in your report. So all cameras for structured-light scanning require a camera driver. And then you go on to say, which is a circuit that amplifies the sensor signals from a -- a matrix

51

radiation receiver and converts them to a format suitable for use by a digital processor, and it goes on.

Do you see that paragraph?

A Yes.

Q Okay. And why would -- why, in your opinion, do all cameras for structured light require a camera driver, as you describe it?

A Let me just reread that paragraph to see --

Q Okay. Yeah.

A -- exactly what I did or didn't say.

Okay. So if you're using a CCD or CMOS camera, there is some minimal circuitry that is required to produce a usable image. In particular, the way these things work in a very, very layman's broad sense, is photons come through the lens. They hit sensor elements. Those sensor elements, using rocket science, end up storing an electrical -- some kind of electrical charge due to the pixel. But this is happening at the incredibly, you know, small-scale level.

You want to pull out from this a -- a usable image. So my understanding, at the very least, is you need to have amplification going on.

52

You also need clock -- clocking. That is, a camera, a video camera takes a picture at various rates. And so there needs to be some notion of the -- the clock speed of when the readout is taking place. And that's going to require circuitry.

You're also, as -- as part of the clocking, you're going to require clearing circuitry, or something's going to need to say, okay, this picture was taken, stored, transmitted. And now I need to reset my sensors back to zero so I can start again and take the picture of the next time. Again, that needs to -- that needs circuitry. You can't do that just with the raw sensor elements.

I'll stop there.

Q Okay. Now, I --

A Oh, actually may I add something?

Q Sure.

A Of course, you could add more -- and that's at the minimal, you would -- a CCD or a CMOS, at minimal, would need amplification, readout, clearing, and clocking. There's more and more stuff. And over time, more and more functionality has been placed into cameras as -- you know, as cameras have gotten -- as circuits have gotten smaller and cheaper. More and more cool stuff can

53

**be done on your camera that -- you know, every -- every five years or whatever, every generation of your iPhone, the camera is doing more and more and more. And an iPhone is all integrated, but even a standalone camera is doing more and more and more.**
**And so in some sense, the sky is the limit as to what kind of additional on-camera processing might want to do beyond the essential things that I just mentioned for which the camera would be usable -- a CCD or a CMOS would be usable without.**
Q Okay. So then -- then it -- is it -- does it follow -- and please, don't let me put words in your mouth if it's not an accurate description. If you have a camera that is using what we would call -- we'll refer to it as a radiation receive -- matrix radiation receiver -- that's a mouthful for me this morning -- matrix radiation receiver -- would be correct, then, that the camera couldn't function unless it had something you could characterize as a camera driver?
MR. PACELLI: Objection. Form.
Go ahead.
**A So you are putting words in my mouth because, as we just talked about, it's not really**

54

**clear what a matrix radiation receiver does or doesn't encompass. If -- I will say, yes, if you gave me a camera, and you told me it was a CCD or CMOS, I would agree with your statement.**
Q So can you --
**A It is true -- I would say that a CCD or a CMOS camera definitely doesn't do anything without a driver circuit.**
Q Okay.
**A A matrix radiation receiver is a little bit of, you know, tea leaves.**
Q I see. And -- and you had -- you said, in your experience, a large majority -- I believe you said it was 99 percent or more of things that you -- that you characterize as functioning as a matrix radiation receiver have either the CCD or the CMOS?
MR. PACELLI: Objection. Form.
**A Correct.**
Q All right. I've moved down -- now, again, Dr. Gortler, we've been going over an hour here. And I generally go between an hour, an hour and 15, typically, between breaks. If there's any time you want a break, please feel free to -- to ask.

55

**A I understand -- understand.**
Q Okay. And the only exception would be if a question is pending. If I've asked you a question and you haven't answered it yet, that's usually not a good time to take a break.
Do you understand that?
**A I understand.**
Q Yeah, and any other time for any other reason. But maybe I'll ask, if it's okay with you, maybe one or two more questions before we move on?
**A No problem.**
Q Okay. Going back to your report, I want to refer to the next paragraph, 66. And it says -- where it says, An early example of camera for structured-light scanning is the image orthicon. And you make a reference to the Le Moigne reference.
Do you see that?
**A Yes, I do.**
Q And I just want -- going -- I'm going to go to what was Exhibit -- I believe, Exhibit 3, your Exhibit B to your report, and look at that for a second. Could you -- could you return to that Exhibit B, if you can find it? I guess it would -- or your Exhibit B. I believe, it was the third thing we entered as exhibit?

56

**A Yes, I see it.**
Q Okay. And on the first page, I can count down -- one, two, three, four, five, six, seven, eight, nine, ten, 11, 12 -- about 12, there's a Le Moigne, et al. structured-light patent for robot mobility.
Do you see that line there?
**A Yes, I do.**
Q Is that the Le Moigne reference that you are referring to in your report in paragraph --
**A So to be 100 percent sure, to see it -- I think, yes. To be 100 percent sure, I would need to see the physical --**
Q And we'll do that right now.
**A -- along with the title --**
Q Okay.
**A -- to see it. But I do believe, at this point, that this is the paper that I looked at that I referred to as Le Moigne.**
Q Okay.
**A It looks like the right title, but I don't see the paper in front of me.**
Q Right.
**A So maybe it was a different paper with a slightly different title.**

57

Q Okay. So we'll put something up that we think has that title into the chat right now.
**A Great.**
Q Okay. And let me know when you can -- I guess, we're up to Exhibit 7, if I'm counting right.
(Whereupon, Exhibit 7 was marked for identification and is attached to the transcript.)
**A This is the paper I was referring to. Correct.**
Q Okay. And I just -- just -- I'm just going for clarity's sake here. If we could -- if you could point them to -- that you point to a certain section in there. I believe it's section V.G.1.D in Le Moigne, and I'm wondering if you could -- just for clarity, if you'd confirm that.
Is that they -- is that the -- the bibliography?
**A Can you give me a page?**
Q The page reference is -- I think it is the eighth page of the document. I have it as an eight-page document.
**A I do, too.**
Q But it's page 548 in the upper left-hand corner, if you see that there?
**A I think you cut out. I didn't hear what you said.**

58

Q Oh, the page is -- it has a page number in the document of a -- on the upper left-hand corner, of 548, it appears.
**A Yes, I have that page.**
Q Okay. And I am -- I'm just wondering, when you -- in your report, your reference, it says V.G.1.D, and I'm just trying to see -- I see a V summary.
**A Oh, hold on. Oh, I see. You're trying to understand what's the reference here.**
Q Yes.
**A V.G.1.D. I think that's a reference of my document, not a reference within Le Moigne.**
Q Oh, that's a reference with -- wherein you talk about Le Moigne in your document?
**A Correct.**
Q Okay. Let me just double-check that so we can make sure that we -- I just wanted some -- clarity's sake on that. So we'll go to what I think is that -- your section there. Give me a minute. It is quite a long document. I want to make sure I actually get to the right spot.
Okay. We're in V.G. -- we'll go there. So far that -- I believe starting on page 70 with

59

paragraph 169, and you're saying V.G.1 -- oh, okay. And G appears to be beginning on page -- on your paragraph 191. I'll have to go back and forth a little bit because I can't -- I should write down that number there so we get it clear. I just want to -- V.G.1.D. I see. Okay.
So that would be your section -- actually, it would be a good time for me to take a break at the moment. And I'll double-check that so we won't -- you won't have to listen -- wait around for me to scroll a bit.
MR. CUMMINGS: And maybe we'll take about a ten-minute break, if that's okay with everybody?
THE WITNESS: Do I have time to refill my coffee cup?
MR. CUMMINGS: Sure. Absolutely. We want to make sure you load up on caffeine for this.
THE WITNESS: Yep.
MR. CUMMINGS: Understood. Okay. We'll -- we can reconvene in ten minutes, plus or minus.
THE WITNESS: Sounds good.
THE VIDEOGRAPHER: All right. We are going off the record. The time is 8:24 a.m.
(Whereupon, there was a recess in the proceedings.)

60

THE VIDEOGRAPHER: We're back on the record. The time is 8:39 a.m.
THE REPORTER: Mr. Cummings, you're on mute, sir.
MR. CUMMINGS: Thank you.
BY MR. CUMMINGS:
Q Just to pick up a topic that we were just on, just a reference in Dr. Gortler's report, where he had referred to a section of V.G.1.D.
**A Did you find it? I didn't look.**
Q I do believe. I believe you're referring to what's on page 75, beginning in paragraph 183, somewhere that's the D. The V.G.1.D, and I believe your -- I don't see a reference to Le Moigne here. You're talking about --
**A Do you want me to try to find it, try to dig this down?**
Q I can, hopefully, find it pretty quickly. But, yeah, if you could, quickly, just -- I don't want to spend very much time. It's not so --
**A V.G.1.D. I wonder if it's a typo. Let's keep looking. Let's see. D. One example is Le Moigne reference. V.G.1.D. Okay. Let's see.**
Q You do mention Le Moigne in an H.1.D.

**A Yes, I'm looking at -- right now I'm looking at -- let's see H.1. -- I see H.1.C. I see the word orthicon. H.1.D. So I'm looking -- I just did a word search for the words image orthicon, which is what I assume you want to talk about, and I found that at 271, 272, which, as you said, was V.H.1.C. So I will take this as a typo in my report.**

Q Okay. Very good. Okay. Going back to your report, back up to approximately where we were. I think it was paragraph 66, and you -- first you talk about an image orthicon as described in Norman, et al. It says, Does the Norman -- the reference you're referring to, and we can go to -- I think we can find that patent if we need to -- disclose something you would characterize as a matrix radiation receiver?

**A So there's two things going on here. Orthicon is an early camera. Norman talks about the early camera and talks about his own addition to it. The early camera, as shown in the figure here, has -- let me take a look -- referred to here -- let's see -- is -- just a second here -- what is that -- is photo cathode. That looks like that's listed as 12. I suspect it probably should have**



**been 16. I need to look at the Norman to get the references right. So there may be a typo there in the label as well.**

**So this is an example where there was a photo cathode. Depending on how you define matrix radiation receiver, if you define it broadly enough, there's your matrix radiation receiver. If you want to have a grid involved, which is not an unreasonable reading as well, Norman himself was saying, if you look at his text, used the word matrix has his novel element in his version of the orthicon.**

**So there's sort of two different things going on here, which weren't -- is not incredibly clear as written, I will admit.**

Q Okay. Now, you next refer to the FLIR -- now I'm on paragraph 67 -- refer to the FLIR camera. And it's referenced in Le Moigne and described in what you call the Florence patent.

You see that? So --

**A Yes, I do.**

Q And so it's the -- in the figure you have there, that's a figure from the Florence patent. If we need to bring that up, I think we can. So -- so the CC device -- you refer to CC devices as 46 and



48. Are you defining them here as the -- as the matrix radiation receivers?

**A So they're described as CCDs. All I know, matrix radiation receiver is a translation of CCD from Russian. But those are what I am using to refer to as, quote, matrix radiation receiver.**

**Yes. So that's a yes, if that's --**

Q Now I'm going to bring in another exhibit at this point. And I think we're up to Exhibit 8. Or you can correct me if I am wrong. Give me a minute. This is -- let me see.

**A Let me say, if a CCD is not a matrix radiation receiver, I don't know what is.**

Q Okay. Give me a second.

**A It's the most matrix receiver thing possible.**

Q Okay. All right. And let me -- I'm going to try to -- give me a second. I'm going to rename the file with an exhibit number on it. So since were getting up to quite a number, I think that we can renumber the other ones perhaps later. But since I am up to about 8 now, I think I will put in -- put it with a number in the chat. So hold on.

So I've put in the chat the May 7th, 2025.



**A Got it.**

(Whereupon, Exhibit 8 was marked for identification and is attached to the transcript.)

Q All right. And this is the report of -- the rebuttal report of Expert David Aikens.

**A Yes.**

Q Have you -- do you recognize this document?

**A Yes, I do.**

Q Have you reviewed this document?

**A Yes, I have.**

Q Okay. So I'm going to -- give me a second to -- I'll refer you down to page 8, his paragraphs 25 and 26. First in 25, he makes reference to your -- your referring to Le Moigne, and that's including an FLIR camera. Then, in 26 -- 26, he states that the FLIR camera is not a device used in matrix radiation receiver. Then he goes on to state, among other things, Early IR systems in the '60s were single-pixel devices scanning serially, and it goes on.

Could you please take a minute and review that paragraph and --

**A Paragraph 26 in particular?**

Q Paragraph 26 in particular.

65

A Yes, sure.
Okay. FLIR is a general term used over a long period of time. And so what he is saying here, which I don't disagree with, is the term itself just means forward-looking infrared. It could mean many different things.
Q But -- and he uses that to conclude that a -- well, in paragraph 25, that a -- a POSA, P-O-S-A, would understand that each of the cameras -- talking -- he's disagreeing with that, with your conclusion, and he is justifying that with 26.
A So -- okay. So there, again, I show examples of orthicons, which, under some definition, has a matrix radiation receiver. Again, hard to know; the term is vague. I showed a specific example of an orthicon that uses the word matrix in its own description. So there certainly were orthicons that would have used a matrix. I showed you a picture of a FLIR which did clearly use a CCD, which is a matrix.
That is -- that is -- that is my explanation of that conclusion.
Q Okay. And what would -- do you have an understanding of, in the Le Moigne reference, and I believe -- let me double-check the date. I believe

66

it was 19 --
A '88.
Q -- 88.
Back in 1988, were the FLIRs using a matrix radiation receiver common at that time?
A So I think my answer is going to be they -- again, depending on how you define matrix radiation receiver, they definitely had to have some kind of receiver. They would have been two-dimensional. Did you want -- did they have a grid of pixels? The answer -- let me see, what year was the Florence, for comparison. Florence was '85. But, no, it is -- it is possible that they were using cameras that did not have CCDs. Actually, certainly, if they -- orthicon did not have CCD; the FLIR, I don't know what they used.
Q Okay. So -- and then, I guess the question, then, is, does Le Moigne, then, by making these references, necessarily teach a person ordinarily skilled in the art, at the time of the patents, beginning with the '656 patent, would it necessarily -- would these references necessarily teach the use of a radiation --
A So I would say --
Q -- the use of a radiation matrix

67

radiation receiver?
A I would say two things. Again, the first one is you have to decide whether orthicon has a matrix radiation receiver or not. I'm going to leave that one open. Moreover, it is true that in the late '80s, camera technology was -- was very -- was advancing. And what we would now call digital camera -- CCDs become much more -- only common in the late '80s and, like, camcorders, and digital cameras really exploded both in, you know -- actually, so take it back.
So CCDs, if you bought any kind of electrical video camera, already by the mid-'90s almost certainly would've had a CCD; by 2000, it would've been a CCD with a digital power output.
So the short answer is, you know, every year there are different cameras. You buy the camera that is best for your purposes. In the late '80s, people were probably scrambling to do the best they could to do image processing. They obviously needed pixels at the end. They needed a matrix of pixels at the end. Whether or not that happened on the camera or downstream -- you know, this -- the Le Moigne paper, I would say, is not incredibly detailed in their hardware choices.

68

Q Okay. And now we're turning back to your report, back to the paragraph -- get back to the paragraph. We were looking at the other one. And I'm going to -- we are going to back up to -- I think you make -- you make a reference -- you're going back up to paragraph 56 in your report.
A 56? Hold on.
Q Your page 14.
A Yes.
Q Okay. And it says -- you give the -- the definition of a vertex of a lens, a point. And this is in the middle of the paragraph. Okay. You mention the optical center of a lens is the point within the lens where light -- light rays pass through without being deviated.
Do you see that?
A Hold on.
Yes.
Q Okay. And later on when you are speaking of Tomasi, you mention -- and I'll get you down to that. I think we are at paragraph -- we'll go down to 177.
A I'm getting there.
Q Okay.
A I'm not there yet, just scrolling.

**Sorry, I should have done a search, but give me a second. 177, hold on. Hold on.**
**I am here.**
Q Okay. And in 177, you state that Tomasi further discloses that the light projector may compromise [sic] -- comprise a projector lens characterized by a lens vertex.
Do you see that?
**A I do.**
Q Okay. Does Tomasi itself disclose a lens with the vertex?
**A All right. So this is an interesting topic. So you need to bear with me for a little while. And let's pull up, if we may, the '656.**
Q Okay.
**A And I'll pull it up here on my end. Okay. So I'm reading this -- oh, I'm sorry, do you have the '656 open?**
Q Yes, I do.
**A Okay. So the '656 patent, even though I'm quite -- I've read, you know, hundreds if not thousands of papers in this area, it's a little bit tricky to read. Again, they tend to use a lot of nonstandard terminology. And vertex is probably one of the funniest ones that they use.**



**And so let's take a look at the word vertex. I'm just going to do a word search, vertex, and start from the beginning. Paragraph 3, line 17, this is a lens having a vertex. We'll note that. There they used the word vertex with lens. Next, page 333, that's the same -- is that the same one? Lens having a vertex.**
Q Correct.
MR. PACELLI: Sorry to interrupt.
Q Let me just --
MR. PACELLI: Correct me if I'm wrong, but you mean --
**A Oh, I'm sorry, columns. Yeah, I'm referring to column and lines.**
Q Okay.
**A Okay. Now we get to column 3, line 62. In one or more embodiments, the vertex of the projected light -- hold on. Sorry, sorry. The center of the entrance and exit pupils of the projection lens -- sorry -- of the projection lens of the projector are in one or more embodiments the vertex of the projected light structure, while the center of the entrance and exit pupils of the lens of the camera are in one or more elements of the vertex of the, quote, camera field of view.**



**So now -- and over here, which is 3 -- I'll note this and come back later -- around 60, we see two new words show up. We see the word entrance and exit pupil. And then we see the word vertex of the camera field of view. Let's keep going.**
**Now in column 5, line 46, we see, Extends from the vertex of the structured light. It doesn't use the word lens there. Okay. Now, I'm in column 5, line 50. Extends from the vertex of the camera -- field of view of the camera. So now we're saying vertex of the field of view.**
**Column 6, line 4, Vertex of the structured light. 113, Projected from that projector with the vertex of the field of view of the camera. So we're seeing again vertex of the field of view.**
**Column 6, line 12, A line connecting the vertex of the structured light projected from the projector with the vertex of the field of view of the camera. Paragraph 6, line 20, Connecting the vertex of the central projection with the vertex of the central projection of the camera. So now it's vertex of that central projection. Maybe that's something else.**
**And then we get to claim 1. Projector**



**lens vertex in claim 1. So we see the word vertex being used in about -- at least three different grammatical contexts. Occasionally, with the word -- mostly with the qualifying field of view, occasionally referring to a central -- an exit -- sorry -- a center of a camera exit or entrance pupil, and then we have one other usage as well.**
**So the question is what does that mean? And the answer is probably you want to be charitable, and I'm a charitable person, the only way to read this in any way that makes any sense, honestly, is for vertex -- okay. So let me say it back again.**
**So what does vertex of lens mean? So vertex of lens, out of context, would be an optical term having to do with the point on a surface of a lens. So for the purposes of discussion, I will now refer to that concept as a surface vertex. So that's one interpretation of the word vertex.**
**We talked quite a bit at length about the fact that when you do triangulation, the only way it will work is to the degree that your camera is well-approximated by a pinhole camera model. And a pinhole camera model has a pinhole. In the pinhole literature, that term is referred to as an optical**

73

center, center of projection, camera center, camera position. It goes by a lot of names, but it's unambiguous, what it means.

Now, if you look at that -- now, if you look at the context of this patent. This is a patent about triangulation. Literally, I showed -- we talked about figure 2 at length. 124 and 130 are shown here. They're shown as single points behaving exactly the way people understand the pinhole of a pinhole model to behave.

If we look at figure 1 -- if you can get there -- that's a picture that shows a lens. It also has points 124 and 130 labeled. Notably, those points correspond to the same points in figure 2 that behaved as the pinhole points. They're almost certainly not drawn, at least intentionally, on the surface of the lens, which is where you would have drawn if you -- if what you intended was the surface vertex.

Finally -- okay. So -- so honestly -- we'll do one more reading. They also refer to the exit and entrance pupil. That was a little bit of a -- of a poser because that was -- but I did do some -- I did try to look that -- track that down. That turns out to be a topic that comes up in

74

panoramic photography.

So when you have panoramic photography, you want to rotate your camera in a way that things don't move based on how far away they are; therefore, you can stitch the pictures together. And so the point that you -- if you had a pinhole camera, you would rotate around the pinhole, and, therefore, things wouldn't change. There would be no parallax. So in -- in panoramic photography, the term no pin -- no parallax point is used in that context to refer to, effectively, the pinhole of a well-approximating pinhole model.

And there's been a lot of discussion in the literature, and also flame wars on the Internet, as to, in a theoretical sense, what point in a physical camera with a complex lens corresponds to the no parallax point?

Now, it's a theoretical discussion because the real way you decide where to rotate your camera for panoramic photography is -- you know, you don't know whether to rotate it around the back of the camera or the middle of a lens or the front of the lens, but you actually experiment. You pick a tripod with a slide, and you rotate, and you figure out where it is.

75

But people wanted to know, sort of from a theoretical point of view, you know, what point in a complex lens is going to correspond to the -- to the pinhole. And the consensus -- and this was written up in some SPIE academic papers -- I would need to find references -- is that the theoretical prediction is, it is going to be the center of the entrance pupil will behave like the no -- will probably behave as the no parallax point, and, therefore, B, behave as the -- as the pinhole vertex.

Okay. So for all these reasons, a couple interpretations. One interpretation is -- again, this is not a -- a standard term. You don't see the word vertex in any context used in structured-light scanning. One interpretation is -- I think the main -- the -- the -- the -- what's the word. The charitable interpretation is it consistently means the pinhole of a pinhole model that well-approximates your camera and is therefore used to organize the discussion and the geometry.

That's a charitable reason -- reasoning. That's the way people in structured light would talk about it. In English, they wouldn't use the word vertex, but that would be my interpretation.

76

Other possibilities is that the patent was written by -- actually, in some places means pinhole point, pinhole vertex, and at some point means surface vertex. Perhaps the patent was written by different people who didn't talk to each other and didn't get on the same page as to what they meant.

A third possibility is it was written by one person who didn't quite know what they themselves meant and was just throwing in some term. So that's a long discussion.

My main point being is that I think the -- that really the only way to make sense of the patent is to interpret vertex to mean the pinhole point, which also goes under the words optical center in a pinhole model. Now, optical center of a lens is slightly different depending on whether it's a thick lens or a thin lens or a compound lens. We can talk about that at length, if you want, but when, for example, Tomasi uses the term optical center, he's not using it in a thick lens or even a thin lens setting. He's using it in the terminology of -- of -- of multi-camera or camera and projector or structured light, which means the pinhole model.

I could find you -- I say that in my

77

**report that -- and that's what I think -- I do say in my report -- I could find -- that's what I think he really meant. But -- but if you want, you can interpret it to mean something else, which means that patent doesn't quite hold -- make a lot of technical sense. But we can go down that discussion as well, if you want.**

Q Okay. Since we mentioned Tomasi, I think we'll -- we'll put it in, in case you -- in case we need to reference it. And we probably will soon. So I will place into the chat what is now going to be Exhibit 9, which I believe is the Tomasi reference that you're referring to. We just -- just for -- since you mentioned it, will be complete at this point.

Let me know when you can see it.

(Whereupon, Exhibit 9 was marked for identification and is attached to the transcript.)

**A I don't see it -- oh, I think maybe -- hold on. I have to press it, like, twice for it to appear, but I do have it now, yes.**

Q Okay. And we'll just enter it in to be sure here. I put a patent publication, actually, with the publication number of US 2004/0005092A1, with the publication date of January 8, 2004, and

78

the inventor is a Carlo Tomasi.

So you can see this document now?

**A Yes, I can.**

Q Okay. And this is what you're referring -- you're referring to in your report as the Tomasi reference, correct?

**A That is correct.**

Q Okay. And what does Tomasi describe about the lenses used in -- the lenses used -- or what does he describe about the lenses in the Tomasi reference?

MR. PACELLI: Objection. Form.

**A Okay. So he doesn't talk a whole lot, again, about the physical decisions he made of which cameras he used or, you know, what lens he bought or the projector he bought. He uses fairly generic terms.**

**Notably though, we can look at figure 3, which is his description of the geometric model of what he is seeing, and there should be a -- so tell me if -- tell me when you've found figure 3.**

Q Yeah, I'm over here on figure 3. Yes.

**A And lo and behold, this figure is identical to the figures we have already looked at, specifically the figure in my report on epipolar**

79

**geometry, as well as the figure 2 in the '656. And this is a classical picture of the geometry -- geometric model of the camera and projector setting. And behold, he's labeled 302 and 304 as projector optical center and camera optical center.**

**So again, it is completely clear from the context that whatever particular camera or projector he bought, he is assuming that the geometry is well-approximated by the pinhole model shown in figure 3.**

Q Now, you said -- so when you say -- you say he refers to, in figure 3, projector optical center, I guess for both the projector and the camera. And is it your interpretation -- you've gone -- you had said quite a bit about what your interpretation is of a vertex. Is a -- is a vertex, then, in your reading of the '656 patent, that the vertex refers -- necessarily refers to this projector optical center?

MR. PACELLI: Objection. Form.

**A If '656 is read to make sense and was written by people who knew what they were doing, then, yes; if it was written by multiple people who meant different things with the word vertex, then, no.**

80

Q Well, I'm going to -- to refer you to -- back to Mr. Aikens' report. And I -- I may -- I think we have that as Exhibit 8.

Do you need a break for some -- some reason?

**A No, no, no, I'm good. Thank you for asking.**

Q I just wanted to check.

And I want to refer you back down to his report on page 12. And he has a -- and paragraphs 41 and 42.

**A I am there.**

Q Okay. Okay. And it says, There are many types of lenses -- I'm reading from paragraph 41, page 12 -- some of them do not have a vertex. Not all lenses are photographic lenses, as he mentioned. And then he listed a number of lenses -- of examples, such as videographer -- videographic lenses, panoramic lenses, Fesnel lenses, binary, holographic, diffractive, gradient, and then many others. And he's claiming that it's not necessarily -- that any lens does, in fact, have something that can be called a vertex. And he gives example of a gradient index lens in his last -- okay.

81

So if there are -- and Tomasi, he doesn't describe his lens any more than to say it's a lens. And it says -- so is it true, then, it's not -- Tomasi is not necessarily describing a lens with a vertex?

MR. PACELLI: Objection. Form.

**A Okay. So like I said, I don't believe '656 is describing a lens with a vertex as well. When they say the word vertex, I don't believe they mean the surface vertex. Or I've said they either don't mean it or they don't mean it completely, because half the time they say vertex of the field of view without qualifying as the word lens.**

**So again, I don't agree at all with the characterization that the '656 is referring to a surface vertex. I believe it is probably poor terminology possibly translated by non-English speakers where the word vertex is what they ended up with.**

**That said, I do know what a vertex -- surface vertex of a lens is. I have no doubt that Dr. Aikens could find exotic lenses, things that are pieces of glass that, for whatever reason, they might argue doesn't have a surface. Who knows? Maybe it doesn't have -- it's not centrally**

82

**symmetric so there's no axis. In which case, maybe it wouldn't have a vertex.**

**That said, in -- in multi-view or structured light, you are -- as we talked about at length, you are trying to get a camera that behaves, essentially, as simply as possible. You literally don't even want blur. You literally just want something that behaves like a pinhole camera in which case you would get a conventional lens.**

**A conventional lens would have a surface vertex as described. I have actually never come across a lens in this context that is not, essentially, a symmetric lens, which, then, should have a surface vertex by this definition.**

**Moreover, you know, you're not trying to -- the point of this -- of this is when you -- if you are trying to create a scanning system, you would figure out -- you'd go to your supplier and find what cameras and lenses are for sale at what price. And again, for this context, you would have to pay a lot of money or hire somebody to create something very exotic. So you could go through extraordinary means, certainly, and possibly produce some cameras that behaved well enough but didn't have lenses with an excess of symmetry, and,**

83

**therefore, not a -- an obvious notion of a surface vertex.**

**But again, that's like -- again, that would be like trying to use a pinhole camera, you know, to film a movie. It -- with enough work, maybe somebody could do it. I don't want to say it's impossible, but it's not the way things are done.**

Q But -- but this is one example in which you mentioned, not necessarily all lenses without a classic vertex or what you said is a surface vertex, would be expensive. For example, isn't it true that plastic lenses are often relatively inexpensive?

**A I think they would have a surface vertex as well. I'm not an expert in optics and that word. But if, you know, you draw a picture of a lens and how it behaves, it typically has a -- an axis of symmetry. It has a surface. Axis plus surface seems to be a surface vertex. So I don't think it's -- glass versus plastic is the least bit relevant.**

Q So to be -- so -- so to finish this off, when you -- is it correct that, in your report, you are -- you are coming to the conclusion that the Le Moigne reference and the Tomasi reference -- so are

84

you -- let me rephrase that.

For your -- your opinion, as to how the Tomasi and Le Moigne references may disclose the claims of the '656 patent, are you -- have you -- are you using a particular meaning to what you ascribe to a lens with a vertex?

MR. PACELLI: Objection. Form.

**A So I -- we're going over the same ground again, but that's -- that's okay.**

Q Sorry. I just wanted you to -- go ahead.

**A But I -- I will answer your question. I try to -- I'd like to answer -- I'll try to answer it.**

**My -- the best interpretation of the '656 to me is if you want to -- the best interpretation of when you say the word for vertex is going to be what I call pinhole vertex. And in that sense, that is completely described by both Le Moigne and, most -- more importantly, by Tomasi.**

**To the degree that you think you can make sense of -- of a claim where it's a lens surface vertex, which we've, again, argued I don't think that's a very reasonable way to read it, but to that degree Le Moigne says the word lens. And so to that degree, I believe that a person working in this area**

who bought a camera -- I wouldn't even -- he wouldn't need to tell me it has a lens. It would have a lense. But he told me it has a lens. And he wouldn't have to tell me that it's not a weird, you know, toric lens that's used for astigmatism, but it's a lens that's used for a camera. And that camera has a -- an axis of symmetry, as conventionally would be found.

And so, yes, I would say, in both senses, it is clear that that's what would be going on to a person working in the area.

And then the third thing, again, is -- which you didn't ask, but I'll just say, of course -- again, you go to your supplier, and you'd say, please buy me a camera. And, you know, they would get you a camera, and the camera would have a lens. And that lens would -- you know, unless you -- unless you, you know, asked for some -- you know, for some wacky optics, you're going to get a camera that has a surface vertex, as defined.

Q Okay. Let's move on for a minute to the next section of your report. On the -- and I'll give you the paragraph. Under section D, beginning of paragraph 76, you referred to epipolar geometry.

A Let me get there. Let me search this



time, get there faster. No. 376. Come on. Oh, I think I got there.

I'm there.

Q Okay. And just going down, we -- we talked about -- under paragraph 77, you mentioned the -- the figure that you have -- that you describe that -- well, again, you mentioned it, but how would you describe the figure under paragraph 77 that you referenced earlier on page 23?

A The figure -- the figure in paragraph 77 is a -- is a -- let's see. Okay. So this figure goes together with the figure in paragraph 79. So these two figures -- and, in fact, the figure in paragraph 80. So I would take these three figures as -- as a sequence describing really one or a set of related ideas.

So now, when you want to talk about them more specifically, the first one -- I'm just -- let me read exactly what my reference is here. Okay. So the first one is -- is a -- is a start -- is trying to motivate the idea of epipolar geometry.

So epipolar geometry is something that -- and we'll go through exactly, if you want, what this means geometrically. It's a geometry that occurs as soon as you have the model of two pinhole cameras



or, equivalently, a pinhole camera and a pinhole projector.

It was discovered, I believe, in the late 1800s and was described in photogrammetry in the photogrammetry literature there. Then it kind of went to sleep because people weren't doing this until, you know, image processing took off. And it comes back, I believe, with the launch of Higgins in the '80s. And then was one of the central concepts used in stereo, which is two-camera vision.

All right. So what are we looking at here? We're looking at two cameras or a camera and a projector. It's just geometry. And there's a point in the scene labeled as X. And in the left camera, you see a point on the square labeled as X. And that -- that connects the line from the point X that is out in the scene, connecting it to the pinhole, which is on the lower left. Again, here, the pinhole is shown behind the film plane, which is the nonphysical description. And then you have that point X. So that's the point X, as observed in the left picture.

Now, the question is, where is that point out in the scene? So you look at -- because it's a pinhole model, the point that created the point X --



capital X, I think is the way they're drawing it here -- that created the imaged point, little X, has to have been somewhere along that line in space that is shown in the figure from the leftmost camera point. So now we have a line in space.

The next question is, well, so we know X has to be somewhere along that line; otherwise, it would not have appeared at this point in the left picture. But we still don't know where along that line it is. But what we can do is we can take that line and see what would that line look like in the rightmost image.

So think of the line as being comprised of, you know, an infinite number of little points. And for each of those points, draw the line connecting it to the pinhole on the right and see where that line intersects the rightmost film plane. And you would see where is that point imaged on the right.

And if you do that for all these points X along the line on the left, that will sweep out, if you have in a pinhole model, a line on the right which is labeled as L-prime. Okay? So this is the beginning description of the epipolar geometry whenever you have two pinhole cameras, which is no

89

**different than one camera and one projector. You just have to reverse the arrows on your rays of light. And what he's telling you here is, the actual image of that line is called an epipolar line.**
**If -- do you want us to go to the next figure and talk through that?**
Q No. Just very quickly, the next figure, just briefly describe what you mean by -- the next figure on -- under 79 on page 24, it has a -- something that's referred to as an epipolar plane.
**A Yes.**
Q Okay. And just briefly, what is that?
**A Okay. Okay. Let me read through the words he's used here.**
**Okay. So again, we already said that any point along the ray from -- now, he's labeled these points, which is nice. So the left point is O, and we have a -- we have a ray going through the imaged point, little X, which maybe hit a point out in the scene to be labeled big X. At any point along, that ray would have to appear along this line shown on the right labeled the right epipolar line.**
**So now you can ask another question. We can -- let's just draw -- let's just play a game**

90

**here. And let's draw a straight line between the left optical center and the right optical center, O-prime, so we draw that straight line. And let's just pick that same point, capital X, out there in the scene.**
THE REPORTER: Sir, sir, you glitched out for me a little bit. Can you go back and start over where you -- let's play the game and draw a line, because I missed a few sentences, and I can't tell you what they are.
THE WITNESS: Okay. Yeah, before we go on, is the glitching over? Is the glitching -- 1, 2, 3, 4, 5. Am I still glitching?
THE REPORTER: No, you're not glitching now.
THE WITNESS: Okay.
THE REPORTER: Wait for my thumbs-up. I have to switch over. Give me one second.
MR. CUMMINGS: That means we can go, right? We can go. Okay. Very good.
THE WITNESS: Thank you.
**A Okay. So let's play a game. We already had a point X. We had a line from O to capital X. And we imaged it on the right as an epipolar line. So we had one line in the right image. So now we're**

91

**going to play a game. Let's take the two optical centers, O and O-prime, and draw a straight line between them, the two pinholes. And let's pick up any point in the scene. Let's just pick point X. It's a point. Three points in three-dimensional geometry form a triangle, and that triangle lives on a two-dimensional plane. Okay? So there's a plane in space when we play this game.**
**Now, before we talk about that plane, notice we could have picked a different point X, and we might have gotten a different plane. And I want to show you a picture of that, if you go to the '656 patent.**
Q Okay.
**A And tell me when you're at figure 6.**
Q I was there a second ago. Please give me a second.
Yes, there.
**A Okay. So in figure 6, it's the same geometry. We've got that point 124 and 130; those are the pinholes. We have the film planes, labeled 122 and I believe 128. They are drawn here behind the pinholes. Again, that's mathematically irrelevant. And what they've done now is, you see at 125, they are drawing a bunch of these stripy**

92

**planar shapes. And what they're doing here is, if you pick different points -- if you pick the single point in the scene X, you'd get a single triangle which lives on a single plane. But you could pick other points. And again, you still keep the single pinhole 124, the single pinhole 130, the single line, call it the baseline, connecting them, and if you change your third point, you get a different triangle in space which spans a different plane. Okay?**
**So the baseline is fixed. The two pinholes are fixed. And now you get these planes depending on your third point. Each of these -- any one of these points -- any one of these planes is called -- in epipolar geometry, is called an epipolar plane. Now, why is that interesting?**
**Before we go back to the other figure, let me just point, before we leave, these stripes that we're shown on -- in figure 6 of '656 on 122 and 128, there were those stripes shown here, labeled, I believe, 187 and 188. So just -- I'm just noting those. And I'd like to go back now to, I guess, my -- just -- oh, yeah, back to paragraph 79 of my report again. So here, we're showing just a single one of these planes. So now, why is this**

93

interesting?
Because we said that if you pick a point X, there was this point on the right. There was this -- there -- if you picked a point, little X, in the left picture, that gave you that ray, and that ray gave you a line. So we know that point X on the left had to appear somewhere from this line on the right.
But notice now, if you pick a different point on this epipolar plane, and you drew the straight line from that point to the pinhole O, it would -- because it lives in that plane, and that plane intersects the left film plane in the line labeled left at the epipolar line, that means that this point has to appear in the left, on the left epipolar line. And for the exact same reasoning, that point has to appear on the right in what is labeled as the right epipolar line.
So the idea is that, any point in the plane of that triangle -- okay -- we don't know where it's going to appear unless we know where that point is, but we already know that it has to appear only on the left epipolar line in the left image, and only on the right epipolar line of the right image. Okay? We know that just from geometry and

94

this pinhole assumption.
Q Yeah.
A Now, what does that tell you? Well, now, let's go work backwards. Suppose I see some point in the left image. All right? Well, now I have three points in space -- sorry -- suppose I see a point in the left image, I know what line it would've appeared to. Anything on the left epipolar line has to come from the right epipolar line. And so this is telling you a lot about -- well, let me back up.
In triangulation, let's say for two cameras, you have two cameras looking at a scene, and you want to say, oh, this pixel on the left camera is looking at the same thing as this pixel on the right camera, well, you have -- that's called a correspondence. And you have to look around for that correspondence. But now we know that this -- we know that this -- if we pick a point on the left camera or projector, and it lives on epipolar line 7, we know that its corresponding point has to be somewhere on -- corresponding epipolar line 7 of the right image. We don't have to look anywhere else.
And so this significantly organizes the way you could think about doing correspondence,

95

which is needed for triangulation. Triangulation, by the way, is very -- if we go to figure -- the figure on page -- paragraph 80 is just a picture of triangulation that, well, once I know that in the left picture X hat corresponds -- X-prime hat corresponding to X hat on the right, I now also know how far away capital X hat is. Okay. So that's the process of triangulation once you have correspondence.
So again, the way the structured-light scanning or stereo scanning is you're trying to do triangulation to figure out depth. In order to do that, you need to do correspondence. What dots or regions in one picture correspond to the other picture. That's one of the trickier aspects of the process of triangulation. And epipolar geometry, as described -- as sketched in the cartoon on page 24, is a description of some inherent geometry which simplifies the way this has -- this can behave and where corresponding things can and cannot be.
Q Okay. Now, you're talking about triangulation here, but it was correct, though, however, that triangulation was not the method described in the '656 patent?
A That is incorrect. '656 is a

96

triangulation patent.
Q Okay. Okay.
A If you want to -- let's look for the word. Hold on.
Q Okay. Maybe triangulation in the sense of triangulation between, I guess, two views. I'm sorry, I misspoke.
A In fact, the third -- the third line of the abstract -- of the abstract, Noncontact structured-light triangulation. So it's in the first sentence of the paper -- of the abstract.
Q I'm sorry.
So going back to figure 6 in the '656 patent there, I believe that is being talked about in the -- in the patent in column 5, approximately starting line 41.
A Give me a second.
Q I think that's the first reference.
A Correct. I -- I found it, yes.
Q Okay. Very good. And so -- and figure 6 is described there. And so it has various -- it talked about what appear to correspond to some of the components in the epipolar geometry, you said in your -- you listed in your report.
So, for -- for example, are there -- does

97

the patent show equivalent or the correspondence to
what you refer to as epipolar lines?
**A So the '656 patent, and I'm going to look**
**more carefully in a second, seems to use -- switch**
**between three different terminologies without**
**wording or explanation but can only mean the same**
**thing. So they are going to use, at some points,**
**the words epipolar. They're going to use, at some**
**times, the words meridians. And they're going to**
**use, at some times, virtual line.**
**No description is given that**
**distinguishes them. It just seems like they, for**
**whatever reason, will switch their words around.**
**Again, this is just part of, I think, just poor**
**writing. But we can look through, if you want, and**
**try to justify this parsing sentences. But it is my**
**belief that those are identical concepts, yes.**
Q Okay. So going up on column 5,
approximately line 11, it says based on affine or
affine --
**A Affine.**
Q Affine epipolar geometry. And then it
continues on. As far as I'm aware, and you can --
if you think I -- I couldn't find another reference
to epipolar in the patent.

98

Is that your understanding as well?
**A Let me do a word search.**
Q Yes, please do.
**A That is the only place -- oh, that's**
**interesting. So here's a possibility. The**
**possibility is they thought they invented it, and**
**they wrote up a patent. And then somebody told them**
**this is epipolar geometry, and so they put that**
**paragraph in. And that would be my interpretation.**
**And that's -- that's conjecture, though.**
Q Okay.
**A But the word only appears here as if it**
**was placed here in, you know, at the last minute.**
Q However, in your opinion, does the
specification of '656 patent describe the use of
epipolar geometry?
**A Correct. Let me actually look at the**
**exact writing and read you the exact sentences where**
**that happens.**
Q Okay. Please.
**A Okay. So let's start off -- let me**
**first -- the paragraph uses the word epipolar. And**
**it says if two cameras are looking at the same**
**scene, you could draw a straight line. All points**
**correspond to that line, lying in a straight**

99

**image -- straight line in the image of the other**
**camera, regardless of the shape of the object or the**
**scene. This principle can be applied to**
**surface-shape scanning using structured-light**
**triangulation.**
**So in here, what they're saying is**
**epipolar geometry is identical with two cameras or,**
**if you replace one of the cameras with the word**
**projector, it does not change any the -- any of the**
**geometry. So that's what that sentence means. But**
**let me read the next paragraph.**
THE REPORTER: When you read, you go a
little fast for me.
THE WITNESS: Okay. I'll read it slowly.
**A This is the last sentence of column 3 --**
**column 5. This principle can be applied to**
**surface-shape scanning using structured-light**
**triangulation to determine the 3D shape of a**
**material object. So that's just clarifying that two**
**cameras don't behave in a different geometric**
**relationship than one camera and one projector, as**
**long as both are modeled as pinhole geometries,**
**which, again, if it's not, you really wouldn't be**
**doing triangulation in the first place.**
**But now I want to read the next paragraph**

100

**to myself, and then I will point out the relevant**
**sentences. Okay. Now, look -- I'll just read the**
**beginning. It's identical words, just now using**
**different terminology.**
**In one or more embodiments, the system**
**and associated method for 3D shape of material**
**objects uses the principle that regardless of the**
**position of the projector or the camera in relation**
**to each other, it is possible to draw a straight**
**line through any point of the slide such that when**
**projected pattern in the structured light is**
**projected onto the surface of the object, a**
**corresponding straight line exists in the image**
**captured by the camera regardless of the shape of**
**the surface being captured.**
**This is indistinguishable from what we**
**just talked about, which is -- which is**
**traditionally called epipolar geometry in the**
**literature.**
Q Okay.
**A Now, let me continue.**
**Any pair of such lines form a one-to-one**
**correspondence, like I said, epipolar line 7 with**
**epipolar line 7, where such lines will be referred**
**to, from now on, as, quote, meridians. So they**

101

**decided to invent a new word here for the exact indistinguishable description that we just talked about, which in the literature is usually referred to as epipolar planes and along epipolar lines.**

Q Okay. That is the -- so -- and it goes on to describe -- so going back up to figure 6, just so we can visualize it a second -- in figure 6 -- so on -- in figure 6, in the upper left, there's 122, which, if we -- I should almost have two patents open. It's -- it's hard to read back and forth.

So in -- so through any point in the slide 122, it refers to -- so in your -- does -- what the patent called slide 122 in column 5 and points to in figure 6, does that correspond to -- where does that -- in your previous descriptions of epipolar geometry, what does that 122 slide correspond to?

**A So 122 and -- is one of -- and 128, each of those is two different squares.**

Q Yes.

**A In the picture we talked about, in paragraph 77, that would correspond to the two squares shown there.**

Q Two squares.

**A So you could decide which one is the**

102

**projector and which one is the camera. It doesn't make a difference.**

Q Okay. And to be clear, that's underneath the -- the figure underneath, or part of paragraph 77, in your report, your April 7th report, correct?

**A That is correct.**

Q Okay. So you drew that so it's clear to someone who may not read it.

So again -- and so -- and point -- again, I'm going to be asking you about these correspondence, to the extent they correspond. If they don't correspond, please tell me. But points 124 and 130, how do those ascribe to the -- correspond to the epipolar geometry you described in your report?

MR. PACELLI: Objection. Form.

**A Those points correspond to the leftmost and rightmost black dot, unlabeled in this figure, but labeled as O and O-prime in the next figure underneath paragraph 79.**

Q I see. Okay. Under 79.

And now, in reference, in both column 5 and figure 6, it points to the -- the number 125, multiple of them.

103

**A Yes.**

Q And just -- just going on, we'll see in column 5, but I believe it refers to -- it calls it a plane 125.

Do the plane or planes 125 shown in figure 6 of the '656 patent correspond to part -- to some aspect of the epipolar geometry you described in your report?

**A So if you go to the figure underneath paragraph 79, we show a -- wait a second here. We show a single triangle which defines a single plane. So you should think of that dark gray triangle here as describing one of the planes in the figure 656. Had you picked a different point capital X, then you would have seen a different plane. And that why -- that's why you would've seen -- that's why in the -- in the figure 656, you see this -- it's called a fan or pencil of planes.**

**Think of -- think of, like, the binding of a book. When you open it up a little bit, you've got all these planes, but they all meet on the spine. And the spine is the baseline connecting point O to point O-prime. And we look at Tomasi for a second. I know that's -- let me take a look at -- give me a second. Where is that?**

104

**Okay. So if we look at Tomasi in figure 3, he's showing, in fact --**

Q Thirty seconds. Hold on. Please give me a second. Let me -- I apologize. Let me get there.

**A Sure. No problem.**

Q Okay. So figure 3 of Tomasi, yes.

**A Yeah, so Tomasi has his left point 302. He calls it -- here, he calls it projector optical center. In point 304 on the right, he calls that camera optical center. That corresponds to the same points we've been talking about, O and O-prime in my -- in my diagram, and the points called vertices in the 656 labeled 120 -- whatever they were labeled -- 124 and something.**

**There's a baseline, which is the straight line connecting them. You see that same line? That's the spine of these pencil of planes. And then, here, they show -- they showed three things that are labeled 312 in Tomasi as epipolar planes. And that would correspond to three of these pencil of sheets in -- I guess in figure 6 of the 626, he shows -- or they show four of the planes. And Tomasi is showing three of them. You can match it pretty clearly. They're drawing the same picture.**

105

**There's one thing -- again, maybe if you want to talk about it some more. I've mentioned this a couple times, but I can draw you some more pictures if it helps to explain things about the -- whether or not you want to draw the planes in front or behind the pinhole in the correspondence. If you are interested in that, I can draw some pictures, and we can add those as exhibits to help understand that, or -- or if you understand that, that's fine.**

Q Okay. And I just -- no, that's -- that's good for now anyway. We may need that if it becomes relevant.

In -- in figure 6, it -- on the far right, it has a number, 186. And referring to a couple of lines on the 111, which I believe is the object. And earlier in the patent, you could search yourself, but I did only find 186 in column 3, I believe, referring to a different figure.

Do you have an understanding of what line 186 referred to in figure 6?

**A Yeah, give me a second here.**

Q Yeah.

**A I -- I think I do. I need to just -- it'll take me a second to track down.**

**Okay. This is column -- column 3, you**

106

**said?**

Q Yeah, column 3. Feel free to -- I didn't find another reference. I'm not aware of another reference, but if you --

**A Give me a second. I think I know, but I want to be sure here.**

**I see something in column 4.**

Q Oh, excuse me. I misspoke. It was column 4. I have, approximately, line 23 or 24?

**A Yeah, okay. I do know what's going on here. So the way -- I'm not sure -- let's look at -- so first I'll tell you what they are, and then we can sort of dive in on why -- where that comes from.**

**So the way that this patent -- the pattern that they chose to project is made up itself of a bunch of parallel stripes. In particular, we can look at figure -- look at figure 13 in the '656 patent.**

Q Yes.

**A So this is a -- what they think their pattern -- what they're describing their pattern, their slide pattern looks like. And you can see that it is organized by horizontal stripes. Okay?**

Q Yes.

107

**A Now, I believe those horizontal stripes -- now, by the way, their -- their setting of their description, very clearly, is -- with their baseline description is when the cameras are mounted vertically. And they'll say over and over and over again, undoubtedly in the setting, that the epipolar lines are substantially vertical. They are not exactly vertical but substantially vertical.**

**So the idea is in the geometry of the camera and the projector, there are epipolar lines. And those, you should think of in these examples, unless stated otherwise, as being essentially vertical. But then, the pattern they drew was organized by a bunch of horizontal lines with, like, these little -- little weird, you know, divot patterns. And -- okay.**

**Now going to figure 6, the horizontal lines that you see there, labeled 186, are meant to represent those horizontal lines that we just talked about in the pattern in figure -- what did I say -- 13. So I do believe I understand what those are.**

Q Okay. Thank you.

Now, going on in your report, briefly --

MR. CUMMINGS: Actually, I'm about to move to another section. So I think we're almost --

108

we're a little -- we're a little over an hour. Were at roughly almost -- a few minutes before 1:00 in the afternoon. If people don't object, I think I would suggest maybe a lunch break around this time, relatively short, maybe a half hour, 45 minutes.

Is that acceptable to people?

THE WITNESS: It is to me.

MR. PACELLI: That works. If we could keep it to -- closer to a half hour, that will be nice.

MR. CUMMINGS: Yes, we'll -- we will try to do that.

MR. PACELLI: Thank you.

MR. CUMMINGS: All right. Thank you.

THE VIDEOGRAPHER: We're going off the record. The time is 9:52 a.m.

(Whereupon, there was a recess in the proceedings.)

THE VIDEOGRAPHER: We're back on the record. The time is 10:28 a.m.

BY MR. CUMMINGS:

Q Okay. To start off, I'm going to put a couple of exhibits in the record. Okay. First of all, Exhibit 10 is the April 7th, 2025 report of Dr. Iman Sadeghi. I think he's listening in, and I

109

usually butcher the pronunciation of his last name, so I apologize.
(Whereupon, Exhibit 10 was marked for identification and is attached to the transcript.)
Q And let me know when you can see that, Dr. Gortler.
**A Got it, yep.**
Q Okay. And so do you recognize this document?
**A Actually, let me close some things. I've got a lot of tabs open now.**
Q Oh, okay. Yeah.
**A Let me ask you a question, I mean, before we go on. Hold on. Okay. So that's my document, 656. There's Exhibit B. I can get rid of that for now, correct?**
Q Yeah, so I'll give you sort of a sense. I won't be -- for a while at least, I won't be handling the -- we'll be sticking on the '656 patent for a while rather than the other two.
**A Should I keep -- should I keep Le Moigne open?**
Q Yes -- I mean, yes, it -- or probably.
**A Fine.**
**8 is, I believe, Aikens. Should I keep**

110

**that open?**
Q No, not for now. I'm not planning to refer to it.
**A I can, of course, reopen it.**
Q Yes.
**A Tomasi, do you want me to keep that open?**
Q Yes, please.
**A Okay. And then, 10 is the new one, and that's Sadeghi. Good. So I have that open. So my windows are cleaned up. Thank you very much.**
Q Okay. Going back to Exhibit 10, Dr. Sadeghi's report, do you recognize this?
**A Yes, I do.**
Q And have you reviewed his report?
**A Yes, I have.**
Q Okay. For now, I'd like to refer you to page 37, paragraph 95 or thereabouts, and --
**A Hold on.**
Q -- under person of ordinary skill in the art.
**A I'm getting there.**
**95, I am there.**
Q Okay. And my question for you -- I think, at the same time, I'm going to refer to your opening report for your definition of person of

111

ordinary skill in the art.
Do you -- do you identify any differences, particularly if there's any what you would consider significantly -- significant differences between your definition of a person of ordinary skill in the art and Dr. Sadeghi's here in Exhibit 10?
**A So let me try to -- let me look at these and compare words to give a clear answer to that question. Let's see.**
Q I believe yours, just for the record --
**A Yes.**
Q -- begins on your page 3 and paragraph -- paragraph 12.
**A Thank you.**
**What do I say this time? Okay. Let me read his.**
**I would say these are substantially the same.**
Q Okay. And just for the record -- we're not going to talk about it, but just so we have it on the record and handy so if we need to refer to it, I am going to put in, as Exhibit 11, the rebuttal report of Dr. Sadeghi.
(Whereupon, Exhibit 11 was marked for

112

identification and is attached to the transcript.)
Q And this is -- even though it's not the title, it is dated May 7th, 2025. And let me know when you can see it.
**A I can see it.**
Q Okay. And do you recognize Exhibit 11?
**A Let me just eyeball it to make sure I do.**
**I'm going to say, yes. There's no figures. Usually figures are the easiest way for me to eyeball it to see if this is the exact same document. But unless I say -- unless I see otherwise, it sort of looks like what I -- the document that I have reviewed, yes.**
Q Okay. We're -- we'll -- we're going to go back. I just want to put it in for the record so we have it and we'll get to it quickly when it's there.
Now I would like to turn back to your -- your April report.
**A Okay.**
Q Particularly, I'd like to go ahead to your section D, beginning on page 45, and the paragraph, 118.
**A I am there.**
Q Okay. And in here, your first -- going a

113

little bit down, under your heading -- lower headings, 1A and beginning at paragraph 119, you -- and onward, you conclude that if -- that the '656 patent failed to provide a written description for the limitation that you listed in 1 -- I think it's called 1.F and 12.F. That refers -- you're here, just for the record, on this claim 1 that's on -- right above -- when you're mentioning in 9 a limitation above -- I mean -- bottom of paragraph 119, you have parentheses after 1.F and 12.F.
Does that 1.F and 12.F -- does that refer to the same limitation in both claim 1 and claim 12 of the patent, the '656 patent?
**A Oh, hold on. So you're saying there's a parenthetical --**
Q Yeah, on your heading 1, which I think is D. -- you know, V. -- V.D. --
**A I'm looking at the top of page 46.**
Q Yes, top of page 46. Okay. Yes. Very good. And then, before these --
**A So I see a bolded paragraph saying 1.F, 12.F.**
Q Okay. And going on to -- and you're referring to the Court's claim construction order, and you -- it takes quotes from that; is that

114

correct?
**A That is correct.**
Q Okay. And maybe if we need to, we can put that up. And if you need to -- just in case we need to reference it, so I won't waste any time later, we'll put that order in as an exhibit and mark it as Exhibit 12.
(Whereupon, Exhibit 12 was marked for identification and is attached to the transcript.)
Q Okay. Let me know when you can see that. So Exhibit 12, I will state for the record is an official document of the Court. It is an order dated October 11th, 2024, with a document or ECF number of 129.
Do you see that -- see that document?
**A Yes, I do.**
Q And do you recognize it?
**A I actually don't believe I've looked at the document itself directly ever.**
Q Okay. And how did -- if your report quotes part of it, it looks like, on -- under 119 there, under your paragraph 119, then, where -- if you didn't look at it, where did these quotes -- did you -- where did these quotes come from?
**A These quotes were given to me by the**

115

**lawyers involved, and I took it -- I didn't look at the original source. I just took the quotes given to me.**
Q Okay. Very good. Okay.
**A And so I can't -- I'm not testifying. You know, if they made this up, then they made it up.**
Q Well, we'll find out if they're trustworthy or not. Just kidding.
Okay. And going through this -- so earlier you had -- you had mentioned -- when we talked about the epipolar geometry and how that was described in the specification of the patent, you mentioned that the patent used different words for that. You mentioned that it -- the meridian lines. You also mentioned the virtual line or virtual lines in the claims.
Do you recall that?
**A Yes, I do.**
Q Okay. And what -- and at least without opining as to claim language or opining as to, you know, the -- the Markman order by the Court, which we just put up as Exhibit 12, would it be your understanding as a person of skill in the art and an expert, that the -- the meridians, projector

116

meridians, referred to, for example, in -- I believe we referred to them in -- I'll get the exact heading. It's in figure 6, elsewhere, and also in column 5. And if you need to, go back to the patent to see those. But I'm -- I'm still referring to that, to the meridians. 187 is shown in figure -- in figure 6 and described in column 7 of the '656 patent.
You know, independent of it not being an interpretation of a claim or of the Markman order, would you consider the virtual line -- the meridians, 187 and 188, described in the patent to be virtual lines?
MR. PACELLI: Objection to form.
**A Outside of the context of this being a patent or this being a claim, I would interpret them as being the same. I would interpret the virtual lines as the same as the meridians.**
Q And it's true, in your -- in your assessment, you know, in corresponding of the -- the projector and camera meridians defined -- you know, talked about in the '656 patent, those correspond to what is generally referred to as epipolar lines in epipolar geometry; is that correct?
**A That is correct.**

117

Q Okay. And going back -- we can -- going back briefly in your report, moving up from this one particular spot really quick, back to, you know, paragraph -- approximately, paragraph -- paragraph 77.
**A Actually, give me one second.**
Q Yeah, go -- go ahead.
**A The one distinction is epipolar lines, in general, usually refer to lines on both cameras or also on the camera and/or projector. The 1.F, just reading it, it does seem to only talk about the lines on the slide surface. So it's -- that's -- I still stand by -- by my agreement with you, that I believe it is referring to epipolar lines out of the context of a claim. And -- but it is -- but, unusually, it only talks about sort of half of them.**
Q In what way? I'm not sure how -- I don't understand how it talks about half of them?
**A Sure, there's two -- okay. I'm sorry. So there's a camera and a projector.**
Q Right.
**A And both have meridians.**
Q Correct.
**A And both have epipolar lines, as seen numerous times in the various figures. The claim language of 1.F appears to only refer to the virtual lines on the slide which is one part -- which is one half of the epipolar setup, as opposed to the line -- the virtual lines on the camera as well.**

118

Q Okay.
**A I'm just pointing out that it -- this seems to be talking about the epipolar lines on the slide even though there really are, as we talked about, epipolar lines both on the slide and on the camera.**
Q I see.
**A That's all I'm clarifying.**
Q So then -- and is it correct, then, that the patent refers to the epipolar lines only on the projector as meridians -- as -- I -- well, I should say, first reference, on the meridians or the projector meridians, 187?
MR. PACELLI: Objection. Form.
**A So I -- I can look. My recollection is the word meridians is used for both in the body of the patent. When we get to the claim, and it -- and it switches to the word virtual lines, at that point, it is only referring to the projector lines.**
Q Okay. And so getting back down to your opinion on -- first, on the written description, you

119

said -- so then, you -- for your -- in paragraph 120, at the very last line and -- well, the whole paragraph, but you conclude, I would equate the claim slide virtual lines with the projector meridians in the specification.
**A I see -- yeah, I see that.**
Q Okay. And that's what we just talked about, the projector meridians. I believe it's 187 in the specification.
**A Let me look at the footnote.**
**Sure. Yes, I still agree, yes.**
Q Okay. So then going to 122, it's your -- in your conclusion -- maybe if you could do me the favor and read it. Again, please, slowly for the court reporter.
**A You want me to read 122 out loud?**
Q Yes, please.
**A And slowly. Okay.**
**122, Because the specification of the '656 patent does not describe the, quote, projector meridians, unquote, as physical lines that exist on the surface of the slide, but rather as mathematical abstractions, it fails to provide written descriptions for the claims of the '656 patent as construed by the Court. Otherwise put, the specification of the '656 patent does not convey, to a person of ordinary skill in the art, that the applicant was in possession of the claimed invention, including, quote, virtual line, unquote, being formed as part of the structured-light pattern.**

120

Q Okay. And so -- and that is your conclusion as to why that limitation with the virtual lines in it is -- does not satisfy the written description requirement in patent law?
**A That is correct.**
Q Okay. If -- would a device that had lines physically on the slide, as described or as you -- you gleaned from the claim construction order, could such a device with those lines -- as we said, physical lines physically on the slide, could such a device be functional to scan three-dimensional images?
MR. PACELLI: Objection. Form.
**A Okay. Should I -- can I answer?**
Q Yes, if you can.
**A Certainly. That's exactly what the Le Moigne patent -- the Le Moigne paper is doing from beginning to end. So in the Le Moigne paper, the cameras are vertically aligned so the epipolar**

121

lines are, they hope, exactly vertical. And indeed, their pattern is a -- is a grid made up of both horizontal and vertical. And this is done intentionally. And the -- and the claim is that the vertical lines are done here to assist in searching for the correspondence.

So if you want, we can look for the exact words, if you're interested.

Q Yes, I would, because we will be talking about Le Moigne.

A Yeah. Sure, sure. But yeah, so the short answer is certainly. Certainly, you could have the epipolar lines as part of your pattern, and that is exactly what Le Moigne does, literally as lines. But let me look for some supporting words. This might take me a second. I'm going to look at my document.

So I'm just looking at my document. I'm going to sort of spit out a variety of references. In my paragraph 293, Le Moigne discloses that the light projector and device for capturing the imagers arranged so that the line extending from the projector vertex and the device vertex is perpendicular to the central axis of the light projector. Specifically, Le Moigne discloses that

122

the focal planes of the camera and projector are chosen to lie in a common plane.

Le Moigne, at 544, Moreover, Le Moigne discloses that the two focal lengths of the camera and projector are equal. Under these conditions, the line extending between the projector vertex and the device vertex is a line parallel to the vertical baseline, it quotes there. In sum, the line extending between the projector vertex and the device vertex is vertical. Okay. Let me keep going.

I'm back up to paragraph 283. In the middle of the sentence -- second sentence, The camera and projector are separated by a vertical baseline. As is known from epipolar geometry, in such a system, vertical lines in the projected grid appear as vertical lines in the image.

Okay. So this establishes that his geometry was vertical. This is also showing in the figure from -- taken from Le Moigne above my paragraph 283. And he explicitly says that he -- he has done his setup so that the epipolar points are literally vertical lines in his -- in his images. Let me keep going.

I want to describe where he says what --

123

where Le Moigne says why this is a good thing. I'll find the quote in a second.

Q In Le Moigne or --

A In Le Moigne, yeah. But I'll find the quote in my report from Le Moigne. But it's in both. But let me just find it -- if I can't find it in my report, I'll find it in Le Moigne.

Q Okay.

A Actually, I think it's going -- I'm going to try to find it in Le Moigne because I think it's actually in my second report, not my first report.

Q Okay.

A Let me -- let me -- give me a second. It's -- let me -- it's getting -- let me first remember where -- where I should look for this. And there's a specific quote I'm interested in. But I have to remember. I might just find it easier in Le Moigne itself.

Okay. I'm in Le Moigne, his page number is 545, left column. It's labeled Extracting the Vertical Lines. And I'll read the last --

Q On page -- the fifth page?

A It's the fifth page in the PDF document, yes.

Q Okay.

124

A Tell me when you're there.

Q Okay. Let me see -- oh, it's -- I think it -- I -- and what is the written page number in the upper left or upper right for this?

A 545, on the right.

Q Okay. Okay. 545 on the right. Okay.

And where are you pointing to here?

A To the paragraph that says extracting vertical lines. Let me read --

Q Oh, I see. Very good.

A I'll read the whole paragraph.

Q Okay.

A The configuration we have chosen utilizes a vertical baseline between the projector and the camera. We just discussed that. This results in horizontal disparities which are nearly independent of the vertical coordinate. In fact, the horizontal disparity is zero if the two focal lines are identical. The implication being that vertical lines in the projected grid appear as vertical lines in the image. Okay?

So he's saying that if you have your -- if you set up your geometry as they've described, the epipolar lines are going to be parallel vertical lines in both the projector and the camera, and,

125

therefore, the vertical lines that are projected from the projector will always appear as vertical. Things within the line might shift up or down but never left or right.

On the other hand, the horizontal lines in the grid appear distorted and/or discontinuous in the image. That's correct because the horizontal lines are not epipolar, and they are free to move -- things are free to move up or down which would distort the horizontal line. Actually, due to accidental rotations of the camera, the vertical lines might not be sensed as oriented vertically, but they will remain straight and approximately parallel.

The fact that they appear approximately straight and parallel makes them easily detectable in the image, and ultimately, this will help us to follow the deformed horizontal lines in order to find the grid intersections.

So what he's saying here is that the vertical lines of his pattern are the epipolar lines. And he's -- he wants that to happen because it will, quote, help him follow the horizontal lines in order to find the grid intersections.

Q Okay. Does Le Moigne require that the

126

vertical lines be exactly parallel, or does it work with something less than an exact?

A That's a -- that's a really good question.

The short answer is that -- so everything we talk about, this is all physical, because there are pixels, there's accuracy. So what will happen is that, in a mathematical sense, there's a well-defined notion of exactly what are the epipolar lines and exactly where -- how you would use that in correspondence.

Now, there is, quote, unquote, some amount of play which means if things aren't exactly, in -- in reality, the way you wanted them to be mathematically, you're going to start getting this -- this deviation happening. And depending on how much deviation there is, it may or may not affect the -- your -- this -- the correctness and the working of your system, of your algorithm. And so at one point, it's a relative question. To some degree, the more they don't align, the more your correspondence might go awry.

At some point, the lines are going to be -- and so here, in his paper, he says -- he -- he basically says he knows that, eventually, this will

127

not be good. He says what he says. He says, well, it's accidental rotations. It won't be too much. It's going to be good enough for his purposes. We can contrast that with Tomasi, which I would like to pull up.

Q Okay.

A Which is what? Exhibit 9, and let's look at 4A and 4B.

Q Okay.

A Now, Tomasi is careful -- and what's the right word to use here? What is the word when you cover everything? Covers all his bases. That's not the word, but I'm losing -- I'm old, so I've lost my synonyms. Comprehensive is the word I was looking for. Tomasi is much more comprehensive.

And in figure 4A, what he shows is that if -- under a very nice geometry -- I won't -- I won't go into all the details -- the epipolar lines should appear, as seen in 4A, in his case, as parallel horizontal lines. But if your geometry is not, quote, unquote, nice, the -- if you analyze the epipolar geometry, it will actually be a pencil of lines that are not parallel.

And so if you see in figure 4B, you see this pattern of lines. It's kind of like a part of

128

a sunburst. And if you were to follow all of those lines, they would intersect at a single point that's off of the screen. And that single point has that name. It's actually called the epipole. And it's labeled, in fact, in figure 3. On the left, there's a projector epipole that is labeled. And on the right, there's a camera epipole that is labeled. And that is because, in his particular picture -- in his picture, his two planes are tilted.

If those two planes had been parallel, then the epipolar planes would have slight -- and the exact same parallel, then -- and parallel with the baseline, then the epipolar planes would have intersected as seen in 4A with parallel horizontal.

So he is being comprehensive in showing that, in general, epipolar geometry can have various incarnations. And in particular, Tomasi is very clear that he can handle both cases. Let me find the -- sort of the quote that seems most relevant in Tomasi. And I'm going to look at -- this is Tomasi paragraph 60.

Q Okay.

A So here, he's describing figure 4A and 4B. And let me read them.

Figure 4A and 4B shows what he calls --

129

he calls them array rows, by the way, for terminology. In Tomasi -- so he -- so I'm sure we'll get to Tomasi when we get to it, but he is organizing his code elements along the epipolar lines. So he refers to those as array rows of his coded elements. So it's an organization -- it's a row of the elements that is placed along the epipolar lines. So it's not technically the lines themselves; it's the -- it's the array of -- of coded elements, organized. But let me keep reading.

In figure 4A, the camera is adjacent to the projector. On the optical axis, the projector and camera are mutually parallel. In this case, both epipoles are points at infinity. And the array rows are mutually parallel lines. This is exactly what we discussed.

Figure 4B shows the arrangement for when the camera's on the side of the projector but slightly ahead of it. So the epipoles are finite points on both the projector and the sensor plane. The description provided in this document, in general, assumes that the configuration of the system will resemble the situation corresponding to 4A since that configuration is easier than the one provided in 4B. It should be clear, however, that

130

any camera and projector arrangement is possible as long as the array rows on the projected pattern are oriented along the epipolar lines. Okay?

So what he's explaining here, very comprehensively, is that he can deal with any camera and projector geometry by appropriately arranging his pattern of coded elements, as described -- as shown, in the way consistent with figure 4B.

Q So again, I'm not sure I follow how you -- what you consider the difference between what he's calling the array rows and epipolar lines.

A Okay. Let me first -- let me search in his document for his first use of the word of array row. And then we can -- that'll clarify it I think. Array row.

Okay. Let's look at the -- the word row appears described, I think, in paragraph 30 of Tomasi.

Q Okay.

A So he says, Figure 2 and figure 3 and the accompanying text detail respective methods for determining the column and row addresses or coordinates of an image array in relation to a projector array.

So what he saying is that we should -- we

131

could be more about this as well. Okay. I'm going to read the next sentence as well.

Figures 4 and 5 and the accompanying text illustrate the concepts behind determining the row coordinates of elements and an image array. Figure 6 and the accompanying text interested [sic] -- illustrate a method for obtaining depth information using addresses of elements in the image array. I'll stop there.

So he talks about row and column. So in a regular, let's say a slide pattern, in a standard pixel representation, every dot has an X -- has an I and a J, an X and Y coordinate. And it's actually integers because it's individual pixels. And so every dot, if you will, has an address, like seventh row, fourth column. And so you would say there -- you would say that my data has column and row addresses. Okay? So these are discrete numbers that are used to identify things. In this case, in a pixel -- in a picture, it would be pixels and an image.

Now let's look at -- in Tomasi, at figure -- for example, figure 12. This was an example of -- let me know when you've got figure 12 up.

132

Q Yes, figure 12.

A So this is a picture of, as seen from the camera, a pattern that Tomasi has projected onto a human. And you see a bunch of -- they're hard to tell what they are, but blobs, I would just call them. These would correspond to what are called coded elements in the '626 patent. And you can see that they are arranged in some kind of grid. This is -- this was the -- actually, this is his preferred situation where the -- where the epipolar lines are horizontal. But in any case, he has them -- it's clearly some kind of grid. And each blob, there are two integers which describe which blob is which. Okay?

Q Yes.

A And one of them is called the -- what we would call the row coordinates. And one of them, you would call the column coordinates. Now, in his preferred geometry, this would literally be like Le Moigne, a horizontal and vertical grid. And so, the row and column coordinates would literally be horizontal and vertical within the slide. But in the more general setting shown in 4B, the actual -- there would be -- the epipolar lines, which are geometric lines, would have a certain pattern.

And what he's saying there is, he's now going to organize his data using a notion of rows and columns. But now your row coordinate is going to say which of the epipolar lines are you -- are you on. And the column coordinate is going to say how far are you along that epipolar line. Okay?

So the column -- the horizontal row, the row addresses, each of them corresponds to a specific epipolar line, like a coordinate, like the first -- the second one in question -- again, really in reality, it's an infinite set. It's geometry. But he's going to take a finite set, give them numbers 1, 2, 10, 24, whatever it is, and call those the row coordinates. And then he is going to have a discrete set of elements along each row, and he's going to number them 1 to 1,000 and call those the column coordinates.

So that is the distinction between the words row coordinates and column coordinates and the word epipolar lines. Epipolar lines are pure geometric lines. He -- Tomasi is organizing his coded elements so that they are aligned very carefully with the actual epipolar geometry, no matter how you set up the camera and the projector. And he uses that to label the blobs with two numbers



called a row coordinate and a column coordinate.

Does that help answer your question?

Q Not -- to some extent.

Now, getting --

A Okay. We can follow up if you want.

Q But the previous question about Le Moigne, then, does Tomasi describe the element, the virtual lines element, that you said at 1.F and 12.F from page -- paragraph 119 in your report, are they showing lines physically placed on the slide?

A The answer is, somewhat, but not as clearly as Le Moigne. Le Moigne -- because Le Moigne's pattern literally is a line, and it is drawn coincident with the epipolar lines. So he literally is -- literally is drawing the epipolar line on his slide.

Tomasi's pattern is not lines. It's blobs. The blobs are aligned with the epipolar lines. So you can clearly see them in the slide, physically. But he's not drawing lines. And so that's why it's a partial yes and possibly subject to some interpretational questions of is that considered drawing a line or not. The line is apparent, but it's not drawn as a solid line in this -- in this figure. And he's got other



figures -- I don't think he ever draws a complete solid line in his particular -- a complete solid line that is an epipolar line.

So that's -- that's the -- that's closest I could say to an answer to your question. Yes and no. Le Moigne, yes; Tomasi, you have to dive down a little bit more into your definition of drawing a line.

Q But in -- as the Court interprets it, and we'll go back briefly to your report -- we're -- on your -- we'll go many different places, but we'll go back to the written description section of paragraph 119 on page 46 -- okay.

Now, let's -- so where you -- where you say, under this -- I guess, you're referring to page 13 of the -- of the order, the Markman order, where he says, Defined unsaid slide terms means fixed or demarcated on the outer surface of the slide. And it cites the Merriam dictionary, and you cite that.

Now --

A Can I jump in?

Q Yes, go ahead. Where do you find it -- you know, where do you find --

A So if you look at this -- that's what I



said. So for Le Moigne, it's clear. Le Moigne, they're the vertical lines. They're on the slide. That's -- that's -- that fits demarcation of epipolar virtual lines on the slide. For Tomasi, I would -- you know, let's look at Tomasi again, if I could find it. Oh, it's here, Exhibit 9. Let's look at figure 12.

This is a question for the judge or for -- you know, has he demarcated horizontal lines? He hasn't drawn them as solid lines. In that sense, it's a no. Do I see where the lines are? In that sense, it's a yes. Is that demarcating? Maybe you need a better dictionary. I don't know. It's definitely on the slide. It definitely represents the line. But it's not a solid line. That's all I can say. Does that demarcate the line? I'm not a linguist.

Q Okay. Now, getting back to -- getting back to -- if -- does Le Moigne -- going back to Le Moigne, if we -- if -- if lines are -- does Le Moigne show epipolar lines being used?

MR. PACELLI: Objection. Form.

A Yes, 100 percent. We just went over that.

Q Okay. So those -- so the line -- you're

137

considering the lines, the vertical lines,
correspond --
**A He says the vertical lines -- he says the vertical lines are epipolar. He says he draws a grid with vertical lines because they will correspond to the epipolar. I don't see any -- any daylight between anything here.**
Q Okay. Now, I would briefly turn your attention to the -- the Markman order. I understand you didn't read it, but since you're quoting it, I think we'll want to look at the places quoted. So -- because there is -- because you say -- and so the Court further explained -- referenced -- you know, you're using language from page 13 of the order. And so if we can go there?
**A I'm going to go there right now.**
Q Yes.
**A I'm on page 13.**
Q Okay. You get there faster than I. I try to find it fast.
Okay. So it says, The virtual lines must be contained on the surface of the slide. That's -- that's -- is that -- I see that's the one you are -- okay. Now, I'm going to go -- put in another -- because the Court relies on the word define to fix

138

or mark the limits of, demarcate. Do you see that? And that's where you realized it's fixed or demarcated on the other -- outer side of the slide. I'd like to put in -- and it quotes Merriam-Webster.com. So I'd like to put that in. I think we are up to Exhibit 12, and we'll get to --
THE REPORTER: 13, sir.
MR. CUMMINGS: Yeah, it's 13. I'm trying to see if I can get to it. I think I have to put a -- I've been trying to take a second to put an exhibit number in front of it so we can keep this -- everything clear. Okay.
MR. PACELLI: While you're doing this, I'm going to object to this line of questions as being outside the expert report of Dr. Gortler.
MR. CUMMINGS: Okay. Understand. I don't accept the objection, but I'm -- the objection is noted.
Q Okay. And we'll get -- and I will say that Exhibit 13 is from the Merriam-Webster.com website. It has -- it's defined as a verb, and it does include a number of definitions. It includes the one quoted by the Court, 2A, to fix or mark the limits of, demarcate. And it appears -- it appears -- and at least that term, whether or not

139

it's somehow not the same term, that is the quote that your report relies on; is that correct?
(Whereupon, Exhibit 13 was marked for identification and is attached to the transcript.)
**A That is correct.**
Q Okay.
**A And --**
MR. PACELLI: Object.
THE WITNESS: Oh, go ahead.
MR. PACELLI: No, go ahead.
Q Okay. And while we're at it, I noticed that nowhere in your report does -- does it appear that you or the Court -- or you're referring to the Court accounting for the word visual -- I mean, virtual; is that correct?
MR. PACELLI: Objection. Outside the scope; calls for a legal conclusion.
Go ahead.
Q I'm just asking for any existence of -- of a reference in your report to the meaning of the word virtual?
**A I do not believe any meaning of the word virtual -- virtual is described or defined in my document. Correct.**
Q Okay. And I will go ahead and just --

140

I'll put in another dictionary definition. Please give me a second. It's taking a second to --
(Whereupon, Exhibit 14 was marked for identification and is attached to the transcript.)
**A 14.**
Q Exhibit 14 is the definition of --
**A I got it.**
Q -- from the same Merriam-Webster.com website, virtual being an adjective, just to be clear, in your -- in making your conclusions, anywhere, you know, the word virtual is in the claims, correct?
**A That is correct.**
Q And did you make any interpretation or use of the -- the meaning of the word virtual in coming to any of the conclusions in your -- in your expert report, either this one or your May 7th report?
MR. PACELLI: Objection. Outside the scope; calls for a legal conclusion by Dr. Gortler.
THE WITNESS: Should I answer?
MR. PACELLI: Sure. Go ahead.
**A Actually, can you repeat the question again?**
Q Okay. Again, so I'm asking you for

141

what -- what you took into consideration. And in coming to any of your conclusions or opinions in your expert reports, did you use a particular interpretation or meaning of the term virtual?
MR. PACELLI: Same objections.
**A In consideration explained there is described -- is -- is clearly describing in consideration based on what was reported to me as the Court's ruling and the Court's interpretation. There was no additional interpretation added by me.**
Q Okay. But your report just -- and I'm --
**A I copied the word. I copied the Court's document -- the Court's description. I make an -- I gave you an opinion of whether or not -- of -- of how the Court's description matches or doesn't match what is implemented in the '656. And now we're talking, I can tell you how that corresponds to Le Moigne, and that's on the document as well. And again, as we've talked about, it's a little bit less clear how to read that interpretation of the Court into Tomasi, whether Tomasi would satisfy that or not.**
Q So if I understand -- does -- but is it correct that Tomasi discloses the use of epipolar lines?

142

**A 100 percent. What -- what I said is it is less clear whether Tomasi is demarcating the virtual lines on the slide. I think that's a -- that's -- that could be argued either way. I think Le Moigne is definitely doing it, unarguably.**
Q Okay. Now, one last -- just one thing on this before we can move on a bit.
In your report, you note that -- okay. Never mind. We'll move on for a second. We'll move on at this point.
**A Do I -- can -- do I still need my dictionary exhibits or can they be --**
Q You can put those away, yes. We can put those away for now.
**A Thank you. Again, I just -- I just don't like too many tabs. And I -- my kids use, like, 8 million tabs on their computers. I don't understand how you do it that way. I can deal with, like, 8 tabs, about, and then I don't know what I'm looking at. Can I get rid of 12, or should I leave that up?**
Q 12 is --
**A The court order?**
Q The order? Yes, you can put away the order for now.

143

**A Okay.**
Q Now, going on, down to -- under your -- an enablemence [sic] now -- enablement analysis in your April report on -- beginning in paragraph -- I believe here -- let me see if I can get a couple of -- enablement on -- beginning at paragraph 124.
Do you see that?
**A I do.**
Q Okay. You state in 124, The specification -- this is the second paragraph. The specification of the '656 patent describes no description of projector median [sic] -- meridians being contained on the surface of the slide median of being fixed or demarcated on the outer surface of the slide. You go on, As such, the specification would not teach a person of ordinary skill in the art how to make or use the invention as claimed without undue experimentation.
And you go on to say that a person of ordinary skill would be left to guess which, out of an infinite number of epipolar lines, would be defined on the slide. But you -- for -- but now, you mentioned in -- with respect to Tomasi -- and I believe it was figure 12, and we can refer to that -- that you believe that a person with ordinary

144

skill in the art could understand what -- showing that -- by looking at the person that you called the blobs could, in some sense, depending on the exact meaning of defined, define lines onto that picture; that's correct?
MR. PACELLI: Objection. Form.
**A I agree.**
Q Okay. So why could a person of ordinary skill in the art not define similar lines, for example, on -- going back to the patent, we'll -- we'll take a look real quick -- in figure 13 -- or let's -- let's actually go -- for example, going up, there's figure 4A, 4B, and 4C, correct?
**A Figure 4A, 4B -- I see 4A, 4B, and 4C.**
Q Right. Could not, for the same reason that you mentioned that, does not, for example, 4A show a series of vertical lines that would be demarcated or physically located on the slide?
MR. PACELLI: Objection. Form.
**A So figures 4A and 4B are given literally as boilerplate examples of structured light. That is the only context they're used to describe. I do agree that 4B and 4C have some horizontal and vertical alignment; 4A only has horizontal alignment which is not vertical, and vertical appears to be**

**the preferred meaning of epipolar in this patent. But let's look specifically at what you suggested at figure 13 which is their actual pattern that they're telling you, you should use.**

**And in this actual pattern, again, their vertical -- their epipolar lines are vertical. And if you look at this pattern here, it is not at all obvious that there's any demarcation of specific vertical epipolar lines that were used in any way or put in any way. You tell me. I don't see any vertical lines naturally -- you know, my eye does not pull anything else here that's vertical or epipolar, unlike in the Tomasi case.**

**So there's -- the actual patterns that they're giving you literally read away from any clear way of saying how -- what epipolar lines are going on in this pattern.**

Q And that -- again, that's limited to what is physically demarcated on the slide, correct?

**A Correct. On the slide, which this appears to be a representation of a physical pattern on the slide, to my eye, I see no -- I do not see any vertical lines here.**

Q And would -- in your opinion, would -- given that much of the prior art that you described



and also described up in 4A or 4B, could a person of ordinary skill in the art, if -- if they can't discern it physically, they can certainly imagine -- could they anticipate -- well, let me get the right verb. Let me take a second back here.

Given the well-known use of both vertical and horizontal lines in the prior art, could not a person of ordinary skill in the art easily define, on this particular pattern in figure 13, vertical lines?

MR. PACELLI: Objection. Form.

**A I'm not sure -- again, I'm -- okay. I'm not sure I understand the question.**

Q I'm just asking -- so --

**A I could -- I mean, I could draw lines in any direction that you ask me to up on top of this picture. Does that answer your question? I could draw diagonal lines; I could draw vertical lines; I could draw circles.**

Q You could draw those, and would you have any -- would a person of ordinary skill in the art have any reason to draw vertical lines upon figure 13?

**A To draw them on top of the slide with a pen? Art.**



Q Or -- or in any other way physically as far as -- I'm -- so to mark them in any way, etching, depositing?

**A You mean, like, after the fact? Like, we're talking you have a piece of paper, and I draw on top of it? Or are you talking about in the context of scanning? Again, I don't understand.**

Q In the context of using. Using in a -- if you were -- if you're shown figure 13 -- well, put it this way --

**A So in Le Moigne and Tomasi, the lines are used in a -- as the organizing principle of the pattern. This is a different pattern that has no clear epipolar organization obvious to the eye or to me. You could throw away this pattern and put another pattern based on the prior art and maybe have better results. And in that case, you would be putting vertical lines. If you -- if you just want to say -- let me just do Tomasi or Le Moigne, yeah, that is prior art. You could do that. The way they described it is useful, and that would've been something that somebody could have done in the prior art based on the prior art.**

**Given this -- you know, given the idea that you're going to use this pattern, I don't see**



**where the -- where the vertical lines do anything. I mean, you could draw them, but that's a -- you know, and you could just throw away this pattern and draw new lines, but I don't understand how -- where the vertical lines are helpful. They're certainly not shown here. They're not -- they're not demarcated in the pattern. Could one add them? Yes, but I don't know why.**

Q Doesn't figure 14 and figure 15 show lines -- show vertical lines in relationship to this pattern? Does the pattern show --

**A Yes, it does. These are -- these are -- yes, figures 14 and 15 are showing vertical lines in an attempt to explain something about this pattern.**

Q And what is it that they are explaining?

**A Well, I'm not sure what they are explaining. What they're trying to explain is that, somehow, the pattern that they have chosen is, in some way, aligned with the epipolar geometry. But no details or descriptions are given, and none is really apparent. So that's why I said it appears to be an attempt to describe something, but I'm not sure what it is describing. They have just drawn vertical lines on top of a pattern that doesn't have any obvious vertical lines.**

149

Q All right. Turning your attention to the bottom of column 6.
**A Column 6 in '656?**
Q Yeah, the '656 patent.
**A Give me one second.**
**Column 6, I am there.**
Q Okay. And column 6 is a very -- very -- it says -- it says, Using such a light structure -- 160 of figure 13 -- portions represented of captured images recorded by the camera, based on the relational positioning of the projector and camera of figure 7, are illustrated in figures 14 and 15 representing planar objects and nonplanar objects, 15. And it goes on to give further description.
Does that -- does that description -- well, the description there and continuing onto the top of column 7 -- provide you any information about lines on figures 14 and 15?
**A Yeah, so this gets to the heart of one of, I think, the -- again, one of the very puzzling parts of this patent, which is, I think, a good topic to dive into. Yes, so let me read this.**
**From these figures, it can be seen that groups of coded elements each lie on a respective projector meridian in the slide and will also lie**

150

**with the retrospective camera meridian in the image -- okay. And I'll just continue actually.**
**The next sentence is, The particular shape will cause the elements to move only in a direction along the length of the camera, which is just -- that's just another statement of the abstract concept of epipolar geometry. Things will move along epipolar lines no matter where they are placed. Okay.**
**So again, he's saying that these figures can show you groups of elements lying on respective meridians. That is, essentially -- and then, this matches the claim language. That claim language, there's a lot -- claim 1 is all background, literally, until the mysterious paragraph about virtual lines being defined that we just talked about. And then the following paragraph where it said coded elements -- let me read it slowly because it seems to be the whole patent where it said coded elements of said first group are located along said first virtual line, and said coded elements of the said second group are located along said second virtual lines.**
**So the main action words here are located along. I would highlight that as being something to**

151

**try to understand. And those same words, I believe, appeared -- each lie on a -- okay? So that is the verbal description of what we are supposed to see here in those words.**
**So let's look. So then I look at figure 13, and I ask myself, what are the elements, and in what way are they demarcating or organized into horizontal lines? Similarly, vertical lines are drawn in figure 140, but I do not see -- and there's nothing apparent to my eye where the blob pattern has actually been, in any careful way at all, aligned with these lines. What I see is, essentially -- I'll use the term haphazard intersection. I have a bunch of blobs. They are big. I've got a bunch of lines. And there's a law of nature that says if I have a lot of lines and a lot of blobs, the lines would hit the blobs.**
**So that is what figure 15 is showing me. Figure 15 is demonstrating a law of nature that if you have lines, and you have a bunch of big blobs, lines will hit blobs. And it's unclear to me whether the claim that you want these things to lie on, whether it is just referring to that general fact or whether it is describing something more specific with an actual limitation as was done by Le**

152

**Moigne very carefully or Tomasi. So Tomasi and Le Moigne have specific descriptions of how things are arranged on these lines. No description is given anywhere other than these magic words, lie on. And the figures really just show what appears to be just haphazard happenstance that just happens whenever you have any number of -- any number of blobs and any lines.**
**In this particular figure, had you drawn diagonal lines, they would have also hit lots of blobs. There is nothing inherently vertical in the pattern shown here. And so, in that sense, nothing --**
Q By the pattern shown here, meaning the pattern -- you said the pattern shown here. What are you referring to?
**A Figure 15.**
Q 15.
**A Of '656.**
Q Of '656. It looks -- there looks like lines that are, at least a majority -- mostly vertical but not perfectly vertical.
**A No. Those are superimposed. Those are superimposed.**
Q Superimposed.

153

A That is not in the figure.
Q Okay.
A The blobs are the actual pattern, those little -- they kind of look like little corpuscles. They look like Abacus beads. There's nothing vertical -- there's no obvious vertical alignment in the Abacus beads. The vertical lines are not in the pattern. They were drawn as part of informative sketches in the patent. And I would ask you if you had made those diagonal, would that, in any less way, align with the Abacus beads. And I would say no differently.
The intersections that I am seeing are just sort of law of nature. Lines hitting blobs. I'm not seeing any limit -- any -- any description of what they're trying to do here.
Q Well --
A They -- they are trying to do something, but I don't know what it is.
Q Right.
A Or if they're trying to do something, I don't know what it is.
Q Okay. So going back to the -- where it's described, it does, in fact -- it doesn't say they are random lines. Doesn't it say that -- it defines

154

them as the -- as -- it says figure 7 illustrated planar objects -- okay -- and non-planar objects, 15. And it can be seen that groups of coded elements -- and each on a line -- each on a line on a respective projector median in the slide 12 will also lie on a respective camera median in the image 140.
So the projector median and the camera median --
A Where are you reading?
Q I'm reading -- I'm reading for you what it says at the bottom of column 6 through the top of column 7 through, approximately, line 6.
A So all you have just stated right now is the abstract concept of epipolar geometry.
Q Right.
A So epipolar geometry, like I said, yes, this is a true statement. Things will move along epipolar lines, will only move based on depth along epipolar lines, as we already established is 200-year-old technology -- or maybe 150-year-old.
THE REPORTER: You're going a little faster, and there is little bit of cross talk going on.
THE WITNESS: Sorry.

155

A There are two separate things to talk about. There is the mere fact of epipolar geometry that things will only appear on corresponding lines. And then there is the question about have you created a slide in which, in some careful way, you have aligned -- there is, inherent in the pattern that you've built, some alignment. Now, we did say that alignment. And what does that mean? Well, if you look at Le Moigne or you look at Tomasi, you see that. You see the alignment. They have done something. They invented something.
If you look here, in terms of that -- in terms of epipolar geometry, yes, of course, that works. Epipolar geometry is great. In terms of have they described any limitation of their pattern so that it meets that claim of -- you know, to give any meaning to the sentence of what does it mean for said coded elements to be located along? The answer is I don't see that.
By the way, we have switched. See, there were two different paragraphs in the claim. And we were talking about both. So let me just clarify. The first paragraph was the -- you know, virtual lines defined. And then the second paragraph is the wherein said elements are located along. I think

156

we've kind of bounced between them, or maybe that's my fault.
Q That's okay.
A And so if you want to -- if you want to sort of -- we're talking about both at the same time, which is maybe a bad idea. So I'm going to pause and let you direct me.
Q Well, then, I'm going to ask you to -- I think when you were talking about being bounced between sentences, you were talking about paragraphs in the claims, correct?
A That is correct.
Q Okay. So just from what I'm talking about, paragraphs in the specification?
A But are we referring back to the concept of defining virtual lines or -- you, yourself, have said -- you know, that's what we were talking about before you pointed to that. Or are we referring now to the coded elements along lines? So the discussion, I think, needs to be organized by the claim. And you were the one who pulled that -- pulled -- pulled it in that direction. So I'll let you --
Q So independent of the claim, for the moment, what the specification shows, if -- can --

157

independent of the words in the claim. All right? So it's finding synonyms to avoid that, you know, what -- for example, what -- normally virtual does not -- does not -- in the normal world, let's say, outside of the claim -- I think you use -- the term virtual does not usually define something that is limited to a physical limit representation, correct?

**A I agree.**

MR. PACELLI: Objection.

THE WITNESS: Oh, sorry.

MR. PACELLI: Objection to form.

Q Okay.

**A I agree.**

Q Or physical existence, okay?

**A I agree.**

Q So virtual lines can be mathematically -- mathematically or algorithmically designated, but they are not limited to physical manifestations; is that correct?

MR. PACELLI: Objection. Form.

**A Virtual lines can be either in a program, or they can be imagined. I didn't get all the exact words, but I agree with those two concepts. Virtual can be imagined in your head, or it can be a statement of mathematics, or it can be a**

158

**representation in computer code.**

Q Okay. If you -- repeating that, your representation of computer code or mathematically defined or something you imagined, is it -- figures 14 and 15 of the patent, is it -- does the patent disclose one of those three options, not to repeat them, for the use of vertical lines in scanning a 3D image?

MR. PACELLI: Objection. Form.

**A Figures 14 and 15 are definitely showing -- they are drawing lines on top -- not -- that were not in the slide. They are drawing lines. They are telling us that they are epipolar lines. Because they are not part of the slide pattern, but they are epipolar lines, and we have drawn them, and we can imagine them. And in that sense, I would say yes, they have -- they have -- in a non-claim-language sense, they are showing you epipolar lines, virtual lines. They're showing them to me.**

**Does that -- does that answer your question?**

Q Yes, thank you. So we'll move on. We've been beating up -- this one up a little bit. And I am going to go for just a little bit longer. If at

159

any time you need a break, please let me know.

THE REPORTER: I really do.

MR. CUMMINGS: Oh, if you want a break, we can take a break at this -- okay. Yes, good. We'll -- I have no problem. If no one objects to that, I have no problem.

THE VIDEOGRAPHER: We are off the record. The time is 11:46 a.m.

(Whereupon, there was a recess in the proceedings.)

THE VIDEOGRAPHER: We're back on the record. The time is 11:57 a.m.

BY MR. CUMMINGS:

Q Okay. Going on in your report, Dr. Gortler, I'll refer you to your next written description argument on page 51, paragraph 131.

**A I'm there.**

Q Okay. Well, I guess we --

**A We started touching on this issue, yes.**

Q Yeah. Since you refer to it here in 131 to your paragraph 5A above, let's go there briefly.

And where in -- in 5A, you refer down in -- in this section to -- as explained above and defined as groups of code, at the most abstract level, without any connection to concrete

160

implementation. You see that there in 131, but you're referring to your section B or A or 5A, above. Where -- where do you -- where are you explaining that in 5A, above?

**A Let me look. Let me look.**

**I'm referring to paragraphs 104 and 105. That's the reference.**

Q Okay. Okay. So you're referring to figure 3 -- to figure 13?

**A That is correct.**

Q And you say that you -- the figure shows no particular position. But at the very end of that, however, figure 13 shows no particular positioning of coded elements along any projector median -- meridians, 187, which are vertical in this setting. Okay? Now, then, you go in 105. Okay. You say that's not shown in figure 13.

Does, however, figure 14 show a positioning of the coded elements along the projector medians -- meridians, 187?

**A So the answer is, no. So 104 -- 13 -- what I'm saying about 13 is that if you look at it, and you don't see any particular organization along the projector meridians. In 14, they've superimposed vertical lines above the blobs, and**

**that further demonstrates, when you look at it, that there's no obvious relationship between them. And so this is the same point again that, even after you draw the lines, that doesn't show you any correlation of how the coded movements, which are not lines, were organized to be aligned with the camera meridians.**

**So, for example, in the Tomasi patent or the Le Moigne patent, you could literally see with your eyes. And if I overlaid the lines, you would see it even more clearly. But here, when you look at 13, you don't see any lines. And if I throw the vertical lines on after the fact, that only makes it clearer that there was no organizational principle.**

Q Well, so you're saying that -- the description that we talked about earlier, figures 14 and 15, starting at the bottom of column 6 and going to the top of column 7, you're saying those do not provide any organizing or organizational -- I forget the word you used -- or any --

**A There is no description of any limitation on the pattern in which to -- to tell me in which way they intend to -- what kind of alignment they intend to occur. They are simply a generic statement about epipolar geometry being good, unlike**



**what is done by Tomasi and/or Le Moigne.**

Q Okay. So then, on the very top of the -- on these figures, referring to 14 and 15 above, it says they can be seen that groups of coded elements, 164 and -- each lie on respective projector median [sic], 187, in the slide 122, will also be -- with respect to camera meridian in the image 140 where the projector meridians and the camera meridians are illustrated as vertical lines in these figures.

**A Right, but what is shown, then -- and, again this is figure 14, I believe. What is shown is vertical lines superimposed upon blobs in a way where there's no apparent correlation. In particular, had you drawn diagonal lines, you would've seen the exact same nonalignment. It's just haphazard intersection. So this doesn't demonstrate anything. This demonstrates nothing other than that, if I have a lot of blobs and they fill a picture, and I draw a line, it's going to hit some blobs. That is all this demonstrates. That is the law of nature.**

Q How -- if you drew some diagonal blobs [sic], however, would those diagonal lines be epipolar lines?

MR. PACELLI: Objection. Form.



**A The diagonal lines would not be epipolar lines, but they would align with the blobs just as much as the -- the true epipolar lines did. And insofar as that happens, then, there is no apparent organization of the blobs along the epipolar lines. Had you drawn non-epipolar lines, they would have the same relationship to the blobs that the epipolar lines did.**

Q But they have a relationship. Don't they have --

**A That tells me that they don't do anything.**

Q Doesn't each blob or each part of -- of that define -- you know, define the coordinates? I know coordinate now. I have a coordinate along a line, along a virtual line that I can use for processing three-dimensional images?

MR. PACELLI: Objection. Form.

**A Given any pattern of blobs with no limitation whatsoever, it doesn't -- you could talk about what epipolar lines intersect it, and that's a law of nature. And you can use that. If you see a blob in a picture, you can identify its epipolar line, and you could know to search only along that line in the projector. That is a classical epipolar**



**geometry. What one could imagine adding on top of that, which was done in La Moigne or Tomasi, is actually designing a pattern where there's actually some clear extra use of the epipolar geometry. And that might be usable, might be useful.**

**What you see in the '656 is nothing of the sort. You see a bunch of blobs. They're organized horizontally in a clear way. There's no vertical organization of any sort. And then they say, oh, look, I draw some vertical lines which happen to be epipolar, and they happen to hit them. And that's true. And epipolar geometry is wonderful. But it doesn't demonstrate that they have done any -- they're not describing anything specific in terms of what it means to -- you know, is there any meaning -- is there any limitation of their pattern to align it atop of the epipolar geometry? And that is simply not visible, not described. It doesn't even seem to exist.**

Q Well, but on the sentence that begins on line 6, it says, The particular shape of service 110 of the object 111 being analyzed will cause the coded elements 164 and 165 in the image 140 to move only in a direction along the length of camera meridians 188. The desired 3D measurements of the

165

surface can then be made by analyzing the movement and/or position of the coded elements along the camera meridians with respect -- with respect to the positions of the respective coded elements 164 and -- in the slide 122. And also with respect to the movement and/or position of the other coded elements 165 in the same group of coded elements 165 along the same or different camera meridians.
So doesn't that show a use of the coded -- of --
**A That is a verbatim description of epipolar geometry that we talked about this morning. There's nothing in that sentence that is beyond what was known in the 19th century.**
Q In that particular sentence?
**A In that paragraph that you read.**
Q In the paragraph there?
**A You have just stated that, because of epipolar geometry, things where you don't know where they are have to live in epipolar lines. That is epipolar geometry. That is not an invention.**
Q But we're not -- here, we're not talking about whether or not we have -- this describes an invention, per se. But we are getting back to -- you -- you were claiming that they were -- you said

166

at various points -- let's go back to your opinion on this. You said that at a merely abstract level -- I'm going back to the paragraph 131. So you -- first it says it does not provide -- the specification of the '656 patent does not provide the written description support for the limitations requiring first/second groups of coded elements being located along first and second virtual lines.
So given what is described in that paragraph, going from the bottom of column 9 -- column 6 to the top of column 7, how does that not provide a written description of support for coded elements being along first and second virtual lines?
MR. PACELLI: Objection. Form.
Go ahead.
**A Let me just read this carefully.**
**Okay. The specification does provide a written description about epipolar geometry, how it works, what it does. The patent also suggests that it is saying something more than that involving words like groups of elements located along, as if this is more than simply stating the 19th century mathematics. I believe there are things that could be stated about coded elements and located along virtual lines that would be inventive and, for**

167

**example, have been done by Le Moigne or Tomasi in the previous work.**
**On the other hand, I don't see anything in this patent that does anything above and beyond the mathematics along with some vague words about located along that is unsupported by any figures or any words other than the words located along. If all they mean is that there are elements that are big enough that, somehow, they hit lines, then that again is just a statement of a law of nature. That's not even a claim.**
**So when I read the patent -- I should be honest with you, when I read the patent, I assumed that they had some clear intention. I kind of gave them the benefit of the doubt that they were describing an interesting way of setting up your pattern so that it lined up. And that actually was done. I knew that was done in scan, like, it's somewhat common practice. So maybe these guys invented it. Although, clearly, it was already known in Tomasi and Le Moigne. And I didn't even look at the pictures that closely because I just kind of gave them the benefit of the doubt that they were really describing some kind of organizational principle.**

168

**I was actually kind of shocked when we started, like, looking more at the detail that, in fact, the patent has nothing like that at all. It literally just shows blobs. It shows nothing. And then, we haven't gotten to the infringement claims, but if you look at the infringement claims, they are even more silly where they show lines that barely hit -- clearly, things are not at all aligned, but they barely wing a block. And then they jump up and down and say, oh, look, you -- a coded element was located along a virtual line.**
**I didn't even expect that that was what the patent was attempting to say. I was shocked -- although, I have done patents, so I wasn't shocked that it was granted. The patent was granted because the patent examiner probably didn't even know what was going on. But without anything specific about coded elements located along any sort of limitation of that description, there's no statement at all.**
Q So I mean, it does say something. So you're reading -- it looks as though you are reading the bottom of -- of the description, from the bottom of column 6 to the top of column 7 as saying -- as describing nothing at all. But there's clearly meridians lines being shown. And if you're going to

169

have meridians lines, they -- you, I think, acknowledge that meridians lines will necessarily -- since they're vertical in this case, they will necessarily intersect with coded elements that are arrayed on a horizontal line, correct?
MR. PACELLI: Objection. Form.
**A I agree, this would necessarily happen essentially as a statement of fact, a statement of geometry, a statement of law of nature. This will necessarily happen without any invention or any intention or any design whatsoever. It's kind of like patenting the idea that you trip after you walk over a crack in the sidewalk. It just happened. It was necessary.**
Q So --
**A You said it.**
Q Well, then, you're saying your written description -- the written description must describe something here that is different than the prior art or doesn't pass -- the written doesn't satisfy the written description requirement?
MR. PACELLI: Objection. Form.
**A I'd say there's two -- I'd say there's two ways. Either the written description was intending -- I can't read their minds -- either it**

170

**was intending to describe something inventive and just never did it and never showed it. Or it was never intending to describe anything inventive but rather just a necessary statement of fact.**
**I gave them the benefit of the doubt. I assumed that they intended something. And I was surprised that there was no description. But maybe they didn't. Maybe they really didn't invent -- intend any invention whatsoever, and then, in that case, they did write what they meant, which was nothing.**
Q Well, I'm not sure what you mean by nothing because they wrote something. There's clearly words that --
**A No, no, no. What they wrote was I have lines that pass through points by accident. They wrote that, and they said that was an invention.**
Q Well, I didn't see the words by accident anywhere in --
**A No, but if you look at the pictures, you don't see anything other than accident. That's my point.**
Q The picture show, by accident --
**A They don't -- they don't look like Tomasi. They don't look like Tomasi. They**

171

**literally just look like, you know, somebody is looking for patterns in a haystack and then saying, I invented that.**
Q Well, you know -- but when you say -- but you -- we're going on to -- when you say figure 14, which -- the description -- when you were talking about -- going down to your paragraph 132 on page 53, you're quoting the bottom of column 6 and the top of column 7 with respect to figure 14, It shows no particular rationale by which groups of coded elements lie within the respective meridians in image 140. But I'm not sure what you mean by show no particular rationale.
Do you mean that it shows reason why you would do that?
**A No. There's no -- there's -- let's go back to '656 because the pictures are a little bit clearer. It's the same pictures. And let's look at figure 15. That's a clear enough figure where you can see both the coded elements, and you can see the superimposed, nearly vertical epipolar lines.**
**With respect to this picture, I will agree -- I will read -- I will re-read the sentence that we just read, which is the paragraph that you just read?**

172

Q Well, I read your paragraph 132 and you wrote it shows no particular rationale.
**A Perfect. Yeah.**
**So if you look at this figure -- and again, I would contrast that with Le Moigne and Tomasi. Looking at figure 15 in the '656, I see no designed way in which the blobs were, quote -- what's the quote from 132 again? Actually, I show that figure as well -- no particular rationale for how the groups of the elements lie on the meridians. It's just we have a whole lot of blobs, and you have a whole lot of meridians. There is no -- they -- they don't show any way in which how do you set up -- you know, how would you organize your group so that they lie vertically in any organized or designed way? Right?**
**What they're showing here is literally -- at this -- or what appears to be no -- you know, something which has some horizontal organization. If you said is there organization in the pattern, I would say yes. Are they telling me any way in which I would make these blobs aligned? No. What they're saying here is -- all they're showing me here is if I draw a vertical line, they will always hit blobs no matter what I do.**

173

**So how do you invent something -- since -- it seems to me that it's hard to invent something where it happens no matter what I do.**
**What would be an invention is if there was some description about how to organize it in a way that would be useful, and that's exactly what we are looking at with Le Moigne and Tomasi. They literally -- you see there, they're doing something interesting and something useful. Here, what I'm just not seeing -- I'm just seeing a statement that, yes, if you have enough blobs, and you draw lines in any direction, you will hit blobs.**
Q But they're not in any directions. They are in -- across the meridian.
**A No, no, no, but you could draw them in any -- you could draw them in any direction, and you would have the exact same relationship. So, therefore, there is nothing special about the way the blobs were set up. The blobs were just blobs that happened to be wherever they were, and, therefore, nothing was done. There was no invention, no design. Nothing was done here.**
**Again, I ask you, take a look at Tomasi, take a look at Le Moigne to give an example of what it would be to do a design to do something. It's --**

174

**it's easier to understand that in the context of what actually was, you know, something useful and interesting above and beyond the basic theory of epipolar geometry which we already know and love.**
Q So however, it -- you could imagine, for example, that -- for -- I want to ask you something you -- ask something about patent law, just general, not a particular thing. You know that, whether or not something described -- whether or not the claimed invention requires all that the accused device meets all the elements of a claim. Your -- is that -- correct -- your understanding?
MR. PACELLI: Objection. Form.
**A Repeat the question again.**
Q Okay. Do you understand that all the elements of a claim in a patent need to be met or satisfied before you can either declare an accused device infringes or a particular piece of prior art invalidates the claim?
MR. PACELLI: Objection. Form.
**A So -- okay. If you're saying if I have to -- you have 12 claims. In order to invalidate, I have to hit all 12 claims? That sounds backwards.**
Q No, I said if you have a claim with 12 elements.

175

**A Oh, okay. Yes, I understand now.**
Q Okay. So it's possible -- is it not possible that, even in a claim with multiple elements, any particular element could describe something that's in the prior art without invalidating the entire claim? Is that possible?
MR. PACELLI: Objection. Form. Objection. Form.
**A I understand that 100 percent.**
Q Okay. So the fact that the -- then, if -- if it were correct that what's being described in figures 13 through 15 and the related descriptions in columns 6 and 7, if those describe something that's in the prior art or describe an element that's in the prior art, does that mean it wouldn't satisfy the written description requirement?
MR. PACELLI: Objection. Form. Objection. Form.
**A Okay. This sounds like a legal question at this point. So let's -- maybe I'd rather stick to the technical questions.**
Q Okay. So technically, you said that nothing in -- you said that nothing, to you, in figures 13 through 15 and their related descriptions

176

showed anything other than that -- what is shown in the prior art; is that correct?
MR. PACELLI: Objection. Form.
**A No, I said more than that. I said the prior art does interesting things along these lines, and these pictures show nothing interesting along these lines.**
Q Okay.
**A So no, I said much more than what was in the prior art, although it is in the prior art.**
Q So then is it true, for it to satisfy -- in your view of what it means to satisfy the written description requirement, that not only does the description of a particular -- in the specification for a particular element need to show something that's in the prior art, you say needs to show something interesting from the prior art?
MR. PACELLI: Objection. Form.
**A I think it needs to show something. And it's something beyond a statement of mathematics.**
Q Okay. I would -- let's go on with it. I'll go back to your report real quickly here.
**A And we talked about examples about what something could mean. We talked about that. What something could mean beyond just stating epipolar**

**geometry. But -- but what I'm saying here is nothing more is said than I have elements that are somehow, you know, on lines.**
THE REPORTER: That are somehow what lines, sir.
THE WITNESS: On lines.
THE REPORTER: It keeps bleeping out on the word.
THE WITNESS: O-N, on.
THE REPORTER: Thank you, sir.
Q Going down to your paragraph 137, you talk about indefiniteness of this particular element that we're talking about. Again, just going back up briefly just to be complete, above your paragraph 131, you have a heading 2, and next to that heading, in brackets, are 1.E and in 12 E.
Is it correct that -- those 1.E and 12.E refer to the fact that this element is found in both claims 1 and 12?
**A Correct.**
Q And that your analysis of the written description there applies to both claims -- those elements in both claims 1 and 12.
**A (Inaudible.)**
Q Is that -- does my question make sense?



**A I said correct. Yes.**
Q Oh, okay. Going down -- going to enablement in your paragraph 135. And your -- in your second paragraph, it's explained about the specification of '656 discusses abstract, quote, unquote, groups of coded elements while providing any specifics, and the drawings show projector meridians with the coded elements placed at locations seemingly unrelated to projector medians?
**A I lost you. Which paragraph are you on, please?**
Q Paragraph 135, page 56.
**A Got it. I found it, yes.**
Q Okay. And you say, The coded -- the drawings show projector meridians -- then the last part -- with the coded elements placed at locations seemingly unrelated to the projector medians [sic]. But it does not say figures 14 and 15 show the relationship that the -- it shows, I think, the meridians being -- crossing the coded elements at regular intervals.
(Cross talk.)
**A No, it doesn't show them crossing at regular intervals. It doesn't show them crossing**



**through their centers. It shows them randomly sometimes intersecting the way a random process might occur. It doesn't show that.**
Q Okay. Now, going on to indefiniteness. It says, for example, Artec -- just going down. Indefiniteness is paragraph 137.
**A Okay.**
Q Okay. And you're referring -- you refer to two images that Artec is using and its infringement contentions supplied in this case; is that correct? And then you show pictures from those infringement -- okay.
**A That is correct.**
Q So let's say -- the -- you're going down to 136 [sic] where you talk about coded elements. What Artec has done is draw two arbitrary epipolar lines and find any two features, coded elements, of the structured light that intersect those two lines. These coded elements are not mathematical points but instead are shapes that are several pixels wide.
Again, so how is it -- you said these coded elements are not mathematical points but instead are shapes and several pixels wide. What do you mean by not being mathematical points in that sentence -- and this is in paragraph 138?



**A Yep. Got it. This goes back to your words. We're talking about things happening necessarily. So let me explain.**
**Supposed I give you a -- I describe a pattern of lines. Let's just say for the sake of argument, they are all perfectly vertical. Okay? So I say -- I say my work, my epipolar lines, are perfectly vertical parallel lines. And now I put down pure points, random points in a plane. This is a mathematical statement now. I would not -- because these points are literally one point, literally 1 nanometer large, I would not expect that any two would lie exactly vertically aligned. Okay? Because I've already told -- epipolar lines, I've have chosen them in advance.**
**And if you talk about specific points, if you show the points that were infinitesimally small and actually aligned, I would know that that shouldn't happen necessarily. It was done because there was some design in the pattern.**
Q Okay.
**A Conversely, if -- again, let's suppose our horizontal -- our lines are all vertical. And now I'm going to draw, I don't know, 50 blobs, each 10 pixels wide. So pixels -- now they're no longer**

181

mathematical points, but they have size. Then, as a statement of mathematics with a high probability, you are going to find some vertical lines that go through more than one -- don't hit -- maybe not right down the centers but wing a couple of elements. And that is what is described in paragraph 138.

Q So this is just more a general question. Going back to the figure 13 of the patent, are -- and you're -- what I -- just -- so to be clear, so what are you referring to -- you just mentioned something as blobs. Are you referring to things in figure 13 as blobs?

A The figure 13 is not -- it's not a blob-based pattern. Rather, it is horizontal patterns -- horizontal -- that the pattern is based in horizontal lines with modulated thickness. So this is not -- you know, there's a number of different ways you could set up your patterns. Figure 13 is not a blob-based. It is, I'll call it, block-based, if you will. So if you look at these horizontal lines, and have these black lines, and then, at some places, they get thick. And so you have these thick blocks that are maybe 20 pixels wide. Now there's some -- some discussion, I know,

182

going in the depositions whether or not we should be focusing on the black lines or the white lines. Honestly, I don't care.

But either way -- so in this case what are the elements are -- let's just, for the sake of argument, look only at the black lines, would be thick portions. And so thick portions here are a little, in this case, rectangles that are probably 20 pixels wide and 7 pixels, roughly, high. And those -- I -- that's what I would associate to the word coded element in this context.

Q Okay. And are you saying that the arrangement of the coded elements in figure 13 are random?

A I don't know what's going on. I would -- I'm not sure they're random. I doubt they're completely random. But I don't see -- I don't under -- I don't have any understanding of any particular organizational principle here. I do believe, looking at it, that they did sort of repeat some lines directly. I would say I see that, maybe. So I would say seemingly random. I wouldn't say random.

What I certainly don't see is something like we saw in Tomasi or Le Moigne where what we

183

think of as the elements are clearly organized along in -- in agreement with epipolar geometry.

Q So going down to your paragraph under patent eligibility, section E -- I guess it's 5E, starting with paragraph 141.

Do you see that?

A Yes, I do.

Q And then, you're doing analysis -- it says, With respect to step 1 of the -- the Alice analysis. That's a particular case that you're referring to --

A Correct.

Q -- and I think you referred to it at some point in your legal background?

A Correct.

Q Okay. So -- so I think for -- on paragraph 144 -- we'll read it -- I'll read it unless you'd like to, paragraph 140. The only purportedly inventive features of the asserted claims in use is the use of virtual lines based on epipolar geometry limitations 1E, F, and G.

Where do you get the assertion that these -- that this is the -- the only purportedly inventive features are in these particular limitations?

184

A You mean E, F, and G?

Q Yes.

A Sure. Well, let's just -- we can -- if we want, we can read A, B, C, and D. And as far as I understand, those are all just recitations of the prior state of the art. So we can look at those. Let's see.

Q So I guess I'm focusing on the word purportedly. You could say -- one might say, abstractly, the only possible inventive features would be your analysis, but you're saying the --

A Oh, well, I guess --

THE REPORTER: Sir, I didn't get the end of your question. There's cross talk.

Doctor, your -- the end of your question -- Dr. Gortler, if you could just give a beat. I'm losing the ends of Mr. Cummings' sentences -- questions.

A So let me just read over what I wrote here.

Okay. I think this is described in my paragraph 146 where what I describe is how parts A, B, C, and D correspond to elements in the body where they are acknowledged as prior art and as a standard practice. If you want we can go to those in detail,

185

**but that is what's going on.**
Q Okay. I just --
**A Should we read that paragraph?**
Q No, we don't need to go through that.
So what your just -- I'm just trying to understand what your analysis or what your reasoning is, that if -- if -- as you assert that these limitations 1.E, 1.F, and 1.G -- and I'm assuming that's applying to 12.F -- 12.E, F, and G -- that -- because -- and going back down to the bottom, 154, it's your conclusion that these, quote, unquote, are off-the-shelf components universally used and structured-light scanning systems, and well-known at the time of filing the application.
MR. PACELLI: Objection. Form.
**A That is correct.**
Q Okay. If some court or some other decisional body were to rule that there -- that something in those three elements in the claims did, in fact, distinguish over the prior art, would that affect your analysis for eligibility?
MR. PACELLI: Objection. Form.
Q Do you understand my question? I meant --
**A Yeah, I'm looking at the claims now to --**

186

**I'm looking at the claims now to see if there's any -- if there's a shot in hell of that ever happening. That's why I'm just looking at them right now.**
**I will agree with that statement, yes. If somehow someone is -- someone rules that there is something inventive and not just a preamble at -- going on in A, B, C, or D, that is not what I -- my description is -- is based on the reading that that is just given -- given as a standard background.**
Q Okay.
**A I agree with your question.**
Q Okay. Now -- we are now looking at the prior art in your -- we'll continue on. We're going down. Now we are in section F and -- where you are comparing Tomasi to the claims in the '656 patent, it begins with the paragraph 153.
**A I'm there.**
Q Okay. Will you give me a second. Okay. And we'll try to get, quickly, to the right parts of your -- and so -- and going now to -- I'm skipping ahead to paragraph 186 where you say Tomasi discloses that said slide patterns comprises a plurality of coded elements.
Do you see that?

187

And you cite, too, Tomasi. And I think you cite to paragraphs 6 and 24 and a whole number of them. We're going to take a look at these and Tomasi in a second. Let me get there. If you'll excuse me.
**A I'm at paragraph 186. I see what you're talking about, yes.**
Q And I'm going to go through these.
And -- and so, in Tomasi, he describes coded element in a couple different places; is that correct?
**A Yes.**
Q Okay. And I'll let you run through them; otherwise, I'll have to ask you too many questions.
Where are -- where are the coded elements described in Tomasi, and what are those descriptions?
**A Right. So let's -- we will look at that, and I will go one by one through all the coded paragraphs which will take us the next 45 minutes, but let me first give a background.**
Q If you can do this as quickly as possible. You don't need to go through --
**A I understand.**
Q -- entire paragraphs or anything.

188

**A I understand.**
**Okay. So the idea of structured light -- if you have a flashlight, it gives an unorganized beam of light. The whole scene gets lighter. You can find where you dropped your coins, et cetera. The idea of structured light is that you are projecting some kind of pattern where the pattern is made up of spatial patterns that are somewhat recognizable and somewhat identifiable. Okay? That's what structured light is about.**
**Now, there is -- so how you -- so what does that mean? That could mean anything. So how do you have anything that is identifiable? So when you say structured light, that just means you have some way of creating patterns in the scene that are identifiable.**
**Now, it could be they're identifiable because of the spatial pattern, that is it's a certain shape that is -- you know, a little local -- you know, a little icon, a little blobby shape that's identifiable that is being projected. It could be that you're using different colors. So you've got red beams and green beams and purple beams, and because they have different colors, they are somewhat identifiable from each other.**

189

People also use temporal distinctions where they have a -- a flashing pattern. So one pixel might flash bright, bright, bright, dark, dark, and another pixel might flash bright, dark, bright, dark, dark, dark, dark. And so using time as something you can identify what is being -- you can identify that -- essentially, what -- a specific ray is identified somehow by -- distinguished from the other rays passing through the pinhole by something that is -- that is -- again, something distinguishable somehow.

And that's the general -- that's generally how you do -- people do all kinds of distinctions in structured light. Again, whether they use time or color or shape. Sometimes they have each shape -- you might look at the neighboring shapes, and there's some relative coding that also goes on. There's just endless variations. Okay?

And generally speaking -- all of those, I will just call, generally speaking, coded elements. It's anything that you can distinguish in a structured-light pattern would go by the word coded element. Now, again, these have to be distinguishable. And we're using cameras, so they have to be optically distinguishable. Okay?

190

So anything of that sort. And that's just standard. That's how you do structured light. And structured light is based on coded elements. Coded elements is based on something which is optically distinguishable. Typically, there's lots and lots of choices of what you might use. So, for example, if you have a bright and dark pattern, if you have a blob, well, that means it's dark, and the blob got light, and then it got dark.

How do you get something bright or dark? That is a spatial description of amplitude, brightness. Okay? If you had a red dot next to a blue dot, that would be a spatial distinguishing of color or wavelength. I know we can get into a discussion, and I'm a color theorist, so we could talk about colors as long as you would like to. But people will use the word wavelength here just to mean that we're doing some kind of color.

Tomasi -- so now that's the general. Generally coded elements always have patterns. Patterns are always based on something optically distinguishable with very -- you know, there's tons of ways of doing it. The simplest one would be amplitude which literally means brightness. Okay? You don't just have a flashlight; you've got a slide

191

with light and dark things. That means you have modulated amplitude.

okay. Now, if you want, we can walk through Tomasi and look at the various examples he talks about. Do you want to do that?

Q Yes, please.

A Okay. So now, it's going to take me a little while and look up -- let me look at these references here. I'm just going to read from 187 through 188.

Q What -- oh, your --

A Paragraphs --

Q Your paragraph?

A My document, yeah, yeah.

So Tomasi further discloses that each of the coded elements is characterized by a parameter that defines a spatial distribution of a wavelength of a structured light. For example, Tomasi discloses that, quote, grid points are colored to have one color from a set of two or more colors. That's what we just talked about. You could use red and green dots, and those are different and are distinguishable. That's -- Tomasi at 35 and 051, quote, another embodiment assigns colors to the set representing binary values. Therefore, he's using

192

just two colors. Therefore, the spatially distributed binary values correspond to the structured-light; in this case, wavelength because we're talking about color. 189, Tomasi -- is that it? No, that's -- that's it.

So here, he's describing this case using -- oh, did I skip something? I skipped 187. Okay. Let's see.

Okay. 187, each of the coded elements is characterized by a parameter that defines a spatial distribution of an amplitude of structured light. For example -- I'll read slower -- coding the light requires assigning an optically distinguishable attribute to each element of the projection array, and that each element of the projection array is said to be assigned a symbol representing a binary value. Tomasi -- okay. Tomasi also discloses that the manner in which the light may be coded may vary, but in the end, the coding scheme selects -- assigns values to specific characteristics of light propagated from the projector and, quote, or three values can be utilized in the binary scheme.

There is no fundamental description as to the shapes of the symbols used as identifiers.

193

**We'll look at a figure in a second. The main design criteria is that different symbols should be distinguishable; however, the brightness and contrast requirements above suggest projecting binary. He prefers binary because he doesn't have to worry about grade levels. That's what he saying there. He says grid points may be assigned to a set of two or more sizes. Other variations are possible. Therefore, the spatially distributed binary value corresponds to structured-light amplitude. Let's look at Tomasi -- let's look at some figures in his examples.**

**So he gives examples in Tomasi figure 10. There's an example of different shapes that he says you could use. And so you have a pattern of these different shapes, and since you can tell by looking at a region of an image the difference between a circle and a triangle, you could -- that identifies which coded element you are looking at, at least from the other five possible ones.**

**Again, you see something similar in the figure 12 that we've looked at ad nauseam. I don't know what the elements look like there. If you blow them up, they look like weird Pac-Man figures of different shapes and sizes. And again, those are**

194

**what he's using in this figure as his coded elements, as his identifiable blobs that he's going to use.**

**So a coded element is a very general term. And Tomasi appears to describe a variety of ways to do this. This is fairly standard. People always come up with different patterns. It's been well-known. You could use time, that you can use color, you can use shape. That's -- that's -- that's old hat.**

Q Okay. And what is there -- going up to figure 7, per se, figure 7 is -- figures 7, 8, and 9, what do each of the S0, S1s and S2s stand for, et cetera, S with the subscript?

**A Yeah, so Tomasi was describing something kind of sophisticated here. So those Ss, S0, S1, and S2, and S3, you can think of that as being in the figure 10, let's say a triangle -- S1 being triangles, S2 being squares, S3 being Xs, et cetera. So they are symbols representing distinct symbols.**

**And what he was talking about in the patent -- he spends a lot of time, and this is part of his invention -- was actually exactly how to go about laying these out within an epipolar line, within a row. These rows here correspond to what**

195

**are going to be symbols in his well-designed pattern of symbols. And his idea is, you know, what is -- he wants to understand how are you going to organize these patterns? Are you going to same pattern each -- in each row over and over again? Or are you going to shift them?**

**And we can go into it, but a lot of the patent here is in sophisticated ways of arranging your collection of symbols in a way so that -- obviously, if you only had six blobs, you have to repeat them. And so you need to use -- you might not want to use just the blob itself, but which blob do you see, and what blobs is it next to? And so there's a lot of room for invention here. Or how did you actually lay these out in a way that is most identifiable.**

**In particular, I think a nice one to look at -- yeah, so if you look at figure 9, for example, he was suggesting that you do some shifting pattern. You don't just repeat them. So that, locally, you know, you could look at a little window of -- of symbols, and you can tell exactly where you are up to at least a huge region.**

Q And do -- what do you -- do you have an idea of how -- so the term coded elements, I think

196

we described. So it's fair to characterize it as, you would say, an example at least, in the figure we looked at, figure -- both figure 12 and figure 10, show different, you know, coded elements. You know, figure 10 showing six different coded elements, and, it's hard to say, but a number of different coded elements in figure 12. Is that a fair characterization?

**A Figure 11 is also showing coded elements based on size.**

Q On size, okay.

**A That's figure 11. So you can distinguish the tall rectangle from the short one. And those are also a way of coding. He's just telling you there's -- there's just endless ways that you can do coding.**

Q Okay.

**A And -- and well-known. He's not claiming -- I don't think -- there's no novelty that he is claiming, I believe, in this at all.**

Q Okay. And how would -- in comparison to that coded elements described and shown in Tomasi, how do those compare to the coded elements shown in the '656 patent to the extent that they are the same or different?

197

MR. PACELLI: Objection. Form.
A So clearly, the -- okay. So we can look -- there's a bunch of different patterns in the figures of the '656 patent. We can look and see how close they are. Clearly, in intention, there's no difference at all. They are -- they are somehow patterns that are meant to be identifiable. So we already looked at figure 4A, 4B, and 4C. And those were examples.
4C is quite -- these were just described -- I believe these were just described as standard prior art concepts of coded elements. C is quite similar, I would say, in spirit, to Tomasi 10 perhaps. They are not the exact same shapes, but they're different Tetris patterns.
Figures 4B is more like, actually, Le Moigne in that it's a grid, and that there is some weird spatial variation of the light and darks that are used to distinguish parts of the grid. So I don't think this kind of -- 4B is more like Le Moigne.
4A, I don't think we see any more in the rest of either '656 or the prior art that we are discussing.
Let's go down to figure -- figure 13 of

198

the '656 is a different pattern. That's a pattern based on horizontal lines of regularly modulated thickness to the degree that size of rectangles is what we saw in Tomasi figure 11. That's similar, but it's a slightly different pattern. This pattern is much more similar to -- if you want to pull up Vinther. I think Vinther used this pattern or something like it as his coded elements. If you want, we can pull that up somewhere.
Q Yeah, I don't know if I have that.
A This looks a lot like Vinther. I have Vinther in -- at the very least, in my other report, but maybe it's in this report, too. Let me just search Vinther. I have Vinther in figure -- it's on paragraph 84 of my document. We don't need to go further, if you don't want to.
Q Oh, okay. Of your current document. I will go there.
A Yeah, within the current document. We can look here --
Q Paragraph 84, so quite back -- further back up. I see -- okay. So paragraph 84?
A Yes, so there's a figure. It's called figure 5, and that's from Vinther. And that's a substantially similar pattern to what '656 does in

199

figure 13. And then, if you go to figure 15, there we see those little -- I would describe them as lozenges. It seems to be a different -- a different set of elements based on these lozenges. Those are kind of like Tomasi's blobs in figure 12, I would say, but not identical.
But we do see -- we see a variety of patterns described in all of the prior art. People just have different patterns. And, you know, I think some of them are mix and match. Some of them might be more specific to the -- an algorithm in question. It would just depend.
Q Okay. Understood.
So not looking at what the coded elements are, but in -- in the sense of the difference of the -- difference between patterns described in Tomasi and the pattern shown, particularly figure 13 of this '656 pattern [sic] -- '656 patent, do you have a way that you describe the differences of those patterns?
A I would say that figure 13, again, looks more like Vinther where it's -- the patterns are based on variations of thickness of parallel lines. And so we see that in 13. We see that in Vinther as vertical lines being his organizing principles. I

200

don't think we see this in Tomasi or Le Moigne. I think they don't use this particular pattern. You know, they use lots of different coded elements. This one is more like Vinther, much less like Tomasi or Le Moigne.
But again, in principle, it's just yet another variation of coded elements. There's nothing that stands out specifically about 13 shown here.
Q Okay. And -- and I -- really not so much as the -- what the coded elements are, but any details that you thought of that are different in the patterns -- I guess, either, then, Tomasi or the details of the pattern as described in Vinther?
MR. PACELLI: Objection. Form.
A They look -- it would be hard to -- I mean, the difference between Vinther and this, it looks like Vinther has wider spacing in between. So here, the dark and the lights are kind of the same spacing. And in Vinther, it looks like he's got these lights, and then, they are separated a little bit more from each other. That's the main difference I would see there.
Q Okay. And since we're -- we're bouncing around a little bit, I understand, but I want to

201

take a quick look at the coded elements you've identified in Tomasi -- I mean in Le Moigne since we are talking about them at this point. And where you've identified the code -- coded elements in Le Moigne. And I think that we're going down to -- to skip ahead to paragraph 277 in your report.

**A I'm there.**

Q Okay. So you -- so the coded elements of -- I'm going down to 277. I want to be clear. So Le Moigne further describes that each coded element was characterized by a parameter that defines a spatial distribution of an amplitude of the structured light. So for example, the horizontal and vertical lines are defined by modulating the light intensity and amplitude.

So is that -- you've taken a figure from Le Moigne at figure 2 at page 543. Is that, then, demonstrating the modulating of light intensity?

**A Correct. Yes. What you see there is some of the -- you see light, and you see dark. And that is a change in intensity. And so the reason why you see stripes or this -- this grid is because, in some places, the slide is letting more light through, and in other places, it is letting less light through. So that is exactly modulation of**

202

**amplitude.**

Q So are the coded elements, then, just sort of the -- the spaces or -- you have -- you have a set of vertical and horizontal lines in Le Moigne. And are you defining the coded elements as the -- the square or the space within defined as squares by the intersection of coded -- of vertical and horizontal lines?

**A So that's a really good question. So if you look at Le Moigne, and we can try to look chapter and verse if it becomes important. What he does is he projects this pattern from his slide at the scene. It reflects off the surface, and he sees it in the camera. And then what he does is, in the image, he marched down -- he identifies the vertical lines. He marches down them until he finds where he sees the vertical -- a pattern of a vertical intersecting with the horizontal. And then he tries to figure out which -- so these are -- we'll call those crossings.**

Q Right.

**A And that is what he identifies. He tries to identify, using epipolar geometry, as well as -- we can talk about it more if you want, but those big bright squares and their pattern as well. So it's**

203

**the secondary pattern that he uses. But he identifies which crossing in the -- in the captured image corresponds to which crossing in the slide pattern. And then he does a triangulation of what he thinks is the center of the crossing in the camera and in the projector.**

**So effectively, he's treating the crossings as his elements, because those are the points -- those are the pixels or the pixel positions that are used for the triangulation. So he's -- so his elements in the sense of his triangulated objects, his targets, the things he's trying to identify spatially are the crossings of the horizontal and vertical.**

**It's a little bit different than the use of the elements in what we saw in Tomasi -- well, it's actually not clear because, again, if you look at '656 -- so some of the examples were sort of atomic elements, like we saw in the lozenges. But in many of the other examples, you just see a very large pattern. So, for example, again, in figure 4A, you just see lines. Then it's -- the word coded element, it's a little bit less clear what it meets here. I mean, he's probably going to try to find either the centers or maybe the corners of these**

204

**points and use that. So there's a pattern. The pattern has spatial variation in something. Amplitude is your favorite. And then there's correspondence.**

**So in 4A, I think, you know, one could argue what is the code element? In 4B or C, I would just say, it's the little Tetris. In 4B, I'm not sure if it's the squares of the corners. Again, I think that's not a particularly -- what's important is what -- where are you looking to -- what are the points you are looking to identify? How that relates to the pattern is -- is always just a matter of choice.**

**So if you look, for example, at figure -- our favorite figure 13, they don't have atomic elements. They have these lines with modulation. And he just says things like, oh, the thick region -- the thin region is a coded element. It doesn't -- it's not an atomic element necessarily. It's really just a description of anything which you are able to identify using image processing. So that is what we see here.**

**Le Moigne, again, has somewhat of a different pattern. For him, I would say the elements -- the essential elements are the crossing**

**patterns. And you use the rest of the line as an organizing principle to move between the crossing patterns and find them. He describes that pretty carefully in his algorithm section.**
Q Yeah, I was just going back to --
**A But again --**
Q Go ahead.
**A The point is the coded -- this is not -- it's a little just -- it's mostly pedigree [sic].**
Q Okay. Because he does mention -- he doesn't -- I don't think he uses the term. I didn't find the term coded element --
**A No, no, no, I don't know if it's a standard term or not. I understand what it means -- or roughly. Roughly, it just means anything that you can use to -- but based on its individual -- individual characteristics, I can identify where it was.**
Q Okay.
**A That's really the only important meaning of the word here.**
Q Now, I think you mentioned the light and dark spots. And I'd refer you to the column right under figure 2, the first whole paragraph in Le Moigne. It says, Based on the principle of a grid



including several dots, different kind of patterns can be created. So it appears he's using the patterns of these dots to -- in his algorithm; is that correct?
**A So my understanding of the dots, I think he's saying -- well, let me read this paragraph** first. Okay. (Indiscernible.) So I know what the dots are used for.
So in this particular pattern -- this is just a general paragraph saying you could do lots of stuff. There's nothing very specific. The way the dots are used -- so again, for him, the elements whose positions are ultimately used for triangulation are clearly the intersections of the horizontal and vertical lines.
The problem is he does not have little doohickeys to make each of those crossings look different the way that perhaps Tomasi did or -- so the way -- you know, that Tomasi did with his little Tetris patterns or his little shapes patterns or colors. So instead, he needs to use some kind of context information to figure out which grid point am I looking at. Okay? This is kind of like, in the '656 in the figure 13, where you don't just look at one square; you look at, you know, the spacing.



And that helps you identify what you're looking at.
So in Le Moigne, the way that's done is with these white grids. And so he spaces a small number of these white grids -- these white squares throughout his image in a way that he knows he can hopefully see all of them and they form an identifiable pattern so he knows which one is which just from context. And then he can do counting and say, oh, this crossing, this horizontal vertical crossing was next to a dot, or it was to the right of dot 1 and above dot 7. So he's using that as sort of an indirect contextual information to identify each of his crossings.
And then, what he's saying in the paragraph you just mentioned is there's all kinds of variations you could do this.
Q I see. Now, going down to the -- where -- and slightly down -- I'll see if I get to the right spot in -- and we're going down to your section F. We're talking about the -- the coded elements are assigned a first group or second group. Let's see if I'm in the right patent here. So this is your paragraph 279.
**A Got it.**
Q Okay. And what are you calling -- so



you're -- you're referring to -- back to figure 2D for groups of coded elements. And what -- how do you find what the group is? Or how is the group being defined here in Tomasi [sic]?
**A Do you mean in Le Moigne?**
Q Or excuse me, Le Moigne, yes. Sorry about that. I mean to ask you this question about Tomasi, but I figured I'd finish with Le Moigne first.
**A Sure. So in Le Moigne -- I'm referring to the coded elements as the crossings between horizontal and vertical because those are the points he used for triangulation. And as explained in Le Moigne, his camera -- his scanning setup -- in his scanning setup, the epipolar lines are essentially vertical, and, therefore, all of the crossings that lie on each vertical line would be a group.**
**So in figure 2D -- figure 2, there is, like -- one, two, three, four, five, six, seven, eight, nine, ten -- roughly 12 vertical lines. So there would be roughly 12 groups of coded elements in my description here. The groups and being all of the crossings that share a vertical line. That would be one group.**

209

Q Okay. And so then what -- how does Tomasi distinguish -- so there's a first group and a second group? How do you distinguish between the first group and the second group in Tomasi [sic] -- in Le Moigne? I apologize. In Le Moigne.
**A So in this case, he doesn't have two; he's got 12.**
Q He's got 12 in -- each -- each group is a vertical --
**A In this picture, I see 12 vertical lines, and, therefore, he's got 12 groups here.**
Q 12 groups, okay.
**A Roughly. I didn't count it carefully. If you want, we can count it out.**
Q So the -- the -- so I guess -- so the -- so along each group is -- is along the vertical lines. And the elements are the intersections between the lines?
**A Intersection between an -- an intersection between a horizontal and vertical line --**
Q Okay.
**A -- is a point that is going to be used in triangulation and is what I'm interpreting here as a coded element.**

210

Q Okay.
**A Every vertical line of which there appear to be roughly 12 of them --**
Q Yes.
**A -- has roughly 15 coded elements. Every vertical line has roughly 15 crossings, give or take. I didn't count carefully.**
Q Okay. So unlike, say, in Tomasi where there's differences among -- some kind of difference among each of the coded elements, what are the difference, then, of these -- within the groups or between the groups, either way, what are the differences that Tomasi [sic] is observing between the coded elements at the intersections?
**A You said, Tomasi. Did you mean Tomasi?**
Q Le Moigne. In Le Moigne, yes. Unlike Tomasi, in Le Moigne.
**A Yes, so they're doing a little bit different things here. Tomasi is using both identifiable features within the atomic elements, like triangle versus square. He also uses context. And you might look at neighboring ones. He talks about that at length.**
**In Le Moigne, it's really using -- he's got -- so he's got the primary elements which are**

211

**these crossings, and then he's got the white squares as part of his pattern. And Le Moigne is using, essentially, a counting context to identify which crossing is interesting. So his is a little bit more -- or his is a much more contextual identification. So he does modulation to produce his shapes. He's got a pattern. So the elements of triangulation are the crossings. But he also has these elements of these white squares. And relative location and context is what Le Moigne uses to identify which crossing is which.**
**He talks about counting. He talks about actually walking down the vertical lines and counting how many crossings. So it's a much more contextual analysis. He doesn't have a triangle that he distinguishes from a square or a red crossing that he distinguishes from a blue crossing.**
Q Okay. Going back now, I can talk about Tomasi so I won't keep on misspeaking. I'd like to go up again to your paragraph 189 where you address -- first, going to where it says coded elements are assigned to at least one first group or second group of each of the -- I think the grouping -- we are looking at the grouping as claimed by the '656 patent claim, claim 1 in 189.

212

So he's referring -- I'll just skip ahead. He's referring to paragraph 092 and refers to figure 5. I'm not sure what the grouping is from figure -- can you describe what --
**A Sure. Let me first find figure 5 to see what that is.**
Q And then --
**A Okay. Figure 5 does not appear to be the correct one.**
Q Okay. Then maybe it's been going down in --
**A That is not relevant. I don't know -- where are we looking here?**
Q I'm looking under your -- your 1.E.
**A Paragraph number, please?**
Q You're looking at -- which element -- element 1.E, and you're starting at 189, then you're going down to 190.
**A So I'm going to look at 190. 190. Okay. So 191. So I just read 189 and 190. And what are you now referring me to?**
Q Where you're -- you're using these references to show -- to -- a first group and a second group of -- where it says said coded elements are assigned to at least a first group or second

213

group, each of which first group is comprising of at least two of said coded elements.
**A Yeah.**
Q I'm asking where -- where the citations you give, I guess, in paragraph 190, show those?
**A Yeah, so we can look at the words. I think it's easier to look at the figure.**
Q Okay.
**A And so if you go down to figure -- it's on paragraph 202 which is the same figure that we've stared at multiple times.**
Q Okay.
**A So in that picture, there's possibly 100 rows of blobs. He refers to -- he uses -- it's the picture of the face with the blobs on it.**
Q Okay. Oh, figure -- figure 12?
**A Is called figure 12, yes.**
**Okay. So Tomasi doesn't use the word groups. He uses the words rows and columns. And he says that the blobs in a row are -- all of them are set up so that they align -- they align in epipolar lines. So in Tomasi language, in this picture, I would see maybe 100 rows of blobs. That's 100 groups. And each group has in between 20 to 100 elements. So in this picture, each row would**

214

**correspond to a group in the wording of '656.**
Q I see. And so every row would -- so you -- one row would be a first group -- could be -- could be -- or -- a first group, and then --
**A If you looked at only two rows, that would be a first group and second group. If you continued, you would see a third, fourth, and fifth. In D, his entire pattern is organized by groups, which is useful. This is, again, a distinguishment from '656 which doesn't seem to do this.**
Q I see.
MR. CUMMINGS: Okay. I think we've been going more than an hour now. I'd like to take a quick break, if no one objects at this point?
THE WITNESS: No objection.
MR. CUMMINGS: And we'll go off for just five or ten minutes, hopefully, max.
THE VIDEOGRAPHER: All right. We're going off the record. The time is 1:19 p.m.
(Whereupon, there was a recess in the proceedings.)
THE VIDEOGRAPHER: We're back on the record. The time as 1:31 p.m.
BY MR. CUMMINGS:
Q Okay. Doctor, I'd like to turn now to

215

your -- again, your first report, invalidity, with respect to the '129 patent.
**A Sure. Sure thing.**
Q Let me get that. I had your report just a second ago.
**A In terms of cleaning up my desktop, some bookkeeping --**
Q Yeah, so we're done -- anything you had that was with respect to the '656 including Le Moigne or Tomasi, I think could be --
**A Well, we might -- are we going to come back to it for a second round for invalidity?**
Q Probably -- we might, but I don't think so at this point.
**A Okay. So I'm going to kill Le Moigne. I'm going to kill Tomasi. I'm going to leave open Sadeghi because why not? Or should I leave that open?**
Q Yeah, we may get to -- we may get to one of his --
**A It looks like I have two Sadeghis open still. I still have the '656, and the -- I have the 1357 and the 129, and I have the original '656. Should I ditch the original; 656?**
Q Yes, ditch the original 656, and --

216

**A Good.**
Q -- we're going to be returning to the '129 patent.
**A Perfect. My -- thank you for cleaning up my paper -- my desk here. Now I'm down to, like, five tabs, which I can easily navigate. Thank you. Okay.**
Q Okay. And then, going to your -- you -- the first thing we're going to attend to is in the '129 patent, which is, I recall, Exhibit 5. I may be -- I think -- I didn't write it in. Okay. So to your first written description argument that's starting on paragraph 356. And you say that -- going on in 356, you describe that the discussions in the specification simply repeats, in paraphrases, the language of the claim without providing written description of the claim in -- with the invention as claimed. So I would return to the -- in that section, just very briefly, we'll take a look at the '129. So you're talking about column 346 to 62 and column 457 to 67?
**A I lost you there.**
Q Okay. I'm referring to your paragraph -- oh, I had it here. Your paragraph 356.
**A Got it. I'm there.**

217

Q Okay. And so what I'm saying is that -- what -- I guess, given this description, you say that the only description is in 3, 46 to -- column 3, lines 46 to 62, and column 4, 57 to 67. Okay. And so you say that it failed the written description requirement because it doesn't give -- to quote you exactly, there's no disclosure with single embodiment providing a position and orientation.

So by not describing a single embodiment, what description do you think is missing? What does the errors you cite, 3, 46 to 62 and column 4, 57 to 67, show is -- what information is missing there?

**A Sure.**

MR. PACELLI: Objection to form.

**A Okay. So first we'll start -- let me look at -- you're talking about claim 1. First paragraph, second -- I'm just reading from the paragraph, second, third, fourth, a computing device -- all right. So until the last paragraph, my interpretation is that this is literally, again, just a preamble describing the context with no purported attempt at novelty. So the -- the entirety of the novelty is the last paragraph, which I will read.**

218

**Wherein said display device provides a position in orientation for said object to take with respect to said at least one detection device prior to capturing the -- at least one image. All right. So that's the paragraph that I am looking at.**

Q And to be clear, it's the paragraph that is in the claim that's in column 7 in claim 1?

**A That is correct. So I'm just starting with the claim, and then we'll talk about the claim. That -- so I'm reading the claim.**

**My initial opinion is the only attempt at invention is the last paragraph.**

Q Okay.

**A Okay?**

Q Okay.

**A So now the -- should I continue? Or do you --**

Q Please continue.

**A Okay. So now the question becomes -- let's look at the words, provides a position and orientation, et cetera. So the question is, what could that mean? What does that mean? And we could talk about what it could mean, but let's see if it tells us what it means -- well, what could it mean, first of all?**

219

**Maybe it means it's instructions, like the words. It prints out please stand in front of the camera. Maybe that's what it means by providing a position in orientation. Maybe it's a picture. You're standing next to the machine and say please stand next to the machine as shown in this picture. Or maybe it shows you, and it shows there, and it says you're too far to the right. Please move until your face is inside of the circle. We could imagine all kinds of meanings of what it would mean to provide a position in orientation.**

**For example, when you go to the airport, you have those yellow footprints on the floor, and you're supposed to put your feet on there, and there's a picture where you hold your hands. Perhaps that is providing a position in orientation for the person to take before the TSA machine looks at you naked. But in any case -- so let's look at the text and see if the text clarifies what this might mean.**

**Okay. So 346, let's look there. I don't remember what's there. 346, In one or more embodiments, the position and orientation with respect to the object capturing the system may be determined. Okay. This -- here they are saying,**

220

**you might want to have -- the machine wants you to be in a place -- that's fine -- it may be determined based on a position; therefore, the next sentence is important. The display device may provide a reference position and a reference orientation for the position and orientation of the object. So that's a key sentence where it -- this is explaining what does it mean to provide, although it doesn't say anything else other than it uses the word provide.**

**There's no example. Is this text? Is this a picture? Is this, you know -- and the next sentence, again, The machine will work better if you are positioned adjacent. It is not part of -- right? Okay. And it may analyze it. So it only -- the only literal sentence helping out explaining what that claim does or doesn't mean is pretty much a sentence that uses here the identical words of the claim.**

**Let's look at the second quote. That's 457. Let's look there. 457. In one or more embodiments where the object is associated with the user of the display device, the reference position and/or the reference orientation provided by the display device may correspond to a position**

221

**orientation associated with the use of the device.**
**So again, it just tells you provided. There's no -- there's literally no explanation other than the words providing a position in orientation. That's the claim. That's the body. I have no idea what this means.**
Q So you -- are you saying, then, that a person of ordinary skill in the art does not know what the term providing a -- a position would mean?
**A I don't know whether this is text. I don't know whether this is a picture. I don't know anything.**
Q But --
**A Maybe it -- what does it mean to provide advice? I don't know. I let you cry, and I listen to you. I just don't know. It's just complete vague -- vagueness.**
Q I see. But there's certainly -- certainly parameters on what information is --
**A I know what a position means.**
Q Yes.
**A And I know what an orientation -- I don't know what it means to provide this.**
Q But you just said there are different ways. You could do it in a textual way.

222

**A Yeah, many ways. There are many. I just don't know what this means or doesn't mean. You're right.**
Q Or you could have --
**A There are many different ways.**
THE REPORTER: I'm sorry, there's too much cross talk.
MR. CUMMINGS: Okay. Sorry about that.
THE REPORTER: Can you wait for the -- yeah, hold on. I'm not ready.
MR. CUMMINGS: I'm sorry.
THE WITNESS: It's my fault. I'm sorry.
THE REPORTER: No one is waiting for me, I hope. I was giving thumbs-up.
MR. CUMMINGS: Oh, I thought we were. I misunderstood. So I --
THE REPORTER: Oh, no, no, no, I was giving a thumbs-up.
MR. CUMMINGS: I didn't see that. Real quick, I was looking the other way.
Q Okay. So you have no idea what it means, but would a person of ordinary skill in the art at least have some -- while they may not know what's within the range, would a person with ordinary skill in the art have a range of what is meant by the

223

position in orientation?
MR. PACELLI: Objection. Form.
**A No.**
Q It's not going to tell you anything about something other than the display device or the object, is it?
**A Something will -- they use the word display device, so something will be displayed that is somehow informative about position and orientation, which I do understand what that means. I don't know what provide means in this context at all.**
Q By not knowing what it means, you don't know the method of provided or the means of providing?
**A Well, let me give you an example. What -- there's a ton -- let's back up here. I could imagine spending a day writing down a list of ways of providing position in orientation. I might come up with 50 different ideas. And then we could -- I would go back to my meeting, and we would talk about that. And we would say which of these is interesting? Like, for example, I could print out XYZ coordinates. The center of your face has XYZ coordinates, blah, blah, blah. Please place XYZ of**

224

**your coordinates so that they are at something else, something else, something else. That's just one example. Literally, I don't think this word limits it down to anything less than 50 possible options of what you might want to do.**
**Like I said, it's actually ingenious that they put the feet at the TSA. That's actually pretty smart. I look at the feet, I put my feet there. That was pretty clever. That's a nice description of what it would mean to provide information as to where to stand. Okay? So maybe putting down the feet on your display device and say stand on the device here is -- is useful.**
**Again, it's -- there's just no description at all here of anything.**
Q Okay. Why don't we move on -- we'll go on to -- beyond this to your invalidity claims over the -- well, I guess it's Rusinkiewicz.
Rusinkiewicz is the right way to --
**A I'll say it once, but I -- it's Rusinkiewicz.**
Q Rusinkiewicz. I will try it. I will have to write that down phonetically. Okay. And let's go put that in. Give me a minute here. Rusinkiewicz. I will probably forget before the

225

next ten minutes.
MR. PACELLI: If it makes you feel better, I never get that right.
MR. CUMMINGS: Okay.
Q Okay. So I think -- do you see -- do you see -- I put in an exhibit. I believe we're up to -- oh, I am wrong. I called it Exhibit -- let me pull this off. I called it -- I mislabeled it Exhibit 14. I will -- give me just a minute -- sorry -- to withdraw that and relabel it as Exhibit 15.
Okay. Exhibit 15.
(Whereupon, Exhibit 15 was marked for identification and is attached to the transcript.)
**A So I do see that.**
**Two questions?**
Q Okay.
**A Regarding the Rusinkiewicz paper, I recall in my research that we actually had two -- there were at least two different documents that were substantially similar by Rusinkiewicz and friends. And so I'm going to go with this for now, but there's a possibility that this is the twin paper. And I don't -- I don't -- I know there were two papers with similar titles and similar authors**

226

**and similar material.**
Q Pardon me. I don't want to take too much time, but I'm going to take just a minute to see if we can resolve this because I don't want it to be that we are --
**A Yeah, I could look. If you want, I could try to look at my document pile and see what paper I know I was looking at, but you can also -- I just remember -- I remember there was a little confusion going on with this topic. It -- it won't be an issue unless we get to chapter and verse.**
Q Okay. Well, we -- well, we may get to chapter and verse, so will you give me -- I will take just a second to make sure that I can -- if I -- if I have a different -- a different one, we can look at them and see if --
**A This might be my fault. This might be something that I found on the Web and was not provided to me as part of the documentation. Sometimes I just -- it's easier just to Google, and I pulled up a second paper by the same people and the same -- on the same project. So this might just be my fault completely.**
Q Okay. Well, I'll try. I know some papers were provided to us at the same time as your

227

report. And I'm looking through those to see if that is something from -- I've already forgotten the pronunciation, but I'm going to move on.
**A Rusinkiewicz.**
Q Rusinkiewicz.
No, I don't have --
**A Okay. I'm happy to go with this, and then I will -- if something comes up -- if -- I will now -- I assume this is the right paper, and if something that doesn't match the right citation location, we can revisit this question.**
Q Okay. I think we may have gotten this -- I forget. We'll go through. Okay.
**A Can I also request, because -- if we're going to get this, my infringement report of this -- for this topic?**
Q Oh, certainly. Absolutely. Let's -- I don't know if I've entered that. If I haven't, we'll go do that right away.
**A I don't have it up, so --**
Q So let me get there. Okay. And I guess I'll call this, while we're at it, Exhibit 16. Okay. And we'll put this in so we'll have it handy. Okay. I put in, as Exhibit 16, the May 7th expert report of Dr. Gortler.

228

Do you see that up now?
(Whereupon, Exhibit 16 was marked for identification and is attached to the transcript.)
**A Yes, I do.**
Q Okay. And that is, in fact, the report that you entered into this case?
**A It certainly looks like it.**
Q I forget -- I may have -- I thought I might have entered it earlier, but I will double-check.
**A Please do.**
Q We might have two exhibit numbers -- two exhibit numbers. We can maybe ignore the first one if I did that the first time around. No, I don't think I did the first time around. So good. This is a unique exhibit right now.
Okay. Now, just going to the particular issue at hand is to which of the -- which reference Rusinkiewicz -- I'm going to -- I'd like to get it correctly for the record.
**A It's more of a -- Rusinkiewicz. I might be getting it wrong, too. I do know the guy.**
Q Oh, okay.
**A It may be more like Rusinkiewicz. I don't remember -- I don't remember the accent -- the**

229

**proper accenting on the name. We could just call him Szymon.**
Q Okay.
**A The Z, I know, is silent.**
Q Okay.
**A I like to pronounce it ZZZ (phonetic).**
Q And so going, again, here, Rusinkiewicz, is there something in your -- in your noninfringement report that would give you better notion of whether this was the -- the correct reference that you used in your -- in your invalidity report -- or I mean your --
**A Yes.**
Q Okay.
**A Let me -- I will just try to compare reference points and see whether they match, and then I will know. Okay. Noninfringement -- give me a second. Real time level 3D acquisition -- real time 3D -- that all sounds right. The picture in figure 1 is certainly the right figure.**
**The only thing about it that confuses me is that I'm looking at my infringement report, and I have page numbers for Rusinkiewicz, and I have Rusinkiewicz at 443. Looking at the document you sent me, I don't see page numbers. So it certainly --**

230

Q Do you have, by any chance, a copy of --
**A Can I look?**
Q Yes. I think --
**A Okay. I will look. I will look what I have.**
Q If we could do that now, I want to make sure that we're all -- now, there may be --
**A Give me one second.**
**Okay. So now I have a document that looks almost like yours.**
Q Okay.
**A But it does have page numbers. So this is more -- this is certainly what I was looking -- what I was looking at is not identical to the document you have. But it probably -- let me see if it's -- other than -- other than page numbers, let me see if it matches identically. I can tell by looking at, like, when -- you know, what is the word -- okay. The word at the end. Let's see if that's the same word.**
**Okay. So that I have a document that I believe is identical, other than also having page numbers. Should I put it into the chat?**
Q How are the page numbers -- the page

231

numbers -- how are the page numbers referred to in the reference you have?
**A It uses the page numbers in the document that I'm looking at right now that you -- not the one that you have.**
Q I don't see them, but I'm just wondering -- for example, I have nine discrete pages in the document for Exhibit 15.
**A Yes. I have nine discrete pages, and the first one on the bottom says 438.**
Q I see.
**A The next one says 439, et cetera. So the page numbers -- I know how this works.**
**The way it works is the journal -- when you publish the paper, you do your own formatting, and then the journal stamps the -- adds the page numbers to it. So there's often multiple copies of the PDF floating around the Internet. And some have the page numbers, and some won't, the -- the page numbers that were actually in the publication in the book that came out.**
Q I see.
**A So the one I have here has the page numbers, again, beginning at 438, whereas the one that you sent me, I think, is identical document**

232

**[sic]. Other than that -- another difference is the one that was published on the bottom of the first page which has a copyright notice --**
Q Oh, okay. The one that has the copyright notice? The one that we have?
**A My version has a copyright notice; your version does not have a copyright notice. That is another distinction.**
Q Okay. Okay. We'll see if -- if we run into any substantive differences at this point.
**A But other than that, I am -- it looks to be the same document.**
Q Okay. And going to -- through your reports here -- your report here, in the elements you've disclosed, you said -- Rusinkiewicz. I'll try that. Okay. Okay. I'm going to element D, which is starting in your paragraph 387. And it has to do with the element which you call 1.C, at least one detection device for capturing at least one image of the surface. Wherein one of the detection devices captures at least one image of the structured-light pattern acting on the surface of the object.
Are we in the same -- do you see paragraph 387?

A Yes. I'm looking at it, yes.

Q Okay. And you also note below that -- that -- the Court interpreted this to be a means-plus-function device?

A Yes.

Q Okay. And so, of course, there's three components of -- three components of -- or three pieces -- three elements, you might say, or sub elements of the structure identified. And so I want -- want to see where you were finding each of those, a photographic lens, and that lens has a vertex, the radiation receiver, and the driver?

A Sure.

Q For example, you -- and you mention, I believe, three or four different devices there.

And where do -- was there any disclosures as to what devices -- the Sony DXC-LS1, NTSC, and the rest in that last phase, is there any disclosure of what those include?

A I believe we have other exhibits, essentially a catalog of cameras from a camera store that have the exact same product names and descriptions. We can look for that if you want.

Q Okay. If we could -- maybe we could do it quickly on a break so we don't lose too much time. We'll just kind of move on. Okay?



A So yes, we did look at those cameras, and we found just, again, catalog descriptions of these very products.

Q Okay. So going on to another element here. Going on to 392 for -- in Rusinkiewicz where you say that it -- you show the pictures in figure A -- figure 1A.

A Yes.

Q Okay. And how is it that -- you refer to sort of an anchor scan. What -- what shows you that the anchor scan particularly satisfies the limitation that it -- that provides the position orientation prior to capturing the -- at least one image?

A Okay. So there's a lot to unpack there. Let's start from the beginning. We already talked about the -- the part where I -- where I -- where I don't take a position on what it does or doesn't mean personally by providing position and orientation. We talked about that already. My opinion being that there's zero clarity as to what that does or doesn't mean.

So why are we talking about Rusinkiewicz? This is because in the -- in -- we can figure out, in one of the infringement contentions or documents by Sadeghi, their description of the infringement is due to the fact that the Creality product has some kind of -- I'll just call it a preview feature. So I don't think that -- it's not at all -- I'm not conceding that this is in the patent, but because the patent is indecipherable, I'm just going to -- you know, let's take that assumption and see where it takes us.



So let's pretend that providing a position orientation means a preview, because that is what is described in Sadeghi. If you want, we can try to find chapter and verse of Sadeghi where he does that. Should we do that or not?

Q We can -- we can in a minute. I'd just like to do chapter and verse of Rusinkiewicz.

A I understand, but again, the reason for Rusinkiewicz here is, again, only in light -- because the -- only because the patent is -- is contentless, is only in light of the later description by Sadeghi as to what, maybe, this means. Okay. So let's unpack that.

You asked about anchor scans. And let's -- let's talk about that in a second. Let's -- let's go back to that. And you talked about prior to capturing an image. So the actual -- again, the claim language is prior to capturing at least one image.



Okay. So in the -- the immediate question when reading this sentence is, does that mean prior to capturing any image at all? That is, the camera has not yet been turned on, for example? Or does it mean prior to capturing at least one more image?

I take zero position on how this reads, especially because this is a legal document, and people like to put things in like first and one for no reason at all. So I don't know how to read that. I can just -- we could just talk about reading it in different ways and where that leads you to. Okay? So again, I take no position on whether it -- when it says at least -- prior to at least one, whether that means prior to taking any images at all, or this is just legalese for prior to taking another image.

So if we take the first reading, prior to any image, then a preview, either as a preview of the current scan, either as described by Rusinkiewicz or as practiced by Creality wouldn't match. That's if you make prior to be any, because

237

the patent already takes pictures before it does its preview.
If you read prior meaning not any but some, then you would have to make that reading, if you want to follow Sadeghi's infringement theory. Then it means prior to some, which means that, as long as you're taking more pictures, as -- as you're doing the Rusinkiewicz, this would anticipate the meaning of the claim.
The last thing was the anchor scans, and we could talk about that again in detail. What is pointed out in the infringement report is literally a preview which simply shows the current position of what you are looking at, whereas Rusinkiewicz does a little bit more. Where -- what he does is when he feels that he's lost tracking, so you have moved the scanning machine too fast, and it's lost track of where it is, so it already has some idea of the surface, and then it has some idea of what -- the surface you're looking at, but it doesn't know how to match it. And so he's got some ideas, and we can look at what he says about showing specific anchor scans and then instructing the user how to move the camera so that things lined up. So that's what the anchor scans mean. So that was another specific

238

idea of how Rusinkiewicz was going to do his preview.
Let me look at his words more carefully about anchor scans. And I'll also look at my reports to see how I talk about the anchor scans.
So specifically in my paragraph 394 -- and let me read about it. This is how I describe and quote from Rusinkiewicz. After the anchor scans are captured and stored, they are used to provide a position and orientation for the object to take with respect to the camera prior to capturing an image. That's just claim language. Specifically, the system -- and this is the quote -- takes advantage of the human operator's strength in performing pattern matching by simply displaying one or more range images, asking the user to position the object so it roughly lines up with one of them.
Continuing, if automatic alignment fails, the system then, quote, asks the user to move the object to line up, R, which is the range, image, which one of the anchors. And this is also shown in quote -- cite here figure 9, user is asked to move the object to align with the anchor. Now, let's look at figure 9 which is in my document, I believe. There we go. Not in my document. No. It's in the

239

paper. Figure 9, there it is.
Figure 9 says -- A1, A2, R, R line to A2 -- user is asked -- it's just a schematic. I'm not sure it's showing -- this is figure 9 from Rusinkiewicz, A1 and A2 in column -- in row 4 are the anchor scans. So these are scans that have already been created, and the system thinks it understands how they align, whereas R is the current scan. And it's not quite sure whether that should be lined up with 1 or 2. And so in 5, it says, User is asked to move the object so that it aligns with the anchors.
Literally, I think you move the object or the camera, that little thing R, and the visualization will move around, and you keep moving it until you see a match. So this is a specific kind of interesting way of telling somebody how to move the object by showing them where it is relative to anchor scans. And that's what this is about.
Q That's what -- that's -- what Rusinkiewicz labels as an anchor scan, is that different than other scans? It discloses the difference in the kind of data, kind or amount of data, or how it processes that data?
MR. PACELLI: Objection. Form.

240

A We can look exactly. My belief is it is some subset of prior traditional scans. But we can look that up to be sure. Let's see. Let me look at my document first and see whether I -- I have a description.
So in my document 393, the quote is, We maintain some number of anchor scans to which we attempt to align. We would like them to have the following characteristics: They should be large -- I'm going to summarize large and recognizable -- bullet 2, they should have relatively low overlap. 349, After the anchor scans are captured and stored, then they are used.
So your question was, are they -- sort of is it a -- I don't know yet. I have to look a little more carefully whether this is a separate process that creates ten anchor scans. Or whether or not you're just scanning, and it decides, okay, these ten, I'm going to use as anchors. If you want, we can try to dive down deeper into the Rusinkiewicz to see that particular distinction. I don't know offhand which of those two it is.
Q Okay. And so -- but you have --
A Are you interested? Do you want me to look through -- do you want us to -- if you want, I

**can --**

Q No, I think we're -- I'd rather -- I'm afraid we might be running a little late on time. So I'd like to keep on moving a little bit. Maybe if we have time towards the end, we can consider it.

**A Sure thing.**

Q Okay. And so I think we are going to go next to -- give me a second. I will put it in the chat, as usual. Let me make sure I get -- rearrange my -- I'm putting Exhibit 17, which I think is the right order, the Hassebrook patent, US patent number 8,224,046, dated patent July 17th, 2012. First inventor is a Lawrence G. Hassebrook or Hassebrook.

(Whereupon, Exhibit 17 was marked for identification and is attached to the transcript.)

**A I see it.**

Q Okay. And this is that -- this is -- we're not -- we're clear this is the Hassebrook that you relied on in your report?

**A I believe so, yes.**

Q Okay. And let me get to the right -- relevant sections, very quickly, of your report. And again, I'm going to -- I guess it would be on page -- your paragraph 426.



**A I am there.**

Q Okay. And I'm looking to see where Hassebrook -- again, the structure, this is the means plus function identified by the Court. I'm looking to see where Hassebrook -- where Hassebrook describes the structure that the Court identified, again, the lens having a vertex -- photographic lens having vertex, a matrix radiation receiver, and a driver.

**A Sure. So the quote I have in my document, which is in 426, quote, The cameras are preferably -- this is from Hassebrook. The cameras are preferably commercial high-resolution digital cameras or maybe specialty cameras designed and manufactured for biometric systems. And then there is some figures that show pictures of cameras.**

**So high commercial -- high-resolution digital camera, that's probably much more than a matrix receiver. That is, there were plenty of CCD cameras before there were digital cameras that produced digital output. Certainly, once you were producing digital output from your camera, you were not using -- you were using a CCD or a CMOS. So a digital camera, you know, is -- is going to matrix radiation receiver plus, plus. It's going to be a**



**CCD or a CMOS. So it's going to have a driver, no doubt.**

**The word vertex, by the way, this is literally just cut and paste in this patent from the '656 patent. So all of my discussion of that, wherein, I don't believe that vertex should be read as surface vertex but should be read as pinhole vertex so that triangulation is appropriate is my reading of that. But either way, if you want -- in terms of -- in terms of this notion of a surface vertex, they say -- again, they say high commercial camera [sic]. This, no doubt, would be a camera with a lens. The lens would have an axis of symmetry. And it would have a vertex.**

**Certainly, one could hire somebody to do some, you know, Frankenstein experiment where perhaps Dr. Aikens would claim there's no surface vertex. Be my guest.**

Q Okay. I think we need to move on. I'm not sure how long it's been since the last break.

MR. CUMMINGS: A little over an hour; is that correct?

THE VIDEOGRAPHER: It's been about 45 minutes.

MR. CUMMINGS: Oh, okay. I think we can



continue on before we get to the -- actually, I would -- I would -- there is something that I need to go do. I wouldn't mind if -- taking a very short break now, going on, and -- a five-minute break, and we'll be back.

THE WITNESS: Okay. Fine with me.

THE VIDEOGRAPHER: We're going off the record. The time is 2:17 p.m.

(Whereupon, there was a recess in the proceedings.)

THE VIDEOGRAPHER: We're back on the record. The time is 2:27 p.m.

BY MR. CUMMINGS:

Q Okay. We are switching gears here. I'd like to refer you to -- Dr. Gortler, to your -- your May 7th report concerning invalidity. Okay?

**A I've got it in front of me.**

Q Okay. Okay. And I want to turn your attention -- we'll try to go to your section 6D beginning paragraph 51. Okay. And going down from there.

**A I'm there.**

Q Okay. Very good. And again -- again, your analysis under D applies both independent claims 1 and 12; is that correct?

**A That is correct.**
Q Okay. And going down, you note that -- that the -- the device -- sorry, I'm trying -- I'm rushing, and I'm slowing down. So a device for capturing an image is -- was -- is construed as means plus function in the -- by the Court; is that correct?
**A Correct.**
Q Okay. And essentially, you say that -- that Dr. Sadeghi has failed to identify a camera driver, and, therefore, that this limitation is not met; is that correct?
**A That is correct.**
Q Okay. Now -- and part of the reason is because he has referred to soft -- software drivers?
**A That is correct.**
Q Okay. Now, in -- in going through this, did you at all refer to Mr. Aikens' report in considering whether or not Artec had shown that the accused products meet this limitation?
**A Definitely, yes, but we should look chapter and verse if you are interested.**
Q Okay. We'll go there so we can get --
**A Okay. I didn't look at it, I would say, as closely.**



Q Okay. Some things you have -- and so you have said that -- and I'm asking -- the accused devices employ digital cameras; is that correct?
**A I don't -- I could guess that that's a yes. I did not take apart the devices. I used the devices, but I wasn't asked to understand them any more.**
Q I see. I understand.
**A They certainly produce -- they have a wire that plugs into USB, and it gives data. That is undisputable. You know, I didn't look into anything else about what the hardware is doing.**
Q Okay. And we'll -- we'll put up Dr. -- Mr. Aikens' report. I think I have already entered that. If I have not -- I don't think I have.
**A Oh, can we do some cleaning up? Can we do some cleaning up first?**
Q Oh, certainly.
**A Okay.**
Q So I'm not -- I'm not dealing with -- with -- I'm not -- at least -- I might come back to it if we have time before the end, but I'm not, at this point, dealing with your -- well, we might leave your April 7th report up for --
**A Sure. I'll leave that up.**



**Hassebrook, closing or leave open?**
Q We can close that.
**A Hassebrook is closed.**
**Rusinkiewicz, open or closed?**
Q Closed.
**A Okay. We can always bring it back. I'm fine with that.**
**The '357, leave it open?**
Q Yes, we can -- we can leave that open for the moment.
**A Okay. How about the '129?**
Q Yes, let's leave that open. We'll probably come back to that.
**A Okay. Rusinkiewicz?**
Q No, we don't need to leave Rusinkiewicz open.
**A Okay. And then I think I have -- I believe I have two Sadeghis open. Let me make sure.**
Q Yeah, we can leave them open for the moment because we will probably -- you -- we'll come back to them in a minute.
**A Good. All right. I think I've got it.**
Q I need to -- I need to enter as an exhibit -- and let's see what we're up to -- Exhibit 18, the April 7, 2025 report of Dave Aikens.



(Whereupon, Exhibit 18 was marked for identification and is attached to the transcript.)
Q Oh, it's not -- give me a second, please. Okay. We'll do that right away.
I think I may have asked, but have you reviewed this report?
**A Yes, I'm looking at it now, and this is the report that I have reviewed.**
Q Okay. And we're just going to scroll down here to try to get things quickly. Again -- now, I will say that -- and you -- are you -- we're going down to -- we'll -- we'll skip to the point -- my table of contents is not working well. Okay. So we are going down to what is in his report, I believe starting on page 14. It's in the second -- toward the bottom around where the page 44 begins?
**A Yes, I'm at 44. Got it.**
Q And going down from there, he has an analysis of the optical components starting there. And going down, it talks of a --
**A Got it.**
Q Starting on page 28, on page 52, it says -- it says -- and above that in E, it says, A device for capturing an image of said structure's light reflected on said object wherein said device

249

for capturing an image comprises of a device lens characterized by device vertex?
**A I'm there.**
Q Okay. And have you -- have you reviewed this analysis?
**A Yes, but not -- I would say not as in depth as I did the Sadeghi.**
Q Okay.
**A So surprise me.**
Q Okay. I --
**A Honest -- honestly, this just seemed a lot less interesting to me.**
Q Okay.
**A But like I said, please, let's talk about it.**
Q Okay. Excuse me. I managed to lose your second report somehow. Because I want to go back and forth, so please give me a minute. Okay. Well, we'll go through -- we'll go through Mr. Aikens' report right now.
And he mentions in -- in 53 that he reviewed photographs and disassembled versions of the products -- each of the accused products. And he has a table under paragraph 53 for identifying each one of those -- of those. Okay?

250

**A Yes.**
Q And he point out various components. Including in every component here, he identifies each of them as having a matrix radiation receiver.
Do you see that?
**A I do.**
Q Okay. And does -- having identified the cameras that they were electronic that have what he calls a -- for example, on the scanner one, a camera image consisting of a matrix radiation receiver.
Would this -- would the information you have here in this chart tell you whether or not the accused products, the ones he lists in his table and on 53, also have a camera driver as you understand it?
MR. PACELLI: Objection. Form.
**A Maybe. He doesn't say -- he just says camera imager, matrix radiation receiver. No other details are described. Is it a CCD? Is it a CMOS? Is it something else? It's clearly -- clearly electronical [sic], if that's a word -- electrical. I see what you see. I see a chip.**
Q Okay. But is there -- can you think of -- isn't -- isn't it true that it would -- necessarily it would have to have some kind of

251

device that functions to translate signals from the radiation receiver so they can be triggered by the rest of the system? Wouldn't that be true?
**A Again, I don't know what the device is or how it works. In a general sense, yes. In general, I would agree that something like a CCD or a CMOS or other cameras would have some kind of circuitry to help out. That's generally true. I just don't know what -- I'm just looking at a device that you told me nothing else about.**
Q Right.
**A So I don't know. You know, yes. Yes, and no. I mean, like I said. I see a circuit. It's electrical. You know, if you -- if you told me more about it, I could tell you, I guess, more about what it's made of.**
Q Okay. But just sort of -- just so -- I guess, is it fair to say you haven't reviewed these photographs to determine what they -- what they show?
**A I looked at them. I saw the picture. I saw the words camera imager consisting of matrix radiation receiver. I thought to myself, that sounds good, and went on.**
Q Okay.

252

**A That's the extent of my -- of my interaction. I didn't do any sort of diving in any further than reading these -- looking -- I did look at the pictures. I did read the captions.**
Q Okay. All right. Very good. So we'll go on. I'm kind of mystified of how I managed to lose your report here where I had it so obviously available. Okay. Here we go. Back to Exhibit 16. There we go. Sorry about that.
Okay. Now, in your -- I'm referring you to your -- in your May 7th report, on paragraph 59.
**A I'm there.**
Q Okay. And we'll talk again -- as we talked about in this context of invalidity and other reasons, you're claiming here that there's a failure to show that -- or that the accused device is noninfringement because they did not include this limitation, correct?
**A That is correct.**
Q Okay. Again, this is based on the Court's particular interpretation where it requires that the virtual lines be fixed or demarked on the outer surface of the slide?
MR. PACELLI: Objection to form.
**A That is correct.**

253

Q Okay. Given your -- independent of the claims for the moment or their interpretation, has -- wherein there's a discussion we've talked of meridian lines, right?
MR. PACELLI: Objection. Form.
Q Okay. Do you recall -- I can bring up the area of this '656 patent if that is useful for you?
**A Again, what is the question?**
Q Okay. We'll go -- I'll go straight to the '656 patent. We'll bring that back up. I think that was Exhibit 2 or 3 -- Exhibit 4. Excuse me.
**A All right. Let me pull that up. It's long gone, but --**
Q Yeah, I know.
**A Oh, there it is. It says my name, and I have it open, 656.**
Q Okay. The '656 patent, do you recall, in column 5, there is a discussion of meridian lines, 187, which is related to the projector, and meridian 188, which directed to -- there's a camera meridian. It's actually saying projector and camera meridian.
Do you see that?
**A I do.**

254

Q Based on the description here in the patent, do you have any opinion as to whether or not any of -- now, very quickly going back to the reports, when I say accused devices -- let me try to do this. I'm talking about all the accused devices at once, but just -- I'll take a minute here to define which ones they are. And I think they're laid out most easily in Mr. Aikens' report. I think -- yes.
**A You said 18 again, correct?**
Q 18 again, right. And there's a list of devices, not any information, just referring again to -- under 53, it talks of a number of devices. And they are this CR Scan 01, the CR-Scan Lizard. Going down he talks of a MagicSwift Plus, a Whale, a Mole, a Lynx, a Seal, a Moose, and a Seal Lite, and a Moose Lite.
Are you aware if these are -- each of these are products -- products sold by defendants that Artec is accusing of an infringement in this case?
**A So I didn't memorize the list of animals in the zoo, but other than that, I -- yes.**
Q Okay.
**A Other than that, I know that there were**

255

**whales and seals and otters. I'm happy to look at the list to make sure. I'd have to look back at a list to make sure that --**
Q Okay. But if it --
**A I'm happy to --**
Q Okay. And I'll refer to these as the accused devices going forward, as a group. Okay. And so you'll understand that I mean this list of devices that we just mentioned?
**A Good.**
Q Okay. Now -- so for these devices -- and we're turning back to the '656 patent and to the discussion of meridian lines in column 5, and I think it also was identified -- I think it is also referred to in figure 5 -- do you have an opinion of whether or not the accused devices -- the algorithms employed by the accused devices recognize and use meridian lines, at least is what -- as those are defined in the specification of the '656 patent?
MR. PACELLI: Objection to form.
**A So I'll answer -- let me answer the question as clearly as I can.**
**So we have a camera and a projector. And actually, we have -- usually we have a number of cameras and, depending on the product, a number of**

256

**projectors. But for any pair, one camera, one projector in a device, there is -- inherent to the geometry, epipolar geometry, there is the existence of these preferred mathematical set of planes in space and lines in the respective planes.**
**Now, you could decide in your algorithms whether to take advantage of that epipolar geometry or not in the way you do your search and your correspondence. And you asked -- I have no idea if the accused products use the existence of epipolar geometry in any of their implemented algorithms or in any of their coding at all.**
Q So then, you haven't -- is it correct to say, then, that you haven't reviewed the algorithms that any of the accused devices -- the algorithms that they use to capture and render 3D images?
**A I -- there was a lot of code -- in the Sadeghi infringement report, there was, you know, pages and pages and pages of code and descriptions. And I spent a lot of time looking at all of that code, all of the call sequences to understand what that was doing, what was going on. So I spent, you know, dozens of hours looking at code.**
**That said, to look at all of the code would probably take about, you know, a year -- or**

257

maybe I'm exaggerating -- a couple months. And I did not -- I did some random poking around for curiosity. I'm like, how did he do this, and how did they do that? But it's actually really, really, really hard work. The code is uncommented, and so I wasn't -- I didn't do a top page 1 to page -- you know, to -- you know, Genesis-to-Revelation type analysis of code by any means.

Q Okay. Did you speak with anyone, either at Creality or Jimuyida, to have them explain how their algorithms work for the accused products?

A Yes.

Q Who did you speak with?

A I don't really remember his name. His first initial might have been J. His last initial might have been L. There was other people on the call who would remember who was on the call. So that -- I'm sure we could find out who he was, but I don't remember who he was.

Q Okay.

MR. PACELLI: Counsel, if I could object. This is covered in Dr. Gortler's report -- rebuttal report.

MR. CUMMINGS: Okay.

MR. PACELLI: Just so you know.

258

MR. CUMMINGS: Excuse me.

Q So during that conversation, did you get any understanding of how the algorithms that Jimuyida's and Creality's products used to capture 3D images and then render them?

A So we talked for about an hour or maybe 45 minutes. There was an interpreter on the call. Again, there was also a person from the defendants' side, I believe, who speaks Chinese. So there was maybe five or six people on the call. The call was organized by a set -- over -- through a set of questions that I asked said person whose name I don't remember. And that was then placed through an interpreter. There was an answer. And the interpreter talked back to me.

The questions were motivated based on -- I had done my reading. I had understood what I understood. There were a couple things that I didn't -- I wasn't sure I understood. And those formed the basis for the questions that I asked. That was -- and again, that would again go through the translator. And then an answer would be said, and then it would come back to me.

I need to be honest, it was a pretty useless conversation. I spent most of my time

259

trying to figure out -- like I learned, for example, that when a translator said the word agriculture, that meant algorithm.

Q Oh, okay.

A And when that translator said the word pi a colada -- this took me a long time. Pi a colada means point cloud.

Q I see.

A So it was honestly, essentially, a frustrating exercise where I would ask a question. Five minutes later, there would be some gibberish. I would spend a couple minutes trying to understand what was going on. And then I was very hopeful for the call to be over soon as possible. So I learned -- I did have -- I did attempt to have a conversation, but I learned very little.

Q Okay.

A And I essentially gave up. I stopped asking questions. You know, I didn't need to waste everybody's time.

Q Okay. So just to be clear about -- so you -- that conversation -- or did that conversation -- did anything else inform you of the algorithms that the accused devices used?

A So the one -- there was really one

260

question that I -- that I really wanted to understand. So if we ever get to it, in Sadeghi, in his discussion of the '357, he talks about certain variables that are used in certain tests. I could look up the names, if we ever get to that, the names of those variables in those tests.

And I thought there was two tests in particular. And I definitely understood what one of the tests was intending to do. And I thought I had a pretty good guess of the second test. And I asked for the purpose of the second test, and I did get an answer that did, at that point, corresponded to what I was expecting to hear but wasn't sure of.

So I would say there was at least one specific confirmation about a specific use or test using a specific algorithm -- a specific variable that was under discussion of the '357.

Q Okay. So then --

A If you want, we can look that up, and I could tell you the name of the variable.

Q Yeah, hopefully we'll get to that quickly.

So getting back to your report, then, on the '656 patent, so you don't know, then, just to be clear, how the accused devices used epipolar

261

geometry in their functions?
A Not at all.
Q Okay. And you don't know -- do you know the -- the makeup of their -- or anything about how -- how -- if or how they project and record structured light?
A I don't understand the question.
Q Okay. Do you understand -- do the accused devices project a structured light in -- in their operation?
A Yes.
Q Do you know the details of -- of that structured light that the accused devices project?
A I have seen pictures of the patterns in both the various Aikens and Sadeghi reports.
Q Okay. Have you attempted to analyze those patterns to identify such things as coded elements?
A So coded elements is -- really can mean anything that you want it to mean, anything that's identifiable. And in that sense, there's plenty of identifiable possible things that could be counted as coded elements in the pictures of the light patterns that I -- that I saw.
Q Okay. And do you have any opinion

262

concerning how the patterns that you saw with the accused devices compare to the pattern, for example, disclosed in figure 13 of the '656 patent?
A Let me look at that picture.
So figure 13, yeah, I'm looking at that pattern. That was the same pattern that was substantially the same as the Vinther pattern, or at least I said it was substantially the same as the Vinther pattern. And I would say that pattern has some similarity with some of the pictures shown for the Creality product.
Q Okay. And have you -- and when you say some similarity, have you compared them to identify what is similar and what is not similar?
A Sure. Well, what is similar is they seem to be, you know, organized by horizontal lines, dark and light, with various patterns of thickness changes. And that is -- that appears to be in common to at least some -- again, I should look. There was a huge dump load in the exhibits of pictures from all the various different devices. And I don't, without looking at them now, remember all of the patterns.
I am, right now, looking at the pattern in Exhibit 16, my report, on page -- we can talk

263

about it -- on page -- right above paragraph 71, which is a specific pattern. And that specific pattern is -- it looks like it's organized by horizontal lines of various thickness, light and dark, which -- which is similar in spirit to what we've seen already in figure 13 of 656 and in the Vinther. I can look at whether or not the other pattern -- I -- I'm not sure whether all patterns were the same or whether the patterns were -- had quite a bit of variation.
Q Okay.
THE REPORTER: Doctor, you're frozen for me. Is he frozen for everybody else?
MR. CUMMINGS: Yeah, I'm not seeing him at the moment.
THE REPORTER: Okay.
MR. CUMMINGS: Oh, I see him now.
THE WITNESS: You don't see me?
THE REPORTER: Okay. You froze.
Q Dr. Gortler, I didn't hear -- we didn't hear you for a second.
A Yeah. All right. Let me make sure my computer -- do you hear me now?
Q Yes.
A Okay. My computer sometimes -- I know

264

this is a problem -- I think it's -- it overheats, essentially, and then everything freezes. I think we're back now.
THE WITNESS: Okay. What was the last thing you heard me say?
THE REPORTER: It has to do with I don't know if all the patterns were the same.
THE WITNESS: Good. Thank you.
MR. CUMMINGS: Okay. I see the thumb.
A I'm not sure whether all the patterns for the whatever number, ten or so devices we were talking about were the same. I could have a quick look if you're interested. We had those in a pile of Exhibits A through F. In my documents that I'm looking at right now, and in Sadeghi, there was very little visual record, again, of what the actual patterns were. Again, there's one figure that I'm looking at which is the picture above -- I'm sure we'll talk about it -- which is above paragraph 71. But I'm not sure -- I'm not -- without looking again, I don't remember whether this is indicative of the other -- of only one of the products or all the products.
Q Okay. Now, getting -- getting to 71 -- we'll return to that. As part of your -- your

analysis under the element that says, Said coded elements of said first group are located -- I think we maybe need to go up a little bit, about -- I think -- okay. You're -- you're talking to -- yes, under 71, Said coded elements of said first group are located along the first virtual line, and said second coded elements of second group are located on a second virtual line. Okay.
And so -- and you mentioned that you state in -- you state what Dr. Sadeghi says in paragraph 7, and then you note that he relies on the image below. And so there's -- and you say there's no -- you say the image contains lines and rectangles; however, there's no visible alignment between the coded elements outlined by the thicker triangles that one could interpret as an alignment or epipolar line or projector meridians being located on said virtual line.
Again, you're saying that these are arranged at seemingly randomized positions that do not follow any particular alignment?
**A Correct.**
Q Okay. Now, is that -- I think you used almost the same -- you use the word random or randomized in your discussions of the disclosure of



the '656 patent, and that it was indefinite beyond this point.
**A Right.**
Q And so for that -- the reason that you disclosed in your -- I think it -- in your invalidity analysis concerning the '656 patent is the same reason that you're referring to it here on page 71 where you say that they are arranged in a seemingly randomized position that do not follow any particular alignment?
MR. PACELLI: Objection. Form.
**A So let me explain. So we talk about -- we talked about quite a bit the claims in '656 and whether or not they were describing anything in particular about how to arrange your pattern relative to the epipolar lines.**
**In this discussion right now, we're just saying, well, let's just look at a specific pattern and see is there any specific, careful, or at all clear alignment in the pattern that, again, is anything more than just something that would be necessarily true in almost any pattern, in which case -- okay.**
**So in that sense, this is the exact same issue. And what I'm saying here is when you have a**



**picture, 71, and we have a slide pattern, which I can look at and I can see is based on horizontal lines and -- with modulation of various thicknesses. And then somebody has drawn a red and a green line that are substantially vertical but not exactly vertical, and they are claiming that these are the epipolar lines. And let's stipulate that that is correct. I don't know.**
**And then they say, okay, well, let's just look at how these are aligned. So let's look at the red line. The red line, they're claiming -- they're claiming that the alignment that we see here -- the amazing invention is that it goes through this blue square on the top left of the red line and this blue rectangle on the bottom. Notice that the line goes through the left-hand side of the upper rectangle. And the right-hand side of the lower rectangle. That would be the worst version of alignment, getting -- you know, setting up a pattern that I could imagine. Right?**
**If you draw the line -- if you drew the line through the center of the elements, for example, which -- and again, these are two distinct elements. Actually, again -- we'll get back to that point. Looking at this figure, what I see is**



**actually the opposite of any kind of design alignment. What I'm seeing is somebody drew a line, and then somebody saw that it winged two shapes. I played the same game in my figure 5 which is after paragraph 72 of the Vinther pattern.**
**Vinther makes no claim whatsoever that he is trying to align anything with epipolar lines or trying to anything. He just has a pattern. His, again, is substantially 90 degrees. Again, his pattern is vertical, and the epipolar lines were horizontal. He makes no mention about the idea that he's going to, you know, attempt to have his pattern in any way organized by epipolar geometry.**
**But for fun, we drew two red lines which represent the horizontal lines in this geometry, and lo and behold, yeah, if you squint, you can see a bunch of blobs which would be the coded element that the red line kind of goes through. And we have two of them because we want to show that there's two groups. Groups each with, in this case, more than two. It has four elements. He also drew the blue line which is not epipolar at all. It's essentially a randomly chosen line. And lo and behold, it too goes through wings haphazardly or four blobs somewhere in the field of the -- of the scan.**

269

**So this is substantially no different than what was shown in the figure of the accused product that we just saw, wherein there is no -- there is nothing more than a haphazard -- some kind of loosey-goosey intersection between lines and some blobs, kind of, in a way that would have to happen no matter what you did. And so that -- that is what I was describing here, in more -- in more terms.**

Q So now, you say it in the second paragraph -- second sentence of paragraph 71 where it says, However, there is no visible alignment between coded elements, in quotes, and outlined by thicker rectangles that one could interpret as alignment.

Have you considered the possibility of whether coded elements might also include thinner -- thinner -- thin -- thinner rectangles or thinner spaces?

**A Well, looking at the figure, they outlined in this figure what they thought the coded elements were. So mostly I'm following their lead. They've drawn these squares and said these are the elements. And then they have tried to describe what they think is the elements being aligned along epipolar lines such as the red and green line.**

270

Q Okay. Go ahead.

**A It's possible that you could try again, and you could draw some more. I don't see it in here. There was also, again -- this -- I know in the -- in the exhibits for infringement, there was a kind of version of this figure for, I think, each of the ten products, and they all were like this. They all were -- almost all of them were obviously not aligned where -- you know, it was literally somebody threw a -- you know, somebody threw a dart and drew a big circle around where it hit in all of the figures, sort of like what you're saying on the red line here.**

**Again, I don't see any -- like I said, if you look at Tomasi -- we talked about this at length -- if you look at Le Moigne, it is apparent what is going on. It doesn't seem to be anything going on here. Though, you know, if you want to try again, sure.**

Q Okay. Now, I'm -- moving on, going down to your paragraph 75, this says, A line extending between a projector vertex is not perpendicular to either the projector optical axis or the device optical axis.

Do you see that?

271

**A Yes.**

Q Okay. Your -- your 75. And this is going back to -- I think, referring to Dr. Aikens' report, and we could take a look at that real quickly where he is identifying those. I think they begin -- going over to his report, Exhibit 18, starting, approximately, page 31, paragraph 55, I believe, he outlines --

**A I'm there.**

Q Okay. And he actually talks about the specific element beginning in paragraph 59, end of paragraph 59.

**A Yes.**

Q And so this appears -- is it correct that you're reading the element to mean or require that both the projector vertex and the device vertex both not be perpendicular to the optical axis or the device optical -- projector optical axis or the device optical axis?

**A Okay. So let's do this carefully. So first let's -- I will look at the picture -- let's first look at the picture on page 35 -- the pictures on page 35 of the Aikens report. And so, first, in terms of what we're looking at, the blue line is drawn as an approximation of the baseline. It seems**

272

**like a rough approximation. I'm fine with that. The red line, I'm not sure which is the camera and which is the projector. It's not important.**

**And what he is indicating here is that the red line, which he -- which he is describing as the optical axis of the camera/projector on the right-hand side of the picture, is perpendicular to the blue line. And that's -- is indicated by -- that little black rectangle is his indication of orthogonality, of a 90-degree relationship. And then there is the green line which is supposed to indicate the optical axis of the leftmost object. Again, maybe that is a camera; maybe that is a projector. It's not important. And that does not -- that appears to be at an angle that is not 90 degrees off the baseline. There's no block orthogonality indicator added into the picture.**

**In some of the examples, like in the MagicSwift Plus, the green line is almost 45 degrees off of the blue line. So they clearly indicate, we have a baseline that is blue. We have -- one of the axes is perpendicular, and one of them is not perpendicular. So that's what I see in these pictures.**

**So now let's return to the claim. This**

**is line -- this is right above -- I'll read the -- my citation of the claim right above 75 just where I think you pointed me to, quote, a line extending between the projector vertex and the device vertex -- that's the baseline -- is not perpendicular to either the projector optical axis or the device optical axis. So my read is that what they are describing here is a situation where the blue line is not perpendicular to either the red or the green. Okay?**

**But clearly, in the picture, it is -- that we just looked at, the blue was perpendicular to the red, but it was not perpendicular to the green. So in that sense, these pictures that are shown here do not correspond to what the claim language says.**

Q Okay. Let's -- let's move on. I want to turn to your report. Going down to the section that deals with the 129 patent, and the noninfringement of the 129 patent, and here, number 2, beginning at paragraph 100 and going on down from there.

**A I'm there.**

Q Okay. And so you state that -- let me see. I'm getting there. So the first -- and going further, under number A, you said, A preview mode



does not provide a position in orientation.

And again, so you're saying that -- to be clear what we're talking about here, that the accused products do not -- you're saying that the accused products do not provide the required preview mode of -- of a -- for 5A positioning and orientation. And you --

**A So the accused product do have a preview mode.**

Q Yes.

**A But having -- the claim here -- what I'm saying here is that having a preview mode does not correspond to the claim language of the '129 patent. It does have a preview mode.**

Q Okay.

**A But that preview mode -- and preview mode was in Rusinkiewicz already, and from -- I'm sorry -- so preview mode was in Rusinkiewicz, but to whatever degree you want to claim -- forgetting about the prior art, the -- the argument here is that we do have a preview mode, but that preview mode is not -- is not matching the claim here of providing position in orientation. And we can dive down into that and why I'm saying that if you're interested.**



Q Okay. Well, yes -- well, so the information here that -- you take a picture from one of the accused products here. I believe it was -- let's see if you say which one it is. You took this from a tutorial. They found it, and we see a picture there.

And is this picture that you show from a preview mode?

**A Yes, it is showing you the -- the scans that you have so far, and that is what we are calling preview mode.**

Q Okay. Now, I -- we'll go to the Sadeghi report.

**A That's what everybody -- I'm sorry, that's what we are calling it, and that's what Sadeghi is calling it. I'm just using that word preview mode. What it means is you show the scan -- the scans that have happened so far on the display.**

Q I see. Now, I'm going to turn your attention to where Dr. Sadeghi, in his report -- this is Exhibit 10 -- shows a similar -- the same kind of screen there. I'll get down to it. It's pretty far down. Okay. I think I have it here.

MR. PACELLI: Sorry, what paragraph?

MR. CUMMINGS: I'm sorry, I'm looking -- yeah, I'm trying to get the paragraph for you again.



I believe we're starting on -- on or about -- I don't think I have the right patent here. I'm sorry. I lost my bookmark here. Sorry, I had a bookmark, and somehow I'm not finding it. Okay. I'm getting down to his paragraph where he's talking -- this is 120 where he's describing the steps of you doing a scan, and this is page 51 of his Exhibit --

**A I'm there.**

Q Okay. And I note, in 121, he talks about a preview mode that goes through.

Do you see that there?

**A I do see that there.**

Q Okay. And he has two slides of -- in the preview mode. There's a top one. There's a bust of David, and another view, the bust of David, the second one.

**A I see them.**

Q Can you see that, from the two different figures here, one is showing at -- the bust at a different angle, where, in the top one, you can see both eyes and some of his left cheek; in the bottom, you cannot see his left eye and left cheek.

Do you see that?

277

**A I see that.**
Q Now, does that give you -- wouldn't that give you information concerning the orientation of the -- of the object in preview mode?
**A Yes -- so what happened -- the reason why there's two pictures is because someone has moved the camera. So in the first picture, they are showing you the scan when the camera is at one -- is looking at time number 1. And we have a later scan at figure -- on the bottom figure where this scan, now somebody has moved the camera, and we see the object, and it looks different because we've moved the camera.**
Q Okay. All right. It looks different, but one or the other, you can see -- wouldn't it be normal to understand that when you're looking at a -- a three-dimensional object that what information you -- what -- you can tell the orientation of that object by looking at the rendering here in the picture?
MR. PACELLI: Objection. Form.
**A Okay. So cutting to the chase, there are three parts to my discussion as to why the Creality preview doesn't match the claim language. And you are -- there's three parts to that argument, and**

278

**you're talking about one of the specific parts. So let me put this into context.**
**One of the arguments is that the claim language says to take, which the Court has read to me, to have. Again, just to set up the context. We can return to each of these in turn. So over there, the discussion is whether or not a preview of where the object is has any relationship to the claim language of providing information that the object is to take. We're not talking about that now, but that's sort of one part of that sentence.**
**The second part of that sentence or another part of the sentence is the word provide. And that's what we're talking about now. And we'll come right back to that. And then the third part of the claim is prior to taking an image. Prior to taking an image means it's information that is provided before an image has been taken. Okay. And again, the argument there is that, clearly, an image has been taken because we are looking at a scan. So there's three parts in the claim; neither of the three, I argue, have anything to do with the preview mode that we are looking at.**
**What you and I are now talking about, or the question that you asked about was, in some**

279

**sense, the word provide. Is this providing position and orientation?**
**So what it is providing is the raw data of what you see from one camera. Now, in a mathematical sense, it is certainly well-known that you can't know where things are from one camera. For example, when you watch --**
Q Excuse me. Excuse me, Dr. Gortler. I would like to turn to the subject, but I don't know how close we are in time, and I had a couple -- a few questions I would like to get in before the bell might ring today.
**A Okay.**
Q I want to return to the portion of your -- your rebuttal report, Exhibit 16, where you -- first, where you talk about how you have raw opinions about the benefits, or lack thereof, of the '656 patent. And the question, in looking at the benefits of it, particularly with respect to noninfringing alternatives, which I believe you talk about in your paragraph 92, it says, Mr. DeBaere said that he was not aware of any acceptable noninfringing alternatives, and you said that you disagreed, and you use Tomasi and Le Moigne's references as examples of such.

280

If the ultimate trier of fact, either the Court or the jury in this case, were, in fact, to conclude that the '656 patent was not invalidated, that there was -- it found some -- it was not invalid by either Tomasi or Le Moigne, are you aware of anything that would be considered acceptable noninfringing alternatives to the features and benefits of the '656 patent?
MR. PACELLI: Objection. Form.
**A Should I continue?**
Q Yeah.
**A Okay. So all I'm saying is that if you -- if somebody today could look at Le Moigne and look at Tomasi and say, oh, well, let me do what they are doing and let me line up my elements along the epipolar lines as shown by either Le Moigne or by Tomasi, and -- they could do that. I don't know anything about the legality -- legal issues involved with what happens when, for some reason, a patent is declared to be valid for some reason, but you could still do the prior art.**
**So again, the technical statement I want to say is that you certainly -- if you felt -- first of all, it is not at all clear -- let's back up. It is not at all clear anywhere that the Creality**

281

**projects are using, in their algorithms, any of the epipolar lines.**
**To the degree that you want to argue that the mere pattern that they are using is something that was owned by the '626, it is also something that was already done in Tomasi and Le Moigne. That's my technical statement. Anything beyond that would be a legal statement -- would be a legal argument that I'm not qualified to make.**
Q Okay. And I'm asking you -- it's sort of a pure fact question -- I mean it's a hypothetical, in that -- and I don't want to change it, but if we -- if a trier of fact were to say both that the patent was valid or not invalid, and conclude that any one or all of the accused products -- the accused -- that the accused products infringed the '656 patent, would there be an acceptable noninfringing alternative that -- that would be available?
**A Okay. So a lot of it would be -- depend -- I mean, someone would have to, at that point, explain to me what the limits of the '656 are. We talked about this at length. It's not really clear what it's saying. Once someone explains to me what the limits of the patents were, what are the kinds**

282

**of patterns that they are owning versus what kind of patterns do they not own, then it's a matter of changing your pattern. So once you told me what patterns Artec has a legal ownership of, I would change my pattern the next day.**
Q Okay.
**A And that would take about, you know, a day.**
Q Okay. And getting down --
**A Unless -- unless -- I'm sorry. Unless for some reason it has been decided that Artec owns every possible pattern that you could ever imagine, in which case -- yeah, in which case, I would, you know, file an appeal.**
Q Okay. And I'll have the same question -- we'll go to -- on the '129 patent. If it was both -- you know, it was not -- if it was found not invalid over the prior art that you cite in your original report in '07, would there be any -- are you aware of any acceptable noninfringing alternatives?
MR. PACELLI: Objection. Form.
**A Can you give me the paragraph, please?**
Q Okay. You -- you notice -- it's your paragraph 133.

283

**A Thank you.**
Q And I'll note just for the record that -- at the same time while you're getting there, that you said the same identical techniques are being provided by Rusinkiewicz and Hassebrook. And the hypothetical here is whether -- if some trier of fact finds it is not valid over either one, or any other art that might arise in this case.
**A Okay. Very similar answer here. First of all, again, I'm not making any claims on -- legal of any sort. I am simply saying that the preview in the product is indistinguishable in Rusinkiewicz. I do not -- as a matter of fact, as a matter of technical opinion. And that is clearly true.**
**Now, if you want to say that there is a patent, and the patent says something that is different, and that I can't do without paying somebody, I would like you to tell me what that is. And once you told me what that is, then I would think about what do I need to do that's different than that. Without knowing what the patent says, it's kind of an impossible question, other than saying, well, I know I could -- Rusinkiewicz did this. I'm -- let me just copy him, and hopefully that's fine. But again, you have a -- you've asked**

284

**me a hypothetical, but with not -- actually without enough information, other than that, to say anything else.**
Q Okay. And finally, we'll go down to your -- with respect to the '357 patent, and I believe your -- let me see if I can find it here. I do think you mention it. I'm trying to get to your paragraph. You can probably -- your paragraph 217.
I think there's a parallel. And the parallel is there where you say whether -- if, in fact, the trier of fact finds that the '357 patent is not invalid over Popescu or the page references, would you be -- are you -- sitting here, would you be aware of acceptable noninfringing alternatives?
MR. PACELLI: Objection. Form.
**A Let me read this for a second.**
**Again, very similar situation. We have a very long argument as to why we are not -- actually, let me think about that for a second -- okay. Yeah, so again, we have -- we didn't get a chance to talk about it, or we haven't yet had a chance to talk about it. We had a very long discussion of both the prior art and how it anticipates at least some interpretations of the '357. One can start reading the '357 more and more narrowly. And at some point,**

possibly not overlap 100 percent with the prior art. We had a very long discussion about why nothing in -- why the -- the accused products do not practice the claims as written under any interpretation.

I know that the most latest -- I haven't seen -- in the latest Sadeghi rebuttal, it seemed that the new idea that he was proposing was focusing on the words, for example, portion of a surface. It seemed like, in order -- it seemed like, in terms of invalidity, what he was arguing was, well, maybe the patent is not fully anticipated because it uses the word portion of the surface, and maybe that means that you shouldn't have a global threshold. You should only have a threshold for piece of surface. And if somebody said, oh, you're doing that in the accused products, which they aren't as we -- but they -- actually, they aren't doing any discarding whatsoever, but if that's what you argued, then I would say, oh, then I will remove the per portion -- for example, for the -- I would remove the per portion threshold. Okay?

So it's a really hard question to answer because, you know, the -- the meat of the questions come down to, you know, talking about invalidity and



infringement. But to the degree that you want to create a hypothetical that says the patent was both valid on the one hand, and the product, for some reason, is considered to be infringing, what you would do is, presumably, all this has happened because of some very, very specific state of affairs. And then you would change your code so that it wouldn't have that state of affairs.

But again, that's a very hard question to answer until all the other topics have been, you know, determined.

Q Okay. So then, to -- just to be clear, you can't state today if there's any scanners or products or disclosures in -- of any kind, in patents or other articles, that would disclose something that would be an acceptable noninfringing alternative should --

A Well, should somehow things be decided, I would, again, simply say, well, go back to Popescu and literally do exactly 100 percent what they did, and, in that sense, I don't see how, ultimately, you would be infringing.

So whatever it is that you decided was a special, magical thing that I don't know, then I would say, well, just go back to Popescu, read that



paper from start to end, make sure you do exactly what they do, nothing else and nothing more, and presumably, if the law is working, then that would have to be okay.

Q Okay. Now, getting to sort of a general topic, did you have discussions with Mr. Falconer in preparing your reports?

A We had one discussion, and I'm trying to remember when it was. I do not, offhand, remember. It was definitely not before I finished the invalidity report. I don't remember the timing of how that -- we could look it up. It's -- there's certainly record of when it was. I just don't remember whether -- whether it was before or after the invalidity report was finished. Let me see whether or not I mentioned him in this document.

What was his name again?

Q Falconer.

MR. PACELLI: Falconer.

Q Or Falconer.

A Yeah, Falconer. So I don't mention his name which suggests that it certainly wasn't particularly important or anything. So I think we had a conversation. I remember -- it was mostly about -- what was it about? And I think I ended up



talking about, like, the way you apportion the cost of a device. And it had to do -- and that was -- I think that was the most substantive part of that conversation was about what fraction of a device cost is related to what invention. I think that was the meat of the discussion that I had with Adam.

Q Okay. And I want to just turn to the -- your paragraph 83 in this part -- in this Exhibit 16. Your 83 on page 31.

A Yes, I'm there.

Q You see that Dr. Sadeghi appears to assume, without any support, that the '650 patent obligated the needs for the markers.

Can you recall where he states that in his report? We can go -- we can bring it up if you want to take a --

A Sure. I know that was heavily in Aikens' report, but let's -- let's -- it's been a while. Let's take a look and see what I'm referring to here.

MR. PACELLI: While Dr. Gortler looks for that information, I have a question for the videographer.

How much do we have on the record?

THE VIDEOGRAPHER: Seven hours and one

minute.
MR. PACELLI: So if we can keep it to this question, that would be great. I have a couple of minutes of a direct.
**A Okay. So this would be in the Sadeghi infringement. Okay. So this would be Exhibit 10, I believe. Okay. I will now -- I did a search for the word markers, and I found it.**
THE VIDEOGRAPHER: This is the videographer. Mr. Gortler -- Dr. Gortler, if you could make sure you keep your head in the frame.
THE WITNESS: Oh, I'm sorry. Yeah, I am sorry.
**A I'm looking right now at the Sadeghi report.**
**So in Sadeghi, paragraph -- paragraph 70, I believe, is the reference here. And he says, quote, this patent eliminates the overhead and simplifies the learning curve associated with using markers. That is the -- I believe what I'm referencing to when I say that the Sadeghi claims -- that it obviates the need for markers.**
Q Okay.
MR. CUMMINGS: Okay. So just to be clear, Counsel, you're -- you're -- so you're



telling me, since we are past the seven hours, you are ending the deposition, the main part?
Oh, you're -- you're on mute.
MR. PACELLI: I'm going to --
THE WITNESS: Turn the -- turn the camera?
MR. CUMMINGS: No, no, he -- no, no, he was fine. He's fine. I just didn't hear him.
MR. PACELLI: I'm just going to speak closer to the -- to the mic.
Yeah, I mean the rules, we have a seven-hour limit, and it's been a long day. I only have a couple minutes of direct. So yes, I would like to move on with my redirect [sic] and be done for the day.
MR. CUMMINGS: Okay.
EXAMINATION BY COUNSEL FOR THE DEFENDANTS
BY MR. PACELLI:
Q Okay. So I'm going to start with just -- just a couple of questions, Dr. Gortler, to clarify a couple of things that you said.
First of all, you recall counsel asked you --
MR. PACELLI: For the videographer, can you hear me?



THE VIDEOGRAPHER: Yes, sir.
MR. PACELLI: Okay.
Q So you recall counsel asked you whether you knew how the accused products, the defendant products use the epipolar geometry, correct?
**A That is correct.**
Q Okay. Now, I understand you said you didn't review this analysis, correct?
**A That is correct.**
Q Okay. Can you explain why you didn't do that analysis?
**A Sure. The way -- I think I explained. The way that I -- what I did was I looked at all -- in the infringement report, I looked at every single specific code, either variables or -- or -- so there were two separate things.**
**There was just a generic listing of dozens and dozens and dozens of file names. I did not -- in the beginning, I started looking at them, and I realized this was going to go nowhere. But the report has a number of specific discussion of specific variables and specific functions and specific interpretations of those. So what I did was look at each of those, and then spend time with the code, understanding what was going on in that**



**code, what the variables were doing, what the purpose of that was.**
**And I didn't do -- it would have been really -- well, it would have taken -- it would have been impossible -- or not impossible, but it would have taken months to simply do a top-to-bottom scan of what is going on in every single place of the code. I did not look. I suspect what I was looking at was maybe 10 percent of the code. I don't know exactly, but it was certainly a small fraction.**
Q Did you need to do that analysis in order to form your opinions on infringement?
**A No, I did not need -- so the -- most of -- all of the codes that were most relevant had to do with infringement on the '357. There was no claims ever about the code on the '656, for example, using the epipolar geometry within any piece of code. The only thing cited there was a calibration file and a procedure that read the calibration file. And that I looked at, yes. We could read the file and open it up. And, of course, you need calibration to do triangulation. That's very standard. And, of course, you could use calibration information for the inherent epipolar geometry of the physical object that you own, but there was**

293

**nothing else pointed to beyond that, and, of course, the patents themselves, which we have talked about at -- at length. So there was never any suggestion of any other code that was relevant towards infringement of '656.**

Q Okay. Do you recall that there were several questions regarding certain types of cameras of, let's say, historical significance, such as the image orthicon and the FLIR. Do you recall that?

**A Yes, I do.**

Q Do you know what would be the time frame, you know, the heyday of the image orthicon? Do you know?

**A So again, I'm not, certainly, an expert in the history of cameras. It certainly sounds like it was used primarily in the TV industry, probably going way back. As a practitioner -- so I started working in this area in the mid-'90s. And by then, we were using -- we were -- by the mid-'90s, we would not have been using an orthicon. In the mid-'90s, we would have been using a CCD camera that probably, in and of itself, produced an analog output, and then we would have hooked up to that what we call a digitizer scan, which would take an analog output of the CCD camera and turn that into a**

294

**digital -- a digital -- a digital representation.**

**Probably by, I would say, the late '90s, maybe '98, '99, I remember we were using FireWire cameras. That was another -- that, at that point, was actually a digital output-type camera. And then by a couple -- and again -- in those days, in 1998, 1999, like, a consumer, like, wouldn't know -- these were still specialized items. A FireWire camera was something that a man on the street would not have had or known what to do with. But then, of course, fast-forward another two or three years, and all of a sudden, you know, you're buying these little point-and-shoot cameras that have video. And at this point, you know, there's an entire revolution of consumer products where, now, digital, still, and video cameras is a standard consumer-level item, not, like, a special high-tech science lab item.**

**And so there was this real evolution where, in the olden times, people doing scanning were not using on-the-street technology. And they were using whatever technology they could find. And, you know, every year as time went on, the market changed, what you bought changed. And obviously, as we know, by -- I don't know what year the iPhone came out, but whatever -- I certainly,**

295

**well before 2002, had a point-and-shoot digital camera that did video.**

**And so, you know, it would have been, at that point in time, certainly by 2007, I would not have gone out and gotten an orthicon. I've never actually seen an orthicon. I would have, you know, gotten a -- I would have gone and gotten any sort of conventional, fully digital-output video camera.**

Q Okay. So by 2007, when both the '656 and the '129 patents were filed, if a -- a person of ordinary skill in the art heard of the camera, a digital camera, what kind of camera would they be thinking about?

**A They would be thinking of a fully -- possibly -- actually, possibly, a fully digital-output camera with a CCD or a CMOS with a conventional lens. This would have been, you know, what everybody would have known to be a camera. Again, presumably, you could maybe think really hard about funny things and ask -- you know, you could play an academic game, is this a camera? Is that a camera? But that's a game. Right? A camera -- everyone would know a camera when they see it.**

Q Okay. One last thing. I know, right at the beginning of this deposition, you mentioned

296

potential confusion between the '129 and the '357. I just wanted you to explain what this confusion consists in?

**A Oh, okay. So the reason why I'm confused -- I don't know if this is relevant to anything -- was because, although the patents are significantly different, at the end of the day, especially with relation to the infringement contentions, they both started focusing on the element of preview. So the '129 which is the providing position and orientation, as we discussed whatever that means, that ended up getting a discussion of, well, is a preview fitting that kind of description.**

**Meanwhile, in the '357, there was a claim -- I'm going to call it 12. I don't remember which claim it was -- which involved -- so '357 is about thresholds for quantity of data. And there was also a discussion of previews and how those previews might describe different levels -- different achievement of these thresholds. And that is -- because of the overlap due to the preview topic is the element where I sometimes lose track of if we're talking about a preview, are we talking about '357 for the purposes or are we talking about**

**the '129? And that's why I get confused.**
MR. PACELLI: Okay. No further questions.
MR. CUMMINGS: I do have a follow-up question based on Mr. Pacelli's question.
EXAMINATION BY COUNSEL FOR THE PLAINTIFF
BY MR. CUMMINGS:
Q When you talked about a calibration file, you said -- I think you -- when you -- this is in the context, if I recall, when I asked about which source code or which review you needed to do, and I think you mentioned a calibration file.
**A Yes.**
Q And you mentioned that in your report, your Exhibit 16, the May 7th rebuttal report, and 67.
Could we take a quick look at that?
**A No problem. So this is Exhibit 16, and I'll look for the words calibration file.**
**Is a there paragraph you wanted to look at first?**
Q 67. That was the one.
**A Good. Okay.**
Q Is this the calibration file that -- that you mentioned that you did look at? I just want to



make sure this is a reference to the same thing that -- when you answered that question.
**A Yes, it is.**
Q Okay. And this is -- you're, you know, saying that the calibration file is used, I guess, in the accused device at a software level and I want to -- to account for epipolar geometry; that's correct?
**A Yes and no. That's not quite correct. So we talked at length very early in the day about the idea that when you have a physical pair of cameras or a physical camera and projector, that if you want to do -- to do any kind of triangulation, you're going to have to first have a mathematical pinhole model that you hope and believe well-approximates the geometric properties of your physical camera and projector.**
**The way that is done as by doing a calibration process where you put up known objects into the scene, and you image them. Then you run optimization. And that gives you the -- tells you what the geometry of this pinhole approximation model is. And it also gives you data about, you know, to what degree is this an accurate representation or to what degree is this a failure.**



**So calibration always needs to be done when you're triangulating. And clearly, the accused products do -- they do triangulation. I would have told you they do calibration without you telling me. But they do calibration. There's a calibration file. And they read that file. And that information is essential in the triangulation process.**
**Now, once you know the pinhole model, you know the epipolar geometry inherent in the projector/camera pair. It's a mathematical statement. It doesn't mean that you're going to use that in any way. It doesn't mean that -- you may or may not use that in your correspondence algorithm. You can. You would know it from the calibration data. But you would need the calibration data for any triangulation. And that doesn't mean that you are going to take advantage of any of the epipolar geometry. It means that you could take advantage of the epipolar geometry.**
Q Okay. Thank you.
MR. CUMMINGS: I don't have any further questions at this time.
THE WITNESS: Thank you.
MR. CUMMINGS: All right. I think we're



all set.
THE VIDEOGRAPHER: All right. This marks the end of the deposition of Steven Gortler. The time is 3:54 p.m.
(Off the record at 3:54 p.m.)

301

CERTIFICATE OF REPORTER - NOTARY PUBLIC

I, Cynthia Lichtman, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me and thereafter reduced to typewriting under my direction; that reading and signing was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 12th day of June, 2025.

My Commission Expires: April 7, 2026

Cynthia Lichtman
Notary Public in and for the State of California

**A**
**a1**
77:24, 239:2, 239:5
**a2**
239:2, 239:3, 239:5
**abacus**
153:5, 153:7, 153:11
**able**
9:19, 16:16, 30:3, 41:15, 204:21
**above**
113:8, 113:9, 122:20, 159:21, 159:23, 160:3, 160:4, 160:25, 162:3, 167:4, 174:3, 177:14, 193:4, 207:11, 248:23, 263:1, 264:18, 264:19, 273:1, 273:2
**absolutely**
59:16, 227:17
**abstract**
96:9, 96:11, 150:7, 154:15, 159:24, 166:2, 178:5
**abstractions**
119:23
**abstractly**
184:10
**academic**
20:22, 75:5, 295:21
**accent**
228:25
**accenting**
229:1
**accept**
138:17
**acceptable**
108:6, 279:23, 280:6, 281:17, 282:20, 284:14, 286:16
**accident**
170:16, 170:18, 170:21, 170:23
**accidental**
125:11, 127:2
**accompanying**
130:21, 131:3, 131:6
**account**
298:7
**accounting**
139:14
**accuracy**
126:7
**accurate**
11:25, 13:17, 18:6, 53:14, 298:24
**accused**
174:11, 174:17, 245:20, 246:2, 249:23, 250:13, 252:16, 254:4, 254:5, 255:7, 255:16, 255:17, 256:10, 256:15, 257:11, 259:24, 260:25, 261:9, 261:13, 262:2, 269:2, 274:4, 274:5, 274:8, 275:3, 281:15, 281:16, 285:3, 285:17, 291:4, 298:6, 299:2
**accusing**
254:20
**achievement**
296:21
**acknowledge**
169:2
**acknowledged**
184:24
**acquisition**
5:14, 229:18
**across**
82:12, 173:14
**act**
32:14
**acting**
32:8, 232:22
**action**
150:24
**actual**
35:13, 35:19, 44:15, 44:18, 49:16, 49:24, 89:4, 132:23, 133:23, 145:3, 145:5, 145:14, 151:25, 153:3, 236:1, 264:16
**actually**
7:18, 16:23, 17:7, 17:9, 33:24, 35:21, 36:8, 38:10, 41:16, 43:4, 43:10, 43:24, 45:13, 45:25, 46:24, 49:5, 52:16, 58:23, 59:8, 66:14, 67:11, 74:23, 76:2, 77:23, 82:11, 98:17, 107:24, 109:10, 114:18, 117:6, 123:9, 123:11, 125:10, 127:22, 128:4, 131:13, 132:9, 140:23, 144:12, 150:2, 151:11, 164:3, 167:17, 168:1, 172:8, 174:2, 180:18, 194:23, 195:15, 197:16, 203:17, 211:13, 224:6, 224:7, 225:19, 231:20, 244:1, 253:22, 255:24, 257:4, 267:24, 268:1, 271:10, 284:1, 284:18, 285:18, 294:5, 295:6, 295:15
**ad**
193:22
**adam**
288:6
**adams**
3:22
**add**
49:21, 52:16, 52:18, 105:8, 148:7
**added**
141:10, 272:17
**adding**
164:1
**addition**
61:20
**additional**
53:7, 141:10
**additions**
12:16
**additive**
43:4
**address**
23:2, 131:15, 211:21
**addressed**
28:2
**addresses**
130:22, 131:8, 131:18, 133:8
**adds**
231:16
**adjacent**
129:11, 220:14
**adjective**
140:9
**admit**
62:15
**adult**
15:14
**advance**
180:15
**advancing**
67:7

**advantage**
238:13, 256:7, 299:18, 299:19
**advice**
221:15
**affairs**
286:7, 286:8
**affect**
126:18, 185:21
**affecting**
8:7
**affine**
97:19, 97:20, 97:21, 97:22
**affirmed**
7:2
**affixed**
301:13
**afraid**
241:3
**after**
113:10, 147:4, 161:3, 161:13, 169:12, 238:8, 240:12, 268:4, 287:14
**afternoon**
108:3
**ago**
40:20, 91:16, 215:5
**agree**
54:4, 81:14, 119:11, 144:7, 144:23, 157:8, 157:13, 157:15, 157:23, 169:7, 171:23, 186:5, 186:12, 251:6
**agreement**
2:23, 117:13, 183:2
**agriculture**
259:2
**ahead**
9:20, 53:23, 84:10, 112:21, 117:7, 129:19, 135:23, 139:9, 139:10, 139:18, 139:25, 140:22, 166:15, 186:22, 201:6, 205:7, 212:1, 270:1
**aikens**
3:20, 4:19, 5:19, 64:5, 80:2, 81:22, 109:25, 243:17, 245:18, 246:14, 247:25, 249:19, 254:8, 261:15, 271:3, 271:23, 288:17
**air**
46:7
**airport**
219:12
**al**
6:4, 56:5, 61:13
**alexander**
27:11
**alexandrovich**
27:11
**algorithm**
126:19, 199:11, 205:4, 206:3, 259:3, 260:16, 299:14
**algorithmically**
157:17
**algorithms**
31:23, 255:16, 256:6, 256:11, 256:14, 256:15, 257:11, 258:3, 259:24, 281:1
**alice**
183:9
**align**
126:21, 153:11, 163:2, 164:17, 213:21, 238:23, 239:8, 240:8, 268:7
**aligned**
120:25, 133:22, 134:18, 148:19, 151:12, 155:6, 161:6, 168:8, 172:22, 180:13, 180:18, 267:10, 269:24, 270:9
**alignment**
144:24, 153:6, 155:7, 155:8, 155:10, 161:23, 238:18, 265:14, 265:16, 265:21, 266:10, 266:20, 267:12, 267:18, 268:2, 269:11, 269:14
**aligns**
239:11
**allow**
41:19, 41:21
**allowing**
42:18
**allston**
23:6
**almost**
20:11, 41:24, 47:19, 67:14, 73:15, 101:9, 107:25, 108:2, 230:11, 265:24, 266:22, 270:8, 272:19
**along**
12:24, 18:15, 56:15, 88:3, 88:7, 88:9, 88:21, 89:17, 89:21, 89:22, 101:4, 129:4, 129:7, 130:3, 133:6, 133:15, 150:5, 150:8, 150:20, 150:22, 150:25, 154:18, 154:19, 155:18, 155:25, 156:19, 160:14, 160:19, 160:23, 163:5, 163:15, 163:16, 163:24, 164:24, 165:2, 165:8, 166:8, 166:13, 166:21, 166:24, 167:5, 167:6, 167:7, 168:11, 168:18, 176:5, 176:6, 183:1, 209:16, 265:6, 269:24, 280:15
**already**
11:13, 27:24, 28:19, 67:13, 78:24, 89:16, 90:22, 93:22, 154:20, 167:20, 174:4, 180:14, 197:8, 227:2, 234:17, 234:21, 237:1, 237:18, 239:7, 246:14, 263:6, 274:17, 281:6
**also**
3:18, 9:4, 9:11, 10:18, 12:21, 17:22, 18:20, 19:22, 22:12, 23:8, 26:7, 32:23, 32:25, 33:9, 35:14, 52:1, 52:6, 73:13, 73:21, 74:14, 76:15, 95:6, 115:16, 116:3, 117:10, 122:19, 146:1, 149:25, 152:10, 154:6, 162:6, 165:5, 166:19, 189:1, 189:17, 192:18, 196:9, 196:14, 210:21, 211:8, 226:8, 227:14,

230:23, 233:2, 238:4, 238:21, 250:14, 255:14, 258:8, 268:21, 269:16, 270:4, 281:5, 296:19, 298:23
**alternative**
281:18, 286:17
**alternatives**
279:20, 279:23, 280:7, 282:21, 284:14
**although**
7:12, 49:22, 167:20, 168:14, 176:10, 220:8, 296:6
**always**
125:2, 172:24, 190:20, 190:21, 194:7, 204:12, 247:6, 299:1
**amazing**
267:13
**american**
19:17, 20:12
**among**
64:19, 210:9, 210:10
**amount**
41:23, 42:20, 126:13, 239:23
**amplification**
51:25, 52:20
**amplifies**
50:25
**amplitude**
190:11, 190:24, 191:2, 192:11, 193:11, 201:12, 201:15, 202:1, 204:3
**analog**
293:22, 293:25
**analysis**
143:3, 177:21, 183:8, 183:10, 184:11, 185:6, 185:21, 211:15, 244:24, 248:19, 249:5, 257:8, 265:1, 266:6, 291:8, 291:11, 292:11
**analyze**
127:21, 220:15, 261:16
**analyzed**
164:22
**analyzing**
165:1
**anchor**
234:11, 234:12, 235:23, 237:10, 237:22, 237:25, 238:4, 238:5, 238:8, 238:23, 239:6, 239:19, 239:21, 240:7, 240:12, 240:17
**anchors**
238:21, 239:12, 240:19
**andrea**
3:11, 6:18, 23:13, 45:25
**angle**
272:15, 276:22
**animals**
254:22
**another**
8:7, 17:16, 20:15, 21:9, 38:11, 39:7, 39:11, 39:12, 49:4, 49:6, 63:8, 89:24, 97:24, 106:3, 107:25, 137:24, 140:1, 147:16, 150:6, 189:4, 191:24, 200:7, 232:1, 232:8, 234:5, 236:19, 237:25, 276:17, 278:13, 294:4, 294:11
**answer**
8:25, 9:5, 9:14, 9:19, 9:20, 12:19, 18:23, 30:17, 37:23, 44:1, 50:12, 66:6, 66:11, 67:16, 72:9, 84:11, 84:12, 111:9, 120:20, 121:12, 126:5, 134:2, 134:11, 135:5, 140:21, 146:17, 155:18, 158:21, 160:21, 255:21, 258:14, 258:22, 260:12, 283:9, 285:23, 286:10
**answered**
55:4, 298:2
**answering**
7:25
**answers**
8:10
**anticipate**
146:4, 237:8
**anticipated**
285:12
**anticipates**
284:23
**anybody**
20:11, 23:11
**anymore**
49:20
**anyone**
23:14, 257:9
**anything**
8:6, 8:19, 21:19, 54:7, 94:8, 137:7, 145:12, 148:1, 162:17, 163:12, 164:14, 167:3, 167:4, 168:17, 170:3, 170:21, 176:1, 187:25, 188:12, 188:13, 189:21, 190:1, 204:20, 205:16, 215:8, 220:9, 221:12, 223:4, 224:4, 224:15, 246:12, 259:23, 261:4, 261:20, 266:14, 266:21, 268:7, 268:8, 270:17, 278:22, 280:6, 280:18, 281:7, 284:2, 287:23, 296:6
**anytime**
48:22
**anyway**
105:11
**anywhere**
94:23, 140:11, 152:4, 170:19, 280:25
**apart**
50:4, 246:5
**aperture**
41:14
**apologize**
104:4, 109:2, 209:5
**apparent**
134:24, 148:21, 151:10, 162:13, 163:4, 270:16
**appeal**
282:14
**appear**
77:21, 89:22, 93:7, 93:15, 93:17, 93:21, 93:22, 96:22, 122:17, 124:20, 125:2, 125:6, 125:15, 127:19, 139:12, 155:3, 210:2, 212:8
**appeared**
88:8, 94:8,

151:2
**appears**
12:4, 17:21, 18:9, 58:4, 59:2, 98:12, 118:1, 130:17, 138:24, 138:25, 144:25, 145:21, 148:21, 152:5, 172:18, 194:5, 206:2, 262:18, 271:14, 272:15, 288:11
**applicant**
120:3
**application**
4:21, 185:14
**applied**
99:3, 99:16
**applies**
177:22, 244:24
**apply**
17:12
**applying**
185:9
**apportion**
288:1
**appropriate**
243:8
**appropriately**
130:6
**approximate**
12:12
**approximately**
9:23, 61:10, 96:15, 97:19, 106:9, 117:4, 125:13, 125:15, 154:13, 271:7
**approximates**
45:12
**approximation**
271:25, 272:1, 298:22
**april**
11:15, 17:23, 102:5, 108:24, 112:19, 143:4, 246:24, 247:25, 301:15
**arbitrary**
179:16
**area**
14:17, 69:22, 84:25, 85:11, 253:7, 293:18
**areas**
42:23
**aren't**
126:13, 285:17, 285:18
**argue**
81:24, 204:6, 278:22, 281:3
**argued**
84:22, 142:4, 285:19
**arguing**
285:11
**argument**
159:16, 180:6, 182:6, 216:12, 274:20, 277:25, 278:19, 281:9, 284:18
**arguments**
278:3
**arise**
283:8
**around**
36:7, 40:13, 59:10, 71:2, 74:7, 74:21, 94:17, 97:13, 108:4, 200:25, 228:14, 228:15, 231:18, 239:15, 248:16, 257:2, 270:11
**arrange**
266:15
**arranged**
121:22, 132:8, 152:3, 265:20, 266:8
**arrangement**
129:17, 130:1, 182:13
**arranging**
130:6, 195:8
**array**
50:9, 129:1, 129:5, 129:9, 129:14, 130:2, 130:11, 130:13, 130:15, 130:23, 130:24, 131:5, 131:8, 192:15, 192:16
**arrayed**
169:5
**arrows**
89:2
**art**
11:2, 19:15, 47:6, 66:20, 110:20, 111:1, 111:6, 115:24, 120:2, 143:17, 144:1, 144:9, 145:25, 146:2, 146:7, 146:8, 146:21, 146:25, 147:16, 147:20, 147:23, 169:19, 174:18, 175:5, 175:14, 175:15, 176:2, 176:5, 176:10, 176:16, 176:17, 184:6, 184:24, 185:20, 186:14, 197:12, 197:23, 199:8, 221:8, 222:22, 222:25, 274:20, 280:21, 282:18, 283:8, 284:23, 285:1, 295:11
**artec**
1:4, 6:3, 6:16, 179:5, 179:9, 179:16, 245:19, 254:20, 282:4, 282:11
**articles**
286:15
**artistic**
43:1
**as-small-as-possible**
41:15
**ascribe**
84:6, 102:14
**asked**
10:2, 10:3, 10:5, 10:6, 10:12, 10:23, 11:5, 11:6, 25:10, 28:16, 37:23, 46:20, 55:3, 85:18, 235:23, 238:22, 239:3, 239:11, 246:6, 248:5, 256:9, 258:12, 258:20, 260:10, 278:25, 283:25, 290:22, 291:3, 297:10
**asking**
80:7, 102:11, 139:19, 140:25, 146:14, 213:4, 238:16, 246:2, 259:19, 281:10
**asks**
238:19
**aspect**
103:7
**aspects**
95:15
**assert**
185:7
**asserted**
183:19
**assertion**
183:22
**assessment**
116:20
**assigned**
192:16, 193:7, 207:21, 211:22, 212:25
**assigning**
192:13

**assigns**
191:24, 192:20
**assist**
121:5
**associate**
182:10
**associated**
100:6, 220:22, 221:1, 289:19
**assume**
8:19, 28:20, 61:5, 227:9, 288:12
**assumed**
167:13, 170:6
**assumes**
129:22
**assuming**
79:8, 185:8
**assumption**
16:6, 94:1, 235:8
**astigmatism**
85:5
**atomic**
203:19, 204:15, 204:19, 210:20
**atop**
164:17
**attached**
4:7, 5:4, 11:18, 13:2, 18:3, 24:25, 26:1, 28:11, 57:7, 64:3, 77:18, 109:4, 112:1, 114:9, 139:4, 140:4, 225:14, 228:3, 241:16, 248:2
**attempt**
148:14, 148:22, 217:23, 218:11, 240:8, 259:15, 268:12
**attempted**
261:16
**attempting**
168:13
**attend**
216:9
**attending**
6:12
**attention**
137:9, 149:1, 244:19, 275:20
**attorney**
9:11
**attorneys'**
1:13
**attribute**
192:14
**august**
24:21, 25:2
**authors**
20:6, 22:11, 225:25
**automatic**
238:18
**available**
252:8, 281:19
**avenue**
3:13
**avoid**
157:2
**aware**
12:15, 20:18, 97:23, 106:3, 254:18, 279:22, 280:5, 282:20, 284:14
**away**
23:13, 27:5, 35:25, 39:16, 74:4, 95:7, 142:13, 142:14, 142:24, 145:15, 147:15, 148:3, 227:19, 248:4
**awry**
126:22
**axes**
272:22
**axis**
82:1, 83:17, 83:18, 85:7, 121:24, 129:12, 243:13, 270:23, 270:24, 271:17, 271:18, 271:19, 272:6, 272:12, 273:6, 273:7

**B**

**b**
17:19
**back**
35:18, 35:21, 37:19, 39:9, 45:18, 46:10, 52:10, 55:12, 59:3, 60:2, 61:9, 61:10, 66:4, 67:11, 68:1, 68:2, 68:4, 68:6, 71:2, 72:13, 74:21, 80:2, 80:9, 87:8, 90:7, 92:17, 92:22, 92:23, 94:11, 96:13, 101:6, 101:10, 108:19, 110:11, 112:15, 112:18, 116:4, 117:1, 117:2, 117:3, 118:24, 122:12, 135:10, 135:12, 136:18, 136:19, 144:10, 146:5, 153:23, 156:15, 159:11, 165:24, 166:1, 166:3, 171:17, 176:22, 177:14, 180:1, 181:9, 185:10, 198:21, 198:22, 205:5, 208:1, 211:18, 214:22, 215:12, 223:17, 223:21, 235:25, 244:5, 244:11, 246:21, 247:6, 247:13, 247:21, 249:17, 252:8, 253:11, 254:3, 255:2, 255:12, 258:15, 258:23, 260:23, 264:3, 267:24, 271:3, 278:15, 280:24, 286:19, 286:25, 293:17
**background**
16:11, 29:25, 150:14, 183:14, 186:10, 187:21
**backwards**
94:4, 174:23
**bad**
28:3, 156:6
**barely**
168:7, 168:9
**based**
74:4, 97:19, 141:8, 147:16, 147:23, 149:10, 154:19, 181:16, 183:20, 186:9, 190:3, 190:4, 190:21, 196:10, 198:2, 199:4, 199:23, 205:16, 205:25, 220:3, 252:20, 254:1, 258:16, 267:2, 297:5
**baseline**
92:7, 92:11, 103:22, 104:16, 107:4, 122:8, 122:15, 124:14, 128:13, 271:25, 272:16, 272:21, 273:5
**bases**
127:12
**basic**
7:14, 38:7, 174:3
**basically**
30:20, 126:25

**basis**
258:20
**beads**
153:5, 153:7, 153:11
**beam**
188:4
**beams**
188:23, 188:24
**bear**
69:13
**beat**
184:17
**beating**
158:24
**beautiful**
46:8
**because**
9:16, 13:9, 21:1, 22:7, 26:19, 28:1, 36:18, 37:12, 38:7, 38:21, 40:12, 40:14, 42:2, 42:14, 42:25, 44:8, 45:2, 49:23, 53:25, 59:4, 73:23, 74:19, 81:12, 87:6, 87:24, 90:9, 93:2, 93:12, 119:19, 121:9, 123:10, 125:7, 125:22, 126:6, 128:8, 131:14, 134:12, 137:5, 137:12, 137:25, 150:18, 158:14, 165:18, 167:22, 168:15, 170:13, 171:17, 180:11, 180:14, 180:19, 185:10, 188:18, 188:24, 192:3, 193:5, 201:22, 203:8, 203:17, 205:10, 208:12, 215:17, 217:6, 226:4, 227:14, 234:25, 235:6, 235:11, 235:19, 236:11, 236:25, 245:15, 247:20, 249:17, 252:17, 268:19, 277:6, 277:12, 278:20, 285:12, 285:24, 286:6, 296:6, 296:22
**become**
26:22, 67:8
**becomes**
105:11, 202:11, 218:19
**been**
7:21, 7:24, 10:3, 10:4, 16:20, 23:22, 25:12, 37:16, 38:19, 47:19, 52:23, 54:21, 62:1, 66:9, 67:15, 74:13, 88:3, 104:12, 128:10, 138:10, 147:21, 151:11, 158:24, 167:1, 194:7, 212:10, 214:12, 236:7, 239:7, 243:20, 243:23, 257:15, 257:16, 278:18, 278:20, 282:11, 286:10, 288:18, 290:12, 292:3, 292:5, 293:20, 293:21, 295:3, 295:17
**beeping**
46:6
**before**
2:23, 7:10, 9:5, 9:13, 16:12, 17:7, 38:10, 55:10, 90:11, 91:9, 92:17, 92:18, 108:2, 109:13, 113:20, 142:7, 156:18, 174:17, 219:17, 224:25, 237:1, 242:20, 244:1, 246:22, 278:18, 279:11, 287:10, 287:14, 295:1, 301:2
**begin**
271:6
**beginning**
59:2, 60:13, 66:21, 70:3, 85:23, 88:24, 100:3, 112:22, 113:2, 120:24, 143:4, 143:6, 231:24, 234:17, 244:20, 271:11, 273:20, 291:19, 295:25
**begins**
6:1, 111:13, 164:20, 186:17, 248:16
**behalf**
3:2, 3:10
**behave**
41:24, 43:8, 43:21, 73:10, 75:8, 75:9, 75:10, 95:19, 99:20
**behaved**
73:15, 82:24
**behaves**
32:11, 34:25, 82:5, 82:8, 83:17
**behaving**
44:13, 44:24, 44:25, 45:1, 45:3, 73:8
**behavior**
31:21
**behind**
35:21, 35:25, 37:5, 37:18, 39:15, 40:3, 87:19, 91:22, 105:6, 131:4
**behold**
78:23, 79:4, 268:16, 268:23
**being**
7:2, 25:11, 26:8, 33:8, 40:3, 43:12, 49:18, 68:15, 72:2, 76:12, 88:13, 96:14, 100:15, 107:12, 116:9, 116:15, 116:16, 116:17, 120:5, 124:19, 128:15, 136:21, 138:15, 140:9, 143:13, 143:14, 150:16, 150:25, 156:9, 161:25, 164:22, 166:8, 166:13, 168:25, 175:11, 178:21, 179:24, 188:21, 189:6, 194:17, 194:18, 194:19, 199:25, 208:4, 208:23, 234:22, 265:17, 269:24, 283:4
**belief**
97:17, 240:1
**believe**
16:13, 29:16, 34:8, 46:13, 46:19, 54:13, 55:20, 55:24, 56:17, 57:13, 58:25, 60:12, 60:14, 65:25, 77:12, 81:7, 81:9, 81:16, 84:25, 87:3,

87:8, 91:22, 92:21, 96:14, 103:3, 105:15, 105:18, 107:1, 107:21, 109:25, 111:11, 114:18, 116:1, 117:14, 119:8, 139:22, 143:5, 143:24, 143:25, 151:1, 162:11, 166:23, 182:20, 196:20, 197:11, 225:6, 230:23, 233:15, 233:20, 238:24, 241:21, 243:6, 247:18, 248:15, 258:9, 271:8, 275:3, 276:2, 279:20, 284:6, 289:7, 289:17, 289:20, 298:15
**bell**
279:11
**below**
233:2, 265:12
**benefit**
167:15, 167:23, 170:5
**benefits**
279:17, 279:19, 280:8
**best**
33:20, 67:18, 67:20, 84:14, 84:15
**better**
16:3, 45:1, 136:13, 147:17, 220:13, 225:3, 229:9
**between**
21:14, 26:18, 37:5, 40:1, 54:22, 54:23, 90:1, 91:3, 96:6, 97:5, 111:5, 122:6, 122:9, 124:14, 130:10, 133:18, 137:7, 156:1, 156:10, 161:2, 193:17, 199:16, 200:17, 200:18, 205:2, 208:11, 209:3, 209:18, 209:19, 209:20, 210:12, 210:13, 213:24, 265:15, 269:5, 269:12, 270:22, 273:4, 296:1
**beyond**
53:8, 165:13, 167:4, 174:3, 176:20, 176:25, 224:17, 266:1, 281:7, 293:1
**bibliography**
57:17
**big**
13:14, 89:21, 151:15, 151:20, 167:9, 202:24, 270:11
**binary**
80:19, 191:25, 192:2, 192:17, 192:23, 193:5, 193:10
**binding**
103:19
**biometric**
242:15
**bit**
35:1, 54:11, 59:4, 59:11, 69:22, 72:20, 73:22, 79:15, 83:20, 90:7, 103:20, 113:1, 135:7, 141:19, 142:7, 154:23, 158:24, 158:25, 171:17, 200:22, 200:25, 203:15, 203:23, 210:18, 211:5, 237:15, 241:4, 263:10, 265:3, 266:13
**black**
34:17, 34:19, 34:20, 102:19, 181:22, 182:2, 182:6, 272:9
**blah**
223:25
**bleeping**
177:7
**blob**
132:13, 132:14, 151:10, 163:13, 163:23, 190:8, 190:9, 195:12
**blob-based**
181:15, 181:20
**blobby**
188:20
**blobs**
132:5, 133:25, 134:18, 144:3, 151:14, 151:17, 151:20, 151:21, 152:7, 152:11, 153:3, 153:14, 160:25, 162:12, 162:18, 162:20, 162:22, 163:2, 163:5, 163:7, 163:19, 164:7, 168:4, 172:7, 172:11, 172:22, 172:24, 173:11, 173:12, 173:19, 180:24, 181:12, 181:13, 194:2, 195:10, 195:13, 199:5, 213:14, 213:15, 213:20, 213:23, 268:17, 268:24, 269:6
**block**
37:13, 168:9, 272:16
**block-based**
181:21
**blocks**
181:24
**blow**
193:23
**blue**
190:13, 211:17, 267:13, 267:14, 268:21, 271:24, 272:8, 272:20, 272:21, 273:9, 273:12
**blur**
16:24, 17:2, 17:3, 42:25, 82:7
**blurry**
42:6
**body**
118:20, 184:23, 185:18, 221:5
**boilerplate**
144:21
**bolded**
113:21
**book**
15:16, 22:10, 22:13, 22:16, 22:20, 103:20, 231:21
**bookkeeping**
215:7
**bookmark**
276:4, 276:5
**books**
15:18
**boston**
23:6
**both**
9:9, 13:17, 18:18, 30:17, 67:10, 79:13, 84:18, 85:9, 99:22, 102:23, 113:12, 117:9, 117:22, 117:24, 118:9, 118:20,

121:2, 123:6, 124:25, 128:18, 129:14, 129:20, 146:6, 155:22, 156:5, 171:20, 177:18, 177:22, 177:23, 196:3, 210:19, 244:24, 261:15, 271:16, 276:23, 281:13, 282:17, 284:22, 286:2, 295:9, 296:9
**bottom**
24:9, 27:20, 39:9, 113:9, 149:2, 154:12, 161:17, 166:10, 168:22, 171:8, 185:10, 231:10, 232:2, 248:16, 267:15, 276:23, 277:10
**bought**
67:12, 78:15, 78:16, 79:8, 85:1, 294:23
**bounced**
156:1, 156:9
**bouncing**
200:24
**box**
35:15, 36:8
**brackets**
177:16
**brailov**
24:22
**break**
54:24, 55:5, 59:9, 59:13, 80:4, 108:4, 159:1, 159:3, 159:4, 214:14, 233:25, 243:20, 244:4
**breaks**
54:23
**breaths**
8:14
**briefly**
28:1, 47:21, 89:9, 89:13, 107:23, 117:2, 135:10, 137:8, 159:21, 177:14, 216:19
**bright**
36:7, 189:3, 189:4, 189:5, 190:7, 190:10, 202:25
**brightness**
17:3, 36:14, 37:1, 190:12, 190:24, 193:3
**bring**
62:24, 63:8, 247:6, 253:6, 253:11, 288:15
**broad**
49:7, 49:8, 49:12, 50:18, 51:17
**broadest**
49:9
**broadly**
62:6
**broom**
32:13
**building**
23:9
**built**
155:7
**bull's-eye**
44:6
**bullet**
240:11
**bunch**
91:25, 106:17, 107:14, 132:4, 151:14, 151:15, 151:20, 164:7, 197:3, 268:17
**bust**
276:16, 276:17, 276:21
**butcher**
109:1
**button**
11:20
**buy**
45:2, 49:1, 67:17, 85:15
**buying**
294:12

C

**caffeine**
59:17
**calcium**
17:9
**calibrate**
44:21
**calibration**
44:2, 45:8, 292:18, 292:19, 292:22, 292:23, 297:8, 297:12, 297:19, 297:24, 298:5, 298:19, 299:1, 299:4, 299:5, 299:15, 299:16
**california**
2:25, 301:19
**call**
30:24, 34:14, 34:23, 35:5, 35:6, 35:9, 41:14, 50:8, 53:16, 62:19, 67:7, 84:17, 92:7, 132:5, 132:17, 132:18, 133:13, 133:16, 181:20, 189:20, 202:19, 227:22, 229:1, 232:18, 235:4, 256:21, 257:17, 258:7, 258:10, 259:14, 293:24, 296:16
**called**
16:14, 32:25, 43:12, 43:16, 47:3, 80:23, 89:4, 92:15, 94:16, 100:18, 101:13, 103:17, 104:13, 113:6, 128:4, 132:6, 132:16, 134:1, 144:2, 198:23, 213:17, 225:7, 225:8
**calling**
32:16, 34:8, 130:11, 207:25, 275:11, 275:15, 275:16
**calls**
103:3, 104:9, 104:10, 128:25, 129:1, 139:17, 140:20, 250:9
**camcorders**
67:9
**came**
18:21, 21:21, 231:21, 294:25
**camera's**
129:18
**cameras**
14:8, 32:4, 32:5, 32:7, 33:4, 35:6, 38:2, 39:14, 40:14, 42:8, 43:6, 44:4, 45:21, 46:18, 46:24, 47:10, 47:12, 49:1, 49:24, 50:4, 50:6, 50:16, 50:22, 51:7, 52:23, 52:24, 65:9, 66:14, 67:10, 67:17, 78:15, 82:19, 82:24, 86:25, 87:12, 88:25, 94:13, 98:23, 99:7, 99:8, 99:20, 107:4,

117:9, 120:25, 189:24, 233:21, 234:2, 242:11, 242:12, 242:14, 242:16, 242:20, 246:3, 250:8, 251:7, 255:25, 293:7, 293:15, 294:4, 294:13, 294:16, 298:12
**can't**
8:25, 52:13, 59:4, 90:9, 115:5, 123:6, 146:2, 169:25, 279:6, 283:17, 286:13
**cannot**
95:20, 276:24
**capital**
88:1, 90:4, 90:23, 95:7, 103:14
**captions**
252:4
**capture**
8:4, 9:8, 30:12, 33:6, 46:17, 256:16, 258:4
**captured**
31:8, 100:14, 100:15, 149:9, 203:2, 238:9, 240:12
**captures**
232:21
**capturing**
42:15, 121:21, 218:4, 219:24, 232:19, 234:14, 236:1, 236:2, 236:6, 236:8, 238:11, 245:5, 248:24, 249:1
**care**
35:10, 182:3
**careful**
44:15, 127:10, 151:11, 155:5, 266:19
**carefully**
10:24, 97:4, 133:23, 152:1, 166:16, 205:4, 209:13, 210:7, 238:3, 240:16, 271:20
**carlo**
78:1
**cartoon**
39:24, 95:17
**case**
1:6, 6:6, 9:24, 10:5, 10:25, 11:7, 11:10, 12:2, 18:24, 25:12, 26:7, 28:16, 29:2, 43:3, 77:9, 82:1, 82:9, 114:4, 127:19, 129:13, 131:19, 132:11, 145:13, 147:17, 169:3, 170:10, 179:10, 182:4, 182:8, 183:10, 192:3, 192:6, 209:6, 219:18, 228:6, 254:21, 266:23, 268:20, 280:2, 282:13, 283:8, 301:10
**cases**
128:18
**catalog**
233:21, 234:3
**catch**
16:19, 49:13
**category**
49:9
**cathode**
61:24, 62:5
**cause**
150:4, 164:22
**cc**
62:25
**ccd**
19:19, 48:24, 49:3, 50:13, 51:13, 52:19, 53:10, 54:3, 54:6, 54:16, 63:5, 63:12, 65:19, 66:15, 67:14, 67:15, 242:19, 242:23, 243:1, 250:19, 251:6, 293:21, 293:25, 295:16
**ccds**
63:3, 66:14, 67:8, 67:12
**center**
68:13, 70:19, 70:23, 72:6, 73:1, 75:7, 76:16, 76:21, 79:5, 79:13, 79:19, 90:2, 104:10, 104:11, 203:5, 223:24, 267:22
**centers**
91:2, 179:1, 181:5, 203:25
**central**
71:21, 71:22, 71:23, 72:5, 87:9, 121:24
**centrally**
81:25
**century**
165:14, 166:22
**certain**
57:13, 132:25, 188:19, 260:3, 260:4, 293:7
**certainly**
33:17, 65:17, 66:15, 67:14, 73:16, 82:23, 120:22, 121:12, 146:3, 148:5, 182:24, 221:18, 221:19, 227:17, 228:7, 229:20, 229:25, 230:14, 242:21, 243:15, 246:9, 246:18, 279:5, 280:23, 287:13, 287:22, 292:10, 293:14, 293:15, 294:25, 295:4
**certificate**
301:1
**certify**
301:4
**cetera**
11:23, 22:5, 40:19, 188:5, 194:14, 194:19, 218:21, 231:12
**chance**
230:2, 284:20, 284:21
**change**
16:24, 42:8, 74:8, 92:8, 99:9, 201:21, 281:12, 282:5, 286:7
**changed**
294:23
**changes**
12:15, 262:18
**changing**
282:3
**chapter**
202:11, 226:11, 226:13, 235:13, 235:16, 245:22
**characteristics**
192:21, 205:17, 240:9
**characterization**
81:15, 196:8
**characterize**
53:21, 54:15, 61:16, 196:1
**characterized**
69:7, 191:16,

192:10, 201:11, 249:2
**charge**
51:20
**charitable**
72:10, 75:18, 75:22
**chart**
250:12
**chase**
277:22
**chat**
11:16, 11:20, 12:23, 17:17, 24:16, 25:20, 27:8, 27:16, 27:18, 57:2, 63:23, 63:24, 77:11, 230:24, 241:9
**cheaper**
52:25
**check**
80:8
**cheek**
276:23, 276:24
**chinese**
258:9
**chip**
250:22
**choice**
40:4, 204:13
**choices**
67:25, 190:6
**chose**
106:16
**chosen**
122:2, 124:13, 148:18, 180:15, 268:23
**circle**
34:17, 34:19, 34:20, 41:3, 193:18, 219:9, 270:11
**circles**
146:19
**circuit**
50:24, 54:8, 251:13
**circuitry**
51:14, 52:5, 52:8, 52:12, 251:7
**circuits**
52:24
**citation**
227:10, 273:2
**citations**
213:4
**cite**
135:20, 187:1, 187:2, 217:12, 238:22, 282:18
**cited**
292:18
**cites**
135:19
**city**
23:6
**claim**
71:25, 72:1, 84:21, 113:7, 113:12, 113:24, 115:21, 116:10, 116:16, 117:15, 117:25, 118:21, 119:4, 120:14, 121:4, 150:13, 150:14, 151:22, 155:16, 155:21, 156:21, 156:24, 157:1, 157:5, 167:11, 174:11, 174:16, 174:19, 174:24, 175:3, 175:6, 211:25, 216:16, 216:17, 217:17, 218:7, 218:9, 218:10, 220:17, 220:19, 221:5, 236:2, 237:9, 238:12, 243:17, 268:6, 272:25, 273:2, 273:15, 274:11, 274:13, 274:19, 274:22, 277:24, 278:3, 278:8, 278:16, 278:21, 296:16, 296:17
**claimed**
120:3, 143:17, 174:10, 211:25, 216:18
**claiming**
14:19, 80:21, 165:25, 196:19, 196:20, 252:15, 267:6, 267:11, 267:12
**claims**
84:4, 115:17, 119:24, 140:12, 156:11, 168:5, 168:6, 174:22, 174:23, 177:19, 177:22, 177:23, 183:20, 185:19, 185:25, 186:1, 186:16, 224:17, 244:25, 253:2, 266:13, 283:10, 285:4, 289:21, 292:16
**clarifies**
219:19
**clarify**
130:14, 155:22, 290:20
**clarifying**
99:19, 118:12
**clarity**
57:15, 234:22
**clarity's**
57:11, 58:20
**class**
35:16
**classic**
83:11
**classical**
79:2, 163:25
**cleaned**
110:10
**cleaning**
215:6, 216:4, 246:16, 246:17
**clear**
26:23, 26:24, 54:1, 59:5, 62:15, 79:6, 85:10, 102:3, 102:8, 111:9, 128:18, 129:25, 136:1, 138:12, 140:10, 141:20, 142:2, 145:16, 147:14, 164:4, 164:8, 167:14, 171:19, 181:10, 201:9, 203:17, 203:23, 218:6, 241:19, 259:21, 260:25, 266:20, 274:3, 280:24, 280:25, 281:23, 286:12, 289:25
**clearer**
161:14, 171:18
**clearing**
52:7, 52:21
**clearly**
9:1, 39:19, 65:19, 104:25, 107:3, 132:12, 134:12, 134:19, 141:7, 161:11, 167:20, 168:8, 168:24, 170:14, 183:1, 197:2, 197:5, 206:14, 250:20, 255:22, 272:20, 273:11, 278:19, 283:14, 299:2
**clever**
224:9
**click**
23:25
**clock**
52:1, 52:4
**clocking**
52:1, 52:7, 52:21

**close**
32:8, 46:1, 109:10, 197:5, 247:2, 279:10
**closed**
247:3, 247:4, 247:5
**closely**
43:9, 167:22, 245:25
**closer**
108:9, 290:10
**closest**
135:4
**closing**
247:1
**cloud**
259:7
**cmos**
49:3, 50:13, 51:13, 52:19, 53:10, 54:4, 54:7, 54:17, 242:23, 243:1, 250:19, 251:6, 295:16
**cmos-type**
48:25
**co-advised**
16:21
**coast**
46:9
**code**
44:7, 129:4, 158:1, 158:3, 159:24, 201:4, 204:6, 256:17, 256:19, 256:21, 256:23, 256:24, 257:5, 257:8, 286:7, 291:15, 291:25, 292:1, 292:8, 292:9, 292:16, 292:18, 293:4, 297:11
**codes**
292:14
**coding**
189:17, 192:12, 192:20, 196:14, 196:16, 256:12
**coffee**
59:15
**coincident**
134:14
**coins**
188:5
**colada**
259:6, 259:7
**collection**
195:9
**collectively**
29:4
**college**
15:14
**color**
36:6, 36:21, 50:5, 189:15, 190:14, 190:15, 190:18, 191:20, 192:4, 194:9
**colored**
191:19
**colors**
50:7, 188:22, 188:24, 190:16, 191:20, 191:24, 192:1, 206:21
**columbia**
15:22
**column**
70:14, 70:16, 71:6, 71:8, 71:12, 71:17, 96:15, 97:18, 99:15, 99:16, 101:13, 102:24, 103:3, 105:17, 105:25, 106:2, 106:7, 106:9, 116:4, 116:7, 123:20, 130:22, 131:10, 131:16, 131:17, 132:18, 132:21, 133:5, 133:7, 133:17, 133:19, 134:1, 149:2, 149:3, 149:6, 149:7, 149:17, 154:12, 154:13, 161:17, 161:18, 166:10, 166:11, 168:23, 171:8, 171:9, 205:23, 216:21, 217:3, 217:4, 217:12, 218:7, 239:5, 253:19, 255:13
**columns**
70:13, 133:3, 175:13, 213:19
**com**
138:5, 138:20, 140:8
**combination**
20:1
**come**
17:12, 18:15, 20:24, 51:17, 71:2, 82:11, 86:1, 94:9, 114:24, 194:7, 215:11, 223:20, 246:21, 247:13, 247:20, 258:23, 278:15, 285:25
**comes**
15:19, 36:9, 50:3, 73:25, 87:8, 106:13, 227:8
**comfortable**
28:20
**coming**
36:12, 83:24, 140:16, 141:2
**commercial**
242:13, 242:17, 243:11
**commission**
301:15
**common**
66:5, 67:9, 122:2, 167:19, 262:19
**commonly**
47:17
**compare**
111:9, 196:23, 229:15, 262:2
**compared**
262:13
**comparing**
186:16
**comparison**
66:12, 196:21
**complete**
8:9, 77:14, 135:1, 135:2, 177:14, 221:16
**completely**
79:6, 81:11, 84:18, 182:17, 226:23
**complex**
74:16, 75:3
**complicated**
42:10
**component**
250:3
**components**
96:23, 185:12, 233:7, 248:19, 250:2
**compound**
76:18
**comprehensive**
127:14, 127:15, 128:15
**comprehensively**
130:5
**comprise**
69:6
**comprised**
88:13
**comprises**
186:23, 249:1
**comprising**
213:1
**compromise**
69:6
**computer**
14:6, 14:21,

14:22, 15:5, 15:6, 15:19, 15:21, 15:23, 18:19, 22:17, 23:16, 23:18, 23:19, 23:20, 38:7, 158:1, 158:3, 263:23, 263:25
**computers** 142:17
**computing** 217:19
**conceding** 235:6
**concept** 72:18, 150:7, 154:15, 156:15
**concepts** 38:1, 87:10, 97:17, 131:4, 157:23, 197:12
**concerned** 8:15
**concerning** 244:16, 262:1, 266:6, 277:3
**conclude** 65:7, 113:3, 119:3, 280:3, 281:14
**conclusion** 20:8, 65:11, 65:22, 83:24, 119:13, 120:8, 139:17, 140:20, 185:11
**conclusions** 140:10, 140:16, 141:2
**concrete** 159:25
**conditions** 122:5
**conducted** 1:15
**configuration** 124:13, 129:22, 129:24
**confirm** 11:25, 57:15
**confirmation** 260:15
**confused** 26:18, 26:22, 26:23, 27:4, 296:5, 297:1
**confuses** 229:21
**confusion** 226:9, 296:1, 296:2
**conjecture** 98:10
**connecting** 71:17, 71:20, 87:17, 88:16, 92:7, 103:22, 104:17
**connection** 159:25
**connects** 87:16
**consensus** 75:4
**consider** 18:17, 41:16, 111:4, 116:11, 130:10, 241:5
**consideration** 141:1, 141:6, 141:8
**considered** 4:13, 17:21, 18:7, 18:11, 21:5, 134:23, 269:15, 280:6, 286:4
**considering** 137:1, 245:19
**consistent** 130:8
**consistently** 75:18
**consisting** 250:10, 251:22
**consists** 296:3
**construction** 113:24, 120:14
**construed** 119:25, 245:5
**consultant** 10:7
**consumer** 294:7, 294:15
**consumer-level** 294:16
**contact** 14:14
**contacted** 9:25, 10:4
**contained** 137:22, 143:13
**contains** 265:13
**content** 11:3
**contentions** 179:10, 235:1, 296:9
**contentless** 235:20
**contents** 248:13
**context** 15:2, 15:11, 15:18, 15:19, 26:23, 28:16, 32:7, 32:10, 32:19, 72:15, 73:5, 74:11, 75:15, 79:7, 82:12, 82:20, 116:15, 117:15, 144:22, 147:7, 147:8, 174:1, 182:11, 206:22, 207:8, 210:21, 211:3, 211:10, 217:22, 223:11, 252:14, 278:2, 278:5, 297:10
**contexts** 72:3
**contextual** 207:12, 211:5, 211:15
**continue** 8:1, 25:18, 34:24, 40:10, 100:21, 150:2, 186:14, 218:16, 218:18, 244:1, 280:10
**continued** 4:25, 5:1, 214:7
**continues** 39:4, 97:23
**continuing** 149:16, 238:18
**contrast** 127:4, 172:5, 193:4
**convenience** 37:15
**convenient** 37:8
**convention** 25:15
**conventional** 48:23, 82:9, 82:10, 295:8, 295:17
**conventionally** 85:8
**conversation** 9:9, 258:2, 258:25, 259:16, 259:22, 259:23, 287:24, 288:4
**conversely** 180:22
**converts** 51:1
**convey** 120:1
**cool** 52:25
**coordinate** 124:17, 131:13, 133:3, 133:5,

133:9, 134:1, 163:15
**coordinates**
130:23, 131:5, 132:17, 132:18, 132:21, 133:14, 133:17, 133:19, 163:14, 223:24, 223:25, 224:1
**copied**
141:12
**copies**
231:17
**copy**
11:25, 12:22, 230:2, 283:24
**copyright**
232:3, 232:4, 232:6, 232:7
**corner**
57:24, 58:4
**corners**
203:25, 204:8
**corpuscles**
153:4
**correct**
11:6, 11:8, 11:11, 18:9, 24:13, 27:15, 53:19, 54:19, 57:9, 58:17, 63:10, 70:8, 70:11, 78:6, 78:7, 83:23, 95:22, 96:19, 98:17, 102:6, 102:7, 109:16, 114:1, 114:2, 116:24, 116:25, 117:23, 118:13, 120:11, 125:7, 139:2, 139:5, 139:15, 139:24, 140:12, 140:13, 141:24, 144:5, 144:13, 145:19, 145:20, 156:11, 156:12, 157:7, 157:19, 160:10, 169:5, 174:12, 175:11, 176:2, 177:17, 177:20, 178:1, 179:11, 179:13, 183:12, 183:15, 185:16, 187:11, 201:19, 206:4, 212:9, 218:8, 229:10, 243:22, 244:25, 245:1, 245:7, 245:8, 245:12, 245:13, 245:16, 246:3, 252:18, 252:19, 252:25, 254:10, 256:13, 265:22, 267:8, 271:14, 291:5, 291:6, 291:8, 291:9, 298:8, 298:9, 301:5
**corrections**
12:16
**correctly**
27:16, 228:20
**correctness**
126:18
**correlation**
161:5, 162:13
**correspond**
31:3, 73:14, 75:3, 95:14, 96:22, 98:25, 101:14, 101:17, 101:22, 102:12, 102:13, 102:15, 102:18, 103:6, 104:21, 116:22, 132:6, 137:2, 137:6, 184:23, 192:2, 194:25, 214:1, 220:25, 273:15, 274:13
**corresponded**
260:12
**correspondence**
94:17, 94:18, 94:25, 95:9, 95:13, 97:1, 100:23, 102:12, 105:6, 121:6, 126:11, 126:22, 204:4, 256:9, 299:14
**corresponding**
94:21, 94:22, 95:6, 95:20, 100:13, 116:20, 129:23, 155:3
**corresponds**
74:16, 95:5, 104:11, 133:8, 141:17, 193:10, 203:3
**cost**
288:1, 288:5
**couldn't**
37:12, 53:19, 97:24
**counsel**
6:13, 7:5, 7:12, 9:18, 257:21, 289:25, 290:17, 290:22, 291:3, 297:6, 301:9
**count**
32:6, 50:17, 56:2, 209:13, 209:14, 210:7
**counted**
261:22
**counting**
57:5, 207:8, 211:3, 211:12, 211:14
**couple**
19:5, 34:15, 75:12, 105:3, 105:15, 108:23, 143:5, 181:5, 187:10, 257:1, 258:18, 259:12, 279:10, 289:3, 290:13, 290:20, 290:21, 294:6
**course**
15:13, 31:24, 52:18, 85:14, 110:4, 155:13, 233:6, 292:21, 292:23, 293:1, 294:10
**court**
1:1, 6:5, 6:21, 7:18, 8:3, 9:8, 34:18, 114:12, 115:22, 119:15, 119:25, 135:9, 137:13, 137:25, 138:23, 139:13, 139:14, 141:20, 142:23, 185:17, 233:3, 242:4, 242:6, 245:6, 278:4, 280:2
**court's**
113:24, 141:9, 141:12, 141:13, 141:15, 252:21
**cover**
127:12
**covered**
257:22
**covers**
127:12
**cr**
254:14
**cr-scan**
254:14
**crack**
169:13
**cracked**
22:10
**creality**
1:7, 6:4, 235:3, 236:24, 257:10, 262:11, 277:23, 280:25
**creality's**
258:4
**create**
40:23, 82:17,

82:21, 286:2
**created**
87:25, 88:2, 155:5, 206:2, 239:7
**creates**
240:17
**creating**
188:15
**creation**
32:22
**criteria**
193:2
**critter**
16:20
**cross**
154:23, 178:23, 184:14, 222:7
**crossing**
39:5, 178:21, 178:24, 178:25, 203:2, 203:3, 203:5, 204:25, 205:2, 207:9, 207:10, 211:4, 211:11, 211:17
**crossings**
202:20, 203:8, 203:13, 206:17, 207:13, 208:11, 208:17, 208:24, 210:6, 211:1, 211:8, 211:14
**cry**
221:15
**csr**
1:25
**cummings**
3:3, 4:3, 6:15, 7:6, 59:12, 59:16, 59:19, 60:4, 60:6, 60:7, 90:19, 107:24, 108:11, 108:14, 108:21, 138:8, 138:16, 159:3, 159:13, 184:17, 214:12, 214:16, 214:24, 222:8, 222:11, 222:15, 222:19, 225:4, 243:21, 243:25, 244:13, 257:24, 258:1, 263:14, 263:17, 264:9, 275:25, 289:24, 290:7, 290:16, 297:4, 297:7, 299:22, 299:25
**cup**
59:15
**curiosity**
257:3
**current**
13:18, 13:19, 198:17, 198:19, 236:23, 237:13, 239:8
**currently**
23:4
**curve**
289:19
**curvy**
39:5, 39:8
**cut**
35:16, 57:25, 243:4
**cutting**
277:22
**cv**
4:11, 12:24, 13:18, 13:22, 16:14
**cvr**
1:25
**cynthia**
1:25, 2:23, 6:22, 301:2

**D**

**dark**
36:8, 103:12, 189:3, 189:4, 189:5, 190:7, 190:8, 190:9, 190:10, 191:1, 200:19, 201:20, 205:23, 262:16, 263:5
**darks**
197:18
**dart**
270:10
**data**
45:5, 131:17, 133:2, 239:23, 239:24, 246:10, 279:3, 296:18, 298:23, 299:16
**date**
6:8, 25:23, 27:9, 65:25, 77:25
**dated**
24:20, 112:3, 114:13, 241:12
**dave**
247:25
**david**
3:20, 64:5, 276:17
**day**
15:7, 223:18, 282:5, 282:8, 290:12, 290:15, 296:7, 298:10, 301:13
**daylight**
137:7
**days**
50:13, 294:6
**dc**
3:7
**deal**
10:15, 10:18, 130:5, 142:18
**dealing**
246:20, 246:23
**deals**
273:19
**debaere**
279:22
**decide**
9:17, 36:6, 67:3, 74:19, 101:25, 256:6
**decided**
31:3, 101:1, 282:11, 286:18, 286:23
**decides**
240:18
**decisional**
185:18
**decisions**
78:14
**declare**
174:17
**declared**
280:20
**deduce**
16:16, 31:5, 45:11
**deduced**
16:23, 49:18
**deducing**
14:8, 44:11
**deep**
8:13
**deeper**
20:19, 240:20
**defendant**
291:4
**defendant's**
25:12
**defendants**
1:11, 3:10, 6:20, 254:19, 258:8, 290:17
**define**
5:9, 62:5, 62:6, 66:7, 137:25, 144:4, 144:9, 146:8, 157:6, 163:14, 254:7
**defined**
22:12, 85:20, 116:21, 135:17, 138:21, 139:23, 143:22, 144:4, 150:16, 155:24,

158:4, 159:24, 201:14, 202:6, 208:4, 255:19
**defines**
103:11, 153:25, 191:17, 192:10, 201:12
**defining**
63:1, 156:16, 202:5
**definitely**
15:16, 18:18, 22:7, 22:18, 54:7, 66:8, 136:14, 142:5, 158:10, 245:21, 260:8, 287:10
**definition**
5:9, 5:11, 30:13, 40:15, 65:13, 68:11, 82:14, 110:25, 111:5, 135:7, 140:1, 140:6
**definitions**
50:19, 138:22
**defocus**
16:14
**deformations**
14:15
**deformed**
125:18
**degree**
72:22, 84:20, 84:24, 84:25, 126:21, 198:3, 272:10, 274:19, 281:3, 286:1, 298:24, 298:25
**degrees**
46:8, 268:9, 272:16, 272:19
**demarcate**
136:16, 138:1, 138:24
**demarcated**
135:18, 136:9, 138:3, 143:14, 144:18, 145:19, 148:7
**demarcating**
136:12, 142:2, 151:7
**demarcation**
136:3, 145:8
**demarked**
252:22
**demonstrate**
162:17, 164:13
**demonstrates**
161:1, 162:17, 162:20
**demonstrating**
151:19, 201:18
**depend**
199:12, 281:20
**depending**
42:4, 62:5, 66:7, 76:17, 92:13, 126:16, 144:3, 255:25
**depos**
3:21, 3:22, 6:11, 6:22
**depositing**
147:3
**deposition**
1:14, 2:1, 4:8, 5:5, 6:2, 6:12, 7:10, 23:2, 290:2, 295:25, 300:3, 301:3
**depositions**
7:14, 182:1
**depth**
15:25, 16:14, 16:16, 43:18, 95:12, 131:7, 154:19, 249:7
**describe**
21:17, 34:17, 51:8, 78:8, 78:10, 81:2, 86:7, 86:8, 89:9, 98:15, 101:6, 119:20, 122:25, 132:13, 134:7, 144:22, 148:22, 169:18, 170:1, 170:3, 175:4, 175:13, 175:14, 180:4, 184:22, 194:5, 199:2, 199:19, 212:4, 216:14, 238:7, 269:23, 296:20
**described**
26:9, 61:12, 62:18, 63:3, 82:11, 84:18, 87:4, 95:17, 95:24, 96:21, 102:15, 103:7, 115:13, 116:7, 116:12, 120:13, 124:23, 130:7, 130:17, 139:23, 141:7, 145:25, 146:1, 147:21, 153:24, 155:15, 164:19, 166:9, 174:9, 175:11, 181:6, 184:21, 187:16, 196:1, 196:22, 197:10, 197:11, 199:8, 199:17, 200:14, 235:12, 236:23, 250:19
**describes**
31:18, 143:11, 165:23, 187:9, 201:10, 205:3, 242:6
**describing**
81:4, 81:8, 86:15, 103:13, 106:22, 128:23, 141:7, 148:23, 151:24, 164:14, 167:16, 167:24, 168:24, 192:6, 194:15, 217:10, 217:22, 266:14, 269:8, 272:5, 273:8, 276:7
**description**
18:7, 38:8, 53:14, 65:17, 78:19, 87:20, 88:24, 95:18, 97:11, 101:2, 107:3, 107:4, 113:4, 118:25, 120:10, 129:21, 135:12, 141:13, 141:15, 143:12, 149:14, 149:15, 149:16, 151:3, 152:3, 153:15, 159:16, 161:16, 161:21, 165:11, 166:6, 166:12, 166:18, 168:19, 168:22, 169:18, 169:21, 169:24, 170:7, 171:6, 173:5, 175:16, 176:13, 176:14, 177:22, 186:9, 190:11, 192:24, 204:20, 208:23, 216:12, 216:17, 217:2, 217:3, 217:6, 217:11, 224:10, 224:15, 235:2, 235:21, 240:5, 254:1, 296:14
**descriptions**
101:15, 119:24, 148:20, 152:2, 175:13, 175:25, 187:17, 233:23, 234:3, 256:19
**design**
169:11, 173:22, 173:25, 180:20, 193:1, 268:1
**designated**
157:17

**designed**
172:7, 172:16, 242:14
**designing**
17:13, 164:3
**desired**
164:25
**desk**
216:5
**desktop**
215:6
**detail**
34:25, 130:21, 168:2, 184:25, 237:11
**detailed**
19:3, 45:14, 67:25
**details**
12:6, 19:3, 127:18, 148:20, 200:12, 200:14, 250:19, 261:12
**detectable**
125:16
**detection**
218:3, 232:19, 232:20
**determine**
99:18, 251:19
**determined**
36:21, 219:25, 220:2, 286:11
**determining**
130:22, 131:4
**deviated**
68:15
**deviation**
126:16, 126:17
**device**
40:17, 62:25, 64:17, 120:12, 120:15, 120:17, 121:21, 121:23, 122:7, 122:10, 174:11, 174:18, 217:20, 218:1, 218:3, 220:4, 220:23, 220:25, 221:1, 223:5, 223:8, 224:12, 224:13, 232:19, 233:4, 245:3, 245:4, 248:24, 248:25, 249:1, 249:2, 251:1, 251:4, 251:9, 252:16, 256:2, 270:23, 271:16, 271:18, 271:19, 273:4, 273:7, 288:2, 288:4, 298:6
**devices**
62:25, 64:20, 232:21, 233:15, 233:17, 246:3, 246:5, 246:6, 254:4, 254:5, 254:12, 254:13, 255:7, 255:9, 255:11, 255:16, 255:17, 256:15, 259:24, 260:25, 261:9, 261:13, 262:2, 262:21, 264:11
**diagonal**
146:18, 152:10, 153:10, 162:14, 162:22, 162:23, 163:1
**diagram**
104:13
**dictionary**
22:17, 135:19, 136:13, 140:1, 142:12
**difference**
21:14, 37:4, 39:25, 102:2, 130:10, 193:17, 197:6, 199:16, 200:17, 200:23, 210:9, 210:11, 232:1, 239:23
**differences**
111:3, 111:5, 199:20, 210:9, 210:13, 232:10
**different**
15:6, 17:4, 30:16, 32:6, 34:13, 50:7, 56:24, 56:25, 62:13, 65:6, 67:17, 72:2, 76:5, 76:17, 79:24, 89:1, 91:10, 91:11, 92:2, 92:8, 92:9, 93:9, 97:5, 99:20, 100:4, 101:19, 103:14, 103:15, 105:18, 115:14, 135:11, 147:13, 155:21, 165:8, 169:19, 181:19, 187:10, 188:22, 188:24, 191:22, 193:2, 193:14, 193:16, 193:25, 194:7, 196:4, 196:5, 196:6, 196:25, 197:3, 197:15, 198:1, 198:5, 199:3, 199:9, 200:3, 200:12, 203:15, 204:24, 206:1, 206:18, 210:19, 221:24, 222:5, 223:20, 225:20, 226:15, 233:15, 236:15, 239:22, 262:21, 269:1, 276:20, 276:22, 277:12, 277:14, 283:17, 283:20, 296:7, 296:20, 296:21
**differently**
153:12
**difficult**
40:18
**diffractive**
80:20
**dig**
60:18
**digital**
51:2, 67:8, 67:10, 67:15, 242:13, 242:18, 242:20, 242:21, 242:22, 242:24, 246:3, 294:1, 294:5, 294:15, 295:1, 295:12
**digital-output**
295:8, 295:16
**digitizer**
293:24
**dimensions**
35:4
**direct**
156:7, 289:4, 290:13
**directed**
253:21
**direction**
146:16, 150:5, 156:22, 164:24, 173:12, 173:16, 301:7
**directions**
41:10, 173:13
**directly**
114:19, 182:21
**directory**
13:9, 23:25
**disagree**
65:4
**disagreed**
279:24
**disagreeing**
65:10
**disassembled**
249:22
**discarding**
285:18
**discern**
146:3

**disclose**
61:15, 69:10, 84:3, 158:6, 286:15
**disclosed**
232:15, 262:3, 266:5
**discloses**
69:5, 121:20, 121:25, 122:4, 141:24, 186:23, 191:15, 191:19, 192:18, 239:22
**disclosure**
217:7, 233:18, 265:25
**disclosures**
233:16, 286:14
**discontinuous**
125:6
**discovered**
87:3
**discrete**
49:17, 131:18, 133:15, 231:7, 231:9
**discuss**
10:17
**discussed**
124:15, 129:16, 296:11
**discusses**
178:5
**discussing**
197:24
**discussion**
21:10, 21:14, 50:15, 72:17, 74:13, 74:18, 75:21, 76:11, 77:6, 156:20, 181:25, 190:15, 243:5, 253:3, 253:19, 255:13, 260:3, 260:17, 266:17, 277:23, 278:7, 284:22, 285:2, 287:8, 288:6, 291:21, 296:13, 296:19
**discussions**
216:14, 265:25, 287:6
**disparities**
124:16
**disparity**
124:18
**display**
218:1, 220:4, 220:23, 220:25, 223:5, 223:8, 224:12, 275:18
**displayed**
223:8
**displaying**
238:15
**distance**
16:19
**distinct**
14:12, 194:20, 267:23
**distinction**
21:10, 117:8, 133:18, 232:8, 240:21
**distinctions**
189:1, 189:14
**distinguish**
185:20, 189:21, 196:12, 197:19, 209:2, 209:3
**distinguishable**
189:11, 189:24, 189:25, 190:5, 190:22, 191:23, 192:14, 193:3
**distinguished**
189:8
**distinguishes**
97:12, 211:16, 211:17
**distinguishing**
190:13
**distinguishment**
214:9
**distort**
125:10
**distorted**
125:6
**distributed**
192:2, 193:9
**distribution**
191:17, 192:11, 201:12
**district**
1:1, 1:2, 6:5, 6:6
**ditch**
215:24, 215:25
**dive**
11:1, 106:13, 135:6, 149:22, 240:20, 274:23
**diving**
252:2
**divot**
107:15
**doctor**
184:15, 214:25, 263:12
**document**
12:3, 12:5, 12:7, 13:3, 17:19, 17:25, 18:10, 20:15, 21:5, 24:19, 25:7, 25:9, 25:21, 26:2, 26:4, 26:6, 27:8, 27:13, 27:14, 27:21, 28:12, 28:14, 39:22, 57:20, 57:21, 58:3, 58:14, 58:16, 58:22, 64:8, 64:10, 78:2, 109:9, 109:14, 112:11, 112:13, 114:12, 114:13, 114:15, 114:19, 121:17, 121:18, 123:23, 129:21, 130:13, 139:24, 141:13, 141:18, 191:14, 198:15, 198:17, 198:19, 226:7, 229:24, 230:10, 230:16, 230:22, 231:3, 231:8, 231:25, 232:12, 236:11, 238:24, 238:25, 240:4, 240:6, 242:11, 287:16
**documentation**
226:19
**documents**
18:24, 19:20, 19:25, 20:4, 21:5, 21:12, 24:4, 24:16, 225:20, 235:1, 264:14
**doing**
7:24, 7:25, 9:4, 11:3, 16:4, 16:7, 28:6, 30:19, 31:13, 32:2, 32:3, 43:6, 44:23, 53:3, 53:5, 79:22, 87:6, 92:1, 94:25, 99:24, 120:23, 138:13, 142:5, 173:8, 183:8, 190:18, 190:23, 210:18, 237:8, 246:12, 256:22, 276:8, 280:15, 285:16, 285:18, 292:1, 294:19, 298:18
**dominic**
3:22
**done**
14:24, 18:19, 18:25, 21:4, 43:25, 45:10, 53:1, 69:1, 83:8, 91:24, 121:3, 121:5,

122:22, 147:22, 151:25, 155:10, 162:1, 164:2, 164:14, 167:1, 167:18, 168:14, 173:21, 173:22, 179:16, 180:19, 207:2, 215:8, 258:17, 281:6, 290:14, 298:18, 299:1
**doohickeys**
206:17
**dot**
102:19, 131:12, 131:15, 190:12, 190:13, 207:10, 207:11
**dots**
35:24, 35:25, 95:13, 191:22, 206:1, 206:3, 206:5, 206:8, 206:12
**double-check**
58:18, 59:9, 65:25, 228:10
**doubt**
81:21, 167:15, 167:23, 170:5, 182:16, 243:2, 243:12
**down**
8:13, 8:15, 21:16, 38:11, 39:9, 50:21, 54:20, 56:3, 59:4, 60:18, 64:13, 68:20, 68:21, 73:24, 77:6, 80:9, 86:4, 105:24, 113:1, 118:24, 125:3, 125:9, 135:6, 143:2, 159:22, 168:10, 171:7, 177:11, 178:2, 179:5, 179:14, 180:9, 181:5, 183:3, 185:10, 186:15, 197:25, 201:5, 201:9, 202:15, 202:16, 207:17, 207:18, 207:19, 211:13, 212:10, 212:18, 213:9, 216:5, 223:18, 224:4, 224:12, 224:23, 240:20, 244:20, 245:2, 245:4, 248:10, 248:12, 248:14, 248:18, 248:20, 254:15, 270:20, 273:18, 273:21, 274:24, 275:22, 275:23, 276:6, 282:9, 284:4, 285:25
**downstream**
17:6, 31:23, 67:23
**dozens**
256:23, 291:18
**dr**
4:22, 5:6, 7:7, 11:15, 12:24, 17:24, 18:1, 24:23, 26:2, 54:21, 60:9, 81:22, 108:25, 109:6, 110:12, 111:6, 111:24, 138:15, 140:20, 159:15, 184:16, 227:25, 243:17, 244:15, 245:10, 246:13, 257:22, 263:20, 265:10, 271:3, 275:20, 279:8, 288:11, 288:21, 289:10, 290:20
**draw**
37:9, 37:10, 40:5, 83:16, 88:15, 89:25, 90:1, 90:3, 90:8, 91:2, 98:24, 100:9, 105:3, 105:5, 105:7, 146:15, 146:18, 146:19, 146:20, 146:22, 146:24, 147:5, 148:2, 148:4, 161:4, 162:19, 164:10, 172:24, 173:11, 173:15, 173:16, 179:16, 180:24, 267:21, 270:3
**drawing**
36:1, 36:22, 37:16, 38:18, 39:19, 88:1, 91:25, 104:25, 134:15, 134:20, 134:23, 135:7, 158:11, 158:12
**drawings**
178:7, 178:16
**drawn**
37:17, 37:18, 40:3, 73:16, 73:18, 91:22, 134:14, 134:24, 136:10, 148:23, 151:9, 152:9, 153:8, 158:15, 162:14, 163:6, 267:4, 269:22, 271:25
**draws**
135:1, 137:4
**drew**
43:14, 93:10, 102:8, 107:13, 162:22, 267:21, 268:2, 268:14, 268:21, 270:10
**driver**
50:23, 51:8, 53:21, 54:8, 233:12, 242:9, 243:1, 245:11, 250:14
**drivers**
245:15
**dropped**
188:5
**due**
36:15, 51:20, 125:10, 235:3, 296:22
**duly**
7:2
**dump**
262:20
**during**
258:2
**dxc-ls1**
233:17

**E**

**e-mail**
9:25
**each**
42:14, 65:9, 76:5, 88:15, 92:13, 100:9, 101:18, 132:12, 133:8, 133:15, 149:24, 151:2, 154:4, 162:5, 163:13, 180:24, 188:25, 189:16, 191:15, 192:9, 192:14, 192:15, 194:13, 195:5, 200:22, 201:10, 206:17, 207:13, 208:17, 209:8, 209:16, 210:10, 211:23, 213:1, 213:24, 213:25, 233:10, 249:23, 249:25, 250:4, 254:18, 268:20, 270:6, 278:6, 291:24

**earlier**
47:14, 47:15, 86:9, 105:16, 115:11, 161:16, 228:9
**early**
48:22, 55:14, 61:19, 61:20, 61:21, 64:19, 298:10
**easier**
123:17, 129:24, 174:1, 213:7, 226:20
**easiest**
112:9
**easily**
125:16, 146:8, 216:6, 254:8
**east**
46:8
**eastern**
1:2, 6:5
**eat**
16:20
**ecf**
114:13
**effect**
7:17, 43:1, 43:22
**effective**
44:11
**effectively**
74:11, 203:7
**eight**
56:4, 208:21
**eight-page**
57:21
**eighth**
57:20
**either**
8:7, 19:3, 20:5, 21:15, 35:5, 48:24, 54:16, 81:10, 140:17, 142:4, 157:21, 169:24, 169:25, 174:17, 182:4, 197:23, 200:13, 203:25, 210:12, 236:22, 236:23, 243:9, 257:9, 270:23, 273:6, 273:9, 280:1, 280:5, 280:16, 283:7, 291:15
**elect**
49:13
**electric**
48:23
**electrical**
50:13, 51:19, 51:20, 67:13, 250:21, 251:14
**electronic**
250:8
**electronical**
250:21
**electrons**
49:14
**element**
31:2, 31:3, 31:7, 62:11, 134:7, 134:8, 168:10, 175:4, 175:15, 176:15, 177:13, 177:18, 182:11, 187:10, 189:23, 192:14, 192:15, 193:19, 194:4, 201:11, 203:23, 204:6, 204:18, 204:19, 205:12, 209:25, 212:16, 212:17, 232:16, 232:18, 234:5, 265:1, 268:17, 271:11, 271:15, 296:10, 296:23
**elementary**
38:5
**eligibility**
183:4, 185:21
**eliminates**
289:18
**else**
20:11, 22:15, 23:14, 23:15, 71:24, 77:4, 94:23, 145:12, 220:9, 224:1, 224:2, 246:12, 250:20, 251:10, 259:23, 263:13, 284:3, 287:2, 293:1
**elsewhere**
116:3
**embodiment**
191:24, 217:8, 217:10
**embodiments**
70:17, 70:21, 100:5, 219:23, 220:22
**employ**
246:3
**employed**
255:17, 301:9
**enablemence**
143:3
**enablement**
143:3, 143:6, 178:3
**encompass**
54:2
**end**
10:17, 36:24, 51:19, 67:21, 67:22, 69:16, 120:24, 160:12, 184:13, 184:15, 192:19, 230:20, 241:5, 246:22, 271:11, 287:1, 296:7, 300:3
**ended**
17:8, 81:18, 287:25, 296:12
**ending**
290:2
**endless**
189:18, 196:15
**ends**
184:17
**engineering**
13:24, 14:1, 14:20, 23:9
**english**
19:17, 20:12, 32:18, 32:19, 47:24, 75:24
**enough**
10:24, 14:22, 20:3, 41:22, 45:17, 50:4, 50:5, 62:6, 82:24, 83:5, 127:3, 167:9, 171:19, 173:11, 284:2
**enter**
11:14, 12:23, 24:18, 77:22, 247:23
**entered**
25:20, 29:7, 55:25, 227:18, 228:6, 228:9, 246:14
**entertainment**
38:3, 38:4
**entire**
175:6, 187:25, 214:8, 294:14
**entirety**
217:24
**entrance**
20:17, 20:25, 70:19, 70:23, 71:3, 72:6, 73:22, 75:8
**epipole**
128:4, 128:6, 128:7
**epipoles**
129:14, 129:19
**equal**
122:5
**equate**
119:3

**equipment**
14:24
**equivalent**
97:1
**equivalently**
87:1
**errors**
217:12
**especially**
50:5, 236:11, 296:8
**esquire**
3:3, 3:11
**essential**
53:8, 204:25, 299:7
**essentially**
8:13, 36:11, 42:15, 82:6, 82:13, 107:12, 150:12, 151:13, 169:8, 189:7, 208:16, 211:3, 233:21, 245:9, 259:9, 259:18, 264:2, 268:22
**established**
154:20
**establishes**
122:18
**et**
6:4, 11:23, 22:5, 40:19, 56:5, 61:13, 188:5, 194:13, 194:19, 218:21, 231:12
**etching**
147:3
**europe**
1:4, 6:3, 6:16
**even**
9:6, 37:10, 42:24, 49:23, 50:1, 50:5, 50:8, 53:4, 69:20, 76:21, 82:7, 85:1, 112:2, 118:8, 161:3, 161:11, 164:19, 167:11, 167:21, 168:7, 168:12, 168:16, 175:3
**eventually**
126:25
**ever**
7:9, 114:19, 135:1, 186:2, 260:2, 260:5, 282:12, 292:16
**every**
36:4, 36:20, 41:7, 53:1, 53:2, 67:16, 131:12, 131:15, 210:2, 210:5, 214:2, 250:3, 282:12, 291:14, 292:7, 294:22
**everybody**
50:8, 59:13, 263:13, 275:14, 295:18
**everybody's**
259:20
**everyone**
295:23
**everything**
23:20, 126:5, 127:12, 138:12, 264:2
**evolution**
294:18
**exact**
39:13, 39:21, 45:4, 93:16, 98:18, 101:1, 112:10, 116:2, 121:7, 126:2, 128:12, 144:3, 157:22, 162:15, 173:17, 197:14, 233:22, 266:24
**exactly**
51:12, 73:9, 86:19, 86:23, 107:8, 120:22, 121:1, 121:14, 126:1, 126:9, 126:10, 126:13, 129:15, 173:6, 180:13, 194:23, 195:22, 201:25, 217:7, 240:1, 267:5, 286:20, 287:1, 292:10
**exaggerating**
257:1
**examination**
4:2, 7:5, 290:17, 297:6
**examined**
7:4
**examiner**
168:16
**example**
8:25, 15:20, 17:11, 19:21, 20:12, 20:14, 20:15, 21:9, 32:12, 42:23, 46:20, 55:14, 60:23, 62:4, 65:16, 76:20, 80:24, 83:9, 83:12, 96:25, 116:1, 131:23, 131:24, 144:10, 144:12, 144:16, 157:3, 161:8, 167:1, 173:24, 174:6, 179:5, 190:7, 191:18, 192:12, 193:14, 195:18, 196:2, 201:13, 203:21, 204:14, 219:12, 220:11, 223:16, 223:23, 224:3, 231:7, 233:14, 236:7, 250:9, 259:1, 262:2, 267:23, 279:7, 285:9, 285:21, 292:16
**examples**
19:9, 19:10, 21:3, 21:7, 21:23, 22:6, 37:17, 65:13, 80:18, 107:11, 144:21, 176:23, 191:4, 193:12, 193:13, 197:9, 203:18, 203:20, 272:18, 279:25
**except**
8:11, 37:4, 47:20
**exception**
55:2
**excess**
82:25
**excuse**
25:3, 26:21, 106:8, 187:5, 208:6, 249:16, 253:12, 258:1, 279:8
**exercise**
259:10
**exhaustive**
19:11
**exhibits**
4:8, 4:25, 5:1, 5:5, 20:13, 29:7, 47:6, 105:8, 108:23, 142:12, 233:20, 262:20, 264:14, 270:5
**exist**
119:21, 164:19
**existence**
139:19, 157:14, 256:3, 256:10
**exists**
100:13
**exit**
20:17, 70:19, 70:23, 71:4,

72:5, 72:6, 73:22
**exotic** 15:23, 81:22, 82:22
**exotically** 32:11
**expect** 168:12, 180:12
**expecting** 260:13
**expensive** 40:19, 83:12
**experience** 13:23, 54:13
**experiment** 45:9, 74:23, 243:16
**experimentation** 143:18
**expert** 3:19, 3:20, 4:19, 4:22, 5:7, 5:16, 5:19, 10:7, 29:16, 29:19, 64:5, 83:15, 115:25, 138:15, 140:17, 141:3, 227:24, 293:14
**expertise** 14:19, 15:3, 21:20
**experts** 22:8
**expires** 301:15
**explain** 33:21, 34:24, 105:4, 148:14, 148:17, 180:3, 257:10, 266:12, 281:22, 291:10, 296:2
**explained** 7:13, 137:13, 141:6, 159:23, 178:4, 208:13, 291:12
**explaining** 130:4, 148:15, 148:17, 160:4, 220:7, 220:16
**explains** 281:24
**explanation** 65:22, 97:6, 221:3
**explicitly** 122:21
**exploded** 67:10
**explorer** 24:6
**exposition** 35:1
**extending** 121:22, 122:6, 122:9, 270:21, 273:3
**extends** 71:6, 71:9
**extent** 15:6, 15:9, 102:12, 134:3, 196:24, 252:1
**extra** 164:4
**extracting** 123:20, 124:8
**extraordinary** 82:23
**eye** 14:15, 145:11, 145:22, 147:14, 151:10, 276:24
**eyeball** 112:7, 112:10
**eyeglasses** 14:14
**eyes** 1:13, 16:18, 161:10, 276:23

**F**

**face** 213:15, 219:9, 223:24
**fact** 27:17, 72:21, 80:22, 86:13, 96:8, 104:2, 124:17, 125:15, 128:5, 147:4, 151:24, 153:24, 155:2, 161:13, 168:3, 169:8, 170:4, 175:10, 177:18, 185:20, 228:5, 235:3, 280:1, 280:2, 281:11, 281:13, 283:7, 283:13, 284:11
**factor** 8:8
**failed** 113:4, 217:5, 245:10
**fails** 119:23, 238:18
**failure** 252:15, 298:25
**fair** 47:18, 196:1, 196:7, 251:18
**fairly** 17:5, 78:16, 194:6
**falconer** 287:6, 287:18, 287:19, 287:20, 287:21
**fall** 10:1
**fan** 103:17
**far** 7:25, 16:17, 23:16, 26:14, 58:25, 74:4, 95:7, 97:23, 105:13, 133:6, 147:2, 184:4, 219:8, 275:10, 275:18, 275:23
**fast** 99:13, 137:20, 237:17
**fast-forward** 294:11
**faster** 86:1, 137:19, 154:23
**fault** 156:2, 222:12, 226:17, 226:23
**favor** 119:14
**favorite** 204:3, 204:15
**feature** 235:4
**features** 179:17, 183:19, 183:24, 184:10, 210:20, 280:7
**feel** 54:24, 106:2, 225:2
**feels** 237:16
**feet** 23:13, 219:14, 224:7, 224:8, 224:12
**felt** 280:23
**fesnel** 80:19
**few** 7:13, 24:15, 90:9, 108:2, 279:11
**fiber** 14:14
**fiducial** 44:4
**field** 14:1, 14:7, 14:11, 14:12, 14:19, 19:16, 70:25, 71:5,

71:10, 71:11, 71:14, 71:16, 71:19, 72:4, 81:12, 268:25
**fields**
13:23, 14:6
**fifth**
3:13, 123:22, 123:23, 214:7
**figured**
208:8
**figures**
33:25, 34:2, 34:6, 78:24, 86:13, 86:14, 112:9, 117:25, 131:3, 135:1, 144:20, 148:13, 149:12, 149:18, 149:23, 150:10, 152:5, 158:4, 158:10, 161:16, 162:3, 162:9, 167:6, 175:12, 175:25, 178:19, 193:12, 193:24, 194:12, 197:4, 197:16, 242:16, 270:12, 276:21
**file**
13:10, 63:19, 282:14, 291:18, 292:19, 292:20, 297:8, 297:12, 297:19, 297:24, 298:5, 299:6
**filed**
295:10
**filing**
185:14
**fill**
162:19
**film**
35:5, 35:7, 35:9, 35:20, 36:4, 36:5, 36:15, 37:2, 37:11, 38:19, 38:20, 38:23, 38:25, 39:24, 40:2, 40:18, 41:4, 41:8, 41:11, 42:15, 83:5, 87:19, 88:17, 91:21, 93:13
**filmmaking**
42:25
**filter**
17:9
**finally**
73:20, 284:4
**financial**
301:10
**find**
13:10, 22:19, 22:23, 30:5, 34:5, 55:23, 60:11, 60:17, 60:19, 61:15, 75:6, 76:25, 77:2, 81:22, 82:19, 97:24, 105:17, 106:3, 115:8, 123:2, 123:4, 123:6, 123:7, 123:10, 123:17, 125:19, 125:24, 128:18, 135:23, 135:24, 136:6, 137:20, 179:17, 181:3, 188:5, 203:24, 205:3, 205:12, 208:3, 212:5, 235:13, 257:18, 284:6, 294:21
**finding**
157:2, 233:10, 276:5
**finds**
202:16, 283:7, 284:11
**fine**
25:17, 105:9, 109:24, 220:2, 244:6, 247:7, 272:1, 283:25, 290:8
**finish**
9:5, 9:8, 19:7, 19:8, 83:22, 208:8
**finished**
287:10, 287:15
**finite**
41:14, 42:20, 129:19, 133:12
**firewire**
294:3, 294:8
**firm**
6:16, 6:19
**first**
7:2, 7:16, 10:15, 10:20, 10:22, 11:12, 19:19, 20:3, 27:10, 29:24, 30:10, 34:5, 34:8, 48:20, 56:2, 61:11, 64:14, 67:2, 86:18, 86:20, 96:11, 96:18, 98:22, 99:24, 106:12, 108:23, 112:25, 118:16, 118:25, 123:11, 123:14, 130:12, 130:13, 133:10, 150:20, 150:21, 155:23, 166:4, 166:7, 166:8, 166:13, 187:21, 205:24, 206:7, 207:21, 208:9, 209:2, 209:4, 211:21, 211:22, 212:5, 212:23, 212:25, 213:1, 214:3, 214:4, 214:6, 215:1, 216:9, 216:12, 217:16, 217:17, 218:25, 228:13, 228:14, 228:15, 231:10, 232:2, 236:12, 236:21, 240:4, 241:13, 246:17, 257:15, 265:2, 265:5, 265:6, 271:21, 271:22, 271:23, 273:24, 277:7, 279:16, 280:23, 283:9, 290:22, 297:21, 298:14
**fit**
45:5
**fits**
136:3
**fitting**
296:13
**five**
53:2, 56:3, 193:20, 208:20, 214:17, 216:6, 258:10, 259:11
**five-minute**
244:4
**fix**
41:17, 137:25, 138:23
**fixed**
92:11, 92:12, 135:18, 138:2, 143:14, 252:22
**flame**
74:14
**flash**
189:3, 189:4
**flashing**
189:2
**flashlight**
188:3, 190:25
**flipping**
37:4
**flir**
62:16, 62:17, 64:16, 64:17, 65:2, 65:19, 66:16, 293:9

**flirs** 66:4
**floating** 231:18
**floor** 3:14, 36:25, 219:13
**florence** 62:19, 62:23, 66:12
**focal** 122:1, 122:4, 124:18
**focus** 16:1, 16:2, 42:6, 42:12, 42:13, 42:18
**focused** 22:9, 33:7
**focusing** 42:7, 182:2, 184:8, 285:8, 296:9
**folder** 24:6, 24:8
**follow** 39:9, 53:13, 125:18, 125:23, 128:1, 130:9, 134:5, 237:5, 265:21, 266:9
**follow-up** 297:4
**following** 150:17, 240:9, 269:21
**follows** 7:4
**footnote** 119:10
**footprints** 219:13
**foregoing** 301:3, 301:4
**forget** 161:19, 224:25, 227:13, 228:8
**forgetting** 274:19
**forgotten** 227:2
**form** 9:12, 48:6, 48:7, 53:22, 54:18, 78:12, 79:20, 81:6, 84:7, 91:6, 100:22, 102:17, 116:14, 118:18, 120:19, 136:22, 144:6, 144:19, 146:11, 157:11, 157:20, 158:9, 162:25, 163:18, 166:14, 169:6, 169:22, 174:13, 174:20, 175:7, 175:8, 175:18, 175:19, 176:3, 176:18, 185:15, 185:22, 197:1, 200:15, 207:6, 217:15, 223:2, 239:25, 250:16, 252:24, 253:5, 255:20, 266:11, 277:21, 280:9, 282:22, 284:15, 292:12
**formal** 18:23
**format** 51:1
**formation** 31:18, 32:23, 38:9
**formatting** 231:15
**formed** 120:5, 258:20
**forth** 59:3, 101:10, 249:18
**forward** 255:7
**forward-looking** 65:5
**found** 20:22, 61:6, 78:21, 85:8, 96:19, 177:18, 178:14, 226:18, 234:3, 275:5, 280:4, 282:17, 289:8
**four** 56:3, 104:23, 208:20, 233:15, 268:21, 268:24
**fourth** 131:16, 214:7, 217:19
**fraction** 288:4, 292:10
**frame** 289:11, 293:11
**frankenstein** 243:16
**free** 54:24, 106:2, 125:8, 125:9
**freezes** 264:2
**fresh** 46:7
**friends** 225:22
**front** 35:17, 35:24, 37:6, 37:11, 40:4, 56:22, 74:22, 105:5, 138:11, 219:2, 244:17
**froze** 263:19
**frozen** 263:12, 263:13
**frustrating** 259:10
**full** 8:9, 50:14
**fully** 285:12, 295:8, 295:14, 295:15
**fun** 268:14
**function** 53:20, 242:4, 245:6
**functional** 120:17
**functionality** 52:22
**functioning** 54:15
**functions** 251:1, 261:1, 291:22
**fundamental** 192:24
**funniest** 69:25
**funny** 16:18, 295:20
**further** 19:3, 39:16, 69:5, 137:13, 149:14, 161:1, 191:15, 198:16, 198:21, 201:10, 252:3, 273:25, 297:2, 299:22

G

**game** 89:25, 90:8, 90:22, 91:1, 91:8, 268:4, 295:21, 295:22
**gave** 54:3, 93:5, 93:6, 141:14, 167:14, 167:23, 170:5, 259:18
**gears** 244:14
**general** 10:7, 30:13, 65:2, 117:9, 128:16, 129:22, 132:23, 151:23, 174:8, 181:8,

189:12, 190:19, 194:4, 206:10, 251:5, 287:5
**generally**
54:22, 116:23, 189:13, 189:19, 189:20, 190:20, 251:8
**generation**
53:2
**generic**
78:16, 161:24, 291:17
**genesis-to-revel-ation**
257:7
**geometric**
31:4, 31:21, 78:19, 79:3, 99:20, 132:25, 133:21, 298:16
**geometrical**
30:20
**geometrically**
86:24
**geometries**
99:22
**geometry**
31:6, 31:11, 35:10, 35:12, 36:18, 38:8, 40:6, 40:7, 42:9, 44:12, 45:4, 45:14, 75:21, 79:1, 79:2, 79:8, 85:24, 86:21, 86:22, 86:24, 87:13, 88:24, 91:6, 91:20, 92:15, 93:25, 95:16, 95:18, 96:23, 97:22, 98:8, 98:16, 99:7, 99:10, 100:18, 101:16, 102:15, 103:7, 107:9, 115:12, 116:24, 122:15, 122:19, 124:23, 127:17, 127:20, 127:22, 128:16, 130:6, 132:19, 133:11, 133:23, 148:19, 150:7, 154:15, 154:17, 155:2, 155:13, 155:14, 161:25, 164:1, 164:4, 164:12, 164:18, 165:12, 165:19, 165:21, 166:18, 169:9, 174:4, 177:1, 183:2, 183:21, 202:23, 256:3, 256:7, 256:11, 261:1, 268:13, 268:15, 291:5, 292:17, 292:24, 298:7, 298:22, 299:10, 299:19, 299:20
**gestures**
8:3
**getting**
16:8, 24:3, 27:4, 46:7, 63:20, 68:23, 110:21, 118:24, 123:14, 126:15, 134:4, 136:18, 165:24, 228:22, 260:23, 264:24, 267:19, 273:24, 276:6, 282:9, 283:3, 287:5, 296:12
**giant**
40:24, 41:1
**gibberish**
259:11
**give**
9:14, 11:19, 15:20, 17:17, 19:5, 25:20, 26:13, 27:16, 30:2, 38:7, 57:18, 58:21, 63:10, 63:14, 63:18, 64:12, 68:10, 69:1, 85:23, 90:18, 91:16, 96:17, 103:25, 104:3, 105:21, 106:5, 109:17, 111:9, 117:6, 123:13, 133:12, 140:2, 149:5, 149:14, 155:16, 173:24, 180:4, 184:16, 186:19, 187:21, 210:6, 213:5, 217:6, 223:16, 224:24, 225:9, 226:13, 229:9, 229:17, 230:9, 241:8, 248:3, 249:18, 277:2, 277:3, 282:23
**given**
97:11, 114:25, 115:2, 144:20, 145:25, 146:6, 147:24, 148:20, 152:3, 163:19, 166:9, 186:10, 217:2, 253:1, 301:5
**gives**
37:7, 80:23, 188:3, 193:13, 246:10, 298:21, 298:23
**giving**
7:18, 8:9, 43:15, 145:15, 222:14, 222:18
**glass**
14:13, 15:8, 81:23, 83:20
**gleaned**
120:14
**glitched**
90:6
**glitching**
90:12, 90:13, 90:14
**global**
285:14
**goal**
10:15
**goes**
13:9, 31:20, 39:3, 51:2, 64:18, 64:21, 73:2, 76:15, 86:12, 101:5, 149:14, 180:1, 189:18, 267:13, 267:15, 268:18, 268:24, 276:12
**gone**
46:16, 79:15, 253:14, 295:5, 295:7
**good**
7:7, 7:8, 7:25, 9:10, 9:15, 23:10, 28:4, 30:6, 45:15, 45:16, 45:18, 55:5, 59:8, 59:22, 61:9, 80:6, 90:20, 96:20, 105:11, 110:9, 113:20, 115:4, 123:1, 124:10, 126:3, 127:1, 127:3, 149:21, 159:4, 161:25, 202:9, 216:1, 228:15, 244:23, 247:22, 251:24, 252:5, 255:10, 260:10, 264:8, 297:23
**google**
19:18, 19:24, 226:20
**gortler**
1:14, 2:1, 4:2, 4:8, 4:9, 4:11,

4:12, 5:5, 5:15, 6:2, 7:1, 7:7, 11:15, 11:22, 17:19, 18:1, 24:23, 26:2, 29:18, 54:21, 109:6, 138:15, 140:20, 159:15, 184:16, 227:25, 244:15, 263:20, 279:8, 288:21, 289:10, 290:20, 300:3
**gortler's**
12:24, 17:24, 60:9, 257:22
**gotten**
52:24, 91:11, 168:5, 227:12, 295:5, 295:7
**grade**
193:6
**gradient**
80:20, 80:24
**grammatical**
72:3
**granted**
168:15
**graphics**
14:6, 15:6
**gray**
103:12
**great**
57:3, 155:14, 289:3
**green**
188:23, 191:22, 267:4, 269:25, 272:11, 272:19, 273:10, 273:14
**grid**
49:22, 50:3, 50:9, 62:8, 66:11, 121:2, 122:16, 124:20, 125:6, 125:19, 125:24, 132:8, 132:12, 132:20, 137:5, 191:19, 193:7, 197:17, 197:19, 201:22, 205:25, 206:22
**grids**
49:25, 207:3, 207:4
**grinding**
15:8, 17:14
**ground**
7:14, 84:8
**group**
150:20, 150:22, 165:7, 172:14, 207:21, 208:3, 208:18, 208:25, 209:2, 209:3, 209:4, 209:8, 209:16, 211:22, 211:23, 212:23, 212:24, 212:25, 213:1, 213:24, 214:1, 214:3, 214:4, 214:6, 255:7, 265:2, 265:5, 265:7
**grouping**
211:24, 212:3
**groups**
149:24, 150:11, 154:3, 159:24, 162:4, 166:7, 166:21, 171:10, 172:10, 178:6, 208:2, 208:22, 208:23, 209:11, 209:12, 210:11, 210:12, 213:19, 213:24, 214:8, 268:20
**guess**
25:19, 33:21, 33:22, 55:23, 57:5, 66:17, 79:13, 92:23, 96:6, 104:22, 135:15, 143:20, 159:18, 183:4, 184:8, 184:12, 200:13, 209:15, 213:5, 217:2, 224:18, 227:21, 241:24, 246:4, 251:15, 251:18, 260:10, 298:5
**guest**
243:18
**guy**
228:22
**guys**
167:19

**H**

**h-e-c-h-t**
22:13
**half**
41:4, 81:12, 108:5, 108:9, 117:16, 117:18, 118:3
**hand**
41:23, 125:5, 167:3, 228:18, 286:3, 301:13
**handle**
128:18
**handling**
109:19
**hands**
219:15
**handy**
111:22, 227:23
**haphazard**
151:13, 152:6, 162:16, 269:4
**haphazardly**
268:24
**happen**
8:15, 8:17, 27:4, 125:22, 126:7, 164:11, 169:7, 169:10, 180:19, 269:6
**happened**
67:23, 169:13, 173:20, 275:18, 277:5, 286:5
**happening**
51:21, 126:16, 180:2, 186:3
**happens**
8:12, 36:3, 98:19, 152:6, 163:4, 173:3, 280:19
**happenstance**
152:6
**happy**
227:7, 255:1, 255:5
**hard**
65:14, 101:10, 132:4, 173:2, 196:6, 200:16, 257:5, 285:23, 286:9, 295:19
**hardware**
67:25, 246:12
**harvard**
23:8
**hassebrook**
5:18, 241:11, 241:13, 241:14, 241:19, 242:3, 242:5, 242:12, 247:1, 247:3, 283:5
**hat**
95:5, 95:6, 95:7, 194:10
**haystack**
171:2
**he'll**
9:12
**head**
8:2, 157:24, 289:11
**heading**
113:1, 113:16, 116:3, 177:15, 177:16
**headings**
113:2
**hear**
9:1, 20:25,

57:25, 260:13, 263:20, 263:21, 263:23, 290:8, 290:25
**heard**
28:24, 264:5, 295:11
**heart**
149:19
**heartbeat**
8:12
**heavily**
38:6, 288:17
**hecht**
22:13
**held**
2:2
**hell**
186:2
**help**
105:8, 125:17, 125:23, 134:2, 251:8
**helpful**
148:5
**helping**
220:16
**helps**
105:4, 207:1
**here's**
21:9, 98:5
**hereby**
301:3
**hereunto**
301:12
**heyday**
293:12
**higgins**
87:8
**high**
21:17, 47:5, 181:2, 182:9, 242:17, 243:11
**high-resolution**
242:13, 242:17
**high-tech**
294:17
**highlight**
150:25
**himself**
62:9
**hire**
82:21, 243:15
**hired**
10:18, 10:21, 25:12
**historical**
293:8
**history**
293:15
**hit**
41:11, 51:18, 89:20, 151:17, 151:21, 152:10, 162:19, 164:11, 167:9, 168:8, 172:24, 173:12, 174:23, 181:4, 270:11
**hits**
39:11
**hitting**
39:8, 153:14
**hold**
58:10, 63:23, 68:7, 68:17, 69:2, 70:18, 77:5, 77:20, 96:4, 104:3, 109:14, 110:18, 113:14, 219:15, 222:10
**hole**
21:16, 35:18, 40:24, 41:1, 41:9, 41:20, 41:22
**holographic**
80:20
**honest**
167:13, 249:11, 258:24
**honestly**
48:20, 72:12, 73:20, 182:3, 249:11, 259:9
**hooked**
293:23
**hope**
121:1, 222:14, 298:15
**hopeful**
259:13
**hopefully**
26:22, 60:19, 207:6, 214:17, 260:21, 283:24
**horizontal**
34:21, 106:24, 107:1, 107:14, 107:17, 107:19, 121:3, 124:16, 124:18, 125:5, 125:7, 125:10, 125:18, 125:23, 127:20, 128:14, 132:11, 132:20, 132:22, 133:7, 136:9, 144:23, 144:24, 146:7, 151:8, 169:5, 172:19, 180:23, 181:15, 181:16, 181:17, 181:22, 198:2, 201:14, 202:4, 202:8, 202:18, 203:14, 206:15, 207:9, 208:12, 209:20, 262:16, 263:4, 267:2, 268:11, 268:15
**horizontally**
164:8
**hour**
54:21, 54:22, 108:1, 108:5, 108:9, 214:13, 243:21, 258:6
**hours**
12:10, 12:13, 256:23, 288:25, 290:1
**however**
17:20, 95:23, 98:14, 129:25, 160:13, 160:18, 162:23, 174:5, 193:3, 265:14, 269:11
**huge**
195:23, 262:20
**human**
132:4, 238:14
**hundreds**
69:21
**hypothetical**
281:11, 283:6, 284:1, 286:2

**I**

**icon**
188:20
**idea**
10:17, 30:25, 43:12, 86:21, 93:19, 107:9, 147:24, 156:6, 169:12, 188:2, 188:6, 195:2, 195:25, 221:5, 222:21, 237:18, 237:19, 238:1, 256:9, 268:11, 285:8, 298:11
**ideal**
38:8
**idealization**
36:12
**idealized**
39:24
**ideas**
86:16, 223:20, 237:21
**identical**
40:5, 78:24, 97:17, 99:7, 100:3, 124:19, 199:6, 220:18, 230:15, 230:23, 231:25, 283:4
**identically**
230:18
**identifiable**
188:9, 188:13,

188:16, 188:17, 188:21, 188:25, 194:2, 195:16, 197:7, 207:7, 210:20, 261:21, 261:22
**identification**
11:18, 13:2, 18:3, 24:25, 26:1, 28:11, 57:7, 64:3, 77:18, 109:4, 112:1, 114:9, 139:4, 140:4, 211:6, 225:14, 228:3, 241:16, 248:2
**identified**
189:8, 201:2, 201:4, 233:9, 242:4, 242:6, 250:7, 255:14
**identifiers**
192:25
**identifies**
193:18, 202:15, 202:22, 203:2, 250:3
**identify**
6:13, 10:24, 111:2, 131:19, 163:23, 189:6, 189:7, 202:23, 203:13, 204:11, 204:21, 205:18, 207:1, 207:13, 211:3, 211:11, 245:10, 261:17, 262:13
**identifying**
249:24, 271:5
**ignore**
228:13
**illustrate**
131:4, 131:7
**illustrated**
149:12, 154:1, 162:9
**image**
30:12, 30:25, 31:8, 31:18, 32:22, 33:7, 38:9, 41:16, 51:15, 51:24, 55:15, 61:4, 61:12, 67:20, 87:7, 88:12, 89:4, 90:25, 93:23, 93:25, 94:5, 94:7, 94:23, 99:1, 100:13, 122:17, 124:21, 125:7, 125:17, 130:23, 131:5, 131:8, 131:21, 150:2, 154:6, 158:8, 162:7, 164:23, 171:12, 193:17, 202:15, 203:3, 204:21, 207:5, 218:4, 232:20, 232:21, 234:15, 236:1, 236:3, 236:6, 236:9, 236:20, 236:22, 238:11, 238:20, 245:5, 248:24, 249:1, 250:10, 265:12, 265:13, 278:16, 278:17, 278:18, 278:19, 293:9, 293:12, 298:20
**imaged**
88:2, 88:18, 89:19, 90:24
**imager**
250:18, 251:22
**imagers**
121:21
**images**
120:18, 122:23, 149:10, 163:17, 179:9, 236:18, 238:16, 256:16, 258:5
**imagine**
35:23, 36:5, 36:19, 37:9, 41:2, 41:5, 44:6, 146:3, 158:16, 164:1, 174:5, 219:9, 223:18, 267:20, 282:12
**imagined**
157:22, 157:24, 158:4
**imaging**
38:16, 39:13
**imagining**
37:5
**iman**
3:19, 4:22, 5:6, 108:25
**immediate**
236:4
**immediately**
8:20, 8:23
**impact**
41:7, 41:12
**impacted**
41:8
**impede**
8:9
**implementation**
160:1
**implemented**
141:16, 256:11
**implication**
124:19
**important**
21:13, 43:4, 202:11, 204:9, 205:20, 220:4, 272:3, 272:14, 287:23
**importantly**
84:19
**impossible**
33:6, 83:7, 283:22, 292:5
**incarnation**
32:24
**incarnations**
128:17
**include**
138:22, 233:19, 252:17, 269:16
**includes**
14:11, 138:22
**including**
64:16, 120:4, 206:1, 215:9, 250:3
**incorrect**
95:25
**incredibly**
51:21, 62:14, 67:25
**indecipherable**
235:7
**indeed**
121:1
**indefinite**
266:1
**indefiniteness**
177:12, 179:4, 179:6
**independent**
116:9, 124:17, 156:24, 157:1, 244:24, 253:1
**index**
80:24
**indicate**
272:12, 272:20
**indicated**
272:8
**indicating**
272:4
**indication**
272:9
**indicative**
264:21
**indicator**
272:17
**indirect**
207:12
**indistinguishable**
100:16, 101:2, 283:12

**individual** 131:14, 205:17
**industry** 293:16
**inexpensive** 83:13
**infinite** 41:9, 88:14, 133:11, 143:21
**infinitesimally** 180:17
**infinity** 129:14
**inform** 8:20, 29:5, 259:23
**information** 16:1, 16:2, 42:15, 131:7, 149:17, 206:22, 207:12, 217:13, 221:19, 224:11, 250:11, 254:12, 275:2, 277:3, 277:18, 278:9, 278:17, 284:2, 288:22, 292:24, 299:7
**informative** 153:8, 223:9
**infrared** 65:5
**infringed** 281:16
**infringement** 168:5, 168:6, 179:10, 179:12, 227:15, 229:22, 235:1, 235:2, 237:5, 237:12, 254:20, 256:18, 270:5, 286:1, 289:6, 291:14, 292:12, 292:15, 293:5, 296:8
**infringes** 174:18
**infringing** 286:4, 286:22
**ingenious** 224:6
**inherent** 95:18, 155:6, 256:2, 292:24, 299:10
**inherently** 152:11
**initial** 4:9, 11:23, 218:11, 257:15
**initially** 10:4
**inobtrusive** 43:21
**inside** 219:9
**insofar** 163:4
**instead** 40:23, 179:20, 179:23, 206:21
**institutions** 20:7
**instructing** 237:23
**instructions** 219:1
**integers** 131:14, 132:13
**integrated** 53:4
**intend** 161:23, 161:24, 170:9
**intended** 73:18, 170:6
**intending** 169:25, 170:1, 170:3, 260:9
**intense** 17:5
**intensity** 201:15, 201:18, 201:21
**intention** 167:14, 169:11, 197:5
**intentionally** 73:16, 121:4
**interaction** 252:2
**interest** 301:10
**interested** 15:24, 105:7, 121:8, 123:16, 131:6, 240:24, 245:22, 264:13, 274:25
**interesting** 69:12, 92:16, 93:1, 98:5, 167:16, 173:9, 174:3, 176:5, 176:6, 176:17, 211:4, 223:23, 239:17, 249:12
**interestingly** 20:3
**internet** 74:15, 231:18
**interpret** 76:14, 77:4, 116:16, 116:17, 265:16, 269:13
**interpretation** 48:3, 72:19, 75:13, 75:16, 75:18, 75:25, 79:14, 79:16, 84:14, 84:15, 98:9, 116:10, 140:14, 141:4, 141:9, 141:10, 141:20, 217:21, 252:21, 253:2, 285:5
**interpretational** 134:22
**interpretations** 75:13, 284:24, 291:23
**interpreted** 233:3
**interpreter** 258:7, 258:14, 258:15
**interpreting** 209:24
**interprets** 135:9
**interrupt** 70:9
**intersect** 128:2, 163:21, 169:4, 179:18
**intersected** 128:14
**intersecting** 179:2, 202:18
**intersection** 151:14, 162:16, 202:7, 209:19, 209:20, 269:5
**intersections** 125:19, 125:24, 153:13, 206:14, 209:17, 210:14
**intersects** 88:17, 93:13
**intervals** 178:22, 178:25
**invalid** 280:5, 281:14, 282:18, 284:12
**invalidate** 174:22
**invalidated** 280:3
**invalidates** 174:19
**invalidating** 175:6
**invalidity** 10:16, 10:22, 12:25, 18:8, 18:12, 29:18, 215:1, 215:12, 224:17, 229:12, 244:16, 252:14, 266:6, 285:11, 285:25, 287:11, 287:15
**invent** 101:1, 170:8,

173:1, 173:2
**invented**
98:6, 155:11, 167:20, 171:3
**invention**
120:4, 143:17, 165:21, 165:24, 169:10, 170:9, 170:17, 173:4, 173:22, 174:10, 194:23, 195:14, 216:18, 218:12, 267:13, 288:5
**inventive**
166:25, 170:1, 170:3, 183:19, 183:24, 184:10, 186:7
**inventor**
25:23, 27:10, 78:1, 241:13
**inventors**
24:21
**involved**
62:8, 115:1, 280:18, 296:17
**involves**
15:15
**involving**
166:20
**iphone**
53:3, 53:4, 294:25
**ir**
64:19
**irregular**
8:12
**irrelevant**
91:24
**isaiah**
6:10
**isiah**
3:21
**isolation**
19:1
**issue**
159:19, 226:11, 228:18, 266:25
**issues**
280:18
**it'll**
105:24
**item**
294:16, 294:17
**items**
294:8
**itself**
65:4, 69:10, 106:16, 114:19, 123:18, 195:12, 293:22

**J**

**january**
77:25
**jimuyida**
1:9, 257:10
**jimuyida's**
258:4
**job**
1:23, 14:24
**joined**
34:21
**journal**
231:14, 231:16
**judge**
9:17, 136:8
**july**
25:23, 241:12
**jump**
16:19, 135:22, 168:9
**jumping**
16:17
**june**
1:16, 6:8, 301:14
**jury**
280:2
**justify**
97:16
**justifying**
65:11

**K**

**keep**
46:11, 60:23, 71:5, 92:5, 108:9, 109:21, 109:25, 110:6, 122:10, 122:24, 129:10, 138:11, 211:19, 239:15, 241:4, 289:2, 289:11
**keeps**
177:7
**key**
34:15, 34:16, 220:7
**kidding**
115:9
**kids**
142:16
**kill**
215:15, 215:16
**kind**
22:3, 30:13, 46:7, 51:20, 53:7, 66:9, 67:12, 87:5, 127:25, 132:8, 132:12, 153:4, 156:1, 161:23, 167:14, 167:23, 167:24, 168:1, 169:11, 188:7, 190:18, 194:16, 197:20, 199:5, 200:19, 206:1, 206:21, 206:23, 210:9, 234:1, 235:4, 239:17, 239:23, 250:25, 251:7, 252:6, 268:1, 268:18, 269:4, 269:6, 270:6, 275:22, 282:1, 283:22, 286:14, 295:12, 296:13, 298:13
**kinds**
22:6, 189:13, 207:15, 219:10, 281:25
**king**
3:12, 6:19
**kingslake**
22:11
**knew**
20:18, 79:22, 167:18, 291:4
**knowing**
223:13, 283:21
**knowledge**
15:12
**known**
23:8, 44:7, 44:8, 45:10, 122:15, 165:14, 167:21, 294:10, 295:18, 298:19
**knows**
81:24, 126:25, 207:5, 207:7

**L**

**l-prime**
88:23
**la**
164:2
**lab**
294:17
**label**
62:3, 133:25
**labeled**
34:19, 38:23, 38:25, 39:6, 39:10, 39:11, 73:13, 79:4, 87:14, 87:15, 88:23, 89:17, 89:21, 89:23, 91:21, 92:21, 93:14, 93:18, 102:20, 104:14, 104:15, 104:20, 107:18, 123:20, 128:5, 128:6, 128:7
**labels**
239:21
**lack**
279:17

**laid**
254:8
**language**
115:21, 118:1, 137:14, 150:13, 213:22, 216:16, 236:2, 238:12, 273:16, 274:13, 277:24, 278:4, 278:9
**lapa**
24:22, 25:24
**large**
41:4, 41:20, 41:22, 44:19, 54:13, 180:12, 203:21, 240:9, 240:10
**lasers**
32:16
**last**
27:19, 27:21, 28:7, 33:10, 80:24, 98:13, 99:15, 109:1, 119:2, 123:21, 142:6, 178:16, 217:20, 217:24, 218:12, 233:18, 237:10, 243:20, 257:15, 264:4, 295:24
**late**
10:1, 48:22, 67:6, 67:9, 67:18, 87:3, 241:3, 294:2
**later**
10:16, 33:10, 63:21, 68:19, 71:2, 114:6, 235:20, 259:11, 277:9
**latest**
285:6, 285:7
**launch**
87:8
**law**
3:4, 6:16, 120:10, 151:15, 151:19, 153:14, 162:21, 163:22, 167:10, 169:9, 174:7, 287:3
**lawrence**
241:13
**lawyers**
115:1
**lay**
195:15
**laying**
194:24
**layman's**
51:16
**le**
4:17, 55:16, 56:4, 56:9, 56:19, 57:14, 58:14, 58:16, 60:15, 60:23, 60:25, 62:18, 64:15, 65:24, 66:18, 67:24, 83:24, 84:3, 84:18, 84:24, 109:21, 120:23, 120:24, 121:10, 121:14, 121:20, 121:25, 122:3, 122:20, 123:1, 123:3, 123:4, 123:5, 123:7, 123:10, 123:17, 123:19, 125:25, 132:19, 134:6, 134:12, 135:6, 136:1, 136:19, 136:20, 141:17, 142:5, 147:11, 147:19, 151:25, 152:1, 155:9, 161:9, 162:1, 167:1, 167:21, 172:5, 173:7, 173:24, 182:25, 197:16, 197:20, 200:1, 200:5, 201:2, 201:4, 201:10, 201:17, 202:4, 202:10, 204:23, 205:24, 207:2, 208:5, 208:6, 208:8, 208:10, 208:14, 209:5, 210:16, 210:17, 210:24, 211:2, 211:10, 215:9, 215:15, 270:16, 279:24, 280:5, 280:13, 280:16, 281:6
**lead**
269:21
**leads**
236:15
**learn**
17:1, 17:14
**learned**
15:10, 15:11, 259:1, 259:15, 259:16
**learning**
15:15, 289:19
**least**
42:18, 46:23, 51:25, 72:2, 73:16, 83:20, 109:18, 115:20, 138:25, 152:21, 193:19, 195:23, 196:2, 198:12, 211:22, 212:25, 213:2, 218:3, 218:4, 222:23, 225:20, 232:18, 232:19, 232:21, 234:14, 236:3, 236:8, 236:17, 246:21, 255:18, 260:14, 262:8, 262:19, 284:23
**leave**
67:5, 92:18, 142:20, 215:16, 215:17, 246:24, 246:25, 247:1, 247:8, 247:9, 247:12, 247:15, 247:19
**leaves**
54:11
**left**
34:16, 38:16, 87:14, 87:18, 87:22, 88:8, 88:21, 89:18, 90:2, 93:5, 93:7, 93:13, 93:14, 93:15, 93:23, 94:5, 94:7, 94:8, 94:14, 94:19, 95:5, 101:8, 104:8, 123:20, 124:4, 125:4, 128:5, 143:20, 267:14, 276:23, 276:24
**left-hand**
57:23, 58:3, 267:16
**leftmost**
34:19, 88:4, 102:18, 272:12
**legal**
18:24, 139:17, 140:20, 175:20, 183:14, 236:11, 280:18, 281:8, 282:4, 283:10
**legalese**
236:19
**legality**
280:18
**length**
72:20, 73:7, 76:19, 82:5, 150:5, 164:24, 210:23, 270:16, 281:23, 293:3, 298:10
**lengths**
43:15, 122:4

**lens**
15:8, 33:5, 41:18, 41:21, 42:4, 42:17, 42:21, 42:22, 43:4, 43:21, 46:19, 46:24, 47:1, 51:17, 68:11, 68:13, 68:14, 69:6, 69:7, 69:10, 70:4, 70:5, 70:7, 70:20, 70:23, 71:8, 72:1, 72:14, 72:15, 72:17, 73:12, 73:17, 74:16, 74:22, 74:23, 75:3, 76:17, 76:18, 76:21, 76:22, 78:15, 80:22, 80:24, 81:2, 81:4, 81:8, 81:13, 81:21, 82:9, 82:10, 82:12, 82:13, 83:16, 84:6, 84:21, 84:24, 85:2, 85:3, 85:5, 85:6, 85:17, 233:11, 242:7, 243:13, 249:1, 295:17
**lense**
85:3
**lenses**
14:15, 17:4, 17:13, 17:14, 78:9, 78:10, 80:14, 80:16, 80:17, 80:19, 81:22, 82:19, 82:25, 83:10, 83:13
**less**
126:2, 141:19, 142:2, 153:10, 200:4, 201:24, 203:23, 224:4, 249:12
**lesser**
15:5
**let's**
10:14, 13:8, 30:21, 30:22, 33:22, 37:19, 38:12, 38:25, 39:1, 39:8, 42:12, 45:18, 60:22, 60:23, 60:24, 61:2, 61:23, 69:14, 70:1, 71:5, 85:21, 86:11, 89:25, 90:1, 90:3, 90:8, 90:22, 91:1, 91:3, 91:4, 94:4, 94:12, 96:3, 98:21, 106:11, 111:10, 127:7, 130:16, 131:11, 131:22, 135:14, 136:5, 136:6, 144:12, 145:2, 151:5, 157:4, 159:21, 166:1, 171:16, 171:18, 175:21, 176:21, 179:14, 180:5, 180:22, 182:5, 184:3, 184:7, 187:18, 192:8, 193:11, 194:18, 197:25, 207:22, 218:20, 218:23, 219:18, 219:21, 220:20, 220:21, 223:17, 224:24, 227:17, 230:20, 234:17, 235:8, 235:10, 235:22, 235:24, 235:25, 238:23, 240:3, 247:12, 247:24, 249:14, 266:18, 267:7, 267:9, 267:10, 271:20, 271:21, 272:25, 273:17, 275:4, 280:24, 288:18, 288:19, 293:8
**letters**
13:14
**letting**
42:20, 201:23, 201:24
**level**
15:3, 51:22, 159:25, 166:3, 229:18, 298:6
**levels**
17:6, 193:6, 296:20
**lichtman**
1:25, 2:24, 6:22, 301:2
**lie**
8:13, 122:2, 149:24, 149:25, 151:2, 151:22, 152:4, 154:6, 162:5, 171:11, 172:10, 172:15, 180:13, 208:17
**life**
47:7, 49:25
**light**
4:18, 30:19, 30:22, 31:14, 32:3, 32:20, 33:7, 35:11, 36:9, 36:11, 40:16, 40:21, 41:1, 41:6, 41:23, 42:21, 43:7, 44:22, 46:18, 47:11, 51:7, 68:14, 69:5, 70:18, 70:22, 71:7, 71:13, 71:18, 75:23, 76:24, 82:4, 89:3, 100:11, 121:21, 121:24, 144:21, 149:8, 179:18, 188:2, 188:4, 188:6, 188:10, 188:14, 189:14, 190:2, 190:3, 190:9, 191:1, 191:18, 192:12, 192:13, 192:19, 192:21, 197:18, 201:13, 201:15, 201:18, 201:20, 201:23, 201:25, 205:22, 235:18, 235:20, 248:25, 261:6, 261:9, 261:13, 261:23, 262:17, 263:4
**lighter**
188:4
**lights**
200:19, 200:21
**likely**
15:17
**likewise**
39:20, 39:23
**limit**
53:7, 153:15, 157:7, 290:12
**limitation**
113:5, 113:9, 113:12, 120:8, 151:25, 155:15, 161:21, 163:20, 164:16, 168:18, 234:13, 245:11, 245:20, 252:18
**limitations**
166:6, 183:21, 183:25, 185:8
**limited**
145:18, 157:7, 157:18
**limits**
138:1, 138:24,

224:3, 281:22, 281:25
**lined**
167:17, 237:24, 239:10
**linguist**
136:17
**list**
223:18, 254:11, 254:22, 255:2, 255:3, 255:8
**listed**
14:9, 16:14, 21:4, 24:21, 61:25, 80:17, 96:24, 113:5
**listen**
59:10, 221:15
**listening**
108:25
**listing**
25:23, 291:17
**lists**
250:13
**lite**
254:16, 254:17
**literal**
220:16
**literally**
42:24, 73:6, 82:6, 82:7, 121:14, 122:23, 132:19, 132:21, 134:13, 134:15, 144:20, 145:15, 150:15, 161:9, 168:4, 171:1, 172:17, 173:8, 180:11, 180:12, 190:24, 217:21, 221:3, 224:3, 237:12, 239:13, 243:4, 270:9, 286:20
**literature**
20:10, 45:7, 72:25, 74:14, 87:5, 100:19, 101:3
**little**
16:20, 19:14, 24:5, 31:5, 34:12, 34:16, 35:1, 35:16, 35:17, 38:16, 40:16, 54:10, 59:4, 69:13, 69:22, 73:22, 88:2, 88:14, 89:20, 90:7, 93:4, 99:13, 103:20, 107:15, 108:1, 113:1, 135:7, 141:19, 153:4, 154:22, 154:23, 158:24, 158:25, 171:17, 182:8, 188:19, 188:20, 191:8, 195:21, 199:2, 200:21, 200:25, 203:15, 203:23, 204:7, 205:9, 206:16, 206:19, 206:20, 210:18, 211:4, 226:9, 237:15, 239:14, 240:16, 241:3, 241:4, 243:21, 259:16, 264:16, 265:3, 272:9, 294:12
**live**
165:20
**lives**
91:6, 92:4, 93:12, 94:20
**lizard**
254:14
**llp**
6:19
**lo**
78:23, 268:16, 268:23
**load**
27:15, 59:17, 262:20
**local**
188:19
**locally**
195:20
**located**
23:4, 144:18, 150:20, 150:22, 150:24, 155:18, 155:25, 166:8, 166:21, 166:24, 167:6, 167:7, 168:11, 168:18, 265:2, 265:6, 265:7, 265:18
**location**
211:10, 227:11
**locations**
178:9, 178:17
**logistics**
23:1
**long**
58:22, 65:3, 76:11, 99:22, 130:2, 190:16, 237:7, 243:20, 253:14, 259:6, 284:18, 284:22, 285:2, 290:12
**longer**
158:25, 180:25
**looked**
19:4, 20:4, 22:7, 22:12, 22:18, 26:11, 56:18, 78:24, 114:18, 193:22, 196:3, 197:8, 214:5, 251:21, 273:12, 291:13, 291:14, 292:20
**looking**
21:11, 23:18, 23:23, 34:7, 60:23, 61:1, 61:2, 61:3, 68:3, 87:11, 87:12, 94:13, 94:15, 98:23, 113:18, 121:18, 127:14, 142:20, 144:2, 168:2, 171:2, 172:6, 173:7, 182:20, 185:25, 186:1, 186:3, 186:13, 193:16, 193:19, 199:14, 204:10, 204:11, 206:23, 207:1, 211:24, 212:13, 212:14, 212:16, 218:5, 222:20, 226:8, 227:1, 229:22, 229:24, 230:14, 230:15, 230:19, 231:4, 233:1, 237:14, 237:20, 242:2, 242:5, 248:7, 251:9, 252:3, 256:20, 256:23, 262:5, 262:22, 262:24, 264:15, 264:18, 264:20, 267:25, 269:19, 271:24, 275:25, 277:9, 277:16, 277:19, 278:20, 278:23, 279:18, 289:14, 291:19, 292:8
**looks**
18:9, 18:19, 36:7, 56:21, 61:24, 106:23, 112:12, 114:21, 152:20, 168:21, 198:11, 199:21, 200:18, 200:20, 215:21, 219:17, 228:7, 230:11, 232:11, 263:3, 277:12, 277:14, 288:21
**loosey-goosey**
269:5

**lose**
233:25, 249:16, 252:7, 296:23
**losing**
127:13, 184:17
**lost**
127:13, 178:11, 216:22, 237:16, 237:17, 276:4
**lot**
31:12, 41:1, 41:6, 46:2, 69:23, 73:2, 74:13, 77:5, 78:13, 82:21, 94:10, 109:11, 150:14, 151:16, 151:17, 162:18, 172:11, 172:12, 194:22, 195:7, 195:14, 198:11, 234:16, 249:12, 256:17, 256:20, 281:20
**lots**
15:15, 18:14, 18:15, 152:10, 190:5, 190:6, 200:3, 206:10
**loud**
119:16
**love**
174:4
**low**
240:11
**lower**
87:18, 113:1, 267:17
**lozenges**
199:3, 199:4, 203:19
**lunch**
108:4
**lying**
98:25, 150:11
**lynx**
254:16

**M**

**machine**
219:5, 219:6, 219:17, 220:1, 220:13, 237:17
**macro**
42:24
**made**
78:14, 106:16, 115:6, 121:2, 153:10, 165:1, 188:8, 251:16
**magic**
152:4
**magical**
286:24
**magically**
41:24
**magicswift**
254:15, 272:19
**main**
41:21, 42:21, 75:16, 76:12, 150:24, 193:1, 200:22, 290:2
**maintain**
240:7
**majority**
54:13, 152:21
**make**
9:18, 12:16, 12:17, 12:18, 13:19, 27:16, 29:9, 55:16, 58:19, 58:22, 59:17, 68:5, 76:13, 77:5, 79:21, 84:20, 102:2, 112:7, 140:14, 141:13, 143:17, 172:22, 177:25, 206:17, 226:14, 230:7, 236:25, 237:4, 241:9, 247:18, 255:2, 255:3, 263:22, 281:9, 287:1, 289:11, 298:1
**makes**
64:14, 72:11, 125:16, 161:13, 225:2, 268:6, 268:11
**makeup**
261:4
**making**
66:18, 140:10, 283:10
**mallesons**
3:12, 6:19
**man**
294:9
**managed**
249:16, 252:6
**manifestations**
157:18
**manner**
192:18
**manufactured**
242:15
**many**
12:10, 32:5, 32:6, 49:24, 65:5, 80:13, 80:20, 135:11, 142:16, 187:14, 203:20, 211:14, 222:1, 222:5
**march**
27:10
**marched**
202:15
**marches**
202:16
**mark**
114:7, 138:1, 138:23, 147:2
**marked**
11:17, 13:1, 18:2, 24:24, 25:25, 28:10, 57:6, 64:2, 77:17, 109:3, 111:25, 114:8, 139:3, 140:3, 225:13, 228:2, 241:15, 248:1
**markers**
288:13, 289:8, 289:20, 289:22
**market**
294:23
**markman**
5:8, 115:22, 116:10, 135:16, 137:9
**marks**
300:2
**massachusetts**
23:6
**match**
12:7, 104:24, 141:15, 199:10, 227:10, 229:16, 236:25, 237:21, 239:16, 277:24
**matches**
141:15, 150:13, 230:18
**matching**
238:15, 274:22
**material**
17:21, 99:19, 100:6, 226:1
**materials**
4:13, 18:7, 18:11
**mathematical**
31:16, 31:17, 31:24, 32:22, 37:15, 119:22, 126:8, 179:19, 179:22, 179:24, 180:10, 181:1, 256:4, 279:5, 298:14, 299:11
**mathematically**
36:18, 36:19, 37:3, 91:23, 126:15, 157:16, 157:17, 158:3
**mathematics**
37:10, 157:25, 166:23, 167:5, 176:20, 181:2
**matrix**
19:12, 19:23,

47:13, 48:4, 48:18, 49:2, 49:10, 49:11, 49:16, 50:11, 50:18, 50:25, 53:17, 53:18, 54:1, 54:10, 54:16, 61:16, 62:5, 62:7, 62:11, 63:2, 63:4, 63:6, 63:12, 63:15, 64:18, 65:14, 65:16, 65:18, 65:20, 66:5, 66:7, 66:25, 67:4, 67:22, 242:8, 242:19, 242:24, 250:4, 250:10, 250:18, 251:22

**matter**
6:3, 133:24, 150:8, 172:25, 173:3, 204:12, 269:7, 282:2, 283:13

**matters**
17:10

**max**
214:17

**maybe**
27:15, 45:6, 49:23, 55:9, 55:10, 56:24, 59:12, 71:23, 77:19, 81:25, 82:1, 83:6, 89:20, 96:5, 105:1, 108:4, 108:5, 114:3, 119:13, 136:12, 147:16, 154:21, 156:1, 156:6, 167:19, 170:7, 170:8, 175:21, 181:4, 181:24, 182:21, 198:13, 203:25, 212:10, 213:23, 219:1, 219:3, 219:4, 219:7, 221:14, 224:11, 228:13, 233:24, 235:21, 241:4, 242:14, 250:17, 257:1, 258:6, 258:10, 265:3, 272:13, 285:11, 285:13, 292:9, 294:3, 295:19

**mean**
21:8, 29:11, 31:17, 33:12, 46:23, 47:23, 49:12, 65:5, 70:12, 72:8, 72:14, 76:14, 77:4, 81:10, 81:11, 89:9, 97:6, 109:13, 109:23, 113:9, 139:14, 146:15, 147:4, 148:2, 155:8, 155:17, 167:8, 168:20, 170:12, 171:12, 171:14, 175:15, 176:24, 176:25, 179:24, 184:1, 188:12, 190:18, 200:17, 201:2, 203:24, 208:5, 208:7, 210:15, 218:22, 218:23, 218:24, 219:10, 219:20, 220:8, 220:17, 221:9, 221:14, 222:2, 224:10, 229:12, 234:20, 234:23, 236:6, 236:8, 237:25, 251:13, 255:8, 261:19, 261:20, 271:15, 281:11, 281:21, 290:11, 299:12, 299:13, 299:17

**meaning**
5:10, 5:12, 38:4, 84:5, 139:20, 139:22, 140:15, 141:4, 144:4, 145:1, 152:14, 155:17, 164:16, 205:20, 237:3, 237:9

**meanings**
47:24, 219:10

**means**
17:10, 19:11, 42:17, 47:23, 49:10, 65:5, 73:3, 75:18, 76:2, 76:4, 76:24, 77:4, 82:23, 86:24, 90:19, 93:14, 99:10, 126:13, 135:17, 164:15, 176:12, 188:14, 190:8, 190:24, 191:1, 205:15, 218:24, 219:1, 219:3, 221:6, 221:20, 221:23, 222:2, 222:21, 223:10, 223:11, 223:13, 223:14, 235:11, 235:22, 236:18, 237:6, 242:4, 245:6, 257:8, 259:7, 275:17, 278:17, 285:13, 296:12, 299:19

**means-plus-funct-ion**
233:4

**meant**
20:18, 25:4, 35:3, 76:7, 76:10, 77:3, 79:24, 107:18, 170:10, 185:23, 197:7, 222:25, 259:3

**meanwhile**
296:15

**measurable**
41:22

**measurements**
164:25

**meat**
285:24, 288:6

**media**
6:1

**median**
143:12, 143:13, 154:5, 154:6, 154:8, 154:9, 160:15, 162:5

**medians**
160:20, 178:10, 178:18

**medication**
8:8

**meet**
50:13, 103:21, 245:20

**meeting**
223:21

**meets**
155:16, 174:11, 203:23

**memorize**
254:22

**mental**
31:10

**mention**
30:12, 33:9, 60:25, 68:13, 68:20, 205:10, 233:14, 268:11, 284:7, 287:21

**mentioned**
15:10, 23:3, 28:2, 47:14, 47:15, 53:9, 77:8, 77:14, 80:16, 83:10, 86:5, 86:7,

105:2, 115:11, 115:14, 115:15, 115:16, 143:23, 144:16, 181:11, 205:22, 207:15, 255:9, 265:9, 287:16, 295:25, 297:12, 297:14, 297:25
**mentioning**
113:8
**mentions**
249:21
**mere**
155:2, 281:4
**merely**
166:2
**meridian**
115:15, 149:25, 150:1, 162:7, 173:14, 253:4, 253:19, 253:20, 253:22, 253:23, 255:13, 255:18
**meridians**
97:9, 100:25, 115:25, 116:1, 116:6, 116:12, 116:18, 116:21, 117:22, 118:15, 118:16, 118:17, 118:20, 119:5, 119:8, 119:21, 143:12, 150:12, 160:15, 160:20, 160:24, 161:7, 162:8, 164:25, 165:3, 165:8, 168:25, 169:1, 169:2, 171:11, 172:10, 172:12, 178:8, 178:16, 178:21, 265:17
**merriam**
5:10, 5:12, 135:19
**merriam-webster**
138:5, 138:20, 140:8
**met**
174:16, 245:12
**method**
95:23, 100:6, 131:7, 223:14
**methods**
130:21
**mic**
290:10
**michael**
3:3, 6:15
**mid-'s**
67:13, 293:18, 293:19, 293:21
**middle**
68:12, 74:22, 122:13
**might**
8:9, 18:21, 19:4, 21:8, 43:25, 49:16, 49:20, 49:21, 53:8, 81:24, 91:11, 121:16, 123:17, 125:3, 125:12, 126:22, 164:5, 179:3, 184:9, 189:3, 189:4, 189:16, 190:6, 195:11, 199:11, 210:22, 215:11, 215:13, 219:20, 220:1, 223:19, 224:5, 226:17, 226:22, 228:9, 228:12, 228:21, 233:8, 241:3, 246:21, 246:23, 257:15, 257:16, 269:16, 279:12, 283:8, 296:20
**million**
142:17
**mind**
45:24, 142:9, 244:3
**minds**
169:25
**minimal**
51:14, 52:19, 52:20
**minus**
59:21
**minute**
17:17, 23:1, 58:21, 63:11, 64:22, 85:21, 98:13, 224:24, 225:9, 226:3, 235:15, 247:21, 249:18, 254:6, 289:1
**minutes**
59:20, 108:2, 108:5, 187:20, 214:17, 225:1, 243:24, 258:7, 259:11, 259:12, 289:4, 290:13
**minutia**
22:10
**mislabeled**
225:8
**missed**
90:9
**missing**
217:11, 217:13
**misspeaking**
211:19
**misspoke**
96:7, 106:8
**misstate**
27:22
**misunderstood**
222:16
**mix**
199:10
**mixed**
26:18
**mobility**
56:6
**mode**
273:25, 274:6, 274:9, 274:12, 274:14, 274:16, 274:18, 274:21, 274:22, 275:8, 275:11, 275:17, 276:12, 276:16, 277:4, 278:23
**model**
5:14, 16:15, 31:10, 31:14, 31:16, 31:18, 31:22, 31:24, 32:9, 32:22, 33:11, 33:13, 34:14, 34:23, 35:13, 36:2, 36:3, 38:15, 44:14, 44:15, 44:25, 45:1, 45:4, 45:5, 45:11, 45:14, 72:23, 72:24, 73:10, 74:12, 75:19, 76:16, 76:24, 78:19, 79:3, 79:9, 86:25, 87:25, 88:22, 298:15, 298:23, 299:9
**modeled**
36:17, 99:22
**modern**
48:21
**modulated**
181:17, 191:2, 198:2
**modulating**
201:15, 201:18
**modulation**
201:25, 204:16, 211:6, 267:3
**moigne**
4:17, 55:16, 56:5, 56:9, 56:19, 57:14, 58:14, 58:16, 60:15, 60:24, 60:25, 62:18, 64:15, 65:24,

66:18, 67:24, 83:25, 84:3, 84:18, 84:24, 109:21, 120:23, 120:24, 121:10, 121:14, 121:20, 121:25, 122:3, 122:20, 123:1, 123:3, 123:4, 123:5, 123:7, 123:10, 123:18, 123:19, 125:25, 132:20, 134:7, 134:12, 135:6, 136:1, 136:19, 136:20, 136:21, 141:18, 142:5, 147:11, 147:19, 152:1, 152:2, 155:9, 161:9, 162:1, 164:2, 167:1, 167:21, 172:5, 173:7, 173:24, 182:25, 197:17, 197:21, 200:1, 200:5, 201:2, 201:5, 201:10, 201:17, 202:4, 202:10, 204:23, 205:25, 207:2, 208:5, 208:6, 208:8, 208:10, 208:14, 209:5, 210:16, 210:17, 210:24, 211:2, 211:10, 215:10, 215:15, 270:16, 280:5, 280:13, 280:16, 281:6
**moigne's**
134:13, 279:25
**mole**
254:16
**moment**
11:14, 59:9, 156:25, 247:10, 247:20, 253:2, 263:15
**monday**
1:16
**money**
82:21
**monitor**
6:9
**months**
10:20, 257:1, 292:6
**moose**
254:16, 254:17
**more**
10:9, 15:16, 15:17, 15:23, 21:22, 24:15, 26:12, 30:5, 34:25, 37:7, 40:21, 49:8, 49:15, 50:19, 52:18, 52:21, 52:22, 52:25, 53:3, 53:4, 53:5, 54:14, 55:10, 67:8, 70:17, 70:21, 70:24, 73:21, 81:2, 84:19, 86:18, 97:4, 100:5, 105:2, 105:3, 126:21, 127:15, 131:1, 132:23, 135:7, 151:24, 161:11, 166:20, 166:22, 168:2, 168:7, 176:4, 176:9, 177:2, 181:4, 181:8, 191:20, 193:8, 197:16, 197:20, 197:22, 198:6, 199:11, 199:22, 200:4, 200:22, 201:23, 202:24, 211:5, 211:14, 214:13, 219:22, 220:21, 228:21, 228:24, 230:14, 236:8, 237:7, 237:15, 238:3, 238:15, 240:16, 242:18, 246:7, 251:15, 266:21, 268:20, 269:4, 269:8, 270:3, 284:25, 287:2
**moreover**
67:5, 82:15, 122:3
**morning**
7:7, 7:8, 53:18, 165:12
**most**
9:16, 15:14, 34:16, 63:15, 84:19, 128:19, 159:24, 195:15, 254:8, 258:25, 285:6, 288:3, 292:13, 292:14
**mostly**
72:4, 152:21, 205:9, 269:21, 287:24
**motion**
16:24, 17:2
**motivate**
38:1, 86:21
**motivated**
258:16
**mounted**
107:4
**mouth**
47:17, 53:14, 53:24
**mouthful**
53:17
**move**
55:10, 74:4, 85:21, 107:25, 125:8, 125:9, 142:7, 142:9, 150:4, 150:8, 154:18, 154:19, 158:23, 164:23, 205:2, 219:8, 224:16, 227:3, 234:1, 237:23, 238:19, 238:22, 239:11, 239:13, 239:15, 239:18, 243:19, 273:17, 290:14
**moved**
54:20, 237:16, 277:6, 277:11, 277:12
**movement**
165:1, 165:6
**movements**
161:5
**movie**
83:5
**moving**
117:2, 239:15, 241:4, 270:20
**much**
60:21, 67:8, 110:10, 126:17, 127:2, 127:15, 145:25, 163:3, 176:9, 198:6, 200:4, 200:10, 211:5, 211:14, 220:17, 222:7, 226:2, 233:25, 242:18, 288:24
**multi**
31:13
**multi-camera**
16:4, 30:21, 76:23
**multi-view**
31:13, 43:6, 43:7, 82:3
**multiple**
14:8, 32:4, 44:3, 44:9, 79:23, 102:25, 175:3, 213:11, 231:17
**must**
137:21, 169:18

**mute**
60:5, 290:3
**mutually**
129:13, 129:15
**myself**
38:12, 100:1, 151:6, 251:23
**mysterious**
150:15
**mystery**
16:21
**mystified**
252:6

**N**

**naked**
219:18
**name**
15:21, 22:19, 109:1, 128:4, 229:1, 253:16, 257:14, 258:12, 260:20, 287:17, 287:22
**names**
73:2, 233:22, 260:5, 291:18
**nanometer**
180:12
**narrow**
49:15, 49:23, 50:19
**narrowly**
284:25
**naturally**
145:11
**nature**
151:16, 151:19, 153:14, 162:21, 163:22, 167:10, 169:9
**nauseam**
193:22
**navigate**
216:6
**nayar**
15:22, 16:7
**near**
10:17
**nearly**
124:16, 171:21
**necessarily**
66:19, 66:22, 79:18, 80:22, 81:4, 83:10, 169:2, 169:4, 169:7, 169:10, 180:3, 180:19, 204:19, 250:25, 266:22
**necessary**
169:14, 170:4
**need**
8:12, 9:13, 14:23, 14:25, 15:1, 16:3, 16:10, 16:12, 17:14, 17:15, 22:24, 40:17, 40:21, 51:25, 52:1, 52:8, 52:10, 52:20, 56:12, 61:15, 62:1, 62:24, 69:13, 75:5, 77:10, 80:4, 85:2, 95:13, 105:11, 105:23, 111:22, 114:3, 114:4, 114:5, 116:4, 136:13, 142:11, 159:1, 174:16, 176:15, 185:4, 187:23, 195:11, 198:15, 243:19, 244:2, 247:15, 247:23, 258:24, 259:19, 265:3, 283:20, 289:22, 292:11, 292:13, 292:21, 299:16
**needed**
14:24, 16:25, 67:21, 95:1, 297:11
**needs**
14:21, 14:23, 31:10, 52:3, 52:12, 156:20, 176:16, 176:19, 206:21, 288:13, 299:1
**neighborhood**
23:5
**neighboring**
189:16, 210:22
**neither**
21:15, 278:21, 301:8
**nerves**
46:7
**never**
46:25, 47:7, 47:19, 82:11, 125:4, 142:9, 170:2, 170:3, 225:3, 293:3, 295:5
**new**
1:2, 3:15, 6:6, 15:15, 45:2, 71:3, 101:1, 110:8, 148:4, 285:8
**next**
4:25, 11:1, 12:21, 25:19, 33:1, 40:22, 46:16, 47:9, 50:21, 52:11, 55:13, 62:16, 70:5, 85:22, 88:6, 89:6, 89:8, 89:9, 99:11, 99:25, 102:20, 131:2, 150:3, 159:15, 177:15, 187:20, 190:12, 195:13, 207:10, 219:5, 219:6, 220:3, 220:12, 225:1, 231:12, 241:8, 282:5
**nice**
89:18, 108:10, 127:17, 127:21, 195:17, 224:9
**nikolay**
24:22
**nine**
56:4, 208:21, 231:7, 231:9
**nobody**
23:15
**nod**
8:2
**noise**
45:24
**non-claim-langua-ge**
158:18
**non-effects**
43:23
**non-english**
81:17
**non-epipolar**
163:6
**non-infringement**
5:15, 10:19
**non-planar**
154:2
**nonalignment**
162:15
**noncontact**
96:9
**none**
148:20
**noninfringement**
229:9, 252:17, 273:19
**noninfringenment**
229:17
**noninfringing**
279:20, 279:23, 280:7, 281:18, 282:20, 284:14, 286:16
**nonphysical**
87:20
**nonplanar**
149:13
**nonstandard**
69:24

**nonverbal**
8:3
**normal**
157:4, 277:16
**normally**
9:19, 157:3
**norman**
61:12, 61:13, 61:19, 62:1, 62:9
**notably**
73:13, 78:18
**notarial**
301:13
**notary**
2:24, 301:1, 301:19
**note**
21:25, 38:12, 70:4, 71:2, 142:8, 233:2, 245:2, 265:11, 276:11, 283:2
**noted**
20:5, 138:18
**notes**
22:1
**nothing**
7:3, 37:14, 151:10, 152:11, 152:12, 153:5, 162:17, 164:6, 165:13, 168:3, 168:4, 168:24, 170:11, 170:13, 173:18, 173:21, 173:22, 175:24, 176:6, 177:2, 200:8, 206:11, 251:10, 269:4, 285:2, 287:2, 293:1
**notice**
27:4, 30:9, 91:10, 93:9, 232:3, 232:5, 232:6, 232:7, 267:15, 282:24
**noticed**
20:16, 139:11
**noting**
92:22
**notion**
37:25, 52:3, 83:1, 126:9, 133:2, 229:10, 243:10
**novel**
62:11
**novelty**
196:19, 217:23, 217:24
**nowhere**
139:12, 291:20
**ntsc**
233:17
**number**
6:6, 10:20, 12:12, 24:20, 25:22, 27:9, 29:23, 34:13, 41:9, 58:2, 59:5, 63:19, 63:20, 63:23, 77:24, 80:17, 88:14, 102:25, 105:14, 114:14, 123:19, 124:3, 133:16, 138:11, 138:22, 143:21, 152:7, 181:18, 187:2, 196:6, 207:4, 212:15, 240:7, 241:12, 254:13, 255:24, 255:25, 264:11, 273:20, 273:25, 277:9, 291:21
**numbers**
30:2, 131:18, 133:13, 133:25, 228:12, 228:13, 229:23, 229:25, 230:13, 230:17, 230:24, 230:25, 231:1, 231:3, 231:13, 231:17, 231:19, 231:20, 231:24
**numerous**
117:25
**nw**
3:5

O

**o-n**
177:9
**o-prime**
90:3, 91:2, 102:20, 103:23, 104:12
**oath**
7:21
**object**
9:11, 35:14, 99:2, 99:19, 100:12, 105:16, 108:3, 138:14, 139:8, 164:22, 218:2, 219:24, 220:6, 220:22, 223:6, 232:23, 238:10, 238:16, 238:20, 238:23, 239:11, 239:13, 239:18, 248:25, 257:21, 272:12, 277:4, 277:12, 277:17, 277:19, 278:8, 278:9, 292:25
**objection**
9:13, 9:18, 48:6, 48:7, 53:22, 54:18, 78:12, 79:20, 81:6, 84:7, 102:17, 116:14, 118:18, 120:19, 136:22, 138:17, 139:16, 140:19, 144:6, 144:19, 146:11, 157:9, 157:11, 157:20, 158:9, 162:25, 163:18, 166:14, 169:6, 169:22, 174:13, 174:20, 175:7, 175:8, 175:18, 175:19, 176:3, 176:18, 185:15, 185:22, 197:1, 200:15, 214:15, 217:15, 223:2, 239:25, 250:16, 252:24, 253:5, 255:20, 266:11, 277:21, 280:9, 282:22, 284:15
**objections**
141:5
**objects**
33:8, 44:4, 100:7, 149:13, 154:2, 159:5, 203:12, 214:14, 298:19
**obligated**
288:13
**obligation**
7:22
**observed**
87:21
**observing**
45:10, 210:13
**obtaining**
131:7
**obviates**
289:22
**obvious**
9:6, 83:1, 145:8, 147:14, 148:25, 153:6, 161:2
**obviously**
32:1, 37:13, 67:21, 195:10, 252:7, 270:8, 294:24
**occasionally**
8:11, 72:3,

72:5
**occur**
8:19, 161:24, 179:3
**occurs**
86:24
**october**
114:13
**oem) (vms**
1:7, 6:7
**off-the-shelf**
185:12
**offhand**
240:22, 287:9
**office**
23:5
**officer**
301:2
**official**
10:6, 114:12
**officially**
28:5
**offsets**
50:6
**often**
19:11, 37:7, 38:2, 44:5, 83:13, 231:17
**oh**
13:12, 22:4, 22:16, 23:10, 25:3, 27:22, 28:3, 30:4, 52:16, 58:2, 58:10, 58:15, 59:1, 69:17, 70:13, 77:19, 86:1, 92:23, 94:14, 98:4, 106:8, 109:12, 113:14, 124:2, 124:10, 136:6, 139:9, 157:10, 159:3, 164:10, 168:10, 175:1, 178:2, 184:12, 191:11, 192:7, 198:17, 204:17, 207:9, 213:16, 216:24, 222:15, 222:17, 225:7, 227:17, 228:23, 232:4, 243:25, 246:16, 246:18, 248:3, 253:16, 259:4, 263:17, 280:14, 285:16, 285:20, 289:12, 290:3, 296:4
**old**
127:13, 194:10
**olden**
294:19
**omnidirectional--type**
32:13
**on-camera**
53:7
**on-the-street**
294:20
**once**
29:8, 95:4, 95:8, 224:20, 242:21, 254:6, 281:24, 282:3, 283:19, 299:9
**one-to-one**
100:22
**ones**
63:21, 69:25, 193:20, 210:22, 250:13, 254:7
**only**
1:13, 10:3, 10:16, 10:21, 17:8, 36:8, 36:15, 47:5, 55:2, 67:8, 72:10, 72:21, 76:13, 93:23, 93:24, 97:6, 98:4, 98:12, 105:17, 117:11, 117:16, 118:1, 118:14, 118:23, 144:22, 144:24, 150:4, 154:19, 155:3, 161:13, 163:24, 164:24, 176:13, 182:6, 183:18, 183:23, 184:10, 195:10, 205:20, 214:5, 217:3, 218:11, 220:15, 220:16, 229:21, 235:18, 235:19, 235:20, 264:22, 285:15, 290:12, 292:18
**onward**
113:3
**open**
13:5, 13:11, 22:10, 23:21, 24:1, 24:4, 24:6, 45:23, 67:5, 69:18, 101:10, 103:20, 109:11, 109:22, 110:1, 110:6, 110:9, 215:16, 215:18, 215:21, 247:1, 247:4, 247:8, 247:9, 247:12, 247:16, 247:18, 247:19, 253:17, 292:21
**opened**
13:6, 13:12, 13:13
**opening**
110:25
**opens**
11:20
**operation**
261:10
**operator's**
238:14
**opining**
115:21
**opinion**
51:7, 84:2, 98:14, 118:25, 141:14, 145:24, 166:1, 218:11, 234:22, 254:2, 255:15, 261:25, 283:14
**opinions**
141:2, 279:17, 292:12
**opposed**
16:4, 40:3, 41:14, 49:18, 118:3
**opposite**
268:1
**optical**
13:23, 14:1, 14:20, 17:6, 22:10, 42:4, 68:13, 72:15, 72:25, 76:15, 76:16, 76:20, 79:5, 79:12, 79:19, 90:2, 91:1, 104:9, 104:11, 129:12, 248:19, 270:23, 270:24, 271:17, 271:18, 271:19, 272:6, 272:12, 273:6, 273:7
**optically**
189:25, 190:5, 190:21, 192:13
**optics**
13:23, 14:1, 14:13, 14:14, 14:19, 14:22, 15:3, 15:12, 15:13, 15:16, 15:23, 16:4, 16:9, 17:1, 22:10, 83:15, 85:19
**optimization**
45:6, 298:21
**options**
158:6, 224:4
**order**
31:9, 95:12,

113:24, 114:6, 114:12, 115:22, 116:10, 120:15, 125:18, 125:24, 135:16, 137:9, 137:15, 142:23, 142:24, 142:25, 174:22, 241:11, 285:10, 292:11
**ordinarily**
66:20
**ordinary**
110:19, 111:1, 111:6, 120:2, 143:16, 143:20, 143:25, 144:8, 146:2, 146:8, 146:21, 221:8, 222:22, 222:24, 295:11
**organic**
22:3
**organization**
129:6, 147:14, 160:23, 163:5, 164:9, 172:19, 172:20
**organizational**
161:14, 161:19, 167:24, 182:19
**organize**
75:21, 133:2, 172:14, 173:5, 195:3
**organized**
106:24, 107:14, 129:10, 151:7, 156:20, 161:6, 164:8, 172:15, 183:1, 214:8, 258:11, 262:16, 263:3, 268:13
**organizes**
94:24
**organizing**
129:4, 133:21, 147:12, 161:19, 199:25, 205:2
**orientation**
217:9, 218:2, 218:21, 219:4, 219:11, 219:16, 219:23, 220:5, 220:6, 220:24, 221:1, 221:4, 221:22, 223:1, 223:10, 223:19, 234:14, 234:21, 235:11, 238:10, 274:1, 274:7, 274:23, 277:3, 277:19, 279:2, 296:11
**oriented**
125:12, 130:3
**original**
115:2, 215:23, 215:24, 215:25, 282:19
**orthicon**
55:15, 61:3, 61:4, 61:12, 61:19, 62:12, 65:16, 66:15, 67:3, 293:9, 293:12, 293:20, 295:5, 295:6
**orthicons**
65:13, 65:18
**orthogonality**
272:10, 272:17
**other**
8:3, 8:8, 8:24, 18:11, 21:7, 22:6, 23:21, 23:24, 36:24, 37:17, 38:22, 42:23, 43:15, 47:17, 55:8, 63:21, 64:19, 68:3, 72:7, 76:1, 76:6, 92:5, 92:17, 95:14, 99:1, 100:9, 109:20, 125:5, 134:25, 138:3, 147:1, 152:4, 162:18, 165:6, 167:3, 167:7, 170:21, 176:1, 185:17, 188:25, 189:9, 193:8, 193:20, 198:12, 200:22, 201:24, 203:20, 220:9, 221:3, 222:20, 223:5, 230:17, 230:23, 232:1, 232:11, 233:20, 239:22, 250:18, 251:7, 252:14, 254:23, 254:25, 257:16, 263:7, 264:22, 277:15, 283:8, 283:22, 284:2, 286:10, 286:15, 293:4
**others**
80:21
**otherwise**
88:7, 107:12, 112:12, 119:25, 187:14, 301:11
**otters**
255:1
**out**
15:25, 16:17, 16:18, 35:11, 35:16, 41:9, 43:5, 43:17, 45:4, 50:3, 51:23, 57:25, 72:15, 73:25, 74:25, 82:18, 87:17, 87:24, 88:21, 89:20, 90:4, 90:6, 95:12, 100:1, 115:8, 117:14, 118:6, 119:16, 121:19, 143:20, 177:7, 194:24, 195:15, 200:8, 202:19, 206:22, 209:14, 219:2, 220:16, 223:23, 231:21, 234:25, 237:12, 250:2, 251:8, 254:8, 257:18, 259:1, 294:25, 295:5
**outcome**
301:11
**outer**
135:18, 138:3, 143:14, 252:23
**outlined**
265:15, 269:12, 269:20
**outlines**
271:8
**output**
67:15, 242:21, 242:22, 293:23, 293:25
**output-type**
294:5
**outside**
116:15, 138:15, 139:16, 140:19, 157:5
**over**
7:13, 14:10, 14:11, 27:23, 52:22, 54:21, 65:2, 71:1, 78:22, 84:8, 90:7, 90:12, 90:18, 107:5, 108:1, 136:23, 169:13, 184:19, 185:20, 195:5, 224:17, 243:21, 258:11, 259:14, 271:6, 278:6, 282:18, 283:7, 284:12
**overapping**
26:20
**overhead**
289:18

**overheats**
264:1
**overlaid**
161:10
**overlap**
240:11, 285:1, 296:22
**overlapping**
26:20
**own**
61:20, 65:17, 231:15, 282:2, 292:25
**owned**
281:5
**ownership**
282:4
**owning**
282:1
**owns**
282:11

**P**

**p-o-s-a**
65:9
**pac-man**
193:24
**pacelli**
3:11, 4:4, 6:18, 23:13, 48:6, 48:11, 53:22, 54:18, 70:9, 70:11, 78:12, 79:20, 81:6, 84:7, 102:17, 108:8, 108:13, 116:14, 118:18, 120:19, 136:22, 138:13, 139:8, 139:10, 139:16, 140:19, 140:22, 141:5, 144:6, 144:19, 146:11, 157:9, 157:11, 157:20, 158:9, 162:25, 163:18, 166:14, 169:6, 169:22, 174:13, 174:20, 175:7, 175:18, 176:3, 176:18, 185:15, 185:22, 197:1, 200:15, 217:15, 223:2, 225:2, 239:25, 250:16, 252:24, 253:5, 255:20, 257:21, 257:25, 266:11, 275:24, 277:21, 280:9, 282:22, 284:15, 287:19, 288:21, 289:2, 290:4, 290:9, 290:18, 290:24, 291:2, 297:2
**pacelli's**
297:5
**pacific**
6:9
**page**
4:2, 4:8, 4:25, 5:1, 5:5, 12:3, 20:3, 33:3, 34:10, 56:2, 57:18, 57:19, 57:20, 57:23, 58:2, 58:5, 58:25, 59:2, 60:13, 64:13, 68:8, 70:6, 76:6, 80:10, 80:15, 86:9, 89:10, 95:3, 95:17, 110:17, 111:13, 112:22, 113:18, 113:19, 123:19, 123:22, 123:23, 124:3, 134:9, 135:13, 135:16, 137:14, 137:18, 159:16, 171:8, 178:13, 201:17, 229:23, 229:25, 230:13, 230:17, 230:23, 230:25, 231:1, 231:3, 231:13, 231:16, 231:19, 231:23, 232:3, 241:25, 248:15, 248:16, 248:22, 257:6, 262:25, 263:1, 266:8, 271:7, 271:22, 271:23, 276:8, 284:12, 288:9
**pages**
1:24, 231:7, 231:9, 256:19
**pair**
100:22, 256:1, 298:11, 299:11
**panoramic**
74:1, 74:2, 74:9, 74:20, 80:19
**paper**
18:21, 35:18, 43:10, 44:5, 56:18, 56:22, 56:24, 57:8, 67:24, 96:11, 120:23, 120:24, 126:24, 147:5, 216:5, 225:18, 225:24, 226:7, 226:21, 227:9, 231:15, 239:1, 287:1
**papers**
14:10, 14:11, 16:10, 20:22, 69:22, 75:5, 225:25, 226:25
**paragraphs**
64:14, 80:10, 155:21, 156:10, 156:14, 160:6, 187:2, 187:20, 187:25, 191:12
**parallax**
74:9, 74:10, 74:17, 75:9
**parallel**
106:17, 122:7, 124:24, 125:14, 125:16, 126:1, 127:20, 127:23, 128:10, 128:12, 128:14, 129:13, 129:15, 180:8, 199:23, 284:9, 284:10
**parameter**
191:16, 192:10, 201:11
**parameters**
221:19
**paraphrases**
216:16
**pardon**
226:2
**parentheses**
113:10
**parenthetical**
113:15
**parsing**
97:16
**part**
17:4, 18:18, 18:24, 42:25, 43:1, 52:6, 97:14, 102:4, 103:6, 114:21, 118:2, 120:5, 121:13, 127:25, 153:8, 158:14, 163:13, 178:17, 194:22, 211:2, 220:14, 226:19, 234:18, 245:14, 264:25, 278:11, 278:12, 278:13, 278:15, 288:3, 288:8, 290:2
**partial**
134:21
**particular**
16:17, 17:2, 30:15, 32:9, 42:3, 51:15,

64:24, 64:25, 79:7, 84:5, 106:17, 117:3, 128:8, 128:17, 135:2, 141:3, 146:9, 150:3, 152:9, 160:12, 160:13, 160:23, 162:14, 164:21, 165:15, 171:10, 171:13, 172:2, 172:9, 174:8, 174:18, 175:4, 176:14, 176:15, 177:12, 182:19, 183:10, 183:24, 195:17, 200:2, 206:9, 228:17, 240:21, 252:21, 260:8, 265:21, 266:10, 266:15
**particularly**
111:3, 112:21, 199:18, 204:9, 234:12, 279:19, 287:23
**parties**
6:11, 301:10
**parts**
149:21, 184:22, 186:20, 197:19, 277:23, 277:25, 278:1, 278:21
**pass**
68:14, 169:20, 170:16
**passing**
189:9
**past**
290:1
**paste**
12:22, 243:4
**patenting**
169:12
**patents**
10:23, 11:4, 18:12, 19:11, 29:3, 29:4, 29:7, 66:21, 101:9, 168:14, 281:25, 286:15, 293:2, 295:10, 296:6
**patterns**
4:18, 44:6, 45:10, 107:16, 145:14, 171:2, 181:16, 181:19, 186:23, 188:8, 188:15, 190:20, 190:21, 194:7, 195:4, 197:3, 197:7, 197:15, 199:8, 199:9, 199:16, 199:20, 199:22, 200:13, 205:1, 205:3, 206:1, 206:3, 206:20, 261:14, 261:17, 261:24, 262:1, 262:17, 262:23, 263:8, 263:9, 264:7, 264:10, 264:17, 282:1, 282:2, 282:4
**pause**
156:7
**pay**
82:21
**paying**
283:17
**pdf**
11:21, 17:19, 24:8, 29:18, 123:23, 231:18
**pdfs**
23:22, 23:25
**pedigree**
205:9
**pen**
146:25
**pencil**
103:18, 104:18, 104:21, 127:22
**pending**
55:3
**people**
32:6, 40:20, 49:5, 49:24, 67:19, 73:9, 75:1, 75:23, 76:5, 79:22, 79:23, 87:6, 108:3, 108:6, 189:1, 189:13, 190:17, 194:6, 199:8, 226:21, 236:12, 257:16, 258:10, 294:19
**percent**
48:25, 54:14, 56:11, 56:12, 136:23, 142:1, 175:9, 285:1, 286:20, 292:9
**perfect**
172:3, 216:4
**perfectly**
152:22, 180:6, 180:8
**perform**
45:7
**performing**
238:14
**perhaps**
47:6, 63:21, 76:4, 197:14, 206:18, 219:16, 243:17
**period**
65:3
**perpendicular**
121:24, 270:22, 271:17, 272:7, 272:22, 272:23, 273:6, 273:9, 273:12, 273:13
**person**
14:21, 14:23, 15:4, 66:19, 72:10, 76:9, 84:25, 85:11, 110:19, 110:25, 111:5, 115:24, 120:2, 143:16, 143:19, 143:25, 144:2, 144:8, 146:1, 146:8, 146:21, 219:17, 221:8, 222:22, 222:24, 258:8, 258:12, 295:10
**personal**
23:17
**personally**
234:20
**ph**
1:14, 2:2, 3:19, 4:2, 4:8, 5:5, 6:2, 7:1
**phase**
233:18
**philosophy**
50:16
**phonetic**
229:6
**phonetically**
224:23
**photo**
61:24, 62:5
**photogrammetry**
87:4, 87:5
**photographic**
33:5, 46:19, 80:16, 233:11, 242:7
**photographs**
249:22, 251:19
**photography**
42:24, 74:1, 74:2, 74:9, 74:20
**photons**
36:6, 49:13, 51:17
**physical**
31:25, 32:1, 32:2, 32:4, 32:24, 35:14, 36:1, 36:17, 37:25, 40:17, 45:12, 46:25,

49:17, 50:2, 56:13, 74:16, 78:14, 119:21, 120:16, 126:6, 145:21, 157:7, 157:14, 157:18, 292:25, 298:11, 298:12, 298:17
**physically**
49:17, 120:13, 120:16, 134:10, 134:20, 144:18, 145:19, 146:3, 147:1
**pi**
259:6
**pick**
60:8, 74:23, 90:4, 91:3, 91:4, 92:2, 92:4, 93:2, 93:9, 94:19
**picked**
91:10, 93:4, 103:14
**picture**
31:4, 35:2, 35:22, 37:22, 38:15, 39:12, 39:13, 39:15, 39:22, 40:1, 40:2, 40:5, 43:5, 43:10, 44:16, 50:2, 52:2, 52:9, 52:11, 65:19, 73:12, 79:2, 83:16, 87:22, 88:9, 91:12, 93:5, 95:3, 95:5, 95:14, 95:15, 101:21, 104:25, 128:8, 128:9, 131:20, 132:2, 144:4, 146:17, 162:19, 163:23, 170:23, 171:22, 209:10, 213:13, 213:15, 213:22, 213:25, 219:4, 219:6, 219:15, 220:12, 221:11, 229:19, 251:21, 262:4, 264:18, 267:1, 271:21, 271:22, 272:7, 272:17, 273:11, 275:2, 275:6, 275:7, 277:7, 277:20
**pictures**
33:16, 42:5, 44:9, 74:5, 105:4, 105:7, 167:22, 170:20, 171:17, 171:18, 176:6, 179:11, 234:7, 237:1, 237:7, 242:16, 252:4, 261:14, 261:23, 262:10, 262:21, 271:22, 272:24, 273:14, 277:6
**piece**
31:6, 35:20, 147:5, 174:18, 285:15, 292:17
**pieces**
44:5, 81:23, 233:8
**pile**
226:7, 264:13
**pin**
35:19, 40:12, 40:23, 74:10
**pinhole**
31:14, 31:15, 32:9, 32:15, 33:10, 33:13, 34:14, 34:23, 35:13, 35:14, 35:22, 36:2, 36:3, 36:9, 36:10, 36:16, 36:17, 36:23, 37:5, 37:6, 37:11, 37:13, 37:18, 37:23, 37:25, 38:15, 39:10, 39:13, 39:16, 39:20, 39:21, 40:3, 40:7, 40:13, 40:14, 40:16, 40:25, 41:15, 41:25, 42:3, 42:20, 43:9, 44:14, 44:15, 44:19, 44:25, 45:1, 45:3, 45:21, 46:21, 46:24, 46:25, 47:3, 72:23, 72:24, 73:9, 73:10, 73:15, 74:6, 74:7, 74:11, 74:12, 75:4, 75:10, 75:19, 76:3, 76:14, 76:16, 76:24, 79:9, 82:8, 83:4, 84:17, 86:25, 87:1, 87:18, 87:19, 87:25, 88:16, 88:22, 88:25, 92:6, 93:11, 94:1, 99:22, 105:6, 189:9, 243:7, 298:15, 298:22, 299:9
**pinholes**
34:23, 43:14, 91:3, 91:21, 91:23, 92:12
**pinky**
40:23
**pixel**
36:21, 51:20, 94:14, 94:15, 131:12, 131:20, 189:3, 189:4, 203:9
**pixels**
31:20, 49:18, 50:3, 66:11, 67:21, 67:22, 126:7, 131:14, 131:20, 179:20, 179:23, 180:25, 181:24, 182:9, 203:9
**place**
45:15, 45:16, 52:4, 77:11, 98:4, 99:24, 220:2, 223:25, 292:7
**placed**
52:23, 98:13, 129:7, 134:10, 150:9, 178:8, 178:17, 258:13
**places**
76:2, 135:11, 137:11, 181:23, 187:10, 201:23, 201:24
**plaintiff**
1:5, 3:2, 6:16, 7:5, 297:6
**plaintiff's**
25:11, 28:18
**planar**
92:1, 149:13, 154:2
**plane**
35:9, 35:10, 35:20, 36:4, 36:5, 36:20, 36:21, 37:2, 37:5, 37:11, 37:13, 38:20, 38:23, 39:3, 39:11, 39:16, 41:4, 41:7, 41:8, 41:11, 44:18, 44:19, 44:20, 87:19, 88:17, 89:11,

91:7, 91:9, 91:11, 92:4, 92:9, 92:16, 93:10, 93:12, 93:13, 93:20, 103:4, 103:5, 103:11, 103:15, 122:2, 129:20, 180:9
**planes**
35:5, 35:6, 35:7, 35:23, 37:16, 38:25, 39:15, 39:24, 40:2, 91:21, 92:12, 92:14, 92:25, 101:4, 103:5, 103:13, 103:18, 103:21, 104:18, 104:20, 104:23, 105:5, 122:1, 128:9, 128:10, 128:11, 128:13, 256:4, 256:5
**planet**
3:21, 3:22, 6:11, 6:22
**planning**
110:2
**plastic**
14:13, 83:13, 83:20
**play**
89:25, 90:8, 90:22, 91:1, 91:8, 126:13, 295:21
**played**
268:4
**playing**
39:19, 39:21, 39:23, 43:4
**please**
6:13, 8:1, 9:2, 9:4, 9:20, 10:13, 11:24, 18:5, 26:13, 27:3, 27:5, 27:23, 29:12, 29:20, 53:13, 54:24, 64:22, 85:15, 91:16, 98:3, 98:20, 102:13, 104:3, 110:7, 119:14, 119:17, 140:1, 159:1, 178:12, 191:6, 212:15, 218:18, 219:2, 219:5, 219:8, 223:25, 228:11, 248:3, 249:14, 249:18, 282:23
**plenty**
242:19, 261:21
**plugs**
246:10
**plurality**
186:24
**plus**
59:20, 83:18, 242:4, 242:25, 245:6, 254:15, 272:19
**point-and-shoot**
294:13, 295:1
**pointed**
156:18, 237:12, 273:3, 293:1
**pointing**
118:6, 124:7
**points**
31:18, 34:15, 34:16, 34:22, 38:24, 73:8, 73:13, 73:14, 73:15, 88:14, 88:15, 88:20, 89:18, 91:5, 92:2, 92:5, 92:14, 94:6, 97:7, 98:24, 101:14, 102:13, 102:18, 102:24, 104:12, 104:13, 122:22, 129:14, 129:20, 166:1, 170:16, 179:19, 179:22, 179:24, 180:9, 180:11, 180:16, 180:17, 181:1, 191:19, 193:7, 203:9, 204:1, 204:11, 208:12, 229:16
**poking**
257:2
**poor**
81:16, 97:14
**popescu**
284:12, 286:19, 286:25
**portion**
279:14, 285:9, 285:13, 285:20, 285:22
**portions**
149:9, 182:7
**posa**
65:8
**poser**
73:23
**position**
73:2, 100:8, 160:12, 165:2, 165:6, 217:8, 218:2, 218:20, 219:4, 219:11, 219:16, 219:23, 220:3, 220:5, 220:6, 220:23, 220:25, 221:4, 221:9, 221:20, 223:1, 223:9, 223:19, 234:13, 234:19, 234:20, 235:11, 236:10, 236:16, 237:13, 238:10, 238:16, 266:9, 274:1, 274:23, 279:1, 296:11
**positioned**
220:14
**positioning**
149:11, 160:14, 160:19, 274:6
**positions**
165:4, 203:10, 206:13, 265:20
**possession**
120:3
**possibilities**
76:1
**possibility**
76:8, 98:5, 98:6, 225:23, 269:15
**possible**
8:16, 32:8, 42:1, 42:2, 43:8, 43:9, 43:22, 63:16, 66:13, 82:6, 100:9, 130:1, 175:2, 175:3, 175:6, 184:10, 187:23, 193:9, 193:20, 224:4, 259:14, 261:22, 270:2, 282:12
**possibly**
14:14, 15:17, 18:20, 20:10, 38:4, 49:15, 81:17, 82:23, 134:21, 213:13, 285:1, 295:15
**potential**
296:1
**power**
67:15
**practically**
33:6
**practice**
38:3, 43:25, 167:19, 184:25, 285:4
**practiced**
236:24
**practitioner**
15:4, 293:17

**preamble**
186:7, 217:22
**prediction**
75:7
**preferably**
242:12, 242:13
**preferred**
132:10, 132:19, 145:1, 256:4
**prefers**
193:5
**preliminary**
7:9
**prepare**
11:7
**prepared**
11:9, 12:5
**preparing**
12:11, 287:7
**present**
3:18, 9:17
**press**
77:20
**pressed**
13:13
**presumably**
20:9, 286:5, 287:3, 295:19
**pretend**
235:10
**pretty**
60:19, 104:25, 205:3, 220:17, 224:8, 224:9, 258:24, 260:10, 275:23
**preview**
235:4, 235:11, 236:22, 237:2, 237:13, 238:2, 273:25, 274:5, 274:8, 274:12, 274:14, 274:16, 274:18, 274:21, 275:8, 275:11, 275:17, 276:12, 276:16, 277:4, 277:24, 278:7, 278:22, 283:11, 296:10, 296:13, 296:22, 296:24
**previews**
296:19, 296:20
**previous**
5:1, 101:15, 134:6, 167:2
**price**
82:20
**primarily**
293:16
**primary**
210:25
**principle**
99:3, 99:16, 100:7, 147:12, 161:14, 167:25, 182:19, 200:6, 205:2, 205:25
**principles**
199:25
**print**
223:23
**prints**
219:2
**prior**
11:2, 145:25, 146:7, 147:16, 147:20, 147:22, 147:23, 169:19, 174:18, 175:5, 175:14, 175:15, 176:2, 176:5, 176:10, 176:16, 176:17, 184:6, 184:24, 185:20, 186:14, 197:12, 197:23, 199:8, 218:3, 234:14, 236:1, 236:2, 236:6, 236:8, 236:17, 236:18, 236:19, 236:21, 236:25, 237:3, 237:6, 238:11, 240:2, 274:20, 278:16, 280:21, 282:18, 284:23, 285:1
**probability**
181:2
**probably**
21:9, 22:23, 25:19, 45:20, 49:23, 61:25, 67:19, 69:24, 72:9, 75:9, 77:10, 81:16, 109:23, 168:16, 182:8, 203:24, 215:13, 224:25, 230:16, 242:18, 247:13, 247:20, 256:25, 284:8, 293:16, 293:22, 294:2
**problem**
55:11, 104:6, 159:5, 159:6, 206:16, 264:1, 297:18
**procedure**
292:19
**proceedings**
60:1, 108:18, 159:10, 214:21, 244:10
**process**
10:17, 18:18, 22:3, 24:4, 32:23, 43:11, 45:6, 45:8, 50:4, 95:8, 95:16, 179:2, 240:17, 298:19, 299:8
**processes**
239:24
**processing**
53:8, 67:20, 87:7, 163:17, 204:21
**processor**
51:2
**produce**
41:16, 51:15, 82:23, 211:6, 246:9
**produced**
31:8, 31:19, 242:21, 293:22
**produces**
37:2
**producing**
36:13, 43:22, 242:22
**product**
233:22, 235:3, 255:25, 262:11, 269:3, 274:8, 283:12, 286:3
**products**
234:4, 245:20, 249:23, 250:13, 254:19, 256:10, 257:11, 258:4, 264:22, 264:23, 270:7, 274:4, 274:5, 275:3, 281:15, 281:16, 285:3, 285:17, 286:14, 291:4, 291:5, 294:15, 299:3
**program**
157:21
**project**
16:13, 16:15, 16:22, 16:25, 17:5, 106:16, 226:22, 261:5, 261:9, 261:13
**project-type**
38:6
**projected**
31:7, 70:18, 70:22, 71:13, 71:18, 100:11, 100:12, 122:16, 124:20, 125:1, 130:2, 132:3, 188:21
**projecting**
188:7, 193:4

**projection**
38:8, 70:20, 71:21, 71:22, 71:23, 73:1, 192:15, 192:16
**projectors**
14:9, 256:1
**projects**
47:6, 202:12, 281:1
**pronounce**
229:6
**pronunciation**
109:1, 227:3
**propagated**
192:21
**proper**
229:1
**properly**
17:9
**properties**
298:16
**proposing**
285:8
**provide**
113:4, 119:23, 149:17, 161:19, 166:4, 166:5, 166:12, 166:17, 219:11, 220:4, 220:8, 220:10, 221:14, 221:23, 223:11, 224:10, 238:9, 274:1, 274:5, 278:13, 279:1
**provided**
129:21, 129:25, 220:24, 221:2, 223:14, 226:19, 226:25, 278:18, 283:5
**provides**
218:1, 218:20, 234:13
**providing**
178:6, 216:17, 217:8, 219:3, 219:16, 221:4, 221:9, 223:15, 223:19, 234:20, 235:10, 274:23, 278:9, 279:1, 279:3, 296:11
**proving**
17:8
**public**
2:24, 301:1, 301:19
**publication**
77:23, 77:24, 77:25, 231:20
**publish**
231:15
**published**
232:2
**pull**
33:17, 33:19, 51:23, 69:14, 69:16, 127:5, 145:12, 198:6, 198:9, 225:8, 253:13
**pulled**
156:21, 156:22, 226:21
**punch**
35:18
**pupil**
20:17, 20:25, 71:4, 72:7, 73:22, 75:8
**pupils**
70:19, 70:23
**pure**
133:20, 180:9, 281:11
**purple**
188:23
**purported**
217:23
**purportedly**
183:19, 183:23, 184:9
**purpose**
41:18, 41:21, 42:7, 42:11, 42:21, 42:22, 47:8, 260:11, 292:2
**purposes**
32:21, 34:18, 38:3, 41:20, 48:17, 67:18, 72:17, 127:3, 296:25
**pursuant**
2:23
**push**
11:20, 32:13
**put**
7:21, 11:13, 11:15, 12:21, 12:22, 17:16, 20:13, 24:15, 24:19, 27:8, 28:5, 29:17, 35:17, 41:18, 47:16, 53:13, 57:1, 63:22, 63:23, 63:24, 77:9, 77:23, 98:8, 108:22, 111:23, 112:15, 114:4, 114:6, 115:23, 119:25, 137:24, 138:4, 138:5, 138:9, 138:10, 140:1, 142:13, 142:24, 145:10, 147:10, 147:15, 180:8, 219:14, 224:7, 224:8, 224:24, 225:6, 227:23, 227:24, 230:24, 236:12, 241:8, 246:13, 278:2, 298:19
**putting**
53:24, 147:18, 224:12, 241:10
**puzzling**
149:20

**Q**

**qr**
44:7
**quadrilaterals**
35:2
**qualified**
281:9
**qualifying**
72:4, 81:13
**quantity**
296:18
**question**
8:25, 9:5, 9:6, 9:12, 9:19, 9:20, 34:6, 37:24, 48:10, 55:3, 66:18, 72:8, 84:11, 87:23, 88:6, 89:24, 109:13, 110:23, 111:10, 126:4, 126:20, 133:10, 134:2, 134:6, 135:5, 136:8, 140:23, 146:13, 146:17, 155:4, 158:22, 174:14, 175:20, 177:25, 181:8, 184:14, 184:16, 185:23, 186:12, 199:12, 202:9, 208:7, 218:19, 218:21, 227:11, 236:5, 240:14, 253:9, 255:22, 259:10, 260:1, 261:7, 278:25, 279:18, 281:11, 282:15, 283:22, 285:23, 286:9, 288:22, 289:3, 297:5, 298:2
**questions**
8:1, 8:10, 10:10, 10:16, 18:15, 18:16,

30:17, 55:10, 134:22, 138:14, 175:22, 184:18, 187:14, 225:16, 258:12, 258:16, 258:20, 259:19, 279:11, 285:24, 290:20, 293:7, 297:3, 299:23
**quick**
7:13, 117:3, 144:11, 201:1, 214:14, 222:20, 264:12, 297:17
**quickly**
30:5, 60:19, 60:20, 89:8, 112:16, 176:22, 186:20, 187:22, 233:25, 241:23, 248:10, 254:3, 260:22, 271:5
**quiet**
46:2
**quite**
25:8, 42:2, 42:10, 58:22, 63:20, 69:21, 72:20, 76:9, 77:5, 79:15, 197:10, 197:12, 198:21, 239:9, 263:10, 266:13, 298:9
**quote**
19:23, 21:5, 63:6, 70:25, 100:25, 119:20, 120:4, 123:2, 123:5, 123:16, 125:23, 126:12, 127:21, 128:19, 139:1, 172:7, 172:8, 178:5, 185:11, 191:19, 191:24, 192:22, 217:7, 220:20, 238:8, 238:13, 238:19, 238:22, 240:6, 242:10, 242:11, 273:3, 289:18
**quoted**
137:11, 138:23
**quotes**
113:25, 114:21, 114:23, 114:24, 114:25, 115:2, 122:8, 138:4, 269:12
**quoting**
137:10, 171:8

**R**

**rabbit**
21:16
**radiation**
19:12, 19:23, 47:13, 48:4, 48:18, 49:3, 51:1, 53:16, 53:17, 53:18, 54:1, 54:10, 54:16, 61:17, 62:6, 62:7, 63:2, 63:4, 63:6, 63:13, 64:18, 65:14, 66:5, 66:8, 66:23, 66:25, 67:1, 67:4, 233:12, 242:8, 242:25, 250:4, 250:10, 250:18, 251:2, 251:23
**random**
153:25, 179:2, 180:9, 182:14, 182:16, 182:17, 182:22, 182:23, 257:2, 265:24
**randomized**
265:20, 265:25, 266:9
**randomly**
179:1, 268:23
**range**
42:11, 42:12, 42:13, 48:2, 222:24, 222:25, 238:16, 238:20
**rates**
52:2
**rather**
8:2, 35:25, 109:20, 119:22, 170:4, 175:21, 181:15, 241:2
**rationale**
171:10, 171:13, 172:2, 172:9
**raw**
52:13, 279:3, 279:16
**ray**
36:11, 36:15, 89:17, 89:19, 89:22, 93:5, 93:6, 189:8
**rays**
31:19, 41:9, 41:11, 43:14, 68:14, 89:2, 189:9
**re-read**
171:23
**read**
10:23, 15:16, 16:9, 18:16, 18:21, 49:6, 50:10, 69:21, 69:23, 72:11, 79:21, 84:23, 86:19, 89:14, 98:18, 99:11, 99:12, 99:14, 99:25, 100:2, 101:10, 102:9, 111:17, 119:14, 119:16, 123:21, 124:9, 124:11, 128:24, 131:2, 137:10, 141:20, 145:15, 149:22, 150:18, 165:16, 166:16, 167:12, 167:13, 169:25, 171:23, 171:24, 171:25, 172:1, 183:17, 184:4, 184:19, 185:3, 191:9, 192:12, 206:6, 212:20, 217:25, 236:13, 237:3, 238:7, 243:6, 243:7, 252:4, 273:1, 273:7, 278:4, 284:16, 286:25, 292:19, 292:20, 299:6
**reader**
11:21
**reading**
18:16, 21:11, 49:2, 49:4, 49:5, 50:17, 62:9, 69:17, 73:21, 79:17, 80:14, 117:11, 129:10, 154:10, 154:11, 168:21, 186:9, 217:18, 218:10, 236:5, 236:14, 236:21, 237:4, 243:9, 252:3, 258:17, 271:15, 284:24, 301:7
**readout**
52:4, 52:20
**reads**
236:10
**ready**
222:10
**real**
5:13, 37:12, 47:7, 74:19, 144:11, 176:22, 222:19, 229:18, 271:4, 294:18
**reality**
126:14, 133:11

**realized**
40:21, 138:2, 291:20
**really**
16:8, 36:10, 37:3, 40:4, 40:5, 50:9, 50:12, 53:25, 67:10, 76:13, 77:3, 86:15, 99:23, 117:3, 118:8, 126:3, 133:10, 148:21, 152:5, 159:2, 167:24, 170:8, 200:10, 202:9, 204:20, 205:20, 210:24, 257:4, 257:5, 257:14, 259:25, 260:1, 261:19, 281:23, 285:23, 292:4, 295:19
**rearrange**
241:9
**reason**
8:24, 12:6, 40:14, 55:9, 75:22, 80:5, 81:23, 97:13, 144:15, 146:22, 171:14, 201:21, 235:17, 236:13, 245:14, 266:4, 266:7, 277:5, 280:19, 280:20, 282:11, 286:4, 296:4
**reasonable**
84:23
**reasoning**
31:5, 75:22, 93:16, 185:6
**reasons**
75:12, 252:15
**rebuttal**
5:6, 64:5, 111:24, 257:22, 279:15, 285:7, 297:15
**recall**
21:6, 115:18, 216:10, 225:19, 253:6, 253:18, 288:14, 290:22, 291:3, 293:6, 293:9, 297:10
**receive**
53:16
**received**
12:24, 17:22
**receiver**
19:12, 19:23, 47:13, 48:4, 48:19, 49:3, 49:18, 51:1, 53:17, 53:18, 54:1, 54:10, 54:16, 61:17, 62:6, 62:7, 63:4, 63:6, 63:13, 63:15, 64:18, 65:14, 66:5, 66:8, 66:9, 67:1, 67:4, 233:12, 242:8, 242:19, 242:25, 250:4, 250:10, 250:18, 251:2, 251:23
**receivers**
63:2
**recently**
12:18
**recess**
59:25, 108:17, 159:9, 214:20, 244:9
**recitations**
184:5
**recognizable**
188:9, 240:10
**recognize**
25:7, 26:4, 28:12, 64:7, 109:8, 110:12, 112:6, 114:17, 255:17
**recollection**
118:19
**reconvene**
59:20
**record**
33:2, 59:24, 60:3, 108:16, 108:20, 108:23, 111:11, 111:20, 111:22, 112:15, 113:7, 114:11, 159:7, 159:12, 214:19, 214:23, 228:20, 244:8, 244:12, 261:5, 264:16, 283:2, 287:13, 288:24, 300:5, 301:5
**recorded**
36:14, 37:14, 41:12, 149:10
**recording**
37:2
**rectangle**
196:13, 267:15, 267:16, 267:17, 272:9
**rectangles**
182:8, 198:3, 265:14, 269:13, 269:17
**rectangular**
35:3, 49:22, 49:25, 50:9
**red**
188:23, 190:12, 191:21, 211:16, 267:4, 267:11, 267:14, 268:14, 268:18, 269:25, 270:12, 272:2, 272:5, 273:9, 273:13
**redirect**
290:14
**reduced**
301:6
**refer**
25:15, 26:16, 28:21, 28:22, 29:6, 32:20, 32:21, 33:14, 33:15, 53:16, 55:13, 62:16, 62:17, 62:25, 63:6, 64:13, 72:18, 73:21, 74:11, 80:1, 80:9, 97:2, 110:3, 110:16, 110:24, 111:22, 113:11, 117:9, 118:1, 143:24, 159:15, 159:20, 159:22, 177:18, 179:8, 205:23, 234:10, 244:15, 245:18, 255:6
**reference**
55:16, 56:9, 57:19, 58:7, 58:11, 58:13, 58:14, 58:15, 60:9, 60:15, 60:24, 61:13, 64:15, 65:24, 68:5, 77:10, 77:13, 78:6, 78:11, 83:25, 86:19, 96:18, 97:24, 102:23, 106:3, 106:4, 114:5, 118:16, 139:20, 160:7, 220:5, 220:23, 220:24, 228:18, 229:11, 229:16, 231:2, 289:17, 298:1
**referenced**
62:18, 86:9, 137:13
**references**
62:2, 66:19, 66:22, 75:6,

84:3, 121:19, 191:9, 212:23, 279:25, 284:12
**referencing** 289:21
**referred** 20:16, 29:3, 56:19, 60:10, 61:22, 72:25, 85:24, 89:11, 100:24, 101:3, 105:20, 116:1, 116:2, 116:23, 183:13, 231:1, 245:15, 255:15
**referring** 56:10, 57:8, 60:12, 61:14, 64:15, 70:14, 72:5, 77:13, 78:5, 81:15, 105:14, 105:18, 113:24, 116:5, 117:14, 118:23, 135:15, 139:13, 151:23, 152:16, 156:15, 156:18, 160:2, 160:6, 160:8, 162:3, 179:8, 181:11, 181:12, 183:11, 208:1, 208:10, 212:1, 212:2, 212:21, 216:23, 252:10, 254:12, 266:7, 271:3, 288:19
**refers** 32:21, 32:23, 35:14, 79:12, 79:18, 101:12, 103:3, 113:6, 118:14, 129:5, 212:2, 213:14
**refill** 59:14
**reflected** 31:7, 248:25
**reflection** 37:7, 37:9
**reflects** 202:13
**regarding** 225:18, 293:7
**regardless** 99:2, 100:7, 100:14
**region** 193:17, 195:23, 204:18
**regions** 95:14
**regular** 131:11, 178:22, 178:25
**regularly** 198:2
**relabel** 225:10
**related** 11:3, 18:24, 86:16, 175:12, 175:25, 253:20, 288:5, 301:9
**relates** 204:12
**relation** 100:8, 130:23, 296:8
**relational** 149:11
**relationship** 99:21, 148:10, 161:2, 163:7, 163:9, 173:17, 178:20, 272:10, 278:8
**relative** 42:8, 44:18, 44:19, 126:20, 189:17, 211:9, 239:18, 266:16
**relatively** 83:13, 108:5, 240:11
**relevance** 20:23
**relevant** 19:21, 83:21, 100:1, 105:12, 128:19, 212:12, 241:23, 292:14, 293:4, 296:5
**relied** 241:20
**relies** 137:25, 139:2, 265:11
**remain** 125:13
**remember** 22:19, 123:15, 123:17, 219:22, 226:9, 228:25, 257:14, 257:17, 257:19, 258:13, 262:22, 264:21, 287:9, 287:11, 287:14, 287:24, 294:3, 296:16
**remind** 22:25
**remote** 6:10
**remotely** 6:12
**remove** 285:20, 285:21
**rename** 63:19
**render** 256:16, 258:5
**rendering** 277:20
**renumber** 63:21
**reopen** 110:4
**repeat** 140:23, 158:6, 174:14, 182:20, 195:11, 195:20
**repeating** 158:2
**repeats** 216:15
**rephrase** 84:1
**replace** 99:8
**reported** 1:25, 141:8
**reporter** 6:21, 8:4, 9:8, 60:4, 90:6, 90:14, 90:17, 99:12, 119:15, 138:7, 154:22, 159:2, 177:4, 177:7, 177:10, 184:13, 222:6, 222:9, 222:13, 222:17, 263:12, 263:16, 263:19, 264:6, 301:1
**reporting** 34:18
**reports** 11:7, 11:10, 141:3, 232:14, 238:5, 254:4, 261:15, 287:7
**represent** 6:14, 25:21, 34:22, 35:3, 107:19, 268:15
**representation** 131:12, 145:21, 157:7, 158:1, 158:3, 294:1, 298:25
**represented** 149:9
**representing** 6:11, 6:19, 6:22, 149:13, 191:25, 192:17, 194:20
**represents** 38:20, 136:14
**request** 227:14
**requested** 301:8

**require**
30:11, 33:4, 46:18, 47:12, 49:16, 50:23, 51:7, 52:5, 52:7, 125:25, 271:15
**required**
51:15, 274:5
**requirement**
120:10, 169:21, 175:17, 176:13, 217:6
**requirements**
193:4
**requires**
174:10, 192:13, 252:21
**requiring**
166:7
**reread**
51:9
**research**
21:2, 225:19
**researcher**
15:5, 15:14, 15:21
**resemble**
129:23
**reset**
8:14, 52:10
**resolve**
226:4
**respect**
18:11, 143:23, 162:7, 165:3, 165:5, 171:9, 171:22, 183:9, 215:2, 215:9, 218:3, 219:24, 238:11, 279:19, 284:5
**respective**
130:21, 149:24, 150:11, 154:5, 154:6, 162:5, 165:4, 171:11, 256:5
**rest**
20:4, 197:23, 205:1, 233:18, 251:3
**restate**
48:14
**restricted**
1:13
**results**
124:16, 147:17
**retained**
9:24, 10:15
**retrospective**
150:1
**return**
29:15, 45:20, 55:22, 216:18, 264:25, 272:25, 278:6, 279:14
**returning**
216:2
**reverse**
46:6, 89:2
**review**
11:24, 18:5, 64:22, 291:8, 297:11
**reviewed**
64:10, 110:14, 112:13, 248:6, 248:8, 249:4, 249:22, 251:18, 256:14
**revisit**
227:11
**revolution**
294:14
**rid**
109:15, 142:20
**right-hand**
267:17, 272:7
**rightmost**
34:20, 88:12, 88:17, 102:19
**rimon**
3:4, 6:16
**ring**
279:12
**robot**
56:5
**rocket**
51:19
**role**
39:19, 39:21, 39:23, 43:4
**room**
23:12, 195:14
**rotate**
74:3, 74:7, 74:19, 74:21, 74:24
**rotations**
125:11, 127:2
**rough**
272:1
**roughly**
108:2, 182:9, 205:15, 208:21, 208:22, 209:13, 210:3, 210:5, 210:6, 238:17
**round**
215:12
**row**
129:7, 130:14, 130:15, 130:16, 130:22, 131:4, 131:10, 131:16, 131:17, 132:17, 132:21, 133:3, 133:7, 133:8, 133:14, 133:15, 133:19, 134:1, 194:25, 195:5, 213:20, 213:25, 214:2, 214:3, 239:5
**rows**
129:1, 129:5, 129:15, 130:2, 130:11, 133:2, 194:25, 213:14, 213:19, 213:23, 214:5
**rule**
185:18
**rules**
7:14, 186:6, 290:11
**ruling**
5:8, 141:9
**run**
31:23, 187:13, 232:9, 298:20
**running**
241:3
**rushing**
245:4
**rusinkiewicz**
5:13, 224:18, 224:19, 224:21, 224:22, 224:25, 225:18, 225:21, 227:4, 227:5, 228:19, 228:21, 228:24, 229:7, 229:23, 229:24, 232:15, 234:6, 234:24, 235:16, 235:18, 236:24, 237:8, 237:14, 238:1, 238:8, 239:5, 239:21, 240:21, 247:4, 247:14, 247:15, 274:17, 274:18, 283:5, 283:12, 283:23
**russian**
20:6, 20:10, 47:20, 63:5

S

**s**
48:22, 64:20, 67:6, 67:9, 67:19, 87:9, 294:2
**s0**
194:13, 194:16
**s1**
194:16, 194:18
**s1s**
194:13

**s2**
194:17, 194:19
**s2s**
194:13
**s3**
194:17, 194:19
**sadeghi**
3:19, 4:22, 5:6, 108:25, 110:9, 111:24, 215:17, 235:2, 235:12, 235:13, 235:21, 245:10, 249:7, 256:18, 260:2, 261:15, 264:15, 265:10, 275:12, 275:16, 275:20, 285:7, 288:11, 289:5, 289:14, 289:16, 289:21
**sadeghi's**
110:12, 111:6, 237:5
**sadeghis**
215:21, 247:18
**said**
11:13, 25:2, 30:10, 30:11, 33:1, 33:3, 54:12, 54:14, 58:1, 61:6, 79:11, 79:15, 81:7, 81:10, 81:20, 82:3, 83:11, 89:16, 93:2, 96:23, 100:23, 106:1, 119:1, 120:16, 134:8, 136:1, 142:1, 148:21, 150:18, 150:19, 150:20, 150:21, 150:22, 152:15, 154:17, 155:18, 155:25, 156:17, 165:25, 166:2, 169:16, 170:17, 172:20, 174:24, 175:23, 175:24, 176:4, 176:9, 177:2, 178:1, 179:21, 186:23, 192:16, 210:15, 212:24, 213:2, 218:1, 218:2, 218:3, 221:24, 224:6, 232:15, 246:2, 248:24, 248:25, 249:14, 251:13, 254:10, 256:24, 258:12, 258:22, 259:2, 259:5, 262:8, 265:1, 265:2, 265:5, 265:6, 265:18, 269:22, 270:14, 273:25, 279:22, 279:23, 283:4, 285:16, 290:21, 291:7, 297:9, 301:5
**sake**
57:11, 58:20, 180:5, 182:5
**sale**
82:19
**same**
7:17, 12:4, 17:23, 26:7, 26:8, 28:17, 31:20, 35:11, 39:8, 39:13, 39:22, 42:2, 70:6, 73:14, 76:6, 84:8, 90:4, 91:19, 93:16, 94:15, 97:6, 98:23, 104:12, 104:17, 104:25, 110:24, 111:19, 112:10, 113:12, 116:17, 116:18, 128:12, 139:1, 140:8, 141:5, 144:15, 151:1, 156:5, 161:3, 162:15, 163:7, 165:7, 165:8, 171:18, 173:17, 195:4, 196:24, 197:14, 200:19, 213:10, 226:21, 226:22, 226:25, 230:21, 232:12, 232:24, 233:22, 262:6, 262:7, 262:8, 263:9, 264:7, 264:12, 265:24, 266:7, 266:24, 268:4, 275:21, 282:15, 283:3, 283:4, 298:1
**satisfied**
174:17
**satisfies**
234:12
**satisfy**
120:9, 141:21, 169:20, 175:16, 176:11, 176:12
**saw**
19:19, 22:8, 31:6, 39:22, 40:1, 43:11, 182:25, 198:4, 203:16, 203:19, 251:21, 251:22, 261:24, 262:1, 268:3, 269:3
**saying**
59:1, 62:10, 65:3, 71:11, 99:6, 113:14, 113:21, 124:22, 125:20, 130:25, 133:1, 145:16, 150:10, 160:22, 161:15, 161:18, 166:20, 168:23, 169:17, 171:2, 172:23, 174:21, 177:1, 182:12, 184:11, 193:6, 206:6, 206:10, 207:14, 217:1, 219:25, 221:7, 253:22, 265:19, 266:18, 266:25, 270:12, 274:2, 274:4, 274:12, 274:24, 280:12, 281:24, 283:11, 283:23, 298:5
**says**
11:22, 13:13, 25:2, 25:21, 55:13, 55:14, 58:7, 61:13, 68:10, 80:13, 81:3, 84:24, 97:19, 98:23, 122:21, 122:25, 123:1, 124:8, 126:24, 126:25, 127:1, 130:20, 135:17, 137:3, 137:4, 137:21, 149:8, 151:16, 154:1, 154:12, 162:4, 164:21, 166:4, 179:5, 183:9, 193:7, 193:14, 204:17, 205:25, 211:21, 212:24, 213:20, 219:8, 231:10, 231:12, 236:17, 237:22, 239:2, 239:10, 248:23, 250:17, 253:16, 265:1, 265:10, 269:11, 270:21, 273:16, 278:4, 279:21, 283:16, 283:21, 286:2, 289:17
**scan**
120:17, 167:18, 234:11, 234:12, 236:23, 239:9,

239:21, 254:14, 268:25, 275:17, 276:8, 277:8, 277:9, 277:10, 278:20, 292:6, 293:24
**scanned**
33:8
**scanner**
43:20, 250:9
**scanners**
30:11, 43:20, 286:13
**scanning**
31:1, 31:11, 47:12, 50:23, 55:15, 64:20, 75:16, 82:17, 95:11, 99:4, 99:17, 147:7, 158:7, 185:13, 208:14, 208:15, 237:17, 240:18, 294:19
**scans**
33:4, 235:23, 237:10, 237:23, 237:25, 238:4, 238:5, 238:8, 239:6, 239:19, 239:22, 240:2, 240:7, 240:12, 240:17, 275:9, 275:18
**scene**
31:19, 35:24, 35:25, 36:13, 36:23, 39:4, 39:16, 42:16, 87:14, 87:17, 87:24, 89:21, 90:5, 91:4, 92:3, 94:13, 98:24, 99:3, 188:4, 188:15, 202:13, 298:20
**schematic**
239:3
**scheme**
192:20, 192:23
**scholar**
19:18, 19:24
**school**
15:17, 21:17, 38:5, 47:5
**science**
51:19, 294:17
**scope**
139:17, 140:20
**scrambling**
67:19
**screen**
128:3, 275:22
**scroll**
59:11, 248:9
**scrolling**
12:4, 68:25
**se**
165:24, 194:12
**seal**
254:16, 301:13
**seals**
255:1
**search**
61:4, 69:1, 70:2, 85:25, 98:2, 105:16, 130:12, 163:24, 198:14, 256:8, 289:7
**searches**
18:20
**searching**
20:21, 121:5
**second**
4:19, 11:19, 13:8, 13:13, 26:13, 27:16, 46:5, 55:22, 61:23, 63:14, 63:18, 64:13, 69:2, 90:18, 91:16, 91:17, 96:17, 97:4, 101:7, 103:10, 103:24, 103:25, 104:4, 105:21, 105:24, 106:5, 117:6, 121:16, 122:13, 123:2, 123:11, 123:13, 133:10, 138:10, 140:2, 142:9, 143:10, 146:5, 149:5, 150:22, 155:24, 166:7, 166:8, 166:13, 178:4, 186:19, 187:4, 193:1, 207:21, 209:3, 209:4, 211:23, 212:24, 212:25, 214:6, 215:5, 215:12, 217:18, 217:19, 220:20, 226:14, 226:21, 229:18, 230:9, 235:24, 241:8, 248:3, 248:15, 249:17, 260:10, 260:11, 263:21, 265:7, 265:8, 269:9, 269:10, 276:18, 278:12, 284:16, 284:19
**secondary**
203:1
**seconds**
104:3
**section**
29:25, 30:1, 57:13, 58:21, 59:7, 60:10, 85:22, 85:23, 107:25, 112:22, 135:12, 159:23, 160:2, 183:4, 186:15, 205:4, 207:20, 216:19, 244:19, 273:18
**sections**
29:23, 241:23
**seeing**
36:23, 71:15, 78:20, 153:13, 153:15, 173:10, 263:14, 268:2
**seem**
117:11, 164:19, 214:10, 262:15, 270:17
**seemed**
19:14, 19:21, 22:9, 249:11, 285:7, 285:10
**seemingly**
178:9, 178:18, 182:22, 265:20, 266:9
**seems**
83:19, 97:4, 97:12, 118:7, 128:19, 150:19, 173:2, 199:3, 271:25
**seen**
15:25, 16:11, 47:7, 103:15, 103:16, 117:24, 127:19, 128:14, 132:2, 149:23, 154:3, 162:4, 162:15, 261:14, 263:6, 285:7, 295:6
**sees**
202:13, 202:17
**selects**
192:20
**sense**
29:9, 49:12, 51:17, 53:6, 72:11, 74:15, 76:13, 77:6, 79:21, 84:17, 84:21, 96:5, 109:17, 126:8, 136:10, 136:12, 144:3, 152:12, 158:16, 158:18, 177:25, 199:15, 203:11, 251:5,

261:21, 266:24, 273:14, 279:1, 279:5, 286:21
**sensed**
125:12
**senses**
85:9
**sensing**
49:11
**sensitive**
40:18
**sensor**
48:25, 49:19, 50:25, 51:18, 52:13, 129:20
**sensors**
52:10
**sent**
229:25, 231:25
**sentence**
96:11, 99:10, 99:15, 122:13, 131:2, 150:3, 155:17, 164:20, 165:13, 165:15, 171:23, 179:25, 220:3, 220:7, 220:13, 220:16, 220:18, 236:5, 269:10, 278:11, 278:12, 278:13
**sentences**
90:9, 97:16, 98:18, 100:2, 156:10, 184:18
**separate**
155:1, 240:16, 291:16
**separated**
122:14, 200:21
**sequence**
86:15
**sequences**
256:21
**serially**
64:21
**series**
50:18, 144:17
**service**
164:21
**set**
86:15, 124:23, 133:11, 133:12, 133:15, 133:24, 172:13, 173:19, 181:19, 191:20, 191:24, 193:8, 199:4, 202:4, 213:21, 256:4, 258:11, 278:5, 300:1, 301:12
**setting**
17:1, 42:5, 44:22, 76:22, 79:3, 107:2, 107:6, 132:23, 160:16, 167:16, 267:19
**setup**
118:3, 122:22, 208:14, 208:15
**seven**
56:3, 208:20, 288:25, 290:1
**seven-hour**
290:12
**seventh**
131:15
**several**
179:20, 179:23, 206:1, 293:7
**shape**
15:7, 44:15, 44:17, 99:2, 99:18, 100:6, 100:14, 150:4, 164:21, 188:19, 188:20, 189:15, 189:16, 194:9
**shapes**
14:8, 35:3, 92:1, 179:20, 179:23, 189:17, 192:25, 193:14, 193:16, 193:25, 197:14, 206:20, 211:7, 268:3
**sharapov**
27:12
**share**
208:24
**shared**
18:10
**sharp**
42:13, 42:14
**sharpness**
41:17
**sheets**
104:22
**shenzhen**
1:7, 1:9, 6:3
**sheridan**
3:21, 6:10
**shift**
125:3, 195:6
**shifting**
195:19
**shocked**
168:1, 168:13, 168:14
**shoe**
35:15, 36:25
**short**
50:12, 67:16, 108:5, 121:12, 126:5, 196:13, 244:3
**shorthand**
49:3
**shot**
186:2
**should**
8:19, 27:17, 36:7, 37:23, 39:18, 59:4, 61:25, 69:1, 78:20, 82:13, 101:9, 103:12, 107:11, 109:21, 109:25, 118:15, 120:20, 123:15, 127:19, 129:25, 130:25, 140:21, 142:20, 145:4, 167:12, 182:1, 185:3, 193:2, 215:17, 215:24, 218:16, 230:24, 235:14, 239:9, 240:9, 240:11, 243:6, 243:7, 245:21, 262:19, 280:10, 285:15, 286:17, 286:18
**shouldn't**
180:19, 285:14
**show**
13:22, 38:11, 39:4, 39:5, 39:7, 65:12, 71:3, 91:12, 97:1, 103:10, 103:11, 104:19, 104:23, 136:21, 144:17, 148:9, 148:10, 148:11, 150:11, 152:5, 160:18, 161:4, 165:9, 168:7, 170:23, 171:13, 172:8, 172:13, 176:6, 176:15, 176:16, 176:19, 178:7, 178:16, 178:19, 178:24, 178:25, 179:3, 179:11, 180:17, 196:4, 212:23, 213:5, 217:13, 234:7, 242:16, 251:20, 252:16, 268:19, 275:7, 275:17
**showed**
65:15, 65:18, 73:6, 104:19, 170:2, 176:1
**showing**
43:2, 92:24, 104:2, 104:24, 122:19, 128:15, 134:10, 144:1,

148:13, 151:18, 158:11, 158:18, 158:19, 172:17, 172:23, 196:5, 196:9, 237:22, 239:4, 239:18, 275:9, 276:21, 277:8
**shown**
39:15, 61:21, 73:8, 79:9, 87:19, 88:4, 89:22, 92:19, 92:20, 101:23, 103:5, 116:6, 130:8, 132:23, 147:9, 148:6, 152:12, 152:14, 152:15, 160:17, 162:10, 162:11, 168:25, 176:1, 196:22, 196:23, 199:17, 200:8, 219:6, 238:21, 245:19, 262:10, 269:2, 273:15, 280:16
**shows**
73:12, 104:23, 127:16, 128:25, 129:17, 156:25, 160:11, 160:13, 168:4, 171:10, 171:14, 172:2, 178:20, 179:1, 219:7, 234:11, 237:13, 275:21
**shree**
15:21, 16:7
**sic**
14:15, 24:21, 26:20, 38:17, 69:6, 131:6, 143:3, 143:12, 162:6, 162:23, 178:18, 179:15, 199:18, 205:9, 208:4, 209:4, 210:13, 232:1, 243:12, 250:21, 290:14
**sickness**
8:8
**side**
10:19, 15:23, 25:11, 25:13, 28:18, 129:18, 138:3, 258:9, 267:16, 267:17, 272:7
**sides**
9:9, 26:8
**sidewalk**
169:13
**signals**
50:25, 251:1
**signature-mig2k**
301:17
**signed**
12:5
**significance**
293:8
**significant**
111:4
**significantly**
94:24, 111:4, 296:7
**signing**
301:8
**silent**
229:4
**silly**
168:7
**similar**
29:12, 144:9, 193:21, 197:13, 198:4, 198:6, 198:25, 225:21, 225:25, 226:1, 262:14, 262:15, 263:5, 275:21, 283:9, 284:17
**similarity**
262:10, 262:13
**similarly**
151:8
**simple**
16:5, 36:18
**simplest**
190:23
**simplified**
33:10, 33:13
**simplifies**
95:19, 289:19
**simply**
49:2, 49:9, 49:10, 82:6, 161:24, 164:18, 166:22, 216:15, 237:13, 238:15, 283:11, 286:19, 292:6
**since**
18:10, 23:3, 28:19, 44:10, 63:20, 63:22, 77:8, 77:14, 129:24, 137:10, 159:20, 169:3, 173:2, 193:16, 200:24, 201:2, 243:20, 290:1
**single**
36:11, 36:15, 73:8, 92:2, 92:3, 92:4, 92:5, 92:6, 92:25, 103:11, 128:2, 128:3, 217:8, 217:10, 291:14, 292:7
**single-pixel**
64:20
**sir**
60:5, 90:6, 138:7, 177:5, 177:10, 184:13, 291:1
**sit**
8:13
**sitting**
8:15, 12:14, 284:13
**situation**
129:23, 132:10, 273:8, 284:17
**six**
56:3, 195:10, 196:5, 208:20, 258:10
**size**
181:1, 196:10, 196:11, 198:3
**sizes**
44:18, 193:8, 193:25
**sketch**
34:12
**sketched**
95:17
**sketches**
34:13, 153:9
**skill**
110:19, 111:1, 111:6, 115:24, 120:2, 143:16, 143:20, 144:1, 144:9, 146:2, 146:8, 146:21, 221:8, 222:22, 222:24, 295:11
**skilled**
66:20
**skimmed**
18:21, 20:5
**skip**
192:7, 201:6, 212:1, 248:12
**skipped**
192:7
**skipping**
186:21
**sky**
53:6
**sleep**
87:6
**slice**
38:22
**slide**
30:24, 35:5, 35:10, 40:2, 74:24, 100:10, 101:12, 101:13,

101:16, 106:23, 117:12, 118:2, 118:8, 118:9, 119:4, 119:22, 120:13, 120:16, 131:11, 132:22, 134:10, 134:16, 134:19, 135:17, 135:19, 136:2, 136:4, 136:14, 137:22, 138:3, 142:3, 143:13, 143:15, 143:22, 144:18, 145:19, 145:20, 145:22, 146:24, 149:25, 154:5, 155:5, 158:12, 158:14, 162:6, 165:5, 186:23, 190:25, 201:23, 202:12, 203:3, 252:23, 267:1

**slides**
276:15

**slight**
128:11

**slightly**
56:25, 76:17, 129:19, 198:5, 207:18

**slower**
192:12

**slowing**
245:4

**slowly**
99:14, 119:14, 119:18, 150:18

**small**
36:10, 40:15, 180:17, 207:3, 292:10

**small-scale**
51:22

**smaller**
52:25

**smart**
40:20, 224:8

**soft**
245:15

**software**
245:15, 298:6

**sold**
254:19

**solid**
39:2, 39:7, 134:24, 135:2, 136:10, 136:15

**somebody**
15:7, 82:21, 83:6, 98:7, 147:22, 171:1, 239:17, 243:15, 267:4, 268:2, 268:3, 270:9, 270:10, 277:11, 280:13, 283:18, 285:16

**somehow**
32:16, 41:24, 139:1, 148:18, 167:9, 177:3, 177:4, 186:6, 189:8, 189:11, 197:6, 223:9, 249:17, 276:5, 286:18

**someone**
102:9, 186:6, 277:6, 281:21, 281:24

**something**
18:22, 20:16, 29:6, 31:2, 44:7, 49:8, 52:16, 53:20, 57:1, 61:16, 71:24, 77:4, 80:23, 82:8, 82:22, 86:22, 89:11, 104:15, 106:7, 126:2, 147:22, 148:14, 148:22, 150:25, 151:24, 153:18, 153:21, 155:11, 157:6, 158:4, 166:20, 168:20, 169:19, 170:1, 170:6, 170:13, 172:19, 173:1, 173:3, 173:8, 173:9, 173:25, 174:2, 174:7, 174:9, 175:5, 175:14, 176:15, 176:17, 176:19, 176:20, 176:24, 176:25, 181:12, 182:24, 185:19, 186:7, 189:6, 189:10, 190:4, 190:10, 190:21, 192:7, 193:21, 194:15, 198:8, 204:2, 223:5, 223:7, 223:8, 224:1, 224:2, 226:18, 227:2, 227:8, 227:10, 229:8, 244:2, 250:20, 251:6, 266:21, 281:4, 281:5, 283:16, 286:16, 294:9

**something's**
52:8

**sometimes**
9:6, 26:17, 26:18, 29:2, 179:2, 189:15, 226:20, 263:25, 296:23

**somewhat**
16:20, 134:11, 167:19, 188:8, 188:9, 188:25, 204:23

**somewhere**
60:14, 88:3, 88:7, 93:7, 94:22, 198:9, 268:25

**sonar**
32:16

**sony**
233:17

**soon**
10:24, 77:10, 86:25, 259:14

**sophisticated**
194:16, 195:8

**sorry**
19:7, 28:3, 48:13, 69:1, 69:17, 70:9, 70:13, 70:18, 70:20, 72:6, 84:10, 94:6, 96:7, 96:12, 117:19, 154:25, 157:10, 208:6, 222:6, 222:8, 222:11, 222:12, 225:10, 245:3, 252:9, 274:18, 275:14, 275:24, 275:25, 276:4, 282:10, 289:12, 289:13

**sort**
14:15, 32:13, 36:12, 49:7, 50:18, 62:13, 75:1, 106:13, 109:17, 112:12, 117:16, 121:19, 128:19, 153:14, 156:5, 164:7, 164:9, 168:18, 182:20, 190:1, 202:3, 203:18, 207:12, 234:11, 240:14, 251:17, 252:2, 270:12, 278:11, 281:10, 283:11, 287:5, 295:7

**sounds**
9:10, 9:15, 59:22, 174:23, 175:20, 229:19, 251:24, 293:15

**source**
115:2, 297:11
**space**
19:19, 19:23, 31:5, 88:3, 88:5, 91:8, 92:9, 94:6, 202:6, 256:5
**spaces**
202:3, 207:3, 269:18
**spacing**
200:18, 200:20, 206:25
**spans**
92:9
**spatial**
188:8, 188:18, 190:11, 190:13, 191:17, 192:11, 197:18, 201:12, 204:2
**spatially**
192:1, 193:9, 203:13
**speak**
257:9, 257:13, 290:9
**speakers**
81:18
**speaking**
68:19, 189:19, 189:20
**speaks**
258:9
**special**
173:18, 286:24, 294:17
**specialized**
294:8
**specialty**
242:14
**specific**
10:9, 16:24, 19:3, 31:17, 49:5, 65:15, 123:16, 133:9, 145:8, 151:25, 152:2, 164:15, 168:17, 180:16, 189:7, 192:20, 199:11, 206:11, 237:22, 237:25, 239:16, 260:15, 260:16, 263:2, 266:18, 266:19, 271:11, 278:1, 286:6, 291:15, 291:21, 291:22, 291:23
**specifically**
17:1, 38:25, 78:25, 86:18, 121:25, 145:2, 200:8, 238:6, 238:12
**specification**
98:15, 115:13, 119:5, 119:9, 119:19, 120:1, 143:10, 143:11, 143:15, 156:14, 156:25, 166:5, 166:17, 176:14, 178:5, 216:15, 255:19
**specifics**
178:7
**speed**
52:4
**spend**
12:10, 60:21, 259:12, 291:24
**spending**
223:18
**spends**
15:7, 194:22
**spent**
256:20, 256:22, 258:25
**spiders**
16:16, 16:17
**spie**
75:5
**spine**
103:22, 104:18
**spirit**
197:13, 263:5
**spit**
121:19
**spot**
58:23, 117:3, 207:19
**spots**
205:23
**square**
35:16, 38:19, 50:1, 87:15, 202:6, 206:25, 210:21, 211:16, 267:14
**squares**
101:19, 101:23, 101:24, 194:19, 202:6, 202:25, 204:8, 207:4, 211:1, 211:9, 269:22
**squint**
268:16
**ss**
194:16
**stamps**
231:16
**stand**
46:4, 117:13, 194:13, 219:2, 219:6, 224:11, 224:13
**standalone**
53:5
**standard**
19:16, 75:14, 131:11, 184:24, 186:10, 190:2, 194:6, 197:11, 205:14, 292:23, 294:16
**standing**
219:5
**stands**
200:8
**stared**
213:11
**start**
16:8, 27:23, 33:24, 44:11, 50:15, 50:17, 52:11, 70:3, 86:20, 90:7, 98:21, 108:22, 126:15, 217:16, 234:17, 284:24, 287:1, 290:19
**started**
45:17, 159:19, 168:2, 291:19, 293:17, 296:9
**starting**
30:6, 58:25, 96:16, 161:17, 183:5, 212:17, 216:13, 218:8, 232:17, 248:15, 248:19, 248:22, 271:7, 276:2
**starts**
39:2
**state**
2:24, 6:14, 64:19, 69:4, 114:11, 143:9, 184:6, 265:10, 273:23, 286:6, 286:8, 286:13, 301:19
**stated**
9:13, 107:12, 154:14, 165:18, 166:24
**statement**
47:10, 54:4, 150:6, 154:18, 157:25, 161:25, 167:10, 168:19, 169:8, 169:9, 170:4, 173:10, 176:20, 180:10, 181:2, 186:5, 280:22, 281:7, 281:8, 299:12
**states**
1:1, 6:5,

64:17, 288:14
**stating**
166:22, 176:25
**step**
11:1, 183:9
**steps**
276:8
**stereo**
32:3, 43:7, 87:10, 95:11
**stereovision**
30:20, 44:22
**steven**
1:14, 2:1, 4:2, 4:8, 5:5, 6:2, 7:1, 300:3
**stick**
175:21
**sticking**
109:19
**still**
24:3, 41:24, 48:24, 88:9, 90:13, 92:5, 116:5, 117:13, 119:11, 142:11, 215:22, 280:21, 294:8, 294:15
**stipulate**
267:7
**stitch**
74:5
**stop**
45:16, 50:14, 52:14, 131:9
**stopped**
259:18
**store**
45:2, 233:21
**stored**
52:9, 238:9, 240:12
**storing**
51:19
**straight**
36:22, 90:1, 90:3, 91:2, 93:11, 98:24, 98:25, 99:1, 100:9, 100:13, 104:16, 125:13, 125:16, 253:10
**street**
3:5, 294:9
**strength**
238:14
**stripes**
92:18, 92:20, 106:17, 106:24, 107:2, 201:22
**stripy**
91:25
**structure**
70:22, 149:8, 233:9, 242:3, 242:6
**structure's**
248:24
**structured**
4:17, 30:19, 30:22, 31:14, 32:2, 32:20, 33:7, 43:7, 44:22, 46:18, 47:11, 51:7, 71:7, 71:13, 71:18, 75:23, 76:24, 82:4, 100:11, 144:21, 179:18, 188:2, 188:6, 188:10, 188:14, 189:14, 190:2, 190:3, 191:18, 192:11, 201:13, 261:6, 261:9, 261:13
**structured-light**
30:11, 31:1, 33:4, 47:12, 50:23, 55:15, 56:5, 75:15, 95:10, 96:10, 99:4, 99:17, 120:5, 185:13, 189:22, 192:3, 193:10, 232:22
**student**
16:22
**students**
35:15
**studied**
50:5
**study**
14:7, 14:13
**studying**
15:7
**stuff**
52:22, 52:25, 206:11
**sub**
233:8
**subject**
18:12, 45:20, 134:21, 279:9
**submitted**
11:9, 12:1
**subscript**
194:14
**subset**
240:2
**substantial**
34:21
**substantially**
107:7, 107:8, 111:18, 198:25, 225:21, 262:7, 262:8, 267:5, 268:9, 269:1
**substantive**
232:10, 288:3
**sudden**
294:12
**suggest**
108:4, 193:4
**suggested**
145:2
**suggesting**
195:19
**suggestion**
293:3
**suggests**
166:19, 287:22
**suit**
18:12, 28:25, 29:4
**suitable**
51:2
**suite**
3:6
**sum**
122:8
**summarize**
240:10
**summary**
45:9, 58:9
**sunburst**
128:1
**superimposed**
152:23, 152:24, 152:25, 160:25, 162:12, 171:21
**supplied**
179:10
**supplier**
82:18, 85:14
**support**
166:6, 166:12, 288:12
**supporting**
121:15
**suppose**
94:4, 94:6, 180:22
**supposed**
151:3, 180:4, 219:14, 272:11
**sure**
7:12, 7:15, 9:3, 10:24, 12:5, 12:8, 12:18, 13:19, 19:5, 19:10, 19:22, 24:3, 27:6, 27:17, 33:14, 33:17, 48:11, 50:1, 50:7, 52:17, 56:11, 56:12, 58:19, 58:22, 59:16, 59:17, 65:1, 77:23, 104:6, 106:6,

106:11, 112:7, 117:17, 117:19, 119:11, 121:11, 129:2, 130:9, 140:22, 146:12, 146:13, 148:16, 148:23, 170:12, 171:12, 182:16, 184:3, 204:8, 208:10, 212:3, 212:5, 215:3, 217:14, 226:14, 230:8, 233:13, 239:4, 239:9, 240:3, 241:6, 241:9, 242:10, 243:20, 246:25, 247:18, 255:2, 255:3, 257:18, 258:19, 260:13, 262:15, 263:8, 263:22, 264:10, 264:18, 264:20, 270:19, 272:2, 287:1, 288:17, 289:11, 291:12, 298:1

**surface**
15:25, 31:6, 39:5, 39:8, 49:11, 49:13, 72:16, 72:18, 73:17, 73:18, 76:4, 81:10, 81:16, 81:21, 81:24, 82:10, 82:14, 83:1, 83:11, 83:14, 83:18, 83:19, 84:21, 85:20, 100:12, 100:15, 117:12, 119:22, 135:18, 137:22, 143:13, 143:14, 165:1, 202:13, 232:20, 232:22, 237:19, 237:20, 243:7, 243:10, 243:17, 252:23, 285:9, 285:13, 285:15

**surface-shape**
99:4, 99:17

**surprise**
249:9

**surprised**
170:7

**suspect**
31:12, 49:24, 61:25, 292:8

**sweep**
88:21

**switch**
90:18, 97:4, 97:13

**switched**
155:20

**switches**
118:22

**switching**
244:14

**sworn**
6:23, 7:2

**symbol**
192:16

**symbols**
192:25, 193:2, 194:20, 195:1, 195:2, 195:9, 195:22

**symmetric**
82:1, 82:13

**symmetry**
82:25, 83:18, 85:7, 243:14

**synonyms**
127:14, 157:2

**system**
44:12, 82:17, 100:5, 122:16, 126:19, 129:23, 219:24, 238:13, 238:19, 239:7, 251:3

**systems**
64:19, 185:13, 242:15

**szymon**
229:2

**T**

**table**
248:13, 249:24, 250:13

**tabs**
109:11, 142:16, 142:17, 142:19, 216:6

**take**
8:13, 11:5, 13:8, 21:25, 23:1, 29:21, 33:22, 35:1, 35:15, 35:22, 44:8, 49:7, 50:2, 52:11, 55:5, 59:8, 59:12, 61:7, 61:22, 64:22, 67:11, 70:1, 86:14, 88:10, 91:1, 103:24, 105:24, 121:16, 133:12, 138:10, 144:11, 146:5, 159:4, 173:23, 173:24, 187:3, 187:20, 191:7, 201:1, 210:7, 214:13, 216:20, 218:2, 219:17, 226:2, 226:3, 226:14, 234:19, 235:8, 236:10, 236:16, 236:21, 238:10, 246:5, 254:6, 256:7, 256:25, 271:4, 275:2, 278:4, 278:10, 282:7, 288:16, 288:19, 293:24, 297:17, 299:18, 299:19

**taken**
7:10, 50:4, 52:9, 122:20, 201:16, 278:18, 278:20, 292:4, 292:6, 301:3, 301:6

**takes**
52:2, 113:25, 235:9, 237:1, 238:13

**taking**
41:2, 52:4, 140:2, 236:18, 236:19, 237:7, 244:3, 278:16, 278:17

**talk**
19:21, 20:24, 31:12, 47:22, 58:16, 61:5, 61:12, 75:23, 76:5, 76:19, 78:13, 86:17, 89:7, 91:9, 105:2, 111:21, 117:11, 126:6, 154:23, 155:1, 163:20, 177:12, 178:23, 179:15, 180:16, 184:14, 190:16, 202:24, 211:18, 218:9, 218:23, 222:7, 223:22, 235:24, 236:14, 237:11, 238:5, 249:14, 252:13, 262:25, 264:19, 266:12, 279:16, 279:21, 284:20, 284:21

**talked**
27:24, 46:15, 46:17, 53:25, 72:20, 73:7, 82:4, 86:5, 96:14, 96:22, 100:17, 101:2, 101:21, 107:19, 115:12, 116:22,

118:8, 119:7, 141:19, 150:16, 161:16, 165:12, 176:23, 176:24, 191:21, 234:17, 234:21, 235:25, 252:14, 253:3, 258:6, 258:15, 266:13, 270:15, 281:23, 293:2, 297:8, 298:10
**talking**
20:22, 60:16, 65:10, 95:21, 104:12, 118:7, 121:9, 141:17, 147:5, 147:6, 155:22, 156:5, 156:9, 156:10, 156:13, 156:17, 165:22, 171:6, 177:13, 180:2, 187:7, 192:4, 194:21, 201:3, 207:20, 216:20, 217:17, 234:24, 254:5, 264:12, 265:4, 274:3, 276:7, 278:1, 278:10, 278:14, 278:24, 285:25, 288:1, 296:24, 296:25
**talks**
61:19, 61:20, 117:16, 117:18, 131:10, 191:5, 210:22, 211:12, 248:20, 254:13, 254:15, 260:3, 271:10, 276:11
**tall**
196:13
**targets**
203:12
**tea**
54:11
**teach**
38:2, 66:19, 66:23, 143:16
**teachers**
21:17
**technical**
20:9, 77:6, 175:22, 280:22, 281:7, 283:14
**technically**
21:13, 129:8, 175:23
**technician**
3:22
**techniques**
283:4
**technological**
47:8
**technology**
1:8, 1:9, 6:4, 29:25, 67:6, 154:21, 294:20, 294:21
**tell**
7:22, 18:6, 78:20, 78:21, 85:2, 85:4, 90:9, 91:15, 94:3, 102:13, 106:12, 124:1, 132:5, 141:17, 145:10, 161:22, 193:16, 195:22, 223:4, 230:18, 250:12, 251:15, 260:20, 277:18, 283:18
**telling**
89:3, 94:10, 145:4, 158:13, 172:21, 196:14, 239:17, 290:1, 299:4
**tells**
163:11, 218:24, 221:2, 298:21
**temporal**
189:1
**ten**
56:4, 59:20, 208:21, 214:17, 225:1, 240:17, 240:19, 264:11, 270:7
**ten-minute**
59:13
**tend**
69:23
**tends**
15:22
**term**
10:7, 19:14, 19:15, 19:16, 20:10, 22:17, 28:20, 28:24, 29:5, 29:12, 48:17, 65:2, 65:4, 65:15, 72:16, 72:25, 74:10, 75:14, 76:10, 76:20, 138:25, 139:1, 141:4, 151:13, 157:5, 194:5, 195:25, 205:11, 205:12, 205:14, 221:9
**terminologies**
97:5
**terminology**
18:17, 21:2, 45:17, 69:24, 76:22, 81:17, 100:4, 129:2
**terms**
10:8, 15:1, 20:1, 20:18, 20:19, 20:20, 20:23, 22:17, 47:18, 50:19, 78:17, 135:17, 155:12, 155:13, 155:14, 164:15, 215:6, 243:10, 269:8, 271:24, 285:10
**test**
260:10, 260:11, 260:15
**testified**
7:4
**testify**
7:2
**testifying**
115:5
**testimony**
7:17, 7:18, 301:5, 301:6
**tests**
260:4, 260:6, 260:7, 260:9
**tetris**
197:15, 204:7, 206:20
**text**
62:10, 130:21, 131:3, 131:6, 219:19, 220:11, 221:10
**texts**
22:8
**textual**
221:25
**th**
3:14, 27:10, 114:13, 165:14, 166:22, 241:12, 301:13
**thank**
12:9, 24:14, 25:3, 25:5, 46:15, 60:6, 80:6, 90:21, 107:22, 108:13, 108:14, 110:10, 111:15, 142:15, 158:23, 177:10, 216:4, 216:6, 264:8, 283:1, 299:21, 299:24
**themselves**
6:14, 76:10, 129:9, 293:2
**theorem**
17:8
**theoretical**
74:15, 74:18,

75:2, 75:6
**theorist**
190:15
**theory**
16:22, 46:23, 174:3, 237:5
**thereabouts**
110:17
**thereafter**
301:6
**therefore**
36:13, 40:19, 41:13, 43:24, 74:5, 74:8, 75:10, 75:20, 83:1, 125:1, 173:18, 173:21, 191:25, 192:1, 193:9, 208:16, 209:11, 220:3, 245:11
**thereof**
279:17
**thick**
76:18, 76:21, 181:23, 181:24, 182:7, 204:17
**thicker**
265:15, 269:13
**thickness**
181:17, 198:3, 199:23, 262:17, 263:4
**thicknesses**
267:3
**thin**
76:18, 76:22, 204:18, 269:17
**thing**
10:22, 13:4, 30:10, 38:6, 40:22, 47:9, 55:25, 63:15, 85:12, 94:15, 97:7, 105:1, 123:1, 142:6, 174:8, 215:3, 216:9, 229:21, 237:10, 239:14, 241:6, 264:5, 286:24, 292:18, 295:24, 298:1
**things**
10:19, 15:15, 15:24, 16:23, 17:11, 17:12, 18:16, 18:20, 21:3, 21:20, 22:12, 32:6, 42:5, 42:18, 51:16, 53:9, 54:14, 61:18, 62:13, 64:19, 65:6, 67:2, 74:3, 74:8, 79:24, 81:22, 83:7, 95:20, 104:19, 105:4, 109:10, 125:3, 125:9, 126:13, 131:19, 150:7, 151:22, 152:2, 154:18, 155:1, 155:3, 165:19, 166:23, 168:8, 176:5, 180:2, 181:12, 191:1, 203:12, 204:17, 210:19, 236:12, 237:24, 246:1, 248:10, 258:18, 261:17, 261:22, 279:6, 286:18, 290:21, 291:16, 295:20
**thinking**
18:14, 18:25, 23:3, 295:13, 295:14
**thinks**
203:5, 239:7
**thinner**
269:16, 269:17
**third**
28:15, 55:24, 76:8, 85:12, 92:8, 92:13, 96:8, 214:7, 217:19, 278:15
**thirty**
104:3
**thought**
27:24, 47:15, 98:6, 200:12, 222:15, 228:8, 251:23, 260:7, 260:9, 269:20
**thousands**
69:22
**three**
10:23, 29:3, 29:6, 35:3, 56:3, 72:2, 86:14, 91:5, 94:6, 97:5, 104:19, 104:21, 104:24, 158:6, 185:19, 192:22, 208:20, 233:6, 233:7, 233:8, 233:15, 277:23, 277:25, 278:21, 278:22, 294:11
**three-dimensional**
33:8, 91:5, 120:18, 163:17, 277:17
**threshold**
285:14, 285:15, 285:22
**thresholds**
296:18, 296:21
**threw**
270:10
**through**
12:4, 12:18, 16:23, 17:3, 24:1, 27:11, 36:9, 36:22, 39:3, 40:24, 41:2, 41:9, 41:23, 51:17, 68:15, 82:22, 86:23, 89:7, 89:14, 89:19, 97:15, 100:10, 101:11, 115:10, 154:12, 154:13, 170:16, 175:12, 175:25, 179:1, 181:4, 185:4, 187:8, 187:13, 187:19, 187:23, 189:9, 191:4, 191:10, 201:24, 201:25, 227:1, 227:13, 232:13, 240:25, 245:17, 249:19, 258:11, 258:13, 258:21, 264:14, 267:13, 267:16, 267:22, 268:18, 268:24, 276:12
**throughout**
207:5
**throw**
147:15, 148:3, 161:12
**throwing**
76:10
**thumb**
264:9
**thumbs-up**
90:17, 222:14, 222:18
**tilted**
128:9
**time**
5:13, 6:8, 6:9, 9:13, 9:16, 13:13, 14:5, 14:10, 17:23, 24:17, 33:22, 52:12, 52:22, 54:24, 55:5, 55:8, 59:8, 59:14, 59:24, 60:3, 60:21, 65:3, 66:5, 66:20, 81:12, 86:1, 108:4,

108:16, 108:20, 110:24, 111:16, 114:5, 156:6, 159:1, 159:8, 159:12, 185:14, 189:5, 189:15, 194:8, 194:22, 214:19, 214:23, 226:3, 226:25, 228:14, 228:15, 229:18, 229:19, 234:1, 241:3, 241:5, 244:8, 244:12, 246:22, 256:20, 258:25, 259:6, 259:20, 277:9, 279:10, 283:3, 291:24, 293:11, 294:22, 295:4, 299:23, 300:4
**times**
48:21, 97:9, 97:10, 105:3, 117:25, 213:11, 294:19
**timing**
287:11
**tinfoil**
35:17, 40:25
**title**
29:17, 56:15, 56:21, 56:25, 57:2, 112:3
**titled**
17:19
**titles**
225:25
**today**
6:10, 6:22, 7:22, 8:7, 8:10, 12:14, 18:13, 20:24, 46:9, 279:12, 280:13, 286:13
**today's**
6:8
**together**
29:3, 74:5, 86:12
**told**
10:14, 19:24, 21:12, 54:3, 85:3, 98:7, 180:14, 251:9, 251:14, 282:3, 283:19, 299:4
**tomasi's**
134:17, 199:5
**ton**
223:17
**tons**
21:9, 21:20, 190:22
**took**
21:16, 43:13, 87:7, 115:1, 115:2, 141:1, 259:6, 275:4
**top**
113:18, 113:19, 146:16, 146:24, 147:6, 148:24, 149:17, 154:12, 158:11, 161:18, 162:2, 164:1, 166:11, 168:23, 171:9, 257:6, 267:14, 276:16, 276:22
**top-to-bottom**
292:6
**topic**
60:8, 69:13, 73:25, 149:22, 226:10, 227:16, 287:6, 296:23
**topics**
14:7, 18:25, 286:10
**toric**
85:5
**touching**
159:19
**toward**
248:16
**towards**
35:24, 39:9, 39:10, 241:5, 293:4
**track**
73:24, 105:24, 237:17, 296:23
**tracking**
237:16
**traditional**
240:2
**traditionally**
100:18
**transcript**
11:18, 13:2, 18:3, 24:25, 26:1, 28:11, 57:7, 64:3, 77:18, 109:4, 112:1, 114:9, 139:4, 140:4, 225:14, 228:3, 241:16, 248:2, 301:4
**translate**
251:1
**translated**
81:17
**translation**
20:9, 63:4
**translator**
258:22, 259:2, 259:5
**transmitted**
52:9
**treating**
203:7
**triangle**
43:16, 91:6, 92:3, 92:9, 93:20, 103:11, 103:12, 193:18, 194:18, 210:21, 211:15
**triangles**
194:19, 265:16
**triangulated**
203:12
**triangulating**
299:2
**triangulation**
43:12, 43:17, 72:21, 73:6, 94:12, 95:1, 95:4, 95:8, 95:12, 95:16, 95:22, 95:23, 96:1, 96:5, 96:6, 96:10, 99:5, 99:18, 99:24, 203:4, 203:10, 206:14, 208:13, 209:24, 211:8, 243:8, 292:22, 298:13, 299:3, 299:7, 299:17
**triangulation-based**
43:19
**trickier**
95:15
**tricky**
69:23
**tried**
269:23
**trier**
280:1, 281:13, 283:6, 284:11
**tries**
202:18, 202:22
**triggered**
251:2
**trip**
169:12
**tripod**
74:24
**truck**
45:24, 46:6
**true**
11:25, 14:18, 46:22, 54:6, 67:5, 81:3, 83:12, 116:19, 154:18, 163:3, 164:12, 176:11, 250:24, 251:3, 251:8, 266:22,

283:14, 301:4
**trustworthy**
115:9
**truth**
7:3, 7:22
**try**
9:4, 13:12, 22:5, 45:4, 60:17, 63:18, 73:24, 84:12, 97:16, 108:11, 111:8, 123:10, 137:20, 151:1, 186:20, 202:10, 203:24, 224:22, 226:7, 226:24, 229:15, 232:16, 235:13, 240:20, 244:19, 248:10, 254:4, 270:2, 270:18
**trying**
13:5, 16:15, 21:17, 21:24, 33:20, 36:5, 44:23, 58:8, 58:10, 82:5, 82:15, 82:17, 83:4, 86:21, 95:11, 138:8, 138:10, 148:17, 153:16, 153:18, 153:21, 185:5, 203:13, 245:3, 259:1, 259:12, 268:7, 268:8, 276:1, 284:7, 287:8
**tsa**
219:17, 224:7
**turn**
29:24, 46:1, 49:14, 112:18, 137:8, 214:25, 244:18, 273:18, 275:19, 278:6, 279:9, 288:7, 290:5, 293:25
**turned**
236:7
**turning**
41:3, 46:3, 68:1, 149:1, 255:12
**turns**
73:25
**tutorial**
275:5
**tv**
293:16
**twice**
77:20
**twin**
225:23
**two**
11:10, 30:16, 32:21, 34:22, 35:2, 35:6, 35:7, 35:23, 35:24, 35:25, 37:16, 37:24, 38:16, 39:13, 43:14, 43:15, 55:10, 56:3, 61:18, 62:13, 67:2, 71:3, 86:13, 86:25, 87:12, 88:25, 91:1, 91:3, 92:11, 94:12, 94:13, 96:6, 98:23, 99:7, 99:19, 101:9, 101:19, 101:22, 101:24, 109:20, 117:19, 122:4, 124:18, 128:9, 128:10, 132:13, 133:25, 155:1, 155:21, 157:23, 169:23, 169:24, 179:9, 179:16, 179:17, 179:18, 180:13, 191:20, 192:1, 193:8, 208:20, 209:6, 213:2, 214:5, 215:21, 225:16, 225:19, 225:20, 225:25, 228:12, 240:22, 247:18, 260:7, 267:23, 268:3, 268:14, 268:18, 268:19, 268:21, 276:15, 276:20, 277:6, 291:16, 294:11
**two-camera**
87:10
**two-dimensional**
38:18, 38:21, 49:10, 49:19, 66:10, 91:7
**type**
257:7
**typed**
19:18, 19:19, 19:22
**types**
80:14, 293:7
**typewriting**
301:7
**typically**
9:12, 43:20, 54:23, 83:17, 190:5
**typing**
22:4
**typo**
60:22, 61:7, 62:2

**U**

**ukrainian**
20:6
**ultimate**
10:15, 280:1
**ultimately**
50:2, 125:17, 206:13, 286:21
**unambiguous**
73:3
**unarguably**
142:5
**unclear**
151:21
**uncommented**
257:5
**under**
7:21, 16:24, 17:2, 17:3, 48:16, 65:13, 76:15, 85:23, 86:5, 86:8, 89:10, 102:22, 110:19, 113:1, 114:21, 114:22, 122:5, 127:17, 135:15, 143:2, 182:18, 183:3, 205:24, 212:14, 244:24, 249:24, 254:13, 260:17, 265:1, 265:5, 273:25, 285:4, 301:7
**underneath**
102:4, 102:21, 103:9
**understand**
7:16, 7:20, 9:1, 9:14, 9:21, 10:25, 11:2, 14:23, 15:1, 21:2, 22:2, 26:15, 27:1, 28:21, 55:1, 55:6, 55:7, 58:11, 65:9, 73:9, 105:8, 105:9, 107:21, 117:18, 137:9, 138:16, 141:23, 142:18, 144:1, 146:13, 147:7, 148:4, 151:1, 174:1, 174:15, 175:1, 175:9, 184:5, 185:6, 185:23, 187:24, 188:1, 195:3, 200:25, 205:14,

223:10, 235:17, 246:6, 246:8, 250:14, 255:8, 256:21, 259:12, 260:2, 261:7, 261:8, 277:16, 291:7
**understanding** 16:3, 20:20, 48:18, 51:24, 65:24, 98:1, 105:19, 115:24, 174:12, 182:18, 206:5, 258:3, 291:25
**understands** 239:8
**understood** 47:9, 59:19, 199:13, 258:17, 258:18, 258:19, 260:8
**undisputable** 246:11
**undoubtedly** 107:6
**undue** 143:18
**uninterpretable** 47:25
**unique** 228:16
**united** 1:1, 6:5
**universally** 185:12
**universe** 19:25
**university** 23:8
**unlabeled** 102:19
**unless** 53:20, 85:17, 85:18, 93:21, 107:12, 112:11, 183:18, 226:11, 282:10
**unlike** 145:13, 161:25, 210:8, 210:16
**unorganized** 188:3
**unpack** 234:16, 235:22
**unquote** 19:23, 21:5, 119:21, 120:4, 126:12, 127:21, 178:6, 185:11
**unreasonable** 62:9
**unrelated** 178:9, 178:18
**unsaid** 135:17
**unsupported** 167:6
**until** 9:5, 9:7, 39:4, 39:11, 46:2, 87:7, 150:15, 202:16, 217:20, 219:8, 239:16, 286:10
**unusual** 19:15, 47:16
**unusually** 117:16
**uploaded** 24:18
**upper** 57:23, 58:3, 101:8, 124:4, 267:16
**usable** 51:15, 51:24, 53:10, 164:5
**usage** 18:17, 21:14, 72:7
**usages** 21:17
**usb** 246:10
**use** 19:12, 19:25, 22:18, 22:23, 23:20, 25:14, 29:5, 30:14, 31:4, 32:1, 40:12, 40:16, 40:23, 48:9, 48:24, 49:24, 50:6, 50:9, 50:19, 50:20, 51:2, 65:19, 66:23, 66:25, 69:23, 69:25, 71:8, 75:24, 83:4, 97:4, 97:7, 97:8, 97:10, 98:15, 126:10, 127:11, 130:13, 140:15, 141:3, 141:24, 142:16, 143:17, 145:4, 146:6, 147:25, 151:13, 157:5, 158:7, 163:16, 163:22, 164:4, 165:9, 183:20, 189:1, 189:15, 190:6, 190:17, 191:21, 193:15, 194:3, 194:8, 194:9, 195:11, 195:12, 200:2, 200:3, 203:15, 204:1, 205:1, 205:16, 206:21, 213:18, 221:1, 223:7, 240:19, 255:17, 256:10, 256:16, 260:15, 265:24, 279:24, 291:5, 292:23, 299:12, 299:14
**useful** 147:21, 164:5, 173:6, 173:9, 174:2, 214:9, 224:13, 253:7
**useless** 258:25
**user** 220:23, 237:23, 238:16, 238:19, 238:22, 239:3, 239:10
**uses** 65:7, 65:16, 76:20, 78:16, 98:22, 100:7, 133:25, 203:1, 205:11, 210:21, 211:10, 213:14, 213:19, 220:9, 220:18, 231:3, 285:12
**using** 16:1, 16:2, 30:14, 32:12, 32:15, 40:23, 49:11, 51:13, 51:18, 53:15, 63:5, 66:4, 66:14, 76:21, 76:22, 84:5, 99:4, 99:17, 100:3, 131:8, 133:2, 137:14, 147:8, 149:8, 179:9, 188:22, 189:5, 189:24, 191:25, 192:7, 194:1, 202:23, 204:21, 206:2, 207:11, 210:19, 210:24, 211:2, 212:22, 242:23, 260:16, 275:16, 281:1, 281:4, 289:19, 292:17, 293:19, 293:20, 293:21, 294:3, 294:20, 294:21
**usual** 241:9
**usually** 8:14, 55:4, 101:3, 109:1, 112:9, 117:9,

157:6, 255:24
**utilized**
192:23
**utilizes**
124:14

**V**

**vague**
65:15, 167:5, 221:17
**vagueness**
221:17
**valid**
9:18, 280:20, 281:14, 283:7, 286:3
**value**
192:17, 193:10
**values**
191:25, 192:2, 192:20, 192:22
**variable**
260:16, 260:20
**variables**
260:4, 260:6, 291:15, 291:22, 292:1
**variation**
197:18, 200:7, 204:2, 263:10
**variations**
45:7, 189:18, 193:8, 199:23, 207:16
**variegated**
17:4
**variety**
41:10, 121:19, 194:5, 199:7
**various**
11:2, 18:19, 18:20, 42:9, 44:4, 44:5, 50:7, 52:2, 96:21, 117:25, 128:16, 166:1, 191:4, 250:2, 261:15, 262:17, 262:21, 263:4, 267:3
**vary**
192:19
**verb**
138:21, 146:5
**verbal**
151:3
**verbally**
8:1
**verbatim**
165:11
**verse**
202:11, 226:11, 226:13, 235:13, 235:16, 245:22
**version**
13:18, 62:11, 232:6, 232:7, 267:18, 270:6
**versions**
249:22
**versus**
21:15, 83:20, 210:21, 282:1
**vertex**
68:11, 69:7, 69:11, 69:24, 70:2, 70:4, 70:5, 70:7, 70:17, 70:22, 70:25, 71:4, 71:7, 71:9, 71:11, 71:12, 71:14, 71:15, 71:18, 71:19, 71:21, 71:23, 72:1, 72:12, 72:14, 72:15, 72:18, 72:19, 73:19, 75:11, 75:15, 75:25, 76:3, 76:4, 76:14, 79:16, 79:18, 79:24, 80:15, 80:23, 81:5, 81:8, 81:9, 81:10, 81:12, 81:16, 81:18, 81:20, 81:21, 82:2, 82:11, 82:14, 83:2, 83:11, 83:14, 83:19, 84:6, 84:16, 84:17, 84:22, 85:20, 121:23, 122:6, 122:7, 122:9, 122:10, 233:11, 242:7, 242:8, 243:3, 243:6, 243:7, 243:8, 243:11, 243:14, 243:18, 249:2, 270:22, 271:16, 273:4, 273:5
**vertical**
107:7, 107:8, 107:13, 121:1, 121:3, 121:5, 122:7, 122:10, 122:14, 122:16, 122:17, 122:19, 122:23, 123:21, 124:9, 124:14, 124:17, 124:20, 124:21, 124:24, 125:1, 125:2, 125:11, 125:21, 126:1, 132:20, 132:22, 136:2, 137:1, 137:3, 137:4, 137:5, 144:17, 144:24, 144:25, 145:6, 145:9, 145:11, 145:12, 145:23, 146:6, 146:9, 146:18, 146:22, 147:18, 148:1, 148:5, 148:10, 148:13, 148:24, 148:25, 151:8, 152:11, 152:22, 153:6, 153:7, 158:7, 160:15, 160:25, 161:13, 162:9, 162:12, 164:9, 164:10, 169:3, 171:21, 172:24, 180:6, 180:8, 180:23, 181:3, 199:25, 201:14, 202:4, 202:7, 202:15, 202:17, 203:14, 206:15, 207:9, 208:12, 208:16, 208:17, 208:21, 208:24, 209:9, 209:10, 209:16, 209:20, 210:2, 210:6, 211:13, 267:5, 267:6, 268:10
**vertically**
107:5, 120:25, 125:12, 172:15, 180:13
**vertices**
104:14
**via**
2:2
**video**
6:9, 6:12, 48:24, 52:2, 67:13, 294:13, 294:16, 295:2, 295:8
**videoconference**
2:2
**videographer**
3:21, 6:1, 6:10, 6:21, 59:23, 60:2, 80:18, 108:15, 108:19, 159:7, 159:11, 214:18, 214:22, 243:23, 244:7, 244:11, 288:23, 288:25, 289:9, 289:10, 290:24, 291:1,

300:2
**videographic**
80:18
**videotaped**
1:14, 2:1, 6:2
**view**
70:25, 71:5, 71:10, 71:11, 71:14, 71:16, 71:19, 72:4, 75:2, 81:13, 176:12, 276:17
**views**
96:6
**vinther**
198:7, 198:11, 198:12, 198:14, 198:24, 199:22, 199:24, 200:4, 200:14, 200:17, 200:18, 200:20, 262:7, 262:9, 263:7, 268:5, 268:6
**virtual**
5:11, 97:10, 115:16, 116:11, 116:13, 116:17, 118:1, 118:4, 118:22, 119:4, 120:4, 120:9, 134:8, 136:4, 137:21, 139:15, 139:21, 139:23, 140:9, 140:11, 140:15, 141:4, 142:3, 150:16, 150:21, 150:23, 155:23, 156:16, 157:3, 157:6, 157:16, 157:21, 157:23, 158:19, 163:16, 166:8, 166:13, 166:25, 168:11, 183:20, 252:22, 265:6, 265:8, 265:18
**virtually**
1:15, 2:2
**visible**
164:18, 265:14, 269:11
**vision**
14:6, 14:21, 14:22, 15:5, 15:19, 15:21, 15:23, 22:17, 30:21, 38:7, 87:10
**visual**
139:14, 264:16
**visualization**
37:10, 38:22, 239:15
**visualize**
101:7
**voice**
6:13

**W**

**wacky**
85:19
**wait**
9:5, 9:7, 46:5, 59:10, 90:17, 103:10, 222:9
**waiting**
222:13
**walk**
40:13, 169:12, 191:3
**walking**
211:13
**wall**
36:25
**wanted**
20:19, 32:14, 40:16, 58:19, 75:1, 80:8, 84:10, 126:14, 260:1, 296:2, 297:20
**wants**
125:22, 195:3, 220:1
**wars**
74:14
**washington**
3:7
**waste**
114:5, 259:19
**watch**
279:7
**wavelength**
190:14, 190:17, 191:17, 192:3
**wax**
35:18
**way**
8:7, 16:15, 16:23, 17:8, 28:17, 36:8, 39:18, 41:17, 43:11, 43:24, 49:6, 51:16, 72:11, 72:21, 73:9, 74:3, 74:19, 75:23, 76:13, 83:7, 84:23, 88:1, 94:25, 95:2, 95:10, 95:19, 106:11, 106:15, 107:2, 112:9, 117:17, 126:14, 129:1, 130:8, 142:4, 142:18, 145:9, 145:10, 145:16, 147:1, 147:2, 147:10, 147:20, 148:19, 151:7, 151:11, 153:11, 155:5, 155:20, 161:23, 162:12, 164:8, 167:16, 172:7, 172:13, 172:16, 172:21, 173:6, 173:18, 179:2, 182:4, 188:15, 195:9, 195:15, 196:14, 199:19, 206:11, 206:18, 206:19, 207:2, 207:5, 210:12, 221:25, 222:20, 224:19, 231:14, 239:17, 243:3, 243:9, 256:8, 268:13, 269:6, 288:1, 291:12, 291:13, 293:17, 298:18, 299:13
**ways**
37:24, 169:24, 181:19, 190:23, 194:6, 195:8, 196:15, 221:25, 222:1, 222:5, 223:19, 236:15
**we'll**
7:13, 11:13, 11:14, 12:23, 19:21, 24:16, 24:19, 25:14, 25:18, 26:12, 30:23, 31:12, 33:22, 34:13, 35:1, 37:17, 41:14, 45:20, 46:5, 46:11, 53:16, 56:14, 57:1, 58:20, 58:24, 59:12, 59:20, 68:21, 70:4, 73:21, 77:9, 77:22, 86:23, 103:2, 108:11, 109:19, 112:14, 112:16, 114:6, 115:8, 129:3, 135:10, 135:11, 137:11, 138:6, 138:19, 142:9, 144:10, 144:11, 158:23, 159:5, 183:17, 186:14, 186:20, 193:1, 202:19, 214:16, 216:19, 217:16, 218:9, 224:16, 227:13, 227:19, 227:23,

232:9, 234:1, 244:5, 244:19, 245:23, 246:13, 247:12, 247:20, 248:4, 248:12, 249:19, 252:5, 252:13, 253:10, 253:11, 260:21, 264:19, 264:25, 267:24, 275:12, 278:14, 282:16, 284:4
**we're**
17:16, 24:15, 28:6, 33:3, 34:8, 57:5, 58:24, 60:2, 63:9, 68:1, 71:10, 71:15, 84:8, 87:12, 90:25, 92:19, 92:24, 107:25, 108:1, 108:15, 108:19, 111:20, 112:14, 135:10, 139:11, 141:16, 147:5, 156:5, 159:11, 165:22, 171:5, 177:13, 180:2, 186:14, 187:3, 189:24, 190:18, 192:4, 200:24, 201:5, 207:19, 207:20, 214:18, 214:22, 215:8, 216:2, 216:9, 225:6, 227:14, 227:22, 230:8, 241:2, 241:19, 244:7, 244:11, 247:24, 248:9, 248:11, 255:12, 264:3, 266:17, 271:24, 274:3, 276:2, 278:10, 278:14, 296:24, 299:25
**we've**
11:13, 23:22, 27:8, 29:2, 54:21, 84:22, 91:20, 104:12, 141:19, 156:1, 158:23, 193:22, 213:10, 214:12, 253:3, 263:6, 277:12
**web**
22:18, 22:23, 226:18
**website**
138:21, 140:9
**websites**
21:16
**webster**
5:10, 5:12
**weird**
50:6, 85:4, 107:15, 193:24, 197:18
**well-approximated**
42:19, 72:23, 79:9
**well-approximates**
75:20, 298:16
**well-approximati-ng**
74:12
**well-defined**
126:9
**well-designed**
195:1
**well-known**
146:6, 185:13, 194:8, 196:18, 279:5
**went**
12:18, 19:18, 87:6, 136:23, 251:24, 294:22
**weren't**
62:14, 87:6
**whale**
254:15
**whales**
255:1
**whatever**
32:16, 36:13, 37:1, 53:2, 79:7, 81:23, 97:13, 104:14, 133:13, 264:11, 274:19, 286:23, 294:21, 294:25, 296:12
**whatsoever**
41:17, 47:8, 163:20, 169:11, 170:9, 268:6, 285:19
**whenever**
88:25, 152:6
**whereas**
231:24, 237:14, 239:8
**wherein**
58:15, 155:25, 218:1, 232:20, 243:6, 248:25, 253:3, 269:3
**whereof**
301:12
**whereupon**
6:25, 11:17, 13:1, 18:2, 24:24, 25:25, 28:10, 57:6, 59:25, 64:2, 77:17, 108:17, 109:3, 111:25, 114:8, 139:3, 140:3, 159:9, 214:20, 225:13, 228:2, 241:15, 244:9, 248:1
**wherever**
173:20
**whether**
9:17, 11:25, 18:6, 35:10, 37:6, 67:3, 67:22, 74:21, 76:17, 105:5, 138:25, 141:14, 141:21, 142:2, 151:22, 151:23, 151:24, 165:23, 174:9, 182:1, 189:14, 221:10, 221:11, 229:10, 229:16, 236:16, 236:17, 239:9, 240:4, 240:16, 240:17, 245:19, 250:12, 254:2, 255:16, 256:7, 263:7, 263:8, 263:9, 264:10, 264:21, 266:14, 269:16, 278:7, 283:6, 284:10, 287:14, 287:16, 291:3
**white**
182:2, 207:3, 207:4, 211:1, 211:9
**whole**
7:3, 78:13, 119:2, 124:11, 150:19, 172:11, 172:12, 187:2, 188:4, 205:24
**wide**
41:10, 42:4, 179:20, 179:23, 180:25, 181:25, 182:9
**widely**
20:11
**wider**
200:18
**window**
23:24, 24:6, 45:23, 46:1, 195:21
**windows**
23:21, 24:11, 24:12, 110:10
**wing**
168:9, 181:5
**winged**
268:3
**wings**
268:24

**wire**
246:10
**withdraw**
225:10
**within**
15:19, 15:23, 48:2, 58:14, 68:14, 125:3, 132:22, 171:11, 194:24, 194:25, 198:19, 202:6, 210:11, 210:20, 222:24, 292:17
**without**
53:11, 54:7, 68:15, 81:13, 83:10, 97:5, 115:20, 143:18, 159:25, 168:17, 169:10, 175:5, 216:16, 262:22, 264:20, 283:17, 283:21, 284:1, 288:12, 299:4
**witness**
6:23, 10:7, 45:25, 59:14, 59:18, 59:22, 90:11, 90:16, 90:21, 99:14, 108:7, 139:9, 140:21, 154:25, 157:10, 177:6, 177:9, 214:15, 222:12, 244:6, 263:18, 264:4, 264:8, 289:12, 290:5, 299:24, 301:12
**wonder**
60:22
**wonderful**
164:13
**wondering**
57:14, 58:6, 231:7
**wood**
3:12, 6:19
**word**
20:25, 22:5, 32:18, 32:19, 49:11, 50:11, 50:18, 61:3, 61:4, 62:10, 65:16, 70:1, 70:2, 70:5, 71:3, 71:4, 71:8, 72:1, 72:4, 72:19, 75:15, 75:17, 75:24, 79:24, 81:9, 81:13, 81:18, 83:15, 84:16, 84:24, 96:4, 98:2, 98:12, 98:22, 99:8, 101:1, 118:20, 118:22, 127:11, 127:13, 127:14, 130:13, 130:16, 133:20, 137:25, 139:14, 139:21, 139:22, 140:11, 140:15, 141:12, 161:20, 177:8, 182:11, 184:8, 189:22, 190:17, 203:22, 205:21, 213:18, 220:9, 223:7, 224:3, 230:20, 230:21, 243:3, 250:21, 259:2, 259:5, 265:24, 275:16, 278:13, 279:1, 285:13, 289:8
**wording**
97:6, 214:1
**words**
19:12, 21:11, 21:15, 21:18, 47:16, 47:24, 53:13, 53:24, 61:4, 71:3, 76:15, 89:15, 97:8, 97:9, 97:13, 100:3, 111:9, 115:14, 121:8, 121:15, 133:19, 150:24, 151:1, 151:4, 152:4, 157:1, 157:23, 166:21, 167:5, 167:7, 170:14, 170:18, 180:2, 213:6, 213:19, 218:20, 219:2, 220:18, 221:4, 238:3, 251:22, 285:9, 297:19
**work**
9:24, 10:22, 15:22, 16:7, 23:19, 45:3, 51:16, 72:22, 83:5, 94:4, 126:1, 167:2, 180:7, 220:13, 257:5, 257:11
**worked**
14:5, 17:7
**working**
13:25, 14:16, 14:21, 23:17, 84:25, 85:11, 126:19, 248:13, 287:3, 293:18
**works**
108:8, 155:14, 166:19, 231:13, 231:14, 251:5
**world**
157:4
**worry**
193:6
**worst**
267:18
**would've**
38:18, 67:14, 67:15, 94:8, 103:16, 147:21, 162:15
**wouldn't**
32:12, 32:15, 74:8, 75:24, 82:2, 85:1, 85:2, 85:4, 99:23, 175:16, 182:22, 236:24, 244:3, 251:3, 277:2, 277:15, 286:8, 294:7
**write**
38:11, 59:4, 170:10, 216:11, 224:23
**writing**
97:15, 98:18, 223:18
**written**
14:10, 62:15, 75:4, 76:2, 76:5, 76:8, 79:22, 79:23, 113:4, 118:25, 119:23, 120:10, 124:3, 135:12, 159:15, 166:6, 166:12, 166:18, 169:17, 169:18, 169:20, 169:21, 169:24, 175:16, 176:12, 177:21, 216:12, 216:17, 217:5, 285:4
**wrong**
63:10, 70:11, 225:7, 228:22
**wrote**
98:7, 170:13, 170:15, 170:17, 172:2, 184:19

**X**

**x-prime**
95:5
**xs**
194:19
**xyz**
223:24, 223:25

**Y**

**yan**
25:24
**yeah**
33:17, 51:11, 55:8, 60:20, 70:13, 78:22, 90:11, 92:23, 94:2, 104:8, 105:21, 105:22, 106:2, 106:10, 109:12, 109:17, 113:16, 117:7, 119:6, 121:11, 123:4, 138:8, 147:19, 149:4, 149:19, 159:20, 172:3, 185:25, 191:14, 194:15, 195:18, 198:10, 198:19, 205:5, 213:3, 213:6, 215:8, 215:19, 222:1, 222:10, 226:6, 247:19, 253:15, 260:21, 262:5, 263:14, 263:22, 268:16, 276:1, 280:11, 282:13, 284:19, 287:21, 289:12, 290:11
**year**
66:11, 67:17, 256:25, 294:22, 294:24
**year-old**
154:21
**years**
40:20, 45:6, 53:2, 294:11
**yellow**
219:13
**yep**
59:18, 109:7, 180:1
**york**
1:2, 3:15, 6:6
**yourself**
41:19, 41:21, 44:13, 105:17, 156:16
**yury**
24:22

**Z**

**zero**
19:11, 52:10, 124:18, 234:22, 236:10
**zoo**
254:23
**zoom**
2:2, 23:22, 24:8
**zzz**
229:6

**.**

**.1**
57:14, 58:8, 58:13, 59:1, 59:6, 60:10, 60:14, 60:22, 60:24, 60:25, 61:2, 61:3, 61:7

**0**

**00**
108:2
**0005092**
77:24
**01**
254:14
**04**
11:22, 29:18
**051**
191:23
**07**
11:22, 29:18, 282:19
**092**
212:2

**1**

**1**
108:2, 214:19, 214:23
**1,000**
133:16
**10**
4:22, 108:20, 108:24, 109:3, 110:8, 110:11, 111:7, 133:13, 180:25, 193:13, 194:18, 196:3, 196:5, 197:13, 275:21, 289:6, 292:9
**10,962,357**
27:9, 27:21
**100**
56:11, 56:12, 136:23, 142:1, 175:9, 213:13, 213:23, 213:24, 273:21, 285:1, 286:20
**10110**
3:15
**104**
160:6, 160:21
**105**
160:6, 160:16
**109**
4:22
**10962357**
4:16
**11**
4:9, 5:6, 56:4, 97:19, 111:23, 111:25, 112:6, 114:13, 159:8, 159:12, 196:9, 196:12, 198:4
**110**
39:6, 164:21
**111**
5:6, 105:15, 164:22
**113**
71:13
**114**
5:8
**118**
112:23
**119**
113:2, 113:10, 114:21, 114:22, 134:9, 135:13
**12**
5:8, 56:4, 61:25, 71:17, 80:10, 80:15, 111:14, 113:6, 113:10, 113:11, 113:12, 113:22, 114:7, 114:8, 114:11, 115:23, 131:23, 131:24, 132:1, 134:8, 136:7, 138:6, 142:20, 142:22, 143:24, 154:5, 174:22, 174:23, 174:24, 177:16, 177:17, 177:19, 177:23, 185:9, 193:22, 196:3, 196:7, 199:5, 208:21, 208:22, 209:7, 209:8, 209:10, 209:11, 209:12, 210:3, 213:16, 213:17, 244:25, 296:16, 301:13
**120**
104:14, 119:2, 276:7
**121**
276:11
**122**
38:17, 38:19, 39:2, 39:3, 39:16, 39:23, 43:13, 91:22, 92:19, 101:8, 101:12, 101:13, 101:16, 101:18, 119:12, 119:16, 119:19, 162:6,

165:5
**124**
38:17, 39:3, 39:17, 39:19, 41:3, 73:7, 73:13, 91:20, 92:6, 102:14, 104:15, 143:6, 143:9
**125**
91:25, 102:25, 103:4, 103:5
**128**
38:17, 38:23, 39:11, 39:23, 43:14, 44:18, 91:22, 92:20, 101:18
**129**
26:16, 26:19, 27:2, 29:4, 114:14, 215:2, 215:23, 216:3, 216:10, 216:20, 247:11, 273:19, 273:20, 274:13, 282:16, 295:10, 296:1, 296:10, 297:1
**13**
4:11, 5:9, 106:18, 107:21, 135:16, 137:14, 137:18, 138:7, 138:8, 138:20, 139:3, 144:11, 145:3, 146:9, 146:23, 147:9, 149:9, 151:6, 160:9, 160:13, 160:17, 160:21, 160:22, 161:12, 175:12, 175:25, 181:9, 181:13, 181:14, 181:20, 182:13, 197:25, 199:1, 199:18, 199:21, 199:24, 200:8, 204:15, 206:24, 262:3, 262:5, 263:6
**130**
39:11, 39:20, 44:17, 73:7, 73:13, 91:20, 92:6, 102:14
**131**
159:16, 159:20, 160:1, 166:3, 177:15
**132**
171:7, 172:1, 172:8
**133**
282:25
**135**
178:3, 178:13
**1357**
215:23
**136**
179:15
**137**
177:11, 179:6
**138**
179:25, 181:7
**139**
5:9
**14**
1:17, 5:11, 6:9, 68:8, 140:3, 140:5, 140:6, 148:9, 148:13, 149:12, 149:18, 158:5, 158:10, 160:18, 160:24, 161:16, 162:3, 162:11, 171:5, 171:9, 178:19, 225:9, 248:15
**140**
5:11, 151:9, 154:7, 162:7, 164:23, 171:12, 183:18
**141**
183:5
**144**
183:17
**146**
184:22
**14601**
1:25
**15**
5:13, 54:23, 148:9, 148:13, 149:12, 149:14, 149:18, 151:18, 151:19, 152:17, 152:18, 154:3, 158:5, 158:10, 161:17, 162:3, 171:19, 172:6, 175:12, 175:25, 178:19, 199:1, 210:5, 210:6, 225:11, 225:12, 225:13, 231:8
**150**
154:21
**153**
186:17
**154**
185:10
**16**
5:15, 25:23, 62:1, 227:22, 227:24, 228:2, 252:8, 262:25, 279:15, 288:9, 297:15, 297:18
**160**
149:9
**164**
162:5, 164:23, 165:4
**165**
164:23, 165:7
**1676**
1:7, 6:6
**169**
59:1
**17**
5:17, 33:3, 70:3, 241:10, 241:12, 241:15, 244:8
**177**
68:22, 69:2, 69:4
**18**
4:12, 5:19, 247:25, 248:1, 254:10, 254:11, 271:6
**1800**
87:4
**183**
60:13
**186**
105:14, 105:17, 105:20, 107:18, 186:22, 187:6
**187**
92:21, 116:6, 116:12, 118:17, 119:8, 160:15, 160:20, 162:6, 191:9, 192:7, 192:9, 253:20
**188**
92:21, 116:12, 164:25, 191:10, 253:21
**189**
192:4, 211:20, 211:25, 212:17, 212:20
**19**
66:1, 165:14, 166:22, 214:19
**190**
212:18, 212:19, 212:20, 213:5
**191**
59:3, 212:20
**1988**
66:4
**1990**
3:5
**1998**
294:6
**1999**
294:7

**1:**
1:7, 6:6
**1a**
113:2, 234:8
**1e**
183:21

**2**

**2**
244:8, 244:12
**2,200,000**
19:20
**20**
14:11, 19:25, 71:20, 181:24, 182:9, 213:24
**200**
40:20, 154:21
**2000**
67:14
**20006**
3:7
**2002**
295:1
**2004**
77:24, 77:25
**2007**
295:4, 295:9
**2010**
25:2
**2012**
241:12
**2013**
25:23
**202**
3:8, 213:10
**2020**
24:21, 25:2
**2021**
27:10
**2024**
10:1, 13:20, 114:13
**2025**
1:16, 6:8, 11:22, 29:18, 63:25, 108:24, 112:3, 247:25, 301:14
**2026**
301:15
**212**
3:16
**217**
284:8
**22**
1:7, 6:6
**225**
5:13
**228**
5:15
**23**
34:10, 86:9, 106:9
**24**
4:14, 59:24, 89:10, 95:17, 106:9, 133:13, 187:2
**241**
5:17
**248**
5:19
**25**
4:15, 64:14, 65:8
**26**
64:14, 64:16, 64:17, 64:24, 64:25, 65:11
**260**
12:3
**27**
244:12
**271**
61:6
**272**
61:6
**277**
201:6, 201:9
**279**
207:23
**28**
4:16, 108:20, 248:22
**283**
122:12, 122:21
**290**
4:4
**293**
121:20
**297**
4:3
**2a**
138:23
**2d**
208:1, 208:19
**2nd**
6:8

**3**

**3**
300:4, 300:5
**30**
27:10, 45:6, 130:17
**300**
40:20
**301**
1:24
**302**
79:4, 104:8
**304**
79:4, 104:10
**31**
214:23, 271:7, 288:9
**312**
104:20
**319**
3:16
**333**
70:6
**346**
216:21, 219:21, 219:22
**349**
240:12
**35**
191:23, 271:22, 271:23
**356**
216:13, 216:14, 216:24
**357**
26:19, 27:2, 27:25, 28:22, 29:4, 247:8, 260:3, 260:17, 284:5, 284:11, 284:24, 284:25, 292:15, 296:1, 296:15, 296:17, 296:25
**37**
110:17
**376**
86:1
**3846**
3:8
**387**
232:17, 232:25
**39**
60:3
**392**
234:6
**393**
240:6
**394**
238:6
**3d**
1:7, 5:14, 6:4, 99:18, 100:6, 158:7, 164:25, 229:18, 229:19, 256:16, 258:5
**3rd**
24:21, 25:2

**4**

**4/7/25**
4:10, 4:23, 5:20
**400**
3:8
**41**
80:11, 80:14, 96:16
**42**
80:11
**420**
3:6
**426**
241:25, 242:11

**438**
231:10, 231:24
**439**
231:12
**44**
248:16, 248:17
**443**
229:24
**45**
108:5, 112:22, 187:20, 243:23, 258:7, 272:19
**457**
216:21, 220:21
**46**
62:25, 71:6, 113:18, 113:19, 135:13, 159:8, 217:3, 217:4, 217:12
**4755**
3:16
**48**
63:1
**4a**
127:8, 127:16, 127:19, 128:14, 128:23, 128:25, 129:11, 129:24, 144:13, 144:14, 144:16, 144:20, 144:24, 146:1, 197:8, 197:22, 203:22, 204:5
**4b**
127:8, 127:24, 128:24, 128:25, 129:17, 129:25, 130:8, 132:23, 144:13, 144:14, 144:20, 144:23, 146:1, 197:8, 197:16, 197:20, 204:6, 204:7
**4c**
144:13, 144:14, 144:23, 197:8, 197:10

**5**

**5/7/25**
4:20, 5:16
**50**
3:14, 12:13, 45:6, 71:9, 180:24, 223:20, 224:4
**500**
3:13
**51**
159:16, 244:20, 276:8
**52**
46:12, 108:16, 248:22
**53**
171:8, 249:21, 249:24, 250:14, 254:13
**54**
300:4, 300:5
**543**
201:17
**544**
122:3
**545**
123:20, 124:5, 124:6
**548**
57:23, 58:4
**55**
271:7
**56**
68:6, 68:7, 178:13
**57**
4:17, 159:12, 217:4, 217:12
**585829**
1:23
**59**
252:11, 271:11, 271:12
**5a**
159:21, 159:22, 160:2, 160:4, 274:6
**5e**
183:4

**6**

**60**
64:20, 71:2, 128:21
**62**
30:7, 30:10, 46:13, 46:15, 70:16, 216:21, 217:4, 217:12
**626**
37:17, 104:22, 132:7, 281:5
**63**
33:2
**64**
4:19, 47:11
**65**
50:22
**650**
288:12
**656**
20:2, 20:15, 25:16, 27:2, 29:3, 33:15, 33:19, 34:3, 38:12, 66:21, 69:14, 69:18, 69:20, 79:1, 79:17, 79:21, 81:8, 81:15, 84:4, 84:14, 91:12, 92:19, 95:24, 95:25, 96:13, 97:3, 98:15, 103:6, 103:13, 103:17, 104:14, 106:18, 109:15, 109:19, 113:3, 113:13, 116:7, 116:22, 119:20, 119:24, 120:1, 141:16, 143:11, 149:3, 149:4, 152:19, 152:20, 164:6, 166:5, 171:17, 172:6, 178:5, 186:16, 196:24, 197:4, 197:23, 198:1, 198:25, 199:18, 199:19, 203:18, 206:24, 211:25, 214:1, 214:10, 215:9, 215:22, 215:23, 215:24, 215:25, 243:5, 253:7, 253:11, 253:17, 253:18, 255:12, 255:19, 260:24, 262:3, 263:6, 266:1, 266:6, 266:13, 279:18, 280:3, 280:8, 281:17, 281:22, 292:16, 293:5, 295:9
**66**
55:13, 61:11
**67**
62:17, 216:21, 217:4, 217:13, 297:16, 297:22
**6d**
244:19

**7**

**7**
1:17, 6:9
**7,768,656**
24:20
**70**
46:8, 58:25, 289:16
**71**
263:1, 264:19, 264:24, 265:5, 266:8, 267:1, 269:10
**72**
268:5
**75**
60:13, 270:21,

271:2, 273:2
**76**
85:24
**77**
4:21, 34:7, 86:5, 86:8, 86:10, 101:22, 102:5, 117:5
**7768656**
4:14
**79**
86:12, 89:10, 92:24, 102:21, 102:22, 103:10
**7th**
11:15, 17:23, 63:24, 102:5, 108:24, 112:3, 140:18, 227:24, 244:16, 246:24, 252:11, 297:15

**8**

**8**
59:24, 60:3
**8,224,046**
241:12
**8,488,129**
25:22
**80**
48:22, 67:6, 67:9, 67:19, 86:14, 87:9, 95:3
**8224064**
5:17
**83**
288:8, 288:9
**84**
198:15, 198:21, 198:22
**8488129**
4:15, 25:21
**85**
66:12
**88**
66:2, 66:3

**9**

**9**
108:16
**90**
48:22, 67:13, 268:9, 272:10, 272:16, 293:18, 293:19, 293:21, 294:2
**92**
279:21
**95**
110:17, 110:22
**98**
294:3
**99**
54:14, 294:3
**99.9999**
48:25