UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ARTEC EUROPE S.À.R.L.,

                          Plaintiff,

             -against-

SHENZHEN CREALITY 3D TECHNOLOGY CO.,
LTD., and SHENZHEN JIMUYIDA TECHNOLOGY
CO., LTD.,

                          Defendants.
------------------------------------------------------------------x

**MEMORANDUM AND ORDER**
22-CV-01676 (OEM) (CHK)

ORELIA E. MERCHANT, United States District Judge:

On March 25, 2022, Plaintiff Artec Europe S.À.R.L. ("Plaintiff") commenced this patent

infringement action against Defendants Shenzhen Creality 3D Technology Co., Ltd. ("Creality")

and Shenzhen Jimuyida Technology Co. Ltd. ("Jimuyida") (collectively, "Defendants"). Plaintiff

alleges that Defendants infringed upon its patented three-dimensional ("3D") scanning technology.

*See* Second Amended Complaint, Dkt. 106 ("Second Amended Complaint or "SAC").

Before the Court is Plaintiff's fully briefed motion to preclude the testimony of Defendants'

damages expert, Adam Falconer,[1] and Defendants' fully briefed motion to preclude the testimony

of Plaintiff's damages expert, Christopher DeBaere.[2] For the following reasons, Plaintiff's Motion

---

[1] *See* Notice of Motion to Preclude Testimony of Adam Falconer, Dkt. 165 ("Plaintiff's Motion" or "Pl.'s Mot."); Memorandum of Law in Support of Plaintiff Artec Europe's *Daubert* Motion to Preclude Adam Falconer's Expert Testimony, Dkt. 168-5 ("Pl.'s Mem."); Defendants' Opposition to Artec Europe's *Daubert* Motion to Preclude Adam Falconer's Expert Testimony, Dkt. 178-5 ("Defs.' Opp'n"); Reply Memorandum in Support of Artec Europe's *Daubert* Motion to Preclude Adam Falconer's Expert Testimony, Dkt. 168-16 ("Pl.'s Reply").

[2] *See* Defendants' Notice of Motion to Exclude the Opinions and Testimony of Christopher DeBaere, Dkt. 157 ("Defendants' Motion" of "Defs.' Mot."); Memorandum of Law in Support of Defendants' Motion to Exclude the Opinions and Testimony of Christopher DeBaere, Dkt. 178-1 ("Defs.' Mem."); Memorandum in Opposition to Defendants' Motion to Exclude the Opinions and Testimony of Christopher DeBaere, Dkt. 168-9 ("Pl.'s Opp'n"); Reply Memorandum in Support of Artec Europe's *Daubert* Motion to Preclude Adam Falconer's Expert Testimony, Dkt. 168-16 ("Defs.' Reply").

to preclude the testimony of Adam Falconer is granted, and Defendants' Motion to preclude the

testimony of Christopher DeBaere is denied.

## LEGAL STANDARDS

### A. Admissibility of Expert Testimony

Federal Rule of Evidence 702 ("Rule 702") governs the admissibility of expert testimony.

It provides that a person "qualified as an expert by knowledge, skill, experience, training, or

education" may offer opinion testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. "It is a well-accepted principle that Rule 702 embodies a liberal standard of

admissibility for expert opinions . . . ." *Nimely v. City of New York,* 414 F.3d 381, 395 (2d Cir.

2005). "The proffering party bears the burden of establishing admissibility under Rule 702 by

showing that (1) the expert is qualified; (2) the proposed opinion is based on reliable data and

methodology; and (3) the proposed testimony would be helpful to the trier of fact, but the district

court serves as the 'ultimate gatekeeper' against unreliable expert testimony." *Red Hawk, LLC v.*

*Colorforms Brand LLC*, 638 F. Supp. 3d 375, 380 (S.D.N.Y. 2022) (quoting *United States v.*

*Williams*, 506 F.3d 151, 160 (2d Cir. 2007)). In addition to the indicia of reliability identified in

Rule 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), identifies several

factors bearing on reliability that district courts may consider, such as:

> (1) whether a theory or technique has been or can be tested; (2) "whether the theory or technique has been subjected to peer review and publication;" (3) the technique's "known or potential rate of error" and "the existence and maintenance of standards controlling the technique's operation;" and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.

*Williams*, 506 F.3d at 160 (quoting *Daubert,* 509 U.S. at 593-94).

### B. The "Reasonable Royalty" Standard

In a suit for patent infringement, a successful plaintiff is entitled to damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interests and costs as fixed by the court." 35 U.S.C. § 284. A "reasonable royalty" is damages "based upon a hypothetical negotiation between the patentee and the infringer when the infringement began." *Unisplay*, *S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995).[3] The seminal case *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, set forth a comprehensive list of factors "relevant, in general, to the determination of the amount of a reasonable royalty for a patent license." 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); *see also Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) ("This court has sanctioned the use of the *Georgia-Pacific* factors to frame the reasonable royalty inquiry. Those factors properly tie the reasonable royalty calculation to the facts of the hypothetical negotiation at issue.").[4] Damages experts frequently consider the factors as a part of a reasonable royalty analysis, but the Federal Circuit does not require them to do so. *See Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012) ("We do not require that witnesses use any or all of the *Georgia-Pacific* factors when testifying about damages in patent cases. . . . Expert witnesses should concentrate on *fully* analyzing the *applicable* factors, not cursorily reciting all fifteen.").

A damages expert's reasonable royalty analysis is subject to the reliability standards of Rule 702 and *Daubert*. *See, e.g.*, *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852-56 (Fed.

---

[3] "A district court must . . . follow Federal Circuit precedent in a case arising under the patent laws." *Foster v. Hallco Mfg. Co.*, 947 F.2d 469, 475 (Fed. Cir. 1991).

[4] The Court only addresses the *Georgia-Pacific* factors applicable to the present Motions and therefore does not outline all fifteen factors herein.

3

Cir. 2010).  Further, "[t]o be admissible, expert testimony opining on a reasonable royalty rate must 'carefully tie proof of damages to the claimed invention's footprint in the market place.'" *Uniloc*, 632 F.3d at 1317 (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)).

**DISCUSSION**

The Court assumes the parties' familiarity with the procedural history, prior filings, proceedings, and orders.  Additionally, the Court assumes the parties' familiarity with the relevant patents owned by Plaintiff: U.S. Patent 7,768,656, *see* SAC, Exhibit A, Dkt. 106-1 ("'656 Patent"), U.S. Patent 8,488,129, *see* SAC, Exhibit B, Dkt 106-2 ("'129 Patent"), and U.S. Patent 10,962,357, *see* SAC, Exhibit C, Dkt. 106-3 ("'357 Patent") (collectively, "Asserted Patents").  The Court also assumes the parties' familiarity with the allegedly infringing products ("Accused Products").  *See* SAC ¶¶ 3, 4.

**A. Plaintiff's Motion to Preclude the Expert Testimony of Adam Falconer**

Plaintiff moves to preclude the testimony of Defendants' damages expert, Adam Falconer ("Falconer"), thereby asserting that Falconer's reasonable royalty analysis is not based on reliable principles and methods.  In support of this contention, Plaintiff argues that Falconer improperly relies on a cooperation agreement between the Defendants, Creality and Jimuyida, to arrive at his reasonable royalty baseline figure.  *See* Pl's Mem. at 9-11; Declaration of Richard de Bodo in Support of Plaintiff Artec Europe's *Daubert* Motion to Preclude Adam Falconer's Expert Testimony ("de Bodo Decl."), Exhibit C, Dkt. 168-8 ("Cooperation Agreement").  The Cooperation Agreement, according to Plaintiff, "is neither technically nor economically comparable to the patent licenses that would be negotiated during the hypothetical negotiation." Pl's Mem. at 9.  Defendants assert that Plaintiff misrepresents this aspect of Falconer's analysis

4

because Falconer "simply did not select" his reasonably royalty baseline from the Cooperation Agreement.  Defs.' Opp'n at 7.

The second *Georgia-Pacific* factor contemplates the review of "[t]he rates paid by the licensee for the use of other patents comparable to the patent in suit."  318 F. Supp. at 1120. Comparable license valuations "may be the most effective of method of estimating [an] asserted patent's value." *Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys. Inc.*, 809 F.3d 1295, 1303-4 (Fed. Cir. 2015).  "When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012).  Rather, experts "must account for differences in the technologies and economic circumstances of the contracting parties." *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010).

Here, Falconer's reasonable royalty analysis is based on the Defendants' uncomparable Cooperation Agreement and is therefore fundamentally flawed.  As Falconer notes, the Cooperation Agreement reflects a collaboration and supply agreement between the Defendants that was entered into "regarding launching the Accused Products."  De Bodo Decl., Exhibit A ¶ 134, Dkt. 168-6 ("Falconer Report.").  After referencing the Cooperation Agreement, Falconer admits that "Defendants have not entered into any arrangements taking or giving a license to patent assets technically comparable to the [Asserted Patents]." *Id.* ¶ 142.  Falconer further admits that the Cooperation Agreement "may not be instructive in the quantification of a reasonable royalty rate." *Id.* ¶ 143.  However, Falconer uses the profit-sharing payments made by Creality to Jimuyida under the Cooperation Agreement as the sole determinant of a "baseline" reasonable royalty by Creality and as a critical input to the "baseline" rate payable by Jimuyida. *See* Falconer Report, Exhibit 5, Dkt. 168-6 ("Falconer Report Exhibit 5); Falconer Report, Exhibit 7, Dkt. 168-

6 ("Falconer Report Exhibit 7); Falconer Report, Exhibit 8, Dkt.168-6 ("Falconer Report Exhibit 8").

Defendants' attempt to conceal Falconer's flawed analysis merely exposes it.  Defendants state that

> [a]s part of his reasonable royalty analysis, [Falconer] quantified the baseline royalty . . . in connection with his discussion of *Georgia-Pacific* factors 8 and 11, analyzing "[t]he established profitability of the product made under the patent; its commercial success; and its current popularity" and '[t]he extent to which the infringer has made use of the invention; and any evidence probative of the value of that use," respectively.

Opp'n at 7 (quoting Falconer Report ¶ 167).  In considering those factors, Falconer analyzes a Creality "profit and loss" statement which indicates that there is "profit sharing paid to suppliers." *Id.* at 7 (quoting Falconer Report ¶ 172).  Falconer thereby opines that the profit sharing paid to suppliers provides "a reasonable benchmark (or starting point) to develop third-party participation for the Accused Products, on the basis of profit sharing paid as a portion of (adjusted) incremental profit."  Falconer Report ¶ 172; *see* Falconer Report, Exhibit 5 at REF 15, Dkt. 168-6 ("P&L Statement").  Accordingly, Defendants contend that Falconer

> did not resort to using royalty figures from the Cooperation Agreement to select a baseline royalty for his damages calculation without establishing the economic and technical comparability of such agreement.  Rather, [Falconer] employed a damages methodology that was premised on selecting a baseline royalty from actual financial figures concerning sales of the Accused Products directly from Creality's P&L Statement.

Opp'n at 8.

Although Defendants claim that Falconer "did not resort to using royalty figures from the Cooperation Agreement," *id.*, the "profit sharing paid to suppliers" on which Falconer relies is the same as the payment from Creality to Jimuyida pursuant to the Cooperation Agreement.  That is because the only supplier contemplated in the P&L Statement is Jimuyida, and Creality's

6

designated witness confirmed that the "profit-sharing line" in the P&L statement reflects the Cooperation Agreement's profit-sharing between Creality and Jimuyida. *See* de Bodo Decl., Exhibit D at 159:23-160:17, 168:4-7, Dkt. 168-17 ("Luo Deposition Excerpts"). Even Falconer himself acknowledges that the "suppliers" noted in the P&L Statement are Jimuyida. Falconer Report ¶ 142 ("Exhibit 5 hereto shows a profit sharing account paid to suppliers (Jimuyida) representing [a percentage of] sales revenues.").

Therefore, despite his statement that the Cooperation Agreement is not instructive in the quantification of a reasonable royalty rate, *id.* ¶ 143, Falconer utilizes it to form the baseline of his reasonable royalty analysis. This reliance on an uncomparable agreement, which does not disclose any royalty rate, *see* Cooperation Agreement, and does not account for the technical and economic circumstances of the hypothetical negotiation, *see* Falconer Report ¶ 142, demonstrates that Falconer's analysis is foundationally flawed in violation of Rule 702, *see* FED. R. EVID. 702 (requiring that an expert's opinion be "based on sufficient facts or data" and be the "product of reliable principles and methods"). Falconer's damages opinion is therefore inadmissible. *See MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1368 (Fed. Cir. 2021) (affirming the exclusion of an expert opinion under Rule 702 that "rest[ed] on an inference from [a] most favored customer clause that goes well beyond what the clause implie[d]" in an agreement that did not disclose a royalty rate); *On Track Innovations, Ltd. v. T-Mobile USA, Inc.*, 106 F. Supp. 3d 369, 417 (S.D.N.Y. 2015) (rejecting the use of "a non-party's unconsummated offer for a *potentially* similar product" as "evidence for an expert's reasonable royalty analysis" and finding that "[s]uch underpinnings fail to meet Rule 702's foundational requirement that such opinions be based on sufficiently reliable facts or data").

The Court recognizes that the "issue of [license] comparability is often one of sufficiency of the evidence, not admissibility." *Bio-Rad Lab'ys Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1373 (Fed. Cir. 2020). However, degree of license comparability is not at issue here, as the baseline reasonable royalty figure established by Falconer is not even derived from a comparable license, but rather from a Cooperation Agreement that is "untethered from the patented technology at issue and [any] licenses thereto and, as such, [it is] arbitrary and speculative." *LaserDynamics*, 694 F.3d at 81; *see also Allen Archery, Inc. v. Browning Mfg. Co.*, 898 F.2d 787, 790 (Fed. Cir. 1990) (rejecting agreements between related parties as establishing a royalty rate because the transactions were not arms-length). Further, "[b]eginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion." *Uniloc*, 632 F.3d at 1317. Such is the case here, as Falconer's entire damages analysis stems from his flawed reasonable royalty baseline figure. *See* Falconer Report Exhibit 5; Falconer Report Exhibit 7; Falconer Report Exhibit 8.

Accordingly, Plaintiff's Motion to exclude the expert testimony of Falconer is granted. *See EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1345-46 (Fed. Cir. 2025) (finding abuse of discretion where a district court denied a motion to exclude a damages expert's royalty rate testimony, as "a fundamental premise of [the expert's] testimony . . . was not based on sufficient facts or data").

**B. Defendants' Motion Preclude the Expert Testimony of Christopher DeBaere**

Defendants move to preclude the opinions of Plaintiff's damages expert, Christopher DeBaere ("DeBaere"), regarding the appropriate measure of damages for the '656 Patent and the '357 Patent. *See generally* Defs.' Mem.

8

### 1. DeBaere's '656 Patent Opinions

Defendants contend that DeBaere's opinions regarding a reasonable royalty rate for the '656 Parent are impermissibly speculative and should therefore be excluded. *See* Defs.' Mem. at 3-16. In support of this contention, Defendant argues that DeBaere (1) wrongly bases his royalty on Defendants' customers' alleged cost savings rather than cost savings related to the patented invention; (2) unreliably opines on the alleged benefits of the '656 Patent; and (3) wrongly relies on arbitrary and speculative assumptions when conducting his cost-savings calculations. *Id.*

First, Defendants argue that DeBaere's cost savings methodology "is premised on the unreliable principle that Defendants' financial benefit from practicing the '656 Patent, and thus the amount they would be willing to pay for infringement, is equivalent to the financial benefit including time savings purportedly enjoyed by Defendants' customers." Defs.' Mem. at 7. Plaintiff asserts that Defendants mischaracterize DeBaere's opinion regarding customer cost savings, and that DeBaere's "reasonable royalty analysis considers, as it should, the actual measurable value attributable to the patented technology." Pl.'s Opp'n at 7-8.

Defendants indeed mischaracterize DeBaere's cost savings analysis. *Georgia-Pacific* factor nine concerns "[t]he utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results." 318 F. Supp. at 1120. *Georgia-Pacific* factor ten contemplates "[t]he nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention." *Id.* Tethering his reasonable royalty analysis of the '656 Patent to *Georgia Pacific* factors nine and ten, DeBaere analyzes the benefits attributable to the patent, specifically how it "provides for highly accurate scanning without the requirement for targets to be placed on scanned objects." Declaration of Charles Wizenfeld in Support of Defendants'

9

Motion to Exclude the Opinions and Testimony of Christopher DeBaere ("Wizenfeld Decl."), Exhibit A ¶ 191, Dkt. 173-1 ("DeBaere Report").  Such benefits, according to DeBaere, include monetary savings that result from not needing to purchase targets and time savings from not needing to apply, troubleshoot, and remove them.  *See id.* ¶ 191-92.  Both Plaintiff and Defendants market their 3D scanning products as having such cost-saving advantages.  *See id.* ¶¶ 196, 198, 199.  DeBaere further states that he is "not aware of any available, acceptable non-infringing alternatives that provide the same benefits and methods described by the '656 Patent," and as such, "the hypothetical negotiation the parties would consider the advantages and benefits offered by the '656 Patent, including, but not limited to, performance benefits and the ability to achieve highly accurate scanning without the use of targets."  *Id.* ¶ 202.

Contrary to Defendants' argument that DeBaere unreliably bases his reasonable royalty "on the purported benefit enjoyed by an end user of the [Accused Products] in lieu of the benefit received by [Defendants]," Defs.' Mem. at 7, DeBaere does not equate customer cost savings and Defendants' financial benefit from practicing the '656 Patent.  Rather, DeBaere reduces the cost savings range by applying Defendants' estimated profit margins on its sale of the Accused Products and then considers the profit-adjusted range in conjunction with other *Georgia-Pacific* factors.  *See* Debaere Report ¶¶ 228-29.  Moreover, given the parties' marketing of target-free scanning as a differentiating feature of their products, *see* DeBaere Report ¶¶ 196, 198, 199, a consumer's cost savings provides an indication of the economic value of the patent in the marketplace and is therefore an appropriate input for the '656 Patent's reasonable royalty analysis, *see Uniloc*, 632 F.3d at 1317 (requiring a damages expert's reasonable royalty opinion to "carefully tie proof of damages to the claimed invention's footprint in the market place" (quoting *ResQNet.com*, 594 F.3d at 869)).

Second, Defendants contend that DeBaere's "opinions based on the cost savings to the end user associated with the purported benefit of the '656 Patent of 'target-free scanning,' should be excluded for the additional reason that [he] fails to isolate the value attributable to Defendants' practice of the '656 Patent and exclude the value attributable to the unpatentable features." Defs.' Mem. at 9. Plaintiff asserts that Defendants' position is legally flawed and that DeBaere's analysis nevertheless accounts for non-infringing alternatives. Pl.'s Opp'n at 15-16.

Defendants' argument is unavailing. The cost savings analysis DeBaere utilizes accounts for non-infringing alternatives by considering Plaintiff's marketing in the ordinary course of business, and the marketing itself considers cost savings over available alternative products. *See* DeBaere Report ¶ 219. Further, based on his analysis of the market and his discussions with Plaintiff's technical expert and Plaintiff's Chief Experience Officer,[5] DeBaere states that target-free scanning is a benefit of the '656 Patent and that he is "not aware of any *available, acceptable non-infringing* alternatives that provide the same benefits and methods described by the '656 Patent." *Id.* ¶ 202 (emphasis added). DeBaere's statement that "other *non-target* alternatives" exist, *id.* ¶ 192 (emphasis added), does not undermine his consideration of available alternative products or his conclusion "that there are no non-infringing alternatives to the '656 Patent that provide comparable performance," *id.* ¶ 219. Defendants' disagreement with DeBaere's conclusion that there are no comparable non-infringing alternatives is a matter of weight, not admissibility. *See RSB Spine, LLC v. DePuy Synthes Sales, Inc.*, 19-1515-RGA, 2022 WL 17084156, at *4 (D. Del. Nov. 18, 2022) ("The existence of alternative products may affect some

---

[5] DeBaere's reliance on input from these individuals is proper. *See, e.g., PRCM Advisers LLC v. Two Harbors Invest. Corp.,* 20-CV-5649 (LAK) (BCM), 2025 WL 1276513, at *26 (S.D.N.Y. May 2, 2025) (denying motion to exclude where expert spoke with personnel "regarding how they actually used the IP" at issue); *Butler v. Suffolk County.,* 1 l-CV-2602(JS)(ST), 2025 WL 417777, at *4 (E.D.N.Y. Feb. 6, 2025) ("[E]xperts often rely *on facts and data* supplied by third parties, including other experts." (quoting *Jung v. Neschis*, 01 Civ. 6993(RMB)(THK), 2007 WL 5256966, at *16 (S.D.N.Y. Oct. 23, 2007))).

of the fifteen [*Georgia-Pacific*] factors, but the entire possibility of an award does not turn on the alternative's existence."); *Amorgianos v. Nat'l R.R. Passenger Corp*, 303 F.3d 256, 267 (2d Cir. 2002) ("Where an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support may 'go to the weight, not the admissibility' of the expert's testimony." (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)).

Finally, Defendants challenge DeBaere's cost-savings calculations, thereby asserting that the figures DeBaere utilizes for time savings per object and number of scans over the lifetime of a scanner are speculative and arbitrary. Def.'s Mem. at 11-16. Plaintiff argues that the figures used by DeBaere are properly supported and that any criticisms go to the weight of his opinion, not admissibility. Pl.'s Opp'n at 11-15.

Both inputs are sufficiently reliable. The first input in DeBaere's calculation of cost savings for the '656 Patent's target-free scanning benefit is the time it takes to apply targets and remove targets from an object being scanned. *See* DeBaere Report ¶¶ 222-23. In this portion of the analysis, DeBaere reviews one of Plaintiff's internal documents which concerns the target-free scanning of two large objects: a motorbike and an engine body. *Id.* ¶ 221. The document indicates the amount of time it takes to apply and remove target stickers for each object. *Id.* However, noting that "certain objects may be smaller or simpler," DeBaere reduces his average time savings per scan in relation the times for the motorbike and engine. *Id.* ¶ 223. DeBaere also confirms that his time savings input is consistent with his discussions with Plaintiff's Chief Experience Officer, "who indicated a general range of time savings." *Id.* ¶ 223 n.457. Given DeBaere's clearly articulated reasoning for the average time savings figure at which he arrives, Defendants' argument that this figure is without basis and the result of a speculative assumption is unavailing. *See* Defs.' Mem. at 11. Defendants' critique of DeBaere's average time savings figure and its asserted

"failure to account for the vast differences" in the Accused Products and their corresponding time savings goes to the weight that should be accorded DeBaere's opinion, not its admissibility, *see Amorgianos*, 303 F.3d at 267.

The second input in DeBaere's cost-savings analysis is the number of scans over the lifetime of a scanner. *See* DeBaere Report ¶ 225 ("[T]he target and operator cost . . . do not reflect the total value of cost savings, as users of the Accused Products would be expected to perform multiple scans over the life of product."). Contrary to Defendants' assertion that DeBaere "simply 'plucked' the . . . use figure out of nowhere with no explanation for doing so," Defs.' Mem. at 15, DeBaere explains that his use figure is based on the ratios of rental rates to list prices of various 3D scanners for which such information was available, DeBaere Report ¶ 225. As DeBaere notes, "[f]rom an economic perspective, dividing the scanner price by the rental rate provides an indication of the minimum number of uses of the product. *Id.* ¶ 225 n.459. His rental rate analysis "includes products sold by [Plaintiff], Defendants, and third parties," and thereby provides "a reliable indication of the number of scans by typical customers." *Id.* Further, the use figure he arrives at "was consistent with[] the low end of the range of uses implied by rental rates for 3D scanners." *Id.* ¶ 225. Given DeBaere's reasonable explanation for his use of rental pricing data as a proxy for scanner use, Defendants' criticism goes the weight of his opinion, not its admissibility. *See Amorgianos*, 303 F.3d at 267.

Accordingly, Defendants' Motion to exclude the DeBaere's expert testimony as to the '656 Patent is denied. *See Summit 6, LLC v. Samsung Elec. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) ("[W]here the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder.").

13

## 2. DeBaere's '357 Patent Opinions

Defendants also move to exclude DeBaere's reasonable royalty analysis for the '357 Patent on multiple grounds, most notably for the reason that DeBaere improperly relies on a price increase for one of Plaintiff's products as a "starting point" for the measuring the patent's value. *See* Defs.' Mem. at 18-22. Plaintiff argues that "DeBaere's reasonable royalty analysis for the '357 Patent is based on reliable facts and methodology." Pl.'s Opp'n at 16.

DeBaere's reasonable royalty analysis for the '357 Patent is based on the benefit of improved computing efficiency and scan performance from the claimed "data discarding" feature. *See* DeBaere Report ¶ 205. DeBaere's analysis proceeds from the assumption that the '357 Patent is embodied in a feature of Plaintiff's Leo scanner ("Leo") known as "Project Size Optimizer," which is necessary to enable another feature of the Leo known as "HD Mode." *Id.* ¶¶ 205-07. To determine a reasonable royalty for the '357 Patent, DeBaere measures the value of the '357 Patent's claimed data discarding feature using a price increase of the Leo, which purportedly coincided with the launch of Leo's Project Size Optimizer and HD Mode features. *Id.* ¶¶ 242-45; *see id.* ¶ 245 (stating that the Leo price increase "provides a starting point for analyzing the incremental economic value attributable to the features offered by the '357 Patent," which is "embodied in the [Leo's] Project Size Optimizer feature"). Defendants contend that "DeBaere's reliance on the . . . price increase of the Leo product as a benchmark for measuring the value of the claimed data discarding feature is unreliable for at least two separate reasons." Defs.' Mem. at 18. The Court addresses each argument in turn.

First, Defendants assert that DeBaere's analysis is speculative and unsupported in assuming that the Leo's features practice the '357 Patent. *Id.* at 18-20. Specifically, Defendants argue that DeBaere is not qualified to render an expert opinion on that matter, and that Plaintiff's technical

14

expert, Dr. Iman Sadeghi ("Dr. Sadeghi"), does not offer opinions on which DeBaere can rely on to support that assumption. *Id.* Plaintiff claims that "there is extensive evidence establishing that the Leo scanner practices the '357 Patent" and asserts that it will produce at trial "foundational witnesses," including Dr. Sadeghi and two of its employees, who will testify concerning practice of the '357 Patent by the Leo product. Pl.'s Opp'n at 23-25.

Defendants' argument is unavailing. DeBaere, who is not a technical expert, bases his understanding of the Leo's practice of the '357 Patent on discussions with Dr. Sadeghi and Plaintiff's Chief Experience Officer and '357 Patent inventor, Sergey Sukhovey ("Sukhovey"). *See* DeBaere Report ¶¶ 246, 248. He also bases his understanding of the Leo's practice of the '357 Patent on his review of Plaintiff's discovery responses. *See id.* ¶ 187 n.368. Although it is undisputed that Dr. Sadeghi did not offer in his expert report that the Leo scanner practices the asserted claims of the '357 Patent , *see* Defs.' Mem. at 19; Pl.'s Opp'n at 23 n.23, it is nonetheless permissible for DeBaere to rely on his opinion regarding that issue provided that other witnesses testify to the foundational facts. *See Oracle Am. Inc. v. Google Inc.*, C 10-03561 WHA, 2011 WL 5914033, at *1 (N.D. Cal. Nov. 28, 2011) ("Both [damages] experts relied on [defendant's] non-infringement experts, interviews with [defendant's] employees, and documentary evidence for the technical points. Expert reliance on foundational facts supplied by [defendant's] engineers can be proper so long as they testify to the foundational facts with firsthand knowledge."); *MicroVention, Inc. v. Balt USA, LLC*, 8:19-cv-01335-JLS-KES, 2022 WL 4596647, at *8 (C.D. Cal. Aug. 24, 2022) (declining to exclude a damages expert's reasonable royalty testimony that a particular procedure produces non-infringing products so long as the defendant laid a foundation for the jury to reach that conclusion). To the extent that Defendants take issue with Plaintiff's employees testifying to the foundational facts concerning the Leo's practice of the '357 Patent, *see* Defs.'

Reply at 7-8, such an objection "'go[es] to the weight of the evidence rather than the admissibility of [DeBaere's] testimony and analysis,' and may be adequately addressed through cross-examination or the proffering of further scientific evidence," *Microvention*, 2022 WL 4596647, at *5 (quoting *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1221 (Fed. Cir. 2006)).

Defendants rely on *Centricut, LLC v. Esab Group, Inc.*, 390 F.3d 1361 (Fed. Cir. 2004), and *Finjan, Inc. v. Blue Coat Systems, Inc.*, 13-cv-03999-BLF, 2015 WL 4129193 (N.D. Cal. July 8, 2015), for the proposition that Dr. Sadeghi's failure to provide an opinion on the Leo's practice of the '357 Patent renders DeBaere's analysis inadmissible. *See* Defs.' Mem. at 19. Neither case, however, supports Defendants' position. In *Centricut*, the Court held "that in a case involving complex technology, where the accused infringer offers expert testimony negating infringement, the patentee cannot satisfy its burden of proof by relying only on testimony from those who are admittedly not expert in the field." 390 F.3d at 1370. That is not the situation here, as DeBaere is a damages expert who is not opining on matters of infringement. *Finjan* is also distinguishable in that the court in that case did not exclude the testimony of a damages expert. *See* 2015 WL 4129193, at *7. Rather, the court precluded two technical experts from testifying that one of the plaintiff's products practiced the patent-in-suit when they previously testified that they had "no opinions" on the subject. *Id.* Accordingly, Defendants' argument challenging DeBaere's assumption that the Leo practices the '357 Patent is unavailing and is not grounds for excluding his reasonable royalty opinion.

Second, assuming that the Leo's HD Mode and Project Size Optimizer features practice the '357 Patent, Defendants assert that "there is no evidence that the . . . Leo price increase was related to the introduction of the HD Mode and Project Size Optimizer features, as DeBaere further assumes." Defs.' Mem. at 20. Plaintiff contends that DeBaere's determination that the price

16

increase is attributable to those features "is firmly rooted in the facts of the case and is not speculative." Pl.'s Opp'n at 21.

DeBaere's determination that the Leo price increase is attributable to features practicing the '357 Patent is sufficiently supported. DeBaere's analysis of the Leo price increase considers Plaintiff's marketing materials shortly before and after Plaintiff increased the Leo's price. *See* DeBaere Report ¶¶ 244-45. From these materials, he notes that the price increase coincided with the launch of the HD Mode and Project Size Optimizer features. *Id.* Further, the connection of the price increase to the HD Mode and Project Size Optimizer features is consistent with DeBaere's discussions with Sukhovey regarding the portion of the price increase attributable to the '357 Patent. *See id.* ¶¶ 245-48. Therefore, contrary to Defendants' assertion that there is "no evidence" that the Leo's price increase was related to HD Mode and Project Size Optimizer, Defs.' Mem. at 20, DeBaere's assumption has sufficient evidentiary support. To the extent Defendants question DeBaere's inability to identify the exact date of the price increase or Plaintiff's failure to explain why there was no price increase for a different one of Plaintiff's products that added the same features, Defs.' Reply at 8-9, such matters go to weight and can be addressed on cross examination, *Microvention*, 2022 WL 4596647, at *5. To the extent Defendants challenge DeBaere's use of a price comparison, the Federal Circuit has sanctioned the use of price comparisons between products to determine a reasonable royalty. *See, e.g.*, *Rembrandt Wireless Tech., LP v. Samsung Elec. Co.*, 853 F.3d 1370, 1380-81 (Fed Cir. 2017) (affirming a decision not to exclude an expert's royalty opinion based on pricing of chips with and without the patented technology at issue). Accordingly, Defendants' argument challenging DeBaere's assumption that the Leo price increase was related to the HD Mode and Project Size Optimizer features is unavailing and is not grounds for excluding his reasonable royalty opinion.

17

Finally, in addition to challenging DeBaere's use of the Leo price increase as a starting point, Defendants contend that DeBaere "fails to properly apportion that price increase to account for incremental value of the patented features." Defs.' Mem. at 22-23. Plaintiff contends that the allocation factor applied by DeBaere "is supported by and consistent with the economic and technical analyses and represents a reasonable portion of the incremental price that would be attributable to the '357 Patent." Pl.'s Opp'n at 19.

DeBaere's allocation factor is sufficiently supported. "[T]he patentee must in every case give evidence tending to separate or apportion . . . the patentee's damages between the patented feature and the unpatented features . . . ." *Pavo Sols. LLC v. Kingston Tech. Co*, 35 F.4th 1367, 1380 (Fed. Cir. 2022) (quoting *LaserDynamics*, 694 F.3d at 67). Here, DeBaere develops his allocation factor figure "[b]ased on the facts and circumstances of this matter, including [his] understanding of the technical benefits of the '357 Patent and the marketing of the features and benefits of the Leo scanner to consumers." DeBaere Report ¶ 248. He further states that the allocation factor "is consistent with [his] discussion with Dr. Sadeghi and [Sukhovey] regarding the subject matter of the '357 Patent and the related features and benefits." *Id.*

Although Defendants contend that DeBaere's proposed royalty for the '357 Patent is speculative because his apportionment "lacks any quantitative basis," Defs.' Reply at 9, the law does not require an expert to provide a quantitative analysis. "[W]hat matters is that [a] damages expert employ[s] 'reliable principles and methods,' that were 'based on sufficient facts or data,' and that the expert's opinion 'reflects a reliable application of principles and methods to the facts of the case.'" *Altria Client Servs. LLC v. R.J. Reynolds Vapor Co.*, 2023-1546, 2024 WL 5165456, at *5 (Fed. Cir. Dec. 19, 2024) (quoting Fed. R. Evid. 702); *see also Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*, 15-152-RGA, 2018 WL 5729732, at *2 (D. Del. Nov. 2, 2018) (rejecting the

18

argument that a damages expert's apportionment methodology was inappropriate because it relied on a qualitative, rather than quantitative, analysis because the "theory conflicts with the general understanding that 'any reasonable royalty analysis necessarily involves an element of approximation and uncertainty'" (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009)).  DeBaere's qualitative apportionment analysis, which is sufficiently and reliably rooted in Plaintiff's marketing materials and technical information from Dr. Sadeghi and Sukhovey, is therefore admissible.  *See PACT XPP Techs., AG v. Xilinx, Inc.*, 2:07-CV-563-RSP, 2012 WL 1666390, at *1-2 (E.D. Tex. May 11, 2012) (denying a motion to exclude a damages expert's apportionment opinion that relied on the opinion of a technical expert, customer surveys, and internal reports); *see also Whitserve*, 694 F.3d at 31 (noting that "mathematical precision is not required" in reasonable royalty analysis).

Accordingly, Defendants' Motion to exclude DeBaere's expert testimony as to the '357 Patent is denied.  *See Summit 6*, 802 F.3d at 1296.

### CONCLUSION

For the foregoing reasons, Plaintiff's Motion to exclude the expert testimony of Falconer is granted, and Defendants' Motion to exclude the expert testimony of DeBaere is denied.

SO ORDERED.

_____
/s/
ORELIA E. MERCHANT
United States District Judge

July 23, 2026
Brooklyn, New York

19